**<u>Exhibit A</u>**

Solicitation Version of Plan

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------------- x

In re:                                                                      : Chapter 11
                                                                            :
ONCURE HOLDINGS, INC., et al.,                                              : Case No. 13-11540 (KG)
                                                                            :
                  Debtors.[1]                                               : Jointly Administered
                                                                            :
---------------------------------------------------------------------- x

---

**PLAN OF REORGANIZATION FOR
ONCURE HOLDINGS, INC. AND ITS AFFILIATE DEBTORS
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

| **RICHARDS, LAYTON & FINGER, P.A.** | **LATHAM & WATKINS LLP** |
|---|---|
| Daniel J. DeFranceschi (2732) | Paul E. Harner |
| Paul N. Heath (3704) | Keith A. Simon |
| Tyler D. Semmelman (5386) | Aaron M. Singer |
| One Rodney Square | Annemarie V. Reilly |
| 920 North King Street | 885 Third Avenue |
| Wilmington, Delaware 19801 | New York, New York 10022 |
| Telephone:  (302) 651-7700 | Telephone:  (212) 906-1200 |
| Facsimile:  (302) 651-7701 | Facsimile:   (212) 751-4864 |

Counsel for the Debtors and Debtors-in-Possession

Dated:   August 22, 2013

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471). The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

**TABLE OF CONTENTS**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME AND
DEFINED TERMS ...................................................................................1
    A.    Rules of Interpretation; Computation of Time.........................................1
    B.    Defined Terms .........................................................................................2

ARTICLE II. ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS...........18
    A.    Administrative Claims ............................................................................18
    B.    DIP Facility Claims.................................................................................19
    C.    Priority Tax Claims .................................................................................19

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND EQUITY INTERESTS .....................................................................20
    A.    Summary .................................................................................................20
    B.    Classification and Treatment of Claims and Equity Interests................21
    C.    Special Provision Governing Unimpaired Claims ..................................25
    D.    Elimination of Vacant Classes ...............................................................25

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN .............................................25
    A.    Presumed Acceptance of Plan.................................................................25
    B.    Presumed Rejection of Plan ....................................................................25
    C.    Voting Class............................................................................................26
    D.    Acceptance by Impaired Class of Claims ...............................................26
    E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
Bankruptcy Code ...................................................................................26
    F.    Votes Solicited in Good Faith.................................................................26

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ..........................................26
    A.    Limited Substantive Consolidation.........................................................26
    B.    Restructuring Transactions .....................................................................27
    C.    Consummation of the Investment Agreement; Amended Secured Notes
Indenture; Amended Secured Notes Guarantees; New Intercreditor
Agreements .............................................................................................28
    D.    Continued Corporate Existence ..............................................................28
    E.    Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and
Claims ....................................................................................................29
    F.    Amended Secured Notes; Amended Secured Notes Indenture...............29
    G.    No New Issuance of Debt .......................................................................29
    H.    No Discharge or Release of Liens Securing the Prepetition Secured Notes
Claims ....................................................................................................30
    I.    New Common Stock ...............................................................................30
    J.    Plan Securities and Related Documentation; Exemption from Securities
Laws........................................................................................................30
    K.    Release of Liens and Claims...................................................................32

i

L.   Organizational Documents of the Reorganized Debtors .......................................32
M.   Directors and Officers of the Reorganized Debtors.............................................32
N.   Corporate Action....................................................................................................33
O.   Cancellation of Notes, Certificates and Instruments............................................33
P.   Old Affiliate Interests ...........................................................................................34
Q.   Sources of Cash for Plan Distributions..................................................................34
R.   Continuing Effectiveness of Final Orders.............................................................34
S.   Funding and Use of Cash Reserves .......................................................................34
T.   The Noteholders' Representative...........................................................................35
U.   Fees and Expenses of Prepetition Term Loan Agent & Ad Hoc Secured
     Noteholders Committee .........................................................................................37
V.   Fees and Expenses of Indenture Trustee...............................................................37
W.   Completion Bonus Program...................................................................................37

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
     LEASES..........................................................................................................................38
A.   Assumption and Rejection of Executory Contracts and Unexpired Leases ..........38
B.   Assignment of Executory Contracts or Unexpired Leases ....................................38
C.   Rejection of Executory Contracts or Unexpired Leases ........................................39
D.   Claims on Account of the Rejection of Executory Contracts or Unexpired
     Leases.....................................................................................................................39
E.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.........40
F.   Extension of Time to Assume or Reject .................................................................41

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS.............................................41
A.   Distributions for Claims Allowed as of the Effective Date ...................................41
B.   No Postpetition Interest on Claims ........................................................................41
C.   Distributions by the Reorganized Debtors or Other Applicable Distribution
     Agent......................................................................................................................41
D.   Delivery and Distributions; Undeliverable or Unclaimed Distributions ..............41
E.   Compliance with Tax Requirements.......................................................................44
F.   Allocation of Plan Distributions Between Principal and Interest ..........................44
G.   Means of Cash Payment.........................................................................................44
H.   Timing and Calculation of Amounts to Be Distributed.........................................44
I.   Setoffs ....................................................................................................................44

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,
     UNLIQUIDATED AND DISPUTED CLAIMS ............................................................45
A.   Resolution of Disputed Claims ..............................................................................45
B.   No Distributions Pending Allowance ....................................................................46
C.   Distributions on Account of Disputed Claims Once They Are Allowed and
     Additional Distributions on Account of Previously Allowed Claims ...................46
D.   Reserve for Disputed Claims .................................................................................47

ii

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND
    CONSUMMATION OF THE PLAN ........................................................................47
    A.    Conditions Precedent to Confirmation.................................................47
    B.    Conditions Precedent to Consummation..............................................47
    C.    Waiver of Conditions...........................................................................48
    D.    Effect of Non-Occurrence of Conditions to Confirmation or
        Consummation ....................................................................................48

ARTICLE X. RELEASE, DISCHARGE, INJUNCTION AND RELATED
    PROVISIONS .......................................................................................................49
    A.    General ................................................................................................49
    B.    Release of Claims and Causes of Action .............................................49
    C.    Waiver of Statutory Limitations on Releases ......................................51
    D.    Discharge of Claims............................................................................52
    E.    Exculpation .........................................................................................52
    F.    Preservation of Causes of Action........................................................53
    G.    Injunction ...........................................................................................53
    H.    Binding Nature Of Plan.......................................................................54
    I.    Protection Against Discriminatory Treatment .....................................54
    J.    Plan Indemnity ...................................................................................54
    K.    Integral Part of Plan ...........................................................................55

ARTICLE XI. RETENTION OF JURISDICTION ................................................................55

ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................................57
    A.    Dissolution of the Committee ..............................................................57
    B.    Payment of Statutory Fees; Post-Effective Date Professional Fees and
        Expenses ............................................................................................57
    C.    Conflicts.............................................................................................57
    D.    Modification of Plan ...........................................................................57
    E.    Revocation or Withdrawal of Plan.......................................................58
    F.    Successors and Assigns.......................................................................58
    G.    Reservation of Rights..........................................................................58
    H.    Further Assurances..............................................................................58
    I.    Severability .........................................................................................58
    J.    Service of Documents .........................................................................59
    K.    Exemption from Transfer Taxes Pursuant to Section 1146(a) of the
        Bankruptcy Code ................................................................................60
    L.    Governing Law ...................................................................................61
    M.    Tax Reporting and Compliance ...........................................................61
    N.    Schedules ...........................................................................................61
    O.    No Strict Construction ........................................................................61
    P.    Entire Agreement ................................................................................61
    Q.    Closing of Chapter 11 Cases...............................................................62
    R.    Substantial Consummation ..................................................................62
    S.    2002 Notice Parties ............................................................................62

## **EXHIBITS**

Exhibit A          Amended/New Organizational Documents

Exhibit B          Amended Secured Notes Guarantees

Exhibit C          Amended Secured Notes Indenture

Exhibit D          Amended Secured Notes Indenture Term Sheet

Exhibit E          Completion Bonus Program

Exhibit F          Escrowed Notes Agreement

Exhibit G          Investment Agreement

Exhibit H          New Intercreditor Agreements

Exhibit I          Restructuring Support Agreement

Exhibit J          Restructuring Term Sheet

SF\5604545.10

**PLAN SCHEDULES**

Plan Schedule 1          Non-Exclusive List of Litigation Claims

Plan Schedule 2          New Board of Reorganized HoldCo

Plan Schedule 3          Non-Released Parties

Plan Schedule 4          Noteholders' Representative

Plan Schedule 5          Non-Exclusive List of Rejected Executory Contracts and
                         Unexpired Leases

Plan Schedule 6          Causes of Action Preserved by the Debtor Releasing
                         Parties

Plan Schedule 7          Causes of Action Preserved by the Non-Debtor
                         Releasing Parties

SF\5604545.10

**PLAN OF REORGANIZATION FOR**
**ONCURE HOLDINGS, INC. AND ITS AFFILIATE DEBTORS**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

OnCure Holdings, Inc. ("**HoldCo**") and the other above-captioned debtors and debtors-in-possession (each a "**Debtor**" and, collectively, the "**Debtors**") propose the following joint plan of reorganization (the "**Plan**") for the resolution of the outstanding Claims (as defined below) against, and Equity Interests (as defined below) in, each of the Debtors. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code (as defined below). Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, historical financial information, and projections, and for a summary and analysis of this Plan, the treatment provided for herein and certain related matters including, among other things, the proposed substantive consolidation of the Debtors for certain limited purposes. There also are other agreements and documents, which will be filed with the Bankruptcy Court (as defined below), that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Schedules. All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019 and the terms and conditions set forth in this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME AND DEFINED TERMS

A.      *Rules of Interpretation; Computation of Time*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced item shall be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided herein, any reference herein to an existing or to be Filed contract, lease, instrument, release, indenture, or other agreement or document shall mean as it may be amended, modified or supplemented from time to time; (d) any reference to an Entity as a Holder of Claim or Equity Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles", "Sections", "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (f) unless otherwise stated, the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan; (j) references to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein shall, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection; (k) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (l) all references to

docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; and (m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated.  Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

B.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

"*510(b) Equity Claim*" means any Claim against any Debtor subordinated pursuant to section 510(b) of the Bankruptcy Code.

"*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

"*Ad Hoc Secured Noteholders Committee*" means that certain ad hoc committee of Holders of the Prepetition Secured Notes.

"*Ad Hoc Secured Noteholders Committee Fees and Expenses*" means all unpaid reasonable and documented costs, fees, disbursements, charges and out-of-pocket expenses of the Ad Hoc Secured Noteholders Committee incurred in connection with the Chapter 11 Cases, including, but not limited to, the reasonable and documented costs, fees, disbursements, charges and out-of-pocket expenses of the Ad Hoc Secured Noteholders Committee Professionals.

"*Ad Hoc Secured Noteholders Committee Professionals*" means, collectively, (i) GLC Advisors & Co., LLC, as financial advisor to the Ad Hoc Secured Noteholders Committee, (ii) Stroock & Stroock & Lavan LLP, as counsel to the Ad Hoc Secured Noteholders Committee, (iii) Young Conaway Stargatt & Taylor, LLP, as counsel to the Ad Hoc Secured Noteholders Committee and (iv) any other professional retained by the Ad Hoc Secured Noteholders Committee, including, without limitation, healthcare counsel.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331 or 503(b) of the Bankruptcy Code to the extent incurred on or after the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code; (d) the Ad Hoc Secured Noteholders Committee Fees and Expenses; (e) the Prepetition Secured Notes Indenture Trustee Fees and Expenses; (f) the Prepetition

2

Term Loan Agent Fees and Expenses; (g) the DIP Facility Claims; (h) the Cure Claim Amounts; and (i) the Bid Protections, but solely in the manner provided in the Bidding Procedures Order and the Investment Agreement upon the occurrence of the conditions set forth therein.

"*Administrative Claims Bar Date*" means the Business Day which is thirty (30) days after the Effective Date, or such other date as approved by Final Order of the Bankruptcy Court.

"*Affiliate*" means an "affiliate", as defined in section 101(2) of the Bankruptcy Code.

"*Affiliate Debtor(s)*" means, individually or collectively, any Debtor or Debtors other than HoldCo.

"*Allowed*" means, with respect to a Claim, an Allowed Claim in a particular Class or category specified.  Any reference herein to the allowance of a particular Allowed Claim includes both the secured and unsecured portions of such Claim.

"*Allowed Claim*" means any Claim that is not a Disputed Claim or a Disallowed Claim and (a) for which a Proof of Claim has been timely Filed by the applicable Claims Bar Date and as to which no objection to allowance thereof has been timely interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court; (b) that has been listed by the Debtors in their Schedules as liquidated in a specified amount and is not disputed or contingent and for which no contrary Proof of Claim has been timely Filed; or (c) that is expressly Allowed pursuant to the terms of this Plan or a Final Order of the Bankruptcy Court.  The term "Allowed Claim" shall not, for purposes of computing distributions under this Plan, include interest on such Claim from and after the Petition Date, except as provided in sections 506(b) or 511 of the Bankruptcy Code or as otherwise expressly set forth in this Plan or a Final Order of the Bankruptcy Court.

"*Allowed _____ Claim*" means an Allowed Claim of the type described.

"*Amended/New Organizational Documents*" means, as applicable, the amended and restated or new applicable organizational documents of Reorganized HoldCo in substantially the form attached to this Plan as <u>Exhibit A</u> or Filed with the Plan Supplement.

"*Amended Secured Notes*" means the Prepetition Secured Notes reduced on a Pro Rata basis to the principal amount of $82,500,000, and otherwise as amended pursuant to the Amended Secured Notes Indenture.  The Amended Secured Notes shall consist of the Base Notes together with the Escrowed Notes.

"*Amended Secured Notes Guarantees*" means the "Amended Notes Guarantees" defined in, and contemplated by, Section 7.2(i) of the Investment Agreement, in substantially the form attached to this Plan as <u>Exhibit B</u> or Filed with the Plan Supplement.

"*Amended Secured Notes Indenture*" means the indenture governing the Amended Secured Notes, in substantially the form attached to this Plan as <u>Exhibit C</u> or Filed with the Plan Supplement, which indenture shall contain terms and conditions consistent in all material respects with those set forth on the Amended Secured Notes Indenture Term Sheet and, to the extent any terms and conditions are not set forth on or contemplated therein, such other terms and conditions as are reasonably acceptable to the Majority Consenting Debtholders and the Investor.

"*Amended Secured Notes Indenture Term Sheet*" means the term sheet attached as Exhibit G to the Investment Agreement, a copy of which is also attached as <u>Exhibit D</u> to this Plan.

"*Avoidance Actions*" means any and all avoidance, recovery, subordination or other related actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code.

"*Ballots*" means the ballots accompanying the Disclosure Statement, which were approved by the Disclosure Statement Order (modified, as necessary, based upon the applicable voting party in accordance with the Disclosure Statement Order), including any Master Ballots and Beneficial Owner Ballots.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

"*Base Notes*" means $75,000,000 of the Amended Secured Notes.

"*Beneficial Holder*" means, as of the applicable date of determination, a beneficial owner of the Prepetition Secured Notes or Old HoldCo Interests as reflected in the records maintained by the Registered Record Owner or Intermediary Record Owner, as applicable.

"*Beneficial Holder Ballots*" means the Ballots accompanying the Disclosure Statement upon which Beneficial Holders of the Prepetition Secured Notes entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan.

"*Bid Protections*" means the "Bid Protections", as defined in the Bidding Procedures.

"*Bidding Procedures*" means the bidding procedures approved by, and attached as Exhibit 1 to, the Bidding Procedures Order.

"*Bidding Procedures Order*" means that certain *Order (A) Establishing Bidding Procedures For The Sale Of All Or Substantially All Of The Debtors' Purchased Assets Or The New Stock Pursuant To A Chapter 11 Plan (B) Approving Certain Stalking Horse Protections (C) Authorizing And Scheduling A Date And Time For An Auction Pursuant To Such Procedures And (D) Granting Certain Related Relief*, entered by the Bankruptcy Court on July 24, 2013 (Docket No. 164), as such order may be amended, supplemented, or modified from time to time.

"*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Cash Reserves*" means, collectively, and without duplication, the Debtors' Claim Portion Cash Reserve, the Noteholders' Representative Cash Reserve, the Professional Fee Reserve, and the Disputed Claims Reserve, in each case which reserve shall be determined by the Debtors with the written consent of the Supermajority Consenting Debtholders or as otherwise approved by order of the Bankruptcy Court.

"*Causes of Action*" means any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

"*Chapter 11 Case(s)*" means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court, and (b) when used with reference to all Debtors, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court being jointly administered under case number 13-11540 (KG).

"*Claim*" means any "claim" (as defined in section 101(5) of the Bankruptcy Code) against any Debtor.

"*Claims Bar Date*" means the last date for filing Proofs of Claim in these Chapter 11 Cases against any Debtor, which date shall be established by Final Order of the Bankruptcy Court.

"*Claims Objection Deadline*" means, with respect to any applicable Proof of Claim, the latest of (a) one hundred eighty (180) days after the Effective Date; (b) ninety (90) days after the Filing of such Proof of Claim, or (c) such other date as may be specifically fixed by Final Order of the Bankruptcy Court for objecting to such Claim.

"*Claims Register*" means the official register of Claims maintained by the Voting and Claims Agent.

"*Class*" means a category of Holders of Claims or Equity Interests as set forth in <u>Article III</u> hereof pursuant to section 1122(a) of the Bankruptcy Code.

"*Closing*" means the "Closing", as defined in Section 3.1 of the Investment Agreement.

"*Closing Date*" means the "Closing Date", as defined in Section 3.1 of the Investment Agreement.

"*Closing Working Capital*" means "Closing Working Capital", as defined in Section 1.1 of the Investment Agreement.

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"*Collateral*" means any property or interest in property of the Debtors' Estates that is subject to a valid and enforceable Lien to secure a Claim.

"*Commission*" means the U.S. Securities and Exchange Commission.

"*Committee*" means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, if appointed and as reconstituted from time to time.

"*Completion Bonus Program*" means the incentive program for certain key employees of the Debtors, in substantially the form attached to this Plan as Exhibit E or Filed with the Plan Supplement.

"*Confirmation*" means the occurrence of the Confirmation Date, subject to all conditions specified in Article IX of this Plan having been satisfied or waived pursuant to Article IX of this Plan.

"*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Debtors, the Supermajority Consenting Debtholders and the Investor.

"*Consenting Debtholders*" means those Holders of the Prepetition Term Loan Claims and the Prepetition Secured Notes that are party to the Restructuring Support Agreement as "Consenting Debtholders" thereunder.

"*Consolidated Debtors*" has the meaning set forth in Article V.A.1 of this Plan.

"*Consummation*" means the occurrence of the Effective Date.

"*Cure Claim Amount*" has the meaning set forth in Article VI.E of this Plan.

"*Cure Claim Procedures Order*" means that certain *Order Approving Procedures Relating To The Determination Of Cure Amounts In Connection With Certain Executory Contracts*, entered by the Bankruptcy Court on July 23, 2013 (Docket No. 149), as such order may be amended, supplemented, or modified from time to time.

"*D&O Tail Policy*" means that certain directors' & officers' liability insurance policy purchased by the Debtors prior to the Petition Date.

"*Debtor(s)*" means, individually, any of the above-captioned debtors and debtors-in-possession and, collectively, all of the above-captioned debtors and debtors-in-possession.

"*Debtors' Claim Portion*" means, collectively, the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed Secured Tax Claims, and Allowed Prepetition Term Loan Claims that both (i) accrued or were incurred on or prior to the Effective Date and (ii) are not included in the Reorganized Debtors' Claim Portion.

"*Debtors' Claim Portion Cash Reserve*" means the reserve established and maintained by the Debtors from the Purchase Price or other Cash on hand existing immediately prior to the Effective Date to pay in full in Cash the Debtors' Claim Portion.

"*DTC*" means the Depository Trust Company.

6

"*DIP Facility Agent*" means Wells Fargo Bank, National Association, in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement.

"*DIP Facility Claim*" means any Claim arising from, under, or in connection with the DIP Facility Credit Agreement (including, without limitation, any and all "DIP Obligations", as defined therein) or any other DIP Loan Document (as defined therein).

"*DIP Facility Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated as of June 19, 2013 (as amended, supplemented or modified from time to time), together with the other DIP Loan Documents (as defined therein), in each case as amended, supplemented or modified from time to time.

"*DIP Facility Lender*" has the meaning set forth in the DIP Facility Credit Agreement.

"*DIP Facility Orders*" means, collectively, the Interim DIP Order and Final DIP Order.

"*Disallowed Claim*" means a Claim, or any portion thereof, that (a) has been disallowed by a Final Order, or (b) (i) is Scheduled at zero, in an unknown amount or as contingent, disputed or unliquidated and (ii) as to which the Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.

"*Disclosure Statement*" means that certain *Disclosure Statement for the Joint Plan Of Reorganization For OnCure Holdings, Inc. And Its Affiliate Debtors Under Chapter 11 Of The Bankruptcy Code*, dated as of August 22, 2013 (as amended, supplemented, or modified from time to time) that was approved by the Disclosure Statement Order.

"*Disclosure Statement Order*" means that certain Order (A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline and Other Dates, (C) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan and (D) Approving the Manner and Form of Notice and Other Related Documents, entered by the Bankruptcy Court on August 22, 2013 (Docket No. [___]), as such order may be amended, supplemented, or modified from time to time.

"*Disputed Claim*" means any Claim, or any portion thereof, that is not a Disallowed Claim, that has not been Allowed pursuant to this Plan or a Final Order of the Bankruptcy Court, and

      (a)    if a Proof of Claim has been timely Filed by the applicable Claims Bar Date, such Claim is designated on such Proof of Claim as unliquidated, contingent or disputed, or in zero or unknown amount, and has not been resolved by written agreement of the parties or a Final Order of the Bankruptcy Court; or

      (b)    if either (1) a Proof of Claim has been timely Filed by the applicable Claims Bar Date or (2) a Claim has been listed on the Schedules as other than unliquidated, contingent or disputed, or in zero or unknown amount, a Claim (i) as to which any Debtor has timely filed an objection or request for estimation in accordance with this Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court or for which such time period to object or file a request for estimation has not yet expired as of the applicable date of determination or (ii) which is otherwise disputed by any Debtor in accordance with applicable law, in each case which objection, request for estimation or dispute has not been withdrawn, overruled or determined by a Final Order; or

(c)     that is the subject of an objection or request for estimation Filed in the Bankruptcy Court and which such objection or request for estimation has not been withdrawn, resolved or overruled by Final Order of the Bankruptcy Court; or

(d)     that is otherwise disputed by any Debtor in accordance with the provisions of this Plan or applicable law, which dispute has not been withdrawn, resolved or overruled by Final Order.

"*Disputed Claims Reserve*" means any reserve established by the Debtors pursuant to Article VIII.D.

"*Distribution Agent*" means the Reorganized Debtors or any party designated by the Reorganized Debtors to serve as distribution agent under this Plan.  For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims, Allowed Prepetition Term Loan Claims and Allowed Prepetition Secured Notes Claims, the DIP Facility Agent, the Prepetition Term Loan Agent and the Prepetition Secured Notes Indenture Trustee, respectively, will be and shall act as the Distribution Agent.

"*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder, which date shall be the Effective Date.

"*Effective Date*" means the first Business Day on which the conditions specified in Article IX of this Plan, have been satisfied or waived in accordance with the terms of Article IX.

"*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"*Equity Interest*" means (a) any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock and other ownership interests, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and call and put rights; and (4) share-appreciation rights, and (b) any 510(b) Equity Claim, in each case as in existence immediately prior to the Effective Date.

"*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

"*Escrow Agreement*" means the "Escrow Agreement", as defined in Section 2.5(a) of the Investment Agreement.

"*Escrow Amount*" means the "Escrow Amount", as defined in Section 2.5(a) of the Investment Agreement.

"*Escrowed Notes*" means $7,500,000 of the Amended Secured Notes.

"*Escrowed Notes Agreement*" means the escrow agreement governing the deposit and release of the Escrowed Notes to be held by an escrow agent selected by the Majority Consenting Debtholders in their reasonable discretion and reasonably acceptable to the Debtors and Investor, which agreement shall be Filed with the Plan Supplement as Exhibit F and shall be in form and substance reasonably acceptable to the Debtors, Majority Consenting Debtholders and the Investor.

"*Estate(s)*" means, individually, the estate of each of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, as now in effect or hereafter amended, and any similar federal, state or local law.

"*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Term Loan Agent; (e) the Releasing Prepetition Term Loan Lenders; (f) the Prepetition Secured Notes Indenture Trustee; (g) the Releasing Prepetition Secured Noteholders; (h) the DIP Facility Agent; (i) the DIP Facility Lenders; (j) the Distribution Agents; (k) the Investor; (l) the Ad Hoc Secured Noteholders Committee and the members thereof in their capacity as such; (m) Vestar; (n) Match Point; (o) Genstar; and (p) the other Holders of Old HoldCo Interests, and in each case the respective Related Persons of each of the foregoing Entities.

"*Exculpation*" means the exculpation provision set forth in <u>Article X.E</u> hereof.

"*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Exhibit*" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

"*Face Amount*" means (a) when used in reference to a Disputed Claim, the full stated amount of the Claim asserted by the applicable Holder in any Proof of Claim timely Filed with the Bankruptcy Court, and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

"*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"*Final DIP Order*" means that certain *Final Order: (I) Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 And 364 Authorizing The Debtors To (A) Obtain Postpetition Financing, (B) Grant Senior Liens And Superpriority Administrative Expense Status, (C) Approving Use Of Cash Collateral Of Prepetition Secured Parties, And (D) Granting Adequate Protection To Prepetition Lender; (II) Sealing Related Fee Letters; And (III) Granting Related Relief*, entered by the Bankruptcy Court on July 24, 2013 (Docket No. 163), as amended, supplemented or modified from time to time.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

"*Final Purchase Price*" means the "Final Purchase Price", as defined in Section 2.3(c) of the Investment Agreement.

"*General Unsecured Claim*" means any Claim against the Debtors that is not a/an: Administrative Claim; DIP Facility Claim; Professional Fee Claim; Priority Tax Claim; Secured Tax Claim, Other Priority Claim; Other Secured Claim; Intercompany Claim; Prepetition Debt Claim; or 510(b) Equity Claim.  To the extent applicable, the limitations imposed by section 502 of the Bankruptcy Code shall apply to the relevant General Unsecured Claim, including, without limitation, subsection 502(b)(6) and subsection 502(b)(7) thereof.

"*Genstar*" means Genstar Capital, LLC.

"*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"*Guarantees*" has the meaning set forth in Article V.J of this Plan.

"*HoldCo*" means OnCure Holdings, Inc., a Delaware corporation, debtor-in-possession in these Chapter 11 Cases pending in the Bankruptcy Court.

"*HoldCo Subsidiary*" means each direct and indirect, wholly-owned subsidiary of HoldCo, as debtors-in-possession in these Chapter 11 Cases pending in the Bankruptcy Court.

"*Holder*" means an Entity holding a Claim against, or Equity Interest in, any Debtor.

"*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Initial Distribution Date*" means, subject to the "Treatment" sections in Article III hereof, the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims; provided that any applicable distributions under this Plan on account of the DIP Facility Claims or the Prepetition Debt Claims shall be made to the applicable Distribution Agent on the Effective Date, and each such Distribution Agent shall make its respective distributions as soon as practicable thereafter.

"*Initial Purchase Price*" means the "Initial Purchase Price", as defined in Section 2.2(b) of the Investment Agreement.

"*Intercompany Claim*" means any Claim against any of the Debtors held by another Debtor or by a non-Debtor subsidiary of a Debtor, other than an Administrative Claim.

"*Interim DIP Order*" means that certain *Interim Order: (I) Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 And 364 Authorizing The Debtors To (A) Obtain Postpetition Financing, (B) Grant Senior Liens And Superpriority Administrative Expense Status, (C) Approving Use Of Cash Collateral Of Prepetition Secured Parties, And (D) Granting Adequate Protection To Prepetition Lender; (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rules 4001(B) And 4001(C); (III) Sealing Related Fee Letters; And (IV) Granting Related Relief*, entered by the Bankruptcy Court on June 18, 2013 (Docket No. 45), as amended, supplemented or modified from time to time.

"*Intermediary Record Owners*" means, as of the applicable date of determination, the banks, brokerage firms, or the agents thereof as the Entity through which the Beneficial Holders hold the Prepetition Secured Notes or Old HoldCo Interests, as applicable.

"*Investment Agreement*" means that certain Investment Agreement, dated as of June 22, 2013, by and between HoldCo and the Investor, a copy of which without certain schedules and exhibits is attached to this Plan as Exhibit G, as amended, supplemented or modified from time to time.

"*Investor*" means Radiation Therapy Services, Inc.

"*IRC*" means the Internal Revenue Code of 1986, as amended.

"*IRS*" means the Internal Revenue Service of the United States of America.

"*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

"*Litigation Claims*" means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or any Estate may hold against any Entity, including, without limitation, the Causes of Action of the Debtors.  A non-exclusive list of the Litigation Claims held by the Debtors as of the Effective Date is attached hereto as Plan Schedule 1 or to be Filed with the Plan Supplement, which shall be deemed to include any derivative actions filed against any Debtor as of the Effective Date and any Causes of Action against any Non-Released Party.

"*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

"*Majority Consenting Debtholders*" means Consenting Debtholders holding at least 50.01% of the aggregate outstanding principal amount of the Prepetition Secured Notes held by all Consenting Debtholders.

"*Master Ballot*" means the ballot distributed to the Registered Record Owners or Intermediary Record Owners, as applicable, of the Prepetition Secured Notes to record the votes of the Beneficial Holders thereof as of the applicable Voting Record Date.

"*Match Point*" means Match Point Partners, LLC.

"*Net Cash Amount*" means the sum of (x) the Initial Purchase Price (less the Escrow Amount) and (y) the amount of Cash on the Debtors' balance sheet immediately prior to the Effective Date, less the aggregate amount of the Cash Reserves.

"*New Board*" means the initial board of directors of Reorganized HoldCo, which shall be designated by the Investor not later than five (5) Business Days prior to the Confirmation Hearing.  The members of the New Board shall be listed on Plan Schedule 2 attached hereto or to be Filed with the Plan Supplement.

"*New Common Stock*" means the shares of common stock of Reorganized HoldCo authorized to be issued pursuant to this Plan (and subject to the Restructuring Transactions) and the Amended/New Organizational Documents.

"*New Intercreditor Agreements*" means the "Specified Intercreditor Agreements" defined in, and contemplated by, Section 7.2(h) of the Investment Agreement and under the heading "Intercreditor Agreements" in the Amended Secured Notes Indenture Term Sheet (which shall be in form and substance reasonably acceptable to the Debtors, the Majority Consenting Debtholders and the indenture trustee for the Amended Secured Notes), in substantially the form attached to this Plan as Exhibit H or Filed with the Plan Supplement.

"*Non-Debtor Releasing Party*" means, collectively: (a) the Prepetition Term Loan Agent; (b) the Releasing Prepetition Term Loan Lenders; (c) the Prepetition Secured Notes Indenture Trustee; (d) the Releasing Prepetition Secured Noteholders; (e) the DIP Facility Agent; (f) the DIP Facility Lenders; (g) the Investor; (h) Vestar; (i) Genstar; (j) the Committee, and the members thereof in their capacity as such and (k) the Ad Hoc Secured Noteholders Committee, and the members thereof in their capacity as such.

"*Non-Released Party*" means each of the Entities listed as Non-Released Parties on Plan Schedule 3 attached hereto or Filed with the Plan Supplement, which shall be reasonably acceptable to the Debtors, the Majority Consenting Debtholders and the Investor.

"*Non-Voting Classes*" means, collectively, Classes 1, 2, 3, 4, 6, 7, 8 and 9.

"*Noteholders' Representative*" means the Entity designated by the Majority Consenting Debtholders, as identified on Plan Schedule 4 to be Filed with the Plan Supplement, to act as representative for all Prepetition Secured Noteholders and having the rights and duties set forth in this Plan and the Investment Agreement.

"*Noteholders' Representative Cash Reserve*" means the reserve established and maintained by the Debtors from the Purchase Price or other Cash on hand existing immediately prior to the Effective Date to pay in full in Cash any fees, costs and expenses incurred by the Noteholders' Representative, including, without limitation, any legal, accounting and consultant fees and expenses, incurred in connection with the discharge of its duties and responsibilities under this Plan or the Investment Agreement.

"*Old Affiliate Interests*" means, collectively, the Equity Interests in each HoldCo Subsidiary, in each case as in existence immediately prior to the Effective Date.

"*Old HoldCo Interest*" means the Equity Interests in HoldCo, as in existence immediately prior to the Effective Date.

"*Ordinary Course Professionals Order*" means that certain *Order Authorizing the Debtors to Employ and Compensate Certain Professionals in the Ordinary Course of Business Nunc Pro Tunc to the Petition Date*, entered by the Bankruptcy Court on July 24, 2013 (Docket No. 170), as amended, supplemented, or modified from time to time.

"*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, a DIP Facility Claim, or an Administrative Claim.

"*Other Secured Claim*" means any Secured Claim other than an Administrative Claim, DIP Facility Claim, Secured Tax Claim, or Prepetition Debt Claim.

"*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm,

SF/5604545.10

trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

"*Petition Date*" means June 14, 2013, the date on which the Debtors commenced the Chapter 11 Cases.

"*Plan*" means this *Joint Plan Of Reorganization For OnCure Holdings, Inc. And Its Affiliate Debtors Under Chapter 11 Of The Bankruptcy Code*, dated August 22, 2013, including the Exhibits and Plan Schedules and all supplements, appendices, and schedules thereto, either in its present form or as the same may be amended, supplemented, or modified from time to time.

"*Plan Schedule*" means a schedule annexed to either this Plan or as an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time).

"*Plan Securities*" has the meaning set forth in Article V.J of this Plan.

"*Plan Securities and Documents*" has the meaning set forth in Article V.J of this Plan.

"*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits and Plan Schedules, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, supplemented, or modified from time to time, in a manner in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Debtors, the Supermajority Consenting Debtholders and the Investor and which shall be Filed with the Bankruptcy Court at least ten (10) days prior to the Voting Deadline.

"*Prepetition Debt Claims*" means, collectively, the Prepetition Term Loan Claims and the Prepetition Secured Notes Claims.

"*Prepetition Debt Credit Agreements*" means, collectively, the Prepetition Term Loan Credit Agreement and the Prepetition Secured Notes Indenture.

"*Prepetition Secured Noteholder*" means a Holder of the Prepetition Secured Notes.

"*Prepetition Secured Notes*" means those certain 11 ¾% Senior Secured Notes due 2017, issued by OnCure pursuant to the Prepetition Secured Notes Indenture, in an aggregate principal amount of $210,000,000.

"*Prepetition Secured Notes Claims*" means any and all Claims arising from, under, or in connection with the Prepetition Secured Notes, the Prepetition Secured Notes Indenture or any other Collateral Agreement (as defined in the Prepetition Secured Notes Indenture).

"*Prepetition Secured Notes Indenture*" means that certain Indenture governing the Prepetition Secured Notes, dated as of May 13, 2010, together with the other Collateral Documents (as defined therein), in each case as amended, supplemented, or modified from time to time prior to the Petition Date.

"*Prepetition Secured Notes Indenture Trustee*" means Wilmington Trust, National Association, successor by merger to Wilmington Trust FSB, in its capacity as indenture trustee for the Prepetition Secured Notes.

"*Prepetition Secured Notes Indenture Trustee Fees and Expenses*" means all unpaid reasonable and documented fees and out-of-pocket expenses of the Prepetition Secured Notes Indenture Trustee, including the reasonable fees, costs and expenses of the Prepetition Secured Notes Indenture Trustee's attorneys,  incurred through the Effective Date in accordance with the Prepetition Secured Notes Indenture.

"*Prepetition Term Loan Agent*" means Wells Fargo Bank, National Association, in its capacity as administrative agent and collateral agent under the Prepetition Term Loan Credit Agreement.

"*Prepetition Term Loan Agent Fees and Expenses*" means all unpaid reasonable and documented fees and out-of-pocket expenses of the Prepetition Term Loan Agent incurred through the Effective Date in accordance with the Prepetition Term Loan Credit Agreement.

"*Prepetition Term Loan Claims*" means any and all Claims arising from, under or in connection with the Prepetition Term Loan Credit Agreement (including, without limitation, any and all "Obligations" as defined therein) or any other Loan Document (as defined therein).

"*Prepetition Term Loan Credit Agreement*" means that certain $15,000,000 Amended and Restated Credit Agreement, dated as of December 24, 2012, by and among HoldCo, the HoldCo Subsidiaries party thereto, the Prepetition Term Loan Agent, and the Prepetition Term Loan Lenders, together with the other Loan Documents (as defined therein), in each case as amended, supplemented, or modified from time to time prior to the Petition Date.

"*Prepetition Term Loan Lenders*" means the lenders party to the Prepetition Term Loan Credit Agreement from time to time.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" means the proportion that (a) the Face Amount of a Claim in a particular Class or Classes (or portions thereof, as applicable) bears to (b) the aggregate Face Amount of all Claims (including Disputed Claims but excluding Disallowed Claims) in such Class or Classes (or portions thereof, as applicable), unless this Plan provides otherwise. For purposes of determining any distributions under this Plan, Pro Rata amounts shall take into consideration any amounts reserved for under the Disputed Claims Reserve.

"*Professional*" means any Entity retained by the Debtors or the Committee in the Chapter 11 Cases pursuant to section 327, 328 or 1103 of the Bankruptcy Code (other than an ordinary course professional).

"*Professional Fee Claim*" means a Claim for Accrued Professional Compensation under sections 328, 330, 331, 503 or 1103 of the Bankruptcy Code.

"*Professional Fee Reserve*" means the reserve established and maintained by the Debtors from the Purchase Price or other Cash on hand existing immediately prior to the Effective Date to pay in full in Cash the Professional Fee Claims incurred on or prior to the Effective Date.

"*Professional Fees Bar Date*" means the Business Day that is forty-five (45) days after the Effective Date or such other date as approved by Final Order of the Bankruptcy Court.

"*Proof of Claim*" means a proof of Claim Filed against any Debtor in the Chapter 11 Cases.

"*Purchase Price*" means the "Purchase Price" as defined in Section 2.2(a)(ii) of the Investment Agreement.

"*Registered Record Owners*" means, as of the applicable date of determination, the respective owners of the Prepetition Secured Notes or Old HoldCo Interests, as applicable, whose holdings thereof are in their own name.

"*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), managers, managed accounts or funds, management companies, fund advisors, advisory board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the Petition Date, and any Person claiming by or through any of them, including such Related Persons' respective heirs, executors, estates, servants, and nominees; *provided*, *however*, that no insurer of any Debtor and no Non-Released Party shall constitute a Related Person.

"*Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article X.B hereof.

"*Released Party*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Term Loan Agent; (e) the Releasing Prepetition Term Loan Lenders; (f) the Prepetition Secured Notes Indenture Trustee; (g) the Releasing Prepetition Secured Noteholders; (h) the DIP Facility Agent; (i) the DIP Facility Lenders; (j) the Ad Hoc Secured Noteholders Committee and the members thereof in their capacity as such; (k) the Distribution Agents; (l) the Investor; (m) Vestar; (n) Match Point; (o) Genstar; and (p) the other Holders of Old HoldCo Interests, and in each case the respective Related Persons of each of the foregoing Entities.

"*Releasing Prepetition Secured Noteholder*" means a Prepetition Secured Noteholder that affirmatively opts into the Third Party Release as provided on its respective Ballot.

"*Releasing Prepetition Term Loan Lender*" means a Prepetition Term Loan Lender that affirmatively opts into the Third Party Release as provided on its respective Ballot.

"*Releasing Party*" has the meaning set forth in Article X.B hereof.

"*Reorganized Debtors*" means, subject to the Restructuring Transactions, the Debtors as reorganized pursuant to this Plan on or after the Effective Date, and their respective successors.

"*Reorganized Debtors' Claim Portion*" means, collectively, the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Secured Tax Claims that either (i) accrue or are incurred after the Effective Date; *provided*, *however*, that, for the avoidance of doubt, the accrued portion as of the Effective Date of Allowed Priority Tax Claims and Allowed Secured Tax Claims due and payable following the Effective Date shall constitute the Debtors' Claim Portion, (ii) are included in Closing Working Capital or (iii) are a fee, cost, expense, liability or obligation described in the second sentence of the definition of "Selling Expenses" in the Investment Agreement.

"*Reorganized HoldCo*" means, subject to the Restructuring Transactions, OnCure Holdings, Inc., a Delaware corporation, as reorganized pursuant to this Plan on or after the Effective Date, and its successors.

"*Restricted Holders*" has the meaning set forth in <u>Article V.J</u> of this Plan.

"*Restructuring Documents*" means, collectively, the documents and agreements (and the exhibits, schedules, annexes and supplements thereto) necessary to implement, or entered into in connection with, this Plan, including, without limitation, the Amended Secured Notes, the Amended Secured Notes Indenture, the Investment Agreement, the New Intercreditor Agreements, the Escrowed Notes Agreement, the Plan Supplement, the Exhibits, the Plan Schedules, the Amended/New Organizational Documents, and the Plan Securities and Documents.

"*Restructuring Support Agreement*" mean that certain Restructuring Support Agreement, dated as of June 14, 2013, by and among the Debtors, the Prepetition Term Loan Lenders party thereto, and the Prepetition Secured Noteholders party thereto (as amended, supplemented or modified from time to time), a copy of which without certain schedules and exhibits is attached to this Plan as <u>Exhibit I</u>.

"*Restructuring Term Sheet*" means the term sheet attached as Exhibit A to the Investment Agreement, a copy of which is attached hereto as <u>Exhibit J</u>.

"*Restructuring Transaction*" has the meaning ascribed thereto in <u>Article V.B</u> of this Plan.

"*Scheduled*" means with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules.

"*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and the applicable Bankruptcy Rules, as such Schedules they may be amended, modified, or supplemented from time to time.

"*Secured Claim*" means a Claim that is secured by a Lien on property in which any of the Debtors' Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

"*Secured Tax Claim*" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

"*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and any similar federal, state or local law.

"*Selling Expenses*" means "Selling Expenses" as defined in Section 1.1 of the Investment Agreement.

"*Stamp or Similar Tax*" means any stamp tax, recording tax, conveyance fee, intangible or similar tax, mortgage tax, personal or real property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to

speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

"*Subsequent Distribution*" means any distribution of property under this Plan to Holders of Allowed Claims other than the initial distribution given to such Holders on the Initial Distribution Date.

"*Subsequent Distribution Date*" means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided*, *however*, that if the Effective Date is within thirty (30) days of the end of a calendar quarter, then the first Subsequent Distribution Date will be the last Business Day of the month following the end of the first (1st) calendar quarter after the calendar quarter in which the Effective Date falls.

"*Substantive Consolidation Order*" means the order, or provision of the Confirmation Order, substantively consolidating the Chapter 11 Cases on the limited basis as provided in Article V.A of this Plan.

"*Supermajority Consenting Debtholders*" means Consenting Debtholders holding at least 66 2/3% of the aggregate outstanding principal amount of the Prepetition Secured Notes held by all Consenting Debtholders.

"*Trustee Charging Lien*" means any liens for payment of compensation, expenses, disbursements, advances and indemnification of the Prepetition Secured Notes Indenture Trustee, its agents and counsel, and any successors and assigns, including the Prepetition Secured Notes Indenture Fees and Expenses, as set forth in the Prepetition Secured Notes Indenture and the Amended Secured Notes Indenture.

"*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"*Unused Cash Reserve Amount*" means the remaining Cash (if any) in the Cash Reserves after all obligations and liabilities for which such reserves were established are paid, satisfied and discharged in full in Cash or are Disallowed in accordance with this Plan.

"*Vestar*" means Vestar Capital Partners, Inc.

"*Voting and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as solicitation, notice, claims and balloting agent for the Debtors.

"*Voting Class*" means Class 5.

"*Voting Deadline*" means the date and time by which all Ballots must be received by the Voting and Claims Agent in accordance with the Disclosure Statement Order, which date is September 23, 2013 as set forth in the Disclosure Statement Order.

"*Voting Record Date*" means the date for determining which Holders of Claims in the Voting Class are entitled to receive the Disclosure Statement and vote to accept or reject this Plan. With respect to the Prepetition Secured Notes Claims and Old HoldCo Interests, the Voting Record Date is August 14, 2013 as set forth in the Disclosure Statement Order. With respect to all other Claims and Equity Interests

(i.e., those in Classes 1, 2, 3, 4, 6, 7 and 9), the Voting Record Date is August 21, 2013, as set forth in the Disclosure Statement Order.

## ARTICLE II.

## ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS

A.    *Administrative Claims*

The legal, equitable and contractual rights of the Holders of Allowed Administrative Claims are unaltered by this Plan. Subject to sub-paragraph 1 below and Article V.Q of this Plan, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing; *provided*, *however*, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

1.    Bar Date for Administrative Claims

Except as otherwise provided in this Article II.A hereof and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order (as applicable) no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims shall be deemed discharged as of the Effective Date.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G hereof.

Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

In the case of the Ad Hoc Secured Noteholders Committee Fees and Expenses, such Ad Hoc Secured Noteholders Committee Fees and Expenses will be paid in full in Cash on the Effective Date (to the extent invoiced and not previously paid during the course of the Chapter 11 Cases) from the Debtors' Claim Portion Cash Reserve, without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date. The Prepetition Term Loan Agent Fees and Expenses and the Prepetition Secured Notes Indenture Trustee Fees and Expenses will be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent invoiced and not previously paid during the course of the Chapter 11 Cases) from the Debtors' Claim Portion Cash Reserve, without a requirement for the Prepetition Term Loan Agent or the Prepetition Secured Notes Indenture Trustee to file a fee application with the Bankruptcy Court or a formal request

18

for payment by the Administrative Claims Bar Date.  DIP Facility Claims shall be paid pursuant to Article II.B hereof without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date.

2.  Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by Professionals in connection with the implementation and consummation of this Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors' Claim Portion Cash Reserve for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim.

Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash from the Professional Fee Reserve within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.

B.    DIP Facility Claims

Subject to Article V.Q of this Plan, the Allowed DIP Facility Claims shall be indefeasibly paid in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims.

C.    Priority Tax Claims

The legal, equitable and contractual rights of the Holders of Allowed Priority Tax Claims are unaltered by this Plan.  Subject to Article V.Q and Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance

19

from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

*A.      Summary*

This Plan constitutes a single plan of reorganization for all Debtors for voting and confirmation purposes.  All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified as described below.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, for voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remaining portion of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released, Disallowed or otherwise settled prior to the Effective Date.  As described more fully in Article V.A below, this Plan contemplates, and is predicated upon, entry of an order substantively consolidating the Debtors' Estates for the limited purposes of voting and confirmation under this Plan with respect to Impaired Claims.

Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| (1) | Other Priority Claims | Unimpaired | Deemed to Accept |
| (2) | Other Secured Claims | Unimpaired | Deemed to Accept |
| (3) | Secured Tax Claims | Unimpaired | Deemed to Accept |
| (4) | Prepetition Term Loan Claims | Unimpaired | Deemed to Accept |
| (5) | Prepetition Secured Notes Claims | Impaired | Entitled to Vote |
| (6) | General Unsecured Claims | Impaired | Deemed to Reject |

SF\5604545.10

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| (7) | Intercompany Claims | Impaired | Deemed to Accept |
| (8) | Old HoldCo Interests | Impaired | Deemed to Reject |
| (9) | Old Affiliate Interests in any HoldCo Subsidiary | Unimpaired | Deemed to Accept |

B.    *Classification and Treatment of Claims and Equity Interests*

   1.   Class 1 - Other Priority Claims

      (a)   *Classification*: Class 1 consists of the Other Priority Claims.

      (b)   *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered by this Plan.  Subject to Article V.Q and Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim shall have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

      (c)   *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject this Plan.

   2.   Class 2 - Other Secured Claims

      (a)   *Classification*:  Class 2 consists of the Other Secured Claims.  Class 2 consists of separate subclasses for each Other Secured Claim that may exist against the Debtors.

      (b)   *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 2 Claims are unaltered by this Plan.  Subject to Article V.Q and Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the

Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

(c)     *Voting*: Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.

3.   Class 3 - Secured Tax Claims

(a)     *Classification*:  Class 3 consists of the Secured Tax Claims.

(b)     *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 3 Claims are unaltered by this Plan.  Subject to Article V.Q and Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors, as applicable:  (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of

22

business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (D) or (E) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim.

(c)    *Voting:*  Class 3 is an Unimpaired Class, and the Holders of Claims in Class 3 shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 3 are not entitled to vote to accept or reject this Plan.

4.    Class 4 - Prepetition Term Loan Claims

(a)    *Classification*: Class 4 consists of the Prepetition Term Loan Claims.

(b)    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 4 Claims are unaltered by this Plan.  To the extent not previously paid in full pursuant to the DIP Orders, each Holder of an Allowed Class 4 Claim shall receive, on the Effective Date and in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4 Claim, Cash equal to the amount of such Allowed Class 4 Claim.

(c)    *Voting*: Class 4 is an Unimpaired Class, and the Holders of Claims in Class 4 shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 4 are not entitled to vote to accept or reject this Plan.

5.    Class 5 - Prepetition Secured Notes Claims

(a)    *Classification:* Class 5 consists of the Prepetition Secured Notes Claims.

(b)    *Allowance*: The Prepetition Secured Notes Claims are deemed Allowed in the aggregate amount of approximately $210 million.[2]

(c)    *Treatment:*  On the Effective Date, the Prepetition Secured Notes and the Prepetition Secured Notes Indenture shall be deemed amended in their entirety by the Amended Secured Notes and the Amended Secured Notes Indenture, respectively.  On the Effective Date, and in addition to the agreements described in Article V.F, Article V.G, and Article V.H of this Plan, each Holder of an Allowed Prepetition Secured Notes Claim shall receive, on account of such Claim, its Pro Rata share of the Base Notes and the Net Cash Amount.  After the Effective Date, subject to the terms and conditions of this Plan (including Article VII.D.1), the Investment Agreement and the Escrowed Notes Agreement (as applicable), each Holder of an Allowed Prepetition Secured Notes Claim shall receive, on account of such Claim, its Pro Rata share of (x) either (i) in the event

---

[2] The Allowed amount excludes accrued interest, fees and other costs and expenses.

the Final Purchase Price is greater than the Initial Purchase Price, the sum of (A) an amount equal to the amount by which the Final Purchase Price exceeds the Initial Purchase Price plus (B) the Escrow Amount or (ii) in the event the Final Purchase Price is equal to or less than the Initial Purchase Price, an amount equal to the Escrow Amount, if any, following any distribution to the Investor pursuant to Section 2.3(e) of the Investment Agreement, (y) the Unused Cash Reserve Amount and (z) upon satisfaction of the conditions contained in the Escrowed Notes Agreement, its Pro Rata share of the Escrowed Notes, in each case if any.

(d)     *Voting:* Class 5 is Impaired, and Holders of Claims in Class 5 are entitled to vote to accept or reject this Plan.

6.   Class 6 – General Unsecured Claims

(a)     *Classification:* Class 6 consists of the General Unsecured Claims.

(b)     *Treatment:*  Each Holder of a General Unsecured Claim shall not receive any distribution or retain any property on account of such General Unsecured Claim.

(c)     *Voting:* Class 6 is an Impaired Class, and the Holders of Claims in Class 6 will be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, Holders of Claims in Class 6 will not be entitled to vote to accept or reject this Plan.

7.   Class 7 – Intercompany Claims

(a)     *Classification*: Class 7 consists of the Intercompany Claims.

(b)     *Treatment:*  Each Holder of an Intercompany Claim shall not receive any distribution or retain any property under this Plan on account of such Intercompany Claim.  On or after the Effective Date, the Reorganized Debtors may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by such Reorganized Debtor.

(c)     *Voting:* Class 7 is an Impaired Class.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 shall be conclusively deemed to have accepted this Plan.

8.   Class 8 - Old HoldCo Interests

(a)     *Classification*: Class 8 consists of the Old HoldCo Interests.

(b)     *Treatment*: On the Effective Date, the Old HoldCo Interests will be cancelled without further notice to, approval of or action by any Entity, and each Holder of an Old HoldCo Interest shall not receive any distribution or retain any property on account of such Old HoldCo Interest.

(c)     *Voting*: Class 8 is an Impaired Class, and the Holders of Old HoldCo Interests in Class 8 will be conclusively deemed to have rejected this Plan pursuant to section

SF\5604545.10

1126(g) of the Bankruptcy Code.  Therefore, Holders of Old HoldCo Interests in Class 8 will not be entitled to vote to accept or reject this Plan.

9.  Class 9 - Old Affiliate Interests in any HoldCo Subsidiary

(a)  *Classification*: Class 9 consists of the Old Affiliate Interests in any HoldCo Subsidiary.

(b)  *Treatment*:  Subject to the Restructuring Transactions, the Old Affiliate Interests shall remain effective and outstanding on the Effective Date and shall be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.

(c)  *Voting*: Class 9 is an Unimpaired Class, and the Holders of the Old Affiliate Interests in Class 9 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of the Old Affiliate Interests in Class 9 are not entitled to vote to accept or reject this Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under this Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.    *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

A.    *Presumed Acceptance of Plan*

Classes 1, 2, 3, 4 and 9 are Unimpaired under this Plan.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.  Class 7 is Impaired under this Plan.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 are conclusively deemed to have accepted this Plan.

B.    *Presumed Rejection of Plan*

Classes 6 and 8 are Impaired and shall receive no distribution under this Plan on account of their respective Claims or Equity Interests.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

C.      *Voting Class*

Class 5 is Impaired under this Plan.  The Holders of Claims in such Class as of the applicable Voting Record Date are entitled to vote to accept or reject this Plan.

D.      *Acceptance by Impaired Class of Claims*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted this Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept this Plan.

E.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by Class 5. The Debtors request confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126 of the Bankruptcy Code.  Acceptance of this Plan by an Impaired Class holding a Claim against any Consolidated Debtor shall satisfy Section 1129(a)(10) for purposes of all of the Debtors. The Debtors reserve the right to modify this Plan or any Exhibit or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

F.      *Votes Solicited in Good Faith*

The Debtors have, and upon the Confirmation Date shall be deemed to have, solicited votes on this Plan from the Voting Class in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Related Parties shall be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Limited Substantive Consolidation*

1.    *Generally*.  This Plan contemplates and is predicated upon entry of an order substantively consolidating the Estates of HoldCo and each HoldCo Subsidiary (collectively, the "**Consolidated Debtors**") solely for the limited purposes of voting and confirmation under this Plan.  Accordingly, for voting and confirmation purposes only, (i) any obligation of HoldCo or any HoldCo Subsidiary and all guarantees with respect thereto executed by HoldCo or one or more HoldCo Subsidiary shall be treated as a single obligation and any obligation of HoldCo and one or more HoldCo Subsidiaries, and all multiple Claims against such entities on account of such joint obligations, shall be treated and Allowed only as a single Claim against the Consolidated Debtors, (ii) each Claim Filed against HoldCo or one or more HoldCo Subsidiary shall be deemed Filed against the Consolidated Debtors and shall be deemed to be a single Claim against and a single obligation of the Consolidated Debtors, (iii) the Estate of each of the Consolidated Debtors shall be deemed to be one consolidated Estate, and (iv) all property of the Estate of each Consolidated Debtor shall be deemed to be property of the consolidated Estates.

Except for the limited purposes of voting and confirmation related to this Plan as set forth in this Paragraph A.1, such limited substantive consolidation shall not and shall not be deemed to: (i) modify, affect or otherwise alter the legal or corporate structures of the Debtors or the Reorganized Debtors or merge or otherwise affect the separate legal existence of the Debtors or the Reorganized Debtors, subject to the right of the Debtors or Reorganized Debtors to effect Restructuring Transactions as provided in Article V.B of this Plan; (ii) cause any Debtor or Reorganized Debtor to be liable for any Claim for which it otherwise is not liable, and the liability for any such Claim shall not be affected by such substantive consolidation; (iii) modify, affect or otherwise alter the distribution to be made to the holders of Claims in any Class on account of such Claims absent the limited substantive consolidation; (iv) modify, affect or otherwise alter any Intercompany Claims or any Old Affiliate Interests; (v) modify, affect or otherwise alter any obligations under any Executory Contracts or Unexpired Leases assumed by the Debtors; or (vi) modify, affect or otherwise alter any obligations of each and every Debtor to pay quarterly fees to the United States Trustee. Notwithstanding anything to the contrary herein, the Claims of a particular Debtor shall remain the obligations solely of such Debtor and shall not become obligations of any other Debtor by virtue of the limited substantive consolidation set forth in this Paragraph A.1.

2. *Substantive Consolidation Order*. Unless the Bankruptcy Court has approved such limited substantive consolidation of the Chapter 11 Cases by a prior Final Order, this Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Consolidated Debtors on the limited basis as provided in Paragraph A.1 above pursuant to section 105 of the Bankruptcy Code. If no objection to substantive consolidation is timely Filed and served by any Holder of a Claim affected by this Plan as provided herein on or before the deadline for objection to confirmation of this Plan, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Bankruptcy Court without further notice and hearing as to such substantive consolidation. If any such objections are timely filed and served, a hearing with respect to such proposed substantive consolidation and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

B.      *Restructuring Transactions*

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under this Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Documents and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of this Plan prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate certain of the Affiliate Debtors under the laws of jurisdictions other than the laws of which the applicable Affiliate Debtors are presently incorporated. Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of this Plan and the Restructuring Documents and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**").

All such Restructuring Transactions taken, or caused to be taken, shall be deemed to have been authorized and approved by the Bankruptcy Court. The actions to effect the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty,

27

or obligation on terms consistent with the terms of this Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions, but in all cases subject to the terms and conditions of this Plan and the Restructuring Documents and any consents or approvals required thereunder.

C.    *Consummation of the Investment Agreement; Amended Secured Notes Indenture; Amended Secured Notes Guarantees; New Intercreditor Agreements*

On the Effective Date and provided that the conditions precedent set forth in the Investment Agreement have been satisfied or waived in accordance with the terms of the Investment Agreement, the Debtors and the Reorganized Debtors (as applicable) shall be authorized to execute and deliver, and to consummate the transactions contemplated by, the Investment Agreement in exchange for the Initial Purchase Price, as well as execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, in each case in form and substance reasonably acceptable to the Majority Consenting Debtholders and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Investment Agreement).

Upon the Effective Date of this Plan, all Prepetition Secured Noteholders shall be deemed to have consented to the Amended Secured Notes Indenture, Amended Secured Notes, the Amended Secured Notes Guarantees, the New Intercreditor Agreements, the Escrowed Notes Agreement and other Restructuring Documents in the form that they exist on the Effective Date. On and as of the Effective Date, notwithstanding any requirements for amendment set forth in the Prepetition Secured Notes Indenture, and provided that the conditions precedent set forth in the Investment Agreement have been satisfied or waived in accordance with the terms of the Investment Agreement, the Prepetition Secured Notes Indenture Trustee shall be authorized to (i) execute and deliver the Amended Secured Notes Indenture, the Amended Secured Notes Guarantees and the New Intercreditor Agreements (each to the extent it is a party thereto), subject to Article V.J of this Plan, as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Prepetition Secured Notes Indenture Trustee is a party, to the extent provided in the relevant Restructuring Documents, and to promptly consummate the transactions contemplated thereby, and (ii) take any other actions required or contemplated to be taken by the Prepetition Secured Notes Indenture Trustee under this Plan or any of the Restructuring Documents to which it is a party.

D.    *Continued Corporate Existence*

Subject to the Restructuring Transactions permitted by Article V.B of this Plan, after the Effective Date, the Reorganized Debtors shall, notwithstanding the limited substantive consolidation provided in Article V.A hereof, continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable organizational documents, are amended, restated or otherwise modified under this Plan. Notwithstanding anything to the contrary herein, the Claims of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor solely by virtue of this Plan or the Chapter 11 Cases.

E.      *Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or any Restructuring Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c) and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Litigation Claims of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with this Plan (other than the Cash Reserves), shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens which survive the occurrence of the Effective Date as described in Article III of this Plan (including, without limitation, the Liens that secure the Amended Secured Notes).  On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.

F.      *Amended Secured Notes; Amended Secured Notes Indenture*

On and as of the Effective, the following shall occur:

(i)     Without limiting the Prepetition Secured Noteholders' rights to receive the Net Cash Amount or the Unused Cash Reserve Amount as provided in Article III herein, the principal amount of the Prepetition Secured Notes shall be reduced on a Pro Rata basis to $82,500,000;

(ii)    the Prepetition Secured Notes Indenture and the Prepetition Secured Notes shall be amended as set forth in the Amended Secured Notes Indenture and the Amended Secured Notes, respectively;

(iii)   the Escrowed Notes will be transferred to the escrow agent under, and be held in escrow pending release to the Holders of the Amended Secured Notes upon satisfaction of the conditions contained in, the Escrowed Notes Agreement;

For the avoidance of doubt, interest paid on the Escrowed Notes prior to the start of the first accrual period beginning in 2016 will be returned to the Reorganized Debtors.  Interest accruing from the start of the first accrual period beginning in 2016 will be paid pursuant to the Amended Secured Notes Indenture, subject to the terms of the Escrowed Notes Agreement.  The obligations arising under the Amended Secured Notes and the Amended Secured Notes Indenture will be guaranteed by Radiation Therapy Services Holdings, Inc., the Investor, certain subsidiaries of the Investor pursuant to the Amended Secured Notes Guarantees, and certain of the HoldCo Subsidiaries, in each case as set forth in the Amended Secured Notes Indenture Term Sheet.

On and as of the Effective Date, all of the Prepetition Secured Noteholders shall be deemed to be bound by the Amended Secured Notes Indenture, the Amended Secured Notes Guarantees and the related Restructuring Documents.

G.      *No New Issuance of Debt*

Notwithstanding anything in this Plan to the contrary, the Amended Secured Notes will represent the same indebtedness as the Prepetition Secured Notes, and nothing in this Plan is, or shall be deemed to

constitute, an issuance of new indebtedness under or in connection with the Amended Secured Notes or the Amended Secured Notes Indenture.  Except as expressly amended or modified by this Plan, the Prepetition Secured Notes Indenture and all Collateral Documents (as defined therein) shall remain in full force and effect and shall, in their original form and as amended or modified pursuant to this Plan, secure the obligations and indebtedness arising under or in connection with the Amended Secured Notes, and, at the written request of the Prepetition Secured Notes Indenture Trustee, the Reorganized Debtors shall execute and deliver conforming amendments to such documents necessary in order to implement the same, all without further notice to or order of the Bankruptcy Court. The Prepetition Secured Notes Indenture Trustee and any applicable Distribution Agent shall, and the Debtors and/or Reorganized Debtors and their agents shall be authorized to, coordinate with DTC such that the allocations of the Amended Secured Notes shall be made by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC.

H.    No Discharge or Release of Liens Securing the Prepetition Secured Notes Claims

Notwithstanding anything in this Plan to the contrary, all property of the Estates of the Debtors, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with this Plan, shall remain encumbered by and subject to the Liens securing the Prepetition Secured Notes Claims which, as of the Effective Date, secure the obligations and indebtedness arising under or in connection with the Amended Secured Notes, and such Liens shall not be, and shall not be deemed to be, discharged or released on account of the Confirmation or Consummation of this Plan.

I.    New Common Stock

On the Effective Date, subject to the terms and conditions of the Investment Agreement, Reorganized HoldCo shall issue 100% of the New Common Stock to the Investor or its designated Affiliate pursuant to the Amended/New Organizational Documents in consideration for the Purchase Price.  The Reorganized Debtors shall not be obligated to register the New Common Stock under the Securities Act or to list the New Common Stock for public trading on any securities exchange.

Distributions of the New Common Stock may be made by delivery or book-entry transfer thereof by the applicable Distribution Agent in accordance with the Investment Agreement.  Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of Reorganized HoldCo shall be that number of shares of New Common Stock as may be designated in the Amended/New Organizational Documents.

J.    Plan Securities and Related Documentation; Exemption from Securities Laws

On and after the Effective Date, the Debtors, the Reorganized Debtors, the Investor and their respective Affiliates are each authorized to and shall provide or issue, as applicable, the New Common Stock, the Amended Secured Notes, the Amended Secured Notes Guarantees, the guarantees by certain of the HoldCo Subsidiaries and any and all other securities to be distributed or issued under this Plan (collectively, the "**Plan Securities**") and any and all other notes, stock, instruments, certificates, and other documents or agreements required to be distributed, issued, executed or delivered pursuant to or in connection with this Plan, including, without limitation, the Amended Secured Notes Indenture and the Amended Secured Notes Guarantees (collectively, the "**Plan Securities and Documents**"), in each case in form and substance satisfactory to the Supermajority Consenting Debtholders, the Investor, and to the extent it is a signatory thereto, in form and substance reasonably satisfactory to the Prepetition Secured Notes Indenture Trustee, and without further notice to or order of the Bankruptcy Court, act or action

under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The distribution and issuance, as applicable, of the Plan Securities and Documents under this Plan shall be exempt from registration under applicable securities laws (including Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Bankruptcy Code, Section 4(2) of the Securities Act and/or other applicable exemptions.  An offering of Plan Securities provided in reliance on the exemption from registration under the Securities Act pursuant to section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code and is deemed to be a public offering, and such Plan Securities may be resold without registration to the extent permitted under section 1145 of the Bankruptcy Code.  Any Plan Securities and Documents provided in reliance on the exemption from registration under the Securities Act provided by Section 4(2) of such act will be provided in a private placement.

The Amended Secured Notes, the Amended Secured Notes Guarantees and the guarantees by certain of the HoldCo Subsidiaries (together with the Amended Secured Notes Guarantees, the "**Guarantees**") are being issued as a result of certain modifications to the Prepetition Secured Notes Indenture.  As such, the Amended Secured Notes and the Guarantees are a continuation and modification of the Prepetition Secured Notes and the obligations thereunder.  However, the offer and delivery of the Amended Secured Notes and the Guarantees to creditors is subject to federal securities laws. The offer and delivery of the Amended Secured Notes and the Guarantees will be made without registration under the Securities Act, in reliance on an exemption from registration provided by section 1145(a)(1) of the Bankruptcy Code, which also exempts the offer and delivery of the Amended Secured Notes and the Guarantees from similar state securities laws.

Resales by Persons who receive the New Common Stock and any Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code, who are deemed to be "underwriters" (as such term is defined in the Bankruptcy Code) (collectively, the "**Restricted Holders**") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act.  Restricted Holders would, however, be permitted to resell the New Common Stock or Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code, as applicable, without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, or if such securities are registered with the Commission pursuant to a registration agreement or otherwise.  Under this Plan, Restricted Holders are not entitled to any registration rights.

For purposes of this Plan, to the extent necessary, and solely for purposes of section 1145 of the Bankruptcy Code, each of the Investor (as the intended purchaser that plans to acquire the New Common Stock), Radiation Therapy Services Holdings, Inc. (as the parent of the Investor) and certain subsidiaries of the Investor pursuant to the Amended Secured Notes Guarantees (as subsidiaries of the Investor) shall be deemed a "successor" of HoldCo under section 1145(a)(1) of the Bankruptcy Code and are each sponsors of this Plan.  The HoldCo Subsidiaries shall be deemed "affiliates" as defined in Section 101(2) of the Bankruptcy Code of HoldCo and are co-proponents of this Plan.

Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

31

K.    *Release of Liens and Claims*

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided herein or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII hereof, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates shall be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The filing of the Confirmation Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims and other interests described above. Any Entity holding such Liens, Claims or interests shall, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

L.    *Organizational Documents of the Reorganized Debtors*

The respective organizational documents of each of the Debtors shall be amended and restated or replaced (as applicable) in form and substance satisfactory to the Investor and as necessary to satisfy the provisions of this Plan and the Bankruptcy Code.  Such organizational documents shall: (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Common Stock; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Debtors may, subject to the terms and conditions of the Restructuring Documents, amend and restate their respective organizational documents as permitted by applicable law.

M.    *Directors and Officers of the Reorganized Debtors*

The New Board shall initially consist of up to five (5) directors, who shall be designated in accordance with the terms and conditions of the Investment Agreement, which directors shall be identified in the Plan Supplement as Plan Schedule 2.  The initial new board of directors or other governing body of each HoldCo Subsidiary shall consist of one or more of the directors or officers of Reorganized HoldCo.  Any directors elected pursuant to this section shall be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or an officer, the nature of any compensation for such Person.  Each such director and officer shall serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of the applicable Reorganized Debtors.  The existing boards of directors and other governing bodies of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

N.      *Corporate Action*

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, including, without limitation, the issuance and  the distribution of the securities to be issued pursuant hereto, in each case in form and substance satisfactory to the Investor, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or by any other Person (except for those expressly required pursuant hereto or by the Restructuring Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, directors, officers, managers, members or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

As of the Effective Date, all matters provided for in this Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Organization Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors or by any other Person.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case in form and substance satisfactory to the Investor, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The secretary and any assistant secretary of the Debtors and the Reorganized Debtors shall be authorized to certify or attest to any of the foregoing actions.

O.      *Cancellation of Notes, Certificates and Instruments*

On the Effective Date, except to the extent otherwise provided herein (including, without limitation, and for the avoidance of doubt, Article V.F, Article V.G and Article V.H) all notes, stock, instruments, certificates, agreements and other documents evidencing or relating to the DIP Facility Claims, the Prepetition Debt Claims, any Impaired Claim and/or the Old HoldCo Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person; provided that (i) the terms of the Prepetition Secured Notes Indenture shall continue in effect for the limited purpose of allowing Holders

of Claims thereunder to receive, and allowing and preserving the rights of the Prepetition Secured Notes Indenture Trustee to make, distributions under this Plan, and (ii) the DIP Facility Credit Agreement and the Prepetition Term Loan Credit Agreement shall continue in effect for the limited purposes of allowing Holders of Claims thereunder to receive, and allowing and preserving the rights of the applicable Distribution Agents to make, distributions under this Plan.  Except to the extent otherwise provided herein, upon completion of all such distributions, the DIP Facility Credit Agreement and the Prepetition Debt Credit Agreements and any and all notes, securities and instruments issued in connection therewith shall terminate completely without further notice or action and be deemed surrendered.  For the avoidance of doubt, nothing in this Subsection "O" shall affect the Amended Secured Notes Indenture, including without any limitation any Trustee Charging Lien, the Amended Secured Notes Guarantees and related Restructuring Documents, which shall be in full force and effect as of the Effective Date.

P.      *Old Affiliate Interests*

On the Effective Date, the Old Affiliate Interests shall remain effective and outstanding, and shall be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.  Each HoldCo Subsidiary shall continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date, except as amended or modified by this Plan.

Q.      *Sources of Cash for Plan Distributions*

Except as otherwise provided in this Plan or the Confirmation Order, all Cash necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments required pursuant to this Plan will be obtained from their respective Cash balances, including Cash from operations, the Cash Reserve, and the Initial Purchase Price or the Final Purchase Price, as applicable.  The Debtors and the Reorganized Debtors, as applicable, may also make such payments using Cash received from their subsidiaries through their respective consolidated cash management systems and the incurrence of intercompany transactions, but in all cases subject to the terms and conditions of the Restructuring Documents.

To the extent paid in Cash, all Allowed Claims that constitute any amount of the Debtor's Claim Portion shall be paid in Cash from either (i) Cash on the Debtors' balance sheet immediately prior to the Effective Date or (ii) the Cash Reserves.  All Allowed Claims that constitute any amount of the Reorganized Debtor's Claim Portion shall be paid in Cash by the Reorganized Debtors from its cash balances.

R.      *Continuing Effectiveness of Final Orders*

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under this Plan.

S.      *Funding and Use of Cash Reserves*

On or before the Effective Date, the Debtors shall fund the Cash Reserves in such amount as determined by the Debtors, with the consent of the Supermajority Consenting Debtholders or as determined by order of the Bankruptcy Court, as necessary in order to be able to pay in full in Cash the obligations and liabilities for which such reserves were established, including, without limitation, reserving an amount of Cash equal to 100% of distributions to which Holders of Disputed Claims in each

such applicable Class would be entitled under this Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors and the Reorganized Debtors, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims, subject to the rights of Consenting Debtholders Representative contained in Article V.T of this Plan; provided, further, that the Debtors shall provide the Investor with information regarding the Cash Reserves as may be reasonably requested by the Investor.

The Cash contained in each applicable Cash Reserve shall be first used solely to pay the obligations and liabilities for which such applicable reserve was established, with any excess funds (if any) in an applicable Cash Reserve being next available to pay the obligations and liabilities for which any other Cash Reserve was established. The Debtors and the Reorganized Debtors, as applicable, shall maintain detailed records of all payments made from each Cash Reserve, such that all payments and transactions shall be adequately and promptly documented in, and readily ascertainable from, their respective books and records. After the Effective Date, neither the Debtors nor the Reorganized Debtors shall deposit any other funds or property into the Cash Reserves without further order of the Bankruptcy Court or otherwise commingle funds in the Cash Reserves.

T.    *The Noteholders' Representative*

1.    *Appointment*. From and after the Effective Date, the Noteholders' Representative shall be authorized and empowered to act as agent, proxy, attorney-in-fact and representative for all Prepetition Secured Noteholders to the extent contemplated by the Investment Agreement, including but not limited to (i) in connection with any dispute regarding the calculation of the post-closing adjustment to the Initial Purchase Price under the Investment Agreement (to the extent contemplated by the Investment Agreement), (ii) for purposes of electing an Accounting Firm as contemplated by Section 1.1 of the Investment Agreement and (iii) becoming a party to the Escrowed Notes Agreement as contemplated by Section 2.5(a) of the Investment Agreement. The Noteholders' Representative shall serve in such capacity until resignation or discharge and the appointment of a successor Noteholders' Representative by the Majority Consenting Debtholders.

2.    *Rights, Powers and Duties of the Noteholders' Representative*. As the representative for all Prepetition Secured Noteholders, the Noteholders' Representative shall be authorized and empowered to act as agent, proxy, attorney-in-fact and representative for and on behalf of all Prepetition Secured Noteholders, to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions (whether in or out of court) as may be necessary or appropriate to fulfill its obligations under the Investment Agreement, including but not limited to (i) in connection with any dispute regarding the calculation of the post-closing adjustment to the Initial Purchase Price under the Investment Agreement (to the extent contemplated by the Investment Agreement), (ii) for purposes of electing an Accounting Firm as contemplated by Section 1.1 of the Investment Agreement and (iii) becoming a party to the Escrow Agreement as contemplated by Section 2.5(a) of the Investment Agreement, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. From and after the Effective Date and continuing through the date of entry of a final decree closing the Chapter 11 Case, the Noteholders' Representative shall possess the rights of a party-in-interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Chapter 11 Cases and, in connection therewith, shall have the right to appear and be heard on matters brought before the Bankruptcy Court and/or the interpretation or enforcement of the Investment Agreement, including, without limitation, the following:

(a) settling, allowing, objecting to or otherwise disposing of any Claims that constitute the Debtors' Claim Portion;

(b) seeking estimation of contingent or unliquidated Claims that constitute the Debtors' Claim Portion under section 502(c) of the Bankruptcy Code;

(c) seeking determination of the tax liability associated with any Claims that constitute the Debtors' Claim Portion under section 505 of the Bankruptcy Code;

(d) taking any and all other actions necessary or appropriate to implement any of the foregoing.

3. *Reimbursement of Costs and Expenses*.  The reimbursement of reasonable costs and expenses of the Noteholders' Representative, including, without limitation, any professionals retained by the Noteholders' Representative, shall be made from the Noteholders' Representative Cash Reserve.  The payment of such amounts to the Noteholders' Representative and its retained professionals shall be made in the ordinary course of business with the consent of the Supermajority Consenting Debtholders and shall not be subject to the approval of the Bankruptcy Court; *provided, however,* that any disputes related to such fees, costs and expenses shall be brought before the Bankruptcy Court.

4. *Limitation of Liability*.  As of and after the Effective Date, neither the Noteholders' Representative nor any of its Related Persons shall be liable for any act taken or omitted to be taken in such capacity in connection with or in contemplation of the transactions contemplated by this Plan and/or the Investment Agreement, in each case other than for acts or omissions constituting gross negligence, actual fraud or willful misconduct of such applicable Entity as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

The Noteholders' Representative and each of its Related Persons may, in connection with the performance of their respective functions, and in their sole and absolute discretion and without any requirement or obligation, consult with the respective attorneys, accountants, financial advisors, and other professionals of the Reorganized Debtors, and shall not be liable for any act taken, omitted to be taken or suffered to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions are provided in writing (other than for acts or omissions constituting gross negligence, actual fraud or willful misconduct of such applicable Entity as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction).

5. *Forum For Actions Against the Noteholders' Representative*.  The Confirmation Order shall state that, without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Noteholders' Representative in its official capacity as such, with respect to its status, duties, powers, acts or omissions as Noteholders' Representative in any forum other than the Bankruptcy Court.

6. *Insurance*.  The Noteholders' Representative shall be authorized to obtain all reasonably necessary insurance coverage for itself and its Related Persons, including, but not limited to, coverage with respect to the liabilities, duties and obligations of the Noteholders' Representative and its Related Persons under the Investment Agreement and this Plan (in the form of an errors and omissions policy, general liability, or otherwise), which insurance coverage may remain in effect for a reasonable period (not to exceed six years) after the closing of the Chapter 11 Cases.  Any such insurance coverage shall be paid for from the Consenting Debtholders Representative Cash Reserve.

7. *Authority to Object to and Settle Certain Disputed Claims*.  From and after the Effective Date, the Noteholders' Representative shall be authorized with respect to those Claims which are not

SF\5604545.10

Allowed hereunder or by Final Order and that constitute the Debtors' Claim Portion, (i) to object to, and seek estimation of, any such Claims and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle such Disputed Claims, in the ordinary course of business and without further notice to or order of the Bankruptcy Court.

U.      *Fees and Expenses of Prepetition Term Loan Agent & Ad Hoc Secured Noteholders Committee*

Without limiting the terms or conditions of Section 3.3(f) of the Investment Agreement, the Debtors shall, on the Effective Date and to the extent invoiced, pay the Prepetition Term Loan Agent Fees and Expenses and the Ad Hoc Secured Noteholders Committee Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; provided, however, if the Debtors or Reorganized Debtors and any such Entity cannot agree with respect to the reasonableness of the fees and expenses to be paid to such party, the reasonableness of any such fees and expenses shall be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors on the Effective Date and any disputed amounts to be escrowed by the Debtors).

V.      *Fees and Expenses of Indenture Trustee*

Without limiting the terms or conditions of Section 3.3(f) of the Investment Agreement, the Debtors shall, on the Effective Date and to the extent invoiced, pay the Prepetition Secured Notes Indenture Trustee Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without the need to provide individual time records or application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; provided, however, if the Debtors or Reorganized Debtors and any such Entity cannot agree with respect to the reasonableness of the fees and expenses to be paid to such party, the Debtors shall (i) pay the undisputed portion of any invoices submitted on or before the Effective Date, (ii) place any disputed amounts in escrow on the Effective Date, and (iii) notify the Prepetition Secured Notes Indenture Trustee of any dispute within ten (10) days after the presentation of an invoice by the Prepetition Secured Notes Indenture Trustee.  Upon such notification, the Prepetition Secured Notes Indenture Trustee may assert the Trustee Charging Lien to pay the undisputed and unpaid portion of the Prepetition Secured Notes Indenture Trustee Fees and Expenses, and/or after the parties have attempted in good faith to resolve any such dispute for at least fifteen (15) days after the notification of the dispute, may submit such dispute for resolution to the Bankruptcy Court; provided, however, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the Prepetition Secured Notes Indenture.  Nothing herein shall be deemed to impair, waive, discharge, or negatively affect any Trustee Charging Lien for any fees, costs and expenses not paid pursuant to this Plan and otherwise claimed by the Prepetition Secured Notes Indenture Trustee pursuant to this section and in accordance with the Prepetition Secured Notes Indenture.  For the avoidance of doubt, the Trustee Charging Lien shall be released as and when required under the Prepetition Secured Notes Indenture and the Amended Secured Notes Indenture.

W.      *Completion Bonus Program*

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to make the payments contemplated by the Completion Bonus Program pursuant to section 1129(a)(4) of the Bankruptcy Code, without further notice and hearing or consent of any Person.  The aggregate payments under the Completion Bonus Program will not exceed $750,000.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors (subject to the consent of the Investor given in its sole discretion) in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)    have been assumed or rejected by prior order of the Bankruptcy Court;

(ii)    are the subject of a motion to reject pending on the Effective Date;

(iii)    are identified on <u>Plan Schedule 5</u> hereto or in the Plan Supplement, in either case which Plan Schedule may be amended by the Debtors (subject to the consent of the Investor given in its sole discretion) to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Plan Schedule and serving it on the affected contract parties at least ten (10) days prior to the date of the Confirmation Hearing; or

(iv)    are rejected or terminated pursuant to the terms of this Plan.

Without amending or altering the Cure Claim Procedures Order or any other prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to this Plan (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of this Plan, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.  The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.  Each Executory Contract and Unexpired Lease assumed pursuant to this Plan or by an order of the Bankruptcy Court, which has not been assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its respective terms and conditions, except as limited or modified by the provisions of this Plan.

B.    *Assignment of Executory Contracts or Unexpired Leases*

In the event of an assumption and assignment of an Executory Contract or Unexpired Lease, at least ten (10) days prior to the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which

SF\5604545.10

will: (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court. Additionally, the Debtors shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts. Any applicable cure amounts shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable cure amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtors at least three (3) days prior to the Confirmation Hearing (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Without amending or altering the Cure Claim Procedures Order, any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall, without amending or altering the Cure Claim Procedures Order, be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to an assignment or a cure amount is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it. The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

C.      Rejection of Executory Contracts or Unexpired Leases

The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any contract or lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease. All Executory Contracts and Unexpired Leases listed on Plan Schedule 5 shall be deemed rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

D.      Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G hereof.  To the extent applicable, the limitations imposed by section 502 of the Bankruptcy Code shall apply to the relevant rejection Claim, including, without limitation, subsection 502(b)(6) and subsection 502(b)(7) thereof.

E.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code and without amending or altering the Cure Claim Procedures Order, by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree (the "**Cure Claim Amount**").  At least ten (10) days prior to the Confirmation Hearing, the Debtors shall file and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will:  (1) list the applicable cure amount, if any; and (2) describe the procedures for filing objections thereto.

Without amending or altering the Cure Claim Procedures Order, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Debtors at least three (3) days prior to the Confirmation Hearing (notwithstanding anything in the Schedules or a Proof of Claim to the contrary).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to the proposed assumption and cure amount.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall, without amending or altering the Cure Claim Procedures Order, be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to assumption or cure amount is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.  The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption of any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, in each case as provided in section 365 of the Bankruptcy Code.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed by Final Order shall be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Extension of Time to Assume or Reject*

Notwithstanding anything to the contrary set forth in Article VI of this Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed assumption provided for in Article VI.A of this Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

**ARTICLE VII.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the "Treatment" sections in Article III hereof or as ordered by the Bankruptcy Court, initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Article VIII hereof.

B.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in this Plan, the Confirmation Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

C.      *Distributions by the Reorganized Debtors or Other Applicable Distribution Agent*

Other than as specifically set forth below, the Debtors, the Reorganized Debtors or other applicable Distribution Agent shall make all distributions required to be distributed under this Plan. Distributions on account of the Allowed Prepetition Term Loan Claims and Allowed Prepetition Secured Notes Claims shall be made to the Prepetition Term Loan Agent and the Prepetition Secured Notes Indenture Trustee, respectively, and such applicable agent will be, and shall act as, the Distribution Agent with respect to its respective Class of Claims.  The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by this Plan and may pay the reasonable fees and expenses of such entities and the Distribution Agents in the ordinary course of business.  No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

D.      *Delivery and Distributions; Undeliverable or Unclaimed Distributions*

1.      Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed.  Accordingly, the Debtors, the Reorganized Debtors or other applicable Distribution Agent will have no obligation to recognize the

assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim (other than Prepetition Debt Claims) that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims (other than Prepetition Debt Claims) who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  The Reorganized Debtors or other applicable Distribution Agent shall be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date; provided, however, that the foregoing shall not apply to the Prepetition Debt Claims.  Instead, (i) the Prepetition Term Loan Agent shall be deemed the holder of the Prepetition Term Loan Claims and distributions with respect thereto shall be governed by the Prepetition Term Loan Credit Agreement and (ii) solely with respect to receiving distributions under this Plan, the Prepetition Secured Notes Indenture Trustee shall be deemed to be the holder of the Prepetition Secured Notes Claims and distributions with respect thereto shall be governed by the Prepetition Secured Notes Indenture.

2.    Delivery of Distributions in General

Except as otherwise provided herein, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, shall make distributions to Holders of Allowed Claims, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other applicable Distribution Agent's books and records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined in the discretion of the applicable Distribution Agent (subject to the terms and conditions of the relevant Prepetition Debt Credit Agreement, if applicable); provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the latest Proof of Claim Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date.

3.    Minimum Distributions

Notwithstanding anything herein to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $25.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars, in each case with respect to Impaired Claims.  With respect to Impaired Claims, whenever any payment or distribution of a fraction of a dollar (including with respect to the Amended Secured Notes, if applicable) under this Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or more being rounded up to the next higher whole number and with less than half dollars being rounded down to the next lower whole number.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim that is Impaired under this Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $25.00, which shall be treated as an undeliverable distribution under Article VII.D.4 below.

4.   Undeliverable Distributions

(a)      Holding of Certain Undeliverable Distributions

If the distribution to any Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due but missed distributions shall be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent).   Undeliverable distributions shall remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to Article VII.D.4(b) hereof, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

(b)      Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property, or any Distribution Agent.   In such case, any Cash for distribution on account of such rights for undeliverable or unclaimed distributions shall become the property of the Estates free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.   Any Cash, Amended Secured Notes and/or other Plan Securities and Documents or other property held for distribution or allocation on account of such Claim shall be distributed or allocated to the Prepetition Secured Notes Indenture Trustee for distribution or allocation in accordance with this Plan.   Nothing contained in this Plan shall require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim.

(c)      Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check.   In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 90 days after the issuance of such checks, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks.   This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open.   Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.   Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 365 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such Claim against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property.   In such case, any Cash held for payment on account of such Claims shall be distributed to the Prepetition Secured Notes Indenture Trustee for distribution in accordance with this Plan, free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.

E.     *Compliance with Tax Requirements*

In connection with this Plan and all distributions hereunder, the Reorganized Debtors or other applicable Distribution Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors or other applicable Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of this Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F.     *Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

G.     *Means of Cash Payment*

Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

H.     *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the "Treatment" sections in <u>Article III</u> hereof or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in <u>Article VIII</u> hereof.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

I.     *Setoffs*

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; <u>provided</u>

44

that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, shall provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved.  In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Litigation Claims, all of which are reserved unless expressly released or compromised pursuant to this Plan or the Confirmation Order.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.    *Resolution of Disputed Claims*

1.    Allowance of Claims

After the Effective Date, the Debtors and the Reorganized Debtors shall, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  Subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, the Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

2.    Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, shall have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; *provided*, *however*, this provision shall not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases. From and after the Effective Date, the Reorganized Debtors, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors shall, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3.    Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may at any time, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claims, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation.

4.    Deadline to File Objections to Claims

Any objections to Claims shall be Filed by no later than the Claims Objection Deadline; provided that nothing contained herein shall limit the Reorganized Debtors' right to object to Claims, if any, Filed or amended after the Claims Objection Deadline, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan.  Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Debtors or the Reorganized Debtors shall, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.  Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Reorganized Debtors shall continue to have the right to amend any claims or other objections and to File and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is or becomes Allowed by Final Order of the Bankruptcy Court.

B.    *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim pursuant to a Final Order.

C.    *Distributions on Account of Disputed Claims Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims*

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), the Reorganized Debtors or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims of property that would have been distributed to the Holders of such Claim on the dates distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims or Disallowed Claims by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates.  Such distributions will be made pursuant to the applicable provisions of Article VII of this Plan.

D.      *Reserve for Disputed Claims*

        The Debtors, the Reorganized Debtors and the Distribution Agent, as applicable, shall establish such appropriate reserves for Disputed Claims in Classes as it determines necessary and appropriate, including, without limitation, as part of the Cash Reserves, in each case with the consent of the Noteholders' Representative or as approved by order of the Bankruptcy Court.  Without limiting the foregoing, reserves for Disputed Claims shall equal an amount of Cash equal to 100% of distributions to which Holders of such Disputed Claims in each applicable Class would be entitled under this Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors and the Reorganized Debtors, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims, subject to the rights of the Noteholders' Representative contained in <u>Article V.T</u> of this Plan; provided, further, that the Debtors shall provide the Investor with information regarding the reserves established for Disputed Claims as may be reasonably requested by Investor.


# ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation*

        It shall be a condition to Confirmation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of <u>Article IX.C</u> hereof:

        1.      This Plan and the Restructuring Documents shall be in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Debtors, the Supermajority Consenting Debtholders and the Investor; and

        2.      The Confirmation Order shall have been entered by the Bankruptcy Court.

B.      *Conditions Precedent to Consummation*

        It shall be a condition to Consummation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of <u>Article IX.C</u> hereof.

        1.      The Confirmation Order shall have become a Final Order and the Confirmation Date shall have occurred.

        2.      The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order), in form and substance reasonably acceptable to the Debtors and the Supermajority Consenting Debtholders and acceptable to the Investor, authorizing the assumption, assumption and assignment and rejection of the Executory Contracts and Unexpired Leases by the Debtors as contemplated in this Plan and the Plan Supplement.

        3.      This Plan and the Restructuring Documents shall not have been amended or modified other than  in a manner in form and substance consistent in all material respects with the Restructuring Term

Sheet and otherwise reasonably acceptable to the Debtors, the Supermajority Consenting Debtholders and the Investor.

4.      The Restructuring Documents shall have been filed, tendered for delivery, and been effected or executed by all Entities party thereto (as appropriate), and in each case in full force and effect. All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Investment Agreement, shall have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or shall be satisfied concurrently with the occurrence of the Effective Date).

5.      All consents, actions, documents, certificates and agreements necessary to implement this Plan and the transactions contemplated by the Investment Agreement shall have been, as applicable, obtained and not otherwise subject to unfulfilled conditions, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws, and in each case in full force and effect.

6.      The Debtors shall have received, or will receive concurrently with the occurrence of the Effective Date, the Initial Purchase Price in Cash and in accordance with the terms and conditions of the Investment Agreement.

7.      The New Board shall have been selected.

8.      The Cash Reserves shall have been funded in full in Cash by the Debtors in accordance with the terms and conditions of this Plan.

9.      All Ad Hoc Secured Noteholders Committee Fees and Expenses shall have been paid in full in Cash or reserved in a manner acceptable to the Majority Consenting Debtholders to the extent of any disputes, as required by the DIP Facility Orders, including the adequate protection obligations in paragraph 12 thereof, pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.

C.      *Waiver of Conditions*

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of this Plan set forth in this Article IX may be waived by the Debtors, with the consent of the Supermajority Consenting Debtholders and the Investor, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan.  The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

D.      *Effect of Non-Occurrence of Conditions to Confirmation or Consummation*

If the Confirmation or the Consummation of this Plan does not occur with respect to one or more of the Debtors, then this Plan shall, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

SF\5604545.10

## ARTICLE X.

## RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS

A.     *General*

Pursuant to section 1123 of the Bankruptcy Code (and in addition, but solely with respect to Class 5 Claims, Bankruptcy Rule 9019), and in consideration for the classification, distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to this Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; *provided*, *however*, that nothing contained herein shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan.

B.     *Release of Claims and Causes of Action*

1.     *Release by the Debtors*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**Debtor Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or

events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; _provided_, _however_, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule 6; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this Article X.B shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

2.    _Release By Third Parties_.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held,

existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party Release shall not operate to waive or release (i) any Causes of Action expressly listed on Plan Schedule 7; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

C.      *Waiver of Statutory Limitations on Releases*

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party.  The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

D.      *Discharge of Claims*

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, effective as of the Effective Date, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, Equity Interests or Causes of Action.

Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto shall be extinguished completely without further notice or action; and (iii) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

E.      *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; *provided*, *however*, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; *provided*, *further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel

52

concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

F.     *Preservation of Causes of Action*

1.     Maintenance of Causes of Action

Except as otherwise provided in this Article X or elsewhere in this Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases, but in all cases subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan. The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court, but in all cases subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan.

2.     Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors expressly reserve all Causes of Action and Litigation Claims for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except in each case where such Causes of Action or Litigation Claims have been expressly waived, relinquished, released, compromised or settled in this Plan (including, without limitation, and for the avoidance of doubt, the Release contained in Article X.B and Exculpation contained in Article X.E hereof) or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

G.     **Injunction**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY**

**SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).   ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

H.      *Binding Nature Of Plan*

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THIS PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THIS PLAN, EACH ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THIS PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THIS PLAN.**

I.      *Protection Against Discriminatory Treatment*

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.      *Plan Indemnity*

In addition to the matters set forth in this Plan and not by way of limitation thereof, the Reorganized Debtors and the Investor shall, and the Debtors shall continue to, indemnify and hold harmless all Persons who are or were managers, officers or directors of any of the Debtors at any time on

or after the Petition Date on account of and with respect to any Claims (whether or not any Proof of Claim or cure claim has been Filed with respect thereto) or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities threatened or asserted by any Person against any such managers, officers or directors with respect to or based upon, in whole or in part, any act taken or omitted to be taken, or alleged act taken or omitted to be taken, in such capacities on or prior to the Effective Date, irrespective of whether such amounts are owed in connection with a prepetition or postpetition act or omission, but in each case only to the extent that (a) the acts, omissions or alleged acts or omissions of such applicable Person were indemnifiable under the Debtors' prepetition organizational documents (whether in the bylaws, certificates of incorporation, charters, operating agreements, board resolutions, employment contracts or otherwise) and (b) the otherwise indemnifiable expense, liability, loss, or other amount is determined not to be covered under the D&O Tail Policy purchased by the Debtors prior to the Petition Date.  The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court.

K.    *Integral Part of Plan*

Each of the provisions set forth in this Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of this Plan and essential to its implementation.  Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Equity Interest;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtors are party or with respect to which the Debtors or Reorganized Debtors may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected (as applicable);

4. resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

6. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, *provided, however* that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7. enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

8. resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

9. hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10. issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan, except as otherwise provided in this Plan;

11. enforce the terms and conditions of this Plan and the Confirmation Order;

12. resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, the Indemnification and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such provisions;

13. hear and determine the Litigation Claims by or on behalf of the Debtors or Reorganized Debtors;

14. hear and determine all matters related to the administration or implementation of the Investment Agreement, including, without limitation, any issue or dispute pertaining to the Noteholders' Representative;

15. enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

16. resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with this Plan; and

17. enter an order concluding or closing the Chapter 11 Cases.

Notwithstanding the foregoing, if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or

related to the Chapter 11 Cases, including the matters set forth in this Article of the Plan, the provisions of this <u>Article XI</u> shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.      *Dissolution of the Committee*

On and as of the Effective Date, the Committee shall dissolve automatically and its members shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members or advisors to the Committee after the Effective Date.

B.      *Payment of Statutory Fees; Post-Effective Date Professional Fees and Expenses*

All outstanding fees payable pursuant to section 1930 of title 28, United States Code shall be paid when due.  The Reorganized Debtors shall pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses, or related support services (including reasonable fees and expenses relating to the preparation of final fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court, including, without limitation, fees, costs and expenses incurred in connection with the implementation, enforcement and Consummation of this Plan, including but not limited to the reasonable fees and expenses of the Distribution Agents.

C.      *Conflicts*

In the event that a provision of the Restructuring Documents or the Disclosure Statement (including any and all exhibits and attachments thereto) conflicts with a provision of this Plan or the Confirmation Order, the provision of this Plan and the Confirmation Order (as applicable) shall govern and control to the extent of such conflict.

D.      *Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order in a way that is in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Supermajority Consenting Debtholders and the Investor; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan in a way that is in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Supermajority Consenting Debtholders and the Investor, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

SF\5604545.10

E.      *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and/or to File subsequent chapter 11 plans, with respect to one or more of the Debtors.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation of this Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which this Plan was revoked or withdrawn or for which Confirmation or Consummation of this Plan did not occur: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

F.      *Successors and Assigns*

This Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Holders of Claims and Equity Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

G.      *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

H.      *Further Assurances*

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

I.      *Severability*

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that

each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

J.      *Service of Documents*

Any notice, direction or other communication given regarding the matters contemplated by this Plan (each, a "**Notice**") must be in writing, sent by personal delivery, electronic mail, courier or facsimile and addressed as follows:

> If to the Debtors:
>
>> OnCure Holdings, Inc.
>> Attn: Bradford C. Burkett
>> 188 Inverness Drive West, Suite 650
>> Englewood, Colorado, 80112
>> Fax: (303) 643-6560
>> E-mail: brad@mppartnersllc.com
>
> with a copy to:
>
>> Latham & Watkins LLP
>> 885 Third Avenue
>> New York, NY 10022
>> Attention:  Keith A. Simon
>> Fax:   (212) 751-4864
>> E-mail:keith.simon@lw.com
>
> If to the Investor:
>
>> Radiation Therapy Services
>> 1010 Northern Boulevard - Suite 314
>> Great Neck, NY 11021
>> Attention: Norton L. Travis
>> Fax:  (516) 301-5778
>> E-mail:ntravis@rtsx.com
>
> with a copy to:
>
>> Vestar Capital Partners V, L.P.
>> 245 Park Avenue
>> 41st Floor
>> New York, NY 10167
>> Attention: Erin Russell
>> Fax: (212) 808-4922
>> E-mail:ERussell@VestarCapital.com

with a copy to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022
> Attention: Michael Movsovich, P.C.
>     Christopher Marcus, P.C.
> Fax: (212) 446-6460
> E-mail: mmovsovich@kirkland.com;cmarcus@kirkland.com

If to the Noteholders' Representative:

> [To Insert Information Once Appointed]

with a copy to:

> Stroock & Stroock & Lavan LLP
> 2029 Century Park East, Suite 1600
> Los Angeles, California 90067
> Attention: Frank Merola, Esq.
> Fax: (310) 407-6302
> E-mail: fmerola@stroock.com

with a copy to:

> Stroock & Stroock & Lavan LLP
> 180 Maiden Lane
> New York, New York 10038
> Attention: Jayme T. Goldstein, Esq.
> Fax: (212) 806-6006
> E-mail: jgoldstein@stroock.com

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section. Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed. Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party. The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

K.    *Exemption from Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code*

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with this Plan or the Restructuring Documents shall not be subject to any Stamp or Similar Tax or

governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under this Plan or the Restructuring Documents, including, without limitation, the Amended Secured Notes and guarantees issued or provided in connection therewith, (ii) the issuance of the New Common Stock and (iii) the maintenance or creation of security interests or any Lien as contemplated by this Plan or the Restructuring Documents.

L.    *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Restructuring Document or an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

M.    *Tax Reporting and Compliance*

The Reorganized Debtors are hereby authorized, on behalf of the Debtors, but subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

N.    *Schedules*

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated herein and are a part of this Plan as if set forth in full herein.

O.    *No Strict Construction*

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, DIP Lenders, the Prepetition Term Loan Lenders, the Prepetition Secured Noteholders, the Investor and their respective professionals. Each of the foregoing was represented by counsel of its choice who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, the Exhibits and the Plan Schedules, and the agreements and documents ancillary or related thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, the Exhibits or the Plan Schedules, or the documents ancillary and related thereto.

P.    *Entire Agreement*

Except as otherwise provided herein or therein, this Plan and the Restructuring Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan and the Restructuring Documents.

SF\5604545.10

Q.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

R.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

S.      *2002 Notice Parties*

After the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

SF\5604545.10

Dated:  August 22, 2013

Respectfully submitted,

ONCURE HOLDINGS, INC. AND ITS AFFILIATE
DEBTORS

By:      /s/ Bradford C. Burkett
Title:    President and Chief Executive Officer

**<u>Exhibit A</u>**

Amended/New Organizational Documents

[To Be Filed With Plan Supplement]

**Exhibit B**

Amended Secured Notes Guarantees

[To Be Filed With Plan Supplement]

**Exhibit C**


Amended Secured Notes Indenture


[To Be Filed With Plan Supplement]

## **Exhibit D**

Amended Secured Notes Indenture Term Sheet

**Summary of Principal Terms and Conditions of**
**OnCure Holdings, Inc. First Lien Notes**

*This Summary of Principal Terms and Conditions, together with the Annexes attached hereto, (collectively, this "Term Sheet") outlines certain key terms of the Amended Notes. Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Investment Agreement to which this Term Sheet is attached as Exhibit L thereto.*

| | |
|---|---|
| **General Rules of Construction**………. | The terms, covenants, conditions and other provisions contained in the indenture (the "OnCure Indenture") governing the Amended Notes will be substantially similar in form to the terms, covenants, conditions and other provisions contained in the indenture (the "RTS Indenture") governing the 8 7/8% Senior Secured Second Lien Notes due 2017 (the "RTS Second Lien Notes") issued by Radiation Therapy Services, Inc., a Florida corporation (the "Investor"), with revised basket sizes and revisions as described in Annex A hereto; provided, however, that (i) that with respect to matters that are (x) not covered herein or (y) contemplated herein but not fully specified in detail, the Investor and the Consenting Debtholders agree, in each case, to negotiate in good faith to develop modifications and revisions to the OnCure Indenture that are appropriate to reflect such matters and reasonably acceptable to the Investor and the Majority Consenting Debtholders.  Without limitation to the generality of the foregoing, it is acknowledged and agreed that due to the proposed structure of the Amended Notes (including, without limitation, as to matters set forth in "**Guarantors**", "**Ranking**" and "**Collateral**" below), there will be certain terms and conditions in the OnCure Indenture that are (x) not covered herein or (y) contemplated herein but not fully specified in detail that will also need to be modified or otherwise revised to account for such proposed structure and the Investor and the Consenting Debtholders agree to negotiate in good faith to develop modifications and revisions to such terms and conditions that are appropriate to reflect such proposed structure and reasonably acceptable to Investor and the Majority Consenting Debtholders. |

Unless otherwise specifically set forth in this Term Sheet, the terms, covenants, conditions and other provisions contained in the OnCure Indenture will address OnCure (as defined below) and its subsidiaries, such that references in the OnCure Indenture to the term "Company" and "Subsidiaries" (or variations thereof, such as "Restricted Subsidiaries") shall mean and be a reference to OnCure and the subsidiaries of OnCure, respectively.

1

Issuer..................................... OnCure Holdings, Inc., a Delaware corporation ("OnCure").

Amended Notes.......................... $75.0 million in aggregate principal amount (after giving effect to the amendment of the Notes (as in effect on the date of the Investment Agreement)).

In addition, $7.5 million in aggregate principal amount of Amended Notes (the "Earn-Out Notes") will be deposited on the Closing Date into an escrow account (the "Escrow Account") to be held by an escrow agent, which escrow agent shall be selected by the Majority Consenting Debtholders in their reasonable discretion and reasonably acceptable to Investor (the "Escrow Agent"), pursuant to an escrow agreement in form and substance reasonably satisfactory to the Investor and the Majority Consenting Debtholders (the "Escrow Agreement"). Pursuant to the terms of the Escrow Agreement, the Escrow Agent shall release the Earn-Out Notes, together with any amounts deposited therein pursuant to any Earn-Out Prepayment Event, to holders of the Amended Notes of record as of December 31, 2015 (or, if an Earn-Out Prepayment Event has occurred prior to such date that resulted in the redemption, prepayment, retirement, defeasance or refinancing of all of the Amended Notes, the date of determination of the holders of the Amended Notes that were entitled to receive payment in respect of the Amended Notes in connection with such Earn-Out Prepayment Event) upon receipt of audited annual financial statements of OnCure and its subsidiaries for the fiscal year ended December 31, 2015 (the "2015 Financial Statements"), if the combined aggregate "Center-Level EBITDA" (to be defined in the OnCure Indenture) for the Specified Centers (as defined below) for such fiscal year is greater than $1.5 million (such condition, the "Earn-Out Condition"). In the event that the Earn-Out Condition is not satisfied, the Escrow Agent shall release the Earn-Out Notes to OnCure for cancellation, together with any other amounts then held in or credited to the Escrow Account. Any cash interest paid on the Earn-Out Notes while such Earn-Out Notes are held in or credited to the Escrow Account will be released to OnCure, promptly after such interest payment is made to the Escrow Agent, in accordance with the terms of the Escrow Agreement.

In the event an Earn-Out Prepayment Event (as defined below) occurs, OnCure shall pay to the Escrow Agent, for distribution by the Escrow Agent to holders of record of the Amended Notes on December 31, 2015 (or, in the case of any such Earn-Out Prepayment Event that results in the redemption, prepayment, retirement, defeasance or refinancing of all of the Amended Notes, the date of determination of the holders of the Amended Notes entitled to

2

receive payment in respect of the Amended Notes in connection with such Earn-Out Prepayment Event) upon satisfaction of the Earn-Out Condition, an amount in cash equal to the aggregate principal amount of the Earn-Out Notes that are subject to such Earn-Out Prepayment Event. "Earn-Out Prepayment Event" means any redemption, prepayment, retirement, defeasance or refinancing of the Amended Notes prior to the date on which OnCure receives the 2015 Financial Statements.

**Interest Rate and Payments**............    11.75% cash coupon. Interest on the Amended Notes will be paid semi-annually in cash on dates to be determined. Interest will accrue from the Closing Date.

**Maturity Date**...............................    The Amended Notes will mature on January 15, 2017.

**Guarantors**..................................    The Amended Notes will be jointly and severally guaranteed on a senior secured basis by each existing and future domestic restricted subsidiary of OnCure (the "OnCure Subsidiaries," together with OnCure, the "OnCure Entities"). As of the Closing Date, such guarantors shall be the subsidiaries of OnCure that guarantee the obligations under the Note Indenture (as in effect immediately prior to the Closing Date).

The Amended Notes will be jointly and severally guaranteed on a senior unsecured basis by Investor, Radiation Therapy Services Holdings, Inc. (the "Parent") and each existing and future restricted subsidiary of Investor (other than foreign subsidiaries and excluding the OnCure Entities) (the "RTS Subsidiaries," together with Investor and the Parent, the "RTS Entities;" and the RTS Entities together with the OnCure Entities, collectively, the "RTS/OnCure Entities") that guarantees the obligations of the Investor under Credit Agreement (as defined in the RTS Indenture), pursuant to a covenant substantially similar to the covenant to provide guarantees under the RTS Indenture. As of the Closing Date, such guarantors shall be the Investor, Parent and each RTS Subsidiary that guarantees the obligations of the Investor on such date under the Credit Agreement (as defined in the RTS Indenture) as in effect on the Closing Date. The guarantee (the "RTS Guarantee") of each of the RTS Entities shall contain covenants and events of default substantially similar to those applicable to the RTS Entities contained in the RTS Indenture. For the avoidance of doubt, Parent will not be subject to any additional covenants than those to which it is currently subject under the RTS Indenture, except as otherwise set forth herein.

**Ranking**.....................................    The Amended Notes will be:

3

- ranked *pari passu* in right of payment with all existing and future senior indebtedness of the OnCure Entities, but effectively senior to all existing and future senior indebtedness of the OnCure Entities to the extent of the value of the OnCure Collateral (as defined below); and

- senior in right of payment to all existing and future subordinated obligations of the OnCure Entities.

**Optional Redemption**......................

Non-callable, in whole or in part, prior to September 30, 2015. At any time on or prior to such date, the Amended Notes may be redeemed or purchased, in whole or in part, at a price equal to 100% the principal amount thereof *plus* the Applicable Premium (to be defined substantially similar to such definition contained in the RTS Indenture) *plus* accrued and unpaid interest thereon.

Thereafter, the Amended Notes shall be callable, in whole or in part, during the periods set forth below, for the redemption prices set forth opposite such period below (expressed as a percentage of the principal amount of the Amended Notes to be redeemed):

| | |
|---|---|
| September 30, 2015 through but excluding February 15, 2016 | 106% (*plus* accrued and unpaid interest) |
| February 15, 2016 through but excluding July 31, 2016 | 103% (*plus* accrued and unpaid interest) |
| July 31, 2016 and thereafter | 100% (*plus* accrued and unpaid interest) |

At any time on or prior to September 30, 2015, up to 35% of the principal amount of the Amended Notes may be redeemed, with the use of net cash proceeds of one or more equity offerings, at a redemption price of 111.75% of the principal amount thereof *plus* accrued and unpaid interest thereon.

**Change of Control**........................

Upon the occurrence of a change of control of either Investor or OnCure, OnCure will be required to offer to repurchase the Amended Notes at 101% of the outstanding principal amount thereof *plus* accrued and unpaid interest thereon.

**Collateral**.................................

The Amended Notes will be secured by a valid and perfected first priority lien on the same assets and properties of the

4

OnCure Entities that secure, or purport to secure, the OnCure Entities' obligations under the indebtedness and other obligations under the Note Indenture and the related financing documents, in each case, as in effect immediately prior to the Closing Date (such assets and properties, the "<u>OnCure Collateral</u>").

**Intercreditor Agreements**.................. An intercreditor agreement (such intercreditor agreement, the "<u>Lender Intercreditor Agreement</u>") between the duly appointed agent of the holders of the indebtedness and the other obligations under the Investor Credit Documents and the duly appointed agent of the holders of the Amended Notes (the "<u>Amended Notes Agent</u>") shall be entered into on customary terms pursuant to which the Liens on the OnCure Collateral that secure the indebtedness and other obligations under the Investor Credit Documents are made junior and subordinate in all respects to all Liens on the OnCure Collateral that secure the indebtedness and other obligations under the Amended Notes, the OnCure Indenture and the related financing documents (the "<u>Amended Notes Obligations</u>").

An intercreditor agreement (such intercreditor agreement, the "<u>Notes Intercreditor Agreement</u>") between the duly appointed agent of the holders of the RTS Second Lien Notes and the Amended Notes Agent shall be entered into on customary terms pursuant to which the Liens on the OnCure Collateral that secure the indebtedness and other obligations under the RTS Indenture, the RTS Second Lien Notes and the related financing documents are made junior and subordinate in all respects to all Liens on the OnCure Collateral that secure the Amended Notes Obligations.

Each of the Lender Intercreditor Agreement and the Notes Intercreditor Agreement shall be in form and substance reasonably acceptable to the Amended Notes Agent and Majority Consenting Debtholders.

Notwithstanding the foregoing, in lieu of the Lender Intercreditor Agreement and/or the Notes Intercreditor Agreement, a supplemental intercreditor agreement to, or an amendment and/or a joinder to, the Intercreditor Agreement (as defined in the RTS Indenture) may be entered into to the extent that such Intercreditor Agreement as so supplemented or amended provides for both (x) the terms contemplated above for the Lender Intercreditor Agreement and (y) the terms contemplated above for the Notes Intercreditor Agreement, and shall be in form and substance reasonably acceptable to the Amended Notes Agent and Majority Consenting Debtholders,

NY 74611821v7

**Covenants (applicable to the OnCure Entities)**......................................

Notwithstanding the terms and other provisions included in "General Rules of Construction" set forth above, the following modifications will be made to the covenants applicable to the Amended Notes (and the defined terms related to such covenants):

*Restricted Payments*

The restricted payments covenant shall include the following two separate baskets in lieu of the building-basket included in the RTS Indenture:

- A restricted payments build-up basket which shall permit distributions of cash or other assets from the OnCure Entities to the RTS Entities in an amount equal to the sum of (i) the cumulative amount of cash and the fair market value of other assets that are used in the business of the OnCure Entities that, in each case, the RTS Entities contribute to or invest in the OnCure Entities after the Closing Date and (ii) in the event that the cash so contributed or invested pursuant to clause (i) above was drawn from, or the assets so contributed or invested pursuant to clause (i) above were purchased with amounts drawn from, the credit facilities or other credit sources of the RTS Entities, the aggregate amount of interest payments made by the RTS Entities, as of the date of calculation, on such outstanding drawn indebtedness (collectively, the "RTS Contribution Indebtedness"), provided that the aggregate amount of restricted payments subsequently made under this basket shall be deemed to reduce the aggregate principal amount of such RTS Contribution Indebtedness as of the date of such restricted payment is made for purposes of calculating such interest amount under this clause (ii) (the "Investment Build-Up Basket"). Use of the Investment Build-Up Basket will be subject to a minimum liquidity (to be defined) threshold of $5.0 million at the OnCure Entities.

- A build-up basket which shall permit distributions of restricted payments from the OnCure Entities to the RTS Entities in an amount equal to 50% of the Consolidated Net Income (as defined in the RTS Indenture) of the OnCure Entities (or, if Consolidated Net Income is a loss, less 100% of such loss).

The restricted payments carve-outs permitting payments to parent companies for certain taxes, expenses, salaries and other payments (i.e. a carve-out as set forth in Section

6

4.10(b)(5) of the RTS Indenture) will provide for (x) the proportional allocation to the RTS Entities and OnCure Entities of any such tax, expense, payment and salary that is attributable to the operations of both the RTS Entities and OnCure Entities or (y) any such tax, expense, payment and salary that is related to or derived from a specific RTS Entity or OnCure Entity or the business, assets, liabilities, operations, finances, existence or other activities of a specific RTS Entity or OnCure Entity to be directly allocated to such RTS Entity or OnCure Entity.

Appropriate modifications will be made in the OnCure Indenture to prevent "double-counting" of other restricted payments baskets and the separate baskets described above.

Transactions contemplated by the Intercompany Services Agreement (as defined below) shall be permitted without restriction under the OnCure Indenture; provided that such transactions shall not increase or decrease the amount of the Investment Build-Up Basket.

| | |
|---|---|
| *Permitted Liens* | Liens securing indebtedness and the other obligations permitted to be incurred under credit facilities to be made junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |

Liens securing permitted refinancing indebtedness must be junior and subordinate in all respects to the Liens securing the Amended Notes Obligations at least to the same extent that the Liens securing the refinanced indebtedness are junior and subordinate to the Liens securing the Amended Notes Obligations.

Liens securing indebtedness that are permitted under the 3.25:1.00 consolidated secured leverage ratio test, which ratio shall be calculated with respect to the RTS/OnCure Entities, must be made junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. Other than guarantees of indebtedness of the RTS Entities, indebtedness related to such permitted Liens must have a maturity date on or after July 16, 2017.

| | |
|---|---|
| *Indebtedness Covenant* | The calculation of the 2.0:1.0 consolidated fixed charge coverage ratio for purposes of allowing general "ratio" indebtedness (i.e., not indebtedness subject to specific |

7

baskets) shall be based on the RTS/OnCure Entities.

All intercompany indebtedness will be unsecured and subordinate in right of payment to the Amended Notes Obligations pursuant to a subordination agreement, to be an exhibit to the OnCure Indenture (which exhibit shall be in form and substance reasonably satisfactory to the Amended Notes Agent and the Majority Consenting Debtholders).

The anti-layering provision shall be in form and substance substantially identical to the anti-layering provision in the Note Indenture (as in effect on the date of the Investment Agreement).

*Asset Sales*

The asset sale covenant shall be on terms substantially the same as the covenant in the RTS Indenture; provided, that:

- Net proceeds from asset sales of the OnCure Entities must be applied, within 365 days of the receipt thereof, to (i) pre-pay the Amended Notes or (ii) re-invest in the assets or properties owned by the OnCure Entities.

- Asset sales shall include a transaction or series of related transactions for which the OnCure Entities receive aggregate consideration of $1.25 million or more.

- Designated Non-Cash Consideration (as defined in the RTS Indenture) will be limited to the greater of $2.5 million and 2.0% of total assets (calculated with respect to the OnCure Entities).

*Reports*

OnCure will provide the following information to holders of Amended Notes (which, at OnCure's option, may be provided through a password protected website): (i) audited annual financial statements prepared in accordance with GAAP (subject to the absence of footnotes), within the time periods required for such financial statements under the RTS Indenture, provided that such time period for the first fiscal year ending after the Closing Date shall be 120 days, (ii) unaudited quarterly financial statements prepared in accordance with GAAP (subject to the absence of footnotes), within the time periods required for such financial statements under the RTS Indenture, provided that such time period for the first fiscal quarter ending after the Closing Date shall be 60 days, and (iii) within the time periods required in a Current Report on Form 8-K under the Exchange Act, reports containing substantially the same information required to be contained in a Form 8-K pursuant to Item 1.01 (Entry into a

8

Material Definitive Agreement), 1.02 (Termination of a Material Definitive Agreement), 2.01 (Completion of Acquisition or Disposition of Assets), 2.03 (Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant), 2.04 (Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement), 4.01 (Changes in Registrant's Certifying Accountant), 4.02 (Non-Reliance of Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review), 5.01 (Changes in Control of Registrant), 5.02 (Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers), or 5.05 (Amendments to Articles of Incorporation or By-Laws; Change in Fiscal Year) thereof.

The RTS Guarantee shall contain a reporting covenant that requires the Investor to provide, together with delivery of its annual and quarterly reports, segment reporting including operational statistics with respect to the OnCure Entities.

*Intercompany Services Agreement*

OnCure and Investor shall enter into an intercompany services agreement (the "Intercompany Services Agreement"), the terms of which are subject to further mutual agreement; provided, however, it is understood and agreed that the services provided under such Intercompany Services Agreement shall be chargeable to the OnCure Entities at cost and the OnCure Entities shall be provided an annual inspection right (including the right to hire a third party consultant or advisor to assist with such inspection) to verify the books and records of the RTS Entities with respect to such services and the cost thereof.

*Affiliate Transactions*

- Transactions between the OnCure Entities and the RTS Entities ("Internal Affiliate Transactions") in excess of a threshold of $500,000 shall (i) be subject to an "arm's length basis" standard, (ii) to the extent in excess of $2.5 million, require board approval, and (iii) to the extent in excess of $10.0 million, require a fairness opinion; provided, however, no Internal Affiliate Transactions shall be permitted to the extent involving or relating to (w) a management services agreement or any similar agreement with any Managed Practice (to be defined) of the OnCure Entities, except to the extent permitted under **"Certain Additional Restrictions"** below, (x) any of the physicians or other employees within any

9

Managed Practice of the OnCure Entities, except to the extent permitted under "**Certain Additional Restrictions**" below, (y) equipment of the OnCure Entities, except to the extent such equipment is replaced prior to or concurrently with the consummation of such Internal Affiliate Transaction with similar equipment of a higher fair market value useful in the business of the OnCure Entities, and (z) transfers of real property of OnCure Entities or transfers of leases for real property under which an OnCure Entity is the lessee immediately prior to the consummation of such Internal Affiliate Transaction, except to the extent permitted under "**Certain Additional Restrictions**" below.

- The thresholds for affiliate transactions (other than Internal Affiliate Transactions) shall be as set forth on Annex A attached hereto.

*Certain Additional Restrictions*

- None of the RTS Entities shall enter into any management services agreement or any similar agreement with any Managed Practice of the OnCure Entities or any of the physicians or other employees affiliated with any such Managed Practice (for the avoidance of doubt, excluding any physicians or employees within RTS Entities) or transfer any real property or leases for real property of a Managed Practice or the OnCure Entities for a period of three (3) years following the date of expiration or termination of such management services agreement or similar agreement; provided that the RTS Entities may take the actions described above under a profits interest arrangement whereby if a Managed Practice is consolidated with an RTS Entity, the OnCure Entities will be provided in exchange an interest in such entity with a fair market value of no less than the Center-Level EBITDA on a LTM basis of such practice just prior to the consolidation, plus a sharing of the synergies of such consolidation in proportion to the revenue contribution of the relevant OnCure Entity on an LTM basis just prior to such consolidation, provided, that, (i) the Amended Notes Agent is provided a first priority Lien on such interest, (ii) such arrangement provides for a cash management arrangement pursuant to which cash allocable to the OnCure Entities

10

under such arrangement is promptly transferred to an account of OnCure in which the Amended Notes Agent has a first priority perfected Lien, and (iii) the aggregate amount of Center-Level EBITDA of all such practices subject to such arrangements does not exceed 20% of Center-Level EBITDA of all practices calculated as of the Closing Date; provided that the liens contemplated by clauses (i) and (ii) will be granted only to the extent that such Liens are on property or assets that would otherwise constitute OnCure Collateral. In addition, the RTS Entities shall not enter into an agreement outside of such consolidation with any of the physicians or other employees at the relevant Managed Practice unless such agreement is reasonably expected to result in increased synergies to the Managed Practice or Investor is able to replace the physicians or employees with persons reasonably expected to be of comparable talent.

• The OnCure Entities will not consummate any asset sale with respect to the property or assets of any of the Specified Centers or any sale of all or substantially all of the equity interests in any entity that owns a Specified Center and, for purposes hereof, an asset sale shall include any asset sale in which property or assets of any of the Specified Centers are sold or transferred to RTS Entities. Additionally, OnCure shall conduct the business and operations at the Specified Centers in the usual and ordinary course of business. The "Specified Centers" means those outpatient radiation oncology treatment centers for which affiliates of OnCure currently provide management services that are located in (i) Fountain Valley, California, (ii) Anaheim, California, (iii) Placentia, California, and (iv) Santa Maria, California.

• All cash, cash equivalents and other funds that are held or received by or owing to the OnCure Entities shall be deposited and held in or credited to an account or accounts over which a valid and perfected first priority lien has been granted in favor of the Amended Notes Agent (and shall not be commingled with any cash, cash equivalents and other funds of the RTS Entities), and the OnCure Entities shall direct and instruct all of their account debtors and obligors to make all payments due or to become due to the

11

OnCure Entities directly to such an account.

| | |
|---|---|
| **First Lien Obligations**..................... | The Amended Notes Obligations shall be designated and otherwise deemed to constitute "First Lien Obligations" for purposes of the Investor Secured Notes Documents and "Senior Debt" for purposes of the Investor Subordinated Notes Document.  The Investor shall designate Amended Notes Obligations as "senior debt" or the equivalent for purposes any future indenture or financing documentation. |
| **Registration Rights**........................ | None. |

12

# ONCURE HOLDINGS, INC.

### First Lien Notes

*Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Term Sheet.*

Covenant Baskets[1]

| Covenant | RTS Indenture Section Reference | Basket Amount |
|---|---|---|
| **Indebtedness** | | |
| *Credit Facilities Basket* | Section 4.09(b)(2) | $150 million; provided that such indebtedness shall at all times be subject to the Lender Intercreditor Agreement. |
| *Capital Leases/Purchase Money Indebtedness* | Section 4.09(b)(4) | The greater of $10.0 million and 4.0% of total assets (calculated with respect to the OnCure Entities); provided, that the OnCure Entities may incur indebtedness in respect of guarantees of Capital Leases/Purchase Money Indebtedness of the RTS Entities so long as (x) the aggregate principal amount of such guarantees, together with all such other indebtedness incurred under this basket, does not exceed the greater of $50.0 million and 4.0% of Total Assets (calculated with respect to the RTS/OnCure Entities) and (y) such guarantees are unsecured or secured by Liens junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance |

---

[1] Baskets set forth herein apply to the OnCure Entities.

| | | substantially similar to the Lender Intercreditor Agreement. |
|---|---|---|
| *Intercompany Indebtedness* | Section 4.09(b)(8) | Such intercompany indebtedness to be unsecured and subordinated to the Amended Notes as set forth in **"Indebtedness Covenant"** in the Term Sheet. |
| *General Basket* | Section 4.09(b)(15) | $5.0 million; provided, that the OnCure Entities may incur indebtedness in respect of guarantees of indebtedness of the RTS Entities so long as (x) the aggregate principal amount of such guarantees, together with all such other indebtedness incurred under this basket, does not exceed $25.0 million and (y) such guarantees are unsecured or secured by Liens junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
| *Indebtedness of Non-Guarantors* | Section 4.09(b)(18) | The greater of $3.0 million and 1.25% of total assets (calculated with respect to the OnCure Entities). |
| **Restricted Payments** | | |
| *Annual Management Buyback/Rollover* | Section 4.10(b)(4) | $1.0 million per calendar year. |
| *Dividends post-IPO* | Section 4.10(b)(6) | To be deleted. |
| *General Basket* | Section 4.10(b)(12) | $4.0 million. |
| **Investments** | | |

A-2

| | | |
|---|---|---|
| *Management Advances* | Clause (4) of "Permitted Investments" definition. | $1.0 million. |
| *Insurance Subsidiaries* | Clause (11) of "Permitted Investments" definition. | To be deleted |
| *JVs/Unrestricted Subs* | Clauses (10) and (12) of "Permitted Investments" definition. | $3.0 million in the aggregate; provided, however, an additional $7.0 million (or $10.0 million in the aggregate) to the extent that the only RTS/OnCure Entity that is an equity owner of such JVs/Unrestricted Sub is an OnCure Entity. |
| *Increases to existing Investments* | Clause (16) of "Permitted Investments" definition. | $2.5 million. |
| *General Basket* | Clause (19) of "Permitted Investments" definition. | $2.5 million. |
| **Liens** | | |
| *Hedging Obligations* | Clause (5) of "Permitted Liens" definition. | $1.0 million. |
| *Indebtedness Under Currency Agreements* | Clause (12) of "Permitted Liens" definition. | To be deleted (redundant to Clause (11) of "Permitted Liens" definition). |
| *Restricted Subsidiary* | Clause (19) of "Permitted Liens" definition. | To be deleted (redundant to Clause (14) of "Permitted Liens" definition). |
| *General Basket* | Clause (25) of "Permitted Liens" definition. | $5.0 million; provided, that the OnCure Entities may incur Liens in respect of guarantees of indebtedness of the RTS Entities incurred in the ordinary course of business so long as (i) the aggregate principal amount of such guarantees, together with all such other indebtedness secured by Liens under this basket, does not exceed $25.0 million and |

A-3

|  |  | (y) such Liens are junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
|---|---|---|
| *Secured Debt Ratio Test* | Clause (26) of "Permitted Liens" definition. | As set forth in "**Permitted Liens**" in the Term Sheet. |
| **Affiliate Transactions** | | |
| *Carve-out* | Section 4.14(a) | $500,000.00 (other than with respect to Internal Affiliate Transactions). |
| *Board of Directors Approval Threshold* | Section 4.14(a) | $2.5 million (other than with respect to Internal Affiliate Transactions). |
| *Fairness Opinion Threshold* | Section 4.14(a) | $5.0 million (other than with respect to Internal Affiliate Transactions). |
| **Events of Default** | | |
| *Cross Acceleration Threshold* | Section 6.01(4) | $10.0 million (with respect to indebtedness of the RTS/OnCure Entities). |
| *Litigation Threshold* | Section 6.01(5) | $10.0 million (with respect to indebtedness of the RTS/OnCure Entities). |
| *% of Holders Needed to Call an Event of Default* | Section 6.02 | 25% |

A-4

**<u>Exhibit E</u>**


Completion Bonus Program


[To Be Filed With Plan Supplement]

**Exhibit F**

Escrowed Notes Agreement

[To Be Filed With Plan Supplement]

**<u>Exhibit G</u>**

Investment Agreement

**EXECUTION VERSION**

**INVESTMENT AGREEMENT**

**BY AND BETWEEN**

**ONCURE HOLDINGS, INC.**

**AND**

**RADIATION THERAPY SERVICES, INC.,**


**DATED AS OF JUNE 22, 2013**

# TABLE OF CONTENTS

**Page**

**ARTICLE I Definitions** ...................................................................................................1

    1.1    Definitions.........................................................................................................1

**ARTICLE II Sale and Purchase** ....................................................................................17

    2.1    Purchase and Sale of the Shares......................................................................17
    2.2    Purchase Price..................................................................................................17
    2.3    Purchase Price Adjustment ..............................................................................17
    2.4    Transaction Expenses.......................................................................................20
    2.5    Deposit .............................................................................................................21
    2.6    Use of Proceeds................................................................................................22

**ARTICLE III Closing and Deliveries** ...........................................................................22

    3.1    Closing .............................................................................................................22
    3.2    Deliveries by the Company...............................................................................22
    3.3    Deliveries by Investor ......................................................................................23

**ARTICLE IV Representations and Warranties of the Company** ...........................................24

    4.1    Existence and Good Standing ...........................................................................24
    4.2    Validity and Enforceability...............................................................................24
    4.3    Capitalization of the Company and its Subsidiaries ...........................................25
    4.4    No Conflict; Required Filings and Consents ....................................................25
    4.5    Financial Statements ........................................................................................26
    4.6    Conduct of Business ........................................................................................27
    4.7    Taxes................................................................................................................27
    4.8    Real Property ...................................................................................................28
    4.9    Personal Property.............................................................................................28
    4.10   Intellectual Property.........................................................................................29
    4.11   Material Contracts............................................................................................29
    4.12   Insurance .........................................................................................................31
    4.13   Litigation and Orders.......................................................................................31
    4.14   Compliance with Laws ....................................................................................31
    4.15   Permits ............................................................................................................31
    4.16   Labor Matters..................................................................................................32
    4.17   Employee Benefit Plans...................................................................................32
    4.18   Environmental..................................................................................................34
    4.19   Accounts Receivable........................................................................................35
    4.20   Managed Practices and Suppliers ....................................................................35

| 4.21 | Brokers | 36 |
| 4.22 | Healthcare | 36 |
| 4.23 | Arm's Length | 37 |
| 4.24 | No Unlawful Payments | 37 |
| 4.25 | No Other Representations and Warranties | 38 |

**ARTICLE V Representations and Warranties of Investor** .............................................**38**

| 5.1 | Existence and Good Standing | 38 |
| 5.2 | Validity and Enforceability | 38 |
| 5.3 | No Conflict; Required Filings and Consents | 39 |
| 5.4 | Financial Ability | 39 |
| 5.5 | Financial Statements | 39 |
| 5.6 | Solvency | 40 |
| 5.7 | No Litigation or Regulatory Action | 40 |
| 5.8 | Capitalization | 40 |
| 5.9 | SEC Reports | 41 |
| 5.10 | Brokers | 41 |
| 5.11 | Exemption from Registration | 41 |
| 5.12 | Independent Investigation | 41 |
| 5.13 | No Other Representations and Warranties | 42 |

**ARTICLE VI Covenants and Agreements** .............................................**42**

| 6.1 | Certain Bankruptcy Matters | 42 |
| 6.2 | Automatic Stay | 43 |
| 6.3 | Agreement Motion and Agreement Order | 43 |
| 6.4 | Interim Operations of the Company | 43 |
| 6.5 | Financing | 46 |
| 6.6 | Reasonable Access; Confidentiality | 46 |
| 6.7 | Publicity | 47 |
| 6.8 | Notice of Events | 47 |
| 6.9 | All Commercially Reasonable Efforts; Cooperation | 48 |
| 6.10 | Financial Information | 49 |
| 6.11 | Common Interest Agreement | 49 |
| 6.12 | [Intentionally Deleted] | 49 |
| 6.13 | Capitalization of the Company as of the Effective Date | 50 |
| 6.14 | Diligence Questionnaire | 50 |

**ARTICLE VII Conditions to Closing** .............................................**50**

| 7.1 | Conditions to Obligations of the Parties | 51 |
| 7.2 | Conditions to Obligations of the Company | 51 |
| 7.3 | Conditions to Obligations of Investor | 54 |
| 7.4 | Frustration of Closing Conditions | 55 |

**ARTICLE VIII Termination of Agreement** .............................................**56**

8.1      Termination by Investor................................................................56
8.2      Termination by the Company .......................................................57
8.3      Termination by Mutual Agreement .............................................58
8.4      Effect of Termination...................................................................58
8.5      Damages Upon Termination ........................................................58

**ARTICLE IX Tax Matters................................................................60**

9.1      Transfer Taxes .............................................................................60

**ARTICLE X Miscellaneous and General .................................................60**

10.1     Successors and Assigns.................................................................60
10.2     Third Party Beneficiaries .............................................................60
10.3     No Survival of Representations and Warranties ...........................60
10.4     Further Assurances.......................................................................60
10.5     Notices .........................................................................................61
10.6     Entire Agreement .........................................................................63
10.7     Captions; Interpretation ...............................................................63
10.8     Amendment...................................................................................63
10.9     Waiver...........................................................................................64
10.10    Governing Law; Submission to Jurisdiction................................64
10.11    Waiver of Jury Trial .....................................................................64
10.12    Severability ..................................................................................65
10.13    Counterparts .................................................................................65
10.14    Specific Performance ...................................................................65
10.15    Disclosure ....................................................................................66
10.16    Noteholders' Representative .........................................................66

**EXHIBITS**

| Exhibit A | - | Plan Term Sheet |
| Exhibit B | - | Form of the Bidding Procedures |
| Exhibit C | - | Sample Calculation of Closing Working Capital |
| Exhibit D | - | Common Interest Agreement |
| Exhibit E | - | [Intentionally Omitted] |
| Exhibit F | - | Form of Opinion for Amended Notes |
| Exhibit G | - | Terms of Amended Notes |
| Exhibit H | - | Diligence Questionnaire |
| Exhibit I | - | DIP Motion |

**SCHEDULES**

| Schedule 1.1(a) | - | First Day Motions |
| Schedule 1.1(b) | - | Management Services Agreements |
| Schedule 1.1(d) | - | Executory Contracts and Leases |
| Schedule 4.3(b) | - | Capitalization of Subsidiaries |
| Schedule 4.4(a) | - | Breaches and Defaults |

Schedule 4.4(b)        -    Government Authority and Contractual Consents
Schedule 4.5(c)        -    Material Liabilities
Schedule 4.7           -    Taxes
Schedule 4.8(a)        -    Leased Real Property
Schedule 4.8(b)        -    Owned Real Property
Schedule 4.10(a)(i)    -    Purchased Intellectual Property
Schedule 4.10(a)(ii)   -    Intellectual Property Claims or Proceedings
Schedule 4.11(a)       -    Material Contracts
Schedule 4.11(b)       -    Enforceability of Material Contracts
Schedule 4.12          -    Insurance
Schedule 4.13          -    Litigation and Orders
Schedule 4.14          -    Compliance with Law
Schedule 4.15          -    Permits
Schedule 4.16          -    Labor Matters
Schedule 4.17(a)       -    Employee Benefit Plans
Schedule 4.17(g)       -    Post-Termination Employee Benefits
Schedule 4.17(i)       -    Payments Under Employee Benefit Plans
Schedule 4.18          -    Environmental Matters
Schedule 4.20(a)       -    Top Managed Practices
Schedule 4.20(b)       -    Material Suppliers
Schedule 4.21          -    Brokers
Schedule 5.3(b)        -    Required Filings and Consents of Investor
Schedule 5.5(c)        -    Material Liabilities of Investor and its Subsidiaries
Schedule 5.8           -    Capitalization of Parent and Investor
Schedule 6.4           -    Interim Operations of the Company
Schedule 6.13          -    Capitalization of the Company
Schedule 7.3(l)        -    Excluded Management Services Agreements
Schedule 7.3(m)        -    Additional Delivery

## INVESTMENT AGREEMENT

This INVESTMENT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), is dated as of June 22, 2013, by and between OnCure Holdings, Inc., a Delaware corporation (the "Company"), and Radiation Therapy Services, Inc., a Florida corporation ("Investor"). Capitalized terms used, but not otherwise defined in this Agreement, shall have the respective meanings ascribed to such terms in Section 1.1.

## RECITALS

**WHEREAS**, the Company has implemented a financial restructuring of its existing debt, equity and other obligations by commencing cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to pursue confirmation of a chapter 11 plan of reorganization on terms and conditions that are consistent in all material respects with Exhibit A attached hereto and on terms and conditions otherwise reasonably acceptable to Investor (the "Plan", and such restructuring that is contemplated by the Plan, the "Restructuring");

**WHEREAS**, on or prior to the date hereof, the Consenting Debtholders consented in writing to the Company's execution and delivery of this Agreement and its consummation of the transactions contemplated herein; and

**WHEREAS**, subject to the entry of the Confirmation Order and in accordance with the terms and conditions set forth in this Agreement, upon the effective date of the Plan (the "Effective Date"), Investor shall buy from the Company, and the Company shall issue and sell to Investor, 100% of the shares of the reorganized Company's common stock, par value $0.001 per share (collectively, the "Shares"), to be newly issued pursuant to the terms of the Plan (the "Issuance").

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and subject to the terms and conditions set forth herein, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Definitions.  For purposes of this Agreement:

"Accounting Firm" means a nationally recognized accounting firm jointly selected by the Noteholders' Representative and Investor; provided, however, that if the Noteholders' Representative and Investor cannot jointly agree on an Accounting Firm, the Noteholders' Representative and Investor shall each submit to their respective accountants the name of an accounting firm (which shall not be either of their respective accounting firms), and the Accounting Firm shall be selected by lot from these two firms by the respective accountants of the Noteholders' Representative and Investor.

"<u>Affiliate</u>" means, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with such Person.  For purposes of this definition, "control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with an agreement, arrangement or other understanding (written or oral); and the terms "controlling" and "controlled" shall have meanings correlative to the foregoing.

"<u>Agreed Principles</u>" means GAAP, as applied by the Company in connection with the preparation of the Audited Financial Statements.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Agreement Motion</u>" has the meaning set forth in <u>Section 6.3</u>.

"<u>Agreement Order</u>" means an order entered by the Bankruptcy Court granting the relief requested in the Agreement Motion for the approval of the Bidding Procedures and authorization to pay the Break Up Fee and the Transaction Expenses in accordance with the terms of (and subject to the conditions and limitations set forth in) this Agreement, which order shall be in form and substance reasonably acceptable to Investor.

"<u>Amended Note Documents</u>" means, collectively, the Amended Notes, the indenture governing the Amended Notes, the Amended Note Guarantees, and each other agreement (including any security agreement, pledge agreement, access agreement, control agreement and other collateral document), certificate, document, guarantee or instrument executed and/or delivered in connection with any of the foregoing.

"<u>Amended Note Guarantees</u>" has the meaning set forth in <u>Section 7.2(i)</u>.

"<u>Amended Notes</u>" has the meaning set forth in <u>Section 7.3(d)</u>.

"<u>Ancillary Agreement</u>" means the Restructuring Support Agreement, the Escrow Agreement, the Common Interest Agreement, and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Investor or the Company in connection with the consummation of the transactions contemplated by this Agreement, in each case only as applicable to the relevant party or parties to such Ancillary Agreement, as indicated by the context in which such term is used.

"<u>Audited Financial Statements</u>" has the meaning set forth in <u>Section 4.5(a)</u>.

"<u>Balance Sheet Date</u>" has the meaning set forth in <u>Section 4.5(a)</u>.

"<u>Bankruptcy Code</u>" has the meaning given to such term in the recitals to this Agreement.

"<u>Bankruptcy Court</u>" has the meaning given to such term in the recitals to this Agreement.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as

amended from time to time, applicable to the Chapter 11 Cases and any Local Rules of the Bankruptcy Court.

"<u>Bidding Procedures</u>" means the bidding, auction and notice procedures consistent in all material respects with the procedures set forth on <u>Exhibit B</u> attached hereto.

"<u>Break Up Fee</u>" has the meaning set forth in <u>Section 8.5(a)</u>.

"<u>Business</u>" has the meaning set forth in <u>Section 4.22(d)</u>.

"<u>Business Day</u>" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the City of New York in the State of New York.

"<u>Cash</u>" means, as of any time, all cash and all cash equivalent assets of the Company and its Subsidiaries as of such time (reduced by any certificates of deposit, bankers' acceptances or other restricted cash and any outstanding checks and transfers, but including any checks received and deposited by the Company or its Subsidiaries in the ordinary course of business prior to the Closing Date), determined on a consolidated basis in accordance with GAAP.

"<u>Chapter 11 Cases</u>" has the meaning given to such term in the recitals to this Agreement.

"<u>Closing</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Closing Inquiry Date</u>" has the meaning set forth in <u>Section 6.8</u>.

"<u>Closing Statement</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Closing Working Capital</u>" means Net Working Capital as of immediately prior to the Closing but after giving effect to (i) the releases, discharges, compromises, settlements, injunctions and restructurings of fees, costs, expenses, claims, liabilities and obligations of the Company and its Subsidiaries under the Plan, as well as making pro forma adjustments for any fees, costs, expenses or claims that are (w) not included in current liabilities of the Company or its Subsidiaries, (x) liabilities of the Company immediately prior to the Closing, (y) not satisfied in cash pursuant to the Plan or payable from, or covered by, a reserve that has been established under the Plan or an Order of the Bankruptcy Court and (z) will be included in current liabilities of the Company or its Subsidiaries immediately following the Closing Date, and (ii) all distributions made under the Plan on account of fees, costs, expenses, claims, liabilities and obligations of the Company and its Subsidiaries, but not giving effect to any other transactions, events, actions, omissions, circumstances or matters that occur after the Closing. Any fees, costs, expenses, claims, liabilities and obligations of the Company and its Subsidiaries which are (a) paid at or before the Closing, (b) payable from, or are covered by, a reserve that has been established under the Plan or an Order of the Bankruptcy Court, or (c) described in the second sentence of the definition of "Selling Expenses" shall not be included in Closing Working Capital. In addition, for purposes of calculating Closing Working Capital, the current assets of the Company and its Subsidiaries shall be increased, on a dollar-for-dollar basis, by an amount equal to the aggregate amount of fees, costs, expenses and/or claims paid in cash by the

Company or any of its Subsidiaries after the Petition Date and prior to the Closing for any of the items described in the second sentence of the definition of "Selling Expenses". A sample calculation of Closing Working Capital, based on the information included in the Audited Financial Statements, is attached as <u>Exhibit C</u> attached hereto.

"<u>Closing Working Capital Lower Target</u>" means an amount equal to (a) the Target Working Capital <u>minus</u> (b) $500,000.

"<u>Closing Working Capital Upper Target</u>" means an amount equal to (a) the Target Working Capital <u>plus</u> (b) $500,000.

"<u>CMS</u>" has the meaning set forth in <u>Section 1.1</u> in the definition of "Investor MAE".

"<u>CMS MAE</u>" has the meaning set forth in <u>Section 1.1</u> in the definition of "Investor MAE".

"<u>COBRA</u>" has the meaning set forth in <u>Section 4.17(f)</u>.

"<u>Code</u>" means the United States Internal Revenue Code of 1986.

"<u>Common Interest Agreement</u>" means an agreement substantially in the form of <u>Exhibit D</u> attached hereto.

"<u>Company</u>" has the meaning set forth in the preamble.

"<u>Company Debt</u>" means, as of any time, all Indebtedness (including accrued and unpaid interest thereon) of the Company and its Subsidiaries as at such time determined on a consolidated basis in accordance with GAAP. As used herein, the term "<u>Indebtedness</u>" means, with respect to any Person as at any time of determination, without duplication, (a) all indebtedness and other obligations of the Person for borrowed money (including all obligations for principal, interest, premiums, penalties, fees, expenses, breakage costs and bank overdrafts thereunder), (b) all indebtedness and other obligations of the Person evidenced by any bonds, debentures, notes or other similar instruments or debt securities, (c) any indebtedness guaranteed in any manner by the Person or any commitment by which the Person assures any other Person against loss with respect to Indebtedness (including contingent reimbursement obligations with respect to letters of credit), (d) all obligations of the Person secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on any property or assets owned or acquired by, or equity securities of, the Person, (e) any off balance sheet financing, including synthetic leases and project financing, (f) all obligations under capitalized leases required to be recorded as capital leases by GAAP, (g) any payment obligations in respect of banker's acceptances or letters of credit, (h) any liability with respect to interest rate swaps, collars, caps and similar hedging obligations, (i) all obligations for the deferred and unpaid purchase price of property or services, including any "earn-out" payments payable with respect to acquisitions (contingent or otherwise) (excluding any trade accounts payable), (j) any and all amounts payable pursuant to that certain letter agreement, dated as of January 17, 2013, by and between the Company and Match Point Partners, LLC (including the completion fee contemplated thereby), and (k) the retention bonuses owed to each of William

Pegler and Timothy Peach pursuant to their respective retention letter agreements with the Company, each dated as of September 1, 2011.

"Company's Knowledge" or words of similar import, when used in connection with any representation and warranty contained in Article IV, means the actual (but not constructive or imputed) knowledge as of the date of this Agreement of Bradford C. Burkett, William Pegler, Timothy Peach and Peter Kase (such persons, collectively, the "Knowledge Members"), without any implication of verification or investigation concerning such knowledge.

"Computer Systems" has the meaning set forth in Section 4.10(b).

"Confidentiality Agreement" has the meaning set forth in Section 6.6(b).

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to Investor.

"Consent" means any consent, approval, authorization, qualification, waiver or registration required to be obtained from, filed with or delivered to any Person.

"Consenting Debtholders" means those holders of the Notes and other Indebtedness of the Company and/or its Subsidiaries parties to the Restructuring Support Agreement as "Consenting Debtholders" thereunder; provided, that the Consenting Debtholders shall include, as a minimum, the holders of two-thirds of the aggregate principal amount of Notes outstanding from time to time.

"Contemplated Transactions" means, collectively, the Restructuring Transactions and the Issuance.

"Contracts" means all oral or written contracts, leases, licenses, indentures, notes, bonds, loans, instruments, undertakings, commitments and other agreements or arrangements (including any exhibits, supplements, amendments and other modifications thereto).

"Controlled Group" means any trade or business (whether or not incorporated) or other Person at any relevant time (a) under common control within the meaning of Section 4001(b)(1) of ERISA with the Company or any of its Subsidiaries or (b) that together with the Company or any of its Subsidiaries is or was treated as a single employer under Section 414 of the Code.

"Data Room" means (a) the virtual data room established by the Company in connection with the Contemplated Transactions and (b) the virtual data room used by the Company to post its annual report, quarterly reports, current reports and other related information concerning the Company.

"Diligence Questionnaire" has the meaning set forth in Section 6.14.

"DIP Credit Agreement" has the meaning set forth in Section 6.4.

"DIP Motion" has the meaning set forth in Section 6.4(c).

"<u>DIP Order</u>" has the meaning set forth in <u>Section 6.5</u>.

"<u>Disclosing Party</u>" has the meaning set forth in <u>Section 6.8</u>.

"<u>Disclosure Statement</u>" means the disclosure statement that relates to the Plan, as such disclosure statement may be amended, modified or supplemented (including all exhibits, term sheets and schedules annexed thereto or referred to therein).

"<u>Dispute Notice</u>" has the meaning set forth in <u>Section 2.3(b)</u>.

"<u>Disputed Item</u>" has the meaning set forth in <u>Section 2.3(b)</u>.

"<u>Effective Date</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Employee Plan</u>" or "<u>Employee Plans</u>" has the meaning set forth in <u>Section 4.17(a)</u>.

"<u>End Date</u>" has the meaning set forth in <u>Section 6.1(d)</u>.

"<u>Environment</u>" means soil, surface waters, groundwater, land, stream, sediments, surface or subsurface strata, ambient air, indoor air or indoor air quality, including any material or substance used in the physical structure of any building or improvement.

"<u>Environmental Law</u>" means any Law that relates to worker health and safety, public health and safety, or the pollution or protection of the Environment.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974.

"<u>Escrow Account</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Escrow Agent</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Escrow Agreement</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Escrow Amount</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Estimated Closing Statement</u>" has the meaning set forth in <u>Section 2.2(b)</u>.

"<u>Estimated Working Capital</u>" has the meaning set forth in <u>Section 2.3(c)</u>.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934 and the rules and regulations of the SEC thereunder.

"<u>Final Order</u>" means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court) that:  (a) is in full force and effect; (b) is not stayed; and (c) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari; <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed

-6-

relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order.

"Final Purchase Price" has the meaning set forth in Section 2.3(c).

"Final Statement" has the meaning set forth in Section 2.3(b).

"Final Working Capital" has the meaning set forth in Section 2.3(c).

"Financial Statements" has the meaning set forth in Section 4.5(a).

"Financing Documents" has the meaning set forth in Section 1.1 in the definition of "Financing Transactions".

"Financing Transactions" means, collectively, (a) the execution and/or delivery of the Amended Notes, the Amended Note Guarantees, the Specified Intercreditor Agreements, the Specified Consents and the Specified Amendments, and all agreements, instruments and documents in connection therewith or contemplated thereby (collectively, the "Financing Documents"), and the consummation of the transactions contemplated thereby, and (b) the obtaining of any Specified Consents.

"First Day Motions" means any motion listed on Schedule 1.1(a) attached hereto.

"GAAP" means United States generally accepted accounting principles (as in effect from time to time) applied on a consistent basis.

"General Enforceability Exceptions" has the meaning set forth in Section 4.2.

"Government Reimbursement Programs" has the meaning set forth in Section 4.22(c).

"Governmental Authority" means any government or political subdivision, whether federal, state, local or foreign, or any agency or instrumentality of any such government or political subdivision, or any federal, state, local or foreign court or arbitrator.

"Hazardous Material" means any pollutant, hazardous material or toxic substance, including asbestos and asbestos-containing materials, hazardous waste, hazardous material, hazardous substance, contaminant, petroleum, or petroleum-containing materials, radiation and radioactive materials and polychlorinated biphenyls, as defined in, or which would reasonably be expected to give rise to liability under, any Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Inconsistent Transaction" means any direct or indirect (through any Person) acquisition, divestiture, sale, business combination, restructuring or reorganization of or involving all or substantially all of the consolidated assets of the Company and its Subsidiaries or all or substantially all of the equity securities of the Company and its Subsidiaries, in either case, whether proposed to be effected pursuant to a merger, consolidation, share exchange, amalgamation or plan of reorganization, other than the Restructuring or any other transaction

-7-

with Investor or any of its Affiliates.  A Stand-Alone Plan shall not be deemed an Inconsistent Transaction.

"Indebtedness" has the meaning set forth in Section 1.1 in the definition of "Company Debt".

"Initial Purchase Price" has the meaning set forth in Section 2.2(b).

"Inquiry Period" has the meaning set forth in Section 6.8.

"Intellectual Property" means any and all patents and patent applications; trademarks, service marks, trade names, brand names, trade dress, slogans, logos and Internet domain names and uniform resource locators and the goodwill associated with any of the foregoing; inventions (whether patentable or not), industrial designs, discoveries, improvements, ideas, designs, models, formulae, patterns, compilations, data collections, drawings, blueprints, mask works, devices, methods, techniques, processes, know-how, proprietary information, customer and supplier lists, software, technical and other information and trade secrets; copyrights, copyrightable works, and rights in databases and data collections; moral and economic rights of authors and inventors; other intellectual or industrial property rights and foreign equivalent or counterpart rights and forms of protection of a similar or analogous nature to any of the foregoing or having similar effect in any jurisdiction throughout the world; and any issuances, registrations and applications for registration of, any of the foregoing, including any renewals, extensions, continuations (in whole or in part), divisionals, re-examinations or reissues or equivalent or counterpart thereof; and all documentation and embodiments of the foregoing.

"Interim Financial Statements" has the meaning set forth in Section 4.5(a).

"Investor" has the meaning set forth in the preamble.

"Investor Audited Financial Statements" has the meaning set forth in Section 5.5(a).

"Investor Credit Documents" means, collectively, (a) the Credit Agreement, dated as of May 10, 2012, by and among Investor, certain Affiliates of Investor parties thereto, Wells Fargo Bank, National Association as "Administrative Agent" and "Collateral Agent" thereunder, the financial institutions parties thereto as "Lenders" thereunder, and the other Persons parties thereto, and (b) the other "Loan Documents" (as defined in such Credit Agreement), in each case, as amended, supplemented, amended and restated, renewed, extended, replaced, refinanced or otherwise modified from time to time.

"Investor Debt" has the meaning set forth in Section 5.8.

"Investor Financial Statements" has the meaning set forth in Section 5.5(a).

"Investor Financing Documents" means, collectively, (a) the Investor Credit Documents, (b) the Investor Secured Notes Documents, (c) the Investor Subordinated Notes Documents, and (d) any other agreements, documents or instruments that are material to Parent and its Subsidiaries (taken as a whole) or Investor and its Subsidiaries (taken as a whole) and that evidence or govern any Indebtedness of Parent, Investor or any of their respective Subsidiaries.

"Investor Interim Financial Statements" has the meaning set forth in Section 5.5(a).

"Investor MAE" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate with any other changes, effects, events, occurrences, facts or developments, has had or would reasonably be expected to have a material adverse effect on the business, assets, liabilities, operations, results of operations or financial condition of (x) Parent or any of its Subsidiaries (taken as a whole) or (y) Investor or any of its Subsidiaries (taken as a whole); provided, that none of the following will be deemed, either alone or in combination to constitute, and none of the following will be taken into account in determining whether there has been, an Investor MAE: any change, effect, event, occurrence, state of facts or development (a) resulting from any adverse change or disruption in the financial, credit, capital or securities markets or the economy in general, (b) arising out of, resulting from or attributable to changes in applicable Laws or changes in accounting standards, requirements or principles (including GAAP), (c) affecting companies in the free standing outpatient radiation oncology treatment center industry, (d) arising out of, resulting from or attributable to any natural disaster or any acts of terrorism, sabotage, military action or war (whether or not declared) or any escalation or worsening thereof, whether or not occurring or commenced before or after the date of this Agreement, (e) resulting from any failure by Parent or Investor to meet any internal or published projections, forecasts or revenue or earnings predictions for any period ending on or after the date of this Agreement; provided, that the underlying causes of such failures shall be included in determining whether there has been an Investor MAE (unless such underlying causes are otherwise excluded from consideration by one or more of the other clauses set forth in this definition), (f) resulting from any national or international political or social conditions, including the engagement by the United States or any other country in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or any other country, or any of their respective territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States or any other country, (g) related to any damages to any of Parent's or Investor's real or personal property, solely to the extent such damages are fully covered by Parent's or Investor's insurance policies or (h) arising out of, resulting from or attributable to the announcement, execution or performance of this Agreement or the consummation of the Contemplated Transactions or the identity of the Company or any of its Affiliates; provided, that, with respect to each of clauses (a), (b), (c) and (f) above, any such change, effect, event, occurrence, state of facts or development shall only be disregarded and not taken into account in determining whether an Investor MAE has occurred to the extent (and solely to the extent) that such change, effect, event, occurrence, state of facts or development does not have, and would not reasonably be expected to have, a materially disproportionate adverse effect on Parent, Investor and/or any Subsidiary of Parent or Investor relative to the other participants in the industries in which Parent, Investor or any of their respective Subsidiaries conduct their respective businesses. Notwithstanding anything to the contrary herein, if the Centers for Medicare & Medicaid Services ("CMS"), in its proposed physician fee schedule included in its proposed rule addressing changes to payment policies applicable to radiation oncology services (which is expected to be announced on or about July 1, 2013), sets forth a cumulative combined impact to radiation oncology equal to or greater than ten percent (10%), then such event shall be deemed to constitute an "Investor MAE" (such event, a "CMS MAE"); provided, however, that a CMS MAE shall cease to be an Investor MAE for all purposes of this

Agreement, and a CMS MAE shall not be taken into account in determining whether there has been an Investor MAE, on and at all times after 11:59 p.m. prevailing Eastern Time on the tenth (10th) day following the date of issuance or publication by CMS of such proposed rule.  For the purposes of clarity, the comparable number released by CMS in its proposed rules in 2012 applicable to services furnished in the 2013 calendar year was 15%, as set forth in the Federal Register, Volume 77, No. 146, dated July 30, 2012 in Table 84, under the specialty "Radiation Oncology" and in the column "Total (Cumulative Impact)".

"Investor Secured Notes Documents" means, collectively, (a) the Indenture, dated as of May 10, 2012, by and among Investor, certain Affiliates of Investor parties thereto, and Wilmington Trust, National Association as "Trustee" and "Collateral Agent" thereunder, and (b) the other "Note Documents" (as defined in such Indenture), in each case, as amended, supplemented, amended and restated, renewed, extended, replaced, refinanced or otherwise modified from time to time.

"Investor Subordinated Notes Documents" means, collectively, (a) the Indenture, dated as of April 20, 2012, by and among Investor, certain Affiliates of Investor parties thereto, and Wells Fargo Bank, National Association as "Trustee" thereunder, and (b) the "Notes" (as defined in such Indenture), in each case, as amended, supplemented, amended and restated, renewed, extended, replaced, refinanced or otherwise modified from time to time.

"IRS" means the United States Internal Revenue Service.

"Issuance" has the meaning set forth in the recitals to this Agreement.

"Knowledge Members" has the meaning set forth in Section 1.1 in the definition of "Company's Knowledge".

"Law" means any law (including common law), statute, code, ordinance, rule, resolution, executive order, Order or regulation of any Governmental Authority.

"Leased Real Property" has the meaning set forth in Section 4.8.

"Leases" means all leases, subleases, licenses, concessions and other Contracts (written or oral) pursuant to which the Company or any of its Subsidiaries holds any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of the Company and/or any of its Subsidiaries thereunder.

"Liens" means any mortgage, lien, pledge, security interest, option, right-of-way, right of setoff, claim, charge, easement, option or other similar encumbrance.

"Majority Consenting Debtholders" means the Consenting Debtholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes held by all of the Consenting Debtholders.

"Managed Practice" means any medical professional association, professional corporation, partnership or similar entity that provides medical services at a center, clinic or other facility operated or managed by the Company or any of its Subsidiaries pursuant to a

Management Services Agreement, or at a hospital or hospital department with which the Company or any of its Subsidiaries has a Management Services Agreement.

"Management Services Agreements" means all of the management services agreements to which the Company or any of its Subsidiaries is a party and pursuant to which the Company or the applicable Subsidiary provides management and/or administrative services and other related services to the applicable Managed Practice; provided, however, that, upon delivery of the Disclosure Schedules by the Company to Investor, "Management Services Agreements" shall mean those management services agreements set forth on Schedule 1.1(b).

"Material Adverse Effect" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate with any other changes, effects, events, occurrences, facts or developments, has had or would reasonably be expected to have a material adverse effect on the business, assets, liabilities, operations, results of operations or financial condition of the Company or any of its Subsidiaries (taken as a whole); provided, that none of the following will be deemed, either alone or in combination to constitute, and none of the following will be taken into account in determining whether there has been, a Material Adverse Effect: any change, effect, event, occurrence, state of facts or development (a) resulting from any adverse change or disruption in the financial, credit, capital or securities markets or the economy in general, (b) arising out of, resulting from or attributable to changes in applicable Laws or changes in accounting standards, requirements or principles (including GAAP), (c) affecting companies in the free standing outpatient radiation oncology treatment center industry, (d) arising out of, resulting from or attributable to the announcement, execution or performance of this Agreement or the consummation of the Contemplated Transactions or the identity of Investor or any of its Affiliates, (e) arising out of, resulting from or attributable to any natural disaster or any acts of terrorism, sabotage, military action or war (whether or not declared) or any escalation or worsening thereof, whether or not occurring or commenced before or after the date of this Agreement, (f) resulting from any failure by the Company or any of its Subsidiaries to meet any internal or published projections, forecasts or revenue or earnings predictions for any period ending on or after the date of this Agreement; provided, that the underlying causes of such failures shall be included in determining whether there has been a Material Adverse Effect (unless such underlying causes are otherwise excluded from consideration by one or more of the other clauses set forth in this definition), (g) resulting from any national or international political or social conditions, including the engagement by the United States or any other country in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or any other country, or any of their respective territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States or any other country, (h) arising out of or resulting from the commencement of the Chapter 11 Cases, or (i) related to any damages to any of the Company's or any of its Subsidiaries' real or personal property, solely to the extent such damages are fully covered by the Company's or any of its Subsidiaries' insurance policies; provided, that, with respect to each of clauses (a), (b), (c) and (g) above, any such change, effect, event, occurrence, state of facts or development shall only be disregarded and not taken into account in determining whether a Material Adverse Effect has occurred to the extent (and solely to the extent) that such change, effect, event, occurrence, state of facts or development does not have, and would not reasonably be expected to have, a materially disproportionate adverse effect

-11-

on the Company and/or any Subsidiary of the Company relative to the other participants in the industries in which the Company and its Subsidiaries conduct their respective businesses. Notwithstanding anything to the contrary herein, a CMS MAE shall be deemed to constitute a "Material Adverse Effect"; provided, however, that a CMS MAE shall cease to be a Material Adverse Effect for all purposes of this Agreement, and a CMS MAE shall not be taken into account in determining whether there has been a Material Adverse Effect, on and at all times after 11:59 p.m. prevailing Eastern Time on the tenth (10th) day following the date of the issuance or publication by CMS of its proposed rule addressing changes to payment policies applicable to radiation oncology services.  For the purposes of clarity, the comparable number released by CMS in its proposed rules in 2012 applicable to services furnished in the 2013 calendar year was 15%, as set forth in the Federal Register, Volume 77, No. 146, dated July 30, 2012 in Table 84, under the specialty "Radiation Oncology" and in the column "Total (Cumulative Impact)".

"Material Contracts" has the meaning set forth in Section 4.11(a).

"Material Suppliers" has the meaning set forth in Section 4.20(b).

"Monthly Financial Statements" has the meaning set forth in Section 6.10.

"Net Working Capital" means, as of any time, the amount of (a) the Company's and its Subsidiaries' current assets (net of related reserves and excluding Cash, intercompany receivables, and deferred Tax assets) minus (b) the Company's and its Subsidiaries' current liabilities (including all deferred revenue and accrued Selling Expenses, but excluding (i) all Company Debt, (ii) income or other Tax liabilities, (iii) accrued but unpaid interest relating to Company Debt, (iv) management fee accruals (to the extent not otherwise included in Company Debt) and (v) intercompany payables), in each case, as of such time and calculated on a consolidated basis in accordance with the Agreed Principles.

"Noteholders' Representative" means any Person or Persons designated in writing as the "Noteholders' Representative" from time to time by the Majority Consenting Debtholders.

"Notes" means the 11-3/4% Senior Secured Notes due 2017 issued by the Company under the Notes Indenture, as amended, supplemented, amended and restated, renewed, extended, replaced, refinanced or otherwise modified from time to time.

"Notes Indenture" means the Indenture, dated as of May 13, 2010, by and among the Company, the Subsidiaries of the Company parties thereto, and Wilmington Trust, National Association (successor by merger to Wilmington Trust FSB) as "Trustee" and "Collateral Agent" thereunder, as amended, supplemented, amended and restated, renewed, extended, replaced, refinanced or otherwise modified from time to time.

"Notice" shall have the meaning set forth in Section 10.5.

"Order" means any order, judgment, ruling, decree, injunction, assessment, award, charge or writ of any Governmental Authority.

-12-

"Overage" has the meaning set forth in Section 2.2(a)(i).

"ordinary course of business" means, the operation of the Company and its Subsidiaries in the usual and ordinary course in a manner substantially consistent with past custom and practice and normal day to day operations (taking into account the effects on such operations resulting from the Company's financial condition and the diligence, negotiation, preparation and/or consummation of the Restructuring Transactions).

"Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement), in each case to which such Person is a party or to which such Person is bound.

"Owned Real Property" has the meaning set forth in Section 4.8.

"Owner" shall have the meaning set forth in Section 1.1 in the definition of "Subsidiary".

"Parent" means Radiation Therapy Services Holdings, Inc., a Delaware corporation.

"Permits" means any license, permit, authorization, certificate of authority, qualification or similar document or authority that has been issued or granted by any Governmental Authority.

"Permitted Liens" means (a) Liens arising under agreements governing the Company Debt, (b) Liens for Taxes not yet due and payable or delinquent (or which may be paid without interest or penalties) or the validity or amount of which are being contested in good faith by appropriate proceedings, (c) Liens arising under conditional sales contracts and equipment leases with third parties, (d) mechanics', materialman's, workmens', repairmen's, warehousemen's, supplier's, vendor's, carriers' or other similar Liens arising or incurred in the ordinary course of business by operation of Law securing amounts that are not yet due and payable, (e) easements, covenants, conditions and restrictions of record affecting title to the Owned Real Property or Leased Real Property which do not or would not materially impair the use or occupancy of any Owned Real Property or Leased Real Property in the operation of the business conducted thereon, (f) any zoning or other governmentally established restrictions or encumbrances which are not violated by the current use or occupancy of any Owned Real Property or Leased Real Property or the operation of the business of the Company and/or any of its Subsidiaries conducted thereon, (g) all purchase money Liens (including Liens securing obligations to pay the deferred and unpaid purchase price of property acquired by the Company and/or any of its Subsidiaries in the ordinary course of business), (h) Liens that do not materially impair the current use or value of any of the properties or assets of the Company or any of its Subsidiaries, (i) Liens in favor of a bank or other financial institution encumbering deposits or other funds maintained with a bank or other financial institution, (j) Liens that will be terminated at or prior to the Closing, and (k) Liens arising out of, under or in connection with applicable federal, state and/or local securities Laws.

"Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, unincorporated society or association, trust or other legal entity or Governmental Authority.

"Petition Date" means June 14, 2013.

"Plan" has the meaning set forth in the recitals to this Agreement.

"Proceeding" means any suit, complaint, claim, litigation, prosecution, cause of action, audit, investigation, legal proceeding, administrative enforcement proceeding or arbitration proceeding before any Governmental Authority.

"Purchase Price" has the meaning set forth in Section 2.2(a)(ii).

"Purchased Intellectual Property" means all Intellectual Property owned, used or held for use by the Company or any of its Subsidiaries, including all rights of the Company or its Subsidiaries therein to sue and collect damages for past, present or future infringement, misappropriation or other violation of such Intellectual Property.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing, migrating or dumping of a Hazardous Material (including drums or containers of Hazardous Materials) into the Environment.

"Representatives" means, with respect to any Person, such Person's Affiliates and its and their respective officers, directors, managers, employees, agents, counsel, accountants, financial advisors, investment bankers, lenders, equity partners, consultants and other representatives.

"Restructuring" has the meaning given to such term in the recitals to this Agreement.

"Restructuring Support Agreement" means the Restructuring Support Agreement, dated as of June 14, 2013, by and among the Company and the Consenting Debtholders as amended, restated, supplemented or otherwise modified from time to time; provided, that the Restructuring Support Agreement shall not be amended, restated, supplemented or otherwise modified without Investor's prior written consent to the extent that such amendment, restatement, supplement or modification would materially and adversely affect Investor.

"Restructuring Transactions" means all of the transactions contemplated by this Agreement, the Plan and the Restructuring Support Agreement, other than the Issuance.

"SEC" means the U.S. Securities and Exchange Commission.

"SEC Reports" has the meaning set forth in Section 5.9(a).

"Securities Act" means the Securities Act of 1933, as amended, and the rules promulgated pursuant thereto.

"Selling Expenses" means all fees, costs and expenses incurred by or on behalf of the Company and/or any of its Subsidiaries arising from the preparation, execution, performance

-14-

and/or consummation of this Agreement, the Ancillary Agreements, the Plan and the Restructuring Transactions (including the Closing) (including any change of control, success, retention or similar bonus payable to any employee or other service provider to the Company or any of its Subsidiaries arising as a result of the Contemplated Transactions, including any amounts payable pursuant to Schedule 7.3(m), in each case, which fees, costs and expenses are not either (a) paid at or before the Closing or (b) payable from, or covered by, a reserve that has been established under the Plan or an Order of the Bankruptcy Court. Notwithstanding the foregoing, "Selling Expenses" shall not include any fees, costs, expenses or claims that (i) are incurred in connection with the Financing Transactions, (ii) Investor is responsible or liable for pursuant to the terms of this Agreement or any of the other Ancillary Agreements (including any Transfer Taxes and all filing fees in connection with any filings, applications or submissions under the HSR Act or any other applicable competition Laws), (iii) are associated with or arise from any executory Contracts or unexpired Leases that Investor requests in writing to be rejected, except with respect to related fees, costs, expenses or claims related to the rejection of the executory Contracts or Leases set forth on Schedule 1.1(d) hereto (which shall be deemed to be "Selling Expenses" hereunder), (iv) are incurred in connection with any Proceeding regarding the severability of a Management Services Agreement and any of the leases that relate to the Managed Practice associated with such Management Services Agreement, or (v) are incurred in connection with the termination of the operations of any Managed Practice as a result of the rejection of the related Management Services Agreement.

"Shares" has the meaning set forth in the recitals to this Agreement.

"Shortfall" has the meaning set forth in Section 2.2(a)(ii).

"Specified Amendments" has the meaning set forth in Section 7.2(g).

"Specified Consents" has the meaning set forth in Section 7.2(f).

"Specified Intercreditor Agreement" has the meaning set forth in Section 7.2(h).

"Specified Representatives" has the meaning set forth in Section 6.14.

"Stand-Alone Plan" means any transaction involving all or substantially all of the consolidated assets of the Company and/or its Subsidiaries or all or substantially all of the equity securities of the Company and/or its Subsidiaries pursuant to any stand-alone plan of reorganization among the Company and the Company's debt or equityholders.

"Start Date Meeting" has the meaning set forth in Section 6.14.

"Subsidiary" means, with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held by the Owner or one or more of its Subsidiaries.

-15-

"Target Working Capital" means an amount equal to $11,500,000.

"Tax" means (a) any income, alternative or add-on minimum, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, escheat, environmental, windfall profit, customs duty, estimated capital stock, social security (or similar), unemployment, disability, registration, or other tax, duty, charge, assessment, fee, levy or other governmental charge in the nature of a tax, together with any interest, penalties, additions to tax or additional amounts imposed by any Governmental Authority, (b) any liability for or in respect of the payment of any amount of a type described in clause (a) of this definition as a result of being a member of an affiliated, combined, consolidated, unitary or other group for Tax purposes, or (c) any liability for or in respect of the payment of any amount described in clauses (a) or (b) of this definition as a transferee or successor under applicable Law.

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Top Managed Practices" has the meaning set forth in Section 4.20(a).

"Transaction Expenses" means the reasonable and documented fees, costs, expenses, disbursements and charges of Investor paid or payable to third parties (that are not Affiliates of Investor) incurred in connection with the diligence, negotiation, preparation or implementation (including legal, accounting, restructuring, business strategy, advisory and consulting services) of this Agreement or any of the transactions contemplated herein or by the Plan, which shall include but is not limited to, the reasonable and documented fees, costs and expenses of the advisors, agents and Representatives of Investor (that are not Affiliates of Investor) (including, for the avoidance of doubt, the reasonable and documented fees, costs and expenses of each of Kirkland & Ellis LLP, Deloitte & Touche LLP, Millstein & Co. L.P., K&L Gates LLP and Alvarez & Marsal).

"Transfer Taxes" has the meaning set forth in Section 9.1.

"Update MAE" has the meaning set forth in Section 6.8.

"Update MAE Determination Period" has the meaning set forth in Section 6.8.

"Update MAE Notice" has the meaning set forth in Section 6.8.

"Update Recipient" has the meaning set forth in Section 6.8.

"Updated Company Knowledge" has the meaning set forth in Section 6.8.

"Updated Schedules" has the meaning set forth in Section 6.8.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

"willful and intentional breach" has the meaning set forth in Section 8.5(c).

## ARTICLE II
## SALE AND PURCHASE

2.1    Purchase and Sale of the Shares.  On the terms, subject to the conditions and limitations, and in reliance on the representations and warranties, set forth in this Agreement (including the entry of the Confirmation Order by the Bankruptcy Court and the Confirmation Order becoming a Final Order), Investor hereby agrees to purchase at the Closing, and the Company hereby agrees to sell, issue and deliver to Investor at the Closing, for an aggregate purchase price equal to the Purchase Price, the Shares free and clear of any and all Liens (other than Permitted Liens).

2.2    Purchase Price.

(a)    In full consideration for the issuance, sale and delivery of the Shares, on the terms, and subject to the conditions and limitations set forth herein, the aggregate consideration to be paid to the Company shall be an amount in cash equal to $42,500,000:

(i)    plus the amount, if any, by which the Closing Working Capital exceeds the Target Working Capital (the "Overage"); provided that there shall be no such increase unless the amount of the Closing Working Capital exceeds the Closing Working Capital Upper Target, in which case, the full amount of the Overage shall be added thereto; or

(ii)    minus the amount, if any, by which the Target Working Capital exceeds the Closing Working Capital (the "Shortfall"); provided that there shall be no such decrease unless the Closing Working Capital Lower Target exceeds the amount of the Closing Working Capital, in which case, the full amount of the Shortfall shall be deducted therefrom (such amount, as adjusted pursuant to Section 2.3, the "Purchase Price").

(b)    Not later than five (5) days prior to the Closing Date, the Company shall deliver to Investor a statement (the "Estimated Closing Statement") containing (i) the Company's good faith estimate of the Closing Working Capital (including each component thereof) and (ii) a calculation of the Purchase Price based on such estimate based on the provisions of Sections 2.2(a)(i) and 2.2(a)(ii) (the "Initial Purchase Price").

(c)    At the Closing, on the terms, and subject to the conditions and limitations set forth herein, Investor shall pay to the Company, in cash by bank wire transfer of immediately available funds to an account or accounts designated by the Company at least two (2) Business Days prior to Closing, an aggregate amount in cash equal to (i) the Initial Purchase Price minus (ii) the Escrow Amount.

2.3    Purchase Price Adjustment.

-17-

(a)     Within 75 days after the Closing Date, Investor shall prepare and deliver to the Noteholders' Representative a statement (the "Closing Statement") containing (i) the Company's determination of the actual Closing Working Capital (including each component thereof) and (ii) a calculation of the Purchase Price based on such actual Closing Working Capital based on the provisions of Sections 2.2(a)(i) and 2.2(a)(ii).

(b)     Within 75 days following receipt by the Noteholders' Representative of the Closing Statement, the Noteholders' Representative shall deliver written notice to Investor of any dispute it has with respect to the preparation or content of, or any other items or matters set forth in, the Closing Statement (a "Dispute Notice"). Any amount, determination or calculation contained in the Closing Statement and not specifically disputed in a timely delivered Dispute Notice shall be final, conclusive and binding on the parties. If the Noteholders' Representative does not deliver to Investor a Dispute Notice within such 75-day period, such Closing Statement will be final, conclusive and binding on the parties. If the Noteholders' Representative does deliver to Investor a Dispute Notice within such 75-day period, Investor and the Noteholders' Representative shall negotiate in good faith to resolve each disputed amount, determination, calculation, item or other matter raised therein (each, a "Disputed Item"). If Investor and the Noteholders' Representative, notwithstanding such good faith effort, fail to resolve such dispute within 30 days after Investor's receipt of the Dispute Notice, Investor and the Company shall jointly engage the Accounting Firm to resolve each outstanding Disputed Item.   The Accounting Firm shall be instructed by Investor and the Noteholders' Representative to use every reasonable effort to review and resolve such Disputed Items (acting as an expert and not an arbitrator) and to deliver a written report containing its calculation of each Disputed Item (in each case, calculated in accordance with this Agreement and determined within the range of dispute between the Closing Statement and the Dispute Notice) within 45 days of engagement. All Disputed Items that are resolved between Investor and the Noteholders' Representative or are determined by the Accounting Firm will be final, conclusive and binding on the parties absent manifest error.   Until the Accounting Firm makes its determination of the Closing Working Capital, the costs and expenses of the Accounting Firm shall be borne equally by Investor, on the one hand, and the Company, on the other hand; provided that, upon the issuance of its determination of the Closing Working Capital, any costs and expenses (including costs and expenses previously advanced) of the Accounting Firm shall be borne pro rata by Investor, on the one hand, and the Company, on the other hand, in proportion to the difference between (x) the Final Purchase Price and (y) the Final Purchase Price that would have resulted from the use of the proposed calculations of Investor, on the one hand, and the Noteholders' Representative, on the other hand. For example, if the Final Purchase Price that would have resulted based on the Closing Statement delivered by Investor pursuant to Section 2.3(a) was $500,000 less than the Final Purchase Price (as finally determined), but the Final Purchase Price that would have resulted based on the adjustments set forth in the Dispute Notice delivered by the Noteholders' Representative pursuant to Section 2.3(b) was $250,000 more than the Final Purchase Price (as finally determined), Investor will pay 2/3 of such costs and expenses, and the Company will pay 1/3 of such costs and expenses. Any costs and expenses to be paid by the Company pursuant to this Section 2.3(b) shall be satisfied with a portion of

-18-

the Escrow Amount , and Investor and the Noteholders' Representative shall execute and deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to distribute a portion of the Escrow Amount to satisfy such costs and expenses concurrently with the payments that are made pursuant to Section 2.3(e) or Section 2.3(f), as the case may be (or if no such payments are to be made, within five (5) Business Days after the date on which the Final Purchase Price is determined) finally determined pursuant to Section 2.3(c); provided, however, that if the Noteholders' Representative has not become a party to the Escrow Agreement in accordance with the terms thereof, the Company shall execute and  deliver such joint written instructions in lieu of the Noteholders' Representative, but such joint written instructions shall not be delivered by Investor and/or the Company to the Escrow Agent without the prior written consent of the Noteholders' Representative (such consent not to be unreasonably withheld, delayed or conditioned). The "Final Statement" shall be deemed to be (i) the Closing Statement if no Dispute Notice is delivered by the Noteholders' Representative within the 75-day period specified in this Section 2.3(b), (ii) the Closing Statement if the Noteholders' Representative notifies Investor in writing that the Noteholders' Representative agrees with the Closing Statement in its entirety at any time during the 75-day period specified in this Section 2.3(b), or (iii) if a Dispute Notice is delivered by the Noteholders' Representative within the 75-day period specified in this Section 2.3(b), the Closing Statement as adjusted by (A) the written agreement of the Noteholders' Representative and Investor and/or (B) the written determination of the Accounting Firm.

(c)    Within five (5) Business Days after the date on which the Closing Statement becomes the Final Statement in accordance with Section 2.3(b), the Initial Purchase Price shall be increased (if the Adjustment Amount as determined in accordance with this Section 2.3(c) is greater than zero) or decreased (if the Adjustment Amount as determined in accordance with this Section 2.3(c) is less than zero) by the Adjustment Amount. The "Adjustment Amount" shall equal the sum of: (i) the difference between the Closing Working Capital set forth on the Final Statement (the "Final Working Capital") and the Target Working Capital, expressed as (A) a positive number if the Final Working Capital is more than $500,000 greater than the Target Working Capital, (B) a negative number if the Target Working Capital exceeds the Final Working Capital by more than $500,000 or (C) zero if the Final Working Capital is not more than $500,000 greater or less than the Target Working Capital, plus (ii) the difference between the Target Working Capital and the Closing Working Capital set forth on the Estimated Closing Statement (the "Estimated Working Capital"), expressed as (A) a negative number if the Estimated Working Capital is more than $500,000 greater than the Target Working Capital, (B) a positive number if the Target Working Capital exceeds the Estimated Working Capital by more than $500,000 or (C) zero if the Estimated Working Capital is not more than $500,000 greater or less than the Target Working Capital.

The Initial Purchase Price, as so adjusted pursuant to this Section 2.3(c) (or not adjusted after application of the provisions of this Section 2.3(c)), is referred to herein as the "Final Purchase Price".

(d)    Access.  For purposes of complying with the terms set forth in this Section 2.3, each party shall reasonably cooperate with and make available to the other

party and its Representatives, and, subsequent to the Closing Date, Investor shall (and Investor shall cause the Company and its Subsidiaries to) reasonably cooperate with and make available to the Noteholders' Representative, all information, records, data and working papers and shall permit access to its facilities and personnel, as may be reasonably required in connection with the preparation and analysis of the Estimated Closing Statement and the Closing Statement and the resolution of any disputes thereunder.

(e)     <u>Downward Adjustment</u>.  If the Final Purchase Price (as finally determined pursuant to <u>Section 2.3(c)</u>) is less than the Initial Purchase Price paid on the Closing Date, then, within five (5) Business Days after the date on which the Final Purchase Price is finally determined pursuant to <u>Section 2.3(c)</u>, Investor shall receive the amount of such shortfall, by wire transfer of immediately available funds, to be disbursed from the funds remaining in the Escrow Account to an account designated in writing by Investor to the Noteholders' Representative and the Company prior to the date such payment is due hereunder, and Investor and the Noteholders' Representative shall execute and deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to distribute funds from the Escrow Account (to the extent remaining) in the amount of such shortfall to such designated account; <u>provided</u>, <u>however</u>, that if the Noteholders' Representative has not become a party to the Escrow Agreement in accordance with the terms thereof, the Company shall execute and  deliver such joint written instructions in lieu of the Noteholders' Representative, but such joint written instructions shall not be delivered by Investor and/or the Company to the Escrow Agent without the prior written consent of the Noteholders' Representative (such consent not to be unreasonably withheld, delayed or conditioned).  For the avoidance of doubt, in no event shall (i) the amount payable to Investor pursuant to this <u>Section 2.3(e)</u> exceed the Escrow Amount and (ii) neither Investor nor any of its Affiliates shall have any right, or be entitled, to pursue any amount payable to Investor pursuant to <u>Section 2.3(e)</u> against the Noteholders' Representative, any holder of the Notes or any other creditor of the Company.

(f)     <u>Upward Adjustment</u>.  If the Final Purchase Price (as finally determined pursuant to <u>Section 2.3(c)</u>) is greater than Initial Purchase Price paid on the Closing Date, then Investor shall pay, or cause to be paid, an amount in cash equal to such excess, to the Company within five (5) Business Days from the date on which the Final Purchase Price is finally determined pursuant to <u>Section 2.3(c)</u> by bank wire transfer of immediately available funds, and the Company shall, and Investor shall cause the Company to, immediately distribute such amount pursuant to the terms of the Plan.

2.4     <u>Transaction Expenses</u>.

(a)     If this Agreement is terminated pursuant to <u>Section 8.1(b)</u>, <u>8.1(c)</u> (unless such termination is due to the existence of a CMS MAE), <u>8.1(f)</u> or <u>8.2(a)</u>, then (subject to <u>Section 2.4(b)</u>) all accrued and unpaid Transaction Expenses incurred up to (and including) the date of such termination shall be paid in full promptly after such termination (but in any event within two (2) Business Days after such termination), but only after invoices are presented to the Company, and without Bankruptcy Court review or further Bankruptcy Court order, but in accordance with the Plan; <u>provided</u>, <u>however</u>,

that, notwithstanding anything to the contrary herein, if at the time of any such termination described in this Section 2.4(a) Investor is also in material breach of this Agreement such that any of the conditions set forth in Section 7.2(d) or Section 7.3(e) would not be satisfied, Investor shall have no right to reimbursement for, or otherwise be paid in respect of, any Transaction Expenses. All Transaction Expenses of Investor that are payable by the Company shall be paid to Investor (or its designee) in cash by wire transfer of immediately available funds to the account(s) specified by Investor. For the avoidance of doubt, Investor shall not be entitled to receive payment of any Transaction Expenses, and the Company shall not be required to pay any Transaction Expenses to Investor, if this Agreement is terminated by Investor as a result of, or on account of, a CMS MAE.

(b)    The amount of Transaction Expenses reimbursable and payable pursuant to this Section 2.4 shall not exceed $2,000,000.00 in the aggregate.

(c)    The obligations set forth in this Section 2.4 are in addition to, and do not limit, the Company's obligations under Article VIII.

(d)    Amounts required to be paid by the Company pursuant to this Section 2.4 shall constitute allowed superpriority administrative expenses under the Bankruptcy Code (which shall be an administrative expense claim of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code).

2.5    Deposit.

(a)    On the date of this Agreement, the Company and Investor shall enter into an escrow agreement (the "Escrow Agreement") with JPMorgan Chase Bank, National Association (the "Escrow Agent"), and prior to 5:00 p.m. (prevailing Eastern Time) on June 24, 2013, Investor shall deposit in cash an amount equal to $5,000,000.00 (together with all interest and other earnings accrued thereon that have not been otherwise distributed in accordance with the Escrow Agreement, the "Escrow Amount") to an escrow account (the "Escrow Account") to be established and maintained with the Escrow Agent pursuant to the terms of the Escrow Agreement. Upon the written request of the Noteholders' Representative, the Company shall immediately assign any or all of its rights under the Escrow Agreement to the Noteholders' Representative pursuant to the terms of Section 11 of the Escrow Agreement, including compliance by the Noteholders' Representative with the last sentence of Section 11 thereof.

(b)    Upon (i) the termination of this Agreement for any reason other than pursuant to Section 8.2(b) or Section 8.2(c), the remaining Escrow Amount shall be distributed to Investor and Investor shall have no further obligation or liability of any kind whatsoever to any Person except as otherwise set forth in Article VIII, or (ii) the determination of the Final Purchase Price (as finally determined pursuant to Section 2.3(c)), on the terms, and subject to the conditions and limitations set forth herein, and subject to the prior payment of any amounts that are payable from the Escrow Account pursuant to Section 2.3(b) and/or Section 2.3(e), the remaining Escrow Amount shall be distributed to the Company, by bank wire transfer of immediately available

-21-

funds, and the Company shall, and Investor shall cause the Company to, immediately distribute such remaining Escrow Amount pursuant to the terms of the Plan. Promptly following any such termination referred to in clause (i) of the immediately preceding sentence or any such determination of the Final Purchase Price referred to in clause (ii) of the immediately preceding sentence, Investor and the Noteholders' Representative shall execute and deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to distribute the Escrow Amount in accordance with the terms of the immediately preceding sentence; provided, however, that if the Noteholders' Representative has not become a party to the Escrow Agreement in accordance with the terms thereof, the Company shall execute and deliver such joint written instructions in lieu of the Noteholders' Representative, but such joint written instructions shall not be delivered by Investor and/or the Company to the Escrow Agent without the prior written consent of the Noteholders' Representative (such consent not to be unreasonably withheld, delayed or conditioned). The Company shall also be entitled to receive the Escrow Amount pursuant to the terms of Section 8.5(c). The fees and charges of the Escrow Agent shall be paid 50% by the Company and 50% by Investor in accordance with the terms of the Escrow Agreement. Anything in this Agreement to the contrary notwithstanding, if the Noteholders' Representative has not become a party to the Escrow Agreement in accordance with the terms thereof at or following the Closing, neither the Company nor Investor shall instruct or otherwise direct the Escrow Agent to release and/or distribute any funds from the Escrow Account without the prior written consent of the Noteholders' Representative (such consent not to be unreasonably withheld, delayed or conditioned).

2.6    Use of Proceeds. The Company shall apply the net proceeds from the sale of the Shares pursuant to this Agreement (including any proceeds received pursuant to Section 2.3(f) and clause (ii) of Section 2.5(b)) in accordance with the terms of the Plan, including if applicable, to fund the payment of claims and administrative claims as provided in the Plan.

## ARTICLE III
## CLOSING AND DELIVERIES

3.1    Closing. The closing of the purchase and sale of the Shares hereunder (the "Closing") will occur at 10:00 a.m. (prevailing Eastern Time) on the Effective Date, subject to the satisfaction or waiver (by the party having the benefit of any such condition) of all conditions to Closing set forth in Article VII (other than those conditions that are to be satisfied at the Closing), or at such other time, on such other date or in such other manner as the parties mutually agree in writing (the "Closing Date"). All proceedings to be taken and all documents to be executed and delivered by the parties at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

3.2    Deliveries by the Company. At the Closing, the Company shall deliver or cause to be delivered to Investor the following items:

(a)    original corporate record books and stock record books of the Company and its Subsidiaries that are in the possession or control of the Company (or make such

-22-

record books otherwise available if a delivery at Closing would not be reasonably practicable);

(b)    the original stock certificates representing the Shares;

(c)    a certificate of good standing for the Company and each of its Subsidiaries issued by the applicable Governmental Authority of the jurisdiction of organization or formation of the Company and each such Subsidiary; and

(d)    a certificate from an officer of the Company, given by or on behalf of the Company and not in his or her individual capacity, to the effect that the conditions set forth in Sections 7.3(g), 7.3(i) and 7.3(j) have been satisfied.

3.3    <u>Deliveries by Investor</u>.  At the Closing, Investor shall deliver to the Company (or, in the case of <u>Section 3.3(f)(i)</u>, the Persons set forth therein) the following items:

(a)    the Initial Purchase Price <u>minus</u> the Escrow Amount, paid in accordance with <u>Section 2.2(c)</u>;

(b)    the certificate of incorporation (or equivalent document) of Investor certified by the Secretary of State of its jurisdiction of incorporation and a copy of the bylaws (or equivalent document) of Investor, certified by an officer of Investor on behalf of Investor and not in his or her individual capacity;

(c)    a certificate of good standing for Investor and each of the other Subsidiaries of Parent issued by the Secretary of State of such Person's jurisdiction of organization or formation;

(d)    a certified copy of the resolutions (or written consent) of the board of directors (or comparable governing body) of Investor and each of the other Subsidiaries of Parent authorizing the execution and delivery of this Agreement, the Ancillary Agreements and the Financing Documents to which Investor and/or such Subsidiary is a party, and the consummation of the Contemplated Transactions and the Financing Transactions;

(e)    a certificate of an officer of Investor, given on behalf of Investor and not in his or her individual capacity, to the effect that the conditions set forth in Sections 7.2(d), 7.2(e) and 7.2(m) have been satisfied; and

(f)    (i) the unpaid fees, costs, expenses and disbursements of Stroock & Stroock & Lavan LLP, counsel to the Consenting Debtholders, and GLC Advisors & Co., LLC, financial advisor to the Consenting Debtholders, in an aggregate amount not to exceed $1,500,000, such amounts to be paid by wire transfer in immediately available funds to the account(s) designated for such Persons in writing to Investor prior to the Closing Date; and (ii) all fees, costs, expenses and disbursements previously paid by the Company to Stroock & Stroock & Lavan LLP, counsel to the Consenting Debtholders, and GLC Advisors & Co., LLC, financial advisor to the Consenting Debtholders, in an

-23-

aggregate amount not to exceed (x) $1,500,000 *less* (y) such amounts paid by Investor pursuant to Section 3.3(f)(i) (which amount shall in no event be less than $0.00), such amounts to be paid by wire transfer in immediately available funds to the account designated by the Company in writing to Investor prior to the Closing Date.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in (a) the schedules to this Agreement delivered by the Company to Investor within ten (10) Business Days after the date hereof or subsequently delivered to Investor in accordance with Section 6.8 (collectively, the "Disclosure Schedules"), (b) the Data Room and (c) the Plan, the Company hereby represents and warrants to Investor as of the date of the delivery of the applicable Disclosure Schedules and as of the Closing as follows:

4.1    Existence and Good Standing.  The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and the Company is duly qualified to do business, and in good standing, in each jurisdiction in which the character of the properties owned or leased by it or in which the conduct of its business requires it to be so qualified, except where the failure to be so qualified or to be in good standing would not have a Material Adverse Effect. Each Subsidiary of the Company (a) is duly organized and formed, validly existing and in good standing under the laws of its jurisdiction of formation, (b) has all requisite power and authority to own its properties and to carry on its businesses as now conducted and (c) is qualified to do business and is in good standing in every jurisdiction in which the property owned, leased or held for use by it or the conduct of its business as now conducted requires it to qualify, except in each such case where the failure to be so qualified would not have a Material Adverse Effect. To the Company's Knowledge, the copies of the governing documents of the Company and its Subsidiaries which have been furnished to Investor reflect all amendments made thereto and are true, complete and correct copies of the originals thereof.

4.2    Validity and Enforceability.  Subject to entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order, the Company has the requisite power and authority (a) to enter into, execute and deliver this Agreement, the Ancillary Agreements and the Plan and (b) to consummate the Contemplated Transactions, and has taken all necessary corporate action required for (i) the due authorization, execution and delivery of this Agreement and the Ancillary Agreements, (ii) the due authorization, execution and filing with the Bankruptcy Court of the Plan and (iii) the performance and consummation of the Contemplated Transactions.  Subject to entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order, this Agreement and each of the Ancillary Agreements have been duly executed and delivered by the Company and, assuming due authorization, execution and delivery by Investor, represent the legal, valid and binding obligation of the Company, enforceable against it in accordance with their respective terms, except as limited by (y) applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally from time to time in effect and (z) the availability of equitable remedies (regardless of whether enforceability is considered in a proceeding at law or in equity) (collectively, the "General Enforceability Exceptions").  The Plan, upon being entered by the Bankruptcy Court, will be duly executed and delivered by the Company and its

-24-

Subsidiaries, and, subject to entry of the Confirmation Order, the Plan will constitute the legal, valid and binding obligation of the Company and its Subsidiaries, enforceable against the Company and its Subsidiaries in accordance with its terms.

       4.3    <u>Capitalization of the Company and its Subsidiaries</u>.

       (a)    As of the date hereof, the authorized capital stock of the Company consists of 50,000,000 shares of common stock, $0.001 par value per share, of which 26,317,673 are issued and outstanding, and all of which are duly authorized, validly issued, fully paid and nonassessable, and 1,000,000 shares of preferred stock, $0.001 par value per share, of which no shares are issued and outstanding.

       (b)    <u>Schedule 4.3(b)</u> sets forth for each Subsidiary of the Company, in each case, as of the date hereof (i) its name and jurisdiction of incorporation or organization, (ii) the number of authorized shares (or equivalent) for each class of its capital stock or other ownership interest, (iii) the number of issued and outstanding shares (or equivalent) of each class of its capital stock or other ownership interest, the names of the holders thereof and the number of shares (or equivalent) held by each such holder and (iv) the number of shares (or equivalent) of its capital stock or other ownership interest held in treasury. To the Company's Knowledge, all of the issued and outstanding shares (or equivalent) of capital stock or other ownership interest of each Subsidiary of the Company have been duly authorized and are validly issued, and, if applicable, are fully paid and non-assessable. To the Company's Knowledge, there are no authorized or outstanding options, warrants, calls, subscriptions, equity appreciation, phantom equity or other rights relating to the capital stock or other ownership interest of any Subsidiary of the Company or with respect to which any Subsidiary may be obligated to issue or sell any shares of capital stock or other ownership interests of such Subsidiary. The Company directly or indirectly owns all of the issued and outstanding shares of capital stock of each Subsidiary (free and clear of all Liens other than Permitted Liens).

       4.4    <u>No Conflict; Required Filings and Consents</u>.

       (a)    To the extent any such breach, default, right or violation described below is valid and enforceable under applicable Law, including the Bankruptcy Code, neither the execution and delivery of this Agreement, any Ancillary Agreement or the Plan by the Company, nor the consummation by the Company of the Contemplated Transactions, nor compliance by the Company with any term, condition or provision hereof, will, directly or indirectly, (i) conflict with, constitute or otherwise result in a breach of any term, condition or provision of the Organizational Documents of the Company or any of its Subsidiaries, (ii) except as set forth in <u>Schedule 4.4(a)</u>, and subject to the entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order, constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation, modification or acceleration with respect to, or result in the creation or imposition of a Lien upon any property or assets of the Company or any of its Subsidiaries, pursuant to any Material Contract to which any of them is a party, or (iii) subject to receipt of the requisite approvals referred to in <u>Schedule 4.4(b)</u>, violate any Order or Law applicable to the Company or any of its

Subsidiaries or pursuant to which any of their respective properties, assets, rights or interests may be subject, except in the case of clause (ii) and (iii), where any such breach, default, right or violation would not reasonably be expected to have a Material Adverse Effect.

(b)    Other than as set forth in Schedule 4.4(b) and entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order, no Consent of any Governmental Authority is required to be obtained by the Company for the consummation by the Company of the Contemplated Transactions, except for such Consent the failure of which to be obtained would not reasonably be expected to have a Material Adverse Effect.

4.5    Financial Statements.

(a)    Copies of the following financial statements have been delivered to Investor or have been made available to Investor for its review: (i) the audited consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2010, December 31, 2011, and December 31, 2012 (the "Balance Sheet Date"), and the related audited consolidated statements of income, Company' equity, and cash flows for the years then ended, together with the notes thereto (the "Audited Financial Statements"), and (ii) the unaudited consolidated balance sheet of the Company and its Subsidiaries as of March 31, 2013, and the related unaudited consolidated statements of income for the 3-month period then ended (the "Interim Financial Statements", and together with the Audited Financial Statements, the "Financial Statements").

(b)    The Audited Financial Statements have been prepared in accordance with GAAP and fairly present, in all material respects, the financial position, results of operations, shareholders' equity, and cash flows of the Company and its Subsidiaries on a consolidated basis, as of the date and for the period indicated.  The Interim Financial Statements have been prepared by management in accordance with GAAP applied consistently with the Audited Financial Statements (except for the absence of footnote disclosure, which, if presented would not provide information materially different than the information set forth in such Interim Financial Statements, and year-end adjustments, the effect of which will not, individually or on the aggregate, be materially adverse).  The Financial Statements were derived from the books and records of the Company and its Subsidiaries.

(c)    Except as set forth on Schedule 4.5(c), none of the Company or any of its Subsidiaries has any material liabilities that would be required to be reflected in, or reserved against, or otherwise described on, a balance sheet prepared in accordance with GAAP, other than (i) liabilities that are set forth on the face of, or quantified in the footnotes to, the Interim Financial Statements, (ii) liabilities incurred since the date of the Interim Financial Statements, (iii)  liabilities arising since the Balance Sheet Date (none of which is a liability resulting from tort, infringement or violation of Law), and (iv) liabilities or obligations incurred in connection with the Contemplated Transactions and the Financing Transactions.

4.6    <u>Conduct of Business</u>.  Since the Balance Sheet Date through the Petition Date, there has not been any event, change or circumstance that has had, or would be reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.7    <u>Taxes</u>.  To the Company's Knowledge and except as set forth on <u>Schedule 4.7</u>:

(a)    Each of the Company and each of its Subsidiaries has filed all federal income and all other material Tax Returns that it was required to file and has paid all Taxes required to be paid, whether or not such Taxes are shown or are required to be shown on any Tax Return. All such Tax Returns are true, correct and complete in all material respects.  The Company and each of its Subsidiaries has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, except as would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

(b)    Neither the Company nor any of its Subsidiaries has agreed to any extension or waiver of the statute of limitations applicable to any material Tax, or agreed to any extension of time with respect to a material Tax assessment or deficiency, which period (after giving effect to such extension or waiver) has not yet expired.

(c)    There are no Liens for unpaid Taxes (other than Taxes not yet due and payable) on the assets of the Company or any of its Subsidiaries.

(d)    There is no Proceeding currently pending or, to the Company's Knowledge, threatened with respect to the Company or any of its Subsidiaries in respect of any Tax that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No written claim has ever been made by a Governmental Authority in a jurisdiction where the Company or any of its Subsidiaries does not file Tax Returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction, except as would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

(e)    Neither the Company nor any of its Subsidiaries (i) has been a member of an affiliated group of corporations within the meaning of Section 1504 of the Code (other than a group the common parent of which is the Company) or (ii) has any material liability for Taxes of any Person (other than the Company and its Subsidiaries) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. law), as a transferee, successor, by Contract or otherwise.

(f)    Neither the Company nor any of its Subsidiaries has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction occurring during the last three (3) years that was purported or intended to be governed in whole or in part by Section 355 or 361 of the Code.

(g)    Neither the Company nor any of its Subsidiaries will be required to include any item of income in, or to exclude any item of deduction from, taxable income

for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method, or use of an improper method, of accounting, (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. income Tax law), (iii) intercompany transaction or excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or non-U.S. income Tax law), (iv) installment sale or open transaction disposition made on or prior to the Closing Date, (v) prepaid amount received on or prior to the Closing Date or (vi) election under Section 108(i) of the Code.

(h)    Since the Balance Sheet Date, neither the Company nor any of its Subsidiaries has made or changed any Tax election, changed an annual accounting period, adopted or changed any accounting method, filed any amended Tax Return, entered into any closing agreement, settled any Tax claim or assessment, surrendered any right to claim a refund of Taxes or consented to any extension or waiver of the limitation period applicable to any Tax claim or assessment.

(i)    Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this <u>Section 4.7</u> and <u>Section 4.17</u> are the sole representations and warranties of the Company relating to Taxes.

4.8    <u>Real Property</u>.  <u>Schedule 4.8(a)</u> contains a true and complete list of all real property owned by the Company or any of its Subsidiaries ("<u>Owned Real Property</u>"). <u>Schedule 4.8(b)</u> contains a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each leasehold or subleasehold estate and all other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by the Company and/or any of its Subsidiaries (the "<u>Leased Real Property</u>").  To the Company's Knowledge, the Company has delivered to Investor a true and complete copy of each such Lease and in the case of any oral Lease, a written summary of the material terms of such Lease.  To the Company's Knowledge and except as set forth in <u>Schedule 4.8(b)</u>, with respect to each of the Leases: (a) the Company's or any of its Subsidiary's possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed and there are no material disputes with respect to such Lease; (b) neither the Company nor any of its Subsidiaries has subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (c) neither the Company nor any of its Subsidiaries has collaterally assigned or granted any other security interest in such Lease or any interest therein; and (d) there are no Liens on the estate or interest created by such Lease, other than Permitted Liens. The owned real property listed on <u>Schedule 4.8(a)</u> and the Leased Real Property listed on <u>Schedule 4.8(b)</u> comprise all real property interests used or held for use in the conduct of the business and operations of the Company and/or any of its Subsidiaries as now conducted.

4.9    <u>Personal Property</u>.  Except as would not reasonably be expected to have a Material Adverse Effect, the Company and/or its Subsidiaries have (a) good and valid title to all of the material properties and material assets, tangible or intangible, reflected in the Financial Statements as being owned by the Company and/or any of its Subsidiaries and (b) a valid leasehold interest in all material assets leased by it, in each case, free and clear of all Liens

except for Permitted Liens, excluding properties and assets sold or disposed of by the Company or its Subsidiaries since the Balance Sheet Date. All items of personal property which, individually or in the aggregate, are material to the Company or its Subsidiaries, are in good condition and in a state of good maintenance and repair (ordinary wear and tear are excepted) and are suitable for all purposes currently used.

4.10    Intellectual Property.

(a)    To the Company's Knowledge, Schedule 4.10(a)(i) contains a complete list of all patented, registered or applied for all material Purchased Intellectual Property owned by the Company or any of its Subsidiaries. The Company or its Subsidiaries is the sole owner of (free and clear of all Liens) all right, title and interest in and to, or has the right to use pursuant to a valid and enforceable license, all Purchased Intellectual Property.  To the Company's Knowledge and except as set forth on Schedule 4.10(a)(ii), neither the Company nor any of its Subsidiaries has received within the last year any written notice of any Proceeding and there is no threatened Proceeding pending against the Company or any of its Subsidiaries, asserting that any use of the Purchased Intellectual Property, or the conduct of the businesses of the Company or any of its Subsidiaries, infringes, misappropriates or otherwise violates the Intellectual Property of any Person.    To the Company's Knowledge and except as set forth on Schedule 4.10(a)(ii), (i) the conduct of the businesses of the Company or its Subsidiaries has not infringed, misappropriated or otherwise violated any Intellectual Property of any Person, and (ii) no Person has infringed, misappropriated or otherwise violated any of the Purchased Intellectual Property.

(b)    To the Company's Knowledge, the computer systems, including the software, firmware, hardware, networks, interfaces and related systems (collectively, the "Computer Systems") owned or leased by the Company or any of its Subsidiaries that are used or held for use in the conduct of their respective businesses are sufficient for the immediate needs of such businesses, and in the last six (6) months, there have been no material failures, substandard performance or other similar material adverse events with respect to any Computer Systems that have not been remedied or replaced in all material respects.  The Computer Systems and the Purchased Intellectual Property will continue to be owned or available for use by the Company and its Subsidiaries on the same terms and conditions after Closing as they were prior to Closing, except where the failure to own or possess any such rights would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.11    Material Contracts.

(a)    Set forth on Schedule 4.11(a) is a list of the following Contracts to which the Company and/or any of its Subsidiaries is a party or by which any or their respective properties or assets are bound (the "Material Contracts"):

(i)    the Management Services Agreements;

-29-

(ii)    each partnership, collaboration, joint development, strategic alliance or joint venture Contract or other Contract for the sharing of profits;

(iii)    each management, consulting, severance or similar Contract, and each employment Contract;

(iv)    each Contract with a Material Supplier;

(v)    each Contract relating to the acquisition, sale, assignment, disposition or lease of all or a material portion of the assets, business or capital stock of any Person within the last three (3) years (including the Company and/or any of its Subsidiaries);

(vi)    each Contract that contains any non-solicitation, non-competition, confidentiality or similar obligations (other than any Contract with an employee or former employee or with a customer or supplier entered into in the ordinary course of business otherwise described in this clause vi solely because it contains customary restrictions);

(vii)    each Contract pursuant to which the Company or any of its Subsidiaries have granted to, or been granted from, any Person any (x) exclusive license to any Intellectual Property, or (y) material non-exclusive license to any software (other than any unmodified commercially available off-the-shelf software); and

(viii)    each other Contract that involves (x) payments over the life thereof in excess of $500,000 or (y) payments in any one fiscal year in excess of $100,000.

(b)    To the Company's Knowledge and except as set forth on Schedule 4.11(b), each of the Material Contracts is in full force and effect and is a legal, valid and binding Contract or agreement of the Company and/or its Subsidiaries, as applicable, and, there is no material default, violation or breach by the Company and/or any of its Subsidiaries, or, to the Company's Knowledge, any other party thereto, in the timely performance of any material obligation to be performed or paid thereunder or any other material provision thereof, nor does any condition exist that with notice or lapse of time or both would constitute such a material default, violation or breach thereunder by the Company, any of its Subsidiaries or, to the Company's Knowledge, any such other party (as applicable), in each case to the extent such material default, violation or breach is not or cannot be cured under Section 365 of the Bankruptcy Code.  To the Company's Knowledge, except as set forth on Schedule 4.11(b), and to the extent such action is valid and enforceable under applicable Law, including the Bankruptcy Code, neither the Company nor any of its Subsidiaries has received written notice that any party to any Material Contract intends to cancel or terminate any such Material Contract or to not exercise any option to renew thereunder and, to the Company's Knowledge, no party to any Material Contract intends to exercise any right of cancellation, termination, acceleration or modification under any such Material Contract.

-30-

4.12    Insurance.  Schedule 4.12 sets forth, as of the date of this Agreement, all policies of insurance covering the Company and its Subsidiaries and their respective businesses, and, to the Company's Knowledge, as of the date hereof such policies are in full force and effect and all premiums and amounts due and payable thereunder have been paid.

4.13    Litigation and Orders.  To the Company's Knowledge and except as set forth in Schedule 4.13, there are no pending, outstanding or threatened, and for the past twelve (12) months there have been no Proceedings against, (a) the Company or any of its Subsidiaries or any current or former officer, director, employee, consultant, agent or equityholder of the Company or any of its Subsidiaries with respect to the Company, any of its Subsidiaries or their respective businesses or assets, except for (i) the Chapter 11 Cases, (ii) such Proceedings that, if adversely determined, are not covered by insurance of the Company or any of its Subsidiaries, subject to a discharge in the Chapter 11 Cases, and would not, individually or in the aggregate, reasonably be expected to result in (A) liabilities or obligations of any nature of the Company or its Subsidiaries in excess of $1,000,000, and (iii) claims of creditors or other parties in the Chapter 11 Cases, or (b) Proceedings that challenge, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions.  To the Company's Knowledge, neither the Company nor any of its Subsidiaries is subject to any Order, other than Orders of the Bankruptcy Court.

4.14    Compliance with Laws.  To the Company' Knowledge and except as set forth in Schedule 4.14, each of the Company and its Subsidiaries:

     (a)    is, and for the past six (6) months has been, in compliance, in all material respects, with all Laws applicable to its business and/or employees (except for Laws addressed in Section 4.7, Section 4.16, Section 4.17, Section 4.18 and Section 4.22); and

     (b)    has not received any written notification or communication from any Person, and no Proceeding has been filed or otherwise commenced, asserting that the Company or any of its Subsidiaries is not in material compliance with any Law (except for Laws addressed in Section 4.7, Section 4.16, Section 4.17, Section 4.18 and Section 4.22).

4.15    Permits.  To the Company's Knowledge, Schedule 4.15 contains a complete list of all material Permits issued to the Company or its Subsidiaries that are currently used by the Company or any of its Subsidiaries in connection with their respective businesses and, to the Company's Knowledge, such Permits constitute all of the material Permits required for the conduct of the respective businesses of the Company and the Subsidiaries, as applicable, as currently conducted, all of which are valid and in full force and effect except in each such case where the failure to be in full force and effect would not have a Material Adverse Effect. To the Company's Knowledge each of the Company and the Subsidiaries is in material compliance with all such listed Permits and no written notice has been received by the Company or any Subsidiary alleging a default or violation in connection with any such Permit, except such defaults or violations that would not have, nor would reasonably be expected to have, a Material Adverse Effect.  Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this Section 4.15 are the sole representations and warranties of the Company relating to Permits.

4.16    Labor Matters.  Neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or any other Contract or relationship with any labor union or similar employee representative.  To the Company's Knowledge, (a) no labor union or other collective bargaining unit represents any of the Company's or any of its Subsidiaries' employees and (b) there is no union campaign being conducted to solicit cards from employees to authorize a union to request a National Labor Relations Board certifications election with respect to the Company's or any of its Subsidiaries' employees.  Except as set forth on Schedule 4.16, (i) with respect to the employees of the Company and/or any of the Subsidiaries, there is no strike, slowdown, work stoppage, lockout or other material labor dispute underway or, to the Company's Knowledge, threatened, and no such dispute has occurred in the past five years, and (ii) neither the Company nor any Subsidiary has engaged in any unfair labor practices.  Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this Section 4.16 are the sole representations and warranties of the Company relating to labor matters.

4.17    Employee Benefit Plans.

(a)    Schedule 4.17(a) sets forth a complete and correct list of (i) all "employee benefit plans", as defined in Section 3(3) of ERISA, (ii) all other severance pay, salary continuation, bonus, incentive, stock option, equity based retirement, pension, profit sharing or deferred compensation plans, retention, change in control contracts, programs, funds or arrangements of any kind, (iii) all other benefit or compensation plans, Contracts, programs, funds, or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated) and any trust, escrow, or similar agreement related thereto, whether or not funded, and (iv) all employment, consulting or independent contractor agreements (A) in respect of any present or former employees, directors, officers, shareholders, consultants or independent contractors of the Company or any of its Subsidiaries that are sponsored or maintained or contributed or required to be contributed to by the Company or any of its Subsidiaries or (B) with respect to which the Company or any of its Subsidiaries is required to make payments, transfers or contributions or with respect to which, to the Company's Knowledge, the Company or any of its Subsidiaries has any liability or obligation (all of the above being hereinafter individually or collectively referred to as "Employee Plan" or "Employee Plans", respectively).

(b)    Copies of the following materials have been made available to Investor: (i) all current plan documents for each Employee Plan, (ii) all determination letters from the IRS with respect to any of the Employee Plans, if applicable, (iii) all current summary plan descriptions, summaries of material modifications, annual reports, and summary annual reports with respect to the Employee Plans, (iv) all current trust agreements, insurance contracts and other documents relating to the funding or payment of benefits under any Employee Plan, and (v) the two most recent Form 5500 required to be filed for each Employee Plan.

(c)    To the Company's Knowledge, each Employee Plan has been maintained, operated, funded and administered in material compliance with its terms and any related documents or agreements and in material compliance with all applicable Laws other than

noncompliance which would not be reasonably expected to give rise to any material liability on the part of the Company or its Subsidiaries or, as of or subsequent to the Closing Date, the Investor. To the Company's Knowledge, there have been no prohibited transactions or breaches of any of the duties imposed on "fiduciaries" (within the meaning of Section 3(21) of ERISA) by ERISA with respect to the Employee Plans that would result in any material liability or excise Tax under ERISA or the Code being imposed on the Company or any of its Subsidiaries. All material contributions, premiums or other payments under or with respect to each Employee Plan that are due from the Company or any of its Subsidiaries for any time period ending on or before the Closing Date shall have been paid.

(d)    Except as would not reasonably be expected to have a Material Adverse Effect, each Employee Plan intended to be qualified under Section 401(a) of the Code is so qualified, has received a favorable determination letter from the IRS, and each trust created thereunder has been determined by the IRS to be exempt from tax under the provisions of Section 501(a) of the Code, and nothing has occurred that could adversely affect the qualification of such Employee Plan.

(e)    Neither the Company nor, to the Company's Knowledge, any member of the Controlled Group currently has an obligation to contribute to, and neither the Company nor any of its Subsidiaries has any current or potential liability or obligation under or with respect to, a "defined benefit plan" as defined in Section 3(35) of ERISA, a pension plan subject to the funding standards of Section 302 of ERISA or Section 412 of the Code, or a "multiemployer plan" as defined in Section 3(37) of ERISA or Section 414(f) of the Code. To the Company's Knowledge, neither the Company nor any of its Subsidiaries has any current or potential liability or obligation on account of at any time being considered a single employer under Section 414 of the Code with any other Person.

(f)    With respect to each group health plan benefiting any current or former employee of the Company or any of its Subsidiaries that is subject to Section 4980B of the Code, the Company and its Subsidiaries have complied in all material respects with the continuation coverage requirements of Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA ("COBRA").

(g)    Except as set forth on Schedule 4.17(g), no Employee Plan provides benefits, including death or medical benefits, beyond termination of service or retirement other than (i) coverage mandated by COBRA, or (ii) death or retirement benefits under any Employee Plan that is intended to be qualified under Section 401(a) of the Code.

(h)    To the Company's Knowledge, no amount that could be received (whether in cash or property or the vesting of property) as a result of any of the transactions contemplated by this Agreement by any employee, officer or director of the Company or any of its Affiliates who is a "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) under any employment, severance or termination agreement, other compensation arrangement or Employee Plan currently in effect would be characterized as an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code). No individual is entitled to receive any additional payment

-33-

(e.g., a Tax gross-up or other payment) from the Company or any of its Subsidiaries in the event that the excise or penalty tax required by Section 409A of the Code (or any corresponding provision of state, local, or foreign Tax law) is imposed on such individual.

(i)     Except as set forth on Schedule 4.17(i), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will, alone or in connection with any other event: (i) result in a payment (including severance, unemployment compensation or otherwise) becoming due under any Employee Plan; (ii) increase the amount or value of any benefit or compensation otherwise payable under any Employee Plan; or (iii) accelerate the time of payment or vesting, or increase the amount of or result in the funding of, any compensation or benefit due to any Person.

(j)     Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this Section 4.17 are the sole representations and warranties of the Company relating to Employee Plans.

4.18     Environmental.

(a)     Except as set forth on Schedule 4.18 or as would not reasonably be excepted to have a Material Adverse Effect:

(i)     the Company and its Subsidiaries are and have been in compliance with all Environmental Laws, including those applicable to their use and occupation of the Leased Real Property and operation of their respective businesses;

(ii)     neither the Company nor its Subsidiaries has generated, manufactured, refined, transported, treated, stored, handled, arranged for or permitted the disposal of, disposed, transferred, produced, processed or exposed any Person to any Hazardous Materials, and, as of the date of this Agreement, there has been no Release or, to the Company's Knowledge, threat of Release of any Hazardous Material at or in the vicinity of any Leased Real Property, in each case above, that requires reporting, investigation, assessment, cleanup, remediation or any other type of response action by, or would otherwise give rise to any material liability of, the Company or any of its Subsidiaries pursuant to any Environmental Law;

(iii)     neither the Company nor its Subsidiaries has (A) received written notice under the citizen suit provisions of any Environmental Law, (B) received any written request for information, notice, demand letter, administrative inquiry or formal or informal complaint or claim under or relating to any Environmental Law or (C) been subject to or, to the Company's Knowledge, threatened with any governmental or citizen enforcement action, claim or other Proceeding with respect to any Environmental Law;

-34-

(iv)    neither the Company nor any of its Subsidiaries nor, to the Company's Knowledge, any predecessor or affiliate of the Company or any of its Subsidiaries, has manufactured, sold, marketed, installed or distributed products or items containing asbestos or other Hazardous Materials and none of the foregoing Persons have any material liability, contingent or otherwise, with respect to the presence or alleged presence of asbestos or other Hazardous Materials in any product or item or at or upon any property or facility; and

(v)    the Company and its Subsidiaries have obtained all material Permits required under any Environmental Law that are materially necessary for the Company's or its Subsidiaries' activities and operations at the Leased Real Property, and all such Permits are in full force and effect.

(b)    To the Company's Knowledge, the Company and each of its Subsidiaries have made available to Investor all environmental audits, assessments, reports and other documents materially bearing on any environmental, health or safety matters, which are in their possession or under their reasonable control.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this Section 4.18 are the sole representations and warranties of the Company relating to environmental matters.

4.19    Accounts Receivable.  To the Company's Knowledge, all accounts receivable of each of the Company and its Subsidiaries represent bona fide sales actually made in the ordinary course of business or valid claims as to which performance has been rendered by the Company or its Subsidiaries and none of the Company and/or any of its Subsidiaries has increased or extended the payment terms with respect to any such accounts receivables in a manner not consistent with its ordinary course of business.

4.20    Managed Practices and Suppliers.

(a)    Schedule 4.20(a) sets forth the top ten (10) Managed Practices of the Company and its Subsidiaries on a consolidated basis (based on the dollar amount of sales to such customers) for the year ended December 31, 2012 (collectively, the "Top Managed Practices"). To the Company's Knowledge and except as set forth on Schedule 4.20(a), (i) neither the Company nor any of its Subsidiaries has received written notice that any Top Managed Practice intends to terminate its relationship with the Company or such Subsidiary, and (ii) neither the Company nor any of its Subsidiaries is involved in any dispute or disagreement with any Top Managed Practice that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, in each case of clause (i) and clause (ii) to the extent such termination is valid and enforceable under applicable Law, including the Bankruptcy Code.

(b)    Schedule 4.20(b) sets forth the top ten suppliers of the Company and its Subsidiaries on a consolidated basis (based on the dollar amount of purchases from such suppliers) for the year ended December 31, 2012 and each additional supplier who based on such purchases of the Company or any of the Subsidiaries since December 31, 2012

-35-

would reasonably be expected to be a top ten supplier of the Company and its Subsidiaries on a consolidated basis for the year ended December 31, 2013 (the "Material Suppliers").  Except as set forth on Schedule 4.20(b), neither the Company nor any of its Subsidiaries has received written notice, and to the Company's Knowledge no facts or circumstances exist to the effect, that (i) any Material Supplier intends to terminate its relationship with the Company or such Subsidiary, (ii) any dispute exists or is anticipated with any Material Supplier that, individually or in the aggregate, could reasonably be anticipated to be material and adverse to the Company or any of its Subsidiaries, or (iii) any Material Supplier has or may stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to supplying materials, products or services to the Company or any of its Subsidiaries (whether as a result of the consummation of the Contemplated Transactions or otherwise), in each case to the extent such action described above is valid and enforceable under applicable Law, including the Bankruptcy Code.  The terms under which the Material Suppliers supply materials, products or services to the Company and its Subsidiaries are on market terms and are the result of arms'-length transactions.

4.21    Brokers.  Except as set forth on Schedule 4.21, no broker, finder or similar agent has been employed by or on behalf of the Company, and no Person with which the Company has had any dealings or communications of any kind is entitled to any brokerage commission or finder's fee in connection with this Agreement or the Contemplated Transactions.

4.22    Healthcare.

(a)    To the Company's Knowledge, the Company and each of its Subsidiaries, and their respective directors and officers, is, and for the past three (3) years has been, in material compliance with all applicable and material healthcare laws, ordinances, regulations and orders relating to or affecting its healthcare operations, including, but not limited to, Sections 1128A, 1128B, or 1877 of the Social Security Act (42 U.S.C. §§ 1320a-7a, 1320a-7b, and 1395nn), 31 U.S.C. § 3729 et seq. (the Civil False Claims Act), 18 U.S.C. § 1347 (Health Care Fraud), Public Law 104-191 (the Health Insurance Portability and Accountability Act of 1996), fraud and abuse, false claims and anti-self referral Laws and Laws related to the confidentiality, privacy and security of medical information, or to licensing, the corporate practice of medicine, fee-splitting, certificate of need  and reimbursement or billing for healthcare services, except where such noncompliance would not have, nor would reasonably be expected to have, a Material Adverse Effect and, to the Company's Knowledge, neither the Company, any of its Subsidiaries, nor any of the Managed Practices has received any written notice to the contrary. To the Company's Knowledge, each of the Company and its Subsidiaries possess all material Permits, orders and franchises reasonably necessary to own, lease and conduct their respective businesses in the manner and to the full extent now operated, in each case issued by the appropriate Governmental Authority, including, without limitation, the United States Department of Health and Human Services and each other federal, state and local agency, except where the failure to possess such Permits would not reasonably be expected to have a Material Adverse Effect.

(b)    To the Company's Knowledge, the operation of the healthcare business of the Company and its Subsidiaries is in material compliance with the applicable material healthcare Permits, franchises and orders, and no event has occurred which permits (nor has an event occurred which with notice or lapse of time or both would permit) the revocation or termination of any such necessary material Permits, orders or franchises or which might result in any other impairment of the rights of the Company therein or thereunder, except where the failure to so comply or such revocation, termination or impairment would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    Neither the Company nor any of its Subsidiaries participates in any federal healthcare programs, including the Medicare program, the Medicaid program, and the Tricare program (together with their respective intermediaries or carriers, the "Government Reimbursement Programs").

(d)    The Company is not a party to any corporate integrity or similar agreements with any Governmental Agency which apply to its businesses and activities and those of its Subsidiaries (collectively, the "Business").    To the Company's Knowledge, no employee of the Business is excluded from participating in any Government Reimbursement Program, nor to the Company's Knowledge is any such exclusion threatened or pending.    To the Company's Knowledge, none of the officers, directors or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)) of the Company or its Subsidiaries has been excluded from any Government Reimbursement Program, been subject to sanction pursuant to 42 U.S.C. §1320a-7a or 1320a-8, or been convicted of a crime described at 42 U.S.C. §1320a-7b, nor to the Company's Knowledge is any such exclusion, sanction or conviction threatened or pending.    Neither the Company nor its Subsidiaries has been excluded from the Government Reimbursement Programs.

(e)    This Section 4.22 contains the sole representations and warranties of the Company and the Subsidiaries with respect to healthcare regulatory matters.

4.23    Arm's Length.    The Company acknowledges and agrees that Investor is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the Contemplated Transactions (including in connection with determining the terms of the Issuance) and not as a financial advisor or fiduciary to, or agent of, the Company or any other Person.    Additionally, Investor is not advising the Company or any other Person as to any legal, Tax, investment, accounting or regulatory matters in any jurisdiction. The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the Contemplated Transactions, and Investor shall not have any responsibility or liability to the Company with respect thereto.    Any review by Investor of the Company, the Contemplated Transactions or other matters relating to the Contemplated Transactions will be performed solely for the benefit of Investor and shall not be on behalf of the Company.

4.24    No Unlawful Payments.    Except as would not reasonably be expected to create a Material Adverse Effect, neither the Company nor any of its Subsidiaries nor, to the Company's

-37-

Knowledge, any current or former director, officer or employee of the Company or any of its Subsidiaries has, directly or indirectly:  (a) offered, paid, delivered or otherwise used any funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (b) offered, delivered or made any direct or indirect unlawful payment to any official or employee of a Governmental Authority; (c) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977 or any comparable legislation applicable under foreign Law; or (d) offered, delivered, made or received any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

4.25    No Other Representations and Warranties.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE COMPANY MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE COMPANY OR ITS SUBSIDIARIES OR ANY OF THEIR RESPECTIVE ASSETS, LIABILITIES OR OPERATIONS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. INVESTOR HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT TO THE EXTENT SET FORTH IN THIS AGREEMENT, INVESTOR IS ACQUIRING THE SHARES ON AN "AS IS, WHERE IS" BASIS.  THE DISCLOSURE OF ANY MATTER OR ITEM IN ANY SCHEDULE HERETO WILL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGEMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF INVESTOR

Investor represents and warrants to the Company as of the date of this Agreement and as of the Closing as follows:

5.1    Existence and Good Standing.  Investor and each other Subsidiary of Parent is a corporation or limited liability company, duly formed or organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization. Investor and each other Subsidiary of Parent is duly qualified to do business, and in good standing, in each jurisdiction in which the character of the properties owned or leased by it or in which the conduct of its business requires it to be so qualified, except where the failure to be so qualified or to be in good standing would not have an Investor MAE.

5.2    Validity and Enforceability.  Investor and each other Subsidiary of Parent has the requisite corporate or limited liability company power and authority to execute and deliver this Agreement, the Ancillary Agreements and the Financing Documents to which it is (or will be) a party, and to consummate the Contemplated Transactions and the Financing Transactions.  The execution and delivery of this Agreement, the Ancillary Agreements and the Financing Documents, and the consummation of the transactions contemplated herein and therein, have been duly and validly authorized by all necessary corporate or limited liability action on the part of Investor and each other Subsidiary of Parent.  This Agreement has been (or, in the case of each other Ancillary Agreement and Financing Document to be entered into by Investor and each other Subsidiary of Parent at or prior to the Closing will be) duly and validly executed and delivered by Investor and each other Subsidiary of Parent and, assuming due authorization,

execution and delivery by the Company, represents (or, in the case of each other Ancillary Agreement and Financing Documents to be entered into by Investor and each other Subsidiary of Parent at or prior to the Closing, will represent) the legal, valid and binding obligation of Investor and each other Subsidiary of Parent, enforceable against Investor and each other Subsidiary of Parent in accordance with its terms, except as limited by the General Enforceability Exceptions.

5.3     No Conflict; Required Filings and Consents.

(a)     Neither the execution and delivery of this Agreement, any Ancillary Agreements or any Financing Documents to which Investor and each other Subsidiary of Parent is a (or will be a) party, nor the consummation by Investor and each other Subsidiary of Parent of the transactions contemplated herein or therein, nor compliance by Investor and each other Subsidiary of Parent with any of the provisions hereof or thereof, will (i) conflict with or result in a breach of any provisions of the Organizational Documents of Investor or each other Subsidiary of Parent, (ii) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of any Lien upon, any property or assets of Investor or each other Subsidiary of Parent or, pursuant to any Contract to which it is a party or by which it or any of its properties or assets may be subject, or (iii) subject to receipt of the requisite approvals referred to in Schedule 5.3(b), violate any Law applicable to Investor or each other Subsidiary of Parent or any of its properties or assets, except in the case of clause (ii) and (iii), where any such breach, default, right or violation would not reasonably be expected to have an Investor MAE.

(b)     Other than as set forth in Schedule 5.3(b), no third party Consent is necessary for the consummation by Investor or each other Subsidiary of Parent of the Contemplated Transactions or the Financing Transactions.

5.4     Financial Ability.  Investor currently has, and on the Closing Date will have, sufficient immediately available funds in such amount as is required to pay the Initial Purchase Price (less the Escrow Amount) and to make all other payments (including the fees and expenses of Investor related to the Contemplated Transactions and the Financing Transactions) required by the terms hereof to consummate the Contemplated Transactions and the Financing Transactions on the terms set forth herein and otherwise to perform all of Investor's obligations under this Agreement.

5.5     Financial Statements.

(a)     Copies of the following financial statements have been made available to the Company for its review: (i) the audited consolidated balance sheet of Investor and its Subsidiaries as of December 31, 2010, December 31, 2011, and December 31, 2012, and the related audited consolidated statements of comprehensive loss, cash flows and changes in equity for the years then ended, together with the notes thereto (the "Investor Audited Financial Statements"), and (ii) the unaudited condensed consolidated balance sheet of Investor and its Subsidiaries as of March 31, 2013, and the related unaudited

condensed consolidated statements of operations and comprehensive loss, and cash flows for the 3-month period then ended (the "Investor Interim Financial Statements", and together with the Investor Audited Financial Statements, the "Investor Financial Statements").

(b)     The Investor Audited Financial Statements have been prepared in accordance with GAAP and fairly present, in all material respects, the financial position, results of operations, shareholders' equity, and cash flows of Investor and its Subsidiaries on a consolidated basis, as of the date and for the period indicated.  The Investor Interim Financial Statements have been prepared by management in accordance with GAAP applied consistently with the Investor Audited Financial Statements (except for the absence of footnote disclosure, which, if presented would not provide information materially different than the information set forth in such Investor Interim Financial Statements, and year-end adjustments, the effect of which will not, individually or on the aggregate, be materially adverse).  The Investor Financial Statements were derived from the books and records of Investor and its Subsidiaries.

(c)     Except as set forth on Schedule 5.5(c), none of Investor nor any of its Subsidiaries has any material liabilities, other than (i) liabilities that are set forth on the face of, or quantified in the footnotes to, the Investor Interim Financial Statements, (ii) liabilities incurred in the ordinary course of business that are not required to be set forth in the Investor Interim Financial Statements under GAAP, (iii) liabilities arising since the Balance Sheet Date in the ordinary course of business and consistent with past practice (none of which is a liability resulting from breach of Contract, breach of warranty, tort, infringement or violation of Law), and (iv) liabilities incurred in connection with the execution of this Agreement.

5.6    Solvency.  On the Closing Date, Investor and the other Subsidiaries of Parent will not (a) be insolvent (either because their financial condition is such that the sum of their debts is greater than the fair value of their assets or because the present fair saleable value of their assets will be less than the amount required to pay their probable liability on their debts as they become absolute and matured), (b) have unreasonably small capital with which to engage in their businesses or (c) have incurred or plan to incur debts beyond their ability to pay as they become absolute and matured.

5.7    No Litigation or Regulatory Action.  There is no litigation, arbitration, or other proceedings pending or, to Investor's knowledge, threatened, against Investor or its Affiliates which would reasonably be expected to prevent, hinder or delay the consummation of the Contemplated Transactions, the Financing Transactions or the payment of the Purchase Price.  There is no litigation, arbitration, or other proceedings pending or, to Investor's knowledge, threatened, that questions the legality or propriety of the Contemplated Transactions or the Financing Transactions.

5.8    Capitalization.  Schedule 5.8 correctly and accurately sets forth (a) all of the issued and outstanding shares of capital stock of Parent and Investor of each class and/or series and the names of the holders of such shares and (b) all of the issued and outstanding funded

Indebtedness for borrowed money of Parent, Investor and/or any of their Subsidiaries (collectively, the "Investor Debt").

5.9     SEC Reports.

(a)     Parent has timely filed all forms, reports, statements, certifications and other documents (including all exhibits, amendments and supplements thereto) required to be filed by it with the SEC pursuant to the Exchange Act or other applicable United States federal securities Laws (the "SEC Reports").

(b)     As of their respective filing dates, the SEC Reports complied as to form in all material respects with the applicable requirements of the Securities Act and Exchange Act.

(c)     None of the SEC Reports when filed with the SEC and, if amended, as of the date of such amendment, contained any untrue statement of a material fact or omitted to state a material fact required to be stated or incorporated by reference therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(d)     There are no material unresolved comments issued by the staff of the SEC with respect to any of the SEC Reports.

5.10     Brokers.  No broker, finder or similar agent has been employed by or on behalf of Investor, and no Person with which Investor has had any dealings or communications of any kind is entitled to any brokerage commission or finder's fee in connection with this Agreement, the Contemplated Transactions or the Financing Transactions.

5.11     Exemption from Registration.  It is not necessary, in connection with the offer, issuance and delivery of the Amended Note Guarantees, to register the Amended Note Guarantees under the Securities Act.

5.12     Independent Investigation.  Investor has conducted its own independent investigation, review and analysis of the business, operations, assets (including Contracts), liabilities, results of operations, financial condition, software, technology and prospects of the Company and its Subsidiaries, which investigation, review and analysis was undertaken by Investor and its Affiliates and Representatives.  Investor hereby agrees and acknowledges that (a) other than the representations and warranties made in Article IV, neither the Company, its Affiliates, nor any of their respective officers, directors, employees or Representatives makes or has made any representation or warranty, express or implied, at law or in equity, with respect to the Company or any of its Subsidiaries and (b) except in the case of fraud or intentional misrepresentation, none of the Company, its Affiliates, or any of their respective officers, directors, employees or Representatives will have or be subject to any liability or indemnification obligation to Investor or to any other Person resulting from this Agreement or the transactions contemplated hereby.

5.13     No Other Representations and Warranties.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, INVESTOR MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF INVESTOR, PARENT OR ITS SUBSIDIARIES OR ANY OF THEIR RESPECTIVE ASSETS, LIABILITIES OR OPERATIONS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. THE COMPANY HEREBY ACKNOWLEDGES THE DISCLOSURE OF ANY MATTER OR ITEM IN ANY SCHEDULE HERETO WILL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGEMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED.

**ARTICLE VI**
**COVENANTS AND AGREEMENTS**

6.1     Certain Bankruptcy Matters.  Except as expressly set forth in this Agreement, the Plan or the Restructuring Support Agreement, or as required by applicable Law, during the period from the date of this Agreement to the Closing Date or the earlier termination of this Agreement, the Company shall use all commercially reasonable efforts to, and shall cause each of its Subsidiaries to use all commercially reasonable efforts to:

(a)     [Intentionally Deleted];

(b)     [Intentionally Deleted];

(c)     within thirty (30) days after filing of the Agreement Motion, obtain entry by the Bankruptcy Court of the Agreement Order;

(d)     (i) file the motion to approve the Disclosure Statement on or before July 15, 2013; (ii) commence the solicitation of the Plan in accordance with Section 1126(b) of the Bankruptcy Code on or before August 26, 2013; (iii) hold the confirmation hearing to approve the Plan on or before October 11, 2013; and (iv) cause the Effective Date to occur on or before October 25, 2013 (the "End Date");

(e)     timely file with the Bankruptcy Court a formal written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of an examiner with expanded powers or a trustee, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases or (iv) modifying or terminating the Company's exclusive right to file or solicit acceptances of a plan of reorganization; and

(f)     provide to Investor or its representatives, no later than five (5) business days before the hearing on the confirmation of the Plan, a schedule of executory Contracts and unexpired Leases the Company intends to reject, which schedule shall be in form and substance acceptable to Investor in its sole discretion; provided, however, that nothing in this Agreement shall require the Company or any of its Subsidiaries to, and neither the Company nor any of its Subsidiaries shall be required to, (i) reject the lease described on Schedule 7.3(m), (ii) reject any executory Contract or unexpired Lease

-42-

prior to the conclusion of the Auction and the acceptance of the Winning Bid (as defined in the Bidding Procedures) in accordance with the terms of the Bidding Procedures or (iii) reject any executory Contract or unexpired Lease that would result in or cause to occur any expense or claim that is associated with or arises from the rejection thereof and that is entitled to treatment under the Plan in priority to, or equal to, the Notes (including any expense or claim described in section 503(b)(7) or section 503(b)(8) of the Bankruptcy Code) unless the amount of any such expense or claim that has been paid at or prior to the Closing increases the current assets of the Company and its Subsidiaries for purposes of the calculation of "Closing Working Capital" in accordance with the terms of such definition set forth in Section 1.1. For the avoidance of doubt, to the extent such expenses or claims referred to in clause (iii) of the immediately preceding sentence have not been paid at or prior to Closing, they shall not be deemed to constitute "Selling Expenses" or a current liability of the Company or its Subsidiaries for purposes of the definition of "Closing Working Capital".

6.2    _Automatic Stay_.  The Company acknowledges and agrees and shall not dispute that the giving of notice of termination by any party pursuant to this Agreement shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

6.3    _Agreement Motion and Agreement Order_.  As soon as is practicable after the date of this Agreement, the Company shall file a motion (the "Agreement Motion") with the Bankruptcy Court seeking approval of the Bidding Procedures and the payment by the Company of the Break Up Fee and the Transaction Expenses in accordance with the terms of (and subject to the conditions and limitations set forth in) this Agreement.

6.4    _Interim Operations of the Company_.  From the date hereof until the Closing or the earlier termination of this Agreement, except as (i) set forth in Schedule 6.4 or Schedule 7.3(m), (ii) contemplated by this Agreement, the Plan or the Restructuring Support Agreement, (iii) consented to in writing by Investor (such consent not to be unreasonably withheld, delayed or conditioned, except with respect to the matters set forth in subsections (c), (e), (f), (g), (m) and (q), which shall be subject to Investor's consent in its sole discretion), (iv) necessary to effect the Contemplated Transactions, (v) required by Law, (vi) contemplated or permitted by the DIP Order or the credit agreement entered into pursuant to the DIP Order (the "DIP Credit Agreement") or (vii) contemplated by any First Day Motion, (a) the Company will, and will cause its Subsidiaries to, conduct the Company's and its Subsidiaries' business in the ordinary course of business (as is customary for Chapter 11 debtors), and use all commercially reasonable efforts to preserve in all material respects their current material relationships with Governmental Authorities, Managed Practices, suppliers, lessors, creditors and key employees and (b) the Company shall not, and shall cause its Subsidiaries not to:

(a)    (i) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of the capital stock of the Company or any of its Subsidiaries, or (ii) purchase, redeem or otherwise acquire any shares of capital stock of the Company or any of its Subsidiaries or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities;

-43-

(b)  adjust, split, combine or reclassify any capital stock or equity interests or issue or propose or authorize the issuance of any other securities (including options, profit interests, warrants or any similar security exercisable for, or convertible into, such other security);

(c)  incur or commit to incur any capital expenditure in excess of $100,000 individually or $500,000 in the aggregate, or authorization or commitment with respect thereto, or fail to make any material capital expenditures contemplated by the debtor-in-possession motion filed by the Company on June 16, 2013, attached hereto as Exhibit I(the "DIP Motion"), on or prior to the time that such capital expenditure was to be incurred as set forth in the DIP Motion;

(d)  acquire or agree to acquire by merging or consolidating with, or purchase any portion of the stock of, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, or limited liability company;

(e)  sell, lease, mortgage, pledge, grant any Lien on or otherwise encumber (excluding any Permitted Liens) or dispose of any of its material properties (including the real property) or material assets, including the capital stock or equity interests of the Company, in each case, having value in excess of $100,000 individually or $375,000 in the aggregate or discharge or cause the satisfaction of any material Lien or obligation other than current liabilities in the ordinary course of business;

(f)  (i) incur or permit to exist any Company Debt in excess of $375,000 in the aggregate, except as permitted pursuant to and in accordance with the DIP Order, (ii) waive, cancel or modify any Company Debt, claims or rights involving in excess of $375,000, except as contemplated by the Plan, (iii) make any loan or advances to any Person (except as permitted by the DIP Credit Agreement) or (iv) guarantee any Company Debt of any Person (other than the Company or any of its Subsidiaries) or enter into any "keep well" or other agreement to maintain any financial condition of another Person (other than a Subsidiary of the Company) or enter into any arrangement having the economic effect of any of the foregoing;

(g)  (i) other than in the ordinary course of business, enter into, assume, amend, waive or terminate any Material Contract, material permit or unexpired Lease, or any provision thereof, (ii) enter into any settlement of any material Proceeding relating to a Material Contract, except as contemplated by the Plan, or (iii) enter into any Contract that would not be a Material Contract that delays or is reasonably expected to impede or materially delay the Contemplated Transactions, including the Closing;

(h)  adopt or propose any amendments to any of the Company's or its Subsidiaries' Organizational Documents or take any steps to incorporate or organize any Subsidiary, except, in each case, in furtherance of the Restructuring or the Contemplated Transactions (and approved by Investor to the extent not expressly set forth in this Agreement or the Plan);

-44-

(i)      fail to maintain the Leased Real Property in substantially the same condition as of the date of this Agreement, ordinary wear and tear excepted, in accordance with the applicable terms under the applicable Lease;

(j)      except (i) as required by the terms of an existing Contract, agreement, arrangement, plan or policy disclosed to Investor on a schedule to this Agreement or provided in the Plan, (ii) as required to comply with Law or (iii) in the ordinary course of business, (A) enter into, adopt, amend or terminate any Employee Plan, (B) increase in any material manner the compensation or benefits of any director or officer, or management level employee with a total annual compensation as of the date hereof in excess of $250,000, of the Company or any of its Subsidiaries, or (C) enter into, renew (other than automatically without action by either party) or terminate any Contract, agreement, commitment or arrangement providing for the payment of compensation or benefits to any director or officer, or management level employee, of the Company or any of its Subsidiaries, with a total annual compensation as of the date hereof in excess of $250,000;

(k)      implement any employee layoffs that would reasonably be expected to implicate the WARN Act;

(l)      commence any Proceeding (other than a Proceeding as a result of a Proceeding commenced against the Company or any of its Subsidiaries), or compromise, settle or agree to settle any Proceeding other than compromises, settlements or agreements contemplated by the Plan or in the ordinary course of business that involve only the payment of money damages either covered by insurance of the Company or any of its Subsidiaries or not in excess of $250,000 individually or $500,000 in the aggregate, in any case without the imposition of any equitable relief;

(m)      change materially its financial or tax accounting methods, elections, principles, periods or practices, except insofar as may have been required by a change in GAAP or applicable Law;

(n)      amend or modify the Restructuring Support Agreement or the Plan to the extent that such amendment or modification would materially and adversely affect Investor;

(o)      withdraw or revoke the Restructuring Support Agreement or the Plan or publicly announce its intention not to pursue the Restructuring Support Agreement or the Plan;

(p)      file any motion, application or pleading with the Bankruptcy Court (including any modifications or amendments thereof) that, in whole or in part, is not consistent in any material respect with this Agreement, the Restructuring Support Agreement or the Plan, except for, with respect to the Restructuring Support Agreement or the Plan any, such motion, application or pleading that would not materially and adversely affect Investor;

-45-

(q)     make any material changes to the working capital policies applicable to the Company and its Subsidiaries;

(r)     make any disclosure to, or any other filing with, a Government Authority, unless required by Law, required in the reasonable judgment of the Company or otherwise required by the Bankruptcy Court in connection with the Chapter 11 Cases (in which case, such disclosure or filing would be made subject to the terms and conditions of this Agreement, the Ancillary Agreements and the Plan); or

(s)     commit or agree in writing to take any of the foregoing actions.

6.5    <u>Financing</u>.  The Company shall obtain the use of cash collateral and debtor-in-possession financing pursuant to an order entered by the Bankruptcy Court (the "<u>DIP Order</u>"), which financing shall in form and substance be reasonably acceptable to Investor, and such order shall be consistent in all material respects with the financing contemplated by the DIP Credit Agreement and such order shall be substantially in the form attached as an exhibit to the DIP Motion.

6.6    <u>Reasonable Access; Confidentiality</u>.

(a)     From the date hereof until the Closing Date or the earlier termination of this Agreement, and subject to applicable Law, the Company and its Subsidiaries shall give Investor and its Representatives reasonable access, during normal business hours and upon reasonable advance written notice delivered to the Company's Chief Executive Officer or Chief Financial Officer, to the assets, properties, books, records, agreements, employees and other personnel, customers, suppliers, vendors, Managed Practices and any other significant business relationships of the Company and its Subsidiaries and shall permit Investor to make such inspections as it may reasonably require and to furnish Investor during such period with all such information relating to the Company and its Subsidiaries as Investor may from time to time reasonably request in writing (for which purposes e-mail shall suffice).  Notwithstanding anything to the contrary contained in this Agreement, the Company is not required to provide any information or access that the Company reasonably believes would violate applicable Law, the terms of any confidentiality agreement or confidentiality provision in any Contract to which the Company or any of its Subsidiaries is otherwise bound, the fiduciary duties of the Company's board of directors, or impact any privilege; <u>provided</u> that the Company shall, with respect to any privileged information that Investor is requesting, promptly upon the request of Investor enter into a common interest agreement with Investor that is in the form of the Common Interest Agreement with respect to such information, and shall thereafter provide such privileged information to Investor; <u>provided</u>, <u>further</u>, that with respect to any such other information, agreements, provisions or facts the Company shall use all reasonable best efforts to provide to Investor (or its agents) a description of such information, agreement, provision or facts and without the express prior written consent of the Company (which consent shall not be unreasonably withheld, delayed or conditioned), Investor shall not contact any Managed Practice or any physicians within a Managed Practice. Notwithstanding anything to the contrary in this Agreement, the Company shall not be required to disclose any information to Investor if such disclosure

would, in the Company's reasonable discretion, cause significant competitive harm to the Company and its Subsidiaries. For the avoidance of doubt, the failure of the Company to disclose any information to Investor in accordance with the foregoing shall not constitute a breach or inaccuracy of any representations and warranties of the Company contained in this Agreement.

(b)    Any information provided to or obtained by Investor pursuant to Section 6.6(a) above will be subject to that certain Confidentiality Agreement, dated January 22, 2013, by and between the Company and Investor (the "Confidentiality Agreement").    The Company and Investor agree and acknowledge that the Confidentiality Agreement shall upon the Closing immediately terminate and be of no further force and effect without the need for any further action by any Person.

6.7    Publicity.  Except as may be required to comply with the requirements of any applicable Law (including by the Bankruptcy Court in connection with the Chapter 11 Cases) or the Plan, no party will issue any press release or other public announcement relating to the subject matter of this Agreement or the Contemplated Transactions without the prior approval (which approval will not be unreasonably withheld, conditioned or delayed) of the other party. Notwithstanding anything to the contrary in this Agreement, in no event shall either Section 6.7 or Section 6.6 limit disclosure by Investor and/or any of its Affiliates to any direct or indirect investors in any such Person, as applicable, or in connection with normal fund raising and related marketing or informational or reporting activities of Investor and/or any such Affiliate.

6.8    Notice of Events.  During the period from the date of this Agreement until the Closing Date or the earlier termination of this Agreement, each party hereto shall promptly notify the other party hereto in writing as soon as such party becomes aware of the occurrence, or non-occurrence, of any event, condition or circumstance occurring at any time (whether before or after the date of this Agreement) which (a) has caused, or would reasonably be expected to cause, any representation or warranty made by such party in this Agreement to become untrue; provided, that, for purposes of this clause (a) any reference to the "Company's Knowledge" or similar qualification set forth in such representation or warranty shall be disregarded, (b) would constitute a violation or breach of this Agreement or cause any failure by such party to comply with or satisfy any covenant, Closing condition or agreement to be complied with or satisfied by such party hereunder or (c) would reasonably be expected to delay or otherwise materially affect the consummation of the Contemplated Transactions and/or the Financing Transactions. In furtherance and not in limitation of the foregoing, (i) following the date hereof for a period of 20 consecutive days (the "Inquiry Period") and (ii) on a date determined by the Company within five (5) Business Days of the written request of Investor (the "Closing Inquiry Date") (for the avoidance of doubt, Investor can make the foregoing request only once and such request must be at least five (5) Business Days prior to the Closing Date), with respect to any representation or warranty contained in Article IV that is qualified by the "Company's Knowledge", the Company agrees to use commercially reasonable efforts to cause the Knowledge Members to (x) make reasonable due inquiry of each such Knowledge Member's direct reports and (y) make due inquiry of the Company's counsel (including healthcare counsel) with respect to the subject matter addressed by the applicable representations and warranties (the Company's Knowledge, as qualified by the information obtained from such inquiries, the "Updated Company Knowledge").    Promptly following such Inquiry Period, the Company shall update the

-47-

Disclosure Schedules with any additional information and disclosures applicable as a result of the foregoing inquiry. In the event that the Company provides an update to the Disclosure Schedules in accordance with this Section 6.8, it shall provide such additional disclosures to Investor promptly in accordance with Section 10.5. Following the delivery of notice by a Party (the "Disclosing Party") to the other Party (the "Update Recipient") of any addition to the disclosure included in the Disclosing Party's Schedules in accordance with this Section 6.8 (the "Updated Schedules"), the Update Recipient would have ten (10) Business Days to advise the Disclosing Party in writing (an "Update MAE Notice") in accordance with Section 10.5 that, as of such date, it believes the information set forth in the Updated Schedules, together with all changes, effects, events, occurrences, state of facts or developments previously disclosed in accordance with this Section 6.8 (individually or in the aggregate), constitute a Material Adverse Effect or Investor MAE, as the case may be (an "Update MAE"). Following the delivery notice of an Update MAE Notice to the Disclosing Party, the Update Recipient would have an additional five (5) Business Days (the "Update MAE Determination Period") in which to terminate this Agreement as a result of the Update MAE pursuant to, in the case of Investor, Section 8.1(c)(ii) or Section 8.1(c)(iii), or, in the case of the Company, Section 8.2(b)(ii). During the Update MAE Determination Period, the Disclosing Party and the Update Recipient shall cooperate in good faith with respect to the determination of whether there is a Material Adverse Effect or an Investor MAE, as the case may. If the Update Recipient has not terminated this Agreement pursuant to the applicable provisions referenced above prior to 10:00 pm Eastern Time on the last day of the Update MAE Determination Period, the Update Recipient shall have been deemed to have waived its right to terminate this Agreement based on the changes, effects, events, occurrences, state of facts or developments disclosed in accordance with this Section 6.8 prior to the delivery of the Update MAE Notice pursuant to, in the case of Investor, Section 7.3(g) or Section 7.3(i), or, in the case of the Company, Section 7.2(d) or Section 7.2(m); provided, however, that in the event that there is a further update to the Schedules by the Disclosing Party, the provisions of this Section 6.8 with respect to an Update MAE shall once again apply and all changes, effects, events, occurrences, state of facts or developments previously disclosed in accordance with this Section 6.8 will be taken into consideration by the Update Recipient in determining whether there is a Material Adverse Effect or an Investor MAE, as the case may be.

6.9    All Commercially Reasonable Efforts; Cooperation. Upon the terms and subject to the conditions set forth in this Agreement, each of the parties agrees to use all commercially reasonable efforts to take, or cause to be taken, all reasonable actions, and to do, or cause to be done, and to reasonably assist and cooperate with the other parties in doing, all things reasonably necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Contemplated Transactions and the Financing Transactions, and to obtain satisfaction or waiver of the conditions precedent to the parties' obligations hereunder, including the execution and delivery of any additional agreements and instruments reasonably necessary to consummate the transactions contemplated by this Agreement, the Ancillary Agreements and the Financing Documents. Anything in this Agreement to the contrary notwithstanding, neither the Company nor any of its Subsidiaries shall be required to make any payments, or incur any expenses, in connection with any of the Financing Transactions. Notwithstanding anything to the contrary in this Agreement, Investor shall not be required to (i)

-48-

sell, license, divest, dispose of or hold separate, or agree to sell, license, divest, dispose of or hold separate, any assets, services or businesses of either Investor or the Company, or otherwise take or commit to take any action that reasonably could limit its freedom of action with respect to, or its ability to retain, one or more businesses, services or assets or (ii) litigate or defend against any administrative or judicial action or proceeding (including any proceeding seeking a temporary restraining order or preliminary injunction) challenging any of the transactions contemplated hereby as violating the HSR Act or any other law that is designed or intended to prohibit, restrict, or regulate antitrust, monopolization, restraint of trade or competition. Anything in this Agreement to the contrary notwithstanding, this Agreement and the transactions contemplated hereby are subject to the Company's right and ability to consider higher or better competing bids with respect to the assets or equity securities of the Company and/or its Subsidiaries pursuant to the Bidding Procedures. In accordance with the Bidding Procedures, but subject to the Company's obligation, as applicable, to pay Investor the Transaction Expenses and/or the Break Up Fee pursuant to (and only to the extent required by) this Agreement, the Company shall have the right to, and may cause its Representatives and Affiliates to, (x) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Investor and its Affiliates and Representatives) in connection with any sale or other disposition of the assets or equity securities of the Company and/or its Subsidiaries; (y) respond to any request for information or due diligence inquiry, or make any employee or Representative available for such purposes, to any such Person; and (z) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing.

6.10    Financial Information.  The Company shall provide to Investor (a) an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of cash flows for each month, beginning June 2013 until the Effective Date (the "Monthly Financial Statements"), in each case, as promptly as practicable and in any event within 45 days of the end of each month and the end of each fiscal quarter, (b) copies of any materials, correspondence and other information of a material nature that is (i) provided by or on behalf of the Company to the lender(s) under the DIP Credit Agreement (including Weekly Reports (as defined in the DIP Credit Agreement) required to be delivered under Section 5.3 of the DIP Credit Agreement), or (ii) received by the Company or on its behalf from the lender(s) under the DIP Credit Agreement , including such information and reports that are provided under Section 6.1 of the DIP Credit Agreement, in each case, promptly upon receipt or delivery thereof, and (c) such other financial information as is reasonably requested by Investor.  The Monthly Financial Statements, except as indicated therein and the absence of footnote disclosures and year-end adjustments, shall be prepared in accordance with GAAP and shall fairly present in all material respects the financial position, results of operations and cash flows of the Company as of the dates indicated and for the periods specified.

6.11    Common Interest Agreement.  Immediately following the execution of this Agreement by the parties hereto, the parties shall execute and deliver the Common Interest Agreement.

6.12    [Intentionally Deleted]

6.13    <u>Capitalization of the Company as of the Effective Date</u>.  As of the Effective Date (a) the authorized capital stock of the Company will be as set forth in the certificate of incorporation of the Company, as amended to reflect the terms set forth on the applicable exhibit to the Plan, (b) the only shares of capital stock of the Company that shall be issued and outstanding shall be the Shares, which shall have been issued in accordance with this Agreement and the Plan and all of which will be duly authorized, validly issued, fully paid and nonassessable, (c) the Shares will be offered, issued, sold and delivered by the Company in compliance with all applicable Laws governing the issuance of securities, (d) except as set forth on <u>Schedule 6.13</u>, there will be no (i) outstanding securities convertible or exchangeable into shares of capital stock of the Company or other equity securities of the Company; (ii) options, warrants, calls, subscriptions or other rights, agreements or commitments obligating the Company to issue, transfer, repurchase, redeem, acquire or sell any shares of its capital stock or other equity securities; (iii) voting trusts or other agreements or understandings to which the Company is a party or by which the Company is bound with respect to the voting, transfer or other disposition of its shares of capital stock or other equity securities; or (iv) outstanding or authorized equity appreciation, phantom equity or similar rights with respect to the Company, and (e) no registration rights will be outstanding with respect to any of the Company's securities or any securities of its Subsidiaries.

6.14    <u>Diligence Questionnaire</u>.  Immediately following the execution of the Common Interest Agreement, the Company will use all commercially reasonable efforts to (and will use all commercially reasonable efforts to cause its applicable Representatives to) promptly provide Investor and its Representatives to whom information may disclosed under the Common Interest Agreement (the "<u>Specified Representatives</u>") with oral responses (to the Company's Knowledge) to the matters identified in the questionnaire attached hereto as <u>Exhibit H</u> (the "<u>Diligence Questionnaire</u>"), and will otherwise reasonably cooperate and assist Investor and the Specified Representatives in connection with such due diligence investigation, including (i) having the Company's counsel (including its healthcare counsel) participate in a telephonic meeting on a mutually acceptable Business Day and during regular business hours that the Company may propose to Investor on not less than 2 Business Days' notice among the Company and such counsel, on the one hand, and Investor and the Specified Representatives, on the other hand, at which the Company shall provide (with the assistance of such counsel) its initial oral responses to the questions included in the Diligence Questionnaire (the date of such telephonic meeting described in this <u>clause (i)</u>, the "<u>Start Date Meeting</u>"), (ii) providing Investor and the Specified Representatives with such documents, agreements and other material communications that are reasonably requested by Investor or the Specified Representatives in the Diligence Questionnaire (as well as any internal or external correspondence that is materially relevant to the questions and requests set forth in the Diligence Questionnaire) and (iii) reasonably assisting and cooperating with Investor and the Specified Representatives with any reasonable follow up questions or requests that arise in connection with the matters that are the subject of the Diligence Questionnaire (the Company's obligations hereunder are deemed to be in furtherance, and not in limitation, of the Company's obligations under <u>Section 6.9</u> hereof).

**ARTICLE VII**
**CONDITIONS TO CLOSING**

7.1     <u>Conditions to Obligations of the Parties</u>.   The respective obligations of the Company and Investor to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver (if permitted by applicable Law and in any event in each applicable party's sole and absolute discretion) at or prior to the Closing of each of the following conditions:

(a)     none of the parties hereto will be subject to any Order of a court of competent jurisdiction that prohibits the consummation of the transactions contemplated by this Agreement.  Subject to <u>Section 6.9</u> hereof, if any such Order has been issued, the party that is subject to such Order shall use all commercially reasonable efforts to have any such Order overturned or lifted;

(b)     no Proceeding shall be pending or threatened by a Governmental Authority before any Governmental Authority wherein an unfavorable Order would reasonably be expected to (i) prevent consummation of a material portion of the transactions contemplated by this Agreement, or (ii) cause a material portion of the transactions contemplated by this Agreement to be rescinded following consummation;

(c)     no Law shall be in effect as of the Closing Date having the effect of making the transactions contemplated herein illegal or otherwise prohibiting consummation of, or making void or voidable, the transactions contemplated herein; and

(d)     if the purchase of the Shares by Investor pursuant to this Agreement is subject to the terms of the HSR Act or any foreign competition Laws, the applicable waiting periods shall have expired or been terminated thereunder with respect to such purchase.

7.2     <u>Conditions to Obligations of the Company</u>.  The obligations of the Company to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver (if permitted by applicable Law and in any event in the Company's sole and absolute discretion) at or prior to the Closing of each of the following additional conditions:

(a)     <u>Agreement Order</u>.  The Agreement Order shall have been entered by the Bankruptcy Court and the Agreement Order shall have become a Final Order;

(b)     <u>Confirmation Order</u>.  The Confirmation Order shall have been entered by the Bankruptcy Court and the Confirmation Order shall have become a Final Order;

(c)     <u>Conditions to Effective Date</u>. The conditions to the Effective Date set forth in the Plan shall have been satisfied or waived in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing;

(d)     <u>Representations and Warranties</u>.  (i) The representations and warranties of Investor set forth in this Agreement shall be true and correct in all respects (<u>provided</u> that any representation or warranty of Investor contained herein that is subject to a "materiality" or "Investor MAE" qualification, will not be so qualified and any such qualification shall be given no effect for purposes of determining the existence of any

breach thereof on the part of Investor) as of the Closing Date as though made on and as of the Closing Date except where the failure of such representations and warranties (other than the representations and warranties set forth in Sections 5.1, 5.2, 5.6, and 5.10) to be so true and correct would not, individually or in the aggregate with any other such failures or breaches on the part of Investor, have an Investor MAE and (ii) the representations and warranties of Investor set forth in Section 5.8 shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date;

(e)     Agreements and Covenants. Each of the agreements and covenants of Investor to be performed and complied with by Investor pursuant to this Agreement prior to the Closing Date will have been duly performed and complied with in all material respects;

(f)     Consents.  Investor shall have delivered to the Company all Consents that are necessary or required under the terms of the Investor Financing Documents to permit the Contemplated Transactions and/or the Financing Transactions (the "Specified Consents"), and all such Specified Consents shall be in form and substance reasonably acceptable to the Company and in full force and effect;

(g)     Amendments and Modifications.  Investor shall have delivered to the Company all amendments, modifications and supplements to the Investor Financing Documents that are necessary or required to permit the Contemplated Transactions and/or the Financing Transactions (the "Specified Amendments"), and all such Specified Amendments shall be in form and substance reasonably acceptable to the Company and in full force and effect;

(h)     Intercreditor Agreement(s).  Investor shall have delivered to the Company (i) an intercreditor agreement or amendment to an existing intercreditor agreement (which may be combined with the intercreditor agreement referenced in clause (ii)) duly executed by Parent, Investor, the other Subsidiaries of Parent and the holders of the Indebtedness under the Investor Credit Documents, or their duly appointed agent, pursuant to which the Liens on the assets and properties of the Company and its Subsidiaries that secure the Indebtedness and other obligations under the Investor Credit Documents are made junior and subordinate in all respects to all Liens on the assets and properties of the Company and its Subsidiaries that secure the Indebtedness and other obligations under the Amended Notes and the other Amended Note Documents, and (ii) an intercreditor agreement or amendment to an existing intercreditor agreement (which may be combined with the intercreditor agreement referenced in clause (i)) duly executed by Parent, Investor, the other Subsidiaries of Parent and the holders of the Indebtedness under the Investor Secured Notes Documents, or their duly appointed agent, pursuant to which the Liens on the assets and properties of the Company and its Subsidiaries that secure the Indebtedness and other obligations under the Investor Secured Notes Documents are made junior and subordinate in all respects to all Liens on the assets and properties of the Company and its Subsidiaries that secure the Indebtedness and other obligations under the Amended Notes and the other Amended Note Documents, and each such intercreditor agreement referred to in clause (i) and clause (ii)

-52-

(collectively, the "Specified Intercreditor Agreements") shall be in form and substance reasonably acceptable to the Company and in full force and effect (subject to the execution and delivery thereof by the duly appointed agent of the holders of the Amended Notes);

(i)      Amended Note Guarantees.  Investor shall have delivered to the Company one or more guarantees (the "Amended Note Guarantees") duly executed and delivered by Radiation Therapy Services Holdings, Inc. and each of its Subsidiaries that guarantee the obligations of Radiation Therapy Services, Inc. under the Investor Secured Notes Documents pursuant to which such Persons guarantee the due and punctual payment and performance of all Indebtedness and other obligations of the Company and its Subsidiaries under the Amended Notes and the other Amended Note Documents, and such Amended Note Guarantees shall contain covenants substantially the same as the covenants contained in the Investor Secured Notes Documents (as in effect on the date of this Agreement) and shall otherwise be in form and substance reasonably acceptable to the Company, and in full force and effect;

(j)      Liens on Collateral.  The Indebtedness and other obligations under the Amended Notes and the other Amended Note Documents shall be secured by valid and perfected first-priority Liens on the same assets and properties of the Company and its Subsidiaries that secure, or purport to secure, the Indebtedness and other obligations of the Company and/or any of its Subsidiaries under the Notes and the Notes Indenture (as in effect immediately prior to the consummation of the Closing), granted in favor of the duly appointed agent of the holders of the Amended Notes, for the benefit of the holders of the Amended Notes; provided, however, that in no event shall any assets or properties of the Company or any of its Subsidiaries be subject to, or otherwise encumbered by, any Lien that secures the Indebtedness and other obligations under any of the Investor Financing Documents unless such asset or property is also subject to, or otherwise encumbered by, a valid and perfected first-priority Lien that secures the Indebtedness and other obligations under Amended Note Documents;

(k)      Legal Opinion.  Investor shall have delivered to the Company a written opinion of (i) Kirkland & Ellis LLP (counsel to Investor), accompanied by a reliance letter authorizing the holders of the Amended Notes as of the Closing to rely on such opinion, covering such matters as are set forth in Exhibit F-1 attached hereto, and such opinion shall be in form and substance reasonably acceptable to the Company, and (ii) counsel to Investor reasonably acceptable to the Company in each jurisdiction where a Subsidiary of Parent has been formed or organized other than New York or Delaware, accompanied by a reliance letter authorizing the holders of the Amended Notes as of the Closing to rely on such opinion, covering such matters as are set forth in Exhibit F-2 attached hereto, and such opinion shall be in form and substance reasonably acceptable to the Company;

(l)      No Registration; Compliance with Securities Laws.  The offer, issuance and delivery of the Amended Note Guarantees shall be exempt from the registration and prospectus delivery requirements of the Securities Act, and no Proceeding shall be pending or threatened by any Governmental Authority that alleges that the offer, issuance

and/or delivery of the Amended Note Guarantees is not exempt from the registration and prospectus delivery requirements of the Securities Act;

(m)    Investor MAE.  Since the date of this Agreement, there shall not have occurred an Investor MAE; and

(n)    Closing Deliveries. Investor shall have delivered to the Company (or, in the case of Section 3.3(f), the Persons set forth therein) the items required by Section 3.3 of this Agreement.

7.3    Conditions to Obligations of Investor.  The obligations of Investor to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver (if permitted by applicable Law and in any event in Investor's sole and absolute discretion) at or prior to the Closing of each of the following conditions:

(a)    Agreement Order.  The Agreement Order shall have been entered by the Bankruptcy Court, and the Agreement Order shall have become a Final Order; provided, however, that the condition set forth in this Section 7.3(a) shall be deemed waived and of no further force or effect fifteen (15) days following the date on which an Order is entered by the Bankruptcy Court with respect to the Agreement Motion;

(b)    Confirmation Order. The Confirmation Order shall have been entered by the Bankruptcy Court and the Confirmation Order shall have become a Final Order;

(c)    Conditions to Confirmation. The conditions to the Effective Date set forth in the Plan shall have been satisfied (or waived) in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing;

(d)    Amended Notes.  The terms of the Notes shall have been amended on terms and conditions consistent in all material respects with those set forth on Exhibit G (the "Amended Notes") and, to the extent any terms and conditions are not set forth on or contemplated by Exhibit G, such other terms and conditions shall be reasonably acceptable by the Majority Consenting Debtholders and Investor;

(e)    [Intentionally Deleted];

(f)    Valid Issuance.  The Shares shall be, upon payment of the Purchase Price as provided herein, duly authorized, validly issued, fully paid, non-assessable and free and clear of all Taxes, Liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except for any restrictions on transfer as may be imposed by applicable Law or Liens created under the Investor Financing Documents or other Liens created by Investor;

(g)    Company Representations and Warranties. The representations and warranties of the Company set forth in Article IV shall be true and correct in all respects (provided that any representation or warranty of the Company contained in Article IV that is subject to a "materiality" or "Material Adverse Effect" qualification will not be so

qualified and any such qualification shall be given no effect for purposes of determining the existence of any breach thereof on the part of the Company) as of the Closing Inquiry Date as though made on and as of the Closing Inquiry Date (except to the extent such representations and warranties speak as of an earlier date and provided that any reference to the "Company's Knowledge" set forth therein shall for purposes of this Section 7.3(g) be deemed to be the "Updated Company Knowledge"), except where the failure of such representations and warranties (other than the representations and warranties set forth in Sections 4.1 and 4.2) to be so true and correct would not, individually or in the aggregate with any other such failures or breaches on the part of the Company, have a Material Adverse Effect.

(h)    Organizational Documents.  At the written request of Investor (given no less than ten (10) days prior to the Closing Date), the Organizational Documents of the Company and each of its Subsidiaries shall have been (or simultaneously with the Closing will be) amended, and shall have been (or simultaneously with the Closing will be) filed with the applicable Governmental Authority of the jurisdiction of organization or formation of the Company and each such Subsidiary to be effective as such as of the Closing, and such amended Organizational Documents shall be in form and substance reasonably acceptable to Investor;

(i)    Material Adverse Effect. Since the date of this Agreement, there shall not have occurred a Material Adverse Effect;

(j)    Company Agreements and Covenants. Each of the agreements and covenants of the Company to be performed and complied with by the Company pursuant to this Agreement prior to or as of the Closing Date will have been duly performed and complied with in all material respects;

(k)    Closing Deliveries. The Company shall have delivered to Investor the items required by Section 3.2 of this Agreement (other than Section 3.2(a));

(l)    Management Services Agreements.  Except for the Management Services Agreements set forth on Schedule 7.3(l), each Management Services Agreement shall be valid and in full force and effect. The Bankruptcy Court shall have entered an Order authorizing the assumption of each of the Management Services Agreements by the Company or its applicable Subsidiary party to such Management Services Agreement pursuant to and in accordance with the Plan (except to the extent any covenants are modified by the Bankruptcy Court), except for the Management Services Agreements set forth on Schedule 7.3(l); and

(m)    Additional Delivery.  The Company shall have made the delivery described on Schedule 7.3(m).

7.4    Frustration of Closing Conditions.  Neither Investor nor the Company may rely on the failure of any condition set forth in Section 7.1, Section 7.2 or Section 7.3, as the case may be, to be satisfied if such failure was caused by such party's failure to comply with its obligations under Section 6.9.

## ARTICLE VIII
## TERMINATION OF AGREEMENT

8.1    <u>Termination by Investor</u>.    This Agreement may be terminated and the Contemplated Transactions may be abandoned at any time by Investor by written notice to the Company:

(a)    if the Company has breached or failed to perform any of its covenants, obligations or other agreements that are set forth in <u>Section 6.1(e)</u>; <u>provided</u> that such breach or failure to perform is not cured within 30 days after receipt by the Company of written notice thereof from Investor or is incapable of being cured by the Company on or prior to the End Date;

(b)    if the Company has breached or failed to perform any of its covenants, obligations or other agreements that are set forth in <u>Sections 6.1(c)</u> and <u>6.1(d)</u>; <u>provided</u> that such breach or failure to perform is not cured within 30 days after receipt by the Company of written notice thereof from Investor or is incapable of being cured by the Company on or prior to the End Date (it being understood that the 30 day cure period set forth in this <u>Section 8.1(b)</u> shall correspondingly extend the applicable dates set forth in <u>Section 6.1(c)</u> and <u>6.1(d)</u>, except the End Date);

(c)    if (i) the Company has breached or failed to perform any of its covenants or other agreements contained in this Agreement to be complied with by it such that the closing condition set forth in <u>Section 7.3(j)</u> would not be satisfied, except with respect to the covenants or other agreements set forth in <u>Sections 6.1(c)</u>, <u>6.1(d)</u>, <u>6.1(e)</u> and <u>6.14</u>, which shall be governed with regard to such matters by <u>Section 8.1(a)</u>, <u>Section 8.1(b)</u> and <u>Section 8.1(g)</u> (as applicable), (ii) there exists any change, effect, event, occurrence, state of facts or development such that the closing condition set forth in <u>Section 7.3(i)</u> would not be satisfied or (iii) any representation or warranty of the Company contained in this Agreement shall have become untrue such that the closing condition set forth in <u>Section 7.3(g)</u> would not be satisfied, and in the case of each of <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> above, such breach, failure to perform or occurrence is not cured within thirty (30) days after receipt by the Company of written notice thereof from Investor or is incapable of being cured by the Company on or prior to the End Date;

(d)    if the Restructuring Support Agreement shall have been terminated as to (i) the Company or (ii) the Consenting Debtholders;

(e)    if the Bankruptcy Court enters an Order (i) directing the appointment of an examiner with expanded powers or a trustee, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases;

(f)    if the Company enters into a definitive agreement with any Person (other than Investor or its Affiliates) with respect to (i) any Inconsistent Transaction except, subject to the terms of the Bidding Procedures, in the event that the entering into such agreement relates to an Inconsistent Transaction with the Winning Bidder (as defined in

the Bidding Procedures) and Investor is the Second-Highest Bidder (as defined in the Bidding Procedures), in which case, Investor shall have the right to terminate this Agreement pursuant to this Section 8.1(f) upon the earlier of (x) the date that is 90 days after acceptance by the Company of the Winning Bid in accordance with the Bidding Procedures and (y) the closing of the Winning Bid or (ii) a Stand-Alone Plan; or

(g)    within ten (10) Business Days following the Start Date Meeting, without liability or obligation to any party hereunder, if Investor determines, in its sole discretion, that the results of its due diligence investigation with respect to the matters that are the subject of the Diligence Questionnaire could have a material impact on any of Investor or its Affiliates, the Company or the Subsidiaries of the Company following the Closing, whether due to the substance of such findings or a conclusion that it has not received sufficient or complete information with respect to such matters or for any other reason.

8.2    Termination by the Company.  This Agreement may be terminated and the Contemplated Transactions may be abandoned at any time by the Company by written notice to Investor:

(a)    in the event that the Company's board of directors approves an Inconsistent Transaction or Stand-Alone Plan at any time after the date of this Agreement and prior to the entry of the Confirmation Order;

(b)    if (i) Investor has breached or failed to perform any of its covenants or other agreements contained in this Agreement to be complied with by it such that the closing condition set forth in Section 7.2(e) would not be satisfied or (ii) any representation or warranty of Investor contained in this Agreement shall have become untrue such that the closing condition set forth in Section 7.2(d) would not be satisfied, and in the case of both clauses (i) and (ii) above, such breach, failure to perform or occurrence is not cured within thirty (30) days after receipt by Investor of written notice thereof from the Company or is incapable of being cured by Investor on or prior to the End Date;

(c)    if (i) Investor shall have failed to satisfy any of the conditions set forth in Section 7.2(f), Section 7.2(g), Section 7.2(h), Section 7.2(i), Section 7.2(k) or Section 7.2(l) prior to the End Date or (ii) any event, fact, circumstance or condition exists that shall have made any of the conditions set forth in Section 7.2(f), Section 7.2(g), Section 7.2(h), Section 7.2(i) or Section 7.2(l) incapable or impossible of being satisfied prior to the End Date.  If the Company terminates this Agreement pursuant to this Section 8.2(c) on the End Date or on any date after the End Date and the Investor terminates this Agreement pursuant to Section 8.3(c) on the same date that the Company so terminated this Agreement, then this Agreement shall be deemed to be terminated by the Company pursuant to this Section 8.2(c); or

(d)    if the condition set forth in Section 7.3(m) has not been satisfied as of the date that is forty-five (45) days from the date of this Agreement.

8.3     Termination by Mutual Agreement.  This Agreement may be terminated at any time:

(a)     by mutual written consent of the Company and Investor;

(b)     by Investor or the Company, upon written notice to the other party, if a Governmental Authority of competent jurisdiction has issued an Order permanently enjoining or otherwise prohibiting the consummation of the Contemplated Transactions, and such Order has become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this Section 8.3(b) shall not be available to any party whose material breach of any provision of this Agreement results in or causes such Order; or

(c)     by either Investor or the Company if the Closing has not occurred on or before 11:59 p.m. prevailing Eastern Time on the End Date; provided, however, that the right to terminate this Agreement pursuant to this Section 8.3(c) shall not be available to any party who is in material breach of this Agreement.

8.4     Effect of Termination.  In the event of termination of this Agreement pursuant to this Article VIII, this Agreement shall become void and have no further force or effect and no party will have any liability or any further obligation to any other party, except that (a) the terms and provisions of this Section 8.4, Section 2.4, Section 2.5, Section 6.7, Section 8.5, Article I and Article X will survive any termination of this Agreement, and (b) the terms and provisions of the Confidentiality Agreement shall survive any termination of this Agreement in accordance with its terms.  The Company hereby acknowledges and agrees and shall not dispute that the giving of notice of termination by Investor pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and each such person hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

8.5     Damages Upon Termination.

(a)     If (i) this Agreement is (x) terminated pursuant to  and in accordance with Section 8.1(b) or Section 8.1(c) (unless such termination is due to the existence of a CMS MAE) and (y) the Company consummates an Inconsistent Transaction on or prior to the date that is four (4) months following the date of such termination, (ii) this Agreement is terminated pursuant to Section 8.1(f)(i), (iii) this Agreement is (x) terminated pursuant to Section 8.1(f)(ii) and (y) the Company consummates an Inconsistent Transaction on or prior to the date that is four (4) months following the date of such termination or (iv) this Agreement is terminated pursuant to Section 8.2(a), whether or not any of parties are then party, voluntarily or involuntarily, to a Proceeding under the Bankruptcy Code, then at such time, the Company will pay (or will cause to be paid) to Investor (or its designee), as liquidated damages, a payment of $1,000,000 (the "Break Up Fee"), by wire transfer of immediately available funds to an account designated by Investor, and Investor's right to receive the Break Up Fee under the circumstances described in this Section 8.5(a) shall be Investor's sole and exclusive remedy following a termination of this Agreement; provided, however, that, notwithstanding anything to the contrary herein, if at the time of any such termination described in this Section 8.5 Investor is also in material breach of

-58-

this Agreement such that any of the conditions set forth in <u>Section 7.2(d)</u> or <u>Section 7.2(e)</u> would not be satisfied, Investor shall have no right to the Break Up Fee. For the avoidance of doubt, Investor shall not be entitled to receive payment of the Break Up Fee, and the Company shall not be required to pay the Break Up Fee to Investor, if this Agreement is terminated by Investor as a result of, or on account of, a CMS MAE. Investor acknowledges and agrees that payment of the Break Up Fee and reimbursement of its Transaction Expenses, in each case to the extent due and payable in accordance with the terms and conditions of this Agreement, shall be Investor's sole and exclusive remedies against the Company, any Affiliate or Representative of the Company and each of their respective assets and properties following a termination of this Agreement.

(b)    Any such payments pursuant to <u>Section 8.5(a)</u> will be earned and payable by the Company to Investor (or its designee) immediately upon the consummation of the Inconsistent Transaction and without Bankruptcy Court review or further Bankruptcy Court order, but in accordance with the Plan.  Investor and the Company agree that it would be impractical and extremely difficult to determine the extent of any damages to Investor that might result from a termination of this Agreement by the Company under such circumstances. Therefore, the parties acknowledge and agree that any payment to Investor made pursuant <u>Section 8.5(a)</u> will be paid as liquidated damages and the parties' good faith estimate of the actual potential damages to Investor for any such termination.

(c)    In the event of a termination of this Agreement prior to the Closing pursuant to <u>Section 8.2(b)</u> or <u>Section 8.2(c)</u>, whether or not the parties are then party, voluntarily or involuntarily, to a Proceeding under the Bankruptcy Code , then the Company shall receive all of the amounts then remaining in the Escrow Account and the receipt of such amounts shall be the Company's sole and exclusive remedy as a result of any such termination; <u>provided</u>, <u>however</u>, that in the event that the termination of this Agreement pursuant to <u>Section 8.2(b)</u> or <u>Section 8.2(c)</u> shall have been caused by, or shall have resulted from, a willful and intentional breach of any term, covenant, representation, warranty or other provision of this Agreement (including Investor's willful and intentional failure to pay any portion of the Initial Purchase Price upon satisfaction (or deemed satisfaction) or waiver of the conditions to Closing set forth in <u>Section 7.1</u> and <u>Section 7.3</u> (other than those conditions which are to be satisfied only on the Closing Date)), then, in addition to (and not in lieu of) the Company's right to receive the amounts then remaining in the Escrow Account in accordance with the terms hereof, and as the Company's sole and exclusive remedy, Investor shall be liable for all actual damages and/or liabilities incurred or suffered by the Company or any of its Subsidiaries as a result of any such breach; <u>provided</u>, that, in no event shall such liability exceed an amount equal to the sum of (x) amounts then remaining in the Escrow Account and (y) $10,000,000; <u>provided</u>, <u>further</u>, that, notwithstanding anything to the contrary herein, if at such time the Company is also in material breach of this Agreement such that any of the conditions set forth in <u>Section 7.3(j)</u> or <u>Section 7.3(g)</u> would not be satisfied, the Company shall have no right to any damages and/or liabilities under this <u>Section 8.5</u>, and for purposes of clarity, Investor shall receive the Escrow Amount then remaining in the Escrow Account.  Immediately following any termination of this Agreement pursuant to <u>Section 8.2(b)</u> or <u>Section 8.2(c)</u>, Investor and the Company shall execute and deliver joint

-59-

written instructions to the Escrow Agent instructing the Escrow Agent to distribute all of the amounts then remaining in the Escrow Account to the Company by wire transfer of immediately available funds to an account designated by the Company.  For purposes of this Agreement, "<u>willful and intentional breach</u>" shall mean a breach by Investor of any term, covenant, representation, warranty or other provision set forth in this Agreement that is a consequence of an act or failure to act, in each case, taken or omitted intentionally and with the knowledge that the taking of such act or failure to act would, when taken in the context of other related actions taken by Investor, cause a breach of this Agreement.

**ARTICLE IX**
**TAX MATTERS**

9.1    <u>Transfer Taxes</u>.  All transfer, documentary, sales, use, registration, stamp and other such Taxes and conveyancing fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement ("<u>Transfer Taxes</u>") shall be paid by Investor, and Investor will file all necessary Tax Returns and other documentation with respect to such Transfer Taxes.

**ARTICLE X**
**MISCELLANEOUS AND GENERAL**

10.1    <u>Successors and Assigns</u>.  This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns, but is not assignable by any party without the prior written consent of the other parties hereto; <u>provided</u> that Investor may, without the prior written consent of any party, assign any or all of its rights hereunder to (a) one or more of its Affiliates; <u>provided</u> that (i) the assignee shall assume in writing all of Investor's obligations hereunder and (ii) Investor shall not be released from any of its obligations hereunder by reason of such assignment, (b) any lender for collateral purposes or (c) any future purchaser of all or substantially all of the equity securities or assets of the Company.

10.2    <u>Third Party Beneficiaries</u>.  Each party hereto intends that this Agreement does not benefit or create any right, remedy or cause of action in or on behalf of any Person other than the parties hereto (and their permitted assigns).  Notwithstanding the foregoing, subject to the occurrence of the Closing, the Noteholders' Representative is an intended third party beneficiary of the provisions of this Agreement, to the extent such provisions expressly relate to the Noteholders' Representative.

10.3    <u>No Survival of Representations and Warranties</u>.  None of the representations and warranties contained in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Closing.  No party hereto will be entitled to any indemnification or other recourse on account of any breaches of any of the representations, warranties, covenants or obligations contained in this Agreement.

10.4    <u>Further Assurances</u>.  The parties shall execute such further instruments and take such further actions as may reasonably be necessary to carry out the intent of this Agreement.  Each party hereto shall use its commercially reasonable efforts to cooperate affirmatively with

-60-

the other party, to the extent reasonably requested by such other party, to enforce rights and obligations herein provided.

10.5    Notices.    Any notice, direction or other communication given regarding the matters contemplated by this Agreement (each, a "Notice") must be in writing, sent by personal delivery, electronic mail, courier or facsimile and addressed:

If to the Company (only after Closing) or Investor:

Radiation Therapy Services
1010 Northern Boulevard - Suite 314
Great Neck, NY 11021
Attention: Norton L. Travis
Fax:  (516) 301-5778
E-mail:ntravis@rtsx.com

with a copy to:

Vestar Capital Partners V, L.P.
245 Park Avenue
41st Floor
New York, NY 10167
Attention: Erin Russell
Fax: (212) 808-4922
E-mail:ERussell@VestarCapital.com

with a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Michael Movsovich, P.C.
              Christopher Marcus, P.C.
Fax: (212) 446-6460
E-mail: mmovsovich@kirkland.com;cmarcus@kirkland.com

If to the Company (only prior to Closing):

OnCure Holdings, Inc.
Attn: Bradford C. Burkett
188 Inverness Drive West, Suite 650
Englewood, Colorado, 80112
Fax: (303) 643-6560
E-mail: brad@mppartnersllc.com

with a copy to:

-61-

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attention:      Scott Haber
Fax:  1-212-751.4864; 1-213-8918763
E-mail:paul.harner@lw.com

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attention:      Scott Haber
Fax:  1-212-751.4864; 1-213-8918763
E-mail:scott.haber@lw.com

If to the Noteholders' Representative:

The name, address, e-mail address and facsimile number delivered to the Company and Investor by the Majority Consenting Debtholders or, after the Majority Consenting Debtholders have notified the Company and Investor of the identity of the Noteholders' Representative, the name, address, e-mail address and facsimile number delivered to the Company and Investor by the Noteholders' Representative.

with a copy to:

Stroock & Stroock & Lavan LLP
2029 Century Park East, Suite 1600
Los Angeles, California 90067
Attention: Frank Merola, Esq.
Fax: (310) 407-6302
E-mail: fmerola@stroock.com

with a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attention: Jayme T. Goldstein, Esq.
Fax: (212) 806-6006
E-mail: jgoldstein@stroock.com

-62-

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day,  or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section 10.5.  Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed.  Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party.  The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

10.6    Entire Agreement.  This Agreement, the Exhibits and Disclosure Schedules referred to herein, the Plan, the Common Interest Agreement, the Escrow Agreement and the Confidentiality Agreement contain the complete agreement between the parties hereto with respect to the subject matter hereof and supersede and cancel all prior and contemporaneous agreements and understandings between the parties hereto with respect thereto, whether written or oral, express or implied.

10.7    Captions; Interpretation.  The captions contained in this Agreement are for convenience of reference only and do not form a part of this Agreement.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any schedules and exhibits hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.  Any capitalized terms used in any schedule or exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement.  The words "include", "includes" and "including" will be deemed to be followed by the phrase "without limitation".  The word "if" means "if and only if."  The meanings given to terms defined herein will be equally applicable to both the singular and plural forms of such terms.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  All references to "dollars" or "$" will be deemed references to the lawful money of the United States of America.  Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules and regulations made under it, as it or they may have been or may from time to time be amended, re-enacted or replaced. The Disclosure Schedules shall be arranged in sections and subsections corresponding to the numbered and lettered sections and subsections contained in Article IV and the disclosure in any section or subsection shall, to the extent applicable, qualify other sections and subsections in Article IV.

10.8    Amendment.  This Agreement may be amended or modified only by an instrument in writing duly executed by the Company and Investor; provided, that no amendment may be made that alters the terms, substance or meaning of the provisions expressly relating to the Noteholders' Representative without the prior written approval of the Noteholders' Representative.

10.9    Waiver.  At any time prior to the Closing Date, the Company and Investor may (a) extend the time for the performance of any of the obligations or other acts of the parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto or (c) waive compliance with any of the agreements or conditions contained herein, to the extent permitted by applicable Law.  Any agreement to any such extension or waiver will be valid only if set forth in a writing signed by the Company, Noteholders' Representative and Investor.

10.10    Governing Law; Submission to Jurisdiction.    This Agreement and any claim, controversy or dispute arising under or related in any way to this Agreement, the relationship of the parties, the transactions leading to this Agreement or contemplated hereby, and/or the interpretation and enforcement of the rights and duties of the parties hereunder or related in any way to the foregoing, shall be governed by and construed in accordance with Federal bankruptcy law and, where state law is implicated, the internal, substantive laws of the State of New York applicable to agreements entered into and to be performed solely within such state without giving effect to the principles of conflict of laws thereof that would require the application of the laws of another jurisdiction.  ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING UNDER OR RELATED IN ANY WAY TO THIS AGREEMENT, THE RELATIONSHIP OF THE PARTIES, THE TRANSACTIONS LEADING TO THIS AGREEMENT OR CONTEMPLATED HEREBY, AND/OR THE INTERPRETATION AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER OR RELATED IN ANY WAY TO THE FOREGOING MAY ONLY BE INSTITUTED IN THE BANKRUPTCY COURT (AS DEFINED HEREIN), AND EACH PARTY WAIVES ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH ACTION, SUIT OR PROCEEDING, AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT (AS DEFINED HEREIN) IN ANY SUCH ACTION, SUIT OR PROCEEDING. EACH OF THE PARTIES WAIVES ANY BOND, SURETY, OR OTHER SECURITY THAT MIGHT BE REQUIRED OF ANY OTHER PARTY WITH RESPECT THERETO. ANY PARTY MAY MAKE SERVICE ON ANY OTHER PARTY BY SENDING OR DELIVERING A COPY OF THE PROCESS TO SUCH PARTY TO BE SERVED AT THE ADDRESS AND IN THE MANNER PROVIDED FOR THE GIVING OF NOTICES IN SECTION 10.5 ABOVE.  NOTHING IN THIS SECTION 10.10, HOWEVER, SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR IN EQUITY. EACH PARTY AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING SO BROUGHT SHALL BE CONCLUSIVE AND MAY BE ENFORCED BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW OR IN EQUITY.

10.11    Waiver of Jury Trial.    TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER

HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE CONTEMPLATED TRANSACTIONS OR THE FINANCING TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTY HERETO THAT THIS <u>SECTION 10.11</u> CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH IT IS RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 10.11</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

10.12  <u>Severability</u>.    Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

10.13  <u>Counterparts</u>.    This Agreement may be executed in two or more counterparts (including by means of telecopied, facsimile or .pdf signature pages), each of which will be deemed an original but all of which will constitute but one instrument.

10.14  <u>Specific Performance</u>.    Subject in all respects to the last sentence of this <u>Section 10.14</u>, the Company and Investor acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (b) remedies at Law would not be adequate to compensate the non-breaching party. Accordingly, subject to the Bidding Procedures and the last sentence of this <u>Section 10.14</u>, prior to any valid termination of this Agreement in accordance with the terms hereof, the Company and Investor agree that each of them and (following the Closing) the Noteholders' Representative shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce its rights and obligations hereunder not only by a Proceeding or Proceedings for damages but also by a Proceeding or Proceedings for specific performance, injunctive or other equitable relief without the necessity of proving the inadequacy of money damages as a remedy. Subject to the Bidding Procedures and the last sentence of this <u>Section 10.14</u>, the right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the Company and Investor hereby waives any defense that a remedy at Law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies. Subject to the Bidding Procedures and the last sentence of this <u>Section 10.14</u>, each of the Company and Investor hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, and invalid, contrary to Law or inequitable for any reason. The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, or the limitations set forth in the last sentence of this <u>Section 10.14</u>, neither the Company

nor Investor would have entered into this Agreement.  Notwithstanding the foregoing, nothing in this Section 10.14 shall limit, alter or impair the Company's rights under Section 6.9 of this Agreement or to consummate an Inconsistent Transaction in accordance with the Bidding Procedures.  Anything in this Agreement to the contrary notwithstanding, neither the Company, the Noteholders' Representative or any other Person shall be entitled to seek or otherwise obtain specific performance to require Investor (or its assignee) to effect the Closing or pay the Initial Purchase Price.  In furtherance and not in limitation of the foregoing, neither the Company, the Noteholders' Representative or any other Person shall have any right whatsoever to injunctive relief in order to prevent breaches of the provisions of Article III or Article VII, or any right whatsoever to specific performance, injunctive or other equitable relief under Article III or Article VII.

10.15   Disclosure.  Unless otherwise required by applicable Law or in connection with the Chapter 11 Cases or as permitted by the Confidentiality Agreement, the Company will not, without Investor's prior written consent, disclose to any Person the identity of Investor or its Representatives, other than to the Company's Representatives, in each case in connection with the Contemplated Transactions  and the Financing Transactions.

10.16   Noteholders' Representative.   Anything in this Agreement to the contrary notwithstanding, neither the Noteholders' Representative nor any past, present or future incorporator, member, partner, stockholder, trustee or Representative of the Noteholders' Representative shall have any liability or obligation with respect to this Agreement or with respect to any claim or cause of action that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.  For the avoidance of doubt, the Company shall not be deemed to be a Representative of the Noteholders' Representative hereunder.

**[Signatures on Following Page]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**RADIATION THERAPY SERVICES, INC.**

By: _____

Name:  Bryan Carey

Title:  Vice Chairman and Chief Financial Officer

**ONCURE HOLDINGS, INC.**

By: _____

Name: Bradford C. Burkett

Title:  President and Chief Executive Officer
(JDT with permission of Bradford C. Burkett)

[Signature Page to Investment Agreement]

## Exhibit C

|  | [m/d/yyyy] | |
|---|---|---|
| **Current Assets** | | |
| Cash | $[ ] | |
| Net accounts receivable | +[ ] | |
| Deferred income taxes | +[ ] | |
| Prepaid expenses | +[ ] | |
| Other current assets | +[ ] | |
|    **Total Current Assets** | =$[ ] | A |
| | | |
| **Current Liabilities** | | |
| Accounts payable | $[ ] | |
| Accrued expenses | +[ ] | |
| Accrued interest | +[ ] | |
| Current portion of note payable | +[ ] | |
| Capital lease obligations – current | +[ ] | |
| Other current obligations | +[ ] | |
|    **Total Current Liabilities** | =$[ ] | B |
| | | |
| **Investment Agreement Adjustments** | | |
| 1.  Exclude Cash | -$[ ] | |
| 2.  Exclude Tax assets | -[ ] | |
| 3.  Exclude Tax liabilities | +[ ] | |
| 4.  Exclude current portion of Company Debt[1] | +[ ] | |
| 5.  Exclude accrued interest on Company Debt | +[ ] | |
| 6.  Exclude management fee[2] | +[ ] | |
| 7.  Paid Selling Expenses[3] | +[ ] | |
| 8.  Other current liabilities of the Company[4] | -[ ] | |
| 9.  Accrued Selling Expenses[5] | -[ ] | |
|    **Total Investment Agreement Adjustments** | =$[ ] | C |
| | | |
| **Closing Working Capital (A – B + C)** | =$[ ] | |

---

[1] Including current capital lease obligations and the current portion of note payable.
[2] For the avoidance of doubt, management fees include any accrued but unpaid fees included in current liabilities owed to Genstar Capital, LLC ("Genstar") or any of Genstar's affiliates.
[3] Includes the aggregate expenses paid in cash by the Company after the Petition Date and prior to the Closing for items described in the second sentence of "Selling Expenses" in the Investment Agreement.
[4] Included as a deduction only to the extent are (w) not included in current liabilities of the Company or its Subsidiaries, (x) liabilities of the Company immediately prior to the Closing, (y) not satisfied in cash pursuant to the Plan or payable from, or covered by, a reserve that has been established under the Plan or an Order of the Bankruptcy Court and (z) will be included in current liabilities of the Company or its Subsidiaries immediately following the Closing Date (e.g., liabilities subject to compromise not actually extinguished).
[5] Includes Selling Expenses not paid or reserved for with funds from the Company and pursuant to the Plan.

**Exhibit D**

**COMMON INTEREST AGREEMENT**

This **COMMON INTEREST AGREEMENT** (the "Agreement"), effective as of this June 22, 2013, is entered into by and between OnCure Holdings, Inc. (the "Company") and Radiation Therapy Services, Inc. (the "Investor", and together with the Company, each a "Party", and collectively, the "Parties"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in that certain Investment Agreement, dated as of June 22, 2013, by and between the Parties (the "Investment Agreement").

**WHEREAS**, the Company intends to implement a financial restructuring of its existing debt, equity and other obligations, which restructuring will be consummated by commencing the Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court to pursue confirmation of the Plan;

**WHEREAS**, pursuant to the Investment Agreement, on the terms and subject to the conditions set forth therein, the Investor shall buy from the Company, and the Company shall issue to Investor, 100% of the shares of the Company's common stock, par value $0.001 per share, that are to be newly issued pursuant to the terms of the Plan, and the Investor will assume certain of the legal liabilities, claims, obligations and matters of the Company as expressly set forth in, and subject to the terms and conditions of, the Investment Agreement;

**WHEREAS**, the Parties have common legal interests (the "Common Interests") in seeking, among other things, to analyze and consider the legal liabilities, claims, obligations and matters that are the subject of, or arise in connection with, the due diligence questionnaire

attached hereto as <u>Exhibit A</u> (such matters, the "<u>Due Diligence Matters</u>", and such questionnaire, the "<u>Due Diligence Questionnaire</u>");

**WHEREAS**, the Parties believe that their Common Interests will be furthered by the Parties and their respective counsel sharing and exchanging information, documents, materials, mental impressions, opinions, legal theories and conclusions in connection with the Due Diligence Matters and Due Diligence Questionnaire (the "<u>Common Interest Information</u>", and the Party that, directly or indirectly, shares or exchanges Common Interest Information, the "<u>Disclosing Party</u>", and the Party that receives, directly or indirectly, Common Interest Information, the "<u>Receiving Party</u>", in each case, with respect to such Common Interest Information);

**WHEREAS**, the Common Interest Information may be privileged from disclosure as a result of the attorney-client privilege, the work-product doctrine, or other applicable privileges or immunities; and

**WHEREAS**, by entering into this Agreement, the Parties wish to ensure and intend that the exchange and disclosure of Common Interest Information in furtherance of a joint and/or coordinated effort while preserving and protecting the confidentiality of the Common Interest Information, and the Parties expressly do not intend to waive any privileges or immunities otherwise applicable.

NOW, THEREFORE, IT IS HEREBY AGREED, by the Parties as follows:

1.    All Common Interest Information shall be and remain confidential and privileged or otherwise protected from discovery by third parties and any exchange or disclosure of

SF\5600032.3

Common Interest Information pursuant to this Agreement will be made within the so-called "common interest" privilege, as recognized by numerous courts and other authorities, to the maximum extent recognized by law.

2.      The Parties may disclose to each other or exchange documents and communications (written, oral or in electronic form) which are or may be helpful in furthering their common legal interests under this Agreement. Nothing in this Agreement shall be construed to require any Party to disclose or exchange documents or communications related to any matter in which they share a common legal interest.

3.      Common Interest Information that is in written or electronic form should be marked "Privileged" or "Confidential" where possible, but a failure to so mark any materials shall not in any way constitute a waiver of privilege or the applicability of this Agreement.

4.      Each Party shall treat all Common Interest Information provided to it by any Disclosing Party, or by any expert, consultant, or other person retained by such Disclosing Party, as confidential and, except as set forth in this Agreement, shall not disclose or make available any such Common Interest Information to any third party, shall not treat such Common Interest Information in any way that is inconsistent with its privileged and confidential status, and shall maintain the Common Interest Information in confidence in accordance with the terms hereof and preserve all applicable privileges and legal protections with respect thereto.

5.      All Common Interest Information produced by or on behalf of a Disclosing Party or its attorneys, experts or consultants to any Receiving Party shall be used by such Receiving Party solely in furtherance of the Parties' Common Interests and for no other purposes whatsoever.

3

6.     Except as permitted by this Agreement, the Receiving Party and its counsel agree not to disclose Common Interest Information received from the Disclosing Party or its counsel to any other person or entity other than (1) attorneys and their staff representing the Receiving Party who are involved in or have responsibilities for the Due Diligence Matters; (2) experts or consultants retained by the Receiving Party in connection with evaluating the Due Diligence Matters or preparing a defense with respect to such matters; and (3) employees, officers, principals or directors of the Receiving Party who are or may be involved in, or who have responsibilities with respect to, the Due Diligence Matters, without the prior written consent of the Disclosing Party.    Persons permitted access to Common Interest Information shall be advised by Receiving Party that the Common Interest Information is confidential and subject to this Agreement.

7.     If any other person or entity requests or demands, by notice, subpoena or otherwise, any Common Interest Information from any Receiving Party (or its attorneys or any persons assisting such attorneys, or any other person who has received Common Interest Information pursuant to Paragraph 6 of this Agreement), the Receiving Party (or its attorneys or any persons assisting such attorneys, or any other person who has received Common Interest Information pursuant to Paragraph 6 of this Agreement) receiving the request or demand shall promptly notify the Disclosing Party, provide a copy of the request or demand to the Disclosing Party to the extent it relates to the Common Interest Information and as permitted by applicable law, use commercially reasonably efforts to assert all applicable rights, privileges and objections with respect to such requests or demands, and, at the sole cost and expense of the Disclosing Party, reasonably cooperate with the Disclosing Party if it seeks a protective order or other relief

4

to prevent or limit the disclosure of Common Interest Information provided to the Receiving Party.

8.    Any Party is free to terminate this Agreement upon giving express written notification to the other Party, in which event this Agreement shall no longer be operative with respect to any information disclosed after such date; provided, however, that this Agreement shall continue to cover and protect all Common Interest Information disclosed prior to such termination in accordance with the terms hereof. Each Receiving Party shall return, or provide confirmation of the destruction of, all Common Interest Information to the Disclosing Party within thirty (30) days after termination of this Agreement.

9.    The Parties agree that the existence of this Agreement or of their Common Interest shall not be used by any of them in any litigation or otherwise except to enforce the terms thereof or to prove the continued existence of any privilege, and neither the existence of this Agreement nor the exchange or disclosure of Common Interest Information or other information pursuant hereto shall constitute waiver of the attorney-client privilege, work product doctrine or any other applicable privilege or protection in any dispute between the Parties.

10.    The Parties acknowledge and agree that disclosure of any communication or information in violation of this Agreement will cause the other Parties to suffer irreparable harm for which there is no adequate legal remedy. Accordingly, specific performance and injunctive relief (without the requirement of posting a bond) is an appropriate remedy to compel compliance with the provisions of the Agreement.

11.    Nothing in this Agreement has any effect of transforming any Party's counsel into counsel for any other Party or entity. There is no duty of loyalty, and no duty of loyalty will be

5

deemed to arise by implication from this Agreement, between an attorney and anyone other than the attorney's own client.

12.    In the event that any provision(s) of this Agreement shall be held by any court of competent jurisdiction to be illegal, void, or unenforceable, such provision(s) shall have no force or effect, but the illegality or unenforceability of such provision(s) shall neither affect nor impair the enforceability of any provision in this Agreement.

13.    This Agreement shall be governed by, and construed in accordance with, the substantive laws of the State of New York, without reference to principles of conflicts of laws that would require the application of the laws of another jurisdiction. ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING UNDER OR RELATED TO THIS AGREEMENT AND/OR THE INTERPRETATION AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER MAY ONLY BE INSTITUTED IN THE U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN OR THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK, AND EACH PARTY WAIVES ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH ACTION, SUIT OR PROCEEDING, AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH ACTION, SUIT OR PROCEEDING.

14.    No modification, rescission, waiver or amendment of any provision of this Agreement shall be effective unless set forth in a written agreement signed by or on behalf of each Party.

15.     This Agreement does not amend, limit, or otherwise alter the provisions of, or obligations of the Parties under, that certain Non-Disclosure Agreement between the Parties dated January 22, 2013, and such Non-Disclosure Agreement remains in full force and effect in accordance with the terms thereof.

16.     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or pdf signature pages shall be equally effective as delivery of the original, and shall not affect the validity, enforceability or binding effect of this Agreement.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.


By:_____          By:_____
      Radiation Therapy Services, Inc.                OnCure Holdings, Inc.

## Exhibit F-1

## Matters Covered by Kirkland & Ellis Opinion[1][2]

1.    Based solely upon our review of the Good Standing Certificates, each of the Specified Guarantors[3] is a corporation or limited liability company existing and in good standing under the laws of the jurisdiction of its organization.

2.    Each of the Specified Guarantors has the corporate or limited liability company power, as applicable, to enter into and perform its obligations under the Transaction Documents[4] to which it is a party.

3.    Each of the Specified Guarantors has the corporate or limited liability company power, as applicable, to own and lease its properties and to conduct its business as presently conducted.

4.    Assuming due authorization, execution and delivery of the Specified Intercreditor Agreements by the Non-Specified Guarantors party thereto and the other parties thereto (other than the Specified Guarantors), the Intercreditor Agreements are valid and binding obligations of such Non-Specified Guarantors and are enforceable against such Non-Specified Guarantors in accordance with their terms. The Specified Intercreditor Agreements have been duly authorized, executed and delivered by the Specified Guarantors party thereto, and the Specified Intercreditor Agreements are valid and binding obligations of such Specified Guarantors and are enforceable against such Specified Guarantors in accordance with their terms.

5.    The Amended Note Guarantees have been duly authorized, executed and delivered by each of the Specified Guarantors and (assuming the due authorization, execution and delivery of the Amended Note Guarantees by the Non-Specified Guarantors,[5] the due authorization, execution and delivery of the indenture governing the Amended Notes (the "Amended Notes Indenture") by the Trustee[6] and the Company and its Subsidiaries party

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Investment Agreement to which this exhibit is attached as Exhibit F-1 thereto.

[2] The opinion will address these matters under New York law and Delaware law and, as applicable, federal law, and will be subject to qualifications customarily contained within opinions given by Kirkland & Ellis LLP in transactions similar to the Financing Transactions.

[3] The Specified Guarantors will be each of the guarantors of the Amended Notes whose jurisdiction of organization or formation is New York or Delaware.

[4] Transaction Documents will be defined as the Amended Note Guarantees and the Specified Intercreditor Agreements.

[5] The Non-Specified Guarantors will be each of the guarantors of the Amended Notes other than the Specified Guarantors.

[6] The Trustee under the Amended Notes Indenture.

thereto and the due authentication and delivery of the Amended Notes by the Trustee and the Company in accordance with the Amended Indenture), the Amended Note Guarantees constitute the valid and legally binding obligations of each of the Guarantors,[7] and will be enforceable against each of the Guarantors in accordance with their terms.

6.    The execution and delivery of the Transaction Documents by each of the Guarantors, as applicable, the performance by each of the Guarantors of their respective obligations thereunder (collectively, the "Transactions") and the purchase of the Shares by Investor pursuant to the Investment Agreement do not and will not (i) result in any breach of any of the terms and provisions of the charter, bylaws or other organizational documents of the Specified Guarantors, (ii) result in any breach of any of the terms and provisions of, or constitute a default (or an event which with notice or lapse of time or both, would constitute a default) under, or result in the creation or imposition of any lien, charge or encumbrance upon any property or assets of the Guarantors pursuant to, any Specified Contracts,[8] it being expressly understood that in each case we express no opinion as to compliance with any financial covenant or test or cross-default provision in any Specified Contract, or (iii) violate any Specified Law,[9] except in the case of clause (ii), for any such conflict, breach, violation or default which has been waived by the party or parties with power to waive such conflict, breach, violation or default. (The advice in this paragraph is referred to herein as the "No Conflicts Opinion").

7.    No consent, approval, authorization, or order of, or qualification with, any governmental body or agency under any Specified Law is required to be obtained, nor are any filings required to be made by the Guarantors under any Specified Law with respect to the execution and delivery of the Transaction Documents by the Guarantors or the consummation of the Transactions. (The advice in this paragraph is referred to herein as the "No Consent Opinion").

8.    Based upon our review of the Confirmation Order, no registration under the Securities Act of the Amended Note Guarantees is required in connection with the issuance of the Amended Note Guarantees to the holders of Amended Notes.

9.    Each of the Guarantors is not and, immediately after giving effect to the issuance of the Amended Note Guarantees will not be, required to register as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended.

---

[7] The Guarantors will be the Specified Guarantors and the Non-Specified Guarantors, collectively.

[8] Specified Contracts will include (i) the credit agreement described in clause (a) of the definition of "Investor Credit Documents," (ii) the indenture described in clause (a) of the definition of "Investor Secured Notes Documents," (iii) the indenture described in clause (a) of the definition of "Investor Subordinated Notes Documents," and (iv) certain of the agreements filed as exhibits to the Annual Report on Form 10-K filed by Radiation Therapy Services Holdings, Inc. with the Securities and Exchange Commission on March 28, 2013.

[9] Specified Law will be defined as internal law of the State of New York, the General Corporation Law of the State of Delaware, the Delaware Limited Liability Company Act, and the federal laws of the United States (except that we do not opine as to the federal securities laws with respect to the No Conflicts Opinion and the No Consent Opinion).

**Exhibit F-2**

**Matters Covered by Local Counsel Opinion[12]**

1.      Based solely upon our review of the Good Standing Certificates, each of the Specified Guarantors[3] is a corporation or limited liability company existing and in good standing[4] under the laws of the jurisdiction of its organization.

2.      Each of the Specified Guarantors has the corporate or limited liability company power, as applicable, to enter into and perform its obligations under the Transaction Documents[5] to which it is a party.

3.      Each of the Specified Guarantors has the corporate or limited liability company power, as applicable, to own and lease its properties and to conduct its business as presently conducted.

4.      The Specified Intercreditor Agreements have been duly authorized, executed and delivered each of the Specified Guarantors party thereto.

5.      The Amended Note Guarantees have been duly authorized, executed and delivered by each of the Specified Guarantors.

6.      The execution and delivery of the Transaction Documents by each of the Specified Guarantors, as applicable, and the performance by each of the Specified Guarantors of their respective obligations thereunder (collectively, the "Transactions") do not and will not (i) result in any breach of any of the terms and provisions of the charter, bylaws or other organizational documents of the Specified Guarantors, or (ii) violate any Specified Law[6].

7.      No consent, approval, authorization, or order of, or qualification with, any governmental body or agency under any Specified Law is required to be obtained, nor are any filings

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Investment Agreement to which this exhibit is attached as Exhibit F-2 thereto.

[2] The opinion will address these matters under the local law covered by the local counsel and will be subject to qualifications customarily contained within opinions given by such counsel in transactions similar to the Financing Transactions.

[3] The Specified Guarantors will be each of the guarantors of the Amended Notes whose jurisdiction of organization or formation is the jurisdiction(s) covered by the local counsel.

[4] Or a similar concept in jurisdictions where the concept of good standing is not used.

[5] Transaction Documents will be defined as the Amended Note Guarantees and the Specified Intercreditor Agreements.

[6] Specified Law will be defined as the local law covered by the local counsel.

required to be made by the Guarantors[7] under any Specified Law with respect to the execution and delivery of the Transaction Documents by the Guarantors, or the execution and delivery of the Transaction Documents by the Guarantors, or the consummation of the Transactions.

---

[7] The Guarantors will be the Specified Guarantors and each of the guarantors of the Amended Notes whose

jurisdiction of organization or formation is New York or Delaware, collectively.

## Exhibit G

### Summary of Principal Terms and Conditions of
### OnCure Holdings, Inc. First Lien Notes

*This Summary of Principal Terms and Conditions, together with the Annexes attached hereto, (collectively, this "Term Sheet") outlines certain key terms of the Amended Notes. Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Investment Agreement to which this Term Sheet is attached as Exhibit L thereto.*

**General Rules of Construction.........**

The terms, covenants, conditions and other provisions contained in the indenture (the "OnCure Indenture") governing the Amended Notes will be substantially similar in form to the terms, covenants, conditions and other provisions contained in the indenture (the "RTS Indenture") governing the 8 7/8% Senior Secured Second Lien Notes due 2017 (the "RTS Second Lien Notes") issued by Radiation Therapy Services, Inc., a Florida corporation (the "Investor"), with revised basket sizes and revisions as described in Annex A hereto; provided, however, that (i) that with respect to matters that are (x) not covered herein or (y) contemplated herein but not fully specified in detail, the Investor and the Consenting Debtholders agree, in each case, to negotiate in good faith to develop modifications and revisions to the OnCure Indenture that are appropriate to reflect such matters and reasonably acceptable to the Investor and the Majority Consenting Debtholders. Without limitation to the generality of the foregoing, it is acknowledged and agreed that due to the proposed structure of the Amended Notes (including, without limitation, as to matters set forth in "**Guarantors**", "**Ranking**" and "**Collateral**" below), there will be certain terms and conditions in the OnCure Indenture that are (x) not covered herein or (y) contemplated herein but not fully specified in detail that will also need to be modified or otherwise revised to account for such proposed structure and the Investor and the Consenting Debtholders agree to negotiate in good faith to develop modifications and revisions to such terms and conditions that are appropriate to reflect such proposed structure and reasonably acceptable to Investor and the Majority Consenting Debtholders.

Unless otherwise specifically set forth in this Term Sheet, the terms, covenants, conditions and other provisions contained in the OnCure Indenture will address OnCure (as defined below) and its subsidiaries, such that references in the OnCure Indenture to the term "Company" and "Subsidiaries" (or variations thereof, such as "Restricted Subsidiaries") shall mean and be a reference to OnCure and the subsidiaries of OnCure, respectively.

1

| | |
|---|---|
| **Issuer**............................................ | OnCure Holdings, Inc., a Delaware corporation ("OnCure"). |
| **Amended Notes**............................ | $75.0 million in aggregate principal amount (after giving effect to the amendment of the Notes (as in effect on the date of the Investment Agreement)). |

In addition, $7.5 million in aggregate principal amount of Amended Notes (the "Earn-Out Notes") will be deposited on the Closing Date into an escrow account (the "Escrow Account") to be held by an escrow agent, which escrow agent shall be selected by the Majority Consenting Debtholders in their reasonable discretion and reasonably acceptable to Investor (the "Escrow Agent"), pursuant to an escrow agreement in form and substance reasonably satisfactory to the Investor and the Majority Consenting Debtholders (the "Escrow Agreement"). Pursuant to the terms of the Escrow Agreement, the Escrow Agent shall release the Earn-Out Notes, together with any amounts deposited therein pursuant to any Earn-Out Prepayment Event, to holders of the Amended Notes of record as of December 31, 2015 (or, if an Earn-Out Prepayment Event has occurred prior to such date that resulted in the redemption, prepayment, retirement, defeasance or refinancing of all of the Amended Notes, the date of determination of the holders of the Amended Notes that were entitled to receive payment in respect of the Amended Notes in connection with such Earn-Out Prepayment Event) upon receipt of audited annual financial statements of OnCure and its subsidiaries for the fiscal year ended December 31, 2015 (the "2015 Financial Statements"), if the combined aggregate "Center-Level EBITDA" (to be defined in the OnCure Indenture) for the Specified Centers (as defined below) for such fiscal year is greater than $1.5 million (such condition, the "Earn-Out Condition"). In the event that the Earn-Out Condition is not satisfied, the Escrow Agent shall release the Earn-Out Notes to OnCure for cancellation, together with any other amounts then held in or credited to the Escrow Account. Any cash interest paid on the Earn-Out Notes while such Earn-Out Notes are held in or credited to the Escrow Account will be released to OnCure, promptly after such interest payment is made to the Escrow Agent, in accordance with the terms of the Escrow Agreement.

In the event an Earn-Out Prepayment Event (as defined below) occurs, OnCure shall pay to the Escrow Agent, for distribution by the Escrow Agent to holders of record of the Amended Notes on December 31, 2015 (or, in the case of any such Earn-Out Prepayment Event that results in the redemption, prepayment, retirement, defeasance or refinancing of all of the Amended Notes, the date of determination of the holders of the Amended Notes entitled to

2

receive payment in respect of the Amended Notes in connection with such Earn-Out Prepayment Event) upon satisfaction of the Earn-Out Condition, an amount in cash equal to the aggregate principal amount of the Earn-Out Notes that are subject to such Earn-Out Prepayment Event. "Earn-Out Prepayment Event" means any redemption, prepayment, retirement, defeasance or refinancing of the Amended Notes prior to the date on which OnCure receives the 2015 Financial Statements.

**Interest Rate and Payments**............    11.75% cash coupon. Interest on the Amended Notes will be paid semi-annually in cash on dates to be determined. Interest will accrue from the Closing Date.

**Maturity Date**..............................    The Amended Notes will mature on January 15, 2017.

**Guarantors**.................................    The Amended Notes will be jointly and severally guaranteed on a senior secured basis by each existing and future domestic restricted subsidiary of OnCure (the "OnCure Subsidiaries," together with OnCure, the "OnCure Entities"). As of the Closing Date, such guarantors shall be the subsidiaries of OnCure that guarantee the obligations under the Note Indenture (as in effect immediately prior to the Closing Date).

The Amended Notes will be jointly and severally guaranteed on a senior unsecured basis by Investor, Radiation Therapy Services Holdings, Inc. (the "Parent") and each existing and future restricted subsidiary of Investor (other than foreign subsidiaries and excluding the OnCure Entities) (the "RTS Subsidiaries," together with Investor and the Parent, the "RTS Entities;" and the RTS Entities together with the OnCure Entities, collectively, the "RTS/OnCure Entities") that guarantees the obligations of the Investor under Credit Agreement (as defined in the RTS Indenture), pursuant to a covenant substantially similar to the covenant to provide guarantees under the RTS Indenture. As of the Closing Date, such guarantors shall be the Investor, Parent and each RTS Subsidiary that guarantees the obligations of the Investor on such date under the Credit Agreement (as defined in the RTS Indenture) as in effect on the Closing Date. The guarantee (the "RTS Guarantee") of each of the RTS Entities shall contain covenants and events of default substantially similar to those applicable to the RTS Entities contained in the RTS Indenture. For the avoidance of doubt, Parent will not be subject to any additional covenants than those to which it is currently subject under the RTS Indenture, except as otherwise set forth herein.

**Ranking**.....................................    The Amended Notes will be:

3

- ranked *pari passu* in right of payment with all existing and future senior indebtedness of the OnCure Entities, but effectively senior to all existing and future senior indebtedness of the OnCure Entities to the extent of the value of the OnCure Collateral (as defined below); and

- senior in right of payment to all existing and future subordinated obligations of the OnCure Entities.

**Optional Redemption**....................... Non-callable, in whole or in part, prior to September 30, 2015. At any time on or prior to such date, the Amended Notes may be redeemed or purchased, in whole or in part, at a price equal to 100% the principal amount thereof *plus* the Applicable Premium (to be defined substantially similar to such definition contained in the RTS Indenture) *plus* accrued and unpaid interest thereon.

Thereafter, the Amended Notes shall be callable, in whole or in part, during the periods set forth below, for the redemption prices set forth opposite such period below (expressed as a percentage of the principal amount of the Amended Notes to be redeemed):

| | |
|---|---|
| September 30, 2015 through but excluding February 15, 2016 | 106% (*plus* accrued and unpaid interest) |
| February 15, 2016 through but excluding July 31, 2016 | 103% (*plus* accrued and unpaid interest) |
| July 31, 2016 and thereafter | 100% (*plus* accrued and unpaid interest) |

At any time on or prior to September 30, 2015, up to 35% of the principal amount of the Amended Notes may be redeemed, with the use of net cash proceeds of one or more equity offerings, at a redemption price of 111.75% of the principal amount thereof *plus* accrued and unpaid interest thereon.

**Change of Control**....................... Upon the occurrence of a change of control of either Investor or OnCure, OnCure will be required to offer to repurchase the Amended Notes at 101% of the outstanding principal amount thereof *plus* accrued and unpaid interest thereon.

**Collateral**................................. The Amended Notes will be secured by a valid and perfected first priority lien on the same assets and properties of the

4

OnCure Entities that secure, or purport to secure, the OnCure Entities' obligations under the indebtedness and other obligations under the Note Indenture and the related financing documents, in each case, as in effect immediately prior to the Closing Date (such assets and properties, the "OnCure Collateral").

**Intercreditor Agreements**............... An intercreditor agreement (such intercreditor agreement, the "Lender Intercreditor Agreement") between the duly appointed agent of the holders of the indebtedness and the other obligations under the Investor Credit Documents and the duly appointed agent of the holders of the Amended Notes (the "Amended Notes Agent") shall be entered into on customary terms pursuant to which the Liens on the OnCure Collateral that secure the indebtedness and other obligations under the Investor Credit Documents are made junior and subordinate in all respects to all Liens on the OnCure Collateral that secure the indebtedness and other obligations under the Amended Notes, the OnCure Indenture and the related financing documents (the "Amended Notes Obligations").

An intercreditor agreement (such intercreditor agreement, the "Notes Intercreditor Agreement") between the duly appointed agent of the holders of the RTS Second Lien Notes and the Amended Notes Agent shall be entered into on customary terms pursuant to which the Liens on the OnCure Collateral that secure the indebtedness and other obligations under the RTS Indenture, the RTS Second Lien Notes and the related financing documents are made junior and subordinate in all respects to all Liens on the OnCure Collateral that secure the Amended Notes Obligations.

Each of the Lender Intercreditor Agreement and the Notes Intercreditor Agreement shall be in form and substance reasonably acceptable to the Amended Notes Agent and Majority Consenting Debtholders.

Notwithstanding the foregoing, in lieu of the Lender Intercreditor Agreement and/or the Notes Intercreditor Agreement, a supplemental intercreditor agreement to, or an amendment and/or a joinder to, the Intercreditor Agreement (as defined in the RTS Indenture) may be entered into to the extent that such Intercreditor Agreement as so supplemented or amended provides for both (x) the terms contemplated above for the Lender Intercreditor Agreement and (y) the terms contemplated above for the Notes Intercreditor Agreement, and shall be in form and substance reasonably acceptable to the Amended Notes Agent and Majority Consenting Debtholders,

5

Covenants (applicable to the OnCure
Entities).......................................

Notwithstanding the terms and other provisions included in "General Rules of Construction" set forth above, the following modifications will be made to the covenants applicable to the Amended Notes (and the defined terms related to such covenants):

*Restricted Payments*

The restricted payments covenant shall include the following two separate baskets in lieu of the building-basket included in the RTS Indenture:

- A restricted payments build-up basket which shall permit distributions of cash or other assets from the OnCure Entities to the RTS Entities in an amount equal to the sum of (i) the cumulative amount of cash and the fair market value of other assets that are used in the business of the OnCure Entities that, in each case, the RTS Entities contribute to or invest in the OnCure Entities after the Closing Date and (ii) in the event that the cash so contributed or invested pursuant to clause (i) above was drawn from, or the assets so contributed or invested pursuant to clause (i) above were purchased with amounts drawn from, the credit facilities or other credit sources of the RTS Entities, the aggregate amount of interest payments made by the RTS Entities, as of the date of calculation, on such outstanding drawn indebtedness (collectively, the "RTS Contribution Indebtedness"), provided that the aggregate amount of restricted payments subsequently made under this basket shall be deemed to reduce the aggregate principal amount of such RTS Contribution Indebtedness as of the date of such restricted payment is made for purposes of calculating such interest amount under this clause (ii) (the "Investment Build-Up Basket"). Use of the Investment Build-Up Basket will be subject to a minimum liquidity (to be defined) threshold of $5.0 million at the OnCure Entities.

- A build-up basket which shall permit distributions of restricted payments from the OnCure Entities to the RTS Entities in an amount equal to 50% of the Consolidated Net Income (as defined in the RTS Indenture) of the OnCure Entities (or, if Consolidated Net Income is a loss, less 100% of such loss).

The restricted payments carve-outs permitting payments to parent companies for certain taxes, expenses, salaries and other payments (i.e. a carve-out as set forth in Section

6

4.10(b)(5) of the RTS Indenture) will provide for (x) the proportional allocation to the RTS Entities and OnCure Entities of any such tax, expense, payment and salary that is attributable to the operations of both the RTS Entities and OnCure Entities or (y) any such tax, expense, payment and salary that is related to or derived from a specific RTS Entity or OnCure Entity or the business, assets, liabilities, operations, finances, existence or other activities of a specific RTS Entity or OnCure Entity to be directly allocated to such RTS Entity or OnCure Entity.

Appropriate modifications will be made in the OnCure Indenture to prevent "double-counting" of other restricted payments baskets and the separate baskets described above.

Transactions contemplated by the Intercompany Services Agreement (as defined below) shall be permitted without restriction under the OnCure Indenture; provided that such transactions shall not increase or decrease the amount of the Investment Build-Up Basket.

|  |  |
|---|---|
| *Permitted Liens* | Liens securing indebtedness and the other obligations permitted to be incurred under credit facilities to be made junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
|  | Liens securing permitted refinancing indebtedness must be junior and subordinate in all respects to the Liens securing the Amended Notes Obligations at least to the same extent that the Liens securing the refinanced indebtedness are junior and subordinate to the Liens securing the Amended Notes Obligations. |
|  | Liens securing indebtedness that are permitted under the 3.25:1.00 consolidated secured leverage ratio test, which ratio shall be calculated with respect to the RTS/OnCure Entities, must be made junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. Other than guarantees of indebtedness of the RTS Entities, indebtedness related to such permitted Liens must have a maturity date on or after July 16, 2017. |
| *Indebtedness Covenant* | The calculation of the 2.0:1.0 consolidated fixed charge coverage ratio for purposes of allowing general "ratio" indebtedness (i.e., not indebtedness subject to specific |

7

baskets) shall be based on the RTS/OnCure Entities.

All intercompany indebtedness will be unsecured and subordinate in right of payment to the Amended Notes Obligations pursuant to a subordination agreement, to be an exhibit to the OnCure Indenture (which exhibit shall be in form and substance reasonably satisfactory to the Amended Notes Agent and the Majority Consenting Debtholders).

The anti-layering provision shall be in form and substance substantially identical to the anti-layering provision in the Note Indenture (as in effect on the date of the Investment Agreement).

*Asset Sales*

The asset sale covenant shall be on terms substantially the same as the covenant in the RTS Indenture; provided, that:

- Net proceeds from asset sales of the OnCure Entities must be applied, within 365 days of the receipt thereof, to (i) pre-pay the Amended Notes or (ii) re-invest in the assets or properties owned by the OnCure Entities.

- Asset sales shall include a transaction or series of related transactions for which the OnCure Entities receive aggregate consideration of $1.25 million or more.

- Designated Non-Cash Consideration (as defined in the RTS Indenture) will be limited to the greater of $2.5 million and 2.0% of total assets (calculated with respect to the OnCure Entities).

*Reports*

OnCure will provide the following information to holders of Amended Notes (which, at OnCure's option, may be provided through a password protected website): (i) audited annual financial statements prepared in accordance with GAAP (subject to the absence of footnotes), within the time periods required for such financial statements under the RTS Indenture, provided that such time period for the first fiscal year ending after the Closing Date shall be 120 days, (ii) unaudited quarterly financial statements prepared in accordance with GAAP (subject to the absence of footnotes), within the time periods required for such financial statements under the RTS Indenture, provided that such time period for the first fiscal quarter ending after the Closing Date shall be 60 days, and (iii) within the time periods required in a Current Report on Form 8-K under the Exchange Act, reports containing substantially the same information required to be contained in a Form 8-K pursuant to Item 1.01 (Entry into a

8

Material Definitive Agreement), 1.02 (Termination of a Material Definitive Agreement), 2.01 (Completion of Acquisition or Disposition of Assets), 2.03 (Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant), 2.04 (Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement), 4.01 (Changes in Registrant's Certifying Accountant), 4.02 (Non-Reliance of Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review), 5.01 (Changes in Control of Registrant), 5.02 (Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers), or 5.05 (Amendments to Articles of Incorporation or By-Laws; Change in Fiscal Year) thereof.

The RTS Guarantee shall contain a reporting covenant that requires the Investor to provide, together with delivery of its annual and quarterly reports, segment reporting including operational statistics with respect to the OnCure Entities.

*Intercompany Services Agreement*

OnCure and Investor shall enter into an intercompany services agreement (the "Intercompany Services Agreement"), the terms of which are subject to further mutual agreement; provided, however, it is understood and agreed that the services provided under such Intercompany Services Agreement shall be chargeable to the OnCure Entities at cost and the OnCure Entities shall be provided an annual inspection right (including the right to hire a third party consultant or advisor to assist with such inspection) to verify the books and records of the RTS Entities with respect to such services and the cost thereof.

*Affiliate Transactions*

- Transactions between the OnCure Entities and the RTS Entities ("Internal Affiliate Transactions") in excess of a threshold of $500,000 shall (i) be subject to an "arm's length basis" standard, (ii) to the extent in excess of $2.5 million, require board approval, and (iii) to the extent in excess of $10.0 million, require a fairness opinion; provided, however, no Internal Affiliate Transactions shall be permitted to the extent involving or relating to (w) a management services agreement or any similar agreement with any Managed Practice (to be defined) of the OnCure Entities, except to the extent permitted under "**Certain Additional Restrictions**" below, (x) any of the physicians or other employees within any

9

Managed Practice of the OnCure Entities, except to the extent permitted under "**Certain Additional Restrictions**" below, (y) equipment of the OnCure Entities, except to the extent such equipment is replaced prior to or concurrently with the consummation of such Internal Affiliate Transaction with similar equipment of a higher fair market value useful in the business of the OnCure Entities, and (z) transfers of real property of OnCure Entities or transfers of leases for real property under which an OnCure Entity is the lessee immediately prior to the consummation of such Internal Affiliate Transaction, except to the extent permitted under "**Certain Additional Restrictions**" below.

- The thresholds for affiliate transactions (other than Internal Affiliate Transactions) shall be as set forth on Annex A attached hereto.

*Certain Additional Restrictions*

- None of the RTS Entities shall enter into any management services agreement or any similar agreement with any Managed Practice of the OnCure Entities or any of the physicians or other employees affiliated with any such Managed Practice (for the avoidance of doubt, excluding any physicians or employees within RTS Entities) or transfer any real property or leases for real property of a Managed Practice or the OnCure Entities for a period of three (3) years following the date of expiration or termination of such management services agreement or similar agreement; provided that the RTS Entities may take the actions described above under a profits interest arrangement whereby if a Managed Practice is consolidated with an RTS Entity, the OnCure Entities will be provided in exchange an interest in such entity with a fair market value of no less than the Center-Level EBITDA on a LTM basis of such practice just prior to the consolidation, plus a sharing of the synergies of such consolidation in proportion to the revenue contribution of the relevant OnCure Entity on an LTM basis just prior to such consolidation, provided, that, (i) the Amended Notes Agent is provided a first priority Lien on such interest, (ii) such arrangement provides for a cash management arrangement pursuant to which cash allocable to the OnCure Entities

10

under such arrangement is promptly transferred to an account of OnCure in which the Amended Notes Agent has a first priority perfected Lien, and (iii) the aggregate amount of Center-Level EBITDA of all such practices subject to such arrangements does not exceed 20% of Center-Level EBITDA of all practices calculated as of the Closing Date; provided that the liens contemplated by clauses (i) and (ii) will be granted only to the extent that such Liens are on property or assets that would otherwise constitute OnCure Collateral. In addition, the RTS Entities shall not enter into an agreement outside of such consolidation with any of the physicians or other employees at the relevant Managed Practice unless such agreement is reasonably expected to result in increased synergies to the Managed Practice or Investor is able to replace the physicians or employees with persons reasonably expected to be of comparable talent.

- The OnCure Entities will not consummate any asset sale with respect to the property or assets of any of the Specified Centers or any sale of all or substantially all of the equity interests in any entity that owns a Specified Center and, for purposes hereof, an asset sale shall include any asset sale in which property or assets of any of the Specified Centers are sold or transferred to RTS Entities. Additionally, OnCure shall conduct the business and operations at the Specified Centers in the usual and ordinary course of business. The "Specified Centers" means those outpatient radiation oncology treatment centers for which affiliates of OnCure currently provide management services that are located in (i) Fountain Valley, California, (ii) Anaheim, California, (iii) Placentia, California, and (iv) Santa Maria, California.

- All cash, cash equivalents and other funds that are held or received by or owing to the OnCure Entities shall be deposited and held in or credited to an account or accounts over which a valid and perfected first priority lien has been granted in favor of the Amended Notes Agent (and shall not be commingled with any cash, cash equivalents and other funds of the RTS Entities), and the OnCure Entities shall direct and instruct all of their account debtors and obligors to make all payments due or to become due to the

OnCure Entities directly to such an account.

| | |
|---|---|
| **First Lien Obligations**..................... | The Amended Notes Obligations shall be designated and otherwise deemed to constitute "First Lien Obligations" for purposes of the Investor Secured Notes Documents and "Senior Debt" for purposes of the Investor Subordinated Notes Document.  The Investor shall designate Amended Notes Obligations as "senior debt" or the equivalent for purposes any future indenture or financing documentation. |
| **Registration Rights**....................... | None. |

12

## ONCURE HOLDINGS, INC.

First Lien Notes

*Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Term Sheet.*

Covenant Baskets[1]

| Covenant | RTS Indenture Section Reference | Basket Amount |
|---|---|---|
| **Indebtedness** | | |
| *Credit Facilities Basket* | Section 4.09(b)(2) | $150 million; provided that such indebtedness shall at all times be subject to the Lender Intercreditor Agreement. |
| *Capital Leases/Purchase Money Indebtedness* | Section 4.09(b)(4) | The greater of $10.0 million and 4.0% of total assets (calculated with respect to the OnCure Entities); provided, that the OnCure Entities may incur indebtedness in respect of guarantees of Capital Leases/Purchase Money Indebtedness of the RTS Entities so long as (x) the aggregate principal amount of such guarantees, together with all such other indebtedness incurred under this basket, does not exceed the greater of $50.0 million and 4.0% of Total Assets (calculated with respect to the RTS/OnCure Entities) and (y) such guarantees are unsecured or secured by Liens junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance |

---

[1] Baskets set forth herein apply to the OnCure Entities.

NY 74611821v7

| | | substantially similar to the Lender Intercreditor Agreement. |
|---|---|---|
| *Intercompany Indebtedness* | Section 4.09(b)(8) | Such intercompany indebtedness to be unsecured and subordinated to the Amended Notes as set forth in **"Indebtedness Covenant"** in the Term Sheet. |
| *General Basket* | Section 4.09(b)(15) | $5.0 million; provided, that the OnCure Entities may incur indebtedness in respect of guarantees of indebtedness of the RTS Entities so long as (x) the aggregate principal amount of such guarantees, together with all such other indebtedness incurred under this basket, does not exceed $25.0 million and (y) such guarantees are unsecured or secured by Liens junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
| *Indebtedness of Non-Guarantors* | Section 4.09(b)(18) | The greater of $3.0 million and 1.25% of total assets (calculated with respect to the OnCure Entities). |
| **Restricted Payments** | | |
| *Annual Management Buyback/Rollover* | Section 4.10(b)(4) | $1.0 million per calendar year. |
| *Dividends post-IPO* | Section 4.10(b)(6) | To be deleted. |
| *General Basket* | Section 4.10(b)(12) | $4.0 million. |
| **Investments** | | |

A-2

| *Management Advances* | Clause (4) of "Permitted Investments" definition. | $1.0 million. |
|---|---|---|
| *Insurance Subsidiaries* | Clause (11) of "Permitted Investments" definition. | To be deleted |
| *JVs/Unrestricted Subs* | Clauses (10) and (12) of "Permitted Investments" definition. | $3.0 million in the aggregate; provided, however, an additional $7.0 million (or $10.0 million in the aggregate) to the extent that the only RTS/OnCure Entity that is an equity owner of such JVs/Unrestricted Sub is an OnCure Entity. |
| *Increases to existing Investments* | Clause (16) of "Permitted Investments" definition. | $2.5 million. |
| *General Basket* | Clause (19) of "Permitted Investments" definition. | $2.5 million. |
| **Liens** | | |
| *Hedging Obligations* | Clause (5) of "Permitted Liens" definition. | $1.0 million. |
| *Indebtedness Under Currency Agreements* | Clause (12) of "Permitted Liens" definition. | To be deleted (redundant to Clause (11) of "Permitted Liens" definition). |
| *Restricted Subsidiary* | Clause (19) of "Permitted Liens" definition. | To be deleted (redundant to Clause (14) of "Permitted Liens" definition). |
| *General Basket* | Clause (25) of "Permitted Liens" definition. | $5.0 million; provided, that the OnCure Entities may incur Liens in respect of guarantees of indebtedness of the RTS Entities incurred in the ordinary course of business so long as (i) the aggregate principal amount of such guarantees, together with all such other indebtedness secured by Liens under this basket, does not exceed $25.0 million and |

A-3

|  |  | (y) such Liens are junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
|---|---|---|
| *Secured Debt Ratio Test* | Clause (26) of "Permitted Liens" definition. | As set forth in "**Permitted Liens**" in the Term Sheet. |
| **Affiliate Transactions** |  |  |
| *Carve-out* | Section 4.14(a) | $500,000.00 (other than with respect to Internal Affiliate Transactions). |
| *Board of Directors Approval Threshold* | Section 4.14(a) | $2.5 million (other than with respect to Internal Affiliate Transactions). |
| *Fairness Opinion Threshold* | Section 4.14(a) | $5.0 million (other than with respect to Internal Affiliate Transactions). |
| **Events of Default** |  |  |
| *Cross Acceleration Threshold* | Section 6.01(4) | $10.0 million (with respect to indebtedness of the RTS/OnCure Entities). |
| *Litigation Threshold* | Section 6.01(5) | $10.0 million (with respect to indebtedness of the RTS/OnCure Entities). |
| *% of Holders Needed to Call an Event of Default* | Section 6.02 | 25% |

A-4

## Exhibit I

**Attached.**

# *See* Docket No. 13

Debtors' Motion (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, (C) Approving Use of Cash Collateral of Prepetition Secured Parties, and (D) Granting Adequate Protection to Prepetition Lenders; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); (III) Sealing Related Fee Letters and (IV) Granting Related Relief

## Schedule 1.1(a)

## First Day Motions

1.    Motion of Debtors for Order Under Fed. R. Bankr. P. 1015 and Del . Bankr. L.R. 1015-1 Authorizing Joint Administration of Chapter 11 Cases (Docket No. 3)

2.    Motion of Debtors for Order Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment (Docket No. 5)

3.    Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 1107, and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors to (A) Maintain Postpetition Financing of Insurance Premiums and Renewals Thereof, (B) Pay Prepetition Insurance Obligations, (C) Refund Overpayments Made by Third-Party Payors, and (D) Maintain Postpetition Insurance Coverage (Docket No. 6)

4.    Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 506(b), 1107(a), and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Certain Prepetition (I) Warehousing and Related Claims and (II) Mechanics and Materialmen Claims (Docket No. 7)

5.    Motion of Debtors for Order Under 11 U.S.C. §§ 105(A), 362(A)(3), and 541 Establishing Certain Notice and Hearing Procedures for Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Interests of OnCure Holdings, Inc. (Docket No. 8)

6.    Motion of Debtors for Order (I) Under 11 U.S.C. §§ 105(a), 363(b), 364, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Claims of Certain Critical Vendors and Service Providers, and (II) Under 11 U.S.C. §§ 105(a), 363(c), and 503(b)(1)(A) and Fed. R. Bankr. P. 6003 Confirming Administrative Expense Priority Status of Debtors' Undisputed Obligations for Postpetition Delivery of Goods and Services (Docket No. 9)

7.    Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 506(a), 507(a)(8) and 541 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Taxes and Fees (Docket No. 10)

8.    Motion of Debtors for an Order Pursuant to 11 U.S.C. §§ 105(a), 345, 363, and 364, Fed. R. Bankr. P. 6003, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Authorizing Continuation of Intercompany Transactions, and (IV) Granting Superpriority Status to Postpetition Intercompany Claims (Docket No. 11)

9. Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 (I) Authorizing Payment of Certain Prepetition Workforce Obligations, Including Compensation, Benefits, Expense Reimbursements, and Related Obligations, (II) Confirming Right to Continue Workforce Programs on Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators of, or Third Party Providers Under, Workforce Programs, and (V) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments (Docket No. 12)

10. Debtors' Motion (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, (C) Approving Use of Cash Collateral of Prepetition Secured Parties, and (D) Granting Adequate Protection to Prepetition Lenders; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); (III) Sealing Related Fee Letters and (IV) Granting Related Relief (Docket No. 13)

11. Declaration of Richard Klein in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors' (A) Use of Cash Collateral and (B) Entry into Debtor In Possession Financing Facility and (II) Granting Related Relief (Docket No. 14)

## Schedule 5.3(b)

### Required Filings and Consents of Investor

Any Consent necessary or required in connection with the Financing Transactions.

Amendment No. 1 to Investment Agreement


Available to Holders of Class 5 Claims on the Debtors' Secured Noteholder Website

**Exhibit H**


New Intercreditor Agreements


[To Be Filed With Plan Supplement]

**<u>Exhibit I</u>**

Restructuring Support Agreement

**Exhibit I**

Restructuring Support Agreement

EXECUTION VERSION

# RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (as may be amended, modified or otherwise supplemented from time to time in accordance with the terms hereof, and including the exhibits attached hereto, including, without limitation, the Term Sheet and the Bidding Procedures (each as defined below)), this "**Agreement**"), dated as of June 14, 2013, is entered into by and among (a) OnCure Holdings, Inc. ("**HoldCo**"), (b) each direct and indirect, wholly-owned subsidiary of HoldCo (each, a "**HoldCo Subsidiary**" and, collectively, the "**HoldCo Subsidiaries**", and together with HoldCo, the "**Company**")), and (c)(i) each of the beneficial owners (or investment managers or advisors on behalf of the beneficial owners) of the Notes or Term Loans (each as defined below) identified on the signature pages hereto and (ii) each of the beneficial owners (or investment managers or advisors for the beneficial owners) of the Notes or the Term Loans that becomes a party hereto from time to time in accordance with the terms hereof by executing a Joinder (as defined below) (such persons and entities described in this clause (c), together with any of their respective successors and permitted assigns, each, a "**Consenting Debtholder**", and collectively, the "**Consenting Debtholders**")); provided, however, for the avoidance of doubt, it is understood that an investment manager or advisor for a beneficial owner of the Notes or the Term Loans is considered to be a Consenting Debtholder only with respect to the beneficial owners specifically identified on the signature pages of this Agreement, and such investment manager or advisor shall not be considered a Consenting Debtholder with respect to any other beneficial owners of the Notes or the Term Loans not a party hereto, including beneficial owners that are advised by its affiliates or other separate business units. Each of the Company and the Consenting Debtholders are referred to herein individually as a "**Party**", and collectively as the "**Parties**".

## RECITALS

WHEREAS, HoldCo has outstanding term loans (the "**Term Loans**") under that certain Amended and Restated Credit Agreement, dated as of December 24, 2012 (as the same has been, and may be, amended, modified or supplemented from time to time, the "**Term Loan Agreement**"), among HoldCo, the HoldCo Subsidiaries party thereto, the lenders party thereto (the "**Term Loan Lenders**"), and Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, together with any successor agent, the "**Term Loan Agent**," and all claims and obligations arising under or in connection with the Term Loan Agreement and the other Loan Documents (as defined in the Term Loan Agreement), the "**Term Loan Obligations**");

WHEREAS, HoldCo issued $210 million in principal amount of $11^{3/4}$% Senior Secured Notes due 2017 (together with any and all guarantees of the indebtedness and obligations evidenced by such Notes, the "**Notes**," and the holders thereof, the "**Noteholders**") pursuant to that certain Indenture, dated May 13, 2010 (as the same may have been or as may be amended, modified or otherwise supplemented from time to time, the "**Indenture**"), by and among HoldCo, the HoldCo Subsidiaries party thereto, and Wilmington Trust FSB, as trustee and collateral agent (in such capacity, together with any successor trustee, the "**Trustee**", and all

claims and obligations arising under or in connection with the Indenture, the "**Indenture Obligations**");

WHEREAS, as of the date hereof, the Consenting Debtholders collectively hold or otherwise control, in the aggregate, in excess of 73% of the aggregate outstanding principal amount of the Notes and 100% of the aggregate outstanding principal amount of the Term Loans;

WHEREAS, prior to the date hereof, the Parties engaged in good faith, arm's length negotiations that have led to an agreement regarding the material terms of a restructuring of the Company (the "**Transaction**") that the Parties now desire to implement in accordance with the terms and conditions set forth in this Agreement (including the restructuring term sheet attached hereto as Exhibit A (the "**Term Sheet**")); [1]

WHEREAS, it is anticipated that, subject to the terms and conditions set forth in this Agreement, the Transaction will be implemented through a plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), which plan of reorganization shall be consistent in all material respects with the terms and conditions of this Agreement (as amended, modified or otherwise supplemented from time to time in accordance with this Agreement, the "**Plan**") and provide for, among other things, certain distributions on account of the Indenture Obligations;

WHEREAS, the Transaction shall be implemented pursuant to the Plan through either (A) (i) the marketing and sale of (x) all or substantially all of the Company's assets or (y) all of the new equity of Reorganized Holdco, (ii) the distribution of the proceeds of such sale and (iii) (x) in the case of a sale of all or substantially all of the Company's assets, the wind down of the Company's estates or (y) in the case of a sale of all of the new equity of Reorganized Holdco, a restructuring of the Company's liabilities, including the Notes, in each case, consistent in all material respects with the terms and conditions of, this Agreement (a "**Sale Transaction**") or (B) the reorganization of the Company on a standalone basis without the consummation of a Sale Transaction consistent in all material respects with the terms and conditions of, this Agreement (the "**Plan Transaction**");

WHEREAS, in accordance with, and subject to the terms and conditions of, this Agreement, HoldCo and each wholly-owned subsidiary of HoldCo intends to commence voluntary, pre-arranged reorganization cases (to be jointly administered) under chapter 11 of the Bankruptcy Code for the Company (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to implement the Transaction and to (a) file (x) the Plan and (y) the accompanying disclosure statement (as amended, supplemented or otherwise modified from time to time in accordance with this Agreement, the "**Disclosure Statement**") with the Bankruptcy Court, (b) use commercially reasonable efforts to have the Disclosure Statement approved and the Plan confirmed by the Bankruptcy Court, and (c) conduct a sale and marketing process in pursuit of a potential Sale Transaction in accordance with, and subject to the terms and conditions of, this Agreement, including, without limitation,

---

[1] Capitalized terms used but not otherwise defined herein are defined in accordance with the Term Sheet, which is expressly made part of this Agreement as if fully set forth herein and incorporated herein by reference.

the bidding procedures to be filed with the Bankruptcy Court, which shall be materially consistent in form and substance with the bidding procedures attached hereto as <u>Exhibit B</u> (the "**Bidding Procedures**");

WHEREAS, this Agreement is the product of good faith, arm's length negotiations among the Parties and their respective professionals; and

WHEREAS, the Parties desire to express to each other their mutual support and commitment in respect of the Transaction on the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the premises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Generally</u>

a.    Subject to the terms and conditions of this Agreement, each of the Parties agrees that, during the Plan Support Period (as defined below), the Parties will use commercially reasonable efforts to cause to occur, and cooperate in the prompt consummation of, the Transaction on terms and conditions consistent in all material respects with this Agreement.  Notwithstanding anything in this Agreement to the contrary, the representations, warranties, covenants and agreements of the Company set forth in this Agreement shall be joint and several but the representations, warranties, covenants and agreements of each Consenting Debtholder set forth in this Agreement shall be several but not joint, and shall only be applicable to each Consenting Debtholder with respect to and to the extent of the Specified Debt Claims (defined below) for which it is the legal owner, beneficial owner and/or investment advisor or manager with the power and authority to vote the claims arising under the Specified Debt Claims.

b.    The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet sets forth the material terms and conditions of the Transaction; <u>provided</u>, <u>however</u>, the Term Sheet is supplemented by the other terms and conditions of this Agreement.  In the event of any inconsistency between the Term Sheet and any other provision of this Agreement, the Term Sheet will govern.

2.    <u>Agreement Effective Date</u>

This Agreement shall be effective at 12:01 a.m. prevailing Eastern Time on the date on which the following conditions have been satisfied (such date, the "**Agreement Effective Date**"): (a) the Company shall have executed and delivered counterpart signature pages to this Agreement to the Consenting Debtholders; and (b) Consenting Debtholders holding at least 66 2/3% of the aggregate outstanding principal amount of the Notes and at least 66 2/3% of the aggregate outstanding principal amount of the Term Loans shall have executed and delivered counterpart signature pages to this Agreement to the Company; <u>provided</u>, <u>however</u>, that signature pages executed by the Consenting Debtholders shall be delivered to (x) other Consenting Debtholders in a redacted form that removes each Consenting Debtholder's holdings of Notes

and any other claims against the Company, and (y) the Company in an unredacted form. The terms and provisions of this Agreement, and the rights and the obligations of the Parties hereunder, shall not become effective or binding until the occurrence of the Agreement Effective Date. The "**Plan Support Period**" means the period commencing on the Agreement Effective Date and ending on the date this Agreement is terminated in accordance with <u>Section 6</u> hereof; <u>provided</u>, <u>however</u>, that with respect to any Consenting Debtholder that becomes a Party after the Agreement Effective Date, the Plan Support Period with respect to such Consenting Debtholder will commence on the date that it becomes a Party.

3.     Implementation of the Transaction

Subject to the terms and conditions of this Agreement, each Party hereby covenants and agrees, during the Plan Support Period, (i) to negotiate in good faith any material instrument, pleading, order or other related document utilized for implementing or achieving, or that otherwise relates to, this Agreement, the Plan or the Transaction, which is described in or contemplated by this Agreement, the Plan or the Disclosure Statement (collectively, such material instruments, pleadings, orders and documents, the "**Restructuring Documents**"), including, but not limited to, any stock purchase agreement, investment agreement, equity transfer agreement, stockholder agreement, equity commitment agreement, asset purchase agreement, the Bidding Procedures (including any bid protections, whether or not included in the Bidding Procedures (and any motion seeking approval thereof or the order of the Bankruptcy Court approving thereof)), the motion approving the sale of the assets of the Company or the new equity of Reorganized Holdco (and any order of the Bankruptcy Court approving such sale), debtor-in-possession and exit financing documents, any document, instrument, guarantee or agreement related to the issuance of notes or other debt securities under a Plan (each a "**Notes Document**", and collectively, the "**Notes Documents**"), the Disclosure Statement (and any motion seeking the approval thereof or the order of the Bankruptcy Court approving thereof), the Plan, the order of the Bankruptcy Court confirming the Plan, any "first day" pleadings to be filed by the Company in connection with the Chapter 11 Cases (the "**First Day Motions**"), the ballots, the motion to approve the form of ballots and solicitation procedures and the order of the Bankruptcy Court approving the form of ballots and solicitation procedures, in each case the terms and conditions of which shall be consistent in all material respects with the Term Sheet and otherwise acceptable to the Company and Consenting Debtholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes held by all Consenting Debtholders (the "**Majority Consenting Debtholders**"); <u>provided</u>, that all aspects of the Restructuring Documents, including, without limitation, any Notes Documents, relating to (i) a Winning Bid (as defined below) or (ii) the recovery or consideration to be received (pursuant to the Plan or otherwise) by holders of Indenture Obligations,  shall be acceptable to the Consenting Debtholders holding at least 66 2/3% of the aggregate outstanding principal amount of the Notes held by all Consenting Debtholders (the "**Supermajority Consenting Debtholders**"), (ii) to promptly execute and deliver (as applicable, and to the extent such Party is a party thereto) the Restructuring Documents and otherwise support the prompt consummation of the Transaction, and (iii) not object to, delay, impede, commence any proceeding, or take any other action to interfere, directly or indirectly, in any material respect with the prompt consummation of the Transaction or acceptance or approval of the Disclosure Statement or the Plan (or encourage or

4

support any person or entity to do any of the foregoing or, in the case of a Consenting Debtholder, to instruct or direct the Trustee to do any of the foregoing).

4.      Consenting Debtholders' Obligations

Subject to the terms and conditions of this Agreement, during the Plan Support Period:

a.      Support of the Transaction.  Each Consenting Debtholder agrees that it will (i) not object to, or otherwise commence any proceeding to oppose, the Transaction, the confirmation or consummation of the Plan, or approval of the Disclosure Statement, (ii) not take any action to prevent, delay or impede the consummation of the Transaction or the approval or execution (as applicable) of the Restructuring Documents, (iii) provided that such Consenting Debtholder has been solicited in accordance with sections 1125 and 1126 of the Bankruptcy Code, if applicable, and other applicable law, vote all Specified Debt Claims beneficially owned by such Consenting Debtholder or for which it is the nominee, investment manager, or advisor for beneficial holders thereof to accept the Plan and in favor of the releases and exculpation provided under the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and accompanying voting materials, and return a duly-executed ballot in connection therewith no later than the applicable deadline set forth in the Disclosure Statement, (iv) not change, withdraw or revoke (or seek to change, withdraw or revoke) its vote to accept the Plan; provided, however, that upon written notice to the Company and the other Parties, any Consenting Debtholder can revoke its vote (upon such revocation, such vote being deemed void *ab initio*) at any time following the expiration of the Plan Support Period, and (v) not support or vote in favor of any other restructuring, liquidation or reorganization of the Company (or any plan or proposal in respect of the same) other than the Transaction (an "**Alternative Transaction**"); provided further, however, that an Alternative Transaction does not, and shall not be deemed to, include any bid selected as the winning bid at any auction conducted in connection with, and pursuant to, the Bidding Procedures (the "**Auction**"), so long as such winning bid so selected by the Company shall be acceptable in all respects to the Supermajority Consenting Debtholders, including, without limitation: (i) the purchase price and form of consideration to be provided by such bid; (ii) the valuation of any non-cash consideration to be provided by such bid; (iii) the terms or provisions relating to distributions to creditors under the plan of reorganization to be implemented in connection with such bid; (iv) the terms and conditions with respect to any debt instrument or security to be distributed to, or otherwise received by, creditors in connection with such bid; (v) the terms or provisions relating to the rejection or assumption of any executory contracts or unexpired leases in connection with such bid; (vi) the terms or provisions contained in such bid relating to the closing of any radiation oncology treatment centers subject to a management services agreement between the Company and a physician group; (vii) the terms or provisions relating to the treatment of cure costs contained in such bid; and (viii) any other terms or provisions, including, without limitation, excluded liabilities or adjustments to the purchase price in connection with such bid that would impact or affect the net sale proceeds available for distribution to creditors under the Plan (such bid, the "**Winning Bid**").

b.    <u>Certain Rights of Consenting Debtholders Unaffected</u>.  Nothing contained herein shall (i) limit the ability of any Consenting Debtholder to consult with any other Noteholder, Term Loan Lender, the Company or their respective advisors, (ii) other than as expressly provided herein, limit the rights of any Consenting Debtholder under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance is not in breach of the obligations of such Consenting Debtholder hereunder or under the terms and conditions of the Term Sheet, (iii) limit the ability of any Consenting Debtholder to assert or raise any objection permitted under the proviso in <u>Section 4(a)(iv)</u> above in connection with any hearing on confirmation of the Plan, (iv) limit the ability of any Consenting Debtholder to sell or enter into any transactions in connection with the Notes or Term Loans, as applicable, or any other claims against or interests in the Company, subject to <u>Sections 9</u> and <u>10</u> hereof, (v) other than as expressly provided herein, limit the rights of any Consenting Debtholder under the Indenture, any of the other Note Documents (as defined in the Indenture), the Term Loan Agreement or any of the other Loan Documents (as defined in the Term Loan Agreement) or constitute a waiver or amendment of any provisions of the Indenture, any of the other Note Documents, the Term Loan Agreement or any of the other Loan Documents, (vi) limit the rights of any Consenting Debtholder to take any action related to providing or arranging financing for any party in connection with a Sale Transaction, including, but not limited to, financing in such party's capacity as a prospective bidder at the Auction (if any) or otherwise pursuant to or, in connection with, any Winning Bid, or (vii) other than as expressly provided herein, limit the ability of any Consenting Debtholder to assert or raise objections in the Chapter 11 Cases to the party selected by the Company to consummate a Sale Transaction (including any party selected by the Company as submitting the Winning Bid at the Auction) or the terms of any such Sale Transaction to the extent such Sale Transaction is not consistent with, or otherwise violates, the terms and conditions of this Agreement.

c.    <u>Restructuring Documents</u>.  The obligations of each Consenting Debtholder under <u>Section 1</u>, <u>Section 3</u> and this <u>Section 4</u> are conditioned upon the terms of all documents implementing the Transaction, including, without limitation, the Disclosure Statement, the Plan and the other Restructuring Documents, being consistent in all material respects with this Agreement and otherwise containing terms and conditions reasonably acceptable to the Majority Consenting Debtholders or the Supermajority Consenting Debtholders (as applicable).

5.    <u>The Company's Obligations</u>

a.    <u>Affirmative Covenants</u>.  The Company agrees that, subject to the terms and conditions of this Agreement, during the Plan Support Period (unless otherwise consented to in writing by the Majority Consenting Debtholders), the Company shall do the following:

(1)    conduct the process of marketing the equity and the assets of the Company in order to determine the highest and/or best offer for a Sale Transaction (the "**Marketing Process**").  The Marketing Process shall be conducted by the Company in a commercially reasonable manner and the Company shall provide the Consenting Debtholder Advisors (as defined below) regular updates as to such process and, in any event, upon the

6

reasonable request of any of the Consenting Debtholder Advisors. As part of the Marketing Process, the Company shall use commercially reasonable efforts to ensure that potential bids for the Company's assets or the equity of Reorganized Holdco that are qualified under the Bidding Procedures are due no later than twenty (20) days after entry of an order approving the Bidding Procedures;

(2)      consult in good faith with the Consenting Debtholder Advisors regarding the selection of the Winning Bid at the Auction (if any);

(3)      support and promptly consummate the Transaction as expeditiously as practicable under applicable law on terms and conditions consistent in all material respects with the Term Sheet, and not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with or impede or delay consummation of, the Transaction;

(4)      comply with all material terms, conditions, provisions and obligations (subject to the expiration of any applicable cure periods) contained in any purchase or investment agreement or other transaction document entered into with any stalking horse bidder or the party who submits the Winning Bid (the "__Winning Bidder__");

(5)      obtain debtor-in-possession financing in an amount, and subject to terms and conditions that are, materially consistent with this Agreement (the "**DIP Facility**");

(6)      provide draft copies of all Restructuring Documents (including, but not limited to, all material motions, applications, orders, agreements and other documents) the Company intends to execute and/or file with the Bankruptcy Court to Stroock & Stroock & Lavan LLP, as counsel to the Consenting Debtholders, ("**Stroock**") within three (3) business days prior to the date the Company intends to execute and/or file any such motion, application, order, agreement or other document, and consult in advance in good faith with Stroock regarding the form and substance of any such proposed motion, application, order, agreement or other document;

(7)      except as otherwise provided in this Agreement, cause the amount of Indenture Obligations and Term Loan Obligations identified on the signature pages attached to this Agreement to be redacted to the extent this Agreement is filed on the docket maintained in the Chapter 11 Cases;

(8)      maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized (unless the failure to do so would not, and would not reasonably be expected to, have a Materially Adverse Effect);

(9)      timely file a formal written objection to any motion filed with the Bankruptcy Court by any party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

(10)    timely file a formal written objection to any motion filed with the Bankruptcy Court by any party seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(11)    to the extent approved by order of the Bankruptcy Court (to the extent such order is required by the local rules of the Bankruptcy Court), timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any party with respect to the DIP Facility (or motion filed by such party that seeks to interfere with the DIP Facility);

(12)    subject to any applicable confidentiality restrictions, provide Stroock, GLC Advisors & Co., LLC, as financial advisor to the Consenting Debtholders ("**GLC**"), and such other identified professionals as may be retained by the Consenting Debtholders (collectively, the "**Consenting Debtholder Advisors**") (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records, facilities, management and advisors (including Jefferies, LLC) for the purposes of evaluating the Transaction and the business, assets, liabilities and operations of the Company (to the fullest extent possible under applicable law), (B) timely and reasonably detailed responses to all reasonable diligence requests of the Consenting Debtholder Advisors or any Consenting Debtholder, (C) information with respect to all material executory contracts and unexpired leases of the Company (including the estimated amount of cure costs and rejection damages associated with the assumption, assignment and/or rejection thereof in the Chapter 11 Cases) and (D) full access to the electronic virtual data room established for potential bidders in connection with the Transaction;

(13)    indefeasibly pay in full in cash, to the extent not previously paid, all reasonable and documented fees and expenses of the Consenting Debtholder Advisors, (x) on a current basis prior to the Filing Date and (y) after the Filing Date, under the Plan, to the extent permitted by the Bankruptcy Court and not otherwise paid in connection with the Chapter 11 Cases, pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise, in each case to the extent an invoice is provided to the Company;

(14)    promptly notify the Consenting Debtholder Advisors in writing of any governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened) known to senior management of the Company or the restructuring advisors to the Company, in any such case which could reasonably be expected to (A) materially and adversely affect the Company or (B) prevent or materially delay the consummation of the Transaction;

(15)    comply in all material respects with the covenants contained in the DIP Facility (subject to the expiration of any applicable cure periods); and

(16)    take all reasonable actions contemplated by this Agreement that are necessary to (A) facilitate the implementation or consummation of the Transaction and/or (B) obtain approval by the Bankruptcy Court of the Restructuring Documents.

8

b.    <u>Negative Covenants</u>.  The Company agrees that, subject to the terms and conditions of this Agreement, during the Plan Support Period (unless otherwise consented to in writing by the Majority Consenting Debtholders), the Company shall not, directly or indirectly, do or permit to occur any of the following:

(1)    except as contemplated by this Agreement and pursuant to the Bidding Procedures, directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with, or participate in the formulation of, any Alternative Transaction;

(2)    modify the Plan, in whole or in part, in a manner that is inconsistent in any material respect with this Agreement;

(3)    withdraw or revoke the Plan or publicly announce its intention not to pursue the Plan;

(4)    take any action in connection with the Transaction that, in whole or in part, is inconsistent in any material respect with this Agreement;

(5)    select or enter into any purchase or investment agreement or other transaction document with a stalking horse bidder or Winning Bidder without the consent of the Supermajority Consenting Debtholders;

(6)    (A) make any material modification to a purchase or investment agreement or other transaction document entered into with a stalking horse bidder or Winning Bidder without the consent of the Supermajoirty Consenting Debtholders or (B) grant any waiver with respect to such document or agreement, including a waiver of any closing condition, without the consent of the Supermajority Consenting Debtholders;

(7)    execute, enter into, amend, withdraw, modify, file or agree to any Restructuring Document or other document relating to the Transaction (including any modifications or amendments thereof) that, in whole or in part, is inconsistent in any material respect with this Agreement or the Plan and is not otherwise acceptable to the Majority Consenting Debtholders or the Supermajority Consenting Debtholders (as applicable);

(8)    to the extent the Company has any discretionary consent or approval right in any transaction document in connection with a Winning Bid, or any purchase or investment agreement or other transaction document entered into with a stalking horse bidder, over the form and/or substance of any document (including any Notes Document), instrument, consent, approval, waiver, amendment, modification, supplement, opinion or agreement, or any action or other matter related to a Winning Bid, exercise such consent or approval right without obtaining and complying with the written direction of the Supermajority Consenting Debtholders;

(9)    to the extent not in the ordinary course of business consistent with past practices, pay any post-petition trade payable or other post-petition expense

9

prior to the date such trade payable or expense is due and payable, unless permitted by the terms of this Agreement, or otherwise consented to in writing by the Majority Consenting Debtholders;

(10)    file any motion or pleading with the Bankruptcy Court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent in any material respect with this Agreement or the Plan and is not otherwise reasonably satisfactory in all material respects to the Majority Consenting Debtholders or the Supermajority Consenting Debtholders (as applicable);

(11)    move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of a material executory contract or unexpired lease other than in accordance with this Agreement or the Plan;

(12)    commence an avoidance action or other legal proceeding that challenges the validity, enforceability or priority of the Indenture Obligations or the Term Loan Obligations or liens on, or security interests in, any of the assets or properties of the Company that secures any of the Indenture Obligations or the Term Loan Obligations;

(13)    other than as contemplated by this Agreement or the Plan, issue, sell, pledge, dispose of or encumber any common stock, limited liability company interests and any other equity, ownership or profits interests, or any options, warrants or other agreements to acquire common stock, limited liability company interests or other equity, ownership or profits interests;

(14)    other than as contemplated by this Agreement or the Plan, amend or propose to amend its respective certificate or articles of incorporation, bylaws or other organizational documents;

(15)    split, combine or reclassify any of its outstanding Existing Equity Interests (as defined in the Term Sheet), or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its Existing Equity Interests;

(16)    redeem, purchase or acquire or offer to acquire any of its Existing Equity Interests;

(17)    other than as contemplated by this Agreement or the Plan, acquire or divest (by merger, sale, lease, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or collection of assets constituting all or substantially all of a business or business unit, or (B) assets of the Company, other than in the ordinary course of business consistent with past practices;

(18)    incur any capital expenditures, other than capital expenditures expressly provided for in, or otherwise in compliance with, the capital expenditure budget included in the Company's weekly cash flow budgets that have been provided to the Consenting Debtholders prior to the Agreement Effective Date;

10

(19)    incur or suffer to exist any post-petition indebtedness, except indebtedness existing and outstanding immediately prior to the date hereof, trade payables and operating liabilities arising and incurred in the ordinary course of business and indebtedness arising under the DIP Facility or as otherwise permitted by the documents governing the DIP Facility, this Agreement or the Plan;

(20)    create or suffer to exist any post-petition liens or security interests in or on any of its assets or properties (tangible or intangible), except liens or security interests that secure obligations under the DIP Facility or as otherwise permitted by the documents governing the DIP Facility,  this Agreement or the Plan;

(21)    enter into any collective bargaining agreements or materially modify any existing collective bargaining agreements;

(22)    enter into any commitment or agreement with respect to exit financing that is not on terms acceptable to the Supermajority Consenting Debtholders;

(23)    enter into any commitment or agreement with respect to debtor-in-possession financing other than the DIP Facility, unless such commitment or agreement (A) requires the satisfaction of the DIP Facility obligations in full in cash on the closing date thereof, (B) provides for adequate protection to the Noteholders and Term Loan Lenders acceptable to the Majority Consenting Debtholders and (C) complies in all material respects with this Agreement;

(24)    hire any executive or employee whose total annual compensation is greater than $175,000 or increase the compensation for any executive or employee whose total annual compensation is (or, after giving effect to any such increase, will be) greater than $175,000; provided, however,  that the Company may hire any medical employee in replacement of another medical employee so long as done in the ordinary course of business consistent with past practices and the annual compensation of such newly hired medical employee shall not be greater, without the consent of the Majority Consenting Debtholders, than the medical employee being replaced;

(25)    enter into, amend, waive, supplement or otherwise modify any material term, condition or provision of any (a) management services agreement, (b) real estate lease, (c) medical equipment lease or (d) any other agreement that would require or would be reasonably expected to require the Company to pay (in one or more payments), as a result of such agreement, amendment, waiver, supplement or modification, more than $100,000 to any person or entity in any twelve (12) month period; and

(26)    settle any claim, dispute, controversy, cause of action, proceeding, appeal or pending litigation (A) not otherwise insured under the Company's insurance policies and paid for by the Company's applicable insurance carrier for more than $150,000 (whether such payouts are made individually or in the aggregate) or (B) that would reasonably be expected to materially and adversely affect the Company.

11

c.    <u>Automatic Stay</u>.    The Company acknowledges and agrees, and shall not dispute, that after the commencement of the Chapter 11 Cases, (i) the giving of notice of termination by any Party pursuant to this Agreement and (ii) the seeking of the enforcement of any rights or remedies under this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

6.    <u>Termination</u>

a.    This Agreement shall terminate immediately and all of the obligations of the Parties hereunder shall be of no further force or effect in the event that: (i) the Transaction is consummated; (ii) the Transaction is not consummated in accordance with this Agreement by November 5, 2013, as such date may be extended in writing from time to time by the Company and the Majority Consenting Debtholders; (iii) the Company and the Majority Consenting Debtholders mutually agree to such termination in writing; or (iv) this Agreement is terminated pursuant to paragraph (b) or (c) of this <u>Section 6</u>.

b.    The Company may terminate this Agreement by written notice to the Consenting Debtholders, delivered in accordance with <u>Section 18</u> hereof, upon the occurrence of any of the following events:

(1)    the material breach of this Agreement, by one or more of the Consenting Debtholders of its obligations hereunder and the Consenting Debtholders who have not so breached this Agreement hold less than 50.01% of the outstanding aggregate principal amount of the Notes, which breach is not cured within five (5) business days after the giving of written notice of such breach by the Company to the applicable Consenting Debtholder(s);

(2)    any representation or warranty made by the Consenting Debtholder(s) in this Agreement is materially incorrect or inaccurate as of the Agreement Effective Date (or such other applicable date with respect to representations and warranties expressly made as of a specific date other than the Agreement Effective Date) and the remaining Consenting Debtholders hold less than 50.01% of the outstanding aggregate principal amount of the Notes;

(3)    the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction or other decree or taken any other action, in each case, which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the implementation of the Transaction;

(4)    any court of competent jurisdiction shall enter a final, non-appealable judgment or order declaring this Agreement or any material provision contained herein to be unenforceable; or

(5)    the Company determines termination is required pursuant to Section 31 hereof.

12

c.    The Majority Consenting Debtholders may terminate this Agreement (which shall terminate the obligations of all Consenting Debtholders hereunder) by written notice to the Company, delivered by the Majority Consenting Debtholders in accordance with Section 18 hereof, upon the occurrence of any of the following events:

(1)    upon a material breach by the Company of its obligations hereunder (without giving effect to any materiality qualifier), which breach is not cured within five (5) business days after the giving of written notice of such breach; provided, however, the Company shall not be entitled to any such cure period with respect to a breach of any of the provisions of Sections 5(a) or 5(b) of this Agreement;

(2)    upon the amendment or modification, or waiver of, any term or condition of any Restructuring Document so as to be, in whole or in part, inconsistent in any material respect with this Agreement or otherwise not reasonably acceptable to the Majority Consenting Debtholders or the Supermajority Consenting Debtholders (as applicable), without the prior written consent of the Majority Consenting Debtholders or the Supermajority Consenting Debtholders (as applicable);

(3)    the selection of a bid at the Auction (if any) that does not constitute a Winning Bid pursuant to this Agreement;

(4)    any Notes Document (which the Company (i) is a party to or otherwise bound by, (ii) is a beneficiary of, (iii) has negotiated or (iv) has a consent right or approval over) is entered into, executed, filed, amended, or withdrawn by any party, including any Winning Bidder or affiliate thereof, without the prior written consent of the Supermajority Consenting Debtholders;

(5)    any representation or warranty made by the Company in this Agreement is materially incorrect (without giving effect to any materiality qualifier) or inaccurate as of the Agreement Effective Date (or such other applicable date with respect to representations and warranties expressly made as of a specific date other than the Agreement Effective Date);

(6)    entry of an order of the Bankruptcy Court denying approval of the Disclosure Statement or confirmation of the Plan;

(7)    the Company (i) withdraws the Plan, or publicly announces its intention to withdraw the Plan, to pursue an Alternative Transaction, (ii) moves to voluntarily dismiss any of the Chapter 11 Cases, (iii) moves for conversion of any of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code or (iv) moves for appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Chapter 11 Cases;

(8)    (i) a trustee or an examiner with expanded powers is appointed in any of the Chapter 11 Cases or (ii) any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

13

(9)    the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(10)    the occurrence of any "event of default" under the Indenture or Term Loan Agreement (as defined in each applicable agreement, respectively) on or after the Agreement Effective Date, other than any such event of default arising from (A) the public announcement of this Agreement or the Plan, (B) the commencement or prosecution of the Chapter 11 Cases, or (C) any failure of the Company to pay principal or interest when due under the Term Loan Agreement or the Indenture, other than any payment of interest that the Company is either permitted or required to make as adequate protection pursuant to the order approving the DIP Facility;

(11)    the occurrence of a Material Adverse Effect on or after the Agreement Effective Date.  As used herein, the term "**Material Adverse Effect**" means the occurrence of a change, effect, event, occurrence, development, circumstance or state of facts that, either alone or in combination, has had or would reasonably be expected to have a materially adverse effect on the business, properties, operations, financial condition, assets, liabilities, prospects or results of operations of the Company taken as a whole, or which would or would reasonably be expected to materially impair the ability of the Company to perform its obligations under this Agreement or the Plan, which would have or would reasonably be expected to have a materially adverse effect on or prevent or materially delay the consummation of the Transaction; provided, however, that in no event shall the public announcement of this Agreement or the Plan, the pursuit of the Marketing Process or Auction, the commencement or prosecution of the Chapter 11 Cases, the pursuit of confirmation or consummation of the Plan, or the Company's compliance with its obligations and covenants hereunder, be taken into account in determining whether there has been, or would reasonably be expected to be, a Material Adverse Effect for purposes of this Agreement;

(12)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $250,000; provided that any modification of the automatic stay (A) provided by an order approving the DIP Facility that relates to the DIP Facility or authorizing the Company's use of cash collateral in connection with the DIP Facility or (B) to the extent reasonably necessary to permit the Company's employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum (and the filing of such claims) shall not constitute a termination event;

(13)    the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of a material executory contract or unexpired lease other than in accordance with this Agreement or the Plan or as otherwise approved in writing by the Majority Consenting Debtholders;

(14)    the commencement of an avoidance action or other legal proceeding by the Company to challenge the validity, enforceability or priority of any of the Indenture Obligations or the Term Loan Obligations or any of the liens on or security interests in

14

any of the assets or properties of the Company that secure any of the Indenture Obligations or the Term Loan Obligations;

(15)    the termination of, or occurrence of an "event of default" (as defined in the applicable agreement) under, the DIP Facility or any commitment or agreement to provide exit financing to the Company to the extent permitted hereunder, which shall not have been cured within any applicable grace periods or waived pursuant to the terms of the applicable agreement governing the DIP Facility or exit financing;

(16)    the termination of, or occurrence of an "event of default" (as defined in the applicable order or agreement) under, any order or agreement permitting the use of cash collateral to the extent permitted hereunder, which shall not have been cured within any applicable grace periods or waived pursuant to the terms of such order or agreement;

(17)    except as contemplated by the Bidding Procedures, the termination of any purchase or investment agreement or other transaction document entered into with any stalking horse bidder or Winning Bidder or, subject to the expiration of any applicable cure periods, the occurrence of any breach, violation, event or matter that provides a stalking horse bidder or Winning Bidder (as applicable) with the right to terminate such agreement or document;

(18)    the failure to satisfy, other than as a result of the intentional act of any Consenting Debtholder or the breach by a Consenting Debtholder of its obligations hereunder, any of the conditions to effectiveness set forth in the Plan by the deadlines set forth in the Plan unless otherwise waived in accordance with the terms of the Plan;

(19)    the Bankruptcy Court grants relief that would, or would be reasonably expected to, frustrate the purpose of this Agreement, including, without limitation, by preventing the consummation of the Transaction;

(20)    the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction or other decree or taken any other action, in each case, which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the implementation of the Transaction;

(21)    any court of competent jurisdiction shall enter a final, non-appealable judgment or order declaring this Agreement or any material provision contained herein to be unenforceable; or

(22)    the occurrence of any of the following events:

(a)    the Chapter 11 Cases shall not have been commenced and First Day Motions filed on or prior to June 15, 2013 (the date of commencement of the Chapter 11 Cases, the "**Filing Date**");

(b)    a motion shall not have been filed with the Bankruptcy Court within one (1) day of the Filing Date seeking approval of the DIP Facility;

15

(c)      an order approving the DIP Facility on an interim basis (which order shall be in form and substance reasonably acceptable to the Majority Consenting Debtholders) shall not have been entered by the Bankruptcy Court on or prior to a date that is five (5) days after the Filing Date;

(d)      the Plan and a motion seeking entry of an order approving the Disclosure Statement shall not have been filed with the Bankruptcy Court on or prior to a date that is fourteen (14) days after the Filing Date;

(e)      an order approving the Bidding Procedures shall not have been entered by the Bankruptcy Court on or prior to a date that is twenty-one (21) days after the Filing Date;

(f)      the Auction (if any) shall not have occurred on or prior to a date that is thirty (30) days after entry of the order approving the Bidding Procedures;

(g)      an order approving the DIP Facility on a final basis (which order shall be in form and substance reasonably acceptable to the Majority Consenting Debtholders) shall not have been entered by the Bankruptcy Court on or prior to a date that is thirty-five (35) days after the Filing Date;

(h)      (A) if the Plan Transaction is to be consummated, an order approving the Disclosure Statement (the "**Disclosure Statement Order**") shall not have been entered by the Bankruptcy Court on or prior to a date that is sixty (60) days after the Filing Date, or (B) if a Sale Transaction is to be consummated, the Disclosure Statement Order shall not have been entered by the Bankruptcy Court on or prior to a date that is eighty-five (85) days after the Filing Date;

(i)      solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, as applicable, shall not have commenced on or prior to a date that is five (5) days after entry of the Disclosure Statement Order;

(j)      (A) if the Plan Transaction is to be consummated, an order confirming the Plan shall not have been entered by the Bankruptcy Court on or prior to a date that is one hundred (100) days after the Filing Date, or (B) if a Sale Transaction is to be consummated, an order confirming the Plan shall not have been entered by the Bankruptcy Court on or prior to a date that is one hundred and twenty-five (125) days after the Filing Date; and

(k)      (A) if the Plan Transaction is to be consummated, the effective date of the Plan shall not have occurred and/or the Company shall not have obtained any and all required regulatory and/or third-party approvals for the Transaction (if any and to the extent such approvals are not overridden by the Bankruptcy Code) on or prior to a date that is one hundred fifteen (115) days after the Filing Date, or (B) if a Sale Transaction is to be consummated, the effective date of the Plan shall not have occurred and/or the Company shall not have obtained any and all required regulatory and/or third-party approvals for the

16

Transaction (if any and to the extent such approvals are not overridden by the Bankruptcy Code) on or prior to a date that is one hundred and forty (140) days after the Filing Date.

          d.      If this Agreement is terminated pursuant to this <u>Section 6</u>, any and all further obligations of the Parties hereunder shall be terminated without further liability except as provided in <u>Section 26</u> herein; <u>provided</u>, <u>however</u>, that each Party shall have all rights and remedies available to it under the Indenture, the other Note Documents, the Term Loan Agreement or the other Loan Documents and applicable law. If this Agreement may be terminated at a time when permission of the Bankruptcy Court is required for a Consenting Debtholder to terminate, or cause the termination of, this Agreement, the Company shall not oppose any attempt by such Consenting Debtholder to terminate, or cause the termination of, this Agreement at such time so long as the respective Consenting Debtholder has complied with the provisions of this <u>Section 6</u>. Furthermore, if this Agreement is terminated at a time when permission of the Bankruptcy Court is required for a Consenting Debtholder to change, revoke or withdraw, or cause to change, revoke or withdraw, its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Debtholder to change, revoke or withdraw, or cause to change, revoke or withdraw, such vote at such time so long as such Consenting Debtholder has complied with the provisions of this <u>Section 6</u>. The Consenting Debtholders shall have no liability to the Company in respect of any termination of this Agreement pursuant to and in accordance with the terms and conditions of this <u>Section 6</u>.

          e.      Notwithstanding anything to the contrary in this Agreement, (i) no termination of this Agreement shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination and (ii) the right to terminate this Agreement under this <u>Section 6</u> shall not be available to any Party whose failure to fulfill any of its material obligations under this Agreement has been the cause of, or resulted in, the occurrence of the proposed termination event.

          f.      Notwithstanding anything to the contrary herein, any right to terminate this Agreement as to the Consenting Debtholders may be exercised only by the Majority Consenting Debtholders on behalf of all Consenting Debtholders, and may not be exercised by one or more individual Consenting Debtholders not constituting the Majority Consenting Debtholders.

          7.      <u>Representations of the Company</u>

          The Company hereby jointly and severally represents and warrants to the other Parties that the following statements are true and correct as of the date hereof:

          a.      <u>Due Organization and Good Standing</u>. It is duly organized or formed, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization.

          b.      <u>Power and Authority</u>. It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

17

c.    <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

d.    <u>No Conflicts</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and will not (i) violate any order, edict, injunction, decree, law, statute, rule or regulation applicable to it, (ii) conflict with, result in a breach or violation of, or constitute (with due notice or lapse of time or both and exclusive of defaults relating to solvency and bankruptcy) a default under, or the creation of a right of acceleration of any obligations under or termination of, or require any action by (including any authorization, consent or approval) or notice to any person or entity with respect to, any material contractual obligation (other than this Agreement, the Indenture and Term Loan Agreement) to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents), other than approval of the board of directors of the Company (which approval has been obtained prior to the execution of this Agreement) or (iii) result in the creation of any lien or other encumbrance upon any properties or assets of the Company.

e.    <u>Governmental Consents</u>.    The execution and delivery of this Agreement and the performance of its obligations hereunder do not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than (i) the filing of a pre-merger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, including the rules and regulations promulgated thereunder (the "**HSR Act**"), which, to the extent required, will be made prior to the Filing Date and (ii) such filings as may be necessary or required in connection with the Chapter 11 Cases, the Plan or the Disclosure Statement.

f.    <u>Binding Obligation</u>.  This Agreement has been duly executed and delivered by the Company and is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

g.    <u>No Litigation</u>.  No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

h.    <u>Representation</u>.  It has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement, and has had the contents hereof fully explained by such counsel and is fully aware of such contents and legal effect.

18

8.      <u>Representations of the Consenting Debtholders</u>

Each of the Consenting Debtholders severally, but not jointly, represents and warrants to the other Parties that the following statements are true and correct as of the date hereof (or as of the date such Consenting Debtholder becomes a Party) with respect to itself only:

a.      <u>Holdings by Consenting Debtholders</u>.  It either (i) is the beneficial owner of the principal amount of Notes and Term Loans set forth on its respective signature page hereto or set forth on the Joinder executed by such Consenting Debtholder (as applicable), or (ii) has investment or voting discretion with respect to such Notes and Term Loans and has the power and authority to bind the beneficial owner(s) of such Notes and Term Loans to the terms of this Agreement.  It has full power and authority to vote on and consent to matters concerning such Notes and Term Loans with respect to this Agreement and the Transaction.

b.      <u>Prior Transfers</u>.  It has made no prior assignment, sale, grant, pledge, conveyance, or other transfer of, and has not entered into any agreement to assign, sell, grant, pledge, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in its Notes and Term Loans or its voting rights with respect thereto that are inconsistent with the representations and warranties of such Consenting Debtholder herein or would render such Consenting Debtholder otherwise unable to comply with this Agreement and timely perform its obligations hereunder.

c.      <u>Power and Authority</u>.  It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

d.      <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

e.      <u>No Conflicts</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and will not (i) violate any order, edict, injunction, decree, law, statute, rule or regulation applicable to it, (ii) conflict with, result in a breach or violation of, or constitute (with due notice or lapse of time or both) a default under, or the creation of a right of acceleration of any obligations under or termination of, or require any action by (including any authorization, consent or approval) or notice to any person or entity with respect to, any material contractual obligation (other than this Agreement) to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents), or (iii) result in the creation of any lien or other encumbrance upon any properties or assets of such Consenting Debtholder.

f.      <u>Governmental Consents</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and will not require such Consenting Debtholder to make or obtain any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than (i) such filings as may be necessary and/or required for disclosure by

19

the Securities and Exchange Commission, and (ii) such filings as may be necessary or required in connection with the Chapter 11 Cases.

g.      <u>Binding Obligation</u>.  This Agreement has been duly executed and delivered by such Consenting Debtholder and is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

h.      <u>No Litigation</u>.  No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

i.      <u>Representation</u>.  It has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement, and has had the contents hereof fully explained by such counsel and is fully aware of such contents and legal effect.

j.      <u>Accredited Investor</u>.  It (i) is a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in securities of the Company (including any securities that may be issued in connection with the Transaction), making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement, (ii) is an "accredited investor" within the meaning of Rule 501 of the Securities Act of 1933 (as amended) or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933 (as amended), (iii) is acquiring any securities that may be issued in connection with the Transaction for its own account and not with a view to the distribution thereof, and (iv) has obtained adequate information regarding the Transaction in advance of executing this Agreement.  Each Consenting Debtholder hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate and sufficient (for the avoidance of doubt, if a Consenting Debtholder is the investment manager or advisor for a beneficial owner, the foregoing confirmation applies to such Consenting Debtholder and not the beneficial owner).

9.      Additional Notes, Claims and Interests

This Agreement shall in no way be construed to preclude a Consenting Debtholder from acquiring additional Notes, Term Loans or other claims against or interests in the Company (collectively, the "**Additional Claims/Interests**").  However, so long as this Agreement has not been terminated as provided herein, in the event a Consenting Debtholder shall acquire any such Additional Claims/Interests after the date hereof (or holds such Additional Claims/Interests as of the date hereof), such Additional Claims/Interests shall automatically be deemed, without further notice to or action of any Party, to be subject to the terms and conditions of this Agreement.

10.      Transfer of Notes

Each Consenting Debtholder agrees that, until this Agreement has been terminated in accordance with Section 6, it will not, directly or indirectly, (i) sell, transfer, pledge, assign, hypothecate, grant an option on, or otherwise convey or dispose of any of its respective rights, title, or interests (including, without limitation, voting or consent rights) in the Notes, Term Loans or Additional Claims/Interests (and, in each case, claims on account thereof) (collectively, the "**Specified Debt Claims**"), unless such transferee or other recipient (x) is a Consenting Debtholder, or (y) has executed and delivered to the Company and Stroock a joinder, substantially in the form attached hereto as Exhibit C (a "**Joinder**"), pursuant to which (1) such transferee or other recipient agrees to become a Consenting Debtholder and be bound by all of the terms and conditions of this Agreement and (2) the transferor shall be deemed to relinquish its Notes and other applicable Specified Debt Claims (and be released from its obligations under this Agreement solely to the extent of such transferred Notes and other applicable Specified Debt Claims), or (ii) grant any proxies, deposit any of the Notes or other Specified Debt Claims into a voting trust or enter into a voting agreement with respect to any of the Notes or other Specified Debt Claims (collectively, a "**Debt Claim Transfer**").  Any Debt Claim Transfer that does not comply with the foregoing shall be deemed void *ab initio* and of no force or effect.  No Consenting Debtholder (including in its capacity as a Term Loan Lender) shall have any liability under this Agreement arising from or related to the failure of its permitted transferee to comply with the terms of this Agreement.

11.      Prior Negotiations

This Agreement sets forth in full the terms of agreement between the Parties and is intended as the full, complete and exclusive contract governing the relationship between the Parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect thereto; provided, however, that (a) any confidentiality agreement between or among the Company and any Consenting Debtholder shall remain in full force and effect in accordance with its terms and (b) the Indenture, all other Note Documents, the Term Loan Agreement, all other Loan Documents (as defined in the Term Loan Agreement) and any security interest, lien or collateral securing the Indenture Obligations and Term Loan Obligations shall remain in full force and effect in accordance with their respective terms.

21

12.    <u>Amendment or Waiver</u>

No waiver, modification or amendment of the terms of this Agreement shall be valid unless such waiver, modification or amendment is in writing and has been signed by the Company and the Majority Consenting Debtholders, <u>provided</u>, <u>however</u>, that (i) any term or provision of this Agreement that may require the consent or approval of all Consenting Debtholders shall require, as applicable, the written consent or approval of all Consenting Debtholders to waive, amend or modify such term or provision and (ii) any term or provision of this Agreement that may require the consent of the Supermajority Consenting Debtholders shall require, as applicable, the written consent or approval of the Supermajority Consenting Debtholders to waive, amend or modify such term or provision. No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver. Any amendment or modification of this <u>Section 12</u> shall require the written consent of the Company and all Consenting Debtholders. In determining whether any consent or approval has been given or obtained by the Majority Consenting Debtholders, Supermajority Consenting Debtholders and/or all Consenting Debtholders, as applicable, each then existing Consenting Debtholder (and the respective Notes held by such Consenting Debtholder) that is in material breach of its covenants, obligations or representations under this Agreement shall be excluded from such determination.

13.    **<u>WAIVER OF JURY TRIAL</u>**

**EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE EXHIBITS ATTACHED HERETO.**

14.    <u>Governing Law and Consent to Jurisdiction and Venue</u>

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the United States District Court for the Southern District of New York and only to the extent such court lacks jurisdiction, in the New York State Supreme Court sitting in the Borough of Manhattan, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the jurisdiction of such courts, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction and venue, upon any commencement of the Chapter 11 Cases and until the effective date of the Plan, each of the Parties agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

15.    Specific Performance

It is understood and agreed by the Parties that, without limiting any rights or remedies available under applicable law or in equity, money damages would not be a sufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach without the necessity of proving the inadequacy of damages as a remedy, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

16.    Reservation of Rights; Settlement Discussions

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner, waive, limit, impair or restrict the ability of each Consenting Debtholder to protect and preserve its rights, remedies and interests, including its claims against the Company. Except as expressly provided herein or in the Plan, nothing in this Agreement or the Plan shall be, or shall be deemed to be or constitute, a/an: (1) release, waiver, novation, cancellation, termination or discharge of (i) the Notes (or any of the other Indenture Obligations) or any security interest or lien securing such Notes (or any of the other Indenture Obligations), (ii) the Term Loan (or any Term Loan Obligations) or any security interest or lien securing such Term Loan (or any of the Term Loan Obligations), or (iii) the Company, any guarantor or any other person or entity party to any guarantee from their respective requirements and obligations to pay in full in cash the Notes (and all of the other Indenture Obligations) pursuant to the terms and conditions of the Indenture and the Term Loan (and all of the other Term Loan Obligations) pursuant to the terms and conditions of the Credit Agreement; or (2) amendment, modification or waiver of any term or provision of (A) the Indenture or any of the other Note Documents or (B) the Term Loan Agreement and all other Loan Documents (as defined in the Term Loan Agreement), which are hereby reserved and reaffirmed in full.  If this Agreement is terminated for any reason, the Parties fully reserve any and all of their respective rights and remedies under the Indenture, the other Note Documents, the Term Loan Agreement, all other Loan Documents (as defined in the Term Loan Agreement), and applicable law.

This Agreement and the Transaction are part of a proposed settlement of a dispute among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

17.    Headings; Recitals

The section headings of this Agreement are for convenience of reference only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement. The recitals to this Agreement are true and correct and incorporated by reference into this Section 17.

18.    Notice

Any notices or other communications required or permitted under, or otherwise in connection with, this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger or if duly deposited in the mails, by certified or registered mail, postage prepaid-return receipt requested, or if sent by facsimile or electronic (e-mail) transmission, upon receipt of confirmation that such transmission has been received, to the following addresses, facsimile numbers or e-mail addresses, or such other addresses, facsimile numbers or e-mail addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the Company:

OnCure Holdings, Inc.
188 Inverness Drive West, Suite 650
Englewood, Colorado 80112
Attn: Bradford C. Burkett, Chief Executive Officer
Email:  brad@mppartnersllc.com

- and   -

OnCure Holdings, Inc.
188 Inverness Drive West, Suite 650
Englewood, Colorado 80112
Attn: Timothy A. Peach, Chief Financial Officer
Email:  tpeach@oncure.com
Facsimile: 303-643-6528

with a copy to:

Latham & Watkins LLP
505 Montgomery Street, Suite #2000
San Francisco, CA 94111
Attn: Scott Haber, Esq.
Email:  Scott.Haber@lw.com
Facsimile: 415-395-8095

- and   -

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attn: Paul Harner, Esq.
        Keith Simon, Esq.
Email:  Paul.Harner@lw.com
            Keith.Simon@lw.com

24

Facsimile: 212-751-4864


If to any Consenting Debtholder:

To the address (if any) specified on the signature page of this Agreement or in the Joinder (as applicable) for the applicable Consenting Debtholder

*with a copy to*:

Stroock & Stroock & Lavan, LLP
2029 Century Park East, Suite 1600
Los Angeles, California 90067
Attn: Frank A. Merola, Esq.
Email: fmerola@stroock.com
Facsimile: 310-407-6302

*with a copy to*:

Stroock & Stroock & Lavan, LLP
180 Maiden Lane
New York, New York 10038
Attn: Jayme T. Goldstein, Esq.
Email: jgoldstein@stroock.com
Facsimile: 212-806-6006

19.    Successors and Assigns, Several Obligations

Subject to Section 10, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto, without the prior written consent of the other Parties hereto, and then only to a Person who has agreed to be bound by the provisions of this Agreement. This Agreement is intended to and shall bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives. The agreements, representations and obligations of the Consenting Debtholders under this Agreement are several and not joint in all respects. Any breach of this Agreement by a Consenting Debtholder shall not result in liability for any other Consenting Debtholder.

20.    No Third-Party Beneficiaries

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives, and no other person or entity shall be a third party beneficiary hereof or shall otherwise be entitled to enforce any provision hereof.

21.    Counterparts

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Any Party may execute and deliver a counterpart of this Agreement by delivery by facsimile transmission or electronic mail of a signature page of this Agreement signed by such Party, and any such facsimile or electronic mail signature shall be treated in all respects as having the same effect as having an original signature.

22.    Acknowledgement; Not a Solicitation

This Agreement does not constitute, and shall not be deemed to constitute (i) an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934 (or any other federal or state law or regulation) or (ii) a solicitation of votes on the Plan for purposes of the Bankruptcy Code.  Each Consenting Debtholder's vote on the Plan shall not be solicited until it has received the Disclosure Statement.

23.    Disclosure; Publicity

a.    Not later than 9:00 a.m. New York City time on the business day following the Filing Date, subject to the provisions set forth in Section 23(b) below, the Company shall issue a press release disclosing the existence of this Agreement and the terms hereof (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the Filing Date with such redactions as may be requested by Stroock or the Majority Consenting Debtholders to maintain the confidentiality of the items identified in Section 23(b) below, in each case except as otherwise required by order of the Bankruptcy Court or applicable law, subpoena, order, or other legal process or regulation).  In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any Consenting Debtholder may, thereafter, publicly disclose the foregoing, including, without limitation, this Agreement (including all of its exhibits) (subject to the redactions called for by this Section 23) and the Company hereby waives any claims against the Consenting Debtholders arising as a result of such disclosure by a Consenting Debtholder in compliance with this Agreement.

b.    The Company shall submit drafts to the Consenting Debtholder Advisors of any press releases and public documents that constitute the disclosure of the existence or terms of this Agreement or the Plan or any amendment to the terms of this Agreement or the Plan at least two (2) business days prior to making any such disclosure, which such press releases and public documents shall be subject to the prior approval of the Majority Consenting Debtholders, such approval not to be unreasonably withheld or delayed.  Except as required by order of the Bankruptcy Court or applicable law, subpoena, order, or other legal process or regulation or otherwise permitted under the terms of any other agreement between the Company and a Consenting Debtholder, no Party or its advisors shall (i) use the name of such Consenting Debtholder in any public manner when identifying the parties to this Agreement or (ii) disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Debtholder), other than to the Consenting Debtholder Advisors and to the officers, directors, and advisors to the Company, the principal amount or percentage of any Notes, Term Loans or any

26

other securities of the Company held by any Consenting Debtholder, in each case, without such Consenting Debtholder's prior written consent; provided, however, that (x) if such disclosure is required by order of the Bankruptcy Court, or applicable law, subpoena, order, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Debtholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (y) nothing in this Agreement shall, or shall be deemed to, prohibit or limit the disclosure of the aggregate percentage or aggregate principal amount of Notes or Term Loans held by all the Consenting Debtholders collectively or the aggregate number of Consenting Debtholders party hereto. Notwithstanding the provisions in this Section 23, (A) any Party may disclose the identities of the Parties in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof and (B) any Party may disclose, to the extent consented to in writing by a Consenting Debtholder, such Consenting Debtholder's identity and individual holdings.

24.    Relationship Among Parties

It is understood and agreed that no Consenting Debtholder (a) has any duty of trust or confidence in any form with the Company or any other Consenting Debtholder or (b) has or owes any other duties whatsoever to each other, and, except as expressly provided in this Agreement, there are no commitments among or between them, arising from or in connection with this Agreement. In this regard, it is understood and agreed that any Consenting Debtholder may trade in the Notes (subject to the terms of the Indenture), Term Loans (subject to the terms of the Credit Agreement) or other debt or equity securities of the Company without the consent of any Party, subject to applicable securities laws and Sections 9 and 10 of this Agreement. No Consenting Debtholder shall have any responsibility for any such trading by any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Company and the Consenting Debtholders shall in any way affect or negate this understanding and agreement.

25.    No Strict Construction

Each Party acknowledges that it has received adequate information to enter into this Agreement, and that this Agreement has been prepared through the joint efforts of all of the Parties. Neither the provisions of this Agreement nor any alleged ambiguity herein shall be interpreted or resolved against any Party on the ground that such Party's counsel drafted this Agreement, or based on any other rule of strict construction.

26.    Survival

Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, the agreements and obligations of the Parties in this Section 26, the first proviso set forth in Section 4(a), and in Sections 2, 6(d), 6(e), 11, 12, 13, 14, 15, 16, 18, 19, 20, 24, 25, 26, 28, 29

27

and 31 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

27.    Remedies Cumulative; No Waiver

All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.  The failure of any Party to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

28.    Severability

If any portion of this Agreement shall be held to be invalid, unenforceable, void or voidable, or violative of applicable law, the remaining portions of this Agreement so far as they may practicably be performed shall remain in full force and effect and binding on the Parties.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. Notwithstanding anything in the foregoing, if Section 6(c)(3) of this Agreement is held to be invalid, unenforceable, void or voidable, or violative of applicable law, the entire Agreement shall terminate immediately and all of the obligations of the Parties shall be of no further force or effect; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

29.    Time of Essence

Time is of the essence in the performance of each of the obligations of the Parties and with respect to all covenants and conditions to be satisfied by the Parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

30.    Additional Parties

Without in any way limiting the provisions hereof, additional Noteholders and Term Loan Lenders may elect to become Parties by executing and delivering to the Company and the Consenting Debtholders a Joinder.  Such additional Noteholders and Term Loan Lenders shall become a Party as a Consenting Debtholder in accordance with the terms of this Agreement.

28

31.    <u>Company's Fiduciary Duty</u>

Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or any director or officer of the Company (in such person's capacity as such) to take any action, or to refrain from taking any action, to the extent such person or entity determines, in good faith and based upon advice of legal counsel, that proceeding with such action or refraining from taking such action would be inconsistent with the exercise by such person or entity of its applicable fiduciary duties.  The Company represents and warrants to the Consenting Debtholders that, as of the Agreement Effective Date, the Company's entry into this Agreement is consistent with the fiduciary duties of each of the officers and directors of the Company.

32.    <u>Rules of Interpretation</u>

For purposes of this Agreement, unless otherwise specified:  (a) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) all references herein to "Articles", "Sections", and "Exhibits" are references to Articles, Sections, and Exhibits of this Agreement; and (c) the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Agreement in its entirety rather than to a particular portion of this Agreement.

*[Remainder of page intentionally left blank; signature page follows.]*

29

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**THE COMPANY:**

ONCURE HOLDINGS, INC.
ONCURE MEDICAL CORP.
CENTER FOR RADIATION ONCOLOGY OF TAMPA BAY, INC.
CHARLOTTE COMMUNITY  RADIATION ONCOLOGY, INC.
COASTAL ONCOLOGY, INC.
ENGLEWOOD ONCOLOGY, INC.
FOUNTAIN VALLEY & ANAHEIM RADIATION ONCOLOGY CENTERS, INC.
INTERHEALTH FACILITY TRANSPORT, INC.
JAX PET, LLC
JAXPET/POSITECH, L.L.C.
MANATEE RADIATION ONCOLOGY, INC.
MICA FLO II, INC.
MISSION VIEJO RADIATION ONCOLOGY MEDICAL GROUP, INC.
POINTE WEST ONCOLOGY, LLC
RADIATION ONCOLOGY CENTER, LLC
SANTA CRUZ RADIATION ONCOLOGY MANAGEMENT CORP.
SARASOTA COUNTY ONCOLOGY, INC.
SARASOTA RADIATION & MEDICAL ONCOLOGY CENTER, INC.
U.S. CANCER CARE, INC.
USCC ACQUISITION CORP.
USCC FLORIDA ACQUISITION CORP.
USCC HEALTHCARE MANAGEMENT CORP.
VENICE ONCOLOGY CENTER, INC.


By: _____
Name: Bradford C. Burkett
Title:   Chief Executive Officer of OnCure Holdings, Inc.
         Authorized Person

**Exhibit J**

Restructuring Term Sheet

*RESTRUCTURING TERM SHEET*

**THIS TERM SHEET (THE "<u>TERM SHEET</u>") IS NOT AN OFFER WITH RESPECT TO, OR OF, ANY SECURITIES AND A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO THE BANKRUPTCY CODE.   ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.  THE TRANSACTIONS DESCRIBED IN THIS SUMMARY ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION AND SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH THEREIN.**

      This Term Sheet outlines certain material terms of a proposed restructuring for OnCure Holdings, Inc. ("<u>HoldCo</u>") and each direct and indirect, wholly-owned subsidiary of HoldCo (each a "<u>HoldCo Subsidiary</u>" and collectively the "<u>HoldCo Subsidiaries</u>," and together with HoldCo, the "<u>Company</u>").  Subject to the terms and conditions of the Investment Agreement (as defined below): (i) the terms of this Term Sheet will be effected pursuant to a joint plan of reorganization of the Company (the "<u>Plan</u>"), which will be consistent in all material respects with this Term Sheet; (ii) the Plan will be confirmed in the Company's voluntary reorganization cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") that was commenced on June 14, 2013 (the "<u>Filing Date</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"); and (iii) the Plan will be made effective on the date upon which all conditions precedent to the effectiveness of the Plan (as described herein) are satisfied or waived, as the case may be but in no event later than the End Date (as defined in the Investment Agreement) (the "<u>Effective Date</u>").

      The Plan shall provide that Radiation Therapy Services, Inc. ("<u>RTS</u>") shall buy from reorganized HoldCo, and reorganized HoldCo shall issue and sell to RTS or its designated Affiliate (as defined in the Investment Agreement, dated as of June 22, 2013 (the "<u>Investment Agreement</u>")),[1] 100% of the shares of reorganized HoldCo's new common stock (the "<u>New Stock</u>"), par value $0.001 per share.  Pursuant to the Investment Agreement, RTS will acquire all of the New Stock in exchange for a cash purchase price as set forth in the Investment Agreement and this Term Sheet.  The Plan shall be subject to higher and better bids at an auction conducted pursuant to the Bidding Procedures (as defined in the Investment Agreement).

      Reference is made to the following documents and obligations:

      (i)      that certain Amended and Restated Credit Agreement, dated as of December 24, 2012 (as the same has been, and may be, amended, modified or supplemented from time to time, the "<u>Term Loan Agreement</u>"), among HoldCo, the HoldCo Subsidiaries party thereto, the lenders party thereto (the "<u>Term Loan Lenders</u>"), and Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, together with any successor agent, the "<u>Term Loan Agent</u>," and all claims and obligations arising under or in connection with the Term Loan Agreement and the other Loan Documents (as defined in the Term Loan Agreement), the "<u>Term Loan Obligations</u>"); and

      (ii)      those certain $210.0 million in aggregate outstanding principal amount of 11 3/4% Senior Secured Notes due 2017 (collectively, the "<u>Notes</u>", and the holders thereof, the "<u>Noteholders</u>") issued by HoldCo pursuant to that certain Indenture, dated as of May 13, 2010 (as the same has been, and may be, amended, modified or supplemented from time to time, the "<u>Indenture</u>"), among HoldCo, the HoldCo Subsidiaries party thereto, and Wilmington Trust FSB, as trustee and collateral agent (in such capacities, together with any successor trustee, the "<u>Trustee</u>", and all claims and obligations arising under or in connection with the Indenture and the other Note Documents (as defined in the Indenture), the "<u>Indenture Obligations</u>").

      Reference is also made to the following defined terms:

      "<u>Amended Notes</u>" means the Notes reduced to the principal amount of $82,500,000 and otherwise as amended pursuant to the amended indenture to be negotiated consistent in all material respects with Exhibit L to the Investment Agreement (the "<u>Amended Indenture</u>").

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Investment Agreement.

"**Purchase Price**" shall have the meaning set forth in the Investment Agreement.

## SUMMARY OF PROPOSED TREATMENT[2]

Below is a summary of the proposed treatment to be received on the Effective Date from the Company (unless provided otherwise in the Plan) by holders of claims against, and interests in, the Company pursuant to the Plan.

## TREATMENT OF UNCLASSIFIED CLAIMS

**DIP Facility Claims**

Each holder of an allowed claim arising under the DIP Facility (defined below) (each, a "**DIP Facility Claim**") shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such claim, payment in full in cash on the Effective Date.

**Administrative Claims**

Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) of the Bankruptcy Code, to the extent such claim has not already been paid during the Chapter 11 Cases (each, an "**Administrative Claim**"), shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Administrative Claim, either (A) payment in full in cash of the due and unpaid portion of its Administrative Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) , or (y) the date such claim becomes due and payable; (B) such other treatment to render such Administrative Claim unimpaired under section 1124 of the Bankruptcy Code; or (C) such other treatment permitted by section 1129(a)(9) of the Bankruptcy Code.

**Priority/Secured Tax Claims**

Each holder of an allowed claim described in sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, to the extent such claim has not already been paid during the Chapter 11 Cases (each, a "**Priority/Secured Tax Claim**"), shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Priority/Secured Tax Claim, either (A) payment in full in cash of the due and unpaid portion of its Priority/Secured Tax Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable), or (y) the date such claim becomes due and payable; (B) such other treatment to render such Priority/Secured Tax Claim unimpaired under section 1124 of the Bankruptcy Code; or (C) such other treatment permitted by section 1129(a)(9)(C) of the Bankruptcy Code.  Allowed Priority/Secured Tax Claims due and payable as of the Effective Date shall be payable and paid from the Purchase Price or other cash of the Company on hand as of the Effective Date (or from a reserve established to the extent that such claims are disputed or are not yet due and payable as of the Effective Date).

---

[2] Administrative Claims, Priority/Secured Tax Claims, Other Secured Claims and Other Priority Claims (each as defined below) due and payable as of the Effective Date shall be payable and paid from the Purchase Price or other cash of the Company on hand as of the Effective Date (or from a reserve established to the extent that such claims are disputed or are not yet due and payable as of the Effective Date).  Notwithstanding anything to the contrary in the foregoing or otherwise in this Term Sheet, any and all Administrative Claims, Priority/Secured Tax Claims, Other Secured Claims and Other Priority Claims that are (i) included in Closing Working Capital or (ii) a fee, cost, expense, liability or obligation described in the second sentence of the definition of "Selling Expenses" in the Investment Agreement, shall be payable and paid by the reorganized Company (with cash of the reorganized Company) following the Effective Date.

Allowed Priority/Secured Tax Claims due and payable following the Effective Date shall be payable and paid by the reorganized Company (with cash of the reorganized Company) following the Effective Date; provided, however, that the accrued portion as of the Effective Date of Allowed Priority/Secured Tax Claims due and payable following the Effective Date shall be payable and paid from the Purchase Price (or from a reserve established to the extent that such claims are disputed or are not yet due and payable as of the Effective Date).

### TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

| CLASS | CLAIMS/INTEREST | IMPAIRMENT – VOTING RIGHTS |
|---|---|---|
| 1 | **Other Secured Claims** | Unimpaired – Deemed to Accept |

Each holder of an allowed prepetition secured claim other than a Term Loan Obligation or an Indenture Obligation, to the extent such claim has not already been paid during the Chapter 11 Cases, (each, an "**Other Secured Claim**") shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such claim, either (A) payment in full in cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable), or (y) the date such claim becomes due and payable; (B) such other treatment to render such Other Secured Claim unimpaired under section 1124 of the Bankruptcy Code; or (C) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

| 2 | **Other Priority Claims** | Unimpaired – Deemed to Accept |
|---|---|---|

Each holder of an allowed claim described in section 507(a) of the Bankruptcy Code other than a DIP Facility Claim, Administrative Claim, or Priority/Secured Tax Claim, to the extent such claim has not already been paid during the Chapter 11 Cases (each, an "**Other Priority Claim**"), shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such claim, either (A) payment in full in cash of the due and unpaid portion of its Other Priority Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) or (y) the date such claim becomes due and payable; (B) such other treatment to render such Other Priority Claim unimpaired under section 1124 of the Bankruptcy Code; or (C) such other treatment permitted by section 1129(a)(9) of the Bankruptcy Code.

| 3 | **Term Loan Obligations** | Unimpaired – Deemed to Accept |
|---|---|---|

Each holder of a Term Loan Obligation, to the extent such claim has not already been paid during the Chapter 11 Cases, shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such claim, payment in full in cash on the Effective Date (or as soon thereafter as reasonably practicable).

| 4 | **Indenture Obligations** | Impaired – Entitled to Vote |
|---|---|---|

The principal amount of the Notes shall be reduced on a pro rata basis to $82,500,000, the Indenture and the Notes shall be amended as set forth in the Amended Indenture and the Amended Notes, $7,500,000 of Amended Notes (the "**Escrowed Notes**", and the remaining $75,000,000 of Amended Notes, the "**Base Notes**") will be transferred to an escrow agent and held in escrow pending release to holders of Amended Notes upon satisfaction of the conditions contained in the related escrow agreement (the "**Notes Escrow Agreement**"), and each holder of an Indenture Obligation shall receive such holder's pro rata share of the Base Notes and each holder of Amended Notes will have the right to receive, upon satisfaction of the conditions contained in the Notes Escrow Agreement, its pro rata share of the Escrowed Notes. For the avoidance of doubt, interest accrued on the Escrowed Notes

3

while on deposit in the escrow account will be returned to the Company. The obligations under the Amended Notes and the Amended Indenture will be guaranteed by Radiation Therapy Services Holdings, Inc., RTS and certain of RTS's subsidiaries, and certain of the HoldCo Subsidiaries, in each case, as set forth in the Term Sheet for the Amended Notes attached as Exhibit L to the Investment Agreement. The Amended Notes will represent the same indebtedness as the Notes. In addition, each holder of an Indenture Obligation shall receive its pro rata share of the Purchase Price (including the Escrow Amount (as defined in the Investment Agreement)) plus the amount of the Company's cash on the balance sheet as of the Effective Date remaining after payment in full in cash of, or reserve for the payment in full in cash, in each case in accordance with this Term Sheet and the Plan: DIP Facility Claims, Administrative Claims, Priority/Secured Tax Claims, Other Secured Claims, Other Priority Claims and Term Loan Obligations, except to the extent that such claims are (i) included in Closing Working Capital or (ii) a fee, cost, expense, liability or obligation described in the second sentence of the definition of "Selling Expenses" in the Investment Agreement.

| 5 | **General Unsecured Claims** | Impaired – Deemed to Reject |

Each General Unsecured Claim[3] shall be extinguished without any distribution and such holders of General Unsecured Claims will receive no recovery on account of such claim.

| 6 | **Section 510(b) Claims** | Impaired – Deemed to Reject |

Claims arising under section 510(b) of the Bankruptcy Code (each, a "**510(b) Claim**") shall be extinguished without any distribution and such holders of 510(b) Claims will receive no recovery on account of such claim.

| 7 | **Intercompany Claims** | Unimpaired – Deemed to Accept |

There shall be no distributions on account of intercompany claims between and among Holdco and the Holdco Subsidiaries. Notwithstanding the foregoing, the Plan shall reinstate, compromise, or otherwise treat in a tax efficient manner, as the case may be, the intercompany claims between and among Holdco and the Holdco Subsidiaries.

| 8 | **Existing Equity Interests in HoldCo** | Impaired – Deemed to Reject |

On the Effective Date, all outstanding Existing Equity Interests[4] in HoldCo shall be extinguished and cancelled, and the holders of Existing Equity Interests in Holdco will receive no recovery.

| 9 | **Existing Equity Interests in the HoldCo Subsidiaries** | Unimpaired – Deemed to Accept |

---

[3] "**General Unsecured Claim**" means any claim against the Company that is (i) not secured pursuant to section 506(a) of the Bankruptcy Code, (ii) not subordinated pursuant to section 510 of the Bankruptcy Code, (iii) not entitled to priority under section 503(b) or section 507(a) of the Bankruptcy Code, (iv) not a claim on account of intercompany claims between or among Holdco and the Holdco Subsidiaries, and (v) not an Indenture Obligation.

[4] "**Existing Equity Interests**" shall include common stock, limited liability company interests and any other equity, ownership or profits interests, and options, warrants or other agreements to acquire common stock, limited liability company interests or other equity, ownership or profits interests (whether or not arising under or in connection with any employment agreement).

4

On the Effective Date, all Existing Equity Interests in each HoldCo Subsidiary that are owned by Holdco or another Holdco Subsidiary shall remain effective and outstanding and continue to be owned by reorganized HoldCo or the applicable HoldCo Subsidiary on the Effective Date pursuant to the Plan and the other Restructuring Documents.

<u>OTHER TERMS OF PROPOSED TRANSACTION</u>

**Limited Substantive Consolidation……………**
Subject to the approval of the Consenting Debtholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes held by all Consenting Debtholders, the Plan may be predicated upon entry of an order substantively consolidating the estates of HoldCo and the HoldCo Subsidiaries for the limited purposes of voting and confirmation under the Plan, and not for any other purpose.

**New Stock ……………………………......………...**
All of the New Stock of reorganized HoldCo shall be issued to RTS or its designated subsidiaries on the Effective Date.

**Amended Notes …………..………........................**
The Plan shall provide for reduction in the principal amount of the Notes on a pro rata basis to $82,500,000 and the amendment of the Indenture, consistent in all material respects with the terms set forth in the term sheet for the Amended Notes, attached as Exhibit L to the Investment Agreement.

**DIP Financing
and Use of Cash Collateral …………...………...**
On or after the Filing Date, the Company shall enter into a debtor in possession financing facility consistent in all material respects with Exhibit H to the Investment Agreement (the "**DIP Facility**").

**Releases & Exculpation …………………………**
The Restructuring Documents shall contain mutual customary releases and other exculpatory provisions in favor of the Company, and each of the following who consent to such releases: (a) the Term Loan Agent; (b) the Term Loan Lenders; (c) the Trustee; (d) the Consenting Debtholders; (e) Match Point Partners LLC; (f) RTS; (g) Vestar Capital Partners, Inc.; (h) Genstar Capital, LLC; and (i) each other holder of Existing Equity Interests in the Company; and each of their respective affiliates, subsidiaries and shareholders, and each of their respective current and former members, managers, professionals, directors and officers and other persons and entities, acceptable to the Company, the Majority Consenting Debtholders, and RTS (collectively, the "**Released Parties**").

**Injunction………………………………………..**
Customary injunction provisions, including all Released Parties.

5

**Discharge ………………………………………..**  Customary discharge provisions.

**D&O Liability Insurance Policies,**
**Tail Policies and Indemnification…………………**  RTS shall, and the Company shall continue to, indemnify and hold harmless directors and officers of the Company that served in such capacity as of the Petition Date with respect to claims arising out of acts, omissions, or alleged acts or omissions that took place prior to the Effective Date, but only to the extent that (a) such acts, omissions or alleged acts or omissions were indemnifiable under the Company's prepetition organizational documents and (b) the otherwise indemnifiable expense, liability, or loss is determined not to be covered under the tail policy purchased by the Company prior to the Filing Date.

**Executory Contracts and Unexpired Leases …..**  All executory contracts and unexpired leases to which the Company is a party shall be assumed or rejected in accordance with the terms and conditions of the Investment Agreement.

**Effective Date ……………………………..…..**  The date on which all of the conditions to effectiveness set forth in the Plan and the Investment Agreement have been satisfied or waived (in accordance with their terms) and the Plan is substantially consummated.  The Effective Date must occur on or prior to the End Date.

**Cancellation of Instruments, Certificates, and Other**
**Documents………………………………………**  On the Effective Date, except to the extent otherwise provided herein or in the Plan, all instruments, certificates, and other documents evidencing debt or equity interests in Holdco and the Holdco Subsidiaries, including any intercreditor agreement between the Term Loan Lenders and Noteholders (except the Existing Equity Interests in the Holdco Subsidiaries that are owned by HoldCo or another HoldCo Subsidiary, to the extent expressly reinstated by the Plan) shall be cancelled, and the obligations of Holdco and the Holdco Subsidiaries thereunder, or in any way related thereto, shall be discharged.

**Board of Directors of Reorganized HoldCo. ..………**  The board of directors of reorganized HoldCo shall be designated by RTS not later than five (5) business days prior to the Confirmation Hearing.

**Employees of the Reorganized Company ..…………**  The terms and conditions of employment for the officers and directors of the reorganized Company shall be determined by RTS in its sole discretion; *provided*, however, that execution and delivery of employment agreements or other agreements relating to employment

6

by any employees of the Company shall not be a condition to effectiveness of the Plan.

**Charter and Bylaws** ..………..……………..…… The charter and bylaws of each Debtor shall be amended and restated consistent with section 1123(a)(6) of the Bankruptcy Code and otherwise be in form and substance satisfactory to RTS.

**Exemption Under Section 1145 of the Bankruptcy Code** ..……………………..…… The Plan shall provide that the issuance of any securities thereunder will be exempt from securities laws in accordance with section 1145 of the Bankruptcy Code.

**Resolution of Disputed Claims** ………………..…… The Plan shall provide for the resolution of disputed claims and any reserves therefor.

**Conditions Precedent** ……………..……………….. The Plan shall contain customary conditions precedent to confirmation of the Plan and the Effective Date, including, among others:

(i) the Plan and Restructuring Documents shall be in form and substance consistent in all material respects with this Term Sheet and the Investment Agreement;

(ii) the Bankruptcy Court shall have entered an order confirming the Plan in form and substance consistent in all material respects with this Term Sheet and otherwise reasonably acceptable in all respects to the Company and RTS, and such order shall not have been stayed or modified or vacated on appeal;

(iii) all of the schedules, documents, supplements, and exhibits to the Plan shall be in form and substance consistent in all material respects with this Term Sheet and the Investment Agreement and reasonably acceptable to RTS;

(iv) all governmental approvals and consents, including Bankruptcy Court approval, that are legally required for the consummation of the Transaction shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect; and

(v) the Investment Agreement shall be in full force and effect.

**Purchase Price Adjustment/Consenting Debtholder Representative**……………………………………. The Plan shall provide for the appointment of a Consenting Debtholder to represent the Consenting Debtholders in connection with any dispute regarding the calculation of the post-closing adjustment to the purchase

7

price under the Investment Agreement (the "Consenting Debtholders' Representative") consistent with the Investment Agreement.

The Plan shall include a reserve sufficient to pay any fees, costs and expenses of the Consenting Debtholders' Representative, including any legal, accounting and consultant fees incurred in connection with the discharge of its responsibilities under the Plan.

The Plan shall provide (i) that the Consenting Debtholders' Representative and its officers, directors, managers, employees, stockholders, members, partners, employers, advisors, attorneys, owners, agents and representatives (the "Representative Parties") shall not be liable to any party for any action taken or omitted to be taken by any Representative Party in its capacity as such, except for such actions taken or omitted to be taken resulting from any Representative Party's willful misconduct or gross negligence, and (ii) that an insurance policy shall be obtained (and paid for from the Purchase Price or other cash of the Company on hand as of the Effective Date) on behalf of the Representative Parties so as to indemnify the Representative Parties from all expenses, losses, claims, fines, liabilities, damages, judgments or settlements arising out of or relating to acts or omissions of such Representative Party in such capacity except for actions taken or omitted to be taken resulting from willful misconduct or gross negligence of any Representative Party.

**Other Terms and Conditions** ……………………..          The Restructuring Documents will contain such other terms and conditions as are reasonable or customary for transactions of this type and otherwise reasonably acceptable in all respects to RTS.

8

**<u>Plan Schedule 1</u>**

Non-Exclusive List of Litigation Claims

[To Be Filed With Plan Supplement]

**Plan Schedule 2**

New Board of Reorganized HoldCo

[To Be Filed With Plan Supplement]

**Plan Schedule 3**

Non-Released Parties

[To Be Filed With Plan Supplement]

## **Plan Schedule 4**

Noteholders' Representative

[To Be Filed With Plan Supplement]

**Plan Schedule 5**


Non-Exclusive List of Rejected Executory Contracts and Unexpired Leases


[To Be Filed With Plan Supplement]

**<u>Plan Schedule 6</u>**

Causes of Action Preserved by the Debtor Releasing Parties

[To Be Filed With Plan Supplement]

**Plan Schedule 7**


Causes of Action Preserved by the Non-Debtor Releasing Parties


[To Be Filed With Plan Supplement]