## Exhibit B

Solicitation Version of Disclosure Statement

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

In re:       :   Chapter 11

      :

ONCURE HOLDINGS, INC., et al.,   :   Case No. 13- 11540 (KG)

      :

      Debtors.[1]   :   Jointly Administered

---------------------------------------------------------- x

---

### DISCLOSURE STATEMENT FOR
### THE PLAN OF REORGANIZATION FOR
### ONCURE HOLDINGS, INC. AND ITS AFFILIATE DEBTORS
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

| | |
|---|---|
| **RICHARDS, LAYTON & FINGER, P.A.** | **LATHAM & WATKINS LLP** |
| Daniel J. DeFranceschi (Bar No. 2732) | Paul E. Harner |
| Paul N. Heath (Bar No. 3704) | Keith A. Simon |
| Tyler D. Semmelman (No. 5386) | Aaron M. Singer |
| William A. Romanowicz (No. 5794) | Annemarie V. Reilly |
| One Rodney Square | 885 Third Avenue |
| 920 North King Street | New York, New York 10022 |
| Wilmington, Delaware 19801 | Telephone: (212) 906-1200 |
| Telephone: (302) 651-7700 | Facsimile: (212) 751–4864 |
| Facsimile: (302) 651-7701 | |

Counsel for the Debtors and Debtors-in-Possession

Dated: August 22, 2013

---

[1]    The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471). The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

**THE VOTING DEADLINE IS 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 23, 2013**
(UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).

TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AND CLAIMS AGENT MUST <u>ACTUALLY</u> <u>RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE AS SET FORTH IN THE DISCLOSURE STATEMENT ORDER.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTORS OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.

**PRESERVATION OF AVOIDANCE ACTIONS UNDER THE PLAN:**

IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST, OR TO OBJECT TO CONFIRMATION OF, THE PLAN, CREDITORS, INTEREST HOLDERS AND STAKEHOLDERS SHOULD BE AWARE THAT THE PLAN PRESERVES ALL CAUSES OF ACTION (INCLUDING AVOIDANCE ACTIONS) AND THAT THE PLAN AUTHORIZES THE REORGANIZED DEBTORS TO PROSECUTE THE SAME.

---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE SECURITIES ACT OR OTHER APPLICABLE EXEMPTIONS. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED.  THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

**HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VI HEREIN, "PLAN-RELATED RISK FACTORS."**

**TABLE OF CONTENTS**

**Page**

I.    **EXECUTIVE SUMMARY** ...................................................................................................i

    A.    Purpose and Effect of the Plan .............................................................................ii

    B.    Administrative, DIP Facility and Priority Tax Claims ........................................iii

    C.    Classification and Treatment of Claims and Interests Under the Plan ................v

    D.    Solicitation Procedures .........................................................................................vii

    E.    Voting Procedures ................................................................................................xi

    F.    Confirmation of the Plan ......................................................................................xiv

    G.    Consummation of the Plan ...................................................................................xv

    H.    Risk Factors .........................................................................................................xv

II.   **BACKGROUND TO THE CHAPTER 11 CASE** ...........................................................1

    A.    The Debtors' Corporate History and Structure ...................................................1

    B.    Overview of the Debtors' Businesses ..................................................................1

    C.    Prepetition Indebtedness ......................................................................................2

    D.    Events Leading to the Chapter 11 Filing ............................................................2

III.  **EVENTS DURING THE CHAPTER 11 CASE** ...........................................................4

    A.    First Day Motions and Certain Related Relief ....................................................4

    B.    Reorganization Strategy and Sale Efforts ...........................................................6

    C.    Filing of the Schedules and Establishment of the Claims Bar Date ....................16

    D.    Exclusive Period for Filing a Plan and Soliciting Votes .....................................16

    E.    Deadline to Assume or Reject Leases of Nonresidential Real Property...............16

IV.  **SUMMARY OF THE PLAN** ..........................................................................................17

    A.    Administrative, DIP Facility and Priority Tax Claims ........................................17

    B.    Classification and Treatment of Classified Claims and Equity Interests..............19

    C.    Acceptance or Rejection of the Plan ...................................................................23

    D.    Means for Implementation of the Plan .................................................................24

    E.    Treatment of Executory Contracts and Unexpired Leases ..................................34

    F.    Provisions Governing Distributions .....................................................................37

    G.    Procedures for Resolving Contingent, Unliquidated and Disputed Claims...........40

    H.    Conditions Precedent to Confirmation and Consummation of the Plan................42

    I.    Release, Discharge, Injunction And Related Provisions ......................................43

    J.    Binding Nature of the Plan....................................................................................48

K.      Protection Against Discriminatory Treatment....................................................48

L.      Plan Indemnity .................................................................................................48

M.      Integral Part of Plan ........................................................................................49

**V.      CONFIRMATION AND CONSUMMATION PROCEDURES** .................................................**50**

A.      Solicitation of Votes........................................................................................50

B.      Confirmation Procedures..................................................................................50

C.      Statutory Requirements for Confirmation of the Plan......................................50

D.      Consummation of the Plan ...............................................................................55

**VI.     PLAN-RELATED RISK FACTORS** .......................................................................................**56**

A.      Certain Bankruptcy Law Considerations .........................................................56

B.      Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or Recoveries Under the Plan .............................................................................58

C.      Risk Factors that Could Negatively Impact the Debtors' Business....................59

D.      Risks Associated with Forward Looking Statements ........................................66

E.      Disclosure Statement Disclaimer ....................................................................67

**VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ...........**69**

A.      Liquidation Under Chapter 7 of the Bankruptcy Code......................................69

B.      Filing of an Alternative Plan of Reorganization...............................................69

**VIII.   EXEMPTIONS FROM SECURITIES ACT REGISTRATION** .................................................**70**

**IX.     CERTAIN U.S. FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN** .................................**73**

A.      Introduction.....................................................................................................73

B.      U.S. Federal Income Tax Consequences to the Debtors ...................................74

C.      U.S. Federal Income Tax Consequences to Holders of Allowed Prepetition Secured Notes Claims ...........................................................................................................76

**RECOMMENDATION**.......................................................................................................................**82**

**EXHIBITS**

EXHIBIT A        Plan of Reorganization

EXHIBIT B        Disclosure Statement Order

EXHIBIT C        Financial Projections

EXHIBIT D        Liquidation Analysis

EXHIBIT E        Historical Financial Statements

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO
THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

---

# I.
# EXECUTIVE SUMMARY

OnCure Holdings, Inc. ("**HoldCo**"), a Delaware corporation with its primary headquarters in Englewood, Colorado, and the other debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"), submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended from time to time, the "**Bankruptcy Code**"), in connection with the solicitation of votes on the Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code dated August 22, 2013 (the "**Plan**"),[2] which was filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  The Confirmation Hearing on the Plan is scheduled to commence at 10:00 a.m. prevailing Eastern Time on October 3, 2013 before the Bankruptcy Court.  A copy of the Plan is attached hereto as Exhibit A.

Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires debtors to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

This Executive Summary is being provided as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the commencement of the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**");

- the significant events that have occurred during the Chapter 11 Cases;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

---

[2]      All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

i

A.    **PURPOSE AND EFFECT OF THE PLAN**

    1.    **Plan of Reorganization Under Chapter 11 of the Bankruptcy Code**

       The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business.  Additionally, as discussed in greater detail in Section IV.J herein, titled "Binding Nature of the Plan," a bankruptcy court's confirmation of a plan binds debtors, any entity acquiring property under the plan, any holder of a claim or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the particular plan or affirmatively voted to reject the plan.

    2.    **Financial Restructurings Under the Plan**

       The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in Section IV herein):

- pursuant to an investment agreement dated June 22, 2013 (the "**Investment Agreement**"), Radiation Therapy Services, Inc. ("**RTS**") agreed to (1) buy 100% of the shares of Reorganized HoldCo upon the Effective Date of the Plan and (2) pay $42,500,000 in cash, subject to certain adjustments, and to guarantee $82,500,000 of the Amended Secured Notes.  As of August 22, 2013, the Investment Agreement remains subject to the approval of the Bankruptcy Court.  A detailed summary of the Investment Agreement is provided in Section III.B below;

- the DIP Facility Claims will be satisfied in full in Cash on the Effective Date;

- the Prepetition Term Loan Claims will be satisfied in full on the Effective Date, to the extent not previously paid in full pursuant to the DIP Facility Orders;

- the principal amount of the Prepetition Secured Notes will be reduced on a Pro Rata basis to $82,500,000 and the Prepetition Secured Notes Indenture and the Prepetition Secured Notes will be amended in their entirety as set forth in the Amended Secured Notes Indenture (attached to the Plan as Exhibit C) and the Amended Secured Notes, respectively;

- the Holders of General Unsecured Claims and Old HoldCo Interests will not receive any recovery under the Plan; and

- the Holders of other Claims and Equity Interests will receive the treatment summarized in Section IV below.

    (a)    <u>The Amended Secured Notes and the Amended Secured Notes Guarantees</u>

       As noted above, on and as of the Effective Date, the principal amount of the Prepetition Secured Notes will be reduced on a Pro Rata basis to $82,500,000, the Prepetition Secured Notes Indenture and the Prepetition Secured Notes will be amended in their entirety as set forth in the Amended Secured Notes Indenture (attached to the Plan as Exhibit C or Filed with the Plan Supplement) and the Amended Secured Notes, respectively.  Of the $82,500,000 of Amended Secured Notes, $7,500,000 thereof (the "**Escrowed Notes**") will be transferred to the escrow agent under, and be held in escrow pending release to the Holders of the Amended Secured Notes upon satisfaction of the conditions contained in, the Escrowed Notes Agreement.  Interest paid on the Escrowed Notes prior to the start of the first accrual period beginning in 2016 will be returned to the Reorganized Debtors.  Interest accruing from the start of the first accrual period beginning in 2016 will be paid pursuant to the Amended Secured Notes Indenture, subject to the terms of the Escrowed Notes Agreement..  All of the Prepetition Secured Noteholders will be deemed

to be parties to, and bound by, the Amended Secured Notes Indenture, without the need for execution thereof by any such applicable Prepetition Secured Noteholder.

The Amended Secured Notes will represent the same indebtedness as the Prepetition Secured Notes, and nothing in the Plan is, or will be deemed to constitute, an issuance of new indebtedness under or in connection with the Amended Secured Notes or the Amended Secured Notes Indenture.  The Prepetition Secured Noteholders will also receive the Net Cash Amount on the Effective Date and the Unused Cash Reserve Amount (if any) as and when provided under the Plan.

The obligations arising under the Amended Secured Notes and the Amended Secured Notes Indenture will be guaranteed by RTS, certain subsidiaries of RTS, and certain of the Reorganized Debtors, in each case as set forth in the Amended Secured Notes Indenture Term Sheet.

(b)    New Common Stock To be Issued Under the Plan

On the Effective Date, Reorganized HoldCo will issue and sell to RTS 100% of its New Common Stock to be issued pursuant to the terms of the Plan.  The New Common Stock will represent all of the equity interests in Reorganized HoldCo as of the Effective Date.  Reorganized HoldCo will not be obligated to list the New Common Stock on a national securities exchange.  The New Common Stock will be issued without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VIII herein, titled "Exemptions From Securities Act Registration."

The remaining equity interests in each Affiliate Debtor will remain in effect and outstanding on the Effective Date and will be owned and held by the same Persons that owned and held such interests immediately prior to the Effective Date.

**B.    ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS**

The following is a summary of the treatment of Administrative, DIP Facility and Priority Tax Claims under the Plan.  For a more detailed description of the treatment of such Claims under the Plan, please see Article II of the Plan.

**1.    Administrative Claims**

The legal, equitable and contractual rights of the Holders of Allowed Administrative Claims are unaltered by the Plan.  Subject to sub-paragraph (a) below and Article V.Q of the Plan, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim will have agreed upon in writing; *provided*, *however*, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

SF\5603286.11

(a)     Bar Date for Administrative Claims

Except as otherwise provided in Article II.A of the Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order (as applicable) no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date will be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims will be deemed discharged as of the Effective Date.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.

Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

In the case of the Ad Hoc Secured Noteholders Committee Fees and Expenses, such Ad Hoc Secured Noteholders Committee Fees and Expenses will be paid in full in Cash on the Effective Date (to the extent invoiced and not previously paid during the course of the Chapter 11 Cases) from the Debtors' Claim Portion Cash Reserve, without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date. The Prepetition Term Loan Agent Fees and Expenses and the Prepetition Secured Notes Indenture Trustee Fees and Expenses will be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent invoiced and not previously paid during the course of the Chapter 11 Cases) from the Debtors' Claim Portion Cash Reserve, without a requirement for the Prepetition Term Loan Agent or the Prepetition Secured Notes Indenture Trustee to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date. DIP Facility Claims shall be paid pursuant to Article II.B of the Plan without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date.

(b)     Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors' Claim Portion Cash Reserve for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim.

Each Holder of an Allowed Professional Fee Claim will be paid in full in Cash from the Professional Fee Reserve within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.

**2.        DIP Facility Claims**

Subject to Article V.Q of the Plan, the Allowed DIP Facility Claims will be indefeasibly paid in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims.

**3.        Priority Tax Claims**

The legal, equitable and contractual rights of the Holders of Allowed Priority Tax Claims are unaltered by the Plan.  Subject to Article V.Q and Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

**C.        CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE VI BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW**.

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 1 | Other Priority Claims<br><br>Expected Amount: $0 | Each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim:<br><br>• Cash in an amount equal to the amount of such Allowed Other Priority Claim;<br><br>• Such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors and the Holder of such Allowed Other Priority Claim shall have agreed upon in writing; or<br><br>• Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 2 | Other Secured Claims<br><br>Expected Amount: $0 | Each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:<br><br>• Cash in an amount equal to the amount of such Other Secured Claim;<br><br>• Such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors and the Holder of such Allowed Other Secured Claim shall have agreed upon in writing;<br><br>• The Collateral securing such Other Secured Claim; or<br><br>• Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 3 | Secured Tax Claims<br><br>Expected Amount: $0 | Each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim:<br><br>• Cash in an amount equal to the amount of such Allowed Secured Tax Claim;<br><br>• such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Secured Tax Claim shall have agreed upon in writing;<br><br>• The Collateral securing such Secured Tax Claim;<br><br>• Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or<br><br>• In accordance with section 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Secured Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable. | 100% |
| 4 | Prepetition Term Loan Claims<br><br>Expected Amount: $0 | Each Holder of an Allowed Class 4 Claim, to the extent not previously paid in full pursuant to the DIP Facility Orders, will receive, on the Effective Date and in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4 Claim, Cash equal to the amount of such Allowed Class 4 Claim. | 100% |

SF\5603286.11

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 5 | Prepetition Secured Notes Claims<br><br>Expected Amount: $210,000,000.00[3] | The Prepetition Secured Notes Claims are deemed Allowed in the aggregate amount of approximately $210 million. Each Holder of an Allowed Class 5 Claim will receive, on account of such Claim, its Pro Rata share of the Base Notes and the Net Cash Amount. After the Effective Date, subject to the terms and conditions of the Plan (including Article VII.D.1 of the Plan), the Investment Agreement and the Escrowed Notes Agreement (as applicable), each Holder of an Allowed Class 5 Claim will receive, on account of such Claim, its Pro Rata share of (x) either (i) in the event the Final Purchase Price is greater than the Initial Purchase Price, the sum of (A) an amount equal to the amount by which the Final Purchase Price exceeds the Initial Purchase Price plus (B) the Escrow Amount or (ii) in the event the Final Purchase Price is equal to or less than the Initial Purchase Price, an amount equal to the Escrow Amount, if any, following any distribution to the Investor pursuant to Section 2.3(e) of the Investment Agreement, (y) the Unused Cash Reserve Amount and (z) upon satisfaction of the conditions contained in the Escrowed Notes Agreement, its Pro Rata share of the Escrowed Notes, in each case if any. | 50.3% - 53.9%[4] |
| 6 | General Unsecured Claims<br><br>Expected Amount: $2,546,983.00 | Each Holder of an Allowed Class 6 Claim will not receive any distribution or retain any property on account of such Allowed Class 6 Claim. | 0% |
| 7 | Intercompany Claims | Each Holder of an Intercompany Claim shall not receive any distribution or retain any property under the Plan on account of such Intercompany Claim. On or after the Effective Date, the Reorganized Debtors may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by such Reorganized Debtors. | 0% |
| 8 | Old HoldCo Interests | Old HoldCo Interests will be cancelled and will be of no further force and effect, without further notice to, approval of or action by any Entity, and each Holder of an Old HoldCo Interest shall not receive any distribution or retain any property on account of such Old HoldCo Interest. | 0% |
| 9 | Old Affiliate Interests in any HoldCo Subsidiary | Subject to the Restructuring Transactions, Old Affiliate Interests will remain effective and outstanding on the Effective Date and will be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date. | N/A |

## D.    SOLICITATION PROCEDURES

### 1.    The Solicitation and Voting Procedures

On August 22, 2013 the Bankruptcy Court entered the Disclosure Statement Order which, among other things, (a) approved the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan, as well as certain vote tabulation procedures and (b) established the deadline for filing objections to the Plan and scheduling the hearing to consider confirmation of the Plan.

**The discussion of the procedures below is a summary of the solicitation and voting process.** Detailed voting instructions will be provided with each ballot and are also set forth in greater detail in Disclosure Statement Order.

---

[3]    Expected Amount of Prepetition Secured Notes Claims excludes accrued interest, fees, and other costs and expenses.

[4]    The estimated projected recovery for the Senior Secured Notes Claims does not account for other risk factors that impact their recovery, including, for example, potential adjustments to the purchase price as contemplated under the Investment Agreement.

> PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS AND THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

### 2. The Voting and Claims Agent

The Debtors have sought authority to retain Kurtzman Carson Consultants LLC to, among other things, act as Voting and Claims Agent.

Specifically, the Voting and Claims Agent will assist the Debtors with: (a) mailing Confirmation Hearing Notices (as defined in the Disclosure Statement Order); (b) mailing Solicitation Packages (as defined in the Disclosure Statement Order and as described below); (c) soliciting votes on the Plan; (d) receiving, tabulating, and reporting on ballots cast for or against the Plan by Holders of Claims against the Debtors; (e) responding to inquiries from creditors and stakeholders relating to the Plan, the Disclosure Statement, the Ballots and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan; and (f) if necessary, contacting creditors regarding the Plan and their ballots.

### 3. Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim within such Class) under the Plan:

| SUMMARY OF STATUS AND VOTING RIGHTS | | | |
|---|---|---|---|
| Class | Claim/Equity Interest | Status | Voting Rights |
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4 | Prepetition Term Loan Claims | Unimpaired | Deemed to Accept |
| 5 | Prepetition Secured Notes Claims | **Impaired** | **Entitled to Vote** |
| 6 | General Unsecured Claims | Impaired | Deemed to Reject |
| 7 | Intercompany Claims | Impaired | Deemed to Accept |
| 8 | Old HoldCo Interests | Impaired | Deemed to Reject |
| 9 | Old Affiliate Interests in any HoldCo Subsidiary | Unimpaired | Deemed to Accept |

Based on the foregoing, the Debtors are soliciting votes to accept the Plan only from Holders of Claims in Class 5 (the "**Voting Class**") because Holders of Claims in the Voting Class are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan. The Debtors are **not** soliciting votes from (a) Holders of Unimpaired Claims in Classes 1, 2, 3, and 4, Holders of Intercompany Claims in Class 7, and Holders of Equity Interests in Class 9 because such parties are conclusively presumed to have accepted the Plan or (b) Holders of Claims in Class 6 and Equity Interests in Class 8 because such parties are conclusively presumed to have rejected the Plan (collectively, the "**Non-Voting Classes**").

### 4.    The Voting Record Date

The Bankruptcy Court has approved August 14, 2013 as the voting record date with respect to Prepetition Secured Notes Claims and Old HoldCo Interests (the "**Securities Voting Record Date**").  The Bankruptcy Court has approved August 21, 2013 as the voting record date (the "**Non-Securities Voting Record Date**" and together with the Securities Voting Record Date, the "**Voting Record Date**") with respect to all other Claims and Equity Interests (*i.e.*, those in Classes 1, 2, 3, 4, 6, 7 and 9).  The applicable Voting Record Date is the date on which it will be determined:  (a) which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and receive Solicitation Packages in accordance with the Disclosure Statement Order; (b) which Holders of Claims in Class 6 are entitled to receive Solicitation Packages, the contents of which will not include a ballot or the Plan Supplement, in accordance with the Disclosure Statement Order; and (c) which Holders of Claims and Equity Interests in the Non-Voting Classes are entitled to receive the Confirmation Hearing Notice, including notice of such Holder's non-voting status, in accordance with the Disclosure Statement Order.

### 5.    Contents of the Solicitation Package

The following documents and materials will collectively constitute the Solicitation Package:

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Class to vote to accept the Plan;

- the Confirmation Hearing Notice, attached to the Disclosure Statement Order;

- this Disclosure Statement (and exhibits annexed thereto, including the Plan);

- the Disclosure Statement Order;

- to the extent applicable, a ballot and/or notice, appropriate for the specific creditor, in substantially the forms attached to the Disclosure Statement Order (as may be modified for particular classes and with instruction attached thereto).  For the avoidance of doubt, the Solicitation Packages distributed to Holders of Claims in Class 6 will not include a ballot or the Plan Supplement; and

- such other materials as the Bankruptcy Court may direct.

### 6.    Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan

With the assistance of the Voting and Claims Agent, the Debtors intend to distribute Solicitation Packages on or before August 26, 2013 (the "**Solicitation Mailing Date**").  The Debtors submits that the timing of such distribution will provide such Holders of Claims with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b).  The Debtors will make every reasonable effort to ensure that Holders who have more than one Allowed Claim in the Voting Class receive no more than one Solicitation Package.  If a Holder holds Claims in more than one Class and is entitled to vote in more than one Class, such Holder will receive separate ballots which must be used for each separate Class of Claims.

### 7.    Distribution of Notices to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims

As set forth above, certain Holders of Claims and Equity Interests are **not** entitled to vote on the Plan.  As a result, such parties, with the exception of Holders of Claims in Class 6, will not receive Solicitation Packages and, instead, will receive the appropriate form of notice as follows:

- Underlined text: Unimpaired Claims – Deemed to Accept.  DIP Facility Claims, Administrative Claims and Priority Tax Claims are unclassified, non-voting Claims and Claims in Classes 1, 2, 3, and 4 and Equity

ix

Interests in Class 9 are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan.  As such, Holders of such Claims and Equity Interests will receive, in lieu of a Solicitation Package, an "Unimpaired Claims Notice" attached as <u>Exhibit 4</u> to the Disclosure Statement Order.

- <u>Impaired Claims – Deemed to Accept</u>.  Claims in Class 7 are Impaired.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 will be conclusively deemed to have accepted the Plan.  As such, Holders of Claims in Class 7 will receive, in lieu of a Solicitation Package, a "Notice of Non-Voting Status: No Recovery" attached as <u>Exhibit 5</u> to the Disclosure Statement Order.

- <u>Impaired Claims – Deemed to Reject</u>.  Holders of Claims in Class 6 and Equity Interests in Class 8 are receiving no distribution under the Plan and, therefore, are conclusively presumed to reject the Plan.  As such, Holders of such Claims and Equity Interests will receive, in lieu of a Solicitation Package, a Notice of Non-Voting Status: No Recovery.  For the avoidance of doubt, Holders of Claims in Class 6 will receive a Solicitation Package, which will not include a ballot or the Plan Supplement, and a Notice of Non-Voting Status: No Recovery.

- <u>Disputed Claims</u>.

   (a) Any Holder of a Claim for which the Debtors have filed an objection on or before August 21, 2013, whether such objection related to the entire Claim or a portion thereof, will not be entitled to vote on the Plan and will not be counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the Plan.  Such Holders will receive a "Notice of Non-Voting Status: Disputed Claims," attached as Exhibit 2 to the Disclosure Statement Order.

   (b) Any Holder of a Claim in Class 5 against the Debtors for which such Holder has timely filed a Proof of Claim (or an untimely Proof of Claim which has been allowed as timely by the Bankruptcy Court under applicable law on or before the applicable Voting Record Date), which is marked, in whole or in part, as contingent, unliquidated, or disputed, and that is not subject to an objection filed by the Debtors, will have such Claim temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00.  Such Holders will receive (a) a Solicitation Package that contains the applicable ballot, (b) a "Confirmation Hearing Notice," which notice informs such person or entity that its entire Claim has been allowed temporarily for voting purposes only and not for purposes of allowance or distribution, at $1.00 and (c) a "Notice of Limited Voting Status to Holders of Contingent, Unliquidated or Disputed Claims for Which No Objection Has Been Filed by the Debtors," attached as Exhibit 8 to the Disclosure Statement Order.

   If any Holder described in the preceding two subparagraphs disagrees with the Debtors' classification or status of its Claim, then such Holder <u>MUST</u> file and serve a motion requesting temporary allowance of its Claim solely for voting purposes in accordance with the procedures set forth in the Disclosure Statement Order.

- <u>Contract and Lease Counterparties</u>.  Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have scheduled Claims or Claims based upon Proofs of Claim pending the disposition of their contracts or leases by assumption or rejection.  Without amending or altering the Cure Claim Procedures Order or any other prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, to ensure that such parties nevertheless receive notice of the Plan, counterparties to the Debtors' Executory Contracts and Unexpired Leases will receive, in lieu of a Solicitation Package, a "Contract/Lease Party Notice" attached as Exhibit 6 to the Disclosure Statement Order.

8.       **Additional Distribution of Solicitation Documents**

In addition to the distribution of Solicitation Packages to Holders of Claims in the Voting Class and to Holders of Claims in Class 6, the Debtors will also provide parties who have filed requests for notices under Bankruptcy Rule 2002 as of the applicable Voting Record Date with the Disclosure Statement, Disclosure Statement Order and Plan.  Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Disclosure Statement (and any exhibits thereto, including the Plan) by:  (a) calling the Voting and Claims Agent at (877) 634-7166; (b) writing to OnCure, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (c) visiting the Debtors' restructuring website at: http://www.kccllc.net/OnCure.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

9.       **Filing of the Plan Supplement**

The Debtors will file the Plan Supplement by September 13, 2013.  The Debtors will transmit a copy of the Plan Supplement to the Distribution List, as defined in this Section I.D.9.  Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by:  (a) calling the Voting and Claims Agent at (877) 634-7166; (b) writing to OnCure, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (c) visiting the Debtors' restructuring website at: http://www.kccllc.net/OnCure.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

The Plan Supplement will include all Exhibits and Plan Schedules that were not already filed as exhibits to the Plan or this Disclosure Statement, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

As used herein, the term "**Distribution List**" means (a) the Office of the United States Trustee, (b) counsel to the DIP Facility Agent, (c) counsel to the Prepetition Term Loan Agent, (d) counsel to the Ad Hoc Secured Noteholders Committee, (e) counsel to the Prepetition Secured Notes Indenture Trustee, (f) counsel to RTS, (g) American Stock Transfer & Trust Company, LLC (the "**Stock Transfer Agent**"), (h) the Internal Revenue Service, and (i) all parties that, as of the applicable date of determination, have filed requests for notice in this Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

E.       **VOTING PROCEDURES**

Holders of Claims entitled to vote on the Plan are advised to read the Disclosure Statement Order, which sets forth in greater detail the voting instructions summarized herein.

1.       **The Voting Deadline**

The Bankruptcy Court has approved 5:00 p.m. prevailing Eastern Time on September 23, 2013 as the Voting Deadline.  The Voting Deadline is the date by which all Ballots must be properly executed, completed and delivered to the Voting and Claims Agent in order to be counted as votes to accept or reject the Plan.

2.       **Types of Ballots**

The Debtors will provide the following Ballots to Holders of Claims in the Voting Class (i.e. Class 5):

- "***Beneficial Holder Ballots***", the form of which is attached to the Disclosure Statement Order as Exhibit 3-A, will be sent to Beneficial Holders of Class 5 Prepetition Secured Notes Claims; and

- "***Master Ballots***", the form of which is attached to the Disclosure Statement Order as Exhibit 3-B, will be sent to Registered Record Owners and Intermediary Record Owners holding Prepetition Secured Notes for, and voting on behalf of, Beneficial Holders of Class 5 Prepetition Secured Notes Claims.

xi

3.      **Voting Instructions**

Under the Plan, Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan. Those Holders may so vote by completing a Beneficial Holder Ballot and/or Master Ballot, as applicable, and returning it to the Voting and Claims Agent prior to the Voting Deadline.  There are special voting rules and procedures for Beneficial Holders of Class 5 Prepetition Secured Notes Claims, which are discussed in Section I.E.4 herein (and set forth in greater detail in the Disclosure Statement Order).

**PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS THAT YOU HAVE RECEIVED FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM.**

To be counted as votes to accept or reject the Plan, <u>all</u> pre-validated Beneficial Holder Ballots and Master Ballots, as applicable, (all of which will clearly indicate the appropriate return address) must be properly executed, completed, dated and delivered by using the return envelope provided by (a) first class mail, (b) overnight courier or (c) personal delivery, so that they are **<u>actually</u> <u>received</u>** on or before the Voting Deadline by the Voting and Claims Agent at the following address:

> OnCure Balloting Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, California  90245
>
> If you have any questions on the procedures for voting
> on the Plan, please call the Voting and Claims Agent at:
> (877) 634-7166

*****BENEFICIAL HOLDERS OF CLASS 5 PREPETITION SECURED NOTES CLAIMS MUST EXECUTE, COMPLETE AND RETURN THEIR BENEFICIAL HOLDER BALLOTS IN ACCORDANCE WITH THE RULES FOR VOTING THEIR CLASS 5 PREPETITION SECURED NOTES CLAIMS SET FORTH IN THIS SECTION AND SECTION I.E.4 BELOW.*****

4.      **Voting Procedures**

Prior to the Solicitation Mailing Date, the Voting and Claims Agent will determine the identity of those Registered Record Owners and Intermediary Record Owners (collectively, "**Record Owners**") holding Prepetition Secured Notes on behalf of Beneficial Holders as of the Securities Voting Record Date and will distribute an appropriate number of Solicitation Packages to such Record Owners to allow them to forward one to each applicable Beneficial Holder. Intermediary Record Holders will distribute Solicitation Packages to the respective Beneficial Holders within five (5) business days of receiving Solicitation Packages.

Record Owners who elect to pre-validate Beneficial Holder Ballots must deliver Solicitation Packages, including pre-validated Beneficial Holder Ballots, to Beneficial Holders along with a pre-addressed return envelope addressed to the Voting and Claims Agent.  Beneficial Holders who receive pre-validated Beneficial Holder Ballots must complete, date, execute and deliver such Beneficial Holder Ballots directly  to the Voting and Claims Agent so they are actually received on or before the Voting Deadline.

Record Owners who do not elect to pre-validate Beneficial Holder Ballots must deliver to the Beneficial Holders the Solicitation Packages, including Beneficial Holder Ballots and pre-addressed return envelopes addressed to the Record Owners.  Upon the return of completed Beneficial Holder Ballots, such Record Owners will summarize and compile the votes cast and/or other relevant information onto the Master Ballots and date and return the Master Ballot(s) so that they are actually received on or before the Voting Deadline by the Voting and Claims Agent.

5.        **Tabulation of Votes**

---

**THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS IN THE VOTING CLASS.**

---

- FOR YOUR VOTE TO BE COUNTED, YOUR PRE-VALIDATED BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, AS APPLICABLE, MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY** **RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE VOTING AND CLAIMS AGENT.

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM SO HELD.  BY SIGNING AND RETURNING A BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS WITH RESPECT TO SUCH CLAIM HAS BEEN CAST OR, IF ANY OTHER BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM, SUCH EARLIER BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.[5]

- **ANY BENEFICIAL HOLDER BALLOT OR MASTER BALLOT THAT IS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTORS HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BENEFICIAL HOLDER BALLOT OR MASTER BALLOT.**

- **ADDITIONALLY, THE FOLLOWING BENEFICIAL HOLDER BALLOTS AND MASTER BALLOTS WILL NOT BE COUNTED:**

  o    any Beneficial Holder Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

  o    any Beneficial Holder Ballot or Master Ballot cast by or on behalf of an entity that does not hold a Claim in the Voting Class;

  o    any Beneficial Holder Ballot or Master Ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed;

  o    any Beneficial Holder Ballot or Master Ballot that (a) is properly completed, executed and timely filed, but does not indicate an acceptance or rejection of the Plan, or (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

  o    any Beneficial Holder Ballot or Master Ballot cast for a Claim that is subject to an objection pending as of the applicable Voting Record Date (except as otherwise provided in the Disclosure Statement Order);

---

[5]        If a Beneficial Holder submits more than one Beneficial Holder Ballot to its Intermediary Record Owner, (i) the latest dated Beneficial Holder Ballot received before the submission deadline imposed by the Intermediary Record Owner shall be deemed to supersede any prior Beneficial Holder Ballots submitted by the Beneficial Holder; and (ii) the Intermediary Record Owner shall complete the Master Ballot accordingly.

SF\5603286.11

      o    any Beneficial Holder Ballot or Master Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), any indenture trustee or the Debtors' financial or legal advisors;

      o    any Beneficial Holder Ballot or Master Ballot transmitted by facsimile, telecopy or electronic mail;

      o    any unsigned Beneficial Holder Ballot or Master Ballot; or

      o    any Beneficial Holder Ballot or Master Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order.

## F.    CONFIRMATION OF THE PLAN

### 1.    The Confirmation Hearing

The Confirmation Hearing will commence at 10:00 a.m. prevailing Eastern Time on October 3, 2013 before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801-3024. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

### 2.    The Deadline for Objecting to Confirmation of the Plan

The Confirmation Objection Deadline is 4:00 p.m. prevailing Eastern Time on September 23, 2013. Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "**Notice Parties**").

(a) Counsel to the Debtors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834 (Attn: Aaron M. Singer, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq.);

(b) Counsel to the Ad Hoc Secured Noteholders Committee, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038 (Attn: Jayme T. Goldstein, Esq.) and 2029 Century Park East, Los Angeles, California 90067 (Attn: Frank Merola, Esq.) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn: Edmon L. Morton, Esq. and Matthew B. Lunn, Esq.);

(c) Counsel to the Prepetition Secured Notes Indenture Trustee, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004 (Attn: John R. Ashmead); and

(d) The Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: David L. Buchbinder, Esq.).

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

**3.      Effect of Confirmation of the Plan**

Article X of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims, (b) the release of the Released Parties by the Debtors and certain Holders of Claims, and each of their respective Related Persons, and (c) exculpation of certain parties.  **It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly.**

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

**G.      CONSUMMATION OF THE PLAN**

It will be a condition to confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will be consummated on the Effective Date.

**H.      RISK FACTORS**

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN SECTION VI HEREIN TITLED, "PLAN-RELATED RISK FACTORS."**

SF\5603286.11

## II.
## BACKGROUND TO THE CHAPTER 11 CASE

### A.    THE DEBTORS' CORPORATE HISTORY AND STRUCTURE

HoldCo was incorporated in Delaware in 1998.  The Debtors began operating their first radiation oncology treatment center in 1998, and have grown to operate 34 radiation oncology treatment centers.  In 2006, the Debtors were acquired by Genstar Capital, LLC and its affiliates ("**Genstar**").  Genstar, directly and indirectly, beneficially owns approximately 76.5% of HoldCo's outstanding capital stock.  There is no established public trading market for HoldCo's common stock.  As of March 15, 2013, there were approximately forty Holders of HoldCo's existing common stock.

HoldCo owns, directly or indirectly, all of the Debtors in the Chapter 11 Cases.  HoldCo is also the indirect parent of six partially-owned non-Debtor Affiliates that are not the subject of these Chapter 11 Cases or of an insolvency proceeding under the laws of any country.

### B.    OVERVIEW OF THE DEBTORS' BUSINESSES

The Debtors are principally engaged in providing business management services to oncology physician groups that treat cancer patients.  Specifically, the Debtors contract with radiation oncology medical groups and, in certain cases, with integrated group practices and their radiation oncologists (generally referred to as "physician groups") through long-term management services agreements ("**MSAs**").  The Debtors currently provide services to a network of eleven physician groups that treat cancer patients at radiation oncology treatment centers located in Florida, California, and Indiana.

Pursuant to the MSAs, the Debtors provide to the physician groups non-physician clinical and administrative staff, operations management, marketing, purchasing, managed care contract negotiation assistance, reimbursement, billing and collection services, information technology, human resource and payroll administration, compliance services, accounting, and treasury management, among other things.  In addition to these management services, the Debtors typically lease the facilities where the radiation oncology treatment centers are located, as well as own or lease all of the medical equipment and leasehold improvements located at these centers.  Through the MSAs, the Debtors provide the physician groups with use of these facilities and medical equipment.  The physician groups and their physicians, however, retain full control over the clinical aspects of patient care.

The Debtors' MSAs have an average term of ten years and are generally renewable for an additional five year period.  Under the terms of the MSAs, the Debtors are reimbursed for certain operating expenses of each treatment center and earn a monthly management fee from each physician group that is primarily based on a predetermined percentage of each group's EBITDA.  The Debtors estimate that approximately 99% of the physician groups' revenues depend on reimbursement by third-party payors, including government payors such as Medicare and Medicaid.  In 2012, approximately 46% of such net revenue consisted of reimbursements from the Medicare and Medicaid programs.

As such, although the Debtors' revenue is generated from their MSAs, it is materially impacted by the operations of the treatment centers, especially as they relate to revenues generated by the physician groups.  Medicare payments are subject to a statutory formula that directs annual updates to payment amounts. Beginning January 1, 2013, the Centers for Medicare & Medicaid Services ("**CMS**") instituted changes that resulted in an aggregate payment reduction of 7% for radiation oncology services reimbursed under the Medicare Physician Fee Schedule for the 2013 calendar year.  Further, commencing April 1, 2013, payments to all Medicare providers were reduced by up to an additional 2% per  fiscal year as the federal government begins implementing the "sequestration" required by the Budget Control Act of 2011 after the Joint Select Committee on Deficit Reduction failed to achieve certain targeted deficit reductions and Congress took no further action to delay its implementation. As discussed more fully below, these changes had a material adverse impact on the Debtors' net revenue and results of operations.

1

The Debtors' executive offices are located in Englewood, Colorado.  As of the Petition Date, the Debtors had approximately 370 employees, none of whom are party to any collective bargaining agreements.

## C.    PREPETITION INDEBTEDNESS

The Debtors are party to the Prepetition Term Loan Credit Agreement, under which the Debtors borrowed $15,000,000 in principal amount from the Prepetition Term Loan Lenders. The obligations arising under the Prepetition Term Loan Credit Agreement were secured by senior, first priority security interests in, and liens upon, substantially all of the Debtors' assets.  On June 19, 2013, the Debtors and the DIP Facility Lenders entered into the DIP Facility Credit Agreement and the Prepetition Term Loan Claims were satisfied in full.

HoldCo issued the Prepetition Secured Notes in an aggregate principal amount of $210,000,000 pursuant to the Prepetition Secured Notes Indenture.  All other Debtors are guarantors of the Prepetition Secured Notes, which are secured by second priority security interests in, and liens upon, substantially all of the Debtors' assets.  None of the non-Debtor Affiliates of HoldCo are obligors or guarantors under the Prepetition Term Loan Credit Agreement or the Prepetition Secured Notes Indenture.

## D.    EVENTS LEADING TO THE CHAPTER 11 FILING

### 1.    Reduction in Patient Census and Reimbursement Rates.

Radiation therapy is a highly competitive business.  The Debtors' treatment centers face competition from hospitals, other practitioners, and other operators of radiation oncology treatment centers.  Notwithstanding their positive market and competitive positions, beginning as early as 2011, the Debtors began to experience significant revenue, cash flow, and liquidity challenges.  Most important, overall declines in patient census counts and decreases in Medicare and Medicaid reimbursement rates, which, as noted above, account for almost half of the net revenue of the Debtors' physician groups, led to increasingly poor financial performance.  To illustrate, the Debtors' consolidated EBITDA decreased from approximately $35.3 million in calendar year 2011 to approximately $26.9 million in calendar year 2012. In the same period, the Debtors' net revenue declined from approximately $103.3 million in 2011 to approximately $93.9 million in 2012.

### 2.    Payment Obligations under the Prepetition Debt Credit Agreements.

These challenges left the Debtors in a substantially overleveraged position and unable to make interest payments on their Prepetition Secured Notes, as scheduled.  The Debtors were unable to draw upon their undrawn prepetition revolving credit facility for working capital or other purposes due to their inability to satisfy certain financial covenants.  In October 2012, the Debtors commenced negotiations regarding an overall debt restructuring with the Ad Hoc Secured Noteholders Committee.  In connection with these negotiations, the Debtors elected to make a scheduled interest payment on the Prepetition Secured Notes Indenture on or about November 15, 2012, in the approximate amount of $15.0 million.

Shortly thereafter, and in order to preserve liquidity and stabilize operations, the Debtors and the Prepetition Term Loan Lenders amended and restated the Prepetition Term Loan Credit Agreement.  The borrowings under the Prepetition Term Loan Credit Agreement provided sufficient time and liquidity for the Debtors to conduct the restructuring discussions and marketing efforts leading up to these Chapter 11 Cases.  The Prepetition Term Loan Lenders are a subgroup of the Prepetition Secured Noteholders.  As of the Petition Date, the Debtors had borrowed all amounts available to them under the Prepetition Term Loan Credit Agreement.

2

An additional interest payment under the Prepetition Secured Notes Indenture of approximately $15.0 million came due on May 15, 2013. The Debtors did not have sufficient liquidity to make this interest payment and, in consultation with the Ad Hoc Secured Noteholders Committee, instead entered into a 30-day payment grace period under the Prepetition Secured Notes Indenture before the failure to pay such interest matured into an event of default on June 15, 2013. Upon the occurrence of an event of default under the Indenture, certain physician groups could potentially seek to terminate their applicable MSAs. Around the same time, the Prepetition Term Loan Credit Agreement was amended to, without limitation, extend the maturity date. The Debtors filed these Chapter 11 Cases prior to the end of the payment grace period under the Prepetition Secured Notes Indenture and the maturity date under the Prepetition Term Loan Credit Agreement. Neither the May 15, 2013 interest payment under the Prepetition Secured Notes Indenture nor the amounts due under the Prepetition Term Loan Credit Agreement were paid prior to the Petition Date.

> **3.    The Debtors' Restructuring Efforts: Standalone and Plan Sale Options.**

In late 2012, the Debtors began efforts to restructure their businesses. With the assistance of their financial and legal advisors, the Debtors pursued restructuring on a dual track: a standalone business plan to be effectuated through chapter 11 proceedings or a sale of the businesses through chapter 11 proceedings. In an effort to efficiently restructure, the Debtors engaged in active discussions with the Ad Hoc Secured Noteholders Committee, and their financial and legal advisors, to assess both options.

With respect to a potential standalone business plan, the Debtors' management and advisors, in consultation with the Ad Hoc Secured Noteholders Committee, began developing a standalone Plan in October 2012. The Debtors assessed the financial health of their subsidiaries, the managed radiation oncology centers, their work-force and other factors essential to the implementation of a standalone business plan that would ensure that the Debtors would emerge leaner, more efficient and more profitable. In developing the standalone business plan, the Debtors' primary focus was to maximize the value of the Debtors' estates for the benefit of its creditors and other stakeholders.

Simultaneously with the Debtors' efforts to develop a standalone business plan and beginning in January 2013, the Debtors with their financial advisors, Jefferies LLC ("**Jefferies**") launched a protracted and intensive effort to market the Debtors' assets to potential financial and strategic buyers. Specifically, on January 17, 2013, Jefferies contacted a total of eighty potential buyers, thirty-four of which executed non-disclosure agreements and conducted due diligence. By February 15, 2013, the Debtors had received five preliminary non-binding indications of interest for the acquisition of all or a substantial portion of the Debtors' assets. Thereafter, the Debtors and Jefferies continued to work extensively with the interested bidders in an effort to obtain second round bids that resulted in three offers to acquire either the stock or assets of the Reorganized Debtors.

Exhaustive discussions among the Debtors, the Ad Hoc Secured Noteholders Committee, and other interested parties ensued to determine whether an acceptable transaction could be accomplished. As a result of the prepetition marketing efforts and negotiations, the Debtors reached an agreement in principle with RTS prior to the Petition Date, which was memorialized after the Petition Date in the Investment Agreement (as described in further detail in Section III.B).

> **4.    The Debtors' Entry into the Restructuring Support Agreement.**

On June 14, 2013, the Debtors entered into the Restructuring Support Agreement with the members of the Ad Hoc Secured Noteholders Committee, constituting 100% of the Prepetition Term Loan Lenders under the Prepetition Term Loan Credit Agreement and approximately 73% of the Prepetition Secured Notes. The Restructuring Support Agreement establishes certain obligations of both the Debtors and the Consenting Debtholders, including, without limitation, those relating to the management of the Debtors' businesses during the Chapter 11 Cases, the timetable for these Chapter 11 Cases, any potential standalone business plan, further sale and marketing processes and the Plan.

**III.**
**EVENTS DURING THE CHAPTER 11 CASE**

**A.    FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF**

Immediately following the Petition Date, the Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with, among others, vendors, customers, employees and utility providers that the Debtors believed could be impacted by the commencement of the Chapter 11 Cases.  As a result of these initial efforts, the Debtors were able to minimize, as much as practicable, the negative impacts of the commencement of the Chapter 11 Cases.

On June 15, 2013, the Debtors filed a number of motions (collectively referred to herein as "**First Day Motions**") with the Bankruptcy Court.  At hearings conducted on June 18, 2013 and July 24, 2013, the Bankruptcy Court entered several orders in connection with the First Day Motions to, among other things:  (i) prevent interruptions to the Debtors' businesses; (ii) ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers; (iii) provide access to critical financing and capital; and (iv) allow the Debtors to retain certain advisors to assist with the administration of the Chapter 11 Cases (each, a "**First Day Order**").

**1.        Procedural Motions**

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" First Day Orders, by which the Bankruptcy Court (a) approved an extension of time to file the Debtors' Schedules (which were filed on August 2, 2013), (b) established notice and hearing procedures with respect to trading in equity securities of the Debtors and (c) established procedures with respect to interim compensation of the Debtors' bankruptcy-related advisors.

**2.        Employment of Advisors**

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Bankruptcy Court entered First Day Orders authorizing the Debtors to retain and employ the following advisors:  (a) Latham & Watkins LLP and Richards, Layton & Finger, P.A., as restructuring counsel; (b) Jefferies LLC, as financial advisor and investment banker; (c) Kurtzman Carson Consultants LLC, as the Voting and Claims Agent in the Chapter 11 Cases; and (d) Ernst & Young LLP, as auditor and tax advisor.  The Debtors also sought and obtained orders approving and establishing procedures for the retention of professionals utilized in the ordinary course of the Debtors' businesses.

**3.        Stabilizing Operations**

Recognizing that any interruption of the Debtors' businesses, even for a brief period of time, would negatively impact their operations, relationships with the physician groups, revenue and profits, the Debtors filed a number of First Day Motions to help facilitate the stabilization of its operations and effectuate, as much as possible, a smooth transition into operations as debtors in possession.  Specifically, in addition to certain orders discussed in greater detail below, the Debtors sought and obtained First Day Orders authorizing the Debtors to:

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- pay prepetition obligations to warehousemen and mechanics able to perfect mechanics', materialsmens' or other liens in respect of prepetition obligations;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

4

- continue insurance coverage, honor insurance premium financing agreements, and enter into new insurance policies, if necessary;

- maintain the existing cash management system; and

- remit and pay certain taxes and fees.

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their businesses and to ensure continued deliveries and services on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay the prepetition claims of certain vendors and third-party service providers who the Debtors believe are essential to the ongoing operation of their businesses. The Debtors' ability to pay the claims of these vendors and service providers was and remains critical to maintaining ongoing business operations due to the Debtors' inability to acquire essential replacement goods and services of the same quality, reliability, cost or availability from other sources. The Debtors' ability to pay the claims of these vendors and service providers, ultimately, was and remains critical to the success of the Debtors' Chapter 11 Cases.

### 4.    DIP Financing and Use of Cash Collateral

A critical goal of the Debtors' business stabilization efforts was to ensure the Debtors maintained sufficient liquidity to operate their businesses during the pendency of the Chapter 11 Cases. As such, in April 2013, the Debtors and their advisors determined that the Debtors would need debtor in possession financing to operate in chapter 11. The Prepetition Term Loan Lenders, a subset of the Prepetition Secured Noteholders, provided the Debtors with a proposal (the "**Noteholder Proposal**") for financing that contemplated a $25 million facility that would be used to repay the Prepetition Term Loan Credit Agreement and provide incremental liquidity to fund the Chapter 11 Cases. The Debtors directed their advisors to obtain alternate proposals from various sources of potential debtor in possession financing. Jefferies contacted twenty potential lenders to inquire whether such lenders would provide the Debtors with financing. Ultimately, three lenders submitted non-binding financing proposals to the Debtors. Later, one such lender withdrew its proposal. After carefully evaluating the terms and costs of the competing financing proposals, the Debtors' senior management and advisors determined that, on balance, the Noteholder Proposal presented superior debtor-in-possession financing.

On June 15, 2013, the Debtors filed their *Motion (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, (C) Approving Use of Cash Collateral of Prepetition Secured Parties, and (D) Granting Adequate Protection to Prepetition Lenders; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(c); (III) Sealing Related Fee Letters and (IV) Granting Related Relief* [Docket No. 13] (the "**DIP Motion**"). Through the DIP Motion, the Debtors sought permission from the Bankruptcy Court to enter into the DIP Facility Credit Agreement, which memorialized the terms of the Noteholder Proposal. The Debtors' obligations under the DIP Facility Credit Agreement would be granted super-priority administrative claim status, and would be secured by a first priority lien on substantially all of the Debtors' remaining property and assets. The DIP Facility Credit Agreement also provided for the satisfaction of the Prepetition Term Loan Claims.

At the hearing held on June 18, 2013, the Bankruptcy Court entered the Interim DIP Order, which, among other things: (a) authorized the Debtors to borrow up to $25 million under the DIP Facility Credit Agreement ($20 million of which was made available upon entry of the Interim DIP Order); (b) authorized the satisfaction of the Prepetition Term Loan Claims; and (c) approved the Debtors' request to use cash collateral. On June 19, 2013, the Debtors and the DIP Facility Lenders entered into the DIP Facility Credit Agreement and the Prepetition Term Loan Claims were satisfied in full. On July 24, 2013, the Bankruptcy Court entered the Final DIP Order approving the Debtors' entry into the DIP Facility Credit Agreement.

The financing provided under the DIP Facility Credit Agreement and the use of cash collateral has allowed the Debtors to, without limitation: (a) continue their businesses in an orderly manner; (b) maintain their valuable relationships with vendors, suppliers, customers and employees; (c) pay various interest, fees and expenses under the DIP Facility Credit Agreement; and (d) support their working capital, general corporate and overall operational

needs.  The DIP Facility Credit Agreement has been essential to the preservation and maintenance of the going-concern value of the Debtors' businesses and, ultimately, a successful reorganization.

**B.     REORGANIZATION STRATEGY AND SALE EFFORTS**

With the assistance of their legal and financial advisors, and in consultation with the Ad Hoc Secured Noteholders Committee, the Debtors have continued their prepetition efforts to develop a reorganization strategy to (a) maximize the value of their Estates, (b) address the factors that led to the bankruptcy filing and (c) enable the Debtors to emerge from chapter 11 stronger, more viable companies.  At the business level, this reorganization strategy has primarily, though not exclusively, focused on:

- restructuring the Debtors' balance sheet and emerging from chapter 11 with long-term capital structure conducive to future profitability;

- managing the Debtors' businesses to enhance their financial and operating performance, including utilizing the unique competitive advantage and opportunities afforded to chapter 11 debtors in possession; and

- reviewing the Debtors' Executory Contracts and Unexpired Leases to determine whether there are benefits to the Debtors in assuming or rejecting any Executory Contracts or Unexpired Leases.

Additionally, on June 22, 2013, HoldCo entered into the Investment Agreement with RTS under which RTS agreed to acquire the New Common Stock of Reorganized HoldCo for approximately $125 million, including $42.5 million in cash (plus covering certain expenses and subject to certain working capital adjustments) and up to $82.5 million in assumed debt.  A summary of certain provisions of the Investment Agreement that was attached as Exhibit C to the Bidding Procedures Motion follows:[6]

| Material Term | Summary of Relevant Provisions |
|---|---|
| Company | OnCure Holdings, Inc., a Delaware corporation. |
| Investor | Radiation Therapy Services, Inc., a Florida corporation. |
| Purchase of Shares | On the Closing Date, Investor will purchase 100% of the shares of the reorganized Company's common stock, par value $0.001 per share (collectively, the "**Shares**") free and clear of all Liens (other than Permitted Liens).<br>*See* § 2.1 |
| Purchase Price | $42,500,000, subject to a working capital adjustment.<br>*See* § 2.2 & § 2.3 |

---

[6]     This table is solely intended to be a summary of certain material terms and conditions of the Investment Agreement and is qualified by reference to the entire Investment Agreement.  This summary should not be relied upon for a comprehensive discussion of the Investment Agreement or in lieu of reviewing the Investment Agreement in its entirety.  To the extent of any conflict between the terms of this summary and the Investment Agreement, the terms of the Investment Agreement shall control.  Capitalized terms used in this table but not otherwise defined herein or in the Plan shall have the respective meanings ascribed to such terms in the Investment Agreement.

| Material Term | Summary of Relevant Provisions |
|---|---|
| Amended Notes | Pursuant to the Plan, the principal amount of the Notes shall be reduced to $82,500,000, and otherwise be amended on terms and conditions consistent in all material respects with those set forth on Exhibit G to the Investment Agreement.  Pursuant to the Plan, the Noteholders will retain $75,000,000 of the Amended Notes on and after the Effective Date, and the obligations under the Amended Notes will be guaranteed by Radiation Therapy Services Holdings, Inc., RTS, certain of RTS's subsidiaries, and certain of the Holdco Subsidiaries.  In addition, $7,500,000 of the Amended Notes will be deposited into escrow and upon satisfaction of the conditions contained in the Escrowed Notes Agreement, will be distributed in accordance with the Plan. <br><br> *See* § 7.3(d); Exhibit A to Investment Agreement (Plan Term Sheet; Treatment of Class 4 Claims); Exhibit G to Investment Agreement (Terms of Amended Notes); Exhibit L to Investment Agreement (Amended Indenture) |
| Use of Proceeds | The Company shall apply the net proceeds from the sale of the Shares in accordance with the terms of the Plan, including if applicable, to fund the payment of claims and administrative claims as provided in the Plan. <br><br> *See* § 2.6 |
| Deposit; Escrow Agreement | Investor shall deposit $5,000,000 to an Escrow Account to be established and maintained pursuant to the terms of the Escrow Agreement.  The fees and charges of the Escrow Agent shall be paid 50% by the Company and 50% by Investor in accordance with the terms of the Escrow Agreement. <br><br> If the Investment Agreement is terminated for any reason other than if: (i) Investor has breached or failed to perform any of its covenants or other agreements contained in the Investment Agreement such that the closing condition cannot be satisfied; (ii) any representation or warranty of Investor contained in the Investment Agreement shall have become untrue such that there would be an Investor MAE, or (iii) Investor has failed to satisfy certain closing conditions set forth in the Investment Agreement, then the Deposit shall be returned to Investor and Investor shall have no further obligation or liability of any kind whatsoever to any Person except as otherwise set forth in <u>Article VIII</u> of the Investment Agreement. <br><br> *See* § 2.5 |
| Closing and Deliveries | The closing of the purchase and sale of the Shares will occur at 10:00 a.m. (prevailing Eastern Time) on the Effective Date, subject to the satisfaction or waiver (by the party having the benefit of any such condition) of all conditions to Closing specified in the Investment Agreement) other than those conditions that are to be satisfied at Closing), or at such other time, on such other date or in such other manner as the parties mutually agree in writing. <br><br> *See* § 3.1, 3.2 & 3.3 |
| Representations and Warranties of the Company | Except as set forth in the Disclosure Schedules, the Data Room or the Plan, the Company represents and warrants to Investor as of the date of the delivery of the applicable Disclosure Schedules and as of the Closing to various customary representations and warranties, including the following: Existence and Good Standing; Validity and Enforceability; Capitalization of the Company and its Subsidiaries; No Conflict; Financial Statements; Conduct of Business; Taxes; Real Property; Personal Property; Intellectual Property; Material Contracts; Insurance; Litigation and Orders; Compliance with Laws; Permits; Labor Matters; Employee Benefit Plans; Environmental; Accounts Receivable; Managed Practices and Suppliers; Brokers; Healthcare; Arm's Length; No Unlawful Payments; and No Other Representations and Warranties. <br><br> *See* <u>Article IV</u> |

7

| Material Term | Summary of Relevant Provisions |
|---|---|
| Representations and Warranties of Investor | Investor represents and warrants to the Company as of the date of execution of the Investment Agreement and as of the Closing to various representations and warranties, including the following: Existence and Good Standing; Validity and Enforceability; No Conflict; Financial Ability; Financial Statements; Solvency; No Litigation or Regulatory Action; Capitalization; SEC Reports; Brokers; Exemption from Registration; Independent Investigation and No Other Representations and Warranties.<br><br>*See* Article V |
| Bankruptcy Milestones | During the period from the date of execution of the Investment Agreement to the Closing Date or the earlier termination of the Investment Agreement, the Company shall use all commercially reasonable efforts to:<br><br>a.   Within thirty days after filing of the Agreement Motion, obtain entry by the Bankruptcy Court of the Agreement Order;<br><br>b.   File a motion to approve the Disclosure Statement on or before July 15, 2013;<br><br>c.   Commence the solicitation of the Plan on or before August 26, 2013;<br><br>d.   Hold the confirmation hearing to approve the Plan on or before October 11, 2013; and<br><br>e.   Cause the Effective Date to occur on or before October 25, 2013 (the "**End Date**").<br><br>*See* § 6.1(c) & (d) |
| Interim Operations of the Company | From the date of execution of the Investment Agreement until the earlier of the Closing Date or the date upon which the Investment Agreement is terminated, the Company and its Subsidiaries shall not, among other things, take actions with respect to the following, except as consented to by the Investor or otherwise provided by the Investment Agreement, the Plan or the Restructuring Support Agreement:<br><br>a.   declaring or paying dividends or acquiring capital stock of the Company or any of its Subsidiaries;<br><br>b.   adjusting or reclassifying any capital stock of the Company or any of its Subsidiaries;<br><br>c.   incurring capital expenditures above certain limits or failing to timely make any material capital expenditures in violation of the DIP Motion;<br><br>d.   asset and stock acquisitions and mergers;<br><br>e.   disposition and granting of Liens on assets (excluding Permitted Liens);<br><br>f.   incurring, waiving, cancelling or modifying indebtedness in excess of certain thresholds;<br><br>g.   amending, modifying or waiving terms and conditions of Material Contracts;<br><br>h.   amending Organizational Documents of the Company or any of its Subsidiaries except under specified circumstances;<br><br>i.   failing to maintain Leased Real Property in substantially the same condition as of the date of execution of the Investment Agreement;<br><br>j.   adopting, entering into, amending or terminating any Employee Plan, or materially increasing director/officer compensation;<br><br>k.   implementing any employee layoffs that would reasonably be expected to implicate the WARN Act;<br><br>l.   commencing or settling any Proceedings in excess of certain thresholds;<br><br>m.   changing materially its financial or tax accounting methods or elections except under specified circumstances;<br><br>n.   amending or modifying the Restructuring Support Agreement or the Plan to the extent that such amendment or modification would materially and adversely affect Investor;<br><br>o.   withdrawing or revoking the Restructuring Support Agreement or the Plan or publicly announce its intention not to pursue the Restructuring Support Agreement or the Plan; |

8

| Material Term | Summary of Relevant Provisions |
|---|---|
| | p.    filing any pleading with the Bankruptcy Court that, in whole or in part, is not consistent in any material respect with the Investment Agreement, the Restructuring Support Agreement or the Plan; <br><br> q.    making any material changes to the working capital policies applicable to the Company and its Subsidiaries; <br><br> r.    making any disclosure to, or any other filing with, a Government Authority, unless required by Law, required in the reasonable judgment of the Company or otherwise required by the Bankruptcy Court in connection with the Chapter 11 Cases; or <br><br> s.    committing or agree in writing to take any of the foregoing actions. <br><br> *See* § 6.4 |
| Solicitation of Higher and Better Bids | Anything in the Investment Agreement to the contrary notwithstanding, the Investment Agreement and the transactions contemplated thereby are subject to the Company's right and ability to consider higher or better competing bids with respect to the assets or equity securities of the Company and/or its Subsidiaries pursuant to the Bidding Procedures. <br><br> *See* § 6.9 |
| Common Interest Agreement | Immediately following the execution of the Investment Agreement, the parties shall execute and deliver the Common Interest Agreement. <br><br> *See* § 6.11 |
| CMS MAE | Notwithstanding anything to the contrary in the Investment Agreement, a CMS MAE (as defined below) shall be deemed to constitute a Material Adverse Effect under the Investment Agreement. <br><br> A "**CMS MAE**" means that the Centers for Medicare & Medicaid Services ("**CMS**"), in its proposed physician fee schedule included in its proposed rule addressing changes to payment policies applicable to radiation oncology services (which is expected to be announced on or about July 1, 2013), sets forth a cumulative combined impact to radiation oncology equal to or greater than ten percent (10%). For the purposes of clarity, the comparable number released by CMS in its proposed rules in 2012 applicable to services furnished in the 2013 calendar year was 15%, as set forth in the Federal Register, Volume 77, No. 146, dated July 30, 2012 in Table 84, under the specialty "Radiation Oncology" and in the column "Total (Cumulative Impact)". |
| Due Inquiry; Updated Disclosure Schedules &Update MAE Notice | Following the date of execution of the Investment Agreement and continuing for a period of 20 consecutive days (the "**Inquiry Period**") and on a date determined by the Company within five (5) Business Days of the written request of Investor (the "**Closing Inquiry Date**"), with respect to any representation or warranty contained in Article IV of the Investment Agreement that is qualified by the "Company's Knowledge", the Company agrees to use commercially reasonable efforts to cause the Knowledge Members to (x) make reasonable due inquiry of each such Knowledge Member's direct reports and (y) make due inquiry of the Company's counsel (including healthcare counsel) with respect to the subject matter addressed by the applicable representations and warranties (the Company's Knowledge, as qualified by the information obtained from such inquiries, the "**Updated Company Knowledge**"). <br><br> Promptly following such Inquiry Period, the Company shall update the Disclosure Schedules with any additional information and disclosures applicable as a result of the foregoing inquiry. Following the delivery of notice by a Party (the "**Disclosing Party**") to the other Party (the "**Update Recipient**") of any addition to the disclosure included in the Disclosing Party's Schedules (the "**Updated Schedules**"), the Update Recipient will have ten (10) Business Days to advise the Disclosing Party in writing (an "**Update MAE Notice**") that, as of such date, it believes the information set forth in the Updated Schedules, together with all changes, effects, events, occurrences, state of facts or developments previously disclosed (individually or in the aggregate), constitute a Material Adverse Effect (an "**Update MAE**"). <br><br> Following the delivery notice of an Update MAE Notice to the Disclosing Party, the Update |

| Material Term | Summary of Relevant Provisions |
|---|---|
| | Recipient would have an additional five (5) Business Days (the "**Update MAE Determination Period**") in which to terminate the Investment Agreement as a result of the Update MAE. |
| | During the Update MAE Determination Period, the Disclosing Party and the Update Recipient shall cooperate in good faith with respect to the determination of whether there is a Material Adverse Effect. |
| | If the Update Recipient has not terminated the Investment Agreement pursuant to the applicable provisions referenced above prior to 10:00 pm Eastern Time on the last day of the Update MAE Determination Period, the Update Recipient shall have been deemed to have waived its right to terminate the Investment Agreement with respect thereto; provided, however, that in the event that there is a further update to the Schedules by the Disclosing Party, the provisions set forth herein with respect to an Update MAE shall once again apply and all changes, effects, events, occurrences, state of facts or developments previously disclosed in accordance with the terms hereof will be taken into consideration by the Update Recipient in determining whether there is a Material Adverse Effect or an investor MAE. |
| | *See* § 6.8 |
| Diligence Questionnaire & Start Date Meeting | The Company will use all commercially reasonable efforts to (and will use all commercially reasonable efforts to cause its applicable Representatives to) promptly provide Investor and its Representatives to whom information may be disclosed under the Common Interest Agreement (the "**Specified Representatives**") with oral responses (to the Company's Knowledge) to the matters identified in the questionnaire attached as <u>Exhibit H</u> to the Investment Agreement (the "**Diligence Questionnaire**"), and will otherwise reasonably cooperate and assist Investor and the Specified Representatives in connection with such due diligence investigation, including: |
| | (i)    having the Company's counsel (including its healthcare counsel) participate in a telephonic meeting on a mutually acceptable Business Day and during regular business hours that the Company may propose to Investor on not less than 2 Business Days' notice among the Company and such counsel, on the one hand, and Investor and the Specified Representatives, on the other hand, at which the Company shall provide (with the assistance of such counsel) its initial oral responses to the questions included in the Diligence Questionnaire (the date of such telephonic meeting described in this <u>clause (i)</u>, the "**Start Date Meeting**"); |
| | (ii)   providing Investor and the Specified Representatives with such documents, agreements and other material communications that are reasonably requested by Investor or the Specified Representatives in the Diligence Questionnaire (as well as any internal or external correspondence that is materially relevant to the questions and requests set forth in the Diligence Questionnaire); and |
| | (iii)  reasonably assisting and cooperating with Investor and the Specified Representatives with any reasonable follow up questions or requests that arise in connection with the matters that are the subject of the Diligence Questionnaire. |
| | *See* § 6.14 |
| Company's Closing Conditions | The obligations of the Company to consummate the transactions contemplated by the Investment Agreement are subject to the satisfaction or waiver at or prior to the Closing of each of the following conditions: |
| | a.    The Agreement Order shall have been entered by the Bankruptcy Court and the Agreement Order shall have become a Final Order; |
| | b.    The Confirmation Order shall have been entered by the Bankruptcy Court and the Confirmation Order shall have become a Final Order; |
| | c.    The conditions to the Effective Date set forth in the Plan shall have been satisfied or waived in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing; |

| Material Term | Summary of Relevant Provisions |
|---|---|
| | d.   The representations and warranties of Investor set forth in the Investment Agreement shall be true and correct in all respects, subject to certain MAE qualifications; |
| | e.   Each of the agreements and covenants of Investor to be performed and complied with by Investor shall have been duly performed and complied with in all material respects; |
| | f.   Investor shall have delivered to the Company all Consents that are necessary or required under the terms of the Investor Financing Documents to permit the Contemplated Transactions and/or the Financing Transactions in form and substance reasonably acceptable to the Company; |
| | g.   Investor shall have delivered to the Company all amendments, modifications and supplements to the Investor Financing Documents that are necessary or required to permit the Contemplated Transactions and/or the Financing Transactions in form and substance reasonably acceptable to the Company; |
| | h.   Investor shall have delivered to the Company executed intercreditor agreements (or amendments to existing intercreditor agreements) pursuant to which the Liens on the assets and properties of the Company and its Subsidiaries that secure the Indebtedness under the Investor Credit Documents and the Investor Secured Notes Documents, respectively, are made junior and subordinate in all respects to all Liens on the assets and properties of the Company and its Subsidiaries that secure the Indebtedness under the Amended Notes and the other Amended Note Documents; |
| | i.   Investor shall have delivered to the Company one or more guarantees duly executed and delivered by Radiation Therapy Services Holdings, Inc. and each of its Subsidiaries that guarantee the obligations of Investor under the Investor Secured Notes Documents pursuant to which such Persons guarantee the due and punctual payment and performance of all Indebtedness under the Amended Notes and the other Amended Note Documents; |
| | j.   The Indebtedness and any other obligations under the Amended Notes and the other Amended Note Documents shall be secured by valid and perfected first-priority Liens on the same assets and properties of the Company and its Subsidiaries that secure, or purport to secure, the Indebtedness and other obligations of the Company and/or any of its Subsidiaries under the Notes and the Notes Indenture (as in effect immediately prior to the consummation of the Closing); |
| | k.   Investor shall have delivered to the Company a written opinion of (i) Kirkland & Ellis LLP (counsel to Investor), accompanied by a reliance letter authorizing the holders of the Amended Notes as of the Closing to rely on such opinion, covering such matters as are set forth in <u>Exhibit F-1</u> to the Investment Agreement, and such opinion shall be in form and substance reasonably acceptable to the Company, and (ii) counsel to Investor reasonably acceptable to the Company in each jurisdiction where a Subsidiary of Parent has been formed or organized other than New York or Delaware, accompanied by a reliance letter authorizing the holders of the Amended Notes as of the Closing to rely on such opinion, covering such matters as are set forth in <u>Exhibit F-2</u> attached to the Investment Agreement, and such opinion shall be in form and substance reasonably acceptable to the Company; |
| | l.   The offer, issuance and delivery of the Amended Note Guarantees shall be exempt from the registration and prospectus delivery requirements of the Securities Act, and no Proceeding shall be pending or threatened by any Governmental Authority that alleges that the offer, issuance and/or delivery of the Amended Note Guarantees is not exempt from the registration and prospectus delivery requirements of the Securities Act; |
| | m.   Since the date of the execution of the Investment Agreement, there shall not have occurred an Investor MAE; and |
| | n.   Investor shall have delivered the items required to be delivered by Investor pursuant to the Investment Agreement. |
| | *See* § 7.2 |

11

| Material Term | Summary of Relevant Provisions |
|---|---|
| Investor's Closing Conditions | The obligations of the Investor to consummate the transactions contemplated by the Investment Agreement are subject to the satisfaction or waiver at or prior to the Closing of each of the following conditions:<br><br>a.  The Agreement Order shall have been entered by the Bankruptcy Court and the Agreement Order shall have become a Final Order;<br><br>b.  The Confirmation Order shall have been entered by the Bankruptcy Court and the Confirmation Order shall have become a Final Order;<br><br>c.  The conditions to the Effective Date set forth in the Plan shall have been satisfied or waived in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing;<br><br>d.  The terms of the Notes shall have been amended on terms and conditions consistent in all material respects with those set forth on <u>Exhibit G</u> to the Investment Agreement;<br><br>e.  [Intentionally Deleted];<br><br>f.  The Shares shall be duly authorized, validly issued, and free and clear of all Liens (except Permitted Liens);<br><br>g.  The representations and warranties of the Company set forth in <u>Article IV</u> of the Investment Agreement shall be true and correct, subject to certain MAE qualifications;<br><br>h.  The Organizational Documents of the Company and each of its Subsidiaries shall have been amended and filed with the applicable Governmental Authority to be effective as such as of the Closing and such amended Organizational Documents shall be in form and substance reasonably acceptable to Investor;<br><br>i.  Since the date of execution of the Investment Agreement, there shall not have occurred a Material Adverse Effect;<br><br>j.  Each of the agreements and covenants of the Company to be performed and complied with by the Company shall have been duly performed and complied with in all material respects;<br><br>k.  The Company shall have delivered to Investor the items required to be delivered by the Company pursuant to the Investment Agreement;<br><br>l.  Except for the Management Services Agreements set forth on <u>Schedule 7.3(l)</u>, each Management Services Agreement shall be valid and in full force and effect, and the Bankruptcy Court shall have entered an Order authorizing the assumption of each such Management Services Agreements; and<br><br>m.  The Company shall have made the delivery described on <u>Schedule 7.3(m)</u>.<br><br>*See* § 7.3 |

SF\5603286.11

| Material Term | Summary of Relevant Provisions |
|---|---|
| Investor Termination Rights | The Investment Agreement may be terminated and the Contemplated Transactions may be abandoned at any time by Investor by written notice to the Company, if: <br><br> a. the Company has breached or failed to perform any of its bankruptcy related covenants or obligations, subject to any applicable cure periods (if any); <br><br> b. the Company has breached or failed to perform any of its covenants or other agreements, subject to any applicable cure periods (if any); <br><br> c. any representation or warranty of the Company contained in the Investment Agreement shall have become untrue such that there would be a Material Adverse Effect; <br><br> d. the occurrence of a Material Adverse Effect; <br><br> e. if the Restructuring Support Agreement shall have been terminated; <br><br> f. if the Bankruptcy Court enters an Order (i) directing the appointment of an examiner with expanded powers or a trustee, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases; <br><br> g. if the Company enters into a definitive agreement with any Person with respect to: <br><br>     (i) any Inconsistent Transaction except, subject to the terms of the Bidding Procedures, in the event that the entering into such agreement relates to an Inconsistent Transaction with the Winning Bidder and Investor is the Second-Highest Bidder, in which case Investor shall have the right to terminate the Investment Agreement upon the earlier of (x) the date that is 90 days after acceptance by the Company of the Winning Bid in accordance with the Bidding Procedures and (y) the closing of the Winning Bid; or <br><br>     (ii) a Stand-Alone Plan with the Noteholders; or <br><br> h. within ten (10) Business Days following the Start Date Meeting, without liability or obligation to any party hereunder, if Investor determines, in its sole discretion, that the results of its due diligence investigation with respect to the matters that are the subject of the Diligence Questionnaire could have a material impact on any of Investor or its Affiliates, the Company or the Subsidiaries of the Company following the Closing, whether due to the substance of such findings or a conclusion that it has not received sufficient or complete information with respect to such matters or for any other reason. <br><br> *See* § 8.1 |
| Company Termination Rights | The Investment Agreement may be terminated and the Contemplated Transactions may be abandoned at any time by the Company by written notice to Investor: <br><br> a. in the event that the Company's board of directors approves an Inconsistent Transaction or Stand-Alone Plan at any time after the date of the Investment Agreement and prior to the entry of the Confirmation Order; <br><br> b. if the Investor has breached or failed to perform any of its covenants, obligations or other agreements under the Investment Agreement, subject to any applicable cure periods (if any); <br><br> c. any representation or warranty of the Investor contained in the Investment Agreement shall have become untrue such that there would be a Material Adverse Effect; or <br><br> d. if the condition set forth in <u>Section 7.3(m)</u> has not been satisfied as of the date that is forty-five (45) days from the date of the Investment Agreement. <br><br> *See* § 8.2 |

SF/5603286.11

| Material Term | Summary of Relevant Provisions |
|---|---|
| Other Termination Rights | The Investment Agreement may be terminated at any time:<br><br>   a.   by mutual written consent of the Company and Investor;<br><br>   b.   by Investor or the Company, upon written notice to the other party, if a Governmental Authority of competent jurisdiction has issued an Order permanently enjoining or otherwise prohibiting the consummation of the Contemplated Transactions (unless such party causes the Order to be entered); or<br><br>   c.   by either Investor or the Company if the Closing has not occurred on or before 11:59 p.m. prevailing Eastern Time on the End Date.<br><br>See § 8.3 |
| Break-Up Fee | The Investor will be entitled to a Break-Up Fee of $1,000,000 if:<br><br>   (i)   the Investment Agreement is (x) terminated because the Company breaches any representation or warranty or the occurrence of a Material Adverse Effect (other than a CMS MAE) and (y) the Company consummates an Inconsistent Transaction on or prior to the date that is four (4) months following the date of such termination;<br><br>   (ii)   the Investment Agreement is terminated because the Company enters into an Inconsistent Transaction;<br><br>   (iii)   the Investment Agreement is (x) terminated because the Company enters into a Stand-Alone Plan and (y) the Company consummates such transaction on or prior to the date that is four (4) months following the date of such termination; or<br><br>   (iv)   the Investment Agreement is terminated by the Company in accordance with its fiduciary duties.<br><br>Investor's right to receive the Break Up Fee shall be Investor's sole and exclusive remedy following a termination of the Investment Agreement and shall be paid as liquidated damages.<br><br>For the avoidance of doubt, Investor shall not be entitled to receive payment of the Break Up Fee, and the Company shall not be required to pay the Break Up Fee to Investor, if the Investment Agreement is terminated by Investor as a result of, or on account of, a CMS MAE.<br><br>See § 8.5(a) |
| Limitation of Damages Upon Termination | In the event of a termination of the Investment Agreement by the Company because of the Investor's breach of the Investment Agreement or failure to make its representations and warranties, then the Company shall receive all of the amounts then remaining in the Escrow Account and the receipt of such amounts shall be the Company's sole and exclusive remedy as a result of any such termination; provided, however, that in the event that such termination shall have been caused by, or shall have resulted from, a willful and intentional breach by Investor of any term, covenant, representation, warranty or other provision of the Investment Agreement, then, in addition to (and not in lieu of) the Company's right to receive the amounts then remaining in the Escrow Account, and as the Company's sole and exclusive remedy, Investor shall be liable for all actual damages and/or liabilities incurred or suffered by the Company or any of its Subsidiaries as a result of any such breach; provided, that, in no event shall such liability exceed an amount equal to the sum of (x) amounts then remaining in the Escrow Account and (y) $10,000,000.<br><br>For purposes of the Investment Agreement, "**willful and intentional breach**" shall mean a breach by Investor of any term, covenant, representation, warranty or other provision set forth in the Investment Agreement that is a consequence of an act or failure to act, in each case, taken or omitted intentionally and with the knowledge that the taking of such act or failure to act would, when taken in the context of other related actions taken by Investor, cause a breach of the Investment Agreement.<br><br>See § 8.5(c) |

14

| Material Term | Summary of Relevant Provisions |
|---|---|
| Expense Reimbursement | Investor will be entitled to reimbursement of Transaction Expenses if the Investment Agreement is terminated because: (i) the Company has breached or failed to perform any of its bankruptcy related covenants or obligations, (ii) the Company has breached or failed to perform any of its covenants or other agreements, (iii) there exists any change, effect, event, occurrence, state of facts or development that would cause a Material Adverse Effect, (iv) any representation or warranty of the Company shall have become untrue such that there would be a Material Adverse Effect (unless such termination is due to the existence of a CMS MAE), or (v) the company enters into a definitive agreement with any Person with respect to an Inconsistent Transaction (or the Company's board of directors approves an Inconsistent Transaction or Stand Alone Plan). |
| | The amount of Transaction Expenses reimbursable and payable shall not exceed $2,000,000 in the aggregate. |
| | The obligations of the Company to reimburse the Transaction Expenses are in addition to, and do not limit, the Company's obligations to pay the Break-Up Fee (if earned and payable). |
| | See § 2.4 |
| Specific Performance | Subject to the Bidding Procedures, the Investor has the right to seek the specific performance of the Company and injunctive relief with respect thereto. |
| | Anything in the Investment Agreement to the contrary notwithstanding, neither the Company, the Noteholders' Representative or any other Person shall be entitled to seek or otherwise obtain specific performance to require Investor to effect the Closing or pay the Initial Purchase Price. In furtherance and not in limitation of the foregoing, neither the Company, the Noteholders' Representative or any other Person shall have any right whatsoever to specific performance, injunctive or other equitable relief against Investor. |
| | *See* § 10.14 |

The proposed acquisition of the Debtors' businesses by RTS pursuant to the Investment Agreement remains subject to approval by the Bankruptcy Court. The Investment Agreement constitutes and serves as a lead or "stalking horse" bid in the postpetition sale process. The Investment Agreement is attached, without certain schedules and exhibits thereto, as Exhibit G to the Plan. Certain schedules and exhibits to the Investment Agreement have not been filed due to the sensitive nature of the information contained therein. Copies of the schedules and exhibits are available for review by all Holders of Class 5 Claims on a secure website maintained and monitored by the Debtors in the ordinary course of business.

On August 7, 2013, HoldCo and RTS entered into an amendment to the Investment Agreement (the "**Amendment**"). The Amendment has not been filed due to the sensitive nature of the information contained therein. A copy of the Amendment is available for review by all Holders of Class 5 Claims on a secure website maintained and monitored by the Debtors in the ordinary course of business.

On the same day the Investment Agreement was executed, the Debtors filed the *Motion for Order (A) Establishing Bidding Procedures for the Sale of All or Substantially All of the Debtors' Purchased Assets or New Stock Pursuant to a Chapter 11 Plan (B) Approving Certain Stalking Horse Protections (C) Authorizing and Scheduling a Date and Time for Auction Pursuant to Such Procedures and (D) Granting Certain Related Relief* [Docket No. 58] (the "**Bidding Procedures Motion**"). The Bidding Procedures Motion sought approval, among other things, of proposed bidding procedures for the sale of all or substantially all of the Debtors' assets or the New Common Stock of Reorganized Holdco. These bidding procedures are to be utilized by the Debtors in the postpetition sale process in an effort to secure the highest or otherwise best offer for the sale of the Debtors' businesses. The Debtors also requested authorization to schedule a sale auction, to the extent necessary under the Investment Agreement. A further description of the Investment Agreement, the bidding procedures and the auction are provided in the Bidding Procedures Motion, and are incorporated herein by reference. The Bankruptcy Court entered an order approving the Bidding Procedures Motion on July 24, 2013. No additional bids were received by August 14, 2013, the deadline for potential bidders to submit bids pursuant to the Bidding Procedures Order. On

August 15, 2013, the auction was cancelled pursuant to the terms of the Bidding Procedures Motion and a notice thereof was filed with the Bankruptcy Court.

## C.    FILING OF THE SCHEDULES AND ESTABLISHMENT OF THE CLAIMS BAR DATE

### 1.    Filing of the Schedules

The Debtors filed their Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code on August 2, 2013.

### 2.    Establishment of the Claims Bar Date

On July 3, 2013, the Debtors filed the *Motion of Debtors for Entry of an Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof* [Docket No. 96] (the "**Bar Date Motion**"), requesting that September 12, 2013 be established as the Bar Date (as defined under the Bar Date Motion) and establishing December 11, 2013 as the Governmental Bar Date (as defined under the Bar Date Motion).

## D.    EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

The Debtors' initial exclusive periods to file a plan and solicit acceptances of a plan are set to expire on October 15, 2013 and December 11, 2013, respectively. The Debtors intend to file motions to extend these deadlines as necessary.

## E.    DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtors have to assume or reject unexpired leases of nonresidential real property is also scheduled to expire on October 15, 2013, unless extended by order of the Bankruptcy Court. The Debtors intend to file motions to extend this deadline as necessary.

**IV.**
**SUMMARY OF THE PLAN**

> THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE <u>MATERIAL</u> <u>TERMS</u> OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS SECTION IV AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.

**A.    ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS**

**1.    Administrative Claims**

The legal, equitable and contractual rights of the Holders of Allowed Administrative Claims are unaltered by the Plan.  Subject to sub-paragraph (a) below and <u>Article V.Q</u> of the Plan, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim will have agreed upon in writing; *provided*, *however*, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(a)    <u>Bar Date for Administrative Claims</u>

Except as otherwise provided in <u>Article II.A</u> of the Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order (as applicable) no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims will be deemed discharged as of the Effective Date.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in <u>Article X.G</u> of the Plan.

Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

In the case of the Ad Hoc Secured Noteholders Committee Fees and Expenses, such Ad Hoc Secured Noteholders Committee Fees and Expenses will be paid in full in Cash on the Effective Date (to the extent invoiced and not previously paid during the course of the Chapter 11 Cases) from the Debtors' Claim Portion Cash Reserve, without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date. The Prepetition Term Loan Agent Fees and Expenses and the Prepetition Secured Notes Indenture Trustee Fees and Expenses will be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent invoiced and not previously paid during the course of the Chapter 11 Cases) from the Debtors' Claim Portion Cash Reserve, without a requirement for the Prepetition Term Loan Agent or the Prepetition Secured Notes Indenture Trustee to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date. DIP Facility Claims shall be paid pursuant to <u>Article</u>

17

II.B of the Plan without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date.

> (b)    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors' Claim Portion Cash Reserve for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim.

Each Holder of an Allowed Professional Fee Claim will be paid in full in Cash from the Professional Fee Reserve within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.

**2.    DIP Facility Claims**

Subject to Article V.Q of the Plan, the Allowed DIP Facility Claims will be indefeasibly paid in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims.

**3.    Priority Tax Claims**

The legal, equitable and contractual rights of the Holders of Allowed Priority Tax Claims are unaltered by the Plan. Subject to Article V.Q and Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable: (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

B.    **CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

1.    **Summary**

The Plan constitutes a single plan of reorganization for all Debtors for voting and confirmation purposes. All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified, as described below.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, for voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remaining portion of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released, Disallowed or otherwise settled prior to the Effective Date.  As described more fully in Article V.A of the Plan, the Plan contemplates, and is predicated upon, entry of an order substantively consolidating the Debtors' Estates for the limited purposes of voting and confirmation under the Plan with respect to Impaired Claims.

2.    **Classification and Treatment of Claims and Equity Interests**

(a)    Class 1 – Other Priority Claims

o    *Classification*: Class 1 consists of the Other Priority Claims.

o    *Treatment*: The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered by the Plan.  Subject to Article V.Q and Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

o    *Voting*: Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

(b)    Class 2 – Other Secured Claims

o    *Classification*: Class 2 consists of the Other Secured Claims.  Class 2 consists of separate subclasses for each Other Secured Claim that may exist against the Debtors.

o   *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 2 Claims are unaltered by the Plan.  Subject to <u>Article V.Q</u> and <u>Article VIII</u> of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

o   *Voting*:  Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

(c)   <u>Class 3 - Secured Tax Claims</u>

o   *Classification*:  Class 3 consists of the Secured Tax Claims.

o   *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 3 Claims are unaltered by the Plan.  Subject to <u>Article V.Q</u> and <u>Article VIII</u> of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors, as applicable: (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (D) or (E) above will be made in equal quarterly Cash payments

20

beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim.

o   *Voting*:  Class 3 is an Unimpaired Class, and the Holders of Claims in Class 3 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 3 are not entitled to vote to accept or reject the Plan.

(d)   Class 4 – Prepetition Term Loan Claims

o   *Classification*:  Class 4 consists of the Prepetition Term Loan Claims.

o   *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 4 Claims are unaltered by the Plan.  To the extent not previously paid in full pursuant to the DIP Facility Orders, each Holder of an Allowed Class 4 Claim will receive, on the Effective Date and in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4 Claim, Cash equal to the amount of such Allowed Class 4  Debtors.

o   *Voting*: Class 4 is an Unimpaired Class, and the Holders of Claims in Class 4 will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 4 are not entitled to vote to accept or reject the Plan.

(e)   Class 5 – Prepetition Secured Notes Claims

o   *Classification*:  Class 5 consists of the Prepetition Secured Notes Claims.

o   *Allowance*: The Prepetition Secured Notes Claims are deemed Allowed in the aggregate amount of approximately $210 million.[7]

o   *Treatment*:  On the Effective Date, the Prepetition Secured Notes and the Prepetition Secured Notes Indenture will be deemed amended in their entirety by the Amended Secured Notes and the Amended Secured Notes Indenture, respectively.  On the Effective Date, and in addition to the agreements described in Article V.F, Article V.G, and Article V.H of the Plan, each Holder of an Allowed Prepetition Secured Notes Claim will receive, on account of such Claim, its Pro Rata share of the Base Notes and the Net Cash Amount.  After the Effective Date, subject to the terms and conditions of the Plan (including Article VII.D.1 of the Plan), the Investment Agreement and the Escrowed Notes Agreement (as applicable), each Holder of an Allowed Prepetition Secured Notes Claim will receive, on account of such Claim, its Pro Rata share of (x) either (i) in the event the Final Purchase Price is greater than the Initial Purchase Price, the sum of (A) an amount equal to the amount by which the Final Purchase Price exceeds the Initial Purchase Price plus (B) the Escrow Amount or (ii) in the event the Final Purchase Price is equal to or less than the Initial Purchase Price, an amount equal to the Escrow Amount, if any, following any distribution to the Investor pursuant to Section 2.3(e) of the Investment Agreement, (y) the Unused Cash Reserve Amount and (z) upon satisfaction of the conditions contained in the Escrowed Notes Agreement, its Pro Rata share of the Escrowed Notes, in each case if any.

---

[7]   The Allowed amount excludes accrued interest, fees and other costs and expenses.

21

> o   *Voting*: Class 5 is Impaired, and Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

(f)   Class 6 – General Unsecured Claims

> o   *Classification*: Class 6 consists of all General Unsecured Claims.

> o   *Treatment*:   Each Holder of a General Unsecured Claim will not receive any distribution or retain any property on account of such General Unsecured Claim.

> o   *Voting*:   Class 6 is an Impaired Class, and the Holders of Claims in Class 6 will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, Holders of Claims in Class 6 will not be entitled to vote to accept or reject the Plan.

(g)   Class 7 – Intercompany Claims

> o   *Classification*:  Class 7 consists of the Intercompany Claims.

> o   *Treatment*:   Each Holder of an Intercompany Claim shall not receive any distribution or retain any property under the Plan on account of such Intercompany Claim.  On or after the Effective Date, the Reorganized Debtors may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by such Reorganized Debtor.

> o   *Voting*:  Class 7 is an Impaired Class.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 will be conclusively deemed to have accepted the Plan.

(h)   Class 8 –  Old HoldCo Interests

> o   *Classification*:  Class 8 consists of the Old HoldCo Interests.

> o   *Treatment*:   On the Effective Date, the Old HoldCo Interests will be cancelled without further notice to, approval of or action by any Entity, and each Holder of an Old HoldCo Interest will not receive any distribution or retain any property on account of such Old HoldCo Interest.

> o   *Voting*:  Class 8 is an Impaired Class, and the Holders of Old HoldCo Interests in Class 8 will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Old HoldCo Interests in Class 8 will not be entitled to vote to accept or reject the Plan.

(i)   Class 9 - Old Affiliate Interests in any HoldCo Subsidiary

> o   *Classification*:   Class 9 consists of the Old Affiliate Interests in any HoldCo Subsidiary.

> o   *Treatment*:  Subject to the Restructuring Transactions, the Old Affiliate Interests will remain effective and outstanding on the Effective Date and will be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.

> o   *Voting*:   Class 9 is an Unimpaired Class, and the Holders of the Old Affiliate Interests in Class 9 are conclusively deemed to have accepted the Plan pursuant to

22

section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of the Old Affiliate Interests in Class 9 are not entitled to vote to accept or reject the Plan.

### 3.      Special Provision Governing Unimpaired Claims

Except as otherwise provided therein, nothing under the Plan will affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### 4.      Elimination of Vacant Classes

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## C.      ACCEPTANCE OR REJECTION OF THE PLAN

### 1.      Presumed Acceptance of Plan

Classes 1, 2, 3, 4, and 9 are Unimpaired under the Plan.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.  Class 7 is Impaired under the Plan.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 will be conclusively deemed to have accepted the Plan.

### 2.      Presumed Rejection of Plan

Classes 6 and 8 are Impaired and will receive no distribution under the Plan on account of their respective Claims or Equity Interests.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### 3.      Voting Class

Class 5 is Impaired under the Plan.  The Holders of Claims in such Class as of the Securities Voting Record Date are entitled to vote to accept or reject the Plan.

### 4.      Acceptance by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

### 5.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by Class 5. The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. Acceptance of the Plan by an Impaired Class holding a Claim against any Consolidated Debtor shall satisfy Section 1129(a)(10) for purposes of all of the Debtors.  The Debtors reserve the right to modify the Plan or any Exhibit or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

6.      **Votes Solicited in Good Faith**

The Debtors have, and upon the Confirmation Date will be deemed to have, solicited votes on the Plan from the Voting Class in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Related Parties will be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

D.      **MEANS FOR IMPLEMENTATION OF THE PLAN**

1.      **Limited Substantive Consolidation**

(a)      Generally

The Plan contemplates and is predicated upon entry of an order substantively consolidating the Estates of HoldCo and each HoldCo Subsidiary (collectively, the "**Consolidated Debtors**") solely for the limited purposes of voting and confirmation under the Plan.  Accordingly, for voting and confirmation purposes only, (i) any obligation of HoldCo or any HoldCo Subsidiary and all guarantees with respect thereto executed by HoldCo or one or more HoldCo Subsidiary will be treated as a single obligation and any obligation of HoldCo and one or more HoldCo Subsidiaries, and all multiple Claims against such entities on account of such joint obligations, will be treated and Allowed only as a single Claim against the Consolidated Debtors, (ii) each Claim Filed against HoldCo or one or more HoldCo Subsidiary will be deemed Filed against the Consolidated Debtors and will be deemed to be a single Claim against and a single obligation of the Consolidated Debtors, (iii) the Estate of each of the Consolidated Debtors will be deemed to be one consolidated Estate; and (iv) all property of the Estate of each Consolidated Debtor shall be deemed to be property of the consolidated Estates.

Except for the limited purposes of voting and confirmation related to the Plan as set forth in this Paragraph D.1(a), such limited substantive consolidation will not and will not be deemed to: (i) modify, affect or otherwise alter the legal or corporate structures of the Debtors or the Reorganized Debtors or merge or otherwise affect the separate legal existence of the Debtors or the Reorganized Debtors, subject to the right of the Debtors or Reorganized Debtors to effect Restructuring Transactions as provided in Article V.B of the Plan; (ii) cause any Debtor or Reorganized Debtor to be liable for any Claim for which it otherwise is not liable, and the liability for any such Claim will not be affected by such substantive consolidation; (iii) modify, affect or otherwise alter the distribution to be made to the holders of Claims in any Class on account of such Claims absent the limited substantive consolidation; (iv) modify, affect or otherwise alter any Intercompany Claims or any Old Affiliate Interests; (v) modify, affect or otherwise alter any obligations under any Executory Contracts or Unexpired Leases assumed by the Debtors; or (vi) modify, affect or otherwise alter any obligations of each and every Debtor to pay quarterly fees to the United States Trustee.  Notwithstanding anything to the contrary herein or in the Plan, the Claims of a particular Debtor shall remain the obligations solely of such Debtor and shall not become obligations of any other Debtor by virtue of the limited substantive consolidation set forth in this Paragraph 1(a).

(b)      Substantive Consolidation Order

Unless the Bankruptcy Court has approved such limited substantive consolidation of the Chapter 11 Cases by a prior Final Order, the Plan will serve as, and will be deemed to be, a motion for entry of an order substantively consolidating the Consolidated Debtors on the limited basis as provided in Paragraph A.1 above pursuant to section 105 of the Bankruptcy Code.  If no objection to substantive consolidation is timely Filed and served by any Holder of a Claim affected by the Plan as provided under the Plan on or before the deadline for objection to confirmation of the Plan, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Bankruptcy Court without further notice and hearing as to such substantive consolidation. If any such objections are timely filed and served, a hearing with respect to such proposed substantive consolidation and the objections thereto will be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

2. **Restructuring Transactions**

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Documents and any consents or approvals required thereunder, the entry of the Confirmation Order will constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate certain of the Affiliate Debtors under the laws of jurisdictions other than the laws of which the applicable Affiliate Debtors are presently incorporated. Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations, or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of the Plan and the Restructuring Documents and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**").

All such Restructuring Transactions taken, or caused to be taken, will be deemed to have been authorized and approved by the Bankruptcy Court. The actions to effect the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions, but in all cases subject to the terms and conditions of the Plan and the Restructuring Documents and any consents or approvals required thereunder.

3. **Consummation of the Investment Agreement; Amended Secured Notes Indenture; Amended Secured Notes Guarantees; New Intercreditor Agreements**

On the Effective Date and provided that the conditions precedent set forth in the Investment Agreement have been satisfied or waived in accordance with the terms of the Investment Agreement, the Debtors and the Reorganized Debtors (as applicable) will be authorized to execute and deliver, and to consummate the transactions contemplated by, the Investment Agreement in exchange for the Initial Purchase Price, as well as execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, in each case in form and substance reasonably acceptable to the Majority Consenting Debtholders and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Investment Agreement).

Upon the Effective Date of the Plan, all Prepetition Secured Noteholders shall be deemed to have consented to the Amended Secured Notes Indenture, Amended Secured Notes, the Amended Secured Notes Guarantees, the New Intercreditor Agreements, the Escrowed Notes Agreement and other Restructuring Documents in the form that they exist on the Effective Date. On and as of the Effective Date, notwithstanding any requirements for amendment set forth in the Prepetition Secured Notes Indenture, and provided that the conditions precedent set forth in the Investment Agreement have been satisfied or waived in accordance with the terms of the Investment Agreement, the Prepetition Secured Notes Indenture Trustee shall be authorized to (i) execute and deliver the Amended Secured Notes Indenture, the Amended Secured Notes Guarantees, and the New Intercreditor Agreements (each to the extent it is a party thereto), subject to Article V.J of the Plan, as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Prepetition Secured Notes Indenture Trustee is a party, to the extent provided in the relevant Restructuring Documents, and to promptly consummate the transactions contemplated thereby, and (ii) take any other actions required or contemplated to be taken by the Prepetition Secured Notes Indenture Trustee under the Plan or any of the Restructuring Documents to which it is a party.

4.        **Continued Corporate Existence**

Subject to the Restructuring Transactions permitted by Article V.B of the Plan, after the Effective Date, the Reorganized Debtors will, notwithstanding the limited substantive consolidation provided in Article V.A of the Plan, continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable organizational documents, are amended, restated or otherwise modified under the Plan.  Notwithstanding anything to the contrary under the Plan, the Claims of a particular Debtor or Reorganized Debtor will remain the obligations solely of such Debtor or Reorganized Debtor and will not become obligations of any other Debtor or Reorganized Debtor solely by virtue of the Plan or the Chapter 11 Cases.

5.        **Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or any Restructuring Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Litigation Claims of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan (other than the Cash Reserves), will vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens which survive the occurrence of the Effective Date as described in Article III of the Plan (including, without limitation, the Liens that secure the Amended Secured Notes).  On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

6.        **Amended Secured Notes; Amended Secured Notes Indenture**

On and as of the Effective, the following will occur:

(i)        Without limiting the Prepetition Secured Noteholders' rights to receive the Net Cash Amount or the Unused Cash Reserve amount as provided in Article III under the Plan, the principal amount of the Prepetition Secured Notes will be reduced on a Pro Rata basis to $82,500,000;

(ii)        the Prepetition Secured Notes Indenture and the Prepetition Secured Notes will be amended as set forth in the Amended Secured Notes Indenture and the Amended Secured Notes, respectively;

(iii)        the Escrowed Notes will be transferred to the escrow agent under, and be held in escrow pending release to the Holders of the Amended Secured Notes upon satisfaction of the conditions contained in, the Escrowed Notes Agreement;

For the avoidance of doubt, interest paid on the Escrowed Notes prior to the start of the first accrual period beginning in 2016 will be returned to the Reorganized Debtors.  Interest accruing from the start of the first accrual period beginning in 2016 will be paid pursuant to the Amended Secured Notes Indenture, subject to the terms of the Escrowed Notes Agreement.  The obligations arising under the Amended Secured Notes and the Amended Secured Notes Indenture will be guaranteed by Radiation Therapy Services Holdings, Inc., the Investor, certain subsidiaries of the Investor pursuant to the Amended Secured Notes Guarantees, and certain of the HoldCo Subsidiaries, in each case as set forth in the Amended Secured Notes Indenture Term Sheet.

On and as of the Effective Date, all of the Prepetition Secured Noteholders will be deemed to be bound by the Amended Secured Notes Indenture, the Amended Secured Notes Guarantees and the related Restructuring Documents.

7.    **No New Issuance of Debt**

Notwithstanding anything in the Plan to the contrary, the Amended Secured Notes will represent the same indebtedness as the Prepetition Secured Notes, and nothing in the Plan is, or will be deemed to constitute, an issuance of new indebtedness under or in connection with the Amended Secured Notes or the Amended Secured Notes Indenture.  Except as expressly amended or modified by the Plan, the Prepetition Secured Notes Indenture and all Collateral Documents (as defined therein) will remain in full force and effect and will, in their original form and as amended or modified pursuant to the Plan, secure the obligations and indebtedness arising under or in connection with the Amended Secured Notes, and, at the written request of the Prepetition Secured Notes Indenture Trustee, the Reorganized Debtors will execute and deliver conforming amendments to such documents necessary in order to implement the same, all without further notice to or order of the Bankruptcy Court.  The Prepetition Secured Notes Indenture Trustee and any applicable Distribution Agent shall, and the Debtors and/or Reorganized Debtors and their agents shall be authorized to, coordinate with DTC such that the allocations of the Amended Secured Notes shall be made by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC.

8.    **No Discharge or Release of Liens Securing the Prepetition Secured Notes Claims**

Notwithstanding anything in the Plan to the contrary, all property of the Estates of the Debtors, including all claims, rights, and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, will remain encumbered by and subject to the Liens securing the Prepetition Secured Notes Claims which, as of the Effective Date, secure the obligations and indebtedness arising under or in connection with the Amended Secured Notes, and such Liens will not be, and will not be deemed to be, discharged or released on account of the Confirmation or Consummation of the Plan.

9.    **New Common Stock**

On the Effective Date, subject to the terms and conditions of the Investment Agreement, Reorganized HoldCo will issue 100% of the New Common Stock to the Investor or its designated Affiliate pursuant to the Amended/New Organizational Documents in consideration for the Purchase Price.  The Reorganized Debtors will not be obligated to register the New Common Stock under the Securities Act or to list the New Common Stock for public trading on any securities exchange.

Distributions of the New Common Stock may be made by delivery or book-entry transfer thereof by the applicable Distribution Agent in accordance with the Investment Agreement.  Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of Reorganized HoldCo will be that number of shares of New Common Stock as may be designated in the Amended/New Organizational Documents.

10.    **Plan Securities and Related Documentation; Exemption from Securities Laws**

On and after the Effective Date, the Debtors, the Reorganized Debtors, the Investor and their respective Affiliates are each authorized to and will provide or issue, as applicable, the Plan Securities and the Plan Securities and Documents, in each case in form and substance satisfactory to the Supermajority Consenting Debtholders, the Investor, and to the extent it is a signatory thereto, in form and substance reasonably satisfactory to the Prepetition Secured Notes Indenture Trustee, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The distribution and issuance, as applicable, of the Plan Securities and Documents under the Plan will be exempt from registration under applicable securities laws (including Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Bankruptcy Code, Section 4(2) of the Securities Act and/or other applicable exemptions.  An offering of Plan Securities provided in reliance on the exemption from registration under the Securities Act pursuant to section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code and is deemed to be a public offering, and such Plan

27

Securities may be resold without registration to the extent permitted under section 1145 of the Bankruptcy Code. Any Plan Securities and Documents provided in reliance on the exemption from registration under the Securities Act provided by Section 4(2) of such act will be provided in a private placement.

The Amended Secured Notes and the Guarantees are being issued as a result of certain modifications to the Prepetition Secured Notes Indenture. As such, the Amended Secured Notes and the Guarantees are a continuation and modification of the Prepetition Secured Notes and the obligations thereunder. However, the offer and delivery of the Amended Secured Notes and the Guarantees to creditors is subject to federal securities laws. The offer and delivery of the Amended Secured Notes and the Guarantees will be made without registration under the Securities Act, in reliance on an exemption from registration provided by Section 1145(a)(1) of the Bankruptcy Code, which also exempts the offer and delivery of the Amended Secured Notes and the Guarantees from similar state securities laws.

Resales by Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act. Restricted Holders would, however, be permitted to resell the New Common Stock or any Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code, as applicable, without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, or if such securities are registered with the Commission pursuant to a registration agreement or otherwise. Under the Plan, Restricted Holders are not entitled to any registration rights.

For purposes of the Plan, to the extent necessary, and solely for purposes of section 1145 of the Bankruptcy Code, each of the Investor (as the intended purchaser that plans to acquire the New Common Stock), Radiation Therapy Services Holdings, Inc. (as the parent of the Investor) and certain subsidiaries of the Investor pursuant to the Amended Secured Notes Guarantees (as subsidiaries of the Investor) shall be deemed a "successor" of HoldCo under section 1145(a)(1) of the Bankruptcy Code and are each sponsors of the Plan. The HoldCo Subsidiaries shall be deemed "affiliates" as defined in section 101(2) of the Bankruptcy Code of HoldCo and are co-proponents of the Plan.

Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

## 11. Release of Liens and Claims

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided under the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII of the Plan, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates will be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. The filing of the Confirmation Order with any federal, state, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens, Claims and other interests described above. Any Entity holding such Liens, Claims or interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

## 12. Organizational Documents of the Reorganized Debtors

The respective organizational documents of each of the Debtors will be amended and restated or replaced (as applicable) in form and substance satisfactory to the Investor and as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. Such organizational documents shall (i) to the extent required by section 1123(a)(6)

of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Common Stock; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated under the Plan.  After the Effective Date, the Reorganized Debtors may, subject to the terms and conditions of the Restructuring Documents, amend and restate their respective organizational documents as permitted by applicable law.

**13.      Directors and Officers of the Reorganized Debtors**

The New Board will initially consist of up to five (5) directors, who will be designated in accordance with the terms and conditions of the Investment Agreement, which directors shall be identified in the Plan Supplement as Plan Schedule 2.  The initial new board of directors or other governing body of each HoldCo Subsidiary shall consist of one or more of the directors or officers of Reorganized HoldCo.  Any directors elected pursuant to this section will be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or an officer, the nature of any compensation for such Person.  Each such director and officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of the applicable Reorganized Debtors.  The existing boards of directors and other governing bodies of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

**14.      Corporate Action**

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the issuance and  the distribution of the securities to be issued pursuant hereto, in each case in form and substance satisfactory to the Investor, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or by any other Person (except for those expressly required pursuant to the Plan or by the Restructuring Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, officers, managers, members or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

As of the Effective Date, all matters provided for in the Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Organization Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors or by any other Person.

SF\5603286.11

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case in form and substance satisfactory to the Investor, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The secretary and any assistant secretary of the Debtors and the Reorganized Debtors will be authorized to certify or attest to any of the foregoing actions.

### 15. Cancellation of Notes, Certificates and Instruments

On the Effective Date, except to the extent otherwise provided in the Plan (including, without limitation, and for the avoidance of doubt, <u>Article V.F</u>, <u>Article V.G</u> and <u>Article V.H</u> of the Plan) all notes, stock, instruments, certificates, agreements and other documents evidencing or relating to the DIP Facility Claims, the Prepetition Debt Claims, any Impaired Claim and/or the Old HoldCo Interests will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person; <u>provided</u> that (i) the terms of the Prepetition Secured Notes Indenture will continue in effect for the limited purpose of allowing Holders of Claims thereunder to receive, and allowing and preserving the rights of the Prepetition Secured Notes Indenture Trustee to make, distributions under the Plan, and (ii) the DIP Facility Credit Agreement and the Prepetition Term Loan Credit Agreement will continue in effect for the limited purposes of allowing Holders of Claims thereunder to receive, and allowing and preserving the rights of the applicable Distribution Agents to make, distributions under the Plan.  Except to the extent otherwise provided under the Plan, upon completion of all such distributions, the DIP Facility Credit Agreement and the Prepetition Debt Prepetition Term Loan Credit Agreements and any and all notes, securities and instruments issued in connection therewith will terminate completely without further notice or action and be deemed surrendered.  For the avoidance of doubt, nothing in this Subsection "15" will affect the Amended Secured Notes Indenture, including without any limitation any Trustee Charging Lien, the Amended Secured Notes Guarantees and related Restructuring Documents, which will be in full force and effect as of the Effective Date.

### 16. Old Affiliate Interests

On the Effective Date, the Old Affiliate Interests shall remain effective and outstanding, and shall be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.  Each HoldCo Subsidiary shall continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date, except as amended or modified by the Plan.

### 17. Sources of Cash for Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments required pursuant to the Plan will be obtained from their respective Cash balances, including Cash from operations, the Cash Reserve, and the Initial Purchase Price or the Final Purchase Price, as applicable.  The Debtors and the Reorganized Debtors, as applicable, may also make such payments using Cash received from their subsidiaries through their respective consolidated cash management systems and the incurrence of intercompany transactions, but in all cases subject to the terms and conditions of the Restructuring Documents.

To the extent paid in Cash, all Allowed Claims that constitute any amount of the Debtors' Claim Portion will be paid in Cash from either (i) Cash on the Debtors' balance sheet immediately prior to the Effective Date or (ii) the Cash Reserves.  All Allowed Claims that constitute any amount of the Reorganized Debtors' Claim Portion will be paid in Cash by the Reorganized Debtors from their cash balances.

18.     **Continuing Effectiveness of Final Orders**

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under the Plan.

19.     **Funding and Use of Cash Reserves**

On or before the Effective Date, the Debtors shall fund the Cash Reserves in such amount as determined by the Debtors, with the consent of the Supermajority Consenting Debtholders or as determined by order of the Bankruptcy Court, as necessary in order to be able to pay in full in Cash the obligations and liabilities for which such reserves were established, including, without limitation, reserving an amount of Cash equal to 100% of distributions to which Holders of Disputed Claims in each such applicable Class would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); *provided*, *however*, that the Debtors and the Reorganized Debtors, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims, subject to the rights of the Noteholders' Representative contained in Article V.T of the Plan; provided, further, that the Debtors shall provide the Investor with information regarding the Cash Reserves as may be reasonably requested by the Investor.

The Cash contained in each applicable Cash Reserve shall be first used solely to pay the obligations and liabilities for which such applicable reserve was established, with any excess funds (if any) in an applicable Cash Reserve being next available to pay the obligations and liabilities for which any other Cash Reserve was established. The Debtors and the Reorganized Debtors, as applicable, shall maintain detailed records of all payments made from each Cash Reserve, such that all payments and transactions shall be adequately and promptly documented in, and readily ascertainable from, their respective books and records. After the Effective Date, neither the Debtors nor the Reorganized Debtors shall deposit any other funds or property into the Cash Reserves without further order of the Bankruptcy Court or otherwise commingle funds in the Cash Reserves.

20.     **The Noteholders' Representative**

        (a)     Appointment

From and after the Effective Date, the Noteholders' Representative shall be authorized and empowered to act as agent, proxy, attorney-in-fact and representative for all Prepetition Secured Noteholders to the extent contemplated by the Investment Agreement, including but not limited to (i) in connection with any dispute regarding the calculation of the post-closing adjustment to the Initial Purchase Price under the Investment Agreement (to the extent contemplated by the Investment Agreement), (ii) for purposes of electing an Accounting Firm as contemplated by Section 1.1 of the Investment Agreement and (iii) becoming a party to the Escrowed Notes Agreement as contemplated by Section 2.5(a) of the Investment Agreement.  The Noteholders' Representative shall serve in such capacity until resignation or discharge and the appointment of a successor Noteholders' Representative by the Majority Consenting Debtholders.

        (b)     Rights, Powers and Duties of the Noteholders' Representative

As the representative for all Prepetition Secured Noteholders, the Noteholders' Representative shall be authorized and empowered to act as agent, proxy, attorney-in-fact and representative for and on behalf of all Prepetition Secured Noteholders, to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions (whether in or out of court) as may be necessary or appropriate to fulfill its obligations under the Investment Agreement, including but not limited to (i) in connection with any dispute regarding the calculation of the post-closing adjustment to the Initial Purchase Price under the Investment Agreement (to the extent contemplated by the Investment Agreement), (ii) for purposes of electing an Accounting Firm as contemplated by Section 1.1 of the Investment Agreement and (iii) becoming a party to the Escrow Agreement as contemplated by Section 2.5(a) of the Investment Agreement, in each case without further notice to or

31

order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  From and after the Effective Date and continuing through the date of entry of a final decree closing the Chapter 11 Case, the Noteholders' Representative shall possess the rights of a party-in-interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Chapter 11 Cases and, in connection therewith, shall have the right to appear and be heard on matters brought before the Bankruptcy Court and/or the interpretation or enforcement of the Investment Agreement, including, without limitation, the following

    (i)    settling, allowing, objecting to or otherwise disposing of any Claims that constitute the Debtors' Claim Portion;

    (ii)    seeking estimation of contingent or unliquidated Claims that constitute the Debtors' Claim Portion under section 502(c) of the Bankruptcy Code;

    (iii)    seeking determination of the tax liability associated with any Claims that constitute the Debtors' Claim Portion under section 505 of the Bankruptcy Code;

    (iv)    taking any and all other actions necessary or appropriate to implement any of the foregoing.

    (c)    <u>Reimbursement of Costs and Expenses</u>

The reimbursement of reasonable costs and expenses of the Noteholders' Representative, including, without limitation, any professionals retained by the Noteholders' Representative, shall be made from the Noteholders' Representative Cash Reserve.  The payment of such amounts to the Noteholders' Representative and its retained professionals shall be made in the ordinary course of business with the consent of the Supermajority Consenting Debtholders and shall not be subject to the approval of the Bankruptcy Court; <u>provided</u>, <u>however</u>, that any disputes related to such fees, costs and expenses shall be brought before the Bankruptcy Court.

    (d)    <u>Limitation of Liability</u>

As of and after the Effective Date, neither the Noteholders' Representative nor any of its Related Persons shall be liable for any act taken or omitted to be taken in such capacity in connection with or in contemplation of the transactions contemplated by the Plan and/or the Investment Agreement, in each case other than for acts or omissions constituting gross negligence, actual fraud or willful misconduct of such applicable Entity as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

The Noteholders' Representative and each of its Related Persons may, in connection with the performance of their respective functions, and in their sole and absolute discretion and without any requirement or obligation, consult with the respective attorneys, accountants, financial advisors, and other professionals of the Reorganized Debtors, and shall not be liable for any act taken, omitted to be taken or suffered to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions are provided in writing (other than for acts or omissions constituting gross negligence, actual fraud or willful misconduct of such applicable Entity as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction).

    (e)    <u>Forum For Actions Against the Noteholders' Representative</u>

The Confirmation Order shall state that, without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Noteholders' Representative in its official capacity as such, with respect to its status, duties, powers, acts or omissions as Noteholders' Representative in any forum other than the Bankruptcy Court.

(f)    Insurance

The Noteholders' Representative shall be authorized to obtain all reasonably necessary insurance coverage for itself and its Related Persons, including, but not limited to, coverage with respect to the liabilities, duties and obligations of the Noteholders' Representative and its Related Persons under the Investment Agreement and the Plan (in the form of an errors and omissions policy, general liability, or otherwise), which insurance coverage may remain in effect for a reasonable period (not to exceed six years) after the closing of the Chapter 11 Cases.  Any such insurance coverage shall be paid for from the Noteholders' Representative Cash Reserve.

(g)    Authority to Object to and Settle Certain Disputed Claims.

From and after the Effective Date, the Noteholders' Representative shall be authorized with respect to those Claims which are not Allowed under the Plan or by Final Order and that constitute the Debtors' Claim Portion, (i) to object to, and seek estimation of, any such Claims and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle such Disputed Claims, in the ordinary course of business and without further notice to or order of the Bankruptcy Court.

**21.    Fees and Expenses of Prepetition Term Loan Agent & Ad Hoc Secured Noteholders Committee**

Without limiting the terms or conditions of Section 3.3(f) of the Investment Agreement, the Debtors will, on the Effective Date and to the extent invoiced, pay the Prepetition Term Loan Agent Fees and Expenses and the Ad Hoc Secured Noteholders Committee Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; provided, however, if the Debtors or Reorganized Debtors and any such Entity cannot agree with respect to the reasonableness of the fees and expenses to be paid to such party, the reasonableness of any such fees and expenses shall be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors on the Effective Date and any disputed amounts to be escrowed by the Debtors).

**22.    Fees and Expenses of Indenture Trustee**

Without limiting the terms or conditions of Section 3.3(f) of the Investment Agreement, the Debtors will, on the Effective Date and to the extent invoiced, pay the Prepetition Secured Notes Indenture Trustee Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without the need to provide individual time records or application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; provided, however, if the Debtors or Reorganized Debtors and any such Entity cannot agree with respect to the reasonableness of the fees and expenses to be paid to such party, the Debtors shall (i) pay the undisputed portion of any invoices submitted on or before the Effective Date, (ii) place any disputed amounts in escrow on the Effective Date, and (iii) notify the Prepetition Secured Notes Indenture Trustee of any dispute within ten (10) days after the presentation of an invoice by the Prepetition Secured Notes Indenture Trustee.  Upon such notification, the Prepetition Secured Notes Indenture Trustee may assert the Trustee Charging Lien to pay the undisputed and unpaid portion of the Prepetition Secured Notes Indenture Trustee Fees and Expenses, and/or after the parties have attempted in good faith to resolve any such dispute for at least fifteen (15) days after the notification of the dispute, may submit such dispute for resolution to the Bankruptcy Court; provided, however, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the Prepetition Secured Notes Indenture.  Nothing herein or in the Plan shall be deemed to impair, waive, discharge, or negatively affect any Trustee Charging Lien for any fees, costs and expenses not paid pursuant to the Plan and otherwise claimed by the Prepetition Secured Notes Indenture Trustee pursuant to this section and in accordance with the Prepetition Secured Notes Indenture.  For the avoidance of doubt, the Trustee Charging Lien shall be released as and when required under the Prepetition Secured Notes Indenture and the Amended Secured Notes Indenture.

23.    **Completion Bonus Program**

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to make the payments contemplated by the Completion Bonus Program pursuant to section 1129(a)(4) of the Bankruptcy Code, without further notice and hearing or consent of any Person. The aggregate payments under the Completion Bonus Program will not exceed $750,000.

**E.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors (subject to the consent of the Investor given in its sole discretion) in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)    have been assumed or rejected by prior order of the Bankruptcy Court;

(ii)    are the subject of a motion to reject pending on the Effective Date;

(iii)    are identified on Plan Schedule 5 or in the Plan Supplement, in either case which Plan Schedule may be amended by the Debtors (subject to the consent of the Investor given in its sole discretion) to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Plan Schedule and serving it on the affected contract parties at least ten (10) days prior to the date of the Confirmation Hearing; or

(iv)    are rejected or terminated pursuant to the terms of the Plan.

Without amending or altering the Cure Claim Procedures Order or any other prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan. The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by an order of the Bankruptcy Court, which has not been assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its respective terms and conditions, except as limited or modified by the provisions of the Plan.

2.        **Assignment of Executory Contracts of Unexpired Leases**

In the event of an assumption and assignment of an Executory Contract or Unexpired Lease, at least ten (10) days prior to the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will: (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court. Additionally, the Debtors shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts. Any applicable cure amounts shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable cure amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtors at least three (3) days prior to the Confirmation Hearing (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Without amending or altering the Cure Claim Procedures Order, any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall, without amending or altering the Cure Claim Procedures Order, be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to an assignment or a cure amount is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it. The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

3.        **Rejection of Executory Contracts or Unexpired Leases**

The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to reject any contract or lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease. All Executory Contracts and Unexpired Leases listed on Plan Schedule 5 shall be deemed rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

4.        **Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property shall be forever

35

discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided under the Plan.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.  To the extent applicable, the limitations imposed by section 502 of the Bankruptcy Code shall apply to the relevant rejection Claim, including, without limitation, subsection 502(b)(6) and subsection 502(b)(7) thereof.

#### 5.        Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code and without amending or altering the Cure Claim Procedures Order, by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree (the "**Cure Claim Amount**").  At least ten (10) days prior to the Confirmation Hearing, the Debtors shall file and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will:  (1) list the applicable cure amount, if any; and (2) describe the procedures for filing objections thereto.

Without amending or altering the Cure Claim Procedures Order, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Debtors at least three (3) days prior to the Confirmation Hearing (notwithstanding anything in the Schedules or a Proof of Claim to the contrary).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to the proposed assumption and cure amount.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall, without amending or altering the Cure Claim Procedures Order, be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to assumption or cure amount is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.  The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, in each case as provided in section 365 of the Bankruptcy Code.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed by Final Order shall be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

#### 6.        Extension of Time to Assume or Reject

Notwithstanding anything to the contrary set forth in Article VI of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed assumption provided for in Article VI.A of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

F.     **PROVISIONS GOVERNING DISTRIBUTIONS**

1.     **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the "Treatment" sections in <u>Article III</u> of the Plan or as ordered by the Bankruptcy Court, initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to <u>Article VIII</u> of the Plan.

2.     **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

3.     **Distributions by Reorganized Debtors or Other Applicable Distribution Agent**

Other than as specifically set forth below, the Debtors, the Reorganized Debtors, or other applicable Distribution Agent shall make all distributions required to be distributed under the Plan.  Distributions on account of the Allowed Prepetition Term Loan Claims and Allowed Prepetition Secured Notes Claims shall be made to the Prepetition Term Loan Agent and the Prepetition Secured Notes Indenture Trustee, respectively, and such applicable agent will be, and shall act as, the Distribution Agent with respect to its respective Class of Claims.   The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by the Plan and may pay the reasonable fees and expenses of such entities and the Distribution Agents in the ordinary course of business.  No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

4.     **Delivery and Distributions; Undeliverable or Unclaimed Distributions**

(a)     <u>Record Date for Distributions</u>

On the Distribution Record Date, the Claims Register shall be closed.  Accordingly, the Debtors, the Reorganized Debtors, or other applicable Distribution Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim (other than Prepetition Debt Claims) that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes under the Plan to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims (other than Prepetition Debt Claims) who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  The Reorganized Debtors or other applicable Distribution Agent shall be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date; provided, however, that the foregoing shall not apply to the Prepetition Debt Claims.  Instead, (i) the Prepetition Term Loan Agent shall be deemed the holder of the Prepetition Term Loan Claims and distributions with respect thereto shall be governed by the Prepetition Term Loan Credit Agreement and (ii) solely with respect to receiving distributions under the Plan, the Prepetition Secured Notes Indenture Trustee shall be deemed to be the holder of the Prepetition Secured Notes Claims and distributions with respect thereto shall be governed by the Prepetition Secured Notes Indenture.

(b)     <u>Delivery of Distributions in General</u>

Except as otherwise provided under the Plan, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, shall make distributions to Holders of Allowed Claims, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other

37

applicable Distribution Agent's books and records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined in the discretion of the applicable Distribution Agent (subject to the terms and conditions of the relevant Prepetition Debt Credit Agreement, if applicable); *provided* further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the latest Proof of Claim Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date.

       (c)       <u>Minimum Distributions</u>

Notwithstanding anything under the Plan to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $25.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars, in each case with respect to Impaired Claims. With respect to Impaired Claims, whenever any payment or distribution of a fraction of a dollar (including with respect to the Amended Secured Notes, if applicable) under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or more being rounded up to the next higher whole number and with less than half dollars being rounded down to the next lower whole number.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim that is Impaired under the Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $25.00, which shall be treated as an undeliverable distribution under subsection (d) below.

       (d)       <u>Undeliverable Distributions</u>

<u>Holding of Certain Undeliverable Distributions</u>. If the distribution to any Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due but missed distributions shall be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent). Undeliverable distributions shall remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to <u>Article VII.D.4(b)</u> of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

<u>Failure to Claim Undeliverable Distributions</u>. Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property, or any Distribution Agent. In such case, any Cash for distribution on account of such rights for undeliverable or unclaimed distributions shall become the property of the Estates free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary. Any Cash, Amended Secured Notes and/or other Plan Securities and Documents or other property held for distribution or allocation on account of such Claim shall be distributed or allocated to the Prepetition Secured Notes Indenture Trustee for distribution or allocation in accordance with the Plan. Nothing contained in the Plan shall require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim.

SF/5603286.11

Failure to Present Checks. Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 90 days after the issuance of such checks, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 365 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such Claim against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property. In such case, any Cash held for payment on account of such Claims shall be distributed to the Prepetition Secured Notes Indenture Trustee for distribution in accordance with the Plan, free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.

## 5.     Compliance with Tax Requirements

In connection with the Plan and all distributions under the Plan, the Reorganized Debtors or other applicable Distribution Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan shall be subject to any such withholding and reporting requirements. The Reorganized Debtors or other applicable Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

## 6.     Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## 7.     Means of Cash Payment

Payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## 8.     Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII of the Plan. Except as otherwise provided under the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for under the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

9. **Setoffs**

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; provided that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, shall provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved. In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Litigation Claims, all of which are reserved unless expressly released or compromised pursuant to the Plan or the Confirmation Order.

G. **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

1. **Resolution of Disputed Claims**

(a) <u>Allowance of Claims</u>

After the Effective Date, the Debtors and the Reorganized Debtors shall, subject to the rights of the Noteholders' Representative contained in <u>Article V.T</u> of the Plan, have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code. Subject to the rights of the Noteholders' Representative contained in <u>Article V.T</u> of the Plan, the Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

(b) <u>Prosecution of Objections to Claims</u>

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors, subject to the rights of the Noteholders' Representative contained in <u>Article V.T</u> of the Plan, shall have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; provided, however, this provision shall not apply to Professional Fee Claims, which may be objected to by any party in interest in these Chapter 11 Cases. From and after the Effective Date, the Reorganized Debtors, subject to the rights of the Noteholders' Representative contained in <u>Article V.T</u> of the Plan, may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtors shall, subject to the rights of the Noteholders' Representative contained in <u>Article V.T</u> of the Plan, have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

(c) <u>Claims Estimation</u>

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may at any time, subject to the rights of the Noteholders' Representative contained in <u>Article V.T</u> of the Plan, request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the

Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claims, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.   All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation.

(d)      <u>Deadline to File Objections to Claims</u>

Any objections to Claims will be Filed by no later than the Claims Objection Deadline; <u>provided</u> that nothing contained herein will limit the Reorganized Debtors' right to object to Claims, if any, Filed or amended after the Claims Objection Deadline, subject to the rights of the Noteholders' Representative contained in <u>Article V.T</u> of the Plan.   Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Debtors or the Reorganized Debtors shall, subject to the rights of the Noteholders' Representative contained in <u>Article V.T</u> of the Plan, continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.   Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Reorganized Debtors shall continue to have the right to amend any claims or other objections and to File and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is or becomes Allowed by Final Order of the Bankruptcy Court.

**2.**       **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim pursuant to a Final Order.

**3.**       **Distributions on Account of Disputed Claims Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims**

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), the Reorganized Debtors or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims of property that would have been distributed to the Holders of such Claim on the dates distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims or Disallowed Claims by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates.  Such distributions will be made pursuant to the applicable provisions of <u>Article VII</u> of the Plan.

SF\5603286.11

4.        **Reserve for Disputed Claims**

The Debtors, the Reorganized Debtors and the Distribution Agent, as applicable, shall establish such appropriate reserves for Disputed Claims in Classes as it determines necessary and appropriate, including, without limitation, as part of the Cash Reserves, in each case with the consent of the Noteholders' Representative or as approved by order of the Bankruptcy Court.  Without limiting the foregoing, reserves for Disputed Claims shall equal an amount of Cash equal to 100% of distributions to which Holders of such Disputed Claims in each applicable Class would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors and the Reorganized Debtors, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims, subject to the rights of the Noteholders' Representative contained in Article V.T of the Plan; provided, further, that the Debtors shall provide the Investor with information regarding the reserves established for Disputed Claims as may be reasonably requested by Investor .

**H.        CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

1.        **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Plan and the Restructuring Documents shall be in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Debtors, the Supermajority Consenting Debtholders, and the Investor; and

- The Confirmation Order shall have been entered by the Bankruptcy Court.

2.        **Conditions Precedent to Consummation**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Confirmation Order shall have become a Final Order and the Confirmation Date shall have occurred.

- The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order), in form and substance reasonably acceptable to the Debtors and the Supermajority Consenting Debtholders and acceptable to the Investor, authorizing the assumption, assumption and assignment and rejection of the Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan and the Plan Supplement.

- The Plan and the Restructuring Documents shall not have been amended or modified other than  in a manner in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Debtors, the Supermajority Consenting Debtholders and the Investor.

- The Restructuring Documents shall have been filed, tendered for delivery, and been effected or executed by all Entities party thereto (as appropriate), and in each case in full force and effect.  All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Investment Agreement, shall have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or shall be satisfied concurrently with the occurrence of the Effective Date).

42

- All consents, actions, documents, certificates and agreements necessary to implement the Plan and the transactions contemplated by the Investment Agreement shall have been, as applicable, obtained and not otherwise subject to unfulfilled conditions, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws, and in each case in full force and effect.

- The Debtors shall have received, or will receive concurrently with the occurrence of the Effective Date, the Initial Purchase Price in Cash and in accordance with the terms and conditions of the Investment Agreement.

- The New Board shall have been selected.

- The Cash Reserves shall have been funded in full in Cash by the Debtors in accordance with the terms and conditions of the Plan.

- All Ad Hoc Secured Noteholders Committee Fees and Expenses shall have been paid in full in Cash or reserved in a manner acceptable to the Majority Consenting Debtholders to the extent of any disputes, as required by the DIP Facility Orders, including the adequate protection obligations in paragraph 12 thereof, pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise

### 3.      Waiver of Conditions

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of the Plan set forth in this Article IX may be waived by the Debtors, with the consent of the Supermajority Consenting Debtholders and the Investor, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

### 4.      Effect of Non-Occurrence of Conditions to Confirmation or Consummation

If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan shall, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## I.      RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS

### 1.      General

Pursuant to section 1123 of the Bankruptcy Code (and, in addition, but solely with respect to Class 5 Claims, Bankruptcy Rule 9019), and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

Notwithstanding anything contained under the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under

general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments under the Plan, are settled, compromised, terminated and released pursuant to the Plan; *provided*, *however*, that nothing contained in the Plan shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan.

      2.      **Release of Claims and Causes of Action**

      (a)      <u>Release by the Debtors</u>

      **Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in <u>Article X</u> of the Plan or elsewhere in the Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, The Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule 6; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in <u>Article X.B</u> of the Plan shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have**

**against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained under the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.**

(b)     Release by Third Parties

**Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in <u>Article X</u> of the Plan or elsewhere in the Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "<u>Releasing Parties</u>") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third Party Release</u>") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; _provided_, _however_, that the foregoing provisions of this Third Party Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule 7; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained under the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.**

3.      **Waiver of Statutory Limitations on Releases**

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party.  The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

4.      **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, effective as of the Effective Date, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Equity Interests or Causes of Action.

Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. Such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date: (i) the rights afforded under the Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto shall be extinguished completely without further notice or action; and (iii) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

5.        **Exculpation**

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of the Plan; _provided_, _however_, that the foregoing provisions of this exculpation shall not operate to waive or release (i) any Causes of Action expressly set forth in and preserved by the Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; _provided_, _further_, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this Article X.E of the Plan shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

6.        **Preservation of Causes of Action**

(a)        Maintenance of Causes of Action

Except as otherwise provided in Article X of the Plan or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases, but in all cases subject to the rights of the Noteholders' Representative contained in Article V.T of the Plan.  The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court, but in all cases subject to the rights of the Noteholders' Representative contained in Article V.T of the Plan.

(b)        Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors expressly reserve all Causes of Action and Litigation Claims for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except in each case where such Causes of Action or Litigation Claims have been expressly waived, relinquished, released, compromised or settled in the Plan (including, without limitation, the Release contained in Article X.B of the Plan and Exculpation contained in Article X.E of the Plan) or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the Debtors and the

47

Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

7.    **Injunction**

**Except as otherwise expressly provided in the Plan or the Confirmation Order, from and after the Effective Date, all Entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind,  in each case on account of or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated).  All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

**J.    BINDING NATURE OF THE PLAN**

On the Effective Date, and effective as of the Effective Date, the Plan shall bind, and shall be deemed binding upon, the Debtors, the Reorganized Debtors, any and all Holders of Claims against and Equity Interests in the Debtors, all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, any and all non-debtor parties to Executory Contracts and Unexpired Leases with the Debtors and the respective successors and assigns of each of the foregoing, to the maximum extent permitted by applicable law, and notwithstanding whether or not such Entity (i) will receive or retain any property, or interest in property, under the Plan, (ii) has Filed a Proof of Claim or interest in the Chapter 11 Cases, or (iii) failed to vote to accept or reject the Plan, affirmatively voted to reject the Plan or is conclusively presumed to reject the Plan.

**K.    PROTECTION AGAINST DISCRIMINATORY TREATMENT**

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**L.    PLAN INDEMNITY**

In addition to the matters set forth in the Plan and not by way of limitation thereof, the Reorganized Debtors and the Investor shall, and the Debtors shall continue to, indemnify and hold harmless all Persons who are or were managers, officers or directors of any of the Debtors at any time on or after the Petition Date on account of and with respect to any Claims (whether or not any Proof of Claim or cure claim has been Filed with respect thereto) or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities threatened or asserted by any Person against any such managers, officers or directors with respect to or based upon, in whole or in part, any act taken or omitted to be taken, or alleged act taken or omitted to be taken, in such capacities on or prior to the Effective Date, irrespective of whether such amounts are owed in connection with a prepetition or postpetition act or omission, but in each case only to the extent that (a) the acts, omissions or alleged acts or omissions of such applicable Person were indemnifiable under the Debtors' prepetition organizational documents (whether in the bylaws, certificates of incorporation, charters, operating agreements, board resolutions, employment contracts or

48

otherwise) and (b) the otherwise indemnifiable expense, liability, loss, or other amount is determined not to be covered under the D&O Tail Policy purchased by the Debtors prior to the Petition Date.  The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court.

## M.   INTEGRAL PART OF PLAN

Each of the provisions set forth in the Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of the Plan and essential to its implementation.  Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision.

SF\5603286.11

## V.
## CONFIRMATION AND CONSUMMATION PROCEDURES

### A.    SOLICITATION OF VOTES

The process by which the Debtors will solicit votes to accept or reject the Plan is summarized in Section I herein titled, "Executive Summary" and set forth in detail in the Disclosure Statement Order, which is attached as Exhibit B to this Disclosure Statement.

**PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT VOTES ARE PROPERLY AND TIMELY SUBMITTED SUCH THAT THEY ARE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN.**

### B.    CONFIRMATION PROCEDURES

#### 1.    Confirmation Hearing

The Confirmation Hearing will commence at 10:00 a.m. prevailing Eastern Time on October 3, 2013 before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801-3024. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

The Confirmation Objection Deadline is 4:00 p.m. prevailing Eastern Time on September 23, 2013.

All Confirmation Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Confirmation Objection Deadline.

---

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

---

#### 2.    Filing Objections to the Plan

Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the Notice Parties, as defined in Section I.F herein.

### C.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

50

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (a) made before the confirmation of the Plan is reasonable; or (b) if it is to be fixed after confirmation of the Plan, is subject to the approval of the Bankruptcy Court for the determination of reasonableness;

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan.  The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim will have accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code;

- Each Class of Claims that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, and that Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan; and

- All outstanding fees payable pursuant to section 1930 of title 28 of the United States Code will be paid when due.

## 1.    Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provide, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor or debtors are liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must:  (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the chapter 11 cases were converted to a chapter 7 case and the assets of the particular debtors' estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and

(c) compare such holder's liquidation distribution to the distribution under the chapter 11 plan that such holder would receive if the chapter 11 plan were confirmed.

In chapter 7 cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full:  (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the cash amount that would be available for satisfaction of claims (other than secured claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtors, augmented by the unencumbered cash held by the debtors at the time of the commencement of the liquidation.  Such cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the debtor's business and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the liquidation analysis attached hereto as <u>Exhibit D</u> (the "**Liquidation Analysis**"), the Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim or Equity Interest in each Class with a recovery greater than or equal to the value of any distributions if the Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.  In addition, distributions in a chapter 7 case may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions.  In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors.  As set forth in the Liquidation Analysis, Holders of Class 6 and Class 7 Claims and Class 8 Old HoldCo Interests would not receive any recovery under a chapter 7 liquidation, so the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

## 2.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the plan contemplates such liquidation.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed the ability of the Reorganized Debtors to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  Financial projections of the Reorganized Debtors for the quarter ending December 31, 2013, and for the years ending December 31, 2014 and December 31, 2015 (the "**Financial Projections**") are attached hereto as <u>Exhibit C</u>.  Additionally, the Debtors' consolidated historical financial statements from 2010 through 2013 are attached hereto as <u>Exhibit E</u> (the "**Historical Financial Statements**").

In general, as illustrated by the Financial Projections, the Debtors believe that as a result of the transactions contemplated by the Plan and Investment Agreement, the Reorganized Debtors should have sufficient cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing business operations.  The Debtors believe that confirmation and consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

THE FINANCIAL PROJECTIONS HAVE NOT BEEN EXAMINED OR COMPILED BY INDEPENDENT ACCOUNTANTS.  THE DEBTORS AND THE INVESTOR MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THEIR ABILITY TO ACHIEVE THE PROJECTED RESULTS.  MANY OF THE ASSUMPTIONS ON WHICH THE PROJECTIONS ARE BASED ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND THE INVESTOR.  INEVITABLY, SOME ASSUMPTIONS WILL NOT MATERIALIZE AND UNANTICIPATED EVENTS AND CIRCUMSTANCES MAY AFFECT THE ACTUAL FINANCIAL RESULTS.  THEREFORE, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PERIOD OF THE FINANCIAL PROJECTIONS MAY VARY FROM THE PROJECTED RESULTS AND THE VARIATIONS MAY BE MATERIAL.  ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO EXAMINE CAREFULLY ALL OF THE ASSUMPTIONS ON WHICH THE FINANCIAL PROJECTIONS ARE BASED IN CONNECTION WITH THEIR EVALUATION OF THE PLAN.

BASED ON THE FINANCIAL PROJECTIONS SET FORTH IN EXHIBIT C HERETO, THE DEBTORS BELIEVE THAT THEY WILL BE ABLE TO MAKE ALL DISTRIBUTIONS AND PAYMENTS UNDER THE PLAN AND THAT CONFIRMATION OF THE PLAN IS NOT LIKELY TO BE FOLLOWED BY LIQUIDATION OF THE REORGANIZED DEBTORS OR THE NEED FOR FURTHER FINANCIAL REORGANIZATION OF THE REORGANIZED DEBTORS.

**3.        Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Classes 1, 2, 3, 4 and 9 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. Claims in Class 7 are Impaired, but are deemed to have accepted the Plan because such Holders are Affiliates of HoldCo.  Accordingly, the Debtors are not required to solicit their vote.

Claims in Class 5 are Impaired under the Plan, and as a result, the Holders of Claims in Class 5 are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to Class 5, and without considering whether the Plan "discriminates unfairly" with respect to Class 5, as both standards are described herein.  As explained above, Class 5 will have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount and a majority in number of the Claims of Class 5 (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Claims in Class 6 (General Unsecured Claims) and Equity Interests in Class 8 (Old HoldCo Interests) are impaired and deemed to have rejected the Plan. The Debtors, therefore, will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code as more fully described below.

### 4.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, provided that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

### 5.    No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 6.    Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

- Secured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- Unsecured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- Equity Interests. The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o    the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or

  o    if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

**As noted above, the Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 6 and 8.** To the extent that the Voting Class votes to reject the Plan, the Debtors further reserve the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XII of the Plan.

The votes of Holders of Claims in Class 6 and Equity Interests in Class 8 are not being solicited because, under Article III of the Plan, there will be no distribution to such Holders and, therefore, such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. All Class 6 Claims and Class 8 Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding the deemed rejection by Classes 6 and 8, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## D.      CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article IX.B of the Plan.

# VI.
## PLAN-RELATED RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.    ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES, THE PLAN OR THE IMPLEMENTATION OF THE PLAN.

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.    Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    The Debtors May Fail to Satisfy the Vote Requirement.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan of reorganization.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

As discussed above, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that:  (a) such plan does not "unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation were not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Section 1129(b)(1) of the Bankruptcy Code provides that, in the event an impaired class does not vote in favor of a plan, but all other requirements of section 1129(a) are satisfied, the Bankruptcy Court may only confirm such a plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan." Subject to the Restructuring Transactions, the Plan contemplates that all Old Affiliate Interests in any HoldCo Subsidiary will remain effective and outstanding on the

56

Effective Date and will be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date. The Plan's treatment of Old Affiliate Interests has no economic substance and does not enable any junior creditor or interest holder to retain or recover any value under the Plan. This technical preservation of Old Affiliate Interests is solely a means to preserve the corporate and organizational structure of the Debtors in order to avoid the unnecessary cost of reconstituting that structure. There can be no assurance, however, that the Bankruptcy Court will find that the Plan satisfies the requirements of section 1129(b)(1) of the Bankruptcy Code.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.    Non-Consensual Confirmation of the Plan May Be Necessary.

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that the Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5.    The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors and Reorganized Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is or may become subject to an objection. Any Holder of a Claim that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6.    The Effective Date May Not Occur.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 7.    The Investment Agreement, and the Transactions Contemplated Thereby, May Not Become Effective.

Although the Debtors believe that the Investment Agreement will become effective shortly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Investment Agreement, and the transactions contemplated under the Investment Agreement, will become effective. As discussed in Section III.B herein, there are certain material conditions to Closing contemplated by the Investment Agreement that may not be satisfied, including, for example, the Debtors' ability to assume one or more of the MSAs.

8.      **Contingencies Will Not Affect Validity of Votes of the Voting Class to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Voting Class to accept or reject the Plan or require any sort of revote by the Impaired Classes.

9.      **Objection of Simi Valley.**

On August 16, 2013, Simi Valley Hospital & Health Care Services ("**Simi Valley**") Filed its *Objection of Simi Valley Hospital & Health Care Services to Debtors' Motion for Entry of an Order (A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline and Other Dates, (C) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan and (D) Approving the Manner and Forms of Notice and Other Related Documents* [Docket No. 262] (the "**Objection**"). Simi Valley asserts in the Objection, among other things, that the Plan cannot be confirmed because of the proposed treatment of certain executory contracts and rights of first refusal of non-Debtor entities.  The Debtors continue to review the Objection and reserve all of their rights related thereto.  Nevertheless, there can be no assurance that the Bankruptcy Court will not sustain the Objection or that the Objection will not delay Confirmation or consummation of the Plan.

B.      **RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

1.      **The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court.**

In connection with the consummation of the Plan, the Reorganized Debtors expect to receive the consideration contemplated under the Investment Agreement.  Parties in interest in these Chapter 11 Cases may oppose confirmation of the Plan by alleging that the value of the Reorganized Debtors is higher than the purchase price under the Investment Agreement and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan.  At the Confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Reorganized Debtors.  Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtors for purposes of the Plan.

2.      **There May Be a Lack of a Trading Market For the New Common Stock.**

It is anticipated that there will be no active trading market for the New Common Stock.  The Reorganized Debtors have no intention of registering any of the securities under the Securities Act, nor applying to list any of the securities on any national securities exchange.  Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities.  In addition, the Reorganized Debtors will not be required to file reports with the Securities and Exchange Commission or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.

3.      **The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Service Their Debt.**

Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors there is no guarantee that the Financial Projections will be realized.  The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and Cash flows assumed in projecting future business prospects.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and Cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs.  Any

58

one of these failures may preclude the Reorganized Debtors from, among other things:  (a) taking advantage of future opportunities; (b) growing their businesses; or (c) responding to future changes in the healthcare industry or competitive pressures.  Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and Cash flows could lead to Cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital.  The Reorganized Debtors may not be able to obtain such working capital when it is required.

> **4.      The Estimated Valuation of the Reorganized Debtors, the New Common Stock and the Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent the Private or Public Sale Values of the New Common Stock.**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of the Reorganized Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of Reorganized Debtors), including, without limitation:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

> **5.      RTS Will Control Reorganized HoldCo and the Reorganized Debtors.**

Consummation of the Plan and the effectuation of the Investment Agreement will result in RTS acquiring 100% of the New Common Stock of Reorganized Holdco.  RTS will, among other things, exercise a controlling influence over the businesses and affairs of the Reorganized Debtors.

## C.      RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' BUSINESS

> **1.      Medicare and Medicaid Reimbursement Reductions.**

The Debtors depend on Medicare and Medicaid revenues generated by the physician groups and physicians for a significant amount of the Debtors' net revenue, and the Debtors' businesses could be materially harmed by changes that result in reimbursement reductions.

Reimbursements from Medicare patients make up a high proportion of net revenue due to the high proportion of cancer patients over the age of 65.  The Debtors estimate that approximately 46%, 45%, and 44% of the physician groups' net revenue for fiscal years 2012, 2011 and 2010, respectively, consisted of payments from Medicare and Medicaid.  These government programs generally reimburse on a fee-for-service basis based on a predetermined reimbursement rate schedule.  Medicare payments are made under the Medicare Physician Fee Schedule, and many state Medicaid programs use a fixed percentage of the Medicare fee schedule as a basis for their reimbursement rate schedule.  Medicare reimbursement rates under the Medicare Physician Fee Schedule are updated on an annual basis using a statutory formula that is applied to all physician specialties.  Under the existing statutory formula, payments for the past several years would have decreased significantly without Congressional intervention and extensions.  CMS issued projected rate reductions of 27.4%, 26.5% and 24.4% for each of 2012, 2013 and 2014.  In each of 2012 and 2013, these rate reductions were overridden by acts of Congress.  However, if Congress fails to intervene to prevent the CMS projected rate reduction for 2014 and future years, the resulting decrease in payment will adversely impact the Debtors' revenues and results of operations.

In addition to the overall reimbursement rate reductions described above, effective January 1, 2011, CMS made further adjustments to the Medicare Physician Fee Schedule for certain billing codes and specialties.  While CMS increased aggregate payments for those physician specialties, including radiation oncology, that have a higher proportion of their payment rates attributable to operating expenses, it also revised certain radiation oncology billing codes, including decreasing the amount of time allotted to perform intensity-modulated radiation therapy ("**IMRT**") and stereotactic body radiation therapy, which decreased the overall payment for these procedures.  Some of these changes will be transitioned over several years, and in 2012, CMS estimated that the combined impact was a 6% reduction in radiation oncology payments.  In the final Medicare Physician Fee Schedule rule for 2013, CMS instituted an aggregate payment reduction of 7% to radiation oncology.  On July 8, 2013, CMS issued the proposed

2014 Medicare Physician Fee Schedule rule, which included an aggregate payment reduction of 5% to radiation oncology which the Debtors believe will have a further negative impact on their revenues.

Furthermore, commencing April 1, 2013, payments to Medicare providers were reduced by up to an additional 2% per fiscal year as a result of the so-called "sequestration" that occurred as a result of the Budget Control Act of 2011 and the failure of the Joint Select Committee on Deficit Reduction to achieve certain targeted deficit reductions.  These reductions will continue unless Congress intervenes.

The Debtors believe that the combined effect of these reimbursement changes will have a material adverse impact on the Debtors' revenues and results of operations.  The Debtors can give no assurance that future federal or state administrative or legislative changes will not have a further negative impact on Debtors' revenues and results of operations.

**2.      Decrease in Private Payor Revenues of Physician Groups.**

If revenues generated by the physician groups decrease, the Debtors' net revenue and profitability would be adversely affected.  The Debtors estimate that approximately 53%, 54%, and 55% of the physician groups' net revenue for fiscal years 2012, 2011 and 2010, respectively, was derived from payments by non-Medicare and Medicaid fee-for-service programs, specifically, third -party payors such as managed care organizations and private health insurance programs.  These third-party payors generally pay for the services rendered to an insured patient based upon predetermined rates that are generally higher than government program reimbursement rates.  If managed care organizations and other private insurers reduce their rates or the physician groups experience a significant shift toward additional Medicare or Medicaid reimbursements, then the Debtors' net revenue and profitability will decline and the Debtors' operating margins will be reduced.

In addition, managed care organizations and other private insurers are always seeking to control and reduce healthcare costs.  Healthcare providers participating in these plans may be influenced to refer patients seeking radiation therapy for their cancer treatment to certain providers depending on the plan in which a covered patient is enrolled.  The expansion of health maintenance organizations, preferred provider organizations and other managed care organizations within the geographic areas covered by the Debtors' treatment centers could have a negative impact on the utilization and pricing of the Debtors' services, because these organizations may exert greater control over patients' access to radiation therapy services, the selections of the provider of such services and reimbursement rates for those services. Any inability to maintain suitable financial arrangements with third-party payors could have a material adverse impact on the Debtors' business.

**3.      Competition.**

Radiation therapy is a highly competitive business.  The radiation oncology treatment centers face competition from hospitals, other practitioners and other operators of radiation oncology treatment centers.  Certain competing treatment centers have longer operating histories and significantly greater financial and other resources.  Competitors with greater access to financial resources or other operational advantages may enter the markets.  Such competition may make it more difficult for the Debtors to affiliate with additional radiation oncology groups on terms that are favorable to the Debtors or maintain the Debtors' relationships with existing physician groups, which could adversely affect the Debtors' businesses.

**4.      Loss of Key Personnel.**

The Debtors depend on their executive management and the Debtors may be materially harmed if they lose any member of their executive management team.

The Debtors businesses are dependent on their ability to retain, hire and motivate talented, highly skilled personnel, including members of their executive management team.  The Debtors do not carry key-man life insurance on their executive management team and the loss of key personnel or the Debtors' inability to attract and retain qualified personnel could have a material adverse effect on their business.  A decision by any of the Debtors' executive management team to leave their employ, to compete with them or to reduce his involvement on their behalf, could have a material adverse effect on the Debtors' business.

60

5.        **Termination or Expiration of Management Services Agreements.**

If the physicians groups terminate or decline to renew their MSAs with the Debtors, the Debtors could be seriously harmed.  The MSAs are the result of arms' length negotiations.  Under certain circumstances, the physician groups are permitted, and may attempt, to terminate their MSAs with the Debtors.  For example, an MSA can generally be terminated if the Debtors fail to perform their duties and responsibilities under the MSA which breaches a material term or condition of the MSA and fail to cure such breach within a specified period.  If any of the larger physician groups were to succeed in such a termination, the Debtors' businesses could be seriously harmed.

The Debtors may in the future have disputes with physicians and/or physician groups that could result in harmful changes to the Debtors' relationships with them or a termination of an MSA.  Likewise, to the extent that the Debtors' MSAs with physician groups expire and are not renewed, the Debtors' businesses will be adversely affected.  The Debtors' MSAs are subject to certain renewal provisions, but are also scheduled to expire periodically between 2013 and 2023, with no more than two expiring in any given year, except 2016 when six will expire.

6.        **Economic Conditions.**

Negative economic conditions could adversely affect the Debtors' business.  The economy and capital and credit markets have experienced and may continue to experience turmoil and upheaval.  Many major economies worldwide entered significant economic recessions in 2007 and some continue to experience economic weakness.

Ongoing concerns about the systemic impact of potential long-term and widespread recession and potentially prolonged economic recovery, volatile energy costs, geopolitical issues, the availability, cost and terms of credit, consumer and business confidence, substantially increased and potentially increasing unemployment rates, the ongoing crisis in the global housing and mortgage markets and increased market uncertainty and instability in both the United States and international capital and credit markets have all contributed to increased market volatility and diminished expectations for both established and emerging economies.  Continued turbulence in the United States and international markets and economies and prolonged declines in business and consumer spending may adversely affect the Debtors' liquidity and financial condition, and the liquidity and financial condition of the Debtors' customers.

The Debtors' treatment centers are concentrated in Florida and California, with additional centers in Indiana, which makes the Debtors particularly sensitive to economic changes that affect those states.  The Debtors' California treatment centers accounted for approximately 56%, 53% and 53% of the Debtors' net revenues during fiscal years 2012, 2011 and 2010, respectively, and the Debtors' Florida treatment centers accounted for approximately 32%, 34% and 34% of the Debtors' net revenues during fiscal years 2012, 2011 and 2010, respectively.  If the Debtors' treatment centers in these states are adversely affected by changes in economic conditions, the Debtors' net revenue and profitability may decline.

7.        **Compliance with Federal and State Fraud and Abuse Laws.**

The Debtors and the physician groups are subject to numerous federal and state laws governing the relationships between the physician groups, the Debtors, and other third parties.  These federal laws include the federal Anti-Kickback Statute, the physician self-referral law, commonly known as the Stark Law, and the civil monetary penalties statute.  If the Debtors or the physician groups fail to comply with these laws, they could be subject to civil and criminal penalties, exclusion from the Medicare and Medicaid programs and other sanctions, any of which could materially harm the Debtors.

***Anti-Kickback Statute.***  The federal Anti-Kickback Statute is a criminal statute that prohibits any party from knowingly or willfully offering, paying, soliciting or receiving any form of remuneration in return for referring, ordering, leasing, purchasing or arranging for or recommending the ordering, purchasing or leasing of items or services payable by Medicare, Medicaid or any other federally funded healthcare program.  The statute is very broad in scope and many of its provisions have not been uniformly or definitively interpreted by existing case law or regulations.  Financial relationships covered by this statute can include any relationship where remuneration is provided for Medicare and/or Medicaid referrals including payments not commensurate with fair market value,

whether in the form of space or equipment leases, professional or technical services or anything else of value. Violations of the federal Anti-Kickback Statute may result in substantial civil or criminal penalties to the Debtors or the physician groups or both, including monetary fines and exclusion from participating in Medicare and Medicaid programs. This exclusion, if applied to the Debtors or one or more of the physician groups or affiliate personnel, could result in significant reductions in the Debtors' net revenue and could have a material adverse effect on the Debtors' business. In addition, all the states in which the Debtors operate have also adopted similar anti-kickback laws that prohibit payments to or by physicians in exchange for referrals of healthcare business, some of which apply regardless of the source of payment for care. These statutes typically impose criminal and civil penalties.

The Debtors use their best efforts to structure any financial relationship with referral sources of Medicare and/or Medicaid beneficiaries in accordance with safe harbors promulgated under the Anti-Kickback Statute, but cannot guarantee that every such relationship satisfies the safe harbor requirements. In addition, the physician groups covenant in the MSAs to comply with all laws governing the practice of medicine or the provision of radiation oncology services including, but not limited to, the Anti-Kickback Statute. Although the Debtors believe that they are operating in compliance with the Anti-Kickback Statute and comparable state laws, and believe that their arrangements with the physician groups do not violate such laws, the Debtors can offer no assurance that these laws will not be interpreted in a manner that could have an adverse effect on their business.

*Stark Law.* The Debtors and the physician groups with whom the Debtors contract are subject to federal and state statutes and regulations prohibiting payments for certain healthcare services rendered as a result of patient referrals by physicians to entities with whom the physicians have a financial relationship. The Stark Law, which applies to services provided to Medicare and Medicaid beneficiaries, generally prohibits a physician from referring patients for certain designated health services, or DHS, including radiation therapy, radiology and laboratory services, to an entity with which the physician has a financial relationship unless a statutory or regulatory exception applies. The Stark Law defines financial relationships broadly to include both investment interests and any compensation arrangement between the referring physician and the entity seeking Medicare reimbursement. Many states also have state self-referral laws and regulations which vary significantly from state to state and in many cases, have not been interpreted by courts or regulatory agencies. For example, the state laws and regulations in California, Florida and Indiana could be interpreted to encompass not only services reimbursed by Medicaid or government payors, but also private payors. Violation of these federal and state laws and regulations may result in prohibition of payment for services rendered, loss of licenses, fines, civil and criminal penalties and/or exclusion from Medicare and Medicaid programs.

The physician groups to whom the Debtors provide management services must ensure that their practice structure and all financial relationships with outside physicians who refer patients to their practice comply with the Stark Law. The physician groups covenant in the MSAs that they will comply with all laws, including the Stark Law, governing the practice of medicine or the provision of radiation oncology services. Although the Debtors believe that their operations do not violate the Stark Law because their compensation and financial arrangements with physicians meet one or more Stark exceptions, government authorities may determine the physician groups are not in compliance with the Stark Law or prohibited referrals may occur, which could subject the physician groups to civil and criminal penalties, including fines, exclusion from participation in government and private payor programs and requirements to refund amounts previously received from government and private payors and negatively impact the Debtors' revenues.

*Civil Monetary Penalties Law.* Under a provision of the federal Civil Monetary Penalties Law, civil monetary penalties (and exclusion) may be imposed on any person who offers or transfers remuneration to any patient who is a Medicare or Medicaid beneficiary, when the person knows or should know that the remuneration is likely to induce the patient to receive medical services from a particular provider. This broad provision applies to many kinds of inducements or benefits provided to patients, including complimentary items, services or transportation that are of more than a nominal value. If government authorities impose civil monetary penalties or exclusion penalties on the Debtor or physician groups for past or present practices, this could harm the Debtors' business.

8.        **Billing Compliance.**

The Debtors or the physician groups may be subject to actions for failure to comply with government coding and billing rules which could harm the Debtors' businesses given their role as agent for the physician groups.

The Debtors administer billing for services to Medicare, Medicaid and private payors on behalf of the physician groups with which they contract. If the Debtors, or any of the physician groups with which the Debtors contract, fail to comply with federal and state documentation, coding and billing rules, both the Debtors and the physician groups could be subject to repayment obligations, civil and/or criminal penalties, loss of licenses and exclusion from the Medicare and/or Medicaid programs. In billing for services to third-party payors, including government payors, complex documentation, coding and billing rules must be followed. Failure to follow these rules could result in potential civil liability under the federal False Claims Act, under which extensive financial penalties can be imposed, and similar state laws. If the Debtors or the physician groups discover that reimbursements they have already received was submitted in violation of these requirements, failure to return these amounts may also be a violation of the False Claims Act. Violations of the False Claims Act could further result in criminal liability under various federal and state criminal statutes. In addition to enforcement actions bought directly by the government, private parties can also file whistleblower complaints for alleged violations of the False Claims Act. PPACA relaxes the knowledge requirements for filing whistleblower complaints, and while the full impact of these changes is not yet known, they are predicted to increase whistleblower lawsuits.

In addition to potential False Claims Act liabilities, the Medicare and Medicaid claims submitted by the Debtors on behalf of the physician groups are subject to numerous postpayment reviews and audits. These auditors may deny claims for which the physician groups have already received reimbursement and require repayment unless the Debtors engage and are successful in a costly and timely appeal process.

While the Debtors strive to comply with applicable federal and state documentation, coding, and billing requirements, and the charges submitted on behalf of the physician groups are carefully and regularly reviewed as part of the Debtors' compliance program, there can be no assurances that governmental investigators, private insurers or private whistleblowers will not challenge these practices. A challenge could result in a material adverse effect on the Debtors' businesses.

9.        **Fee-Splitting and Corporate Practice of Medicine Prohibitions.**

The Debtors' business could be materially harmed by future interpretation or implementation of state laws regarding prohibitions on fee-splitting and the corporate practice of medicine. The states in which the Debtors operate prohibit the splitting or sharing of fees between physicians and non-physicians. These laws vary from state to state and are enforced by courts and regulatory agencies, each with broad discretion. Some states have interpreted certain types of fee arrangements in management services agreements between entities and physicians as unlawful fee-splitting. If regulatory authorities or other parties successfully asserted a fee-splitting claim in any jurisdiction, the Debtors, the physician groups and their physicians could be subject to civil and criminal penalties and the Debtors could be required to restructure their MSAs. Any restructuring of MSAs with physician groups could result in lower net revenue from such physician groups. Alternatively, some of the Debtors' MSAs could be found to be illegal and unenforceable, which could result in the termination of those MSAs and an associated loss of net revenue which could have a material adverse effect on the Debtors' financial condition, results of operations or cash flows.

State laws also govern how licensed physicians can be organized and engage in the practice of medicine. States where the Debtors operate have laws and regulations prohibiting entities that are not wholly owned by licensed physicians from employing physicians or otherwise engaging in the practice of medicine, generally defined as diagnosing, treating or caring for patients. While the Debtors do not directly employ any physicians, these laws have also been interpreted to prohibit corporations from exercising control over physicians' health care decisions and, in some cases, certain business or management decisions and activities that relate to the provision of health care. These laws and their interpretation vary from state to state.

The Debtors believe that the management services arrangements have been structured so that the Debtors provide non-medical administrative and support services that do not constitute the practice of medicine, but cannot guarantee that relevant state authorities will not assert otherwise. If the Debtors were found to have engaged in the

corporate practice of medicine, both the Debtors and the physician groups could be subject to fines and other civil and criminal penalties. Future interpretations or amendments to these laws and regulations could also require restructuring of the Debtors' current operations, negatively impacting the Debtors' revenues.

In addition, expansion of the Debtors' operations to other states with certain types of fee-splitting or corporate practice of medicine prohibitions may require structural and organizational modification to the form of relationships that the Debtors currently have with physicians, professional corporations and hospitals.

**10.    Changes in Laws or Regulations Regarding Illegal Payments.**

Reforms to the United States healthcare system may adversely affect the Debtors' business. A significant portion of the payments at the Debtors' treatment centers are derived from government healthcare programs, principally Medicare and Medicaid, which are highly regulated and subject to frequent and substantial changes, as discussed above. The Debtors' estimate that approximately 46% of the physician groups' 2012 revenue was derived from government healthcare programs.

In March 2010, President Obama signed into law the Patient Protection and Affordable Care Act ("**PPACA**"). The changes mandated by PPACA have significantly affected and will continue to affect how the healthcare industry operates with respect to Medicare, Medicaid and private health insurance. Specifically, PPACA contains a number of provisions which impact existing government healthcare programs and private payors, with a focus on cost containment, including, among other things, more stringent program integrity measures, new Medicare enrollment criteria and reimbursement changes. PPACA also includes provisions for new payment models. In addition, the legislation expands coverage to more individuals. Many of the provisions of PPACA do not go into effect until 2014 and beyond. Congress has also proposed a number of legislative initiatives, including possible repeal of PPACA. At this time, it remains unclear whether there will be any changes made to PPACA and the overall impact that PPACA will have on the Debtors' revenues.

In addition, if a federal or state agency adopts a different interpretation, changes enforcement of or enacts new laws or regulations relating to the Debtors' business, the Debtors could be required to make changes in the structure of their management service agreements, their treatment centers, equipment, personnel, services, pricing or capital expenditure programs, which could increase the Debtors' operating expenses and have a material adverse effect on their operations or reduce the demand for or profitability of their services. Such changes could also subject the Debtors or the physician groups to civil and criminal penalties, lead to a significant reduction in the Debtors' net revenue or cause the Debtors or the physician groups to be excluded from participation in the Medicare, Medicaid or other governmental programs.

Additionally, new federal or state laws may be enacted that would cause the Debtors' relationships with the Debtors' radiation oncologists to become illegal or result in the imposition of penalties against the Debtors or their treatment centers. If any of the Debtors' MSAs with the physician groups were deemed to violate the federal Anti-Kickback Statute or similar laws, or if new federal or state laws were enacted rendering these arrangements illegal, the Debtors' business would be adversely affected.

As described above, the Debtors' treatment centers are located in Florida, California and Indiana, and the Debtors are particularly susceptible to any changes in the regulatory environments in those states. In addition, expansion of the Debtors' operations to new jurisdictions, or new interpretations of laws in the Debtors' existing jurisdictions, could require structural and organizational modifications of their relationships with physicians to comply with that jurisdiction's laws. Such structural and organizational modifications could result in lower profitability and failure to achieve the Debtors' growth objectives.

**11.    Privacy and Security Laws.**

There are numerous federal and state regulations addressing patient information, privacy and security. Failure to comply with domestic and international privacy and security laws can result in the imposition of significant civil and criminal penalties. The costs of compliance with these laws, including protecting electronically stored information from cyber attacks, and potential liability associated with failure to do so could adversely affect the Debtors' business, financial condition and results of operations.

Both the Debtors and the physician groups must comply with the federal regulations issued under the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), as amended by the Health Information Technology for Economic and Clinical Health ("**HITECH**") Act of 2009. These regulations contain provisions that limit the uses and disclosures of individually identifiable health information and require the implementation of physical, technical and administrative security safeguards to ensure the confidentiality, integrity and availability of individually identifiable health information. Both the Debtors and the physician groups may be subject to audits by the federal government to ensure their compliance with the HIPAA regulations and could be subject to fines and other penalties if they are found not to be in compliance.

Further, the Debtors and the physician groups are subject to reporting obligations to patients, the federal government and the general public in the event of certain unauthorized uses or disclosures of individually identifiable health information. In addition, many states have enacted privacy and security laws that are more stringent than, and not preempted by, HIPAA. If individually identifiable health information maintained by the Debtors on behalf of the physician groups were to be improperly accessed or disclosed, or the Debtors were to otherwise be found not to be in compliance with HIPAA or state privacy laws, the Debtors could be subject to civil fines and other penalties that could materially harm the Debtors' business.

While the Debtors currently expend significant resources to protect against cyber attacks and security breaches, the Debtors may need to expend additional significant resources in the future to continue to protect against potential security breaches or to address problems caused by such attacks or any breach of the Debtors' safeguards. A party that is able to circumvent the Debtors' security safeguards could, among other things, misappropriate or misuse sensitive or confidential information, user information or other proprietary information, cause significant interruptions in the Debtors' operations and cause all or portions of the Debtors' website to be unavailable. Further, any reductions in the availability of the Debtors' website could impair the Debtors' ability to conduct their business, comply with regulations, and adversely impact their customers during the occurrence of any such incident.

12.     **Information Systems.**

The Debtors' information systems are critical to their business and a failure of those systems could materially harm the Debtors. The Debtors depend on their ability to store, retrieve, process and manage a significant amount of information, and to provide their treatment centers with efficient and effective accounting, scheduling, billing and treatment planning systems. If the Debtors' information systems fail to perform as expected, or if they suffer an interruption, malfunction or loss of information processing capabilities, it could have a material adverse effect on the Debtors' business.

13.     **Radiation Therapy Safety Concerns.**

Increased concerns regarding the safety of radiation therapy may result in negative publicity or increased regulatory controls on the Debtors' services. The Debtors' reputation is the foundation of their relationships with their customers. If the Debtors are unable to effectively manage real or perceived issues, which could negatively impact sentiments toward the Debtors, their business could suffer. The Debtors' customers may have a number of concerns about the safety of the Debtors' services whether or not such concerns have a basis in generally accepted science or scientific research. These concerns may be increased by negative publicity, even if the publicity is inaccurate. Such negative publicity, whether accurate or inaccurate, regarding the efficacy, safety or side effects of the Debtors' services or service categories, whether involving the Debtors or a competitor, could materially reduce market acceptance of the Debtors' services or cause consumers to seek alternatives to the Debtors' services. Several recent articles have been published discussing the risks of significant, sometimes fatal, errors in radiation oncology treatment, especially those relating to linear accelerator ("**Linac**") facilities that bill Medicare for radiation oncology services. In addition, various trade organizations have called for quality improvement measures and the establishment of the nation's first central database for the reporting of errors involving Linacs and CT scanners. Federal legislation in these areas is under consideration and a congressional hearing was held. In addition, on September 29, 2010, California enacted a law that will require hospitals and clinics to record radiation doses for CT scans, effective July 1, 2012, and to report any overdoses to patients, their doctors and the California Department of Public Health. Effective July 1, 2013, the new California law also requires all facilities that furnish CT services to be accredited by an organization approved by CMS, the Medical Board of California or the State Department of

Public Health.  The Debtors cannot provide assurances that the cost of complying with any new regulations will not be substantive, that the negative publicity concerning these errors will not adversely affect the Debtors' business, or that these types of errors will not occur at the Debtors' treatment centers.

> **14.    Technological and Therapeutic Changes.**

The Debtors' businesses may be harmed by technological and therapeutic changes.  The treatment of cancer patients is subject to potentially revolutionary technological and therapeutic changes.  Future technological developments could render the Debtors' equipment obsolete.  The Debtors may incur significant costs in replacing or modifying equipment in which they have already made a substantial investment prior to the end of its anticipated useful life.  In addition, there may be significant advances in other cancer treatment methods, such as chemotherapy, surgery, biological therapy or in cancer prevention techniques, which could reduce demand or even eliminate the need for the radiation therapy services the Debtors provide.

## D.    RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

> **1.    The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

**The financial information contained in this Disclosure Statement has not been audited.**  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

> **2.    Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors , some of which may not materialize, including, without limitation, assumptions concerning:   (a) the timing of confirmation and consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Reorganized Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' and Reorganized Debtors' ability to maintain market strength and receive vendor support by way of favorable supply terms; and (f) medical care standards continuing to support the Debtors' and Reorganized Debtors' business plan.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD <u>NOT</u> BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES.  WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

E.      **DISCLOSURE STATEMENT DISCLAIMER**

1.      **The Information Contained Herein Is for Soliciting Votes Only.**

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purpose.

2.      **This Disclosure Statement Was Not Approved by the Securities and Exchange Commission.**

This Disclosure Statement has not been filed with the Securities and Exchange Commission or any state regulatory authority.  Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.      **The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.  The offer of New Common Stock to the Investor and the offer of the Amended Secured Notes and the Amended Secured Notes Guarantees to Holders of Claims in Class 5 have not been registered under the Securities Act or similar state securities or "blue sky" laws.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the issuance of the New Common Stock, the Amended Secured Notes, and the Amended Secured Notes Guarantees, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code or section 4(2) of the Securities Act.

4.      **This Disclosure Statement Contains Forward Looking Statements.**

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5.      **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6.      **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, any Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

SF\5603286.11

7. **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims or causes of action and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims, causes of action or objections to Claims.

8. **Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or its Estate are specifically or generally identified herein.

9. **The Information Used Herein Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10. **The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11. **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors and the United States Trustee.

68

**VII.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If the Plan or an alternative chapter 11 plan of reorganization cannot be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect a chapter 7 liquidation would have on the recovery of Holders of Claims is set forth in Section V.C herein, titled "Statutory Requirements for Confirmation of the Plan."  The Debtors believe that liquidation under chapter 7 would result in (i) smaller or equal distributions being made to creditors entitled to a recovery than those provided for in the Plan based on the liquidation value of the Debtors' assets and because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

**B.    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets.  As discussed above, during the negotiations prior to the filing of the Chapter 11 Cases, the Bidding Procedures Motion and the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan, and the associated transactions contemplated by the Investment Agreement, enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserving their businesses and allowing their creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.

The prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' businesses and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the physician groups and the Debtors' suppliers, distributors, and agents will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.  Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Facility Credit Agreement or otherwise, in order to service its debt and other obligations.  It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all.  If the Debtors were to require additional financing during the Chapter 11 Cases and were to be unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

# VIII.
## EXEMPTIONS FROM SECURITIES ACT REGISTRATION

**SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE SECURITIES ACT**

**1.      Amended Secured Notes and Amended Secured Notes Guarantees Issued in Reliance on Section 1145 of the Bankruptcy Code**

The Amended Secured Notes and the Guarantees are being offered as a result of certain modifications to the Prepetition Secured Notes Indenture.  As such, the Amended Secured Notes and the Guarantees offered under the Plan are a continuation and modification of the Prepetition Secured Notes and the obligations thereunder. However, the offer and delivery of the Amended Secured Notes and the Guarantees to Creditors is subject to federal securities laws. The offer and delivery of the Amended Secured Notes and the Guarantees will be made without registration under the Securities Act of 1933, in reliance on an exemption from registration provided by Section 1145(a)(1) of the Bankruptcy Code, which also exempts the offer and delivery of the Amended Secured Notes and the Guarantees from similar state securities laws.

Under the Plan, the Amended Secured Notes and the Guarantees will be issued to the Holders of Prepetition Secured Notes Claims in reliance upon section 1145(a)(1) of the Bankruptcy Code (together, the "**1145 Securities**").  Section 1145(a)(1) of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of a security by a debtor if:

- the offer or sale occurs under a plan of reorganization;

- the recipients of such security hold a claim against, an interest in or claim for administrative expense in the case concerning the debtor; and

- such security is offered in exchange for a claim against, an interest in or claim for administrative expense in the case concerning the debtor, or is offered principally in such exchange and partly for cash and property.

**2.      Resale of Amended Secured Notes and Amended Secured Notes Guarantees**

Pursuant to section 1145(c) of the Bankruptcy Code, an offer or sale of the 1145 Securities is deemed to be a public offering. The 1145 Securities may be resold without registration under either (a) state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states or (b) the Securities Act pursuant to an exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" (as such term is defined in the Bankruptcy Code) with respect to the 1145 Securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of such securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing such securities and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in the Securities Act.

70

The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

### 3.    New Common Stock Issued in Reliance on Section 4(2) of the Securities Act

The Debtors believe that the issuance of the New Common Stock by Reorganized Holdco to the Investor in connection with the Investment Agreement, as provided under the Plan, will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering and equivalent exemptions in state securities laws.

### 4.    Resale of New Common Stock and Resale of the 1145 Securities by "Underwriters"

Resales by persons who receive the New Common Stock and any persons who receive the 1145 Securities who are deemed to be "underwriters" (as such term is defined in the Bankruptcy Code) (collectively, the "**Restricted Holders**") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act. Restricted Holders would, however, be permitted to sell the New Common Stock or the 1145 Securities, as applicable, without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below, or if such securities are registered with the Securities and Exchange Commission pursuant to a registration agreement or otherwise. Under the Plan, however, Restricted Holders are not entitled to any registration rights. Any person who is an "underwriter" but not an "issuer" with respect to an offer of the 1145 Securities is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

### 5.    Rule 144

Under certain circumstances, Restricted Holders may be entitled to resell their securities pursuant to the limited safe harbor resale provisions under Rule 144 of the Securities Act, to the extent available and in compliance with applicable state and foreign securities laws.

Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the Securities and Exchange Commission. However, Reorganized HoldCo does not presently intend to make publicly available the requisite current information regarding Reorganized HoldCo, and as a result, Rule 144 will not be available for resales of New Common Stock by Restricted Holders.

Pursuant to the Plan, certificates evidencing New Common Stock will bear a legend substantially in the form below (the "**Legend**"):

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES

71

ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT OR STATE ACTS."

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF REORGANIZED HOLDCO WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTORS EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF REORGANIZED HOLDCO, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF REORGANIZED HOLDCO. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

Additionally, any of the 1145 Securities held by an identified Restricted Holder will be subject to bear the Legend on any certificates evidencing such 1145 Securities.

SF\5603286.11

# IX.
## CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

**A.    INTRODUCTION**

The following summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan as they relate to the Debtors and to Holders that are beneficial owners of Prepetition Secured Notes Claims ("**Claimholders**"). This summary is intended for general informational purposes only, is not a complete analysis of all potential U.S. federal income tax consequences that may be relevant to any particular Holder of Claims and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly with retroactive effect, resulting in U.S. federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion is limited to Claimholders that (i) have held their interests in the Prepetition Secured Notes as "capital assets" within the meaning of Section 1221 of the Tax Code (generally, property held for investment), (ii) will receive Amended Secured Notes pursuant to the Plan and (iii) will hold such Amended Secured Notes as capital assets. In addition, this discussion assumes the Prepetition Secured Notes and the Amended Secured Notes constitute debt for U.S. federal income tax purposes.

This summary does not apply to Claimholders that are not U.S. persons for U.S. federal income tax purposes. Moreover, this summary does not address all of the U.S. federal income tax considerations that may be relevant to a particular Claimholder in light of the particular circumstances of that Claimholder or to Claimholders otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies).

Claimholders should consult their tax advisors regarding the U.S. federal income tax consequences of the consummation of the Plan and the ownership and disposition of the Amended Secured Notes deemed received pursuant to the Plan, as well as any tax consequences arising under any state, local or foreign tax laws, or any other U.S. federal tax laws.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN. NEITHER THE DEBTORS NOR THEIR PROFESSIONAL ADVISORS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE DISCUSSION BELOW.**

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.    U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS**

The Debtors are members (or disregarded subsidiaries of members) of a consolidated group of corporations for U.S. federal income tax purposes, of which OnCure Holdings, Inc. is the ultimate parent (the "**Group**"). As of December 31, 2012, the Debtors estimate the Group had approximately $50.9 million of consolidated federal net operating losses ("**NOLs**"). Any such NOLs, however, are subject to audit and possible challenge by the IRS and thus may ultimately vary from any specific amounts claimed.

**1.    Cancellation of Indebtedness and Reduction of Attributes**

The discharge of a debt obligation for an amount less than the remaining amount due on the obligation (as determined for U.S. federal income tax purposes) generally will give rise to cancellation of indebtedness ("**COD**") income that must be included in the debtor's taxable income, subject to certain exceptions. In particular, under Section 108 of the Tax Code, COD income will not be included in a debtor's income if the discharge of the debt obligation occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case, and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**"). The Debtors expect the consummation of the Plan will produce a significant amount of COD income. Because the cancellation of the Debtors' indebtedness will occur in a case brought under the Bankruptcy Code, the Debtors will be under the jurisdiction of the court in such case and the cancellation of the Claims will be pursuant to the Plan, the Debtors will not be required to include any COD income realized as a result of the implementation of the Plan in taxable income under the Bankruptcy Exception.

Under the Tax Code, a debtor that excludes COD income from taxable income under the Bankruptcy Exception generally must reduce certain tax attributes by a corresponding amount. Attributes subject to reduction include consolidated attributes (such as NOLs, NOL carryforwards and certain other losses, credits and carryforwards) attributable to the debtor, attributes that arose in separate return limitation years of the debtor and the debtor's tax basis in its assets (including stock of subsidiaries). A debtor's tax basis in its assets generally may not be reduced below the amount of its liabilities remaining immediately after the discharge of indebtedness. If the debtor is a member of a consolidated group and reduces its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member. NOLs for the taxable year of the discharge and then NOL carryforwards to such year generally are the first attributes subject to reduction. However, a debtor may elect under Section 108(b)(5) of the Tax Code (the "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first. If the debtor is a member of a consolidated group, the debtor may treat stock in another group member as depreciable property for purposes of the Section 108(b)(5) Election, provided the lower-tier member consents to a corresponding reduction in its basis in its depreciable property. If a debtor makes a Section 108(b)(5) Election, the limitation on reducing the debtor's basis in its assets below the amount of its remaining liabilities does not apply. The Debtors have not yet determined whether they will make the Section 108(b)(5) Election. However, the precise effect of the attribute reduction rules on all of the tax attributes of the Debtors is uncertain because, among other things, it will depend on the amount of COD income realized by the Debtors.

SF\5603286.11

2.        **Section 382 Limitation on NOLs**

Section 382 of the Tax Code generally imposes an annual limitation on the use of NOLs (and certain other tax attributes) if a corporation or a consolidated group with NOLs (a "**loss corporation**") undergoes an "ownership change." In general, an ownership change occurs if the percentage of the value of the loss corporation's stock (including the parent corporation in a consolidated group) owned by one or more direct or indirect "five-percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five-percent shareholders at any time during the applicable testing period. The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent ownership change of the corporation. The Debtors expect the consummation of the Plan will result in an ownership change on the Effective Date.

In general, the amount of the annual limitation on a loss corporation's use of its pre-ownership change NOLs (and certain other tax attributes) is equal to the product of the long-term tax-exempt rate (as published by the IRS for the month in which the ownership change occurs, which rate is 3.16% for August 2013) and the value of the loss corporation's outstanding stock immediately before the ownership change.

If a debtor is under the jurisdiction of the court in a bankruptcy case and certain other requirements are satisfied, a special exception under Section 382(l)(5) of the Tax Code will prevent application of the annual limitation provided at least 50% of the stock of the debtor (or stock of a controlling corporation if that corporation is also in bankruptcy) is owned by the shareholders and "old and cold" creditors of the debtor immediately following the reorganization and as a result of being shareholders or creditors immediately before such reorganization (the "**Section 382(l)(5) Exception**"). Under this rule, NOL carryforwards would be subject to a one-time reduction for any deductions with respect to debt converted into stock in the bankruptcy reorganization relating to interest paid or accrued during the three taxable years preceding the year in which the ownership change occurs and the portion of the taxable year preceding and including the effective date of the bankruptcy reorganization. A second ownership change within two years following the first ownership change would eliminate the debtor's ability to utilize any pre-ownership change NOLs for any taxable year ending after the second ownership change. Because 100% of the New Common Stock of the Reorganized HoldCo will be issued to the Investor pursuant to the Plan, the requirements of Section 382(l)(5) will not be satisfied and the Section 382(l)(5) Exception will not apply.

Where the debtor is under the jurisdiction of the court in a bankruptcy case and the Section 382(l)(5) Exception does not apply, Section 382(l)(6) of the Tax Code will apply. Section 382(l)(6) of the Tax Code requires no reduction of the debtor corporation's pre-ownership change NOLs as required by Section 382(l)(5) of the Tax Code but imposes an annual limitation on a loss corporation's use of its pre-ownership change NOLs (and certain other tax attributes), although relief is provided in the form of an increased annual limitation. Specifically, Section 382(l)(6) of the Tax Code provides that the value of the loss corporation's outstanding stock for purposes of computing the annual limitation will be increased to reflect the cancellation of indebtedness in the bankruptcy case (but the value of such stock as adjusted may not exceed the value of the debtor's gross assets immediately before the ownership change (subject to certain adjustments)). The foregoing rules regarding the annual limitation in the event Section 382(l)(6) of the Tax Code applies are subject to modifications. First, if the Debtors have a net unrealized built-in gain ("**NUBIG**") at the time of the ownership change (subject to a *de minimis* threshold), the amount of any built-in gain recognized during the five-year period following the ownership change will increase the amount of taxable income that may be offset by pre-ownership change losses. Second, if the Debtors have a net unrealized built-in loss ("**NUBIL**") at the time of the ownership change (subject to a *de minimis* threshold), certain built-in losses recognized during the five-year period following the ownership change will generally be subject to the annual limitation in the same manner as pre-change losses. Whether the Debtors are in a NUBIG or NUBIL position will depend in part on the fair market value of the Debtors' assets immediately before the ownership change date. This value cannot be known with certainty until the Effective Date.

3.    **Alternative Minimum Tax**

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% tax rate to the extent such tax exceeds the corporation's regular U.S. federal income tax for the taxable year.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, a corporation is generally not allowed to offset more than 90% of its taxable income for AMT purposes by available NOL carryforwards (as computed for AMT purposes). Accordingly, for tax periods after the Effective Date, the Reorganized Debtors may have to pay AMT regardless of whether they generate non-AMT NOLs or have sufficient non-AMT NOL carryforwards to offset regular taxable income for such periods.

In addition, if a corporation (or consolidated group) undergoes an ownership change within the meaning of Section 382 of the Tax Code and is in a NUBIL position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the ownership change date.

Subject to certain limitations, any AMT that a corporation pays will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

C.    **U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED PREPETITION SECURED NOTES CLAIMS**

The discussion herein summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan as they relate to certain Claimholders as described above under "Introduction." The U.S. federal income tax consequences of the transactions contemplated by the Plan to Claimholders (including the character, timing and amount of income, gain or loss recognized) will depend significantly on the individual circumstances of such Claimholder. Therefore, Claimholders should consult their tax advisors to determine the particular tax consequences to them of the transactions contemplated by the Plan. This discussion assumes Claimholders have not taken bad debt deductions with respect to the Prepetition Secured Notes (or any portion thereof) in the current or any prior year.

1.    **Allocation of Payments Between Principal and Interest**

To the extent any Allowed Prepetition Secured Notes Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, the Debtors intend to take the position, and the Plan provides, that, for U.S. federal income tax purposes, such distribution should be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. Any amounts treated as accrued but unpaid interest would be treated as ordinary income to the Claimholder, regardless of whether such Claimholder otherwise realizes a loss as a result of the Plan.  The IRS, however, may take a contrary position and therefore no assurance can be made in this regard. If, contrary to the Debtors' intended position, such a distribution were treated as being allocated first to accrued but unpaid interest, such Claimholder would realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the method of accounting of such Claimholder, regardless of whether such Claimholder otherwise realizes a loss as a result of the Plan.

2.    **Amendment of Prepetition Secured Notes**

Under applicable Treasury Regulations, for U.S. federal income tax purposes, the significant modification of a debt instrument will result in a deemed exchange of the "old" debt instrument for a "new" debt instrument and will be a taxable event upon which gain or loss may be recognized in certain circumstances.  A modification of a debt instrument is significant if the modified instrument differs materially either in kind or extent from the original instrument.  Pursuant to the Plan, the terms of the Prepetition Secured Notes will be amended to provide for the Amended Secured Notes Guarantees, to substantially reduce the principal amount of the outstanding debt, and to make certain additional changes to the terms of the Prepetition Secured Notes (these changes will be reflected in the

Amended Secured Notes). These amendments should result in a significant modification of the Prepetition Secured Notes. Accordingly, the remainder of this discussion assumes that the amendment of the Prepetition Secured Notes is a significant modification for U.S. federal income tax purposes resulting in a deemed exchange of Prepetition Secured Notes for Amended Secured Notes treated as issued on the Effective Date, the Net Cash Amount and certain rights to contingent cash payments as further described in Section IV.B.2.(e) above (the "**Contingent Cash Payment Rights**").

On the Effective Date, pursuant to the Plan and the amendment of the Prepetition Secured Notes, each Claimholder will receive (or be deemed to receive) its Pro Rata share of (1) the Amended Secured Notes treated as issued on the Effective Date, (2) the Net Cash Amount and (3) the Contingent Cash Payment Rights. The U.S. federal income tax consequences of the Plan to Claimholders depend, in part, on whether the Prepetition Secured Notes and the Amended Secured Notes constitute "securities" for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a security depends on an overall evaluation of the nature of the debt, with the term of the obligation usually regarded as one of the most significant factors. In general, debt obligations issued with a term of five years or less have generally not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities. Where a debt obligation is exchanged for another debt obligation of the issuer with substantially similar terms, there is authority that supports the position that the term of the newly issued obligation for purposes of determining whether it is a security is measured from the original issuance date of the obligation exchanged therefor, rather than from the exchange date. Another factor in determining whether a debt obligation is a security is the extent to which the obligation is subordinated to other liabilities of the issuer. Generally, the more senior the debt obligation, the less likely it is to be a security.

If either the Prepetition Secured Notes or the Amended Secured Notes does not constitute a security, the exchange should constitute a taxable exchange for U.S. federal income tax purposes. As such, a Claimholder should, except as described in the next sentence, generally recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (1) the sum of the issue price of any Amended Secured Notes (as described below) treated as issued on the Effective Date, the Net Cash Amount and the fair market value of the Contingent Cash Payment Rights received (or deemed to be received) in respect of an Allowed Prepetition Secured Notes Claim and (2) the Claimholder's adjusted tax basis in the Prepetition Secured Notes. A Claimholder should, however, recognize ordinary income to the extent it receives (or is deemed to receive) any consideration in respect of accrued interest or accrued market discount that has not already been included in income under such Claimholder's method of accounting (as described above under "Allocation of Payments Between Principal and Interest"). Conversely, a Claimholder would generally recognize a deductible loss to the extent any accrued interest or accrued market discount was previously included under such Claimholder's method of accounting and is not paid (or deemed paid) in full. The tax basis of a Claimholder in any Amended Secured Notes deemed received in respect of an Allowed Prepetition Secured Notes Claim on the Effective Date should generally be equal to the issue price of such Amended Secured Notes (as described below). The tax basis of a Claimholder in any Contingent Cash Payment Rights received in respect of an Allowed Prepetition Secured Notes Claim should generally be equal to the fair market value of such Contingent Cash Payment Rights on the Effective Date. The holding period for any such Amended Secured Notes and Contingent Cash Payment Rights should begin on the day after the Effective Date.

If both the Prepetition Secured Notes and the Amended Secured Notes are treated as "securities," the exchange should be treated as occurring pursuant to a "reorganization." In such case, a Claimholder should, except as noted below with respect to accrued interest, recognize gain equal to the lesser of (1) the excess of the sum of the issue price of any Amended Secured Notes treated as issued on the Effective Date, the Net Cash Amount and the fair market value of the Contingent Cash Payment Rights received (or deemed received) over such Claimholder's adjusted tax basis in the Prepetition Secured Notes and (2) the sum of the Net Cash Amount and the fair market value of the Contingent Cash Payment Rights received, and no loss should generally be recognized. Such Claimholder's initial tax basis in the Amended Secured Notes received in respect of an Allowed Prepetition Secured Notes Claim on the Effective Date would be equal to their adjusted tax basis in the Prepetition Secured Notes, increased by the amount of any gain recognized by such Claimholder and decreased by the Net Cash Amount and the fair market value of the Contingent Cash Payment Rights received by such Claimholder. The holding period in such Amended Secured Notes (other than any portion of the Amended Secured Notes treated as received in lieu of accrued interest as noted below) would include such Claimholder's holding period in the Prepetition Secured Notes.

77

The tax basis of a Claimholder in any Contingent Cash Payment Rights received in respect of an Allowed Prepetition Secured Notes Claim should generally be equal to the fair market value of such Contingent Cash Payment Rights on the Effective Date. The holding period for any Contingent Cash Payment Rights should begin on the day after the Effective Date. Notwithstanding the foregoing, even in a "reorganization," a holder will recognize ordinary income to the extent it receives (or is deemed to receive) any consideration in lieu of accrued but unpaid interest not previously included in income (as described above under "Allocation of Payments Between Principal and Interest").

For purposes of the rules described in the two preceding paragraphs, the issue price of a debt instrument issued in an actual or deemed exchange for property other than cash (including another debt instrument) depends on whether either debt instrument is considered publicly traded for U.S. federal income tax purposes. If the new debt instrument is publicly traded, its issue price generally will be its fair market value on the issue date. If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument on the exchange date less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange. If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (*i.e.*, interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest.

A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium or readily available from dealers, broker or traders. Although the matter is not free from doubt, the Debtors believe that the Prepetition Secured Notes are, and the Amended Secured Notes will be, properly treated as publicly traded under these rules. Accordingly, the Debtors believe that the issue price of the Amended Secured Notes for federal income tax purposes will equal their fair market value on the Effective Date, and the remainder of the discussion assumes such treatment.

Claimholders should consult their tax advisors regarding the tax treatment of the amendment of the Prepetition Secured Notes and the character of any gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, as its character will be determined by a number of factors, including (but not limited to) the tax status of the Claimholder, whether such Prepetition Secured Notes have been held for more than one year, whether such Prepetition Secured Notes have bond premium or market discount and whether and to what extent the Claimholder previously claimed a bad debt deduction with respect to such Prepetition Secured Notes. Claimholders should also consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses, and as to whether any resulting gain recognition may be deferred under the installment method. The discussion herein assumes that the installment method does not apply. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### 3.    The Contingent Cash Payment Rights

The characterization and treatment of the Contingent Cash Payment Rights for U.S. federal income tax purposes will depend on the final terms of the Amended Secured Notes Indenture, the Escrowed Notes Agreement, and certain other agreements governing the payment of the Contingent Cash Payment Rights. Depending on the final terms of such agreements, the Contingent Cash Payment Rights may be properly treated for U.S. federal income tax purposes as independent of the Amended Secured Notes or, alternatively, as part of the terms of the underlying Amended Secured Notes. Based on the anticipated terms of the Amended Secured Notes, the Escrowed Notes Agreement, and the agreements governing the Contingent Cash Payment Rights, the Debtors intend to treat the Contingent Cash Payment Rights as separate property issued to the Claimholders on the Effective Date and independent of the Amended Secured Notes for U.S. federal income tax purposes. The remainder of the discussion below assumes the Contingent Cash Payment Rights are properly treated as such separate property for U.S. federal income tax purposes.

Upon receipt of a cash payment in respect of a Contingent Cash Payment Right, a holder of a Contingent Cash Payment Right should generally recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (1) the cash payment received and (2) the adjusted tax basis of such holder in such Contingent Cash Payment Right.

There is no clear guidance on whether any gain or loss recognized on the receipt of cash in respect of the Contingent Cash Payment Rights would be capital or ordinary in character. Holders of Contingent Cash Payment Rights are urged to consult their own tax advisors regarding the tax consequences of the receipt of any payments in respect of such Contingent Cash Payment Rights, and the timing and character of any loss with respect to the Contingent Cash Payment Rights. The discussion herein assumes that the installment method does not apply to the exchange on the Effective Date.

### 4.    Classification of the Amended Secured Notes

Pursuant to the Plan, a portion of the Amended Secured Notes will be transferred to the Escrow Account on the Effective Date (the "**Escrowed Notes**") and, if certain conditions are satisfied (see Section IV.B.2.(e) above) such notes will be released from the Escrow Account and provided to the Indenture Trustee for the benefit of the holders of the Amended Secured Notes of record as of December 31, 2015, with interest accruing and being payable as described in Section IV.D.6 above. Although not free from doubt, the Debtors intend to take the position that each Escrowed Note (or applicable portion thereof) and the Amended Secured Note with respect to which it may be released should be treated as a single, integrated debt instrument for U.S. federal income tax purposes. This discussion assumes such treatment, and references herein to an Amended Secured Note should be interpreted to include the Escrowed Notes (or applicable portion thereof) so treated as integrated therewith.

Although not free from doubt, assuming the facts and circumstances related to the anticipated release of the Escrowed Notes do not change prior to the Effective Date, the Debtors intend to take the position that, for U.S. federal income tax purposes, the Amended Secured Notes shall be accounted for in accordance with Treasury Regulations Section 1.1272-1(c)(2), using a payment schedule which assumes the Escrowed Notes will be released to the Indenture Trustee as described and that the Amended Secured Notes therefore are not subject to the Treasury Regulations governing contingent payment debt instruments (the "**CPDI Regulations**"). The Debtors' assessment of the likelihood of the Escrowed Notes being released to the Indenture Trustee as described above is solely for U.S. federal income tax purposes and does not constitute a representation by the Debtors regarding the likelihood of the release of the Escrowed Notes occurring. Assuming a Claimholder does not take and disclose a position contrary to such assessment (as discussed below), such assessment has particular consequences regarding the timing and amounts of income that a holder must recognize as ordinary interest income on account of the original issue discount rules, discussed below.

A determination made by the Debtors as described in the preceding paragraph is binding on the Claimholder, unless the Claimholder discloses in a proper manner to the IRS that it is taking a different position. The Debtors' determinations are not, however, binding on the IRS, and if the IRS successfully challenges these positions, the tax consequences of owning and disposing of the Amended Secured Notes could be materially different from those described herein, including with respect to the character, timing and amount of income, gain or loss recognized. The remainder of this discussion assumes that the Debtors' determination will be respected by the IRS, but there can be no assurances in this regard.

If the assumptions underlying the Debtors' determination change materially before the Effective Date, the Debtors may be required to account for the Amended Secured Notes pursuant to a different assumed payment schedule or possibly under the CPDI Regulations. Holders are urged to consult their tax advisors regarding the application of the Treasury Regulations described above and the consequences thereof.

### 5.    Tax Characteristics of Amended Secured Notes

*Interest and Original Issue Discount*. Subject to the discussion below on stated interest with respect to the Escrowed Notes, payments of qualified stated interest on the notes will generally be taxable to a Claimholder as ordinary income at the time such payments are paid or accrued, in accordance with the Claimholder's usual method of accounting for U.S. federal income tax purposes. If the Amended Secured Notes are issued with "original issue discount" ("**OID**"), a Claimholder will be required to include the OID in ordinary income as interest for U.S. federal income tax purposes as it accrues in accordance with a constant yield method based upon a compounding of interest, before receiving the cash to which that interest income is attributable. Whether the Amended Secured Notes will be treated as issued with OID for U.S. federal income tax purposes will depend on the issue price of the Amended Secured Notes. An Amended Secured Note generally would be treated as issued with OID if the principal amount

79

of the Amended Secured Note plus all scheduled interest payments thereon, other than payments of "qualified stated interest," exceeds the "issue price" of the Amended Secured Note by more than a *de minimis* amount. The issue price of the Amended Secured Notes will be determined as discussed above under "Amendment of Prepetition Secured Notes." Generally, "qualified stated interest" is stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate.

If the Amended Secured Notes are issued with OID, the amount of OID includible in gross income annually by a holder of the Amended Secured Notes will be the sum of the daily portions of OID with respect to the Amended Secured Notes for each day during the taxable year (or portion thereof) during which the holder holds the Amended Secured Notes. The daily portion is determined by allocating to each day of any accrual period a *pro rata* portion of the OID that accrued during the period. The accrual period of the Amended Secured Notes may be of any length and may vary in length over the term of the Amended Secured Notes, provided each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first or last day of an accrual period. The amount of OID allocable to any accrual period will be an amount equal to the product of the Amended Secured Notes' adjusted issue price at the beginning of the accrual period and its yield to maturity, less any qualified stated interest allocable to the accrual period (determined on a constant yield method, compounded at the close of each accrual period and properly adjusted for the length of the accrual period). The adjusted issue price of the Amended Secured Notes at the beginning of any accrual period will be the issue price of the Amended Secured Notes *plus* the aggregate amount of accrued OID for all prior accrual periods *minus* any payments previously made on the Amended Secured Notes other than payments of qualified stated interest. Under these rules, a holder will be required to include an increasingly greater amount of OID in income in each successive accrual period.

The tax basis of a holder in the Amended Secured Notes will be increased by the amount of OID included in the gross income of such holder and will be decreased by the amount of any payments received by such holder with respect to the Amended Secured Notes other than payments of qualified stated interest.

The Debtors expect that the Amended Secured Notes will be issued with OID. As discussed above under "Classification of Amended Secured Notes," for purposes of calculating the yield to maturity of the Amended Secured Notes for U.S. federal income tax purposes, the Debtors intend to take the position that the yield to maturity is computed using a payment schedule in which the Escrowed Notes are assumed to be released to the Indenture Trustee. As a result of this position and its interaction with the rules described above, stated interest on the Amended Secured Notes treated as issued on the Effective Date will be qualified stated interest, and stated interest on account of the Escrowed Notes will be treated as OID, and a holder will have to include such interest in its income over the entire term of the Amended Secured Notes. In other words, a Claimholder will recognize ordinary income from interest payments attributable to the Escrowed Notes beginning with the original issuance of the Amended Secured Notes, prior to the actual release of the Escrowed Notes from the Escrowed Account, and prior to actual payments of interest on account Escrowed Notes. In addition, depending on the issue price of the Amended Secured Notes (which, in turn, depends on their fair market value on the Effective Date), a portion of the Escrowed Notes principal may be treated as OID, with the result that such portion would similarly be taken into account in the income of a Claimholder as ordinary interest income over the term of the Amended Secured Notes, beginning with their issuance. If, contrary to this assumption, the Escrowed Notes are returned to the Debtors, then, solely for the purposes of determining the amount of OID on the Amended Secured Notes, the Amended Secured Notes will be treated as retired and reissued on the date of such event for an amount equal to their adjusted issue price, and the yield to maturity of the Amended Secured Notes (as well as the amounts of OID to be recognized by a holder of Amended Secured Notes going forward) will be redetermined taking into account the change in circumstances.

The rules regarding OID are complex. Accordingly, holders should consult their own tax advisors regarding the application of the OID rules, including the consequences to holders of the release of the Escrowed Notes.

*Amortizable Bond Premium*. To the extent the initial tax basis of a holder in the Amended Secured Notes (including in any deemed reissued Amended Secured Note, as discussed above under "Interest and Original Issue Discount") is greater than the sum of all amounts payable on the Amended Secured Notes, other than payments of qualified stated interest, such holder generally will be considered to have acquired the Amended Secured Notes with amortizable bond premium (and the Amended Secured Notes would not have any OID). Generally, a holder that

SF\5603286.11

acquires a debt obligation at a premium may elect to amortize bond premium from the acquisition date to the debt's maturity date under a constant yield method. Once made, this election applies to all debt obligations held or subsequently acquired by the holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS. The amount amortized in any taxable year generally is treated as an offset to payments of qualified stated interest on the related debt obligation.

*Sale, Retirement or Other Taxable Disposition.* A holder will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the Amended Secured Notes equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest that has not yet been taken into income, which generally will be taxable as ordinary income) and the adjusted tax basis of such holder in such Amended Secured Notes. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the Amended Secured Notes for more than one year as of the date of disposition. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers. As discussed above under "Interest and Original Issue Discount," special rules apply with respect to determining tax basis and holding period following the release of the Escrowed Notes. Although the matter is not free from doubt, if the Escrowed Notes are released to the Indenture Trustee and if a holder disposes of Escrowed Notes separately from the holder's other Amended Secured Notes, a holder's adjusted tax basis should likely be allocated between the Escrowed Notes and the holder's other Amended Secured Notes, in proportion to their relative principal amounts. A holder's holding period in the Escrowed Notes should also likely be identical to its holding period for the Amended Secured Note with respect to which the Escrowed Notes were received. Holders of Amended Secured Notes should consult their tax advisors as the U.S. federal income tax consequences of disposing of, in separate transactions, the Amended Secured Notes treated as issued at the Effective Time and the Escrowed Notes released from the Escrow Account with respect thereto, including as to the allocation of tax basis and the possible application of the "stripped bond" rules of Section 1286 of the Tax Code.

### 6.    Information Reporting and Backup Withholding

The Debtors or their paying agent may be obligated to furnish information to the IRS regarding the consideration received by Claimholders pursuant to the Plan. In addition, the Debtors generally will be required to report annually to the IRS, the amount of interest (including any OID) paid or accrued on the Amended Secured Notes treated as outstanding for U.S. federal income tax purposes and the amount of any tax withheld from payment thereof. Certain Claimholders (including corporations) generally are not subject to information reporting.

Claimholders may be subject to backup withholding on the consideration received pursuant to the Plan. Backup withholding may also apply to interest paid or accrued on the Amended Secured Notes and to proceeds received upon sale or other disposition of the Amended Secured Notes. Certain Claimholders (including corporations) generally are not subject to backup withholding. A Claimholder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Debtors or their paying agent its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the Claimholder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their U.S. federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

/s/ Bradford C. Burkett

OnCure Holdings, Inc.

By:      Bradford C. Burkett

Title:    President and Chief Executive Officer

Dated:   August 22, 2013

Prepared by:

| **RICHARDS, LAYTON & FINGER, P.A.** | **LATHAM & WATKINS LLP** |
|:---:|:---:|
| Daniel J. DeFranceschi (Bar No. 2732) | Paul E. Harner |
| Paul N. Heath (Bar No. 3704) | Keith A. Simon |
| Tyler D. Semmelman (No. 5386) | Aaron M. Singer |
| William A. Romanowicz (No. 5794) | Annemarie V. Reilly |
| One Rodney Square | 885 Third Avenue |
| 920 North King Street | New York, New York 10022 |
| Wilmington, Delaware 19801 | Telephone:  (212) 906-1200 |
| Telephone:  (302) 651-7700 | Facsimile:   (212) 751–4864 |
| Facsimile:  (302) 651-7701 | |

*Counsel for the Debtors and Debtors in Possession*

SF\5603286.11

## EXHIBIT A

Plan of Reorganization

*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------- x

In re:    : Chapter 11

   :

ONCURE HOLDINGS, INC., et al.,    : Case No. 13-11540 (KG)

   :

      Debtors.[1]    : Jointly Administered

   :

------------------------------------------------------------------------- x

---

## PLAN OF REORGANIZATION FOR
## ONCURE HOLDINGS, INC. AND ITS AFFILIATE DEBTORS
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

**RICHARDS, LAYTON & FINGER, P.A.**

Daniel J. DeFranceschi (2732)
Paul N. Heath (3704)
Tyler D. Semmelman (5386)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

**LATHAM & WATKINS LLP**

Paul E. Harner
Keith A. Simon
Aaron M. Singer
Annemarie V. Reilly
885 Third Avenue
New York, New York 10022
Telephone:  (212) 906-1200
Facsimile:   (212) 751-4864

Counsel for the Debtors and Debtors-in-Possession

Dated:   August 22, 2013

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471). The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

**TABLE OF CONTENTS**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME AND
    DEFINED TERMS ..........................................................................................1
    A.     Rules of Interpretation; Computation of Time.......................................1
    B.     Defined Terms .....................................................................................2

ARTICLE II. ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS............18
    A.     Administrative Claims .......................................................................18
    B.     DIP Facility Claims...........................................................................19
    C.     Priority Tax Claims ...........................................................................19

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
    AND EQUITY INTERESTS ........................................................................20
    A.     Summary............................................................................................20
    B.     Classification and Treatment of Claims and Equity Interests...............21
    C.     Special Provision Governing Unimpaired Claims ................................25
    D.     Elimination of Vacant Classes ...........................................................25

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN .............................................25
    A.     Presumed Acceptance of Plan.............................................................25
    B.     Presumed Rejection of Plan ................................................................25
    C.     Voting Class.......................................................................................26
    D.     Acceptance by Impaired Class of Claims .............................................26
    E.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
         Bankruptcy Code ...............................................................................26
    F.     Votes Solicited in Good Faith.............................................................26

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................26
    A.     Limited Substantive Consolidation......................................................26
    B.     Restructuring Transactions .................................................................27
    C.     Consummation of the Investment Agreement; Amended Secured Notes
         Indenture; Amended Secured Notes Guarantees; New Intercreditor
         Agreements .......................................................................................28
    D.     Continued Corporate Existence ..........................................................28
    E.     Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and
         Claims ..............................................................................................29
    F.     Amended Secured Notes; Amended Secured Notes Indenture...............29
    G.     No New Issuance of Debt ...................................................................29
    H.     No Discharge or Release of Liens Securing the Prepetition Secured Notes
         Claims ..............................................................................................30
    I.     New Common Stock ...........................................................................30
    J.     Plan Securities and Related Documentation; Exemption from Securities
         Laws.................................................................................................30
    K.     Release of Liens and Claims...............................................................32

i

L.    Organizational Documents of the Reorganized Debtors ......................................32
M.    Directors and Officers of the Reorganized Debtors.............................................32
N.    Corporate Action..................................................................................................33
O.    Cancellation of Notes, Certificates and Instruments...........................................33
P.    Old Affiliate Interests .........................................................................................34
Q.    Sources of Cash for Plan Distributions................................................................34
R.    Continuing Effectiveness of Final Orders...........................................................34
S.    Funding and Use of Cash Reserves .....................................................................34
T.    The Noteholders' Representative.........................................................................35
U.    Fees and Expenses of Prepetition Term Loan Agent & Ad Hoc Secured
      Noteholders Committee ........................................................................................37
V.    Fees and Expenses of Indenture Trustee..............................................................37
W.    Completion Bonus Program..................................................................................37

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
      LEASES ................................................................................................................38
A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........38
B.    Assignment of Executory Contracts or Unexpired Leases ...................................38
C.    Rejection of Executory Contracts or Unexpired Leases .......................................39
D.    Claims on Account of the Rejection of Executory Contracts or Unexpired
      Leases....................................................................................................................39
E.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .........40
F.    Extension of Time to Assume or Reject ...............................................................41

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS...............................................41
A.    Distributions for Claims Allowed as of the Effective Date ..................................41
B.    No Postpetition Interest on Claims ......................................................................41
C.    Distributions by the Reorganized Debtors or Other Applicable Distribution
      Agent.....................................................................................................................41
D.    Delivery and Distributions; Undeliverable or Unclaimed Distributions ..............41
E.    Compliance with Tax Requirements.....................................................................44
F.    Allocation of Plan Distributions Between Principal and Interest ..........................44
G.    Means of Cash Payment.......................................................................................44
H.    Timing and Calculation of Amounts to Be Distributed ........................................44
I.    Setoffs ..................................................................................................................44

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,
      UNLIQUIDATED AND DISPUTED CLAIMS .....................................................45
A.    Resolution of Disputed Claims ............................................................................45
B.    No Distributions Pending Allowance ...................................................................46
C.    Distributions on Account of Disputed Claims Once They Are Allowed and
      Additional Distributions on Account of Previously Allowed Claims ...................46
D.    Reserve for Disputed Claims ...............................................................................47

ii

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ...................................................................47
    A.    Conditions Precedent to Confirmation.................................................47
    B.    Conditions Precedent to Consummation.............................................47
    C.    Waiver of Conditions.........................................................................48
    D.    Effect of Non-Occurrence of Conditions to Confirmation or
        Consummation ...................................................................................48

ARTICLE X. RELEASE, DISCHARGE, INJUNCTION AND RELATED
PROVISIONS ...................................................................................................49
    A.    General ...............................................................................................49
    B.    Release of Claims and Causes of Action ............................................49
    C.    Waiver of Statutory Limitations on Releases ......................................51
    D.    Discharge of Claims...........................................................................52
    E.    Exculpation ........................................................................................52
    F.    Preservation of Causes of Action.......................................................53
    G.    Injunction ..........................................................................................53
    H.    Binding Nature Of Plan .....................................................................54
    I.    Protection Against Discriminatory Treatment ....................................54
    J.    Plan Indemnity ..................................................................................54
    K.    Integral Part of Plan ..........................................................................55

ARTICLE XI. RETENTION OF JURISDICTION .................................................55

ARTICLE XII. MISCELLANEOUS PROVISIONS .................................................57
    A.    Dissolution of the Committee .............................................................57
    B.    Payment of Statutory Fees; Post-Effective Date Professional Fees and
        Expenses ...........................................................................................57
    C.    Conflicts.............................................................................................57
    D.    Modification of Plan ..........................................................................57
    E.    Revocation or Withdrawal of Plan......................................................58
    F.    Successors and Assigns.......................................................................58
    G.    Reservation of Rights.........................................................................58
    H.    Further Assurances.............................................................................58
    I.    Severability .......................................................................................58
    J.    Service of Documents.........................................................................59
    K.    Exemption from Transfer Taxes Pursuant to Section 1146(a) of the
        Bankruptcy Code ...............................................................................60
    L.    Governing Law ..................................................................................61
    M.    Tax Reporting and Compliance ..........................................................61
    N.    Schedules ...........................................................................................61
    O.    No Strict Construction ........................................................................61
    P.    Entire Agreement ...............................................................................61
    Q.    Closing of Chapter 11 Cases ..............................................................62
    R.    Substantial Consummation .................................................................62
    S.    2002 Notice Parties ...........................................................................62

## **EXHIBITS**

Exhibit A              Amended/New Organizational Documents

Exhibit B              Amended Secured Notes Guarantees

Exhibit C              Amended Secured Notes Indenture

Exhibit D              Amended Secured Notes Indenture Term Sheet

Exhibit E              Completion Bonus Program

Exhibit F              Escrowed Notes Agreement

Exhibit G              Investment Agreement

Exhibit H              New Intercreditor Agreements

Exhibit I              Restructuring Support Agreement

Exhibit J              Restructuring Term Sheet

iv

## **PLAN SCHEDULES**

Plan Schedule 1        Non-Exclusive List of Litigation Claims

Plan Schedule 2        New Board of Reorganized HoldCo

Plan Schedule 3        Non-Released Parties

Plan Schedule 4        Noteholders' Representative

Plan Schedule 5        Non-Exclusive List of Rejected Executory Contracts and
                       Unexpired Leases

Plan Schedule 6        Causes of Action Preserved by the Debtor Releasing
                       Parties

Plan Schedule 7        Causes of Action Preserved by the Non-Debtor
                       Releasing Parties

**PLAN OF REORGANIZATION FOR**
**ONCURE HOLDINGS, INC. AND ITS AFFILIATE DEBTORS**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

OnCure Holdings, Inc. ("**HoldCo**") and the other above-captioned debtors and debtors-in-possession (each a "**Debtor**" and, collectively, the "**Debtors**") propose the following joint plan of reorganization (the "**Plan**") for the resolution of the outstanding Claims (as defined below) against, and Equity Interests (as defined below) in, each of the Debtors. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code (as defined below). Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, historical financial information, and projections, and for a summary and analysis of this Plan, the treatment provided for herein and certain related matters including, among other things, the proposed substantive consolidation of the Debtors for certain limited purposes. There also are other agreements and documents, which will be filed with the Bankruptcy Court (as defined below), that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Schedules. All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019 and the terms and conditions set forth in this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME AND DEFINED TERMS

A.    *Rules of Interpretation; Computation of Time*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced item shall be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided herein, any reference herein to an existing or to be Filed contract, lease, instrument, release, indenture, or other agreement or document shall mean as it may be amended, modified or supplemented from time to time; (d) any reference to an Entity as a Holder of Claim or Equity Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles", "Sections", "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (f) unless otherwise stated, the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan; (j) references to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein shall, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection; (k) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (l) all references to

docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; and (m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated.  Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

B.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

"*510(b) Equity Claim*" means any Claim against any Debtor subordinated pursuant to section 510(b) of the Bankruptcy Code.

"*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

"*Ad Hoc Secured Noteholders Committee*" means that certain ad hoc committee of Holders of the Prepetition Secured Notes.

"*Ad Hoc Secured Noteholders Committee Fees and Expenses*" means all unpaid reasonable and documented costs, fees, disbursements, charges and out-of-pocket expenses of the Ad Hoc Secured Noteholders Committee incurred in connection with the Chapter 11 Cases, including, but not limited to, the reasonable and documented costs, fees, disbursements, charges and out-of-pocket expenses of the Ad Hoc Secured Noteholders Committee Professionals.

"*Ad Hoc Secured Noteholders Committee Professionals*" means, collectively, (i) GLC Advisors & Co., LLC, as financial advisor to the Ad Hoc Secured Noteholders Committee, (ii) Stroock & Stroock & Lavan LLP, as counsel to the Ad Hoc Secured Noteholders Committee, (iii) Young Conaway Stargatt & Taylor, LLP, as counsel to the Ad Hoc Secured Noteholders Committee and (iv) any other professional retained by the Ad Hoc Secured Noteholders Committee, including, without limitation, healthcare counsel.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331 or 503(b) of the Bankruptcy Code to the extent incurred on or after the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code; (d) the Ad Hoc Secured Noteholders Committee Fees and Expenses; (e) the Prepetition Secured Notes Indenture Trustee Fees and Expenses; (f) the Prepetition

Term Loan Agent Fees and Expenses; (g) the DIP Facility Claims; (h) the Cure Claim Amounts; and (i) the Bid Protections, but solely in the manner provided in the Bidding Procedures Order and the Investment Agreement upon the occurrence of the conditions set forth therein.

"*Administrative Claims Bar Date*" means the Business Day which is thirty (30) days after the Effective Date, or such other date as approved by Final Order of the Bankruptcy Court.

"*Affiliate*" means an "affiliate", as defined in section 101(2) of the Bankruptcy Code.

"*Affiliate Debtor(s)*" means, individually or collectively, any Debtor or Debtors other than HoldCo.

"*Allowed*" means, with respect to a Claim, an Allowed Claim in a particular Class or category specified. Any reference herein to the allowance of a particular Allowed Claim includes both the secured and unsecured portions of such Claim.

"*Allowed Claim*" means any Claim that is not a Disputed Claim or a Disallowed Claim and (a) for which a Proof of Claim has been timely Filed by the applicable Claims Bar Date and as to which no objection to allowance thereof has been timely interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court; (b) that has been listed by the Debtors in their Schedules as liquidated in a specified amount and is not disputed or contingent and for which no contrary Proof of Claim has been timely Filed; or (c) that is expressly Allowed pursuant to the terms of this Plan or a Final Order of the Bankruptcy Court. The term "Allowed Claim" shall not, for purposes of computing distributions under this Plan, include interest on such Claim from and after the Petition Date, except as provided in sections 506(b) or 511 of the Bankruptcy Code or as otherwise expressly set forth in this Plan or a Final Order of the Bankruptcy Court.

"*Allowed _____ Claim*" means an Allowed Claim of the type described.

"*Amended/New Organizational Documents*" means, as applicable, the amended and restated or new applicable organizational documents of Reorganized HoldCo in substantially the form attached to this Plan as Exhibit A or Filed with the Plan Supplement.

"*Amended Secured Notes*" means the Prepetition Secured Notes reduced on a Pro Rata basis to the principal amount of $82,500,000, and otherwise as amended pursuant to the Amended Secured Notes Indenture. The Amended Secured Notes shall consist of the Base Notes together with the Escrowed Notes.

"*Amended Secured Notes Guarantees*" means the "Amended Notes Guarantees" defined in, and contemplated by, Section 7.2(i) of the Investment Agreement, in substantially the form attached to this Plan as Exhibit B or Filed with the Plan Supplement.

"*Amended Secured Notes Indenture*" means the indenture governing the Amended Secured Notes, in substantially the form attached to this Plan as Exhibit C or Filed with the Plan Supplement, which indenture shall contain terms and conditions consistent in all material respects with those set forth on the Amended Secured Notes Indenture Term Sheet and, to the extent any terms and conditions are not set forth on or contemplated therein, such other terms and conditions as are reasonably acceptable to the Majority Consenting Debtholders and the Investor.

"*Amended Secured Notes Indenture Term Sheet*" means the term sheet attached as Exhibit G to the Investment Agreement, a copy of which is also attached as Exhibit D to this Plan.

"*Avoidance Actions*" means any and all avoidance, recovery, subordination or other related actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code.

"*Ballots*" means the ballots accompanying the Disclosure Statement, which were approved by the Disclosure Statement Order (modified, as necessary, based upon the applicable voting party in accordance with the Disclosure Statement Order), including any Master Ballots and Beneficial Owner Ballots.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

"*Base Notes*" means $75,000,000 of the Amended Secured Notes.

"*Beneficial Holder*" means, as of the applicable date of determination, a beneficial owner of the Prepetition Secured Notes or Old HoldCo Interests as reflected in the records maintained by the Registered Record Owner or Intermediary Record Owner, as applicable.

"*Beneficial Holder Ballots*" means the Ballots accompanying the Disclosure Statement upon which Beneficial Holders of the Prepetition Secured Notes entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan.

"*Bid Protections*" means the "Bid Protections", as defined in the Bidding Procedures.

"*Bidding Procedures*" means the bidding procedures approved by, and attached as Exhibit 1 to, the Bidding Procedures Order.

"*Bidding Procedures Order*" means that certain *Order (A) Establishing Bidding Procedures For The Sale Of All Or Substantially All Of The Debtors' Purchased Assets Or The New Stock Pursuant To A Chapter 11 Plan (B) Approving Certain Stalking Horse Protections (C) Authorizing And Scheduling A Date And Time For An Auction Pursuant To Such Procedures And (D) Granting Certain Related Relief*, entered by the Bankruptcy Court on July 24, 2013 (Docket No. 164), as such order may be amended, supplemented, or modified from time to time.

"*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Cash Reserves*" means, collectively, and without duplication, the Debtors' Claim Portion Cash Reserve, the Noteholders' Representative Cash Reserve, the Professional Fee Reserve, and the Disputed Claims Reserve, in each case which reserve shall be determined by the Debtors with the written consent of the Supermajority Consenting Debtholders or as otherwise approved by order of the Bankruptcy Court.

"*Causes of Action*" means any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

"*Chapter 11 Case(s)*" means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court, and (b) when used with reference to all Debtors, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court being jointly administered under case number 13-11540 (KG).

"*Claim*" means any "claim" (as defined in section 101(5) of the Bankruptcy Code) against any Debtor.

"*Claims Bar Date*" means the last date for filing Proofs of Claim in these Chapter 11 Cases against any Debtor, which date shall be established by Final Order of the Bankruptcy Court.

"*Claims Objection Deadline*" means, with respect to any applicable Proof of Claim, the latest of (a) one hundred eighty (180) days after the Effective Date; (b) ninety (90) days after the Filing of such Proof of Claim, or (c) such other date as may be specifically fixed by Final Order of the Bankruptcy Court for objecting to such Claim.

"*Claims Register*" means the official register of Claims maintained by the Voting and Claims Agent.

"*Class*" means a category of Holders of Claims or Equity Interests as set forth in <u>Article III</u> hereof pursuant to section 1122(a) of the Bankruptcy Code.

"*Closing*" means the "Closing", as defined in Section 3.1 of the Investment Agreement.

"*Closing Date*" means the "Closing Date", as defined in Section 3.1 of the Investment Agreement.

"*Closing Working Capital*" means "Closing Working Capital", as defined in Section 1.1 of the Investment Agreement.

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"*Collateral*" means any property or interest in property of the Debtors' Estates that is subject to a valid and enforceable Lien to secure a Claim.

"*Commission*" means the U.S. Securities and Exchange Commission.

"*Committee*" means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, if appointed and as reconstituted from time to time.

"*Completion Bonus Program*" means the incentive program for certain key employees of the Debtors, in substantially the form attached to this Plan as Exhibit E or Filed with the Plan Supplement.

"*Confirmation*" means the occurrence of the Confirmation Date, subject to all conditions specified in Article IX of this Plan having been satisfied or waived pursuant to Article IX of this Plan.

"*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Debtors, the Supermajority Consenting Debtholders and the Investor.

"*Consenting Debtholders*" means those Holders of the Prepetition Term Loan Claims and the Prepetition Secured Notes that are party to the Restructuring Support Agreement as "Consenting Debtholders" thereunder.

"*Consolidated Debtors*" has the meaning set forth in Article V.A.1 of this Plan.

"*Consummation*" means the occurrence of the Effective Date.

"*Cure Claim Amount*" has the meaning set forth in Article VI.E of this Plan.

"*Cure Claim Procedures Order*" means that certain *Order Approving Procedures Relating To The Determination Of Cure Amounts In Connection With Certain Executory Contracts*, entered by the Bankruptcy Court on July 23, 2013 (Docket No. 149), as such order may be amended, supplemented, or modified from time to time.

"*D&O Tail Policy*" means that certain directors' & officers' liability insurance policy purchased by the Debtors prior to the Petition Date.

"*Debtor(s)*" means, individually, any of the above-captioned debtors and debtors-in-possession and, collectively, all of the above-captioned debtors and debtors-in-possession.

"*Debtors' Claim Portion*" means, collectively, the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed Secured Tax Claims, and Allowed Prepetition Term Loan Claims that both (i) accrued or were incurred on or prior to the Effective Date and (ii) are not included in the Reorganized Debtors' Claim Portion.

"*Debtors' Claim Portion Cash Reserve*" means the reserve established and maintained by the Debtors from the Purchase Price or other Cash on hand existing immediately prior to the Effective Date to pay in full in Cash the Debtors' Claim Portion.

"*DTC*" means the Depository Trust Company.

"*DIP Facility Agent*" means Wells Fargo Bank, National Association, in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement.

"*DIP Facility Claim*" means any Claim arising from, under, or in connection with the DIP Facility Credit Agreement (including, without limitation, any and all "DIP Obligations", as defined therein) or any other DIP Loan Document (as defined therein).

"*DIP Facility Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated as of June 19, 2013 (as amended, supplemented or modified from time to time), together with the other DIP Loan Documents (as defined therein), in each case as amended, supplemented or modified from time to time.

"*DIP Facility Lender*" has the meaning set forth in the DIP Facility Credit Agreement.

"*DIP Facility Orders*" means, collectively, the Interim DIP Order and Final DIP Order.

"*Disallowed Claim*" means a Claim, or any portion thereof, that (a) has been disallowed by a Final Order, or (b) (i) is Scheduled at zero, in an unknown amount or as contingent, disputed or unliquidated and (ii) as to which the Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.

"*Disclosure Statement*" means that certain *Disclosure Statement for the Joint Plan Of Reorganization For OnCure Holdings, Inc. And Its Affiliate Debtors Under Chapter 11 Of The Bankruptcy Code*, dated as of August 22, 2013 (as amended, supplemented, or modified from time to time) that was approved by the Disclosure Statement Order.

"*Disclosure Statement Order*" means that certain Order (A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline and Other Dates, (C) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan and (D) Approving the Manner and Form of Notice and Other Related Documents, entered by the Bankruptcy Court on August 22, 2013 (Docket No. [___]), as such order may be amended, supplemented, or modified from time to time.

"*Disputed Claim*" means any Claim, or any portion thereof, that is not a Disallowed Claim, that has not been Allowed pursuant to this Plan or a Final Order of the Bankruptcy Court, and

      (a)      if a Proof of Claim has been timely Filed by the applicable Claims Bar Date, such Claim is designated on such Proof of Claim as unliquidated, contingent or disputed, or in zero or unknown amount, and has not been resolved by written agreement of the parties or a Final Order of the Bankruptcy Court; or

      (b)      if either (1) a Proof of Claim has been timely Filed by the applicable Claims Bar Date or (2) a Claim has been listed on the Schedules as other than unliquidated, contingent or disputed, or in zero or unknown amount, a Claim (i) as to which any Debtor has timely filed an objection or request for estimation in accordance with this Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court or for which such time period to object or file a request for estimation has not yet expired as of the applicable date of determination or (ii) which is otherwise disputed by any Debtor in accordance with applicable law, in each case which objection, request for estimation or dispute has not been withdrawn, overruled or determined by a Final Order; or

(c)    that is the subject of an objection or request for estimation Filed in the Bankruptcy Court and which such objection or request for estimation has not been withdrawn, resolved or overruled by Final Order of the Bankruptcy Court; or

(d)    that is otherwise disputed by any Debtor in accordance with the provisions of this Plan or applicable law, which dispute has not been withdrawn, resolved or overruled by Final Order.

"*Disputed Claims Reserve*" means any reserve established by the Debtors pursuant to <u>Article VIII.D</u>.

"*Distribution Agent*" means the Reorganized Debtors or any party designated by the Reorganized Debtors to serve as distribution agent under this Plan.  For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims, Allowed Prepetition Term Loan Claims and Allowed Prepetition Secured Notes Claims, the DIP Facility Agent, the Prepetition Term Loan Agent and the Prepetition Secured Notes Indenture Trustee, respectively, will be and shall act as the Distribution Agent.

"*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder, which date shall be the Effective Date.

"*Effective Date*" means the first Business Day on which the conditions specified in <u>Article IX</u> of this Plan, have been satisfied or waived in accordance with the terms of <u>Article IX</u>.

"*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"*Equity Interest*" means (a) any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock and other ownership interests, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and call and put rights; and (4) share-appreciation rights, and (b) any 510(b) Equity Claim, in each case as in existence immediately prior to the Effective Date.

"*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

"*Escrow Agreement*" means the "Escrow Agreement", as defined in Section 2.5(a) of the Investment Agreement.

"*Escrow Amount*" means the "Escrow Amount", as defined in Section 2.5(a) of the Investment Agreement.

"*Escrowed Notes*" means $7,500,000 of the Amended Secured Notes.

"*Escrowed Notes Agreement*" means the escrow agreement governing the deposit and release of the Escrowed Notes to be held by an escrow agent selected by the Majority Consenting Debtholders in their reasonable discretion and reasonably acceptable to the Debtors and Investor, which agreement shall be Filed with the Plan Supplement as <u>Exhibit F</u> and shall be in form and substance reasonably acceptable to the Debtors, Majority Consenting Debtholders and the Investor.

SF/5604545.10

"*Estate(s)*" means, individually, the estate of each of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq*., as now in effect or hereafter amended, and any similar federal, state or local law.

"*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Term Loan Agent; (e) the Releasing Prepetition Term Loan Lenders; (f) the Prepetition Secured Notes Indenture Trustee; (g) the Releasing Prepetition Secured Noteholders; (h) the DIP Facility Agent; (i) the DIP Facility Lenders; (j) the Distribution Agents; (k) the Investor; (l) the Ad Hoc Secured Noteholders Committee and the members thereof in their capacity as such; (m) Vestar; (n) Match Point; (o) Genstar; and (p) the other Holders of Old HoldCo Interests, and in each case the respective Related Persons of each of the foregoing Entities.

"*Exculpation*" means the exculpation provision set forth in <u>Article X.E</u> hereof.

"*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Exhibit*" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

"*Face Amount*" means (a) when used in reference to a Disputed Claim, the full stated amount of the Claim asserted by the applicable Holder in any Proof of Claim timely Filed with the Bankruptcy Court, and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

"*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"*Final DIP Order*" means that certain *Final Order: (I) Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 And 364 Authorizing The Debtors To (A) Obtain Postpetition Financing, (B) Grant Senior Liens And Superpriority Administrative Expense Status, (C) Approving Use Of Cash Collateral Of Prepetition Secured Parties, And (D) Granting Adequate Protection To Prepetition Lender; (II) Sealing Related Fee Letters; And (III) Granting Related Relief*, entered by the Bankruptcy Court on July 24, 2013 (Docket No. 163), as amended, supplemented or modified from time to time.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; <u>*provided*</u>, <u>*however*</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

"*Final Purchase Price*" means the "Final Purchase Price", as defined in Section 2.3(c) of the Investment Agreement.

"*General Unsecured Claim*" means any Claim against the Debtors that is not a/an: Administrative Claim; DIP Facility Claim; Professional Fee Claim; Priority Tax Claim; Secured Tax Claim, Other Priority Claim; Other Secured Claim; Intercompany Claim; Prepetition Debt Claim; or 510(b) Equity Claim.  To the extent applicable, the limitations imposed by section 502 of the Bankruptcy Code shall apply to the relevant General Unsecured Claim, including, without limitation, subsection 502(b)(6) and subsection 502(b)(7) thereof.

"*Genstar*" means Genstar Capital, LLC.

"*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"*Guarantees*" has the meaning set forth in Article V.J of this Plan.

"*HoldCo*" means OnCure Holdings, Inc., a Delaware corporation, debtor-in-possession in these Chapter 11 Cases pending in the Bankruptcy Court.

"*HoldCo Subsidiary*" means each direct and indirect, wholly-owned subsidiary of HoldCo, as debtors-in-possession in these Chapter 11 Cases pending in the Bankruptcy Court.

"*Holder*" means an Entity holding a Claim against, or Equity Interest in, any Debtor.

"*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Initial Distribution Date*" means, subject to the "Treatment" sections in Article III hereof, the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims; provided that any applicable distributions under this Plan on account of the DIP Facility Claims or the Prepetition Debt Claims shall be made to the applicable Distribution Agent on the Effective Date, and each such Distribution Agent shall make its respective distributions as soon as practicable thereafter.

"*Initial Purchase Price*" means the "Initial Purchase Price", as defined in Section 2.2(b) of the Investment Agreement.

"*Intercompany Claim*" means any Claim against any of the Debtors held by another Debtor or by a non-Debtor subsidiary of a Debtor, other than an Administrative Claim.

"*Interim DIP Order*" means that certain *Interim Order: (I) Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 And 364 Authorizing The Debtors To (A) Obtain Postpetition Financing, (B) Grant Senior Liens And Superpriority Administrative Expense Status, (C) Approving Use Of Cash Collateral Of Prepetition Secured Parties, And (D) Granting Adequate Protection To Prepetition Lender; (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rules 4001(B) And 4001(C); (III) Sealing Related Fee Letters; And (IV) Granting Related Relief*, entered by the Bankruptcy Court on June 18, 2013 (Docket No. 45), as amended, supplemented or modified from time to time.

"*Intermediary Record Owners*" means, as of the applicable date of determination, the banks, brokerage firms, or the agents thereof as the Entity through which the Beneficial Holders hold the Prepetition Secured Notes or Old HoldCo Interests, as applicable.

"*Investment Agreement*" means that certain Investment Agreement, dated as of June 22, 2013, by and between HoldCo and the Investor, a copy of which without certain schedules and exhibits is attached to this Plan as Exhibit G, as amended, supplemented or modified from time to time.

"*Investor*" means Radiation Therapy Services, Inc.

"*IRC*" means the Internal Revenue Code of 1986, as amended.

"*IRS*" means the Internal Revenue Service of the United States of America.

"*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

"*Litigation Claims*" means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or any Estate may hold against any Entity, including, without limitation, the Causes of Action of the Debtors.  A non-exclusive list of the Litigation Claims held by the Debtors as of the Effective Date is attached hereto as Plan Schedule 1 or to be Filed with the Plan Supplement, which shall be deemed to include any derivative actions filed against any Debtor as of the Effective Date and any Causes of Action against any Non-Released Party.

"*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

"*Majority Consenting Debtholders*" means Consenting Debtholders holding at least 50.01% of the aggregate outstanding principal amount of the Prepetition Secured Notes held by all Consenting Debtholders.

"*Master Ballot*" means the ballot distributed to the Registered Record Owners or Intermediary Record Owners, as applicable, of the Prepetition Secured Notes to record the votes of the Beneficial Holders thereof as of the applicable Voting Record Date.

"*Match Point*" means Match Point Partners, LLC.

"*Net Cash Amount*" means the sum of (x) the Initial Purchase Price (less the Escrow Amount) and (y) the amount of Cash on the Debtors' balance sheet immediately prior to the Effective Date, less the aggregate amount of the Cash Reserves.

"*New Board*" means the initial board of directors of Reorganized HoldCo, which shall be designated by the Investor not later than five (5) Business Days prior to the Confirmation Hearing.  The members of the New Board shall be listed on Plan Schedule 2 attached hereto or to be Filed with the Plan Supplement.

"*New Common Stock*" means the shares of common stock of Reorganized HoldCo authorized to be issued pursuant to this Plan (and subject to the Restructuring Transactions) and the Amended/New Organizational Documents.

"*New Intercreditor Agreements*" means the "Specified Intercreditor Agreements" defined in, and contemplated by, Section 7.2(h) of the Investment Agreement and under the heading "Intercreditor Agreements" in the Amended Secured Notes Indenture Term Sheet (which shall be in form and substance reasonably acceptable to the Debtors, the Majority Consenting Debtholders and the indenture trustee for the Amended Secured Notes), in substantially the form attached to this Plan as Exhibit H or Filed with the Plan Supplement.

"*Non-Debtor Releasing Party*" means, collectively: (a) the Prepetition Term Loan Agent; (b) the Releasing Prepetition Term Loan Lenders; (c) the Prepetition Secured Notes Indenture Trustee; (d) the Releasing Prepetition Secured Noteholders; (e) the DIP Facility Agent; (f) the DIP Facility Lenders; (g) the Investor; (h) Vestar; (i) Genstar; (j) the Committee, and the members thereof in their capacity as such and (k) the Ad Hoc Secured Noteholders Committee, and the members thereof in their capacity as such.

"*Non-Released Party*" means each of the Entities listed as Non-Released Parties on Plan Schedule 3 attached hereto or Filed with the Plan Supplement, which shall be reasonably acceptable to the Debtors, the Majority Consenting Debtholders and the Investor.

"*Non-Voting Classes*" means, collectively, Classes 1, 2, 3, 4, 6, 7, 8 and 9.

"*Noteholders' Representative*" means the Entity designated by the Majority Consenting Debtholders, as identified on Plan Schedule 4 to be Filed with the Plan Supplement, to act as representative for all Prepetition Secured Noteholders and having the rights and duties set forth in this Plan and the Investment Agreement.

"*Noteholders' Representative Cash Reserve*" means the reserve established and maintained by the Debtors from the Purchase Price or other Cash on hand existing immediately prior to the Effective Date to pay in full in Cash any fees, costs and expenses incurred by the Noteholders' Representative, including, without limitation, any legal, accounting and consultant fees and expenses, incurred in connection with the discharge of its duties and responsibilities under this Plan or the Investment Agreement.

"*Old Affiliate Interests*" means, collectively, the Equity Interests in each HoldCo Subsidiary, in each case as in existence immediately prior to the Effective Date.

"*Old HoldCo Interest*" means the Equity Interests in HoldCo, as in existence immediately prior to the Effective Date.

"*Ordinary Course Professionals Order*" means that certain *Order Authorizing the Debtors to Employ and Compensate Certain Professionals in the Ordinary Course of Business Nunc Pro Tunc to the Petition Date*, entered by the Bankruptcy Court on July 24, 2013 (Docket No. 170), as amended, supplemented, or modified from time to time.

"*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, a DIP Facility Claim, or an Administrative Claim.

"*Other Secured Claim*" means any Secured Claim other than an Administrative Claim, DIP Facility Claim, Secured Tax Claim, or Prepetition Debt Claim.

"*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm,

trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

"*Petition Date*" means June 14, 2013, the date on which the Debtors commenced the Chapter 11 Cases.

"*Plan*" means this *Joint Plan Of Reorganization For OnCure Holdings, Inc. And Its Affiliate Debtors Under Chapter 11 Of The Bankruptcy Code*, dated August 22, 2013, including the Exhibits and Plan Schedules and all supplements, appendices, and schedules thereto, either in its present form or as the same may be amended, supplemented, or modified from time to time.

"*Plan Schedule*" means a schedule annexed to either this Plan or as an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time).

"*Plan Securities*" has the meaning set forth in Article V.J of this Plan.

"*Plan Securities and Documents*" has the meaning set forth in Article V.J of this Plan.

"*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits and Plan Schedules, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, supplemented, or modified from time to time, in a manner in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Debtors, the Supermajority Consenting Debtholders and the Investor and which shall be Filed with the Bankruptcy Court at least ten (10) days prior to the Voting Deadline.

"*Prepetition Debt Claims*" means, collectively, the Prepetition Term Loan Claims and the Prepetition Secured Notes Claims.

"*Prepetition Debt Credit Agreements*" means, collectively, the Prepetition Term Loan Credit Agreement and the Prepetition Secured Notes Indenture.

"*Prepetition Secured Noteholder*" means a Holder of the Prepetition Secured Notes.

"*Prepetition Secured Notes*" means those certain 11 ¾% Senior Secured Notes due 2017, issued by OnCure pursuant to the Prepetition Secured Notes Indenture, in an aggregate principal amount of $210,000,000.

"*Prepetition Secured Notes Claims*" means any and all Claims arising from, under, or in connection with the Prepetition Secured Notes, the Prepetition Secured Notes Indenture or any other Collateral Agreement (as defined in the Prepetition Secured Notes Indenture).

"*Prepetition Secured Notes Indenture*" means that certain Indenture governing the Prepetition Secured Notes, dated as of May 13, 2010, together with the other Collateral Documents (as defined therein), in each case as amended, supplemented, or modified from time to time prior to the Petition Date.

"*Prepetition Secured Notes Indenture Trustee*" means Wilmington Trust, National Association, successor by merger to Wilmington Trust FSB, in its capacity as indenture trustee for the Prepetition Secured Notes.

SF\5604545.10

"*Prepetition Secured Notes Indenture Trustee Fees and Expenses*" means all unpaid reasonable and documented fees and out-of-pocket expenses of the Prepetition Secured Notes Indenture Trustee, including the reasonable fees, costs and expenses of the Prepetition Secured Notes Indenture Trustee's attorneys, incurred through the Effective Date in accordance with the Prepetition Secured Notes Indenture.

"*Prepetition Term Loan Agent*" means Wells Fargo Bank, National Association, in its capacity as administrative agent and collateral agent under the Prepetition Term Loan Credit Agreement.

"*Prepetition Term Loan Agent Fees and Expenses*" means all unpaid reasonable and documented fees and out-of-pocket expenses of the Prepetition Term Loan Agent incurred through the Effective Date in accordance with the Prepetition Term Loan Credit Agreement.

"*Prepetition Term Loan Claims*" means any and all Claims arising from, under or in connection with the Prepetition Term Loan Credit Agreement (including, without limitation, any and all "Obligations" as defined therein) or any other Loan Document (as defined therein).

"*Prepetition Term Loan Credit Agreement*" means that certain $15,000,000 Amended and Restated Credit Agreement, dated as of December 24, 2012, by and among HoldCo, the HoldCo Subsidiaries party thereto, the Prepetition Term Loan Agent, and the Prepetition Term Loan Lenders, together with the other Loan Documents (as defined therein), in each case as amended, supplemented, or modified from time to time prior to the Petition Date.

"*Prepetition Term Loan Lenders*" means the lenders party to the Prepetition Term Loan Credit Agreement from time to time.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" means the proportion that (a) the Face Amount of a Claim in a particular Class or Classes (or portions thereof, as applicable) bears to (b) the aggregate Face Amount of all Claims (including Disputed Claims but excluding Disallowed Claims) in such Class or Classes (or portions thereof, as applicable), unless this Plan provides otherwise. For purposes of determining any distributions under this Plan, Pro Rata amounts shall take into consideration any amounts reserved for under the Disputed Claims Reserve.

"*Professional*" means any Entity retained by the Debtors or the Committee in the Chapter 11 Cases pursuant to section 327, 328 or 1103 of the Bankruptcy Code (other than an ordinary course professional).

"*Professional Fee Claim*" means a Claim for Accrued Professional Compensation under sections 328, 330, 331, 503 or 1103 of the Bankruptcy Code.

"*Professional Fee Reserve*" means the reserve established and maintained by the Debtors from the Purchase Price or other Cash on hand existing immediately prior to the Effective Date to pay in full in Cash the Professional Fee Claims incurred on or prior to the Effective Date.

"*Professional Fees Bar Date*" means the Business Day that is forty-five (45) days after the Effective Date or such other date as approved by Final Order of the Bankruptcy Court.

"*Proof of Claim*" means a proof of Claim Filed against any Debtor in the Chapter 11 Cases.

"*Purchase Price*" means the "Purchase Price" as defined in Section 2.2(a)(ii) of the Investment Agreement.

"*Registered Record Owners*" means, as of the applicable date of determination, the respective owners of the Prepetition Secured Notes or Old HoldCo Interests, as applicable, whose holdings thereof are in their own name.

"*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), managers, managed accounts or funds, management companies, fund advisors, advisory board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the Petition Date, and any Person claiming by or through any of them, including such Related Persons' respective heirs, executors, estates, servants, and nominees; *provided*, *however*, that no insurer of any Debtor and no Non-Released Party shall constitute a Related Person.

"*Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article X.B hereof.

"*Released Party*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Term Loan Agent; (e) the Releasing Prepetition Term Loan Lenders; (f) the Prepetition Secured Notes Indenture Trustee; (g) the Releasing Prepetition Secured Noteholders; (h) the DIP Facility Agent; (i) the DIP Facility Lenders; (j) the Ad Hoc Secured Noteholders Committee and the members thereof in their capacity as such; (k) the Distribution Agents; (l) the Investor; (m) Vestar; (n) Match Point; (o) Genstar; and (p) the other Holders of Old HoldCo Interests, and in each case the respective Related Persons of each of the foregoing Entities.

"*Releasing Prepetition Secured Noteholder*" means a Prepetition Secured Noteholder that affirmatively opts into the Third Party Release as provided on its respective Ballot.

"*Releasing Prepetition Term Loan Lender*" means a Prepetition Term Loan Lender that affirmatively opts into the Third Party Release as provided on its respective Ballot.

"*Releasing Party*" has the meaning set forth in Article X.B hereof.

"*Reorganized Debtors*" means, subject to the Restructuring Transactions, the Debtors as reorganized pursuant to this Plan on or after the Effective Date, and their respective successors.

"*Reorganized Debtors' Claim Portion*" means, collectively, the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Secured Tax Claims that either (i) accrue or are incurred after the Effective Date; *provided*, *however*, that, for the avoidance of doubt, the accrued portion as of the Effective Date of Allowed Priority Tax Claims and Allowed Secured Tax Claims due and payable following the Effective Date shall constitute the Debtors' Claim Portion, (ii) are included in Closing Working Capital or (iii) are a fee, cost, expense, liability or obligation described in the second sentence of the definition of "Selling Expenses" in the Investment Agreement.

"*Reorganized HoldCo*" means, subject to the Restructuring Transactions, OnCure Holdings, Inc., a Delaware corporation, as reorganized pursuant to this Plan on or after the Effective Date, and its successors.

"*Restricted Holders*" has the meaning set forth in Article V.J of this Plan.

"*Restructuring Documents*" means, collectively, the documents and agreements (and the exhibits, schedules, annexes and supplements thereto) necessary to implement, or entered into in connection with, this Plan, including, without limitation, the Amended Secured Notes, the Amended Secured Notes Indenture, the Investment Agreement, the New Intercreditor Agreements, the Escrowed Notes Agreement, the Plan Supplement, the Exhibits, the Plan Schedules, the Amended/New Organizational Documents, and the Plan Securities and Documents.

"*Restructuring Support Agreement*" mean that certain Restructuring Support Agreement, dated as of June 14, 2013, by and among the Debtors, the Prepetition Term Loan Lenders party thereto, and the Prepetition Secured Noteholders party thereto (as amended, supplemented or modified from time to time), a copy of which without certain schedules and exhibits is attached to this Plan as Exhibit I.

 "*Restructuring Term Sheet*" means the term sheet attached as Exhibit A to the Investment Agreement, a copy of which is attached hereto as Exhibit J.

"*Restructuring Transaction*" has the meaning ascribed thereto in Article V.B of this Plan.

"*Scheduled*" means with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules.

"*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and the applicable Bankruptcy Rules, as such Schedules they may be amended, modified, or supplemented from time to time.

"*Secured Claim*" means a Claim that is secured by a Lien on property in which any of the Debtors' Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

"*Secured Tax Claim*" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

"*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and any similar federal, state or local law.

"*Selling Expenses*" means "Selling Expenses" as defined in Section 1.1 of the Investment Agreement.

"*Stamp or Similar Tax*" means any stamp tax, recording tax, conveyance fee, intangible or similar tax, mortgage tax, personal or real property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to

speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

"*Subsequent Distribution*" means any distribution of property under this Plan to Holders of Allowed Claims other than the initial distribution given to such Holders on the Initial Distribution Date.

"*Subsequent Distribution Date*" means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided*, *however*, that if the Effective Date is within thirty (30) days of the end of a calendar quarter, then the first Subsequent Distribution Date will be the last Business Day of the month following the end of the first (1st) calendar quarter after the calendar quarter in which the Effective Date falls.

"*Substantive Consolidation Order*" means the order, or provision of the Confirmation Order, substantively consolidating the Chapter 11 Cases on the limited basis as provided in Article V.A of this Plan.

"*Supermajority Consenting Debtholders*" means Consenting Debtholders holding at least 66 2/3% of the aggregate outstanding principal amount of the Prepetition Secured Notes held by all Consenting Debtholders.

"*Trustee Charging Lien*" means any liens for payment of compensation, expenses, disbursements, advances and indemnification of the Prepetition Secured Notes Indenture Trustee, its agents and counsel, and any successors and assigns, including the Prepetition Secured Notes Indenture Fees and Expenses, as set forth in the Prepetition Secured Notes Indenture and the Amended Secured Notes Indenture.

"*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"*Unused Cash Reserve Amount*" means the remaining Cash (if any) in the Cash Reserves after all obligations and liabilities for which such reserves were established are paid, satisfied and discharged in full in Cash or are Disallowed in accordance with this Plan.

"*Vestar*" means Vestar Capital Partners, Inc.

"*Voting and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as solicitation, notice, claims and balloting agent for the Debtors.

"*Voting Class*" means Class 5.

"*Voting Deadline*" means the date and time by which all Ballots must be received by the Voting and Claims Agent in accordance with the Disclosure Statement Order, which date is September 23, 2013 as set forth in the Disclosure Statement Order.

"*Voting Record Date*" means the date for determining which Holders of Claims in the Voting Class are entitled to receive the Disclosure Statement and vote to accept or reject this Plan. With respect to the Prepetition Secured Notes Claims and Old HoldCo Interests, the Voting Record Date is August 14, 2013 as set forth in the Disclosure Statement Order. With respect to all other Claims and Equity Interests

(i.e., those in Classes 1, 2, 3, 4, 6, 7 and 9), the Voting Record Date is August 21, 2013, as set forth in the Disclosure Statement Order.

**ARTICLE II.**

**ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS**

A.    *Administrative Claims*

    The legal, equitable and contractual rights of the Holders of Allowed Administrative Claims are unaltered by this Plan. Subject to sub-paragraph 1 below and Article V.Q of this Plan, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing; *provided*, *however*, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

    1.    Bar Date for Administrative Claims

    Except as otherwise provided in this Article II.A hereof and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order (as applicable) no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims shall be deemed discharged as of the Effective Date. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G hereof.

    Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

    In the case of the Ad Hoc Secured Noteholders Committee Fees and Expenses, such Ad Hoc Secured Noteholders Committee Fees and Expenses will be paid in full in Cash on the Effective Date (to the extent invoiced and not previously paid during the course of the Chapter 11 Cases) from the Debtors' Claim Portion Cash Reserve, without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date. The Prepetition Term Loan Agent Fees and Expenses and the Prepetition Secured Notes Indenture Trustee Fees and Expenses will be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent invoiced and not previously paid during the course of the Chapter 11 Cases) from the Debtors' Claim Portion Cash Reserve, without a requirement for the Prepetition Term Loan Agent or the Prepetition Secured Notes Indenture Trustee to file a fee application with the Bankruptcy Court or a formal request

18

for payment by the Administrative Claims Bar Date.  DIP Facility Claims shall be paid pursuant to Article II.B hereof without the requirement to file a fee application with the Bankruptcy Court or a formal request for payment by the Administrative Claims Bar Date.

2.  <u>Professional Fee Claims</u>

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; <u>provided</u> that the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by Professionals in connection with the implementation and consummation of this Plan, in each case without further application or notice to or order of the Bankruptcy Court; <u>provided, further</u>, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors' Claim Portion Cash Reserve for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim.

Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash from the Professional Fee Reserve within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.

B.    *DIP Facility Claims*

Subject to <u>Article V.Q</u> of this Plan, the Allowed DIP Facility Claims shall be indefeasibly paid in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims.

C.    *Priority Tax Claims*

The legal, equitable and contractual rights of the Holders of Allowed Priority Tax Claims are unaltered by this Plan.  Subject to <u>Article V.Q</u> and <u>Article VIII</u> hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance

from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.      *Summary*

This Plan constitutes a single plan of reorganization for all Debtors for voting and confirmation purposes.  All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified as described below.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, for voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remaining portion of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released, Disallowed or otherwise settled prior to the Effective Date.  As described more fully in Article V.A below, this Plan contemplates, and is predicated upon, entry of an order substantively consolidating the Debtors' Estates for the limited purposes of voting and confirmation under this Plan with respect to Impaired Claims.

Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| (1) | Other Priority Claims | Unimpaired | Deemed to Accept |
| (2) | Other Secured Claims | Unimpaired | Deemed to Accept |
| (3) | Secured Tax Claims | Unimpaired | Deemed to Accept |
| (4) | Prepetition Term Loan Claims | Unimpaired | Deemed to Accept |
| (5) | Prepetition Secured Notes Claims | Impaired | Entitled to Vote |
| (6) | General Unsecured Claims | Impaired | Deemed to Reject |

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| (7) | Intercompany Claims | Impaired | Deemed to Accept |
| (8) | Old HoldCo Interests | Impaired | Deemed to Reject |
| (9) | Old Affiliate Interests in any HoldCo Subsidiary | Unimpaired | Deemed to Accept |

B.    *Classification and Treatment of Claims and Equity Interests*

1.    Class 1 - Other Priority Claims

(a)    *Classification*: Class 1 consists of the Other Priority Claims.

(b)    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered by this Plan.  Subject to Article V.Q and Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim shall have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

(c)    *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject this Plan.

2.    Class 2 - Other Secured Claims

(a)    *Classification*:  Class 2 consists of the Other Secured Claims.  Class 2 consists of separate subclasses for each Other Secured Claim that may exist against the Debtors.

(b)    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 2 Claims are unaltered by this Plan.  Subject to Article V.Q and Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the

SF\5604545.10

Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

(c)    *Voting*: Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.

3.   <u>Class 3 - Secured Tax Claims</u>

(a)    *Classification*:  Class 3 consists of the Secured Tax Claims.

(b)    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 3 Claims are unaltered by this Plan.  Subject to <u>Article V.Q</u> and <u>Article VIII</u> hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors, as applicable:  (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors (with the reasonable consent of the Investor and the Supermajority Consenting Debtholders) or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of

business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (D) or (E) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim.

(c)    *Voting:*  Class 3 is an Unimpaired Class, and the Holders of Claims in Class 3 shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 3 are not entitled to vote to accept or reject this Plan.

4.    <u>Class 4 - Prepetition Term Loan Claims</u>

(a)    *Classification*: Class 4 consists of the Prepetition Term Loan Claims.

(b)    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 4 Claims are unaltered by this Plan.  To the extent not previously paid in full pursuant to the DIP Orders, each Holder of an Allowed Class 4 Claim shall receive, on the Effective Date and in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4 Claim, Cash equal to the amount of such Allowed Class 4 Claim.

(c)    *Voting*: Class 4 is an Unimpaired Class, and the Holders of Claims in Class 4 shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 4 are not entitled to vote to accept or reject this Plan.

5.    <u>Class 5 - Prepetition Secured Notes Claims</u>

(a)    *Classification:* Class 5 consists of the Prepetition Secured Notes Claims.

(b)    *Allowance*: The Prepetition Secured Notes Claims are deemed Allowed in the aggregate amount of approximately $210 million.[2]

(c)    *Treatment:*  On the Effective Date, the Prepetition Secured Notes and the Prepetition Secured Notes Indenture shall be deemed amended in their entirety by the Amended Secured Notes and the Amended Secured Notes Indenture, respectively.  On the Effective Date, and in addition to the agreements described in <u>Article V.F</u>, <u>Article V.G</u>, and <u>Article V.H</u> of this Plan, each Holder of an Allowed Prepetition Secured Notes Claim shall receive, on account of such Claim, its Pro Rata share of the Base Notes and the Net Cash Amount.  After the Effective Date, subject to the terms and conditions of this Plan (including <u>Article VII.D.1</u>), the Investment Agreement and the Escrowed Notes Agreement (as applicable), each Holder of an Allowed Prepetition Secured Notes Claim shall receive, on account of such Claim, its Pro Rata share of (x) either (i) in the event

---

[2] The Allowed amount excludes accrued interest, fees and other costs and expenses.

the Final Purchase Price is greater than the Initial Purchase Price, the sum of (A) an amount equal to the amount by which the Final Purchase Price exceeds the Initial Purchase Price plus (B) the Escrow Amount or (ii) in the event the Final Purchase Price is equal to or less than the Initial Purchase Price, an amount equal to the Escrow Amount, if any, following any distribution to the Investor pursuant to Section 2.3(e) of the Investment Agreement, (y) the Unused Cash Reserve Amount and (z) upon satisfaction of the conditions contained in the Escrowed Notes Agreement, its Pro Rata share of the Escrowed Notes, in each case if any.

(d)     *Voting:* Class 5 is Impaired, and Holders of Claims in Class 5 are entitled to vote to accept or reject this Plan.

6.   Class 6 – General Unsecured Claims

(a)     *Classification:* Class 6 consists of the General Unsecured Claims.

(b)     *Treatment:*  Each Holder of a General Unsecured Claim shall not receive any distribution or retain any property on account of such General Unsecured Claim.

(c)     *Voting:* Class 6 is an Impaired Class, and the Holders of Claims in Class 6 will be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, Holders of Claims in Class 6 will not be entitled to vote to accept or reject this Plan.

7.   Class 7 – Intercompany Claims

(a)     *Classification*: Class 7 consists of the Intercompany Claims.

(b)     *Treatment:*   Each Holder of an Intercompany Claim shall not receive any distribution or retain any property under this Plan on account of such Intercompany Claim.  On or after the Effective Date, the Reorganized Debtors may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by such Reorganized Debtor.

(c)     *Voting:* Class 7 is an Impaired Class.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 shall be conclusively deemed to have accepted this Plan.

8.   Class 8 - Old HoldCo Interests

(a)     *Classification*: Class 8 consists of the Old HoldCo Interests.

(b)     *Treatment*: On the Effective Date, the Old HoldCo Interests will be cancelled without further notice to, approval of or action by any Entity, and each Holder of an Old HoldCo Interest shall not receive any distribution or retain any property on account of such Old HoldCo Interest.

(c)     *Voting*: Class 8 is an Impaired Class, and the Holders of Old HoldCo Interests in Class 8 will be conclusively deemed to have rejected this Plan pursuant to section

1126(g) of the Bankruptcy Code.  Therefore, Holders of Old HoldCo Interests in Class 8 will not be entitled to vote to accept or reject this Plan.

9.  Class 9 - Old Affiliate Interests in any HoldCo Subsidiary

(a)  *Classification*: Class 9 consists of the Old Affiliate Interests in any HoldCo Subsidiary.

(b)  *Treatment*:  Subject to the Restructuring Transactions, the Old Affiliate Interests shall remain effective and outstanding on the Effective Date and shall be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.

(c)  *Voting*: Class 9 is an Unimpaired Class, and the Holders of the Old Affiliate Interests in Class 9 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of the Old Affiliate Interests in Class 9 are not entitled to vote to accept or reject this Plan.

C.  *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under this Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.  *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

A.  *Presumed Acceptance of Plan*

Classes 1, 2, 3, 4 and 9 are Unimpaired under this Plan.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.  Class 7 is Impaired under this Plan.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 7 are conclusively deemed to have accepted this Plan.

B.  *Presumed Rejection of Plan*

Classes 6 and 8 are Impaired and shall receive no distribution under this Plan on account of their respective Claims or Equity Interests.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

C.      *Voting Class*

Class 5 is Impaired under this Plan.  The Holders of Claims in such Class as of the applicable Voting Record Date are entitled to vote to accept or reject this Plan.

D.      *Acceptance by Impaired Class of Claims*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted this Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept this Plan.

E.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by Class 5. The Debtors request confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126 of the Bankruptcy Code.  Acceptance of this Plan by an Impaired Class holding a Claim against any Consolidated Debtor shall satisfy Section 1129(a)(10) for purposes of all of the Debtors. The Debtors reserve the right to modify this Plan or any Exhibit or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

F.      *Votes Solicited in Good Faith*

The Debtors have, and upon the Confirmation Date shall be deemed to have, solicited votes on this Plan from the Voting Class in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Related Parties shall be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Limited Substantive Consolidation*

1.      *Generally*.  This Plan contemplates and is predicated upon entry of an order substantively consolidating the Estates of HoldCo and each HoldCo Subsidiary (collectively, the "**Consolidated Debtors**") solely for the limited purposes of voting and confirmation under this Plan.  Accordingly, for voting and confirmation purposes only, (i) any obligation of HoldCo or any HoldCo Subsidiary and all guarantees with respect thereto executed by HoldCo or one or more HoldCo Subsidiary shall be treated as a single obligation and any obligation of HoldCo and one or more HoldCo Subsidiaries, and all multiple Claims against such entities on account of such joint obligations, shall be treated and Allowed only as a single Claim against the Consolidated Debtors, (ii) each Claim Filed against HoldCo or one or more HoldCo Subsidiary shall be deemed Filed against the Consolidated Debtors and shall be deemed to be a single Claim against and a single obligation of the Consolidated Debtors, (iii) the Estate of each of the Consolidated Debtors shall be deemed to be one consolidated Estate, and (iv) all property of the Estate of each Consolidated Debtor shall be deemed to be property of the consolidated Estates.

Except for the limited purposes of voting and confirmation related to this Plan as set forth in this Paragraph A.1, such limited substantive consolidation shall not and shall not be deemed to: (i) modify, affect or otherwise alter the legal or corporate structures of the Debtors or the Reorganized Debtors or merge or otherwise affect the separate legal existence of the Debtors or the Reorganized Debtors, subject to the right of the Debtors or Reorganized Debtors to effect Restructuring Transactions as provided in Article V.B of this Plan; (ii) cause any Debtor or Reorganized Debtor to be liable for any Claim for which it otherwise is not liable, and the liability for any such Claim shall not be affected by such substantive consolidation; (iii) modify, affect or otherwise alter the distribution to be made to the holders of Claims in any Class on account of such Claims absent the limited substantive consolidation; (iv) modify, affect or otherwise alter any Intercompany Claims or any Old Affiliate Interests; (v) modify, affect or otherwise alter any obligations under any Executory Contracts or Unexpired Leases assumed by the Debtors; or (vi) modify, affect or otherwise alter any obligations of each and every Debtor to pay quarterly fees to the United States Trustee. Notwithstanding anything to the contrary herein, the Claims of a particular Debtor shall remain the obligations solely of such Debtor and shall not become obligations of any other Debtor by virtue of the limited substantive consolidation set forth in this Paragraph A.1.

2. *Substantive Consolidation Order*. Unless the Bankruptcy Court has approved such limited substantive consolidation of the Chapter 11 Cases by a prior Final Order, this Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Consolidated Debtors on the limited basis as provided in Paragraph A.1 above pursuant to section 105 of the Bankruptcy Code. If no objection to substantive consolidation is timely Filed and served by any Holder of a Claim affected by this Plan as provided herein on or before the deadline for objection to confirmation of this Plan, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Bankruptcy Court without further notice and hearing as to such substantive consolidation. If any such objections are timely filed and served, a hearing with respect to such proposed substantive consolidation and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

B.    *Restructuring Transactions*

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under this Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Documents and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of this Plan prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate certain of the Affiliate Debtors under the laws of jurisdictions other than the laws of which the applicable Affiliate Debtors are presently incorporated. Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of this Plan and the Restructuring Documents and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**").

All such Restructuring Transactions taken, or caused to be taken, shall be deemed to have been authorized and approved by the Bankruptcy Court. The actions to effect the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty,

or obligation on terms consistent with the terms of this Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions, but in all cases subject to the terms and conditions of this Plan and the Restructuring Documents and any consents or approvals required thereunder.

C.      *Consummation of the Investment Agreement; Amended Secured Notes Indenture; Amended Secured Notes Guarantees; New Intercreditor Agreements*

On the Effective Date and provided that the conditions precedent set forth in the Investment Agreement have been satisfied or waived in accordance with the terms of the Investment Agreement, the Debtors and the Reorganized Debtors (as applicable) shall be authorized to execute and deliver, and to consummate the transactions contemplated by, the Investment Agreement in exchange for the Initial Purchase Price, as well as execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, in each case in form and substance reasonably acceptable to the Majority Consenting Debtholders and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Investment Agreement).

Upon the Effective Date of this Plan, all Prepetition Secured Noteholders shall be deemed to have consented to the Amended Secured Notes Indenture, Amended Secured Notes, the Amended Secured Notes Guarantees, the New Intercreditor Agreements, the Escrowed Notes Agreement and other Restructuring Documents in the form that they exist on the Effective Date. On and as of the Effective Date, notwithstanding any requirements for amendment set forth in the Prepetition Secured Notes Indenture, and provided that the conditions precedent set forth in the Investment Agreement have been satisfied or waived in accordance with the terms of the Investment Agreement, the Prepetition Secured Notes Indenture Trustee shall be authorized to (i) execute and deliver the Amended Secured Notes Indenture, the Amended Secured Notes Guarantees and the New Intercreditor Agreements (each to the extent it is a party thereto), subject to Article V.J of this Plan, as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Prepetition Secured Notes Indenture Trustee is a party, to the extent provided in the relevant Restructuring Documents, and to promptly consummate the transactions contemplated thereby, and (ii) take any other actions required or contemplated to be taken by the Prepetition Secured Notes Indenture Trustee under this Plan or any of the Restructuring Documents to which it is a party.

D.      *Continued Corporate Existence*

Subject to the Restructuring Transactions permitted by Article V.B of this Plan, after the Effective Date, the Reorganized Debtors shall, notwithstanding the limited substantive consolidation provided in Article V.A hereof, continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable organizational documents, are amended, restated or otherwise modified under this Plan. Notwithstanding anything to the contrary herein, the Claims of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor solely by virtue of this Plan or the Chapter 11 Cases.

E.    *Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or any Restructuring Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c) and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Litigation Claims of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with this Plan (other than the Cash Reserves), shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens which survive the occurrence of the Effective Date as described in Article III of this Plan (including, without limitation, the Liens that secure the Amended Secured Notes).  On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.

F.    *Amended Secured Notes; Amended Secured Notes Indenture*

On and as of the Effective, the following shall occur:

(i)    Without limiting the Prepetition Secured Noteholders' rights to receive the Net Cash Amount or the Unused Cash Reserve Amount as provided in Article III herein, the principal amount of the Prepetition Secured Notes shall be reduced on a Pro Rata basis to $82,500,000;

(ii)    the Prepetition Secured Notes Indenture and the Prepetition Secured Notes shall be amended as set forth in the Amended Secured Notes Indenture and the Amended Secured Notes, respectively;

(iii)    the Escrowed Notes will be transferred to the escrow agent under, and be held in escrow pending release to the Holders of the Amended Secured Notes upon satisfaction of the conditions contained in, the Escrowed Notes Agreement;

For the avoidance of doubt, interest paid on the Escrowed Notes prior to the start of the first accrual period beginning in 2016 will be returned to the Reorganized Debtors.  Interest accruing from the start of the first accrual period beginning in 2016 will be paid pursuant to the Amended Secured Notes Indenture, subject to the terms of the Escrowed Notes Agreement.  The obligations arising under the Amended Secured Notes and the Amended Secured Notes Indenture will be guaranteed by Radiation Therapy Services Holdings, Inc., the Investor, certain subsidiaries of the Investor pursuant to the Amended Secured Notes Guarantees, and certain of the HoldCo Subsidiaries, in each case as set forth in the Amended Secured Notes Indenture Term Sheet.

On and as of the Effective Date, all of the Prepetition Secured Noteholders shall be deemed to be bound by the Amended Secured Notes Indenture, the Amended Secured Notes Guarantees and the related Restructuring Documents.

G.    *No New Issuance of Debt*

Notwithstanding anything in this Plan to the contrary, the Amended Secured Notes will represent the same indebtedness as the Prepetition Secured Notes, and nothing in this Plan is, or shall be deemed to

constitute, an issuance of new indebtedness under or in connection with the Amended Secured Notes or the Amended Secured Notes Indenture.  Except as expressly amended or modified by this Plan, the Prepetition Secured Notes Indenture and all Collateral Documents (as defined therein) shall remain in full force and effect and shall, in their original form and as amended or modified pursuant to this Plan, secure the obligations and indebtedness arising under or in connection with the Amended Secured Notes, and, at the written request of the Prepetition Secured Notes Indenture Trustee, the Reorganized Debtors shall execute and deliver conforming amendments to such documents necessary in order to implement the same, all without further notice to or order of the Bankruptcy Court. The Prepetition Secured Notes Indenture Trustee and any applicable Distribution Agent shall, and the Debtors and/or Reorganized Debtors and their agents shall be authorized to, coordinate with DTC such that the allocations of the Amended Secured Notes shall be made by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC.

H.      *No Discharge or Release of Liens Securing the Prepetition Secured Notes Claims*

        Notwithstanding anything in this Plan to the contrary, all property of the Estates of the Debtors, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with this Plan, shall remain encumbered by and subject to the Liens securing the Prepetition Secured Notes Claims which, as of the Effective Date, secure the obligations and indebtedness arising under or in connection with the Amended Secured Notes, and such Liens shall not be, and shall not be deemed to be, discharged or released on account of the Confirmation or Consummation of this Plan.

I.      *New Common Stock*

        On the Effective Date, subject to the terms and conditions of the Investment Agreement, Reorganized HoldCo shall issue 100% of the New Common Stock to the Investor or its designated Affiliate pursuant to the Amended/New Organizational Documents in consideration for the Purchase Price.  The Reorganized Debtors shall not be obligated to register the New Common Stock under the Securities Act or to list the New Common Stock for public trading on any securities exchange.

        Distributions of the New Common Stock may be made by delivery or book-entry transfer thereof by the applicable Distribution Agent in accordance with the Investment Agreement.  Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of Reorganized HoldCo shall be that number of shares of New Common Stock as may be designated in the Amended/New Organizational Documents.

J.      *Plan Securities and Related Documentation; Exemption from Securities Laws*

        On and after the Effective Date, the Debtors, the Reorganized Debtors, the Investor and their respective Affiliates are each authorized to and shall provide or issue, as applicable, the New Common Stock, the Amended Secured Notes, the Amended Secured Notes Guarantees, the guarantees by certain of the HoldCo Subsidiaries and any and all other securities to be distributed or issued under this Plan (collectively, the "**Plan Securities**") and any and all other notes, stock, instruments, certificates, and other documents or agreements required to be distributed, issued, executed or delivered pursuant to or in connection with this Plan, including, without limitation, the Amended Secured Notes Indenture and the Amended Secured Notes Guarantees (collectively, the "**Plan Securities and Documents**"), in each case in form and substance satisfactory to the Supermajority Consenting Debtholders, the Investor, and to the extent it is a signatory thereto, in form and substance reasonably satisfactory to the Prepetition Secured Notes Indenture Trustee, and without further notice to or order of the Bankruptcy Court, act or action

under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The distribution and issuance, as applicable, of the Plan Securities and Documents under this Plan shall be exempt from registration under applicable securities laws (including Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Bankruptcy Code, Section 4(2) of the Securities Act and/or other applicable exemptions. An offering of Plan Securities provided in reliance on the exemption from registration under the Securities Act pursuant to section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code and is deemed to be a public offering, and such Plan Securities may be resold without registration to the extent permitted under section 1145 of the Bankruptcy Code. Any Plan Securities and Documents provided in reliance on the exemption from registration under the Securities Act provided by Section 4(2) of such act will be provided in a private placement.

The Amended Secured Notes, the Amended Secured Notes Guarantees and the guarantees by certain of the HoldCo Subsidiaries (together with the Amended Secured Notes Guarantees, the "**Guarantees**") are being issued as a result of certain modifications to the Prepetition Secured Notes Indenture. As such, the Amended Secured Notes and the Guarantees are a continuation and modification of the Prepetition Secured Notes and the obligations thereunder. However, the offer and delivery of the Amended Secured Notes and the Guarantees to creditors is subject to federal securities laws. The offer and delivery of the Amended Secured Notes and the Guarantees will be made without registration under the Securities Act, in reliance on an exemption from registration provided by section 1145(a)(1) of the Bankruptcy Code, which also exempts the offer and delivery of the Amended Secured Notes and the Guarantees from similar state securities laws.

Resales by Persons who receive the New Common Stock and any Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code, who are deemed to be "underwriters" (as such term is defined in the Bankruptcy Code) (collectively, the "**Restricted Holders**") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act. Restricted Holders would, however, be permitted to resell the New Common Stock and Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code, as applicable, without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, or if such securities are registered with the Commission pursuant to a registration agreement or otherwise. Under this Plan, Restricted Holders are not entitled to any registration rights.

For purposes of this Plan, to the extent necessary, and solely for purposes of section 1145 of the Bankruptcy Code, each of the Investor (as the intended purchaser that plans to acquire the New Common Stock), Radiation Therapy Services Holdings, Inc. (as the parent of the Investor) and certain subsidiaries of the Investor pursuant to the Amended Secured Notes Guarantees (as subsidiaries of the Investor) shall be deemed a "successor" of HoldCo under section 1145(a)(1) of the Bankruptcy Code and are each sponsors of this Plan. The HoldCo Subsidiaries shall be deemed "affiliates" as defined in Section 101(2) of the Bankruptcy Code of HoldCo and are co-proponents of this Plan.

Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

K.      *Release of Liens and Claims*

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided herein or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII hereof, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates shall be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The filing of the Confirmation Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims and other interests described above. Any Entity holding such Liens, Claims or interests shall, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

L.      *Organizational Documents of the Reorganized Debtors*

The respective organizational documents of each of the Debtors shall be amended and restated or replaced (as applicable) in form and substance satisfactory to the Investor and as necessary to satisfy the provisions of this Plan and the Bankruptcy Code.  Such organizational documents shall: (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Common Stock; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Debtors may, subject to the terms and conditions of the Restructuring Documents, amend and restate their respective organizational documents as permitted by applicable law.

M.      *Directors and Officers of the Reorganized Debtors*

The New Board shall initially consist of up to five (5) directors, who shall be designated in accordance with the terms and conditions of the Investment Agreement, which directors shall be identified in the Plan Supplement as Plan Schedule 2.  The initial new board of directors or other governing body of each HoldCo Subsidiary shall consist of one or more of the directors or officers of Reorganized HoldCo.  Any directors elected pursuant to this section shall be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or an officer, the nature of any compensation for such Person.  Each such director and officer shall serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of the applicable Reorganized Debtors.  The existing boards of directors and other governing bodies of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

N.      *Corporate Action*

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, including, without limitation, the issuance and  the distribution of the securities to be issued pursuant hereto, in each case in form and substance satisfactory to the Investor, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or by any other Person (except for those expressly required pursuant hereto or by the Restructuring Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, directors, officers, managers, members or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

As of the Effective Date, all matters provided for in this Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Organization Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors or by any other Person.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case in form and substance satisfactory to the Investor, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The secretary and any assistant secretary of the Debtors and the Reorganized Debtors shall be authorized to certify or attest to any of the foregoing actions.

O.      *Cancellation of Notes, Certificates and Instruments*

On the Effective Date, except to the extent otherwise provided herein (including, without limitation, and for the avoidance of doubt, Article V.F, Article V.G and Article V.H) all notes, stock, instruments, certificates, agreements and other documents evidencing or relating to the DIP Facility Claims, the Prepetition Debt Claims, any Impaired Claim and/or the Old HoldCo Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person; provided that (i) the terms of the Prepetition Secured Notes Indenture shall continue in effect for the limited purpose of allowing Holders

33

of Claims thereunder to receive, and allowing and preserving the rights of the Prepetition Secured Notes Indenture Trustee to make, distributions under this Plan, and (ii) the DIP Facility Credit Agreement and the Prepetition Term Loan Credit Agreement shall continue in effect for the limited purposes of allowing Holders of Claims thereunder to receive, and allowing and preserving the rights of the applicable Distribution Agents to make, distributions under this Plan.  Except to the extent otherwise provided herein, upon completion of all such distributions, the DIP Facility Credit Agreement and the Prepetition Debt Credit Agreements and any and all notes, securities and instruments issued in connection therewith shall terminate completely without further notice or action and be deemed surrendered.  For the avoidance of doubt, nothing in this Subsection "O" shall affect the Amended Secured Notes Indenture, including without any limitation any Trustee Charging Lien, the Amended Secured Notes Guarantees and related Restructuring Documents, which shall be in full force and effect as of the Effective Date.

P.      *Old Affiliate Interests*

On the Effective Date, the Old Affiliate Interests shall remain effective and outstanding, and shall be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date.  Each HoldCo Subsidiary shall continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date, except as amended or modified by this Plan.

Q.      *Sources of Cash for Plan Distributions*

Except as otherwise provided in this Plan or the Confirmation Order, all Cash necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments required pursuant to this Plan will be obtained from their respective Cash balances, including Cash from operations, the Cash Reserve, and the Initial Purchase Price or the Final Purchase Price, as applicable.  The Debtors and the Reorganized Debtors, as applicable, may also make such payments using Cash received from their subsidiaries through their respective consolidated cash management systems and the incurrence of intercompany transactions, but in all cases subject to the terms and conditions of the Restructuring Documents.

To the extent paid in Cash, all Allowed Claims that constitute any amount of the Debtor's Claim Portion shall be paid in Cash from either (i) Cash on the Debtors' balance sheet immediately prior to the Effective Date or (ii) the Cash Reserves.  All Allowed Claims that constitute any amount of the Reorganized Debtor's Claim Portion shall be paid in Cash by the Reorganized Debtors from its cash balances.

R.      *Continuing Effectiveness of Final Orders*

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under this Plan.

S.      *Funding and Use of Cash Reserves*

On or before the Effective Date, the Debtors shall fund the Cash Reserves in such amount as determined by the Debtors, with the consent of the Supermajority Consenting Debtholders or as determined by order of the Bankruptcy Court, as necessary in order to be able to pay in full in Cash the obligations and liabilities for which such reserves were established, including, without limitation, reserving an amount of Cash equal to 100% of distributions to which Holders of Disputed Claims in each

such applicable Class would be entitled under this Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors and the Reorganized Debtors, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims, subject to the rights of the Consenting Debtholders Representative contained in Article V.T of this Plan; provided, further, that the Debtors shall provide the Investor with information regarding the Cash Reserves as may be reasonably requested by the Investor.

The Cash contained in each applicable Cash Reserve shall be first used solely to pay the obligations and liabilities for which such applicable reserve was established, with any excess funds (if any) in an applicable Cash Reserve being next available to pay the obligations and liabilities for which any other Cash Reserve was established. The Debtors and the Reorganized Debtors, as applicable, shall maintain detailed records of all payments made from each Cash Reserve, such that all payments and transactions shall be adequately and promptly documented in, and readily ascertainable from, their respective books and records. After the Effective Date, neither the Debtors nor the Reorganized Debtors shall deposit any other funds or property into the Cash Reserves without further order of the Bankruptcy Court or otherwise commingle funds in the Cash Reserves.

T.    *The Noteholders' Representative*

1.    *Appointment*.  From and after the Effective Date, the Noteholders' Representative shall be authorized and empowered to act as agent, proxy, attorney-in-fact and representative for all Prepetition Secured Noteholders to the extent contemplated by the Investment Agreement, including but not limited to (i) in connection with any dispute regarding the calculation of the post-closing adjustment to the Initial Purchase Price under the Investment Agreement (to the extent contemplated by the Investment Agreement), (ii) for purposes of electing an Accounting Firm as contemplated by Section 1.1 of the Investment Agreement and (iii) becoming a party to the Escrowed Notes Agreement as contemplated by Section 2.5(a) of the Investment Agreement.  The Noteholders' Representative shall serve in such capacity until resignation or discharge and the appointment of a successor Noteholders' Representative by the Majority Consenting Debtholders.

2.    *Rights, Powers and Duties of the Noteholders' Representative*.  As the representative for all Prepetition Secured Noteholders, the Noteholders' Representative shall be authorized and empowered to act as agent, proxy, attorney-in-fact and representative for and on behalf of all Prepetition Secured Noteholders, to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions (whether in or out of court) as may be necessary or appropriate to fulfill its obligations under the Investment Agreement, including but not limited to (i) in connection with any dispute regarding the calculation of the post-closing adjustment to the Initial Purchase Price under the Investment Agreement (to the extent contemplated by the Investment Agreement), (ii) for purposes of electing an Accounting Firm as contemplated by Section 1.1 of the Investment Agreement and (iii) becoming a party to the Escrow Agreement as contemplated by Section 2.5(a) of the Investment Agreement, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. From and after the Effective Date and continuing through the date of entry of a final decree closing the Chapter 11 Case, the Noteholders' Representative shall possess the rights of a party-in-interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Chapter 11 Cases and, in connection therewith, shall have the right to appear and be heard on matters brought before the Bankruptcy Court and/or the interpretation or enforcement of the Investment Agreement, including, without limitation, the following:

(a)    settling, allowing, objecting to or otherwise disposing of any Claims that constitute the Debtors' Claim Portion;

(b)    seeking estimation of contingent or unliquidated Claims that constitute the Debtors' Claim Portion under section 502(c) of the Bankruptcy Code;

(c)    seeking determination of the tax liability associated with any Claims that constitute the Debtors' Claim Portion under section 505 of the Bankruptcy Code;

(d)    taking any and all other actions necessary or appropriate to implement any of the foregoing.

3.    *Reimbursement of Costs and Expenses*.  The reimbursement of reasonable costs and expenses of the Noteholders' Representative, including, without limitation, any professionals retained by the Noteholders' Representative, shall be made from the Noteholders' Representative Cash Reserve.  The payment of such amounts to the Noteholders' Representative and its retained professionals shall be made in the ordinary course of business with the consent of the Supermajority Consenting Debtholders and shall not be subject to the approval of the Bankruptcy Court; *provided, however,* that any disputes related to such fees, costs and expenses shall be brought before the Bankruptcy Court.

4.    *Limitation of Liability*.  As of and after the Effective Date, neither the Noteholders' Representative nor any of its Related Persons shall be liable for any act taken or omitted to be taken in such capacity in connection with or in contemplation of the transactions contemplated by this Plan and/or the Investment Agreement, in each case other than for acts or omissions constituting gross negligence, actual fraud or willful misconduct of such applicable Entity as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

The Noteholders' Representative and each of its Related Persons may, in connection with the performance of their respective functions, and in their sole and absolute discretion and without any requirement or obligation, consult with the respective attorneys, accountants, financial advisors, and other professionals of the Reorganized Debtors, and shall not be liable for any act taken, omitted to be taken or suffered to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions are provided in writing (other than for acts or omissions constituting gross negligence, actual fraud or willful misconduct of such applicable Entity as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction).

5.    *Forum For Actions Against the Noteholders' Representative*.  The Confirmation Order shall state that, without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Noteholders' Representative in its official capacity as such, with respect to its status, duties, powers, acts or omissions as Noteholders' Representative in any forum other than the Bankruptcy Court.

6.    *Insurance*.  The Noteholders' Representative shall be authorized to obtain all reasonably necessary insurance coverage for itself and its Related Persons, including, but not limited to, coverage with respect to the liabilities, duties and obligations of the Noteholders' Representative and its Related Persons under the Investment Agreement and this Plan (in the form of an errors and omissions policy, general liability, or otherwise), which insurance coverage may remain in effect for a reasonable period (not to exceed six years) after the closing of the Chapter 11 Cases.  Any such insurance coverage shall be paid for from the Consenting Debtholders Representative Cash Reserve.

7.    *Authority to Object to and Settle Certain Disputed Claims*.  From and after the Effective Date, the Noteholders' Representative shall be authorized with respect to those Claims which are not

Allowed hereunder or by Final Order and that constitute the Debtors' Claim Portion, (i) to object to, and seek estimation of, any such Claims and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle such Disputed Claims, in the ordinary course of business and without further notice to or order of the Bankruptcy Court.

U.     *Fees and Expenses of Prepetition Term Loan Agent & Ad Hoc Secured Noteholders Committee*

Without limiting the terms or conditions of Section 3.3(f) of the Investment Agreement, the Debtors shall, on the Effective Date and to the extent invoiced, pay the Prepetition Term Loan Agent Fees and Expenses and the Ad Hoc Secured Noteholders Committee Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; provided, however, if the Debtors or Reorganized Debtors and any such Entity cannot agree with respect to the reasonableness of the fees and expenses to be paid to such party, the reasonableness of any such fees and expenses shall be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors on the Effective Date and any disputed amounts to be escrowed by the Debtors).

V.     *Fees and Expenses of Indenture Trustee*

Without limiting the terms or conditions of Section 3.3(f) of the Investment Agreement, the Debtors shall, on the Effective Date and to the extent invoiced, pay the Prepetition Secured Notes Indenture Trustee Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without the need to provide individual time records or application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; provided, however, if the Debtors or Reorganized Debtors and any such Entity cannot agree with respect to the reasonableness of the fees and expenses to be paid to such party, the Debtors shall (i) pay the undisputed portion of any invoices submitted on or before the Effective Date, (ii) place any disputed amounts in escrow on the Effective Date, and (iii) notify the Prepetition Secured Notes Indenture Trustee of any dispute within ten (10) days after the presentation of an invoice by the Prepetition Secured Notes Indenture Trustee.  Upon such notification, the Prepetition Secured Notes Indenture Trustee may assert the Trustee Charging Lien to pay the undisputed and unpaid portion of the Prepetition Secured Notes Indenture Trustee Fees and Expenses, and/or after the parties have attempted in good faith to resolve any such dispute for at least fifteen (15) days after the notification of the dispute, may submit such dispute for resolution to the Bankruptcy Court; provided, however, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the Prepetition Secured Notes Indenture.  Nothing herein shall be deemed to impair, waive, discharge, or negatively affect any Trustee Charging Lien for any fees, costs and expenses not paid pursuant to this Plan and otherwise claimed by the Prepetition Secured Notes Indenture Trustee pursuant to this section and in accordance with the Prepetition Secured Notes Indenture.  For the avoidance of doubt, the Trustee Charging Lien shall be released as and when required under the Prepetition Secured Notes Indenture and the Amended Secured Notes Indenture.

W.     *Completion Bonus Program*

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to make the payments contemplated by the Completion Bonus Program pursuant to section 1129(a)(4) of the Bankruptcy Code, without further notice and hearing or consent of any Person.  The aggregate payments under the Completion Bonus Program will not exceed $750,000.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors (subject to the consent of the Investor given in its sole discretion) in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)       have been assumed or rejected by prior order of the Bankruptcy Court;

(ii)      are the subject of a motion to reject pending on the Effective Date;

(iii)     are identified on Plan Schedule 5 hereto or in the Plan Supplement, in either case which Plan Schedule may be amended by the Debtors (subject to the consent of the Investor given in its sole discretion) to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Plan Schedule and serving it on the affected contract parties at least ten (10) days prior to the date of the Confirmation Hearing; or

(iv)     are rejected or terminated pursuant to the terms of this Plan.

Without amending or altering the Cure Claim Procedures Order or any other prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to this Plan (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of this Plan, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.  The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.  Each Executory Contract and Unexpired Lease assumed pursuant to this Plan or by an order of the Bankruptcy Court, which has not been assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its respective terms and conditions, except as limited or modified by the provisions of this Plan.

B.    *Assignment of Executory Contracts or Unexpired Leases*

In the event of an assumption and assignment of an Executory Contract or Unexpired Lease, at least ten (10) days prior to the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which

SF\5604545.10

will: (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.  Additionally, the Debtors shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts.  Any applicable cure amounts shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable cure amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtors at least three (3) days prior to the Confirmation Hearing (notwithstanding anything in the Schedules or a Proof of Claim to the contrary).  Without amending or altering the Cure Claim Procedures Order, any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall, without amending or altering the Cure Claim Procedures Order, be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  If an objection to an assignment or a cure amount is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.  The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

C.    *Rejection of Executory Contracts or Unexpired Leases*

The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any contract or lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease.  All Executory Contracts and Unexpired Leases listed on <u>Plan Schedule 5</u> shall be deemed rejected as of the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this <u>Article VI</u> pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

D.    *Claims on Account of the Rejection of Executory Contracts or Unexpired Leases*

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G hereof. To the extent applicable, the limitations imposed by section 502 of the Bankruptcy Code shall apply to the relevant rejection Claim, including, without limitation, subsection 502(b)(6) and subsection 502(b)(7) thereof.

E.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code and without amending or altering the Cure Claim Procedures Order, by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree (the "**Cure Claim Amount**"). At least ten (10) days prior to the Confirmation Hearing, the Debtors shall file and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will:  (1) list the applicable cure amount, if any; and (2) describe the procedures for filing objections thereto.

Without amending or altering the Cure Claim Procedures Order, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Debtors at least three (3) days prior to the Confirmation Hearing (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to the proposed assumption and cure amount. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall, without amending or altering the Cure Claim Procedures Order, be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to assumption or cure amount is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it. The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption of any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed by Final Order shall be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Extension of Time to Assume or Reject*

Notwithstanding anything to the contrary set forth in Article VI of this Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed assumption provided for in Article VI.A of this Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

# ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the "Treatment" sections in Article III hereof or as ordered by the Bankruptcy Court, initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Article VIII hereof.

B.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in this Plan, the Confirmation Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

C.      *Distributions by the Reorganized Debtors or Other Applicable Distribution Agent*

Other than as specifically set forth below, the Debtors, the Reorganized Debtors or other applicable Distribution Agent shall make all distributions required to be distributed under this Plan. Distributions on account of the Allowed Prepetition Term Loan Claims and Allowed Prepetition Secured Notes Claims shall be made to the Prepetition Term Loan Agent and the Prepetition Secured Notes Indenture Trustee, respectively, and such applicable agent will be, and shall act as, the Distribution Agent with respect to its respective Class of Claims.  The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by this Plan and may pay the reasonable fees and expenses of such entities and the Distribution Agents in the ordinary course of business.  No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

D.      *Delivery and Distributions; Undeliverable or Unclaimed Distributions*

1.      Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed.  Accordingly, the Debtors, the Reorganized Debtors or other applicable Distribution Agent will have no obligation to recognize the

assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim (other than Prepetition Debt Claims) that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims (other than Prepetition Debt Claims) who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  The Reorganized Debtors or other applicable Distribution Agent shall be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date; provided, however, that the foregoing shall not apply to the Prepetition Debt Claims.  Instead, (i) the Prepetition Term Loan Agent shall be deemed the holder of the Prepetition Term Loan Claims and distributions with respect thereto shall be governed by the Prepetition Term Loan Credit Agreement and (ii) solely with respect to receiving distributions under this Plan, the Prepetition Secured Notes Indenture Trustee shall be deemed to be the holder of the Prepetition Secured Notes Claims and distributions with respect thereto shall be governed by the Prepetition Secured Notes Indenture.

2.    Delivery of Distributions in General

Except as otherwise provided herein, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, shall make distributions to Holders of Allowed Claims, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other applicable Distribution Agent's books and records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined in the discretion of the applicable Distribution Agent (subject to the terms and conditions of the relevant Prepetition Debt Credit Agreement, if applicable); provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the latest Proof of Claim Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date.

3.    Minimum Distributions

Notwithstanding anything herein to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $25.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars, in each case with respect to Impaired Claims.  With respect to Impaired Claims, whenever any payment or distribution of a fraction of a dollar (including with respect to the Amended Secured Notes, if applicable) under this Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or more being rounded up to the next higher whole number and with less than half dollars being rounded down to the next lower whole number.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim that is Impaired under this Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $25.00, which shall be treated as an undeliverable distribution under Article VII.D.4 below.

4.  Undeliverable Distributions

    (a)       Holding of Certain Undeliverable Distributions

If the distribution to any Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due but missed distributions shall be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent).   Undeliverable distributions shall remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to Article VII.D.4(b) hereof, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

    (b)       Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property, or any Distribution Agent.   In such case, any Cash for distribution on account of such rights for undeliverable or unclaimed distributions shall become the property of the Estates free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.   Any Cash, Amended Secured Notes and/or other Plan Securities and Documents or other property held for distribution or allocation on account of such Claim shall be distributed or allocated to the Prepetition Secured Notes Indenture Trustee for distribution or allocation in accordance with this Plan.    Nothing contained in this Plan shall require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim.

    (c)       Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check.   In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 90 days after the issuance of such checks, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks.   This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open.   Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.   Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 365 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such Claim against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property.   In such case, any Cash held for payment on account of such Claims shall be distributed to the Prepetition Secured Notes Indenture Trustee for distribution in accordance with this Plan, free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.

E.      *Compliance with Tax Requirements*

In connection with this Plan and all distributions hereunder, the Reorganized Debtors or other applicable Distribution Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors or other applicable Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of this Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F.      *Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

G.      *Means of Cash Payment*

Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

H.      *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the "Treatment" sections in <u>Article III</u> hereof or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in <u>Article VIII</u> hereof.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

I.      *Setoffs*

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; <u>provided</u>

that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, shall provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved.  In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Litigation Claims, all of which are reserved unless expressly released or compromised pursuant to this Plan or the Confirmation Order.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.      *Resolution of Disputed Claims*

1.      Allowance of Claims

After the Effective Date, the Debtors and the Reorganized Debtors shall, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  Subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, the Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

2.      Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, shall have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; *provided*, *however*, this provision shall not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases. From and after the Effective Date, the Reorganized Debtors, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors shall, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3.    Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may at any time, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claims, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation.

4.    Deadline to File Objections to Claims

Any objections to Claims shall be Filed by no later than the Claims Objection Deadline; provided that nothing contained herein shall limit the Reorganized Debtors' right to object to Claims, if any, Filed or amended after the Claims Objection Deadline, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan.  Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Debtors or the Reorganized Debtors shall, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.  Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Reorganized Debtors shall continue to have the right to amend any claims or other objections and to File and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is or becomes Allowed by Final Order of the Bankruptcy Court.

B.    *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim pursuant to a Final Order.

C.    *Distributions on Account of Disputed Claims Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims*

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), the Reorganized Debtors or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims of property that would have been distributed to the Holders of such Claim on the dates distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims or Disallowed Claims by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates.  Such distributions will be made pursuant to the applicable provisions of Article VII of this Plan.

D.      *Reserve for Disputed Claims*

The Debtors, the Reorganized Debtors and the Distribution Agent, as applicable, shall establish such appropriate reserves for Disputed Claims in Classes as it determines necessary and appropriate, including, without limitation, as part of the Cash Reserves, in each case with the consent of the Noteholders' Representative or as approved by order of the Bankruptcy Court.  Without limiting the foregoing, reserves for Disputed Claims shall equal an amount of Cash equal to 100% of distributions to which Holders of such Disputed Claims in each applicable Class would be entitled under this Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors and the Reorganized Debtors, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims, subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan; provided, further, that the Debtors shall provide the Investor with information regarding the reserves established for Disputed Claims as may be reasonably requested by Investor.


# ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    This Plan and the Restructuring Documents shall be in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Debtors, the Supermajority Consenting Debtholders and the Investor; and

2.    The Confirmation Order shall have been entered by the Bankruptcy Court.

B.      *Conditions Precedent to Consummation*

It shall be a condition to Consummation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof.

1.      The Confirmation Order shall have become a Final Order and the Confirmation Date shall have occurred.

2.      The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order), in form and substance reasonably acceptable to the Debtors and the Supermajority Consenting Debtholders and acceptable to the Investor, authorizing the assumption, assumption and assignment and rejection of the Executory Contracts and Unexpired Leases by the Debtors as contemplated in this Plan and the Plan Supplement.

3.      This Plan and the Restructuring Documents shall not have been amended or modified other than  in a manner in form and substance consistent in all material respects with the Restructuring Term

Sheet and otherwise reasonably acceptable to the Debtors, the Supermajority Consenting Debtholders and the Investor.

4.    The Restructuring Documents shall have been filed, tendered for delivery, and been effected or executed by all Entities party thereto (as appropriate), and in each case in full force and effect. All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Investment Agreement, shall have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or shall be satisfied concurrently with the occurrence of the Effective Date).

5.    All consents, actions, documents, certificates and agreements necessary to implement this Plan and the transactions contemplated by the Investment Agreement shall have been, as applicable, obtained and not otherwise subject to unfulfilled conditions, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws, and in each case in full force and effect.

6.    The Debtors shall have received, or will receive concurrently with the occurrence of the Effective Date, the Initial Purchase Price in Cash and in accordance with the terms and conditions of the Investment Agreement.

7.    The New Board shall have been selected.

8.    The Cash Reserves shall have been funded in full in Cash by the Debtors in accordance with the terms and conditions of this Plan.

9.    All Ad Hoc Secured Noteholders Committee Fees and Expenses shall have been paid in full in Cash or reserved in a manner acceptable to the Majority Consenting Debtholders to the extent of any disputes, as required by the DIP Facility Orders, including the adequate protection obligations in paragraph 12 thereof, pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.

C.    *Waiver of Conditions*

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of this Plan set forth in this <u>Article IX</u> may be waived by the Debtors, with the consent of the Supermajority Consenting Debtholders and the Investor, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan.  The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

D.    *Effect of Non-Occurrence of Conditions to Confirmation or Consummation*

If the Confirmation or the Consummation of this Plan does not occur with respect to one or more of the Debtors, then this Plan shall, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

# ARTICLE X.

## RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS

A.    *General*

Pursuant to section 1123 of the Bankruptcy Code (and in addition, but solely with respect to Class 5 Claims, Bankruptcy Rule 9019), and in consideration for the classification, distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to this Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; *provided*, *however*, that nothing contained herein shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan.

B.    *Release of Claims and Causes of Action*

1.    *Release by the Debtors*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this <u>Article X</u> or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**Debtor Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or

events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule 6; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this Article X.B shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

2.    *Release By Third Parties*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held,

existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party Release shall not operate to waive or release (i) any Causes of Action expressly listed on Plan Schedule 7; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

C.      *Waiver of Statutory Limitations on Releases*

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party.  The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

D.       *Discharge of Claims*

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, effective as of the Effective Date, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, Equity Interests or Causes of Action.

Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto shall be extinguished completely without further notice or action; and (iii) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

E.       *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; *provided*, *however*, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; *provided*, *further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel

concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

F.      *Preservation of Causes of Action*

    1.    Maintenance of Causes of Action

Except as otherwise provided in this Article X or elsewhere in this Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases, but in all cases subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan. The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court, but in all cases subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan.

    2.    Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors expressly reserve all Causes of Action and Litigation Claims for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except in each case where such Causes of Action or Litigation Claims have been expressly waived, relinquished, released, compromised or settled in this Plan (including, without limitation, and for the avoidance of doubt, the Release contained in Article X.B and Exculpation contained in Article X.E hereof) or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

G.      **Injunction**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY**

**SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).   ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

H.    *Binding Nature Of Plan*

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THIS PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THIS PLAN, EACH ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THIS PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THIS PLAN.**

I.    *Protection Against Discriminatory Treatment*

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.    *Plan Indemnity*

In addition to the matters set forth in this Plan and not by way of limitation thereof, the Reorganized Debtors and the Investor shall, and the Debtors shall continue to, indemnify and hold harmless all Persons who are or were managers, officers or directors of any of the Debtors at any time on

or after the Petition Date on account of and with respect to any Claims (whether or not any Proof of Claim or cure claim has been Filed with respect thereto) or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities threatened or asserted by any Person against any such managers, officers or directors with respect to or based upon, in whole or in part, any act taken or omitted to be taken, or alleged act taken or omitted to be taken, in such capacities on or prior to the Effective Date, irrespective of whether such amounts are owed in connection with a prepetition or postpetition act or omission, but in each case only to the extent that (a) the acts, omissions or alleged acts or omissions of such applicable Person were indemnifiable under the Debtors' prepetition organizational documents (whether in the bylaws, certificates of incorporation, charters, operating agreements, board resolutions, employment contracts or otherwise) and (b) the otherwise indemnifiable expense, liability, loss, or other amount is determined not to be covered under the D&O Tail Policy purchased by the Debtors prior to the Petition Date.  The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court.

K.      *Integral Part of Plan*

Each of the provisions set forth in this Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of this Plan and essential to its implementation.  Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Equity Interest;

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtors are party or with respect to which the Debtors or Reorganized Debtors may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected (as applicable);

4.   resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5.   ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

6.   decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, *provided, however* that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.   enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

8.   resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

9.   hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10. issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan, except as otherwise provided in this Plan;

11. enforce the terms and conditions of this Plan and the Confirmation Order;

12. resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, the Indemnification and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such provisions;

13. hear and determine the Litigation Claims by or on behalf of the Debtors or Reorganized Debtors;

14. hear and determine all matters related to the administration or implementation of the Investment Agreement, including, without limitation, any issue or dispute pertaining to the Noteholders' Representative;

15. enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

16. resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with this Plan; and

17. enter an order concluding or closing the Chapter 11 Cases.

Notwithstanding the foregoing, if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or

related to the Chapter 11 Cases, including the matters set forth in this Article of the Plan, the provisions of this <u>Article XI</u> shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.    *Dissolution of the Committee*

On and as of the Effective Date, the Committee shall dissolve automatically and its members shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members or advisors to the Committee after the Effective Date.

B.    *Payment of Statutory Fees; Post-Effective Date Professional Fees and Expenses*

All outstanding fees payable pursuant to section 1930 of title 28, United States Code shall be paid when due.  The Reorganized Debtors shall pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses, or related support services (including reasonable fees and expenses relating to the preparation of final fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court, including, without limitation, fees, costs and expenses incurred in connection with the implementation, enforcement and Consummation of this Plan, including but not limited to the reasonable fees and expenses of the Distribution Agents.

C.    *Conflicts*

In the event that a provision of the Restructuring Documents or the Disclosure Statement (including any and all exhibits and attachments thereto) conflicts with a provision of this Plan or the Confirmation Order, the provision of this Plan and the Confirmation Order (as applicable) shall govern and control to the extent of such conflict.

D.    *Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order in a way that is in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Supermajority Consenting Debtholders and the Investor; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan in a way that is in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise reasonably acceptable to the Supermajority Consenting Debtholders and the Investor, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

E.        *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and/or to File subsequent chapter 11 plans, with respect to one or more of the Debtors.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation of this Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which this Plan was revoked or withdrawn or for which Confirmation or Consummation of this Plan did not occur: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

F.        *Successors and Assigns*

This Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Holders of Claims and Equity Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

G.        *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

H.        *Further Assurances*

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

I.        *Severability*

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that

each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

J.      Service of Documents

Any notice, direction or other communication given regarding the matters contemplated by this Plan (each, a "**Notice**") must be in writing, sent by personal delivery, electronic mail, courier or facsimile and addressed as follows:

If to the Debtors:

OnCure Holdings, Inc.
Attn: Bradford C. Burkett
188 Inverness Drive West, Suite 650
Englewood, Colorado, 80112
Fax: (303) 643-6560
E-mail: brad@mppartnersllc.com

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attention:  Keith A. Simon
Fax:   (212) 751-4864
E-mail:keith.simon@lw.com

If to the Investor:

Radiation Therapy Services
1010 Northern Boulevard - Suite 314
Great Neck, NY 11021
Attention: Norton L. Travis
Fax:  (516) 301-5778
E-mail:ntravis@rtsx.com

with a copy to:

Vestar Capital Partners V, L.P.
245 Park Avenue
41st Floor
New York, NY 10167
Attention: Erin Russell
Fax: (212) 808-4922
E-mail:ERussell@VestarCapital.com

with a copy to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022
> Attention: Michael Movsovich, P.C.
>            Christopher Marcus, P.C.
> Fax: (212) 446-6460
> E-mail: mmovsovich@kirkland.com;cmarcus@kirkland.com

If to the Noteholders' Representative:

> [To Insert Information Once Appointed]

with a copy to:

> Stroock & Stroock & Lavan LLP
> 2029 Century Park East, Suite 1600
> Los Angeles, California 90067
> Attention: Frank Merola, Esq.
> Fax: (310) 407-6302
> E-mail: fmerola@stroock.com

with a copy to:

> Stroock & Stroock & Lavan LLP
> 180 Maiden Lane
> New York, New York 10038
> Attention: Jayme T. Goldstein, Esq.
> Fax: (212) 806-6006
> E-mail: jgoldstein@stroock.com

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section. Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed. Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party. The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

K.    *Exemption from Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code*

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with this Plan or the Restructuring Documents shall not be subject to any Stamp or Similar Tax or

governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under this Plan or the Restructuring Documents, including, without limitation, the Amended Secured Notes and guarantees issued or provided in connection therewith, (ii) the issuance of the New Common Stock and (iii) the maintenance or creation of security interests or any Lien as contemplated by this Plan or the Restructuring Documents.

L.    *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Restructuring Document or an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

M.    *Tax Reporting and Compliance*

The Reorganized Debtors are hereby authorized, on behalf of the Debtors, but subject to the rights of the Noteholders' Representative contained in Article V.T of this Plan, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

N.    *Schedules*

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated herein and are a part of this Plan as if set forth in full herein.

O.    *No Strict Construction*

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, DIP Lenders, the Prepetition Term Loan Lenders, the Prepetition Secured Noteholders, the Investor and their respective professionals.  Each of the foregoing was represented by counsel of its choice who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, the Exhibits and the Plan Schedules, and the agreements and documents ancillary or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, the Exhibits or the Plan Schedules, or the documents ancillary and related thereto.

P.    *Entire Agreement*

Except as otherwise provided herein or therein, this Plan and the Restructuring Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan and the Restructuring Documents.

Q.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

R.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

S.      *2002 Notice Parties*

After the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

SF\5604545.10

Dated:  August 22, 2013

Respectfully submitted,

ONCURE HOLDINGS, INC. AND ITS AFFILIATE
DEBTORS

By:      /s/ Bradford C. Burkett
Title:    President and Chief Executive Officer

**<u>Exhibit A</u>**


Amended/New Organizational Documents


[To Be Filed With Plan Supplement]

**Exhibit B**

Amended Secured Notes Guarantees

[To Be Filed With Plan Supplement]

**Exhibit C**

Amended Secured Notes Indenture

[To Be Filed With Plan Supplement]

**Exhibit D**

Amended Secured Notes Indenture Term Sheet

## Summary of Principal Terms and Conditions of
## OnCure Holdings, Inc. First Lien Notes

*This Summary of Principal Terms and Conditions, together with the Annexes attached hereto, (collectively, this "Term Sheet") outlines certain key terms of the Amended Notes. Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Investment Agreement to which this Term Sheet is attached as Exhibit L thereto.*

**General Rules of Construction**.........

The terms, covenants, conditions and other provisions contained in the indenture (the "OnCure Indenture") governing the Amended Notes will be substantially similar in form to the terms, covenants, conditions and other provisions contained in the indenture (the "RTS Indenture") governing the 8 7/8% Senior Secured Second Lien Notes due 2017 (the "RTS Second Lien Notes") issued by Radiation Therapy Services, Inc., a Florida corporation (the "Investor"), with revised basket sizes and revisions as described in Annex A hereto; provided, however, that (i) that with respect to matters that are (x) not covered herein or (y) contemplated herein but not fully specified in detail, the Investor and the Consenting Debtholders agree, in each case, to negotiate in good faith to develop modifications and revisions to the OnCure Indenture that are appropriate to reflect such matters and reasonably acceptable to the Investor and the Majority Consenting Debtholders. Without limitation to the generality of the foregoing, it is acknowledged and agreed that due to the proposed structure of the Amended Notes (including, without limitation, as to matters set forth in "**Guarantors**", "**Ranking**" and "**Collateral**" below), there will be certain terms and conditions in the OnCure Indenture that are (x) not covered herein or (y) contemplated herein but not fully specified in detail that will also need to be modified or otherwise revised to account for such proposed structure and the Investor and the Consenting Debtholders agree to negotiate in good faith to develop modifications and revisions to such terms and conditions that are appropriate to reflect such proposed structure and reasonably acceptable to Investor and the Majority Consenting Debtholders.

Unless otherwise specifically set forth in this Term Sheet, the terms, covenants, conditions and other provisions contained in the OnCure Indenture will address OnCure (as defined below) and its subsidiaries, such that references in the OnCure Indenture to the term "Company" and "Subsidiaries" (or variations thereof, such as "Restricted Subsidiaries") shall mean and be a reference to OnCure and the subsidiaries of OnCure, respectively.

1

**Issuer**........................................ OnCure Holdings, Inc., a Delaware corporation ("OnCure").

**Amended Notes**........................... $75.0 million in aggregate principal amount (after giving effect to the amendment of the Notes (as in effect on the date of the Investment Agreement)).

In addition, $7.5 million in aggregate principal amount of Amended Notes (the "Earn-Out Notes") will be deposited on the Closing Date into an escrow account (the "Escrow Account") to be held by an escrow agent, which escrow agent shall be selected by the Majority Consenting Debtholders in their reasonable discretion and reasonably acceptable to Investor (the "Escrow Agent"), pursuant to an escrow agreement in form and substance reasonably satisfactory to the Investor and the Majority Consenting Debtholders (the "Escrow Agreement"). Pursuant to the terms of the Escrow Agreement, the Escrow Agent shall release the Earn-Out Notes, together with any amounts deposited therein pursuant to any Earn-Out Prepayment Event, to holders of the Amended Notes of record as of December 31, 2015 (or, if an Earn-Out Prepayment Event has occurred prior to such date that resulted in the redemption, prepayment, retirement, defeasance or refinancing of all of the Amended Notes, the date of determination of the holders of the Amended Notes that were entitled to receive payment in respect of the Amended Notes in connection with such Earn-Out Prepayment Event) upon receipt of audited annual financial statements of OnCure and its subsidiaries for the fiscal year ended December 31, 2015 (the "2015 Financial Statements"), if the combined aggregate "Center-Level EBITDA" (to be defined in the OnCure Indenture) for the Specified Centers (as defined below) for such fiscal year is greater than $1.5 million (such condition, the "Earn-Out Condition"). In the event that the Earn-Out Condition is not satisfied, the Escrow Agent shall release the Earn-Out Notes to OnCure for cancellation, together with any other amounts then held in or credited to the Escrow Account. Any cash interest paid on the Earn-Out Notes while such Earn-Out Notes are held in or credited to the Escrow Account will be released to OnCure, promptly after such interest payment is made to the Escrow Agent, in accordance with the terms of the Escrow Agreement.

In the event an Earn-Out Prepayment Event (as defined below) occurs, OnCure shall pay to the Escrow Agent, for distribution by the Escrow Agent to holders of record of the Amended Notes on December 31, 2015 (or, in the case of any such Earn-Out Prepayment Event that results in the redemption, prepayment, retirement, defeasance or refinancing of all of the Amended Notes, the date of determination of the holders of the Amended Notes entitled to

2

receive payment in respect of the Amended Notes in connection with such Earn-Out Prepayment Event) upon satisfaction of the Earn-Out Condition, an amount in cash equal to the aggregate principal amount of the Earn-Out Notes that are subject to such Earn-Out Prepayment Event. "Earn-Out Prepayment Event" means any redemption, prepayment, retirement, defeasance or refinancing of the Amended Notes prior to the date on which OnCure receives the 2015 Financial Statements.

**Interest Rate and Payments**............    11.75% cash coupon. Interest on the Amended Notes will be paid semi-annually in cash on dates to be determined. Interest will accrue from the Closing Date.

**Maturity Date**...............................    The Amended Notes will mature on January 15, 2017.

**Guarantors**.................................    The Amended Notes will be jointly and severally guaranteed on a senior secured basis by each existing and future domestic restricted subsidiary of OnCure (the "OnCure Subsidiaries," together with OnCure, the "OnCure Entities"). As of the Closing Date, such guarantors shall be the subsidiaries of OnCure that guarantee the obligations under the Note Indenture (as in effect immediately prior to the Closing Date).

The Amended Notes will be jointly and severally guaranteed on a senior unsecured basis by Investor, Radiation Therapy Services Holdings, Inc. (the "Parent") and each existing and future restricted subsidiary of Investor (other than foreign subsidiaries and excluding the OnCure Entities) (the "RTS Subsidiaries," together with Investor and the Parent, the "RTS Entities;" and the RTS Entities together with the OnCure Entities, collectively, the "RTS/OnCure Entities") that guarantees the obligations of the Investor under Credit Agreement (as defined in the RTS Indenture), pursuant to a covenant substantially similar to the covenant to provide guarantees under the RTS Indenture. As of the Closing Date, such guarantors shall be the Investor, Parent and each RTS Subsidiary that guarantees the obligations of the Investor on such date under the Credit Agreement (as defined in the RTS Indenture) as in effect on the Closing Date. The guarantee (the "RTS Guarantee") of each of the RTS Entities shall contain covenants and events of default substantially similar to those applicable to the RTS Entities contained in the RTS Indenture. For the avoidance of doubt, Parent will not be subject to any additional covenants than those to which it is currently subject under the RTS Indenture, except as otherwise set forth herein.

**Ranking**.....................................    The Amended Notes will be:

3

- ranked *pari passu* in right of payment with all existing and future senior indebtedness of the OnCure Entities, but effectively senior to all existing and future senior indebtedness of the OnCure Entities to the extent of the value of the OnCure Collateral (as defined below); and

- senior in right of payment to all existing and future subordinated obligations of the OnCure Entities.

**Optional Redemption**..................... Non-callable, in whole or in part, prior to September 30, 2015. At any time on or prior to such date, the Amended Notes may be redeemed or purchased, in whole or in part, at a price equal to 100% the principal amount thereof *plus* the Applicable Premium (to be defined substantially similar to such definition contained in the RTS Indenture) *plus* accrued and unpaid interest thereon.

Thereafter, the Amended Notes shall be callable, in whole or in part, during the periods set forth below, for the redemption prices set forth opposite such period below (expressed as a percentage of the principal amount of the Amended Notes to be redeemed):

| | |
|---|---|
| September 30, 2015 through but excluding February 15, 2016 | 106% (*plus* accrued and unpaid interest) |
| February 15, 2016 through but excluding July 31, 2016 | 103% (*plus* accrued and unpaid interest) |
| July 31, 2016 and thereafter | 100% (*plus* accrued and unpaid interest) |

At any time on or prior to September 30, 2015, up to 35% of the principal amount of the Amended Notes may be redeemed, with the use of net cash proceeds of one or more equity offerings, at a redemption price of 111.75% of the principal amount thereof *plus* accrued and unpaid interest thereon.

**Change of Control**........................ Upon the occurrence of a change of control of either Investor or OnCure, OnCure will be required to offer to repurchase the Amended Notes at 101% of the outstanding principal amount thereof *plus* accrued and unpaid interest thereon.

**Collateral**................................. The Amended Notes will be secured by a valid and perfected first priority lien on the same assets and properties of the

4

OnCure Entities that secure, or purport to secure, the OnCure Entities' obligations under the indebtedness and other obligations under the Note Indenture and the related financing documents, in each case, as in effect immediately prior to the Closing Date (such assets and properties, the "OnCure Collateral").

**Intercreditor Agreements**................ An intercreditor agreement (such intercreditor agreement, the "Lender Intercreditor Agreement") between the duly appointed agent of the holders of the indebtedness and the other obligations under the Investor Credit Documents and the duly appointed agent of the holders of the Amended Notes (the "Amended Notes Agent") shall be entered into on customary terms pursuant to which the Liens on the OnCure Collateral that secure the indebtedness and other obligations under the Investor Credit Documents are made junior and subordinate in all respects to all Liens on the OnCure Collateral that secure the indebtedness and other obligations under the Amended Notes, the OnCure Indenture and the related financing documents (the "Amended Notes Obligations").

An intercreditor agreement (such intercreditor agreement, the "Notes Intercreditor Agreement") between the duly appointed agent of the holders of the RTS Second Lien Notes and the Amended Notes Agent shall be entered into on customary terms pursuant to which the Liens on the OnCure Collateral that secure the indebtedness and other obligations under the RTS Indenture, the RTS Second Lien Notes and the related financing documents are made junior and subordinate in all respects to all Liens on the OnCure Collateral that secure the Amended Notes Obligations.

Each of the Lender Intercreditor Agreement and the Notes Intercreditor Agreement shall be in form and substance reasonably acceptable to the Amended Notes Agent and Majority Consenting Debtholders.

Notwithstanding the foregoing, in lieu of the Lender Intercreditor Agreement and/or the Notes Intercreditor Agreement, a supplemental intercreditor agreement to, or an amendment and/or a joinder to, the Intercreditor Agreement (as defined in the RTS Indenture) may be entered into to the extent that such Intercreditor Agreement as so supplemented or amended provides for both (x) the terms contemplated above for the Lender Intercreditor Agreement and (y) the terms contemplated above for the Notes Intercreditor Agreement, and shall be in form and substance reasonably acceptable to the Amended Notes Agent and Majority Consenting Debtholders,

5

**Covenants (applicable to the OnCure Entities)**.....................................

Notwithstanding the terms and other provisions included in "General Rules of Construction" set forth above, the following modifications will be made to the covenants applicable to the Amended Notes (and the defined terms related to such covenants):

*Restricted Payments*

The restricted payments covenant shall include the following two separate baskets in lieu of the building-basket included in the RTS Indenture:

- A restricted payments build-up basket which shall permit distributions of cash or other assets from the OnCure Entities to the RTS Entities in an amount equal to the sum of (i) the cumulative amount of cash and the fair market value of other assets that are used in the business of the OnCure Entities that, in each case, the RTS Entities contribute to or invest in the OnCure Entities after the Closing Date and (ii) in the event that the cash so contributed or invested pursuant to clause (i) above was drawn from, or the assets so contributed or invested pursuant to clause (i) above were purchased with amounts drawn from, the credit facilities or other credit sources of the RTS Entities, the aggregate amount of interest payments made by the RTS Entities, as of the date of calculation, on such outstanding drawn indebtedness (collectively, the "RTS Contribution Indebtedness"), provided that the aggregate amount of restricted payments subsequently made under this basket shall be deemed to reduce the aggregate principal amount of such RTS Contribution Indebtedness as of the date of such restricted payment is made for purposes of calculating such interest amount under this clause (ii) (the "Investment Build-Up Basket"). Use of the Investment Build-Up Basket will be subject to a minimum liquidity (to be defined) threshold of $5.0 million at the OnCure Entities.

- A build-up basket which shall permit distributions of restricted payments from the OnCure Entities to the RTS Entities in an amount equal to 50% of the Consolidated Net Income (as defined in the RTS Indenture) of the OnCure Entities (or, if Consolidated Net Income is a loss, less 100% of such loss).

The restricted payments carve-outs permitting payments to parent companies for certain taxes, expenses, salaries and other payments (i.e. a carve-out as set forth in Section

6

4.10(b)(5) of the RTS Indenture) will provide for (x) the proportional allocation to the RTS Entities and OnCure Entities of any such tax, expense, payment and salary that is attributable to the operations of both the RTS Entities and OnCure Entities or (y) any such tax, expense, payment and salary that is related to or derived from a specific RTS Entity or OnCure Entity or the business, assets, liabilities, operations, finances, existence or other activities of a specific RTS Entity or OnCure Entity to be directly allocated to such RTS Entity or OnCure Entity.

Appropriate modifications will be made in the OnCure Indenture to prevent "double-counting" of other restricted payments baskets and the separate baskets described above.

Transactions contemplated by the Intercompany Services Agreement (as defined below) shall be permitted without restriction under the OnCure Indenture; provided that such transactions shall not increase or decrease the amount of the Investment Build-Up Basket.

| | |
|---|---|
| *Permitted Liens* | Liens securing indebtedness and the other obligations permitted to be incurred under credit facilities to be made junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
| | Liens securing permitted refinancing indebtedness must be junior and subordinate in all respects to the Liens securing the Amended Notes Obligations at least to the same extent that the Liens securing the refinanced indebtedness are junior and subordinate to the Liens securing the Amended Notes Obligations. |
| | Liens securing indebtedness that are permitted under the 3.25:1.00 consolidated secured leverage ratio test, which ratio shall be calculated with respect to the RTS/OnCure Entities, must be made junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. Other than guarantees of indebtedness of the RTS Entities, indebtedness related to such permitted Liens must have a maturity date on or after July 16, 2017. |
| *Indebtedness Covenant* | The calculation of the 2.0:1.0 consolidated fixed charge coverage ratio for purposes of allowing general "ratio" indebtedness (i.e., not indebtedness subject to specific |

7

baskets) shall be based on the RTS/OnCure Entities.

All intercompany indebtedness will be unsecured and subordinate in right of payment to the Amended Notes Obligations pursuant to a subordination agreement, to be an exhibit to the OnCure Indenture (which exhibit shall be in form and substance reasonably satisfactory to the Amended Notes Agent and the Majority Consenting Debtholders).

The anti-layering provision shall be in form and substance substantially identical to the anti-layering provision in the Note Indenture (as in effect on the date of the Investment Agreement).

*Asset Sales*

The asset sale covenant shall be on terms substantially the same as the covenant in the RTS Indenture; provided, that:

- Net proceeds from asset sales of the OnCure Entities must be applied, within 365 days of the receipt thereof, to (i) pre-pay the Amended Notes or (ii) re-invest in the assets or properties owned by the OnCure Entities.

- Asset sales shall include a transaction or series of related transactions for which the OnCure Entities receive aggregate consideration of $1.25 million or more.

- Designated Non-Cash Consideration (as defined in the RTS Indenture) will be limited to the greater of $2.5 million and 2.0% of total assets (calculated with respect to the OnCure Entities).

*Reports*

OnCure will provide the following information to holders of Amended Notes (which, at OnCure's option, may be provided through a password protected website): (i) audited annual financial statements prepared in accordance with GAAP (subject to the absence of footnotes), within the time periods required for such financial statements under the RTS Indenture, provided that such time period for the first fiscal year ending after the Closing Date shall be 120 days, (ii) unaudited quarterly financial statements prepared in accordance with GAAP (subject to the absence of footnotes), within the time periods required for such financial statements under the RTS Indenture, provided that such time period for the first fiscal quarter ending after the Closing Date shall be 60 days, and (iii) within the time periods required in a Current Report on Form 8-K under the Exchange Act, reports containing substantially the same information required to be contained in a Form 8-K pursuant to Item 1.01 (Entry into a

8

Material Definitive Agreement), 1.02 (Termination of a Material Definitive Agreement), 2.01 (Completion of Acquisition or Disposition of Assets), 2.03 (Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant), 2.04 (Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement), 4.01 (Changes in Registrant's Certifying Accountant), 4.02 (Non-Reliance of Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review), 5.01 (Changes in Control of Registrant), 5.02 (Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers), or 5.05 (Amendments to Articles of Incorporation or By-Laws; Change in Fiscal Year) thereof.

The RTS Guarantee shall contain a reporting covenant that requires the Investor to provide, together with delivery of its annual and quarterly reports, segment reporting including operational statistics with respect to the OnCure Entities.

*Intercompany Services Agreement*

OnCure and Investor shall enter into an intercompany services agreement (the "Intercompany Services Agreement"), the terms of which are subject to further mutual agreement; provided, however, it is understood and agreed that the services provided under such Intercompany Services Agreement shall be chargeable to the OnCure Entities at cost and the OnCure Entities shall be provided an annual inspection right (including the right to hire a third party consultant or advisor to assist with such inspection) to verify the books and records of the RTS Entities with respect to such services and the cost thereof.

*Affiliate Transactions*

- Transactions between the OnCure Entities and the RTS Entities ("Internal Affiliate Transactions") in excess of a threshold of $500,000 shall (i) be subject to an "arm's length basis" standard, (ii) to the extent in excess of $2.5 million, require board approval, and (iii) to the extent in excess of $10.0 million, require a fairness opinion; provided, however, no Internal Affiliate Transactions shall be permitted to the extent involving or relating to (w) a management services agreement or any similar agreement with any Managed Practice (to be defined) of the OnCure Entities, except to the extent permitted under "**Certain Additional Restrictions**" below, (x) any of the physicians or other employees within any

9

Managed Practice of the OnCure Entities, except to the extent permitted under "**Certain Additional Restrictions**" below, (y) equipment of the OnCure Entities, except to the extent such equipment is replaced prior to or concurrently with the consummation of such Internal Affiliate Transaction with similar equipment of a higher fair market value useful in the business of the OnCure Entities, and (z) transfers of real property of OnCure Entities or transfers of leases for real property under which an OnCure Entity is the lessee immediately prior to the consummation of such Internal Affiliate Transaction, except to the extent permitted under "**Certain Additional Restrictions**" below.

- The thresholds for affiliate transactions (other than Internal Affiliate Transactions) shall be as set forth on Annex A attached hereto.

*Certain Additional Restrictions*

- None of the RTS Entities shall enter into any management services agreement or any similar agreement with any Managed Practice of the OnCure Entities or any of the physicians or other employees affiliated with any such Managed Practice (for the avoidance of doubt, excluding any physicians or employees within RTS Entities) or transfer any real property or leases for real property of a Managed Practice or the OnCure Entities for a period of three (3) years following the date of expiration or termination of such management services agreement or similar agreement; provided that the RTS Entities may take the actions described above under a profits interest arrangement whereby if a Managed Practice is consolidated with an RTS Entity, the OnCure Entities will be provided in exchange an interest in such entity with a fair market value of no less than the Center-Level EBITDA on a LTM basis of such practice just prior to the consolidation, plus a sharing of the synergies of such consolidation in proportion to the revenue contribution of the relevant OnCure Entity on an LTM basis just prior to such consolidation, provided, that, (i) the Amended Notes Agent is provided a first priority Lien on such interest, (ii) such arrangement provides for a cash management arrangement pursuant to which cash allocable to the OnCure Entities

10

under such arrangement is promptly transferred to an account of OnCure in which the Amended Notes Agent has a first priority perfected Lien, and (iii) the aggregate amount of Center-Level EBITDA of all such practices subject to such arrangements does not exceed 20% of Center-Level EBITDA of all practices calculated as of the Closing Date; provided that the liens contemplated by clauses (i) and (ii) will be granted only to the extent that such Liens are on property or assets that would otherwise constitute OnCure Collateral. In addition, the RTS Entities shall not enter into an agreement outside of such consolidation with any of the physicians or other employees at the relevant Managed Practice unless such agreement is reasonably expected to result in increased synergies to the Managed Practice or Investor is able to replace the physicians or employees with persons reasonably expected to be of comparable talent.

- The OnCure Entities will not consummate any asset sale with respect to the property or assets of any of the Specified Centers or any sale of all or substantially all of the equity interests in any entity that owns a Specified Center and, for purposes hereof, an asset sale shall include any asset sale in which property or assets of any of the Specified Centers are sold or transferred to RTS Entities. Additionally, OnCure shall conduct the business and operations at the Specified Centers in the usual and ordinary course of business. The "Specified Centers" means those outpatient radiation oncology treatment centers for which affiliates of OnCure currently provide management services that are located in (i) Fountain Valley, California, (ii) Anaheim, California, (iii) Placentia, California, and (iv) Santa Maria, California.

- All cash, cash equivalents and other funds that are held or received by or owing to the OnCure Entities shall be deposited and held in or credited to an account or accounts over which a valid and perfected first priority lien has been granted in favor of the Amended Notes Agent (and shall not be commingled with any cash, cash equivalents and other funds of the RTS Entities), and the OnCure Entities shall direct and instruct all of their account debtors and obligors to make all payments due or to become due to the

11

OnCure Entities directly to such an account.

| | |
|---|---|
| **First Lien Obligations**.................... | The Amended Notes Obligations shall be designated and otherwise deemed to constitute "First Lien Obligations" for purposes of the Investor Secured Notes Documents and "Senior Debt" for purposes of the Investor Subordinated Notes Document.  The Investor shall designate Amended Notes Obligations as "senior debt" or the equivalent for purposes any future indenture or financing documentation. |
| **Registration Rights**........................ | None. |

## ONCURE HOLDINGS, INC.

First Lien Notes

*Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Term Sheet.*

Covenant Baskets[1]

| Covenant | RTS Indenture Section Reference | Basket Amount |
|---|---|---|
| **Indebtedness** | | |
| *Credit Facilities Basket* | Section 4.09(b)(2) | $150 million; provided that such indebtedness shall at all times be subject to the Lender Intercreditor Agreement. |
| *Capital Leases/Purchase Money Indebtedness* | Section 4.09(b)(4) | The greater of $10.0 million and 4.0% of total assets (calculated with respect to the OnCure Entities); provided, that the OnCure Entities may incur indebtedness in respect of guarantees of Capital Leases/Purchase Money Indebtedness of the RTS Entities so long as (x) the aggregate principal amount of such guarantees, together with all such other indebtedness incurred under this basket, does not exceed the greater of $50.0 million and 4.0% of Total Assets (calculated with respect to the RTS/OnCure Entities) and (y) such guarantees are unsecured or secured by Liens junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance |

---

[1] Baskets set forth herein apply to the OnCure Entities.

|  |  | substantially similar to the Lender Intercreditor Agreement. |
|---|---|---|
| *Intercompany Indebtedness* | Section 4.09(b)(8) | Such intercompany indebtedness to be unsecured and subordinated to the Amended Notes as set forth in **"Indebtedness Covenant"** in the Term Sheet. |
| *General Basket* | Section 4.09(b)(15) | $5.0 million; provided, that the OnCure Entities may incur indebtedness in respect of guarantees of indebtedness of the RTS Entities so long as (x) the aggregate principal amount of such guarantees, together with all such other indebtedness incurred under this basket, does not exceed $25.0 million and (y) such guarantees are unsecured or secured by Liens junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
| *Indebtedness of Non-Guarantors* | Section 4.09(b)(18) | The greater of $3.0 million and 1.25% of total assets (calculated with respect to the OnCure Entities). |
| **Restricted Payments** | | |
| *Annual Management Buyback/Rollover* | Section 4.10(b)(4) | $1.0 million per calendar year. |
| *Dividends post-IPO* | Section 4.10(b)(6) | To be deleted. |
| *General Basket* | Section 4.10(b)(12) | $4.0 million. |
| **Investments** | | |

A-2

| *Management Advances* | Clause (4) of "Permitted Investments" definition. | $1.0 million. |
|---|---|---|
| *Insurance Subsidiaries* | Clause (11) of "Permitted Investments" definition. | To be deleted |
| *JVs/Unrestricted Subs* | Clauses (10) and (12) of "Permitted Investments" definition. | $3.0 million in the aggregate; provided, however, an additional $7.0 million (or $10.0 million in the aggregate) to the extent that the only RTS/OnCure Entity that is an equity owner of such JVs/Unrestricted Sub is an OnCure Entity. |
| *Increases to existing Investments* | Clause (16) of "Permitted Investments" definition. | $2.5 million. |
| *General Basket* | Clause (19) of "Permitted Investments" definition. | $2.5 million. |
| **Liens** | | |
| *Hedging Obligations* | Clause (5) of "Permitted Liens" definition. | $1.0 million. |
| *Indebtedness Under Currency Agreements* | Clause (12) of "Permitted Liens" definition. | To be deleted (redundant to Clause (11) of "Permitted Liens" definition). |
| *Restricted Subsidiary* | Clause (19) of "Permitted Liens" definition. | To be deleted (redundant to Clause (14) of "Permitted Liens" definition). |
| *General Basket* | Clause (25) of "Permitted Liens" definition. | $5.0 million; provided, that the OnCure Entities may incur Liens in respect of guarantees of indebtedness of the RTS Entities incurred in the ordinary course of business so long as (i) the aggregate principal amount of such guarantees, together with all such other indebtedness secured by Liens under this basket, does not exceed $25.0 million and |

A-3

NY 74611821v7

| | | (y) such Liens are junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
|---|---|---|
| *Secured Debt Ratio Test* | Clause (26) of "Permitted Liens" definition. | As set forth in **"Permitted Liens"** in the Term Sheet. |
| **Affiliate Transactions** | | |
| *Carve-out* | Section 4.14(a) | $500,000.00 (other than with respect to Internal Affiliate Transactions). |
| *Board of Directors Approval Threshold* | Section 4.14(a) | $2.5 million (other than with respect to Internal Affiliate Transactions). |
| *Fairness Opinion Threshold* | Section 4.14(a) | $5.0 million (other than with respect to Internal Affiliate Transactions). |
| **Events of Default** | | |
| *Cross Acceleration Threshold* | Section 6.01(4) | $10.0 million (with respect to indebtedness of the RTS/OnCure Entities). |
| *Litigation Threshold* | Section 6.01(5) | $10.0 million (with respect to indebtedness of the RTS/OnCure Entities). |
| *% of Holders Needed to Call an Event of Default* | Section 6.02 | 25% |

A-4

**Exhibit E**

Completion Bonus Program

[To Be Filed With Plan Supplement]

**Exhibit F**


Escrowed Notes Agreement


[To Be Filed With Plan Supplement]

**<u>Exhibit G</u>**

Investment Agreement

**EXECUTION VERSION**

---

**INVESTMENT AGREEMENT**

**BY AND BETWEEN**

**ONCURE HOLDINGS, INC.**

**AND**

**RADIATION THERAPY SERVICES, INC.,**


**DATED AS OF JUNE 22, 2013**

---

# TABLE OF CONTENTS

**Page**

ARTICLE I Definitions ...................................................................................................1

    1.1    Definitions.................................................................................................1

ARTICLE II Sale and Purchase ....................................................................................17

    2.1    Purchase and Sale of the Shares..............................................................17
    2.2    Purchase Price .........................................................................................17
    2.3    Purchase Price Adjustment ......................................................................17
    2.4    Transaction Expenses...............................................................................20
    2.5    Deposit ....................................................................................................21
    2.6    Use of Proceeds.......................................................................................22

ARTICLE III Closing and Deliveries ...........................................................................22

    3.1    Closing ....................................................................................................22
    3.2    Deliveries by the Company......................................................................22
    3.3    Deliveries by Investor .............................................................................23

ARTICLE IV Representations and Warranties of the Company ...........................................24

    4.1    Existence and Good Standing ..................................................................24
    4.2    Validity and Enforceability......................................................................24
    4.3    Capitalization of the Company and its Subsidiaries ................................25
    4.4    No Conflict; Required Filings and Consents ...........................................25
    4.5    Financial Statements ...............................................................................26
    4.6    Conduct of Business ...............................................................................27
    4.7    Taxes.......................................................................................................27
    4.8    Real Property ...........................................................................................28
    4.9    Personal Property ....................................................................................28
    4.10    Intellectual Property................................................................................29
    4.11    Material Contracts...................................................................................29
    4.12    Insurance .................................................................................................31
    4.13    Litigation and Orders..............................................................................31
    4.14    Compliance with Laws ...........................................................................31
    4.15    Permits ....................................................................................................31
    4.16    Labor Matters..........................................................................................32
    4.17    Employee Benefit Plans ..........................................................................32
    4.18    Environmental..........................................................................................34
    4.19    Accounts Receivable................................................................................35
    4.20    Managed Practices and Suppliers ...........................................................35

4.21    Brokers...........................................................................................................36
4.22    Healthcare ....................................................................................................36
4.23    Arm's Length ................................................................................................37
4.24    No Unlawful Payments ................................................................................37
4.25    No Other Representations and Warranties....................................................38

**ARTICLE V Representations and Warranties of Investor** .................................................**38**

5.1     Existence and Good Standing ......................................................................38
5.2     Validity and Enforceability..........................................................................38
5.3     No Conflict; Required Filings and Consents ...............................................39
5.4     Financial Ability ..........................................................................................39
5.5     Financial Statements ....................................................................................39
5.6     Solvency.......................................................................................................40
5.7     No Litigation or Regulatory Action ............................................................40
5.8     Capitalization ...............................................................................................40
5.9     SEC Reports.................................................................................................41
5.10    Brokers .........................................................................................................41
5.11    Exemption from Registration.......................................................................41
5.12    Independent Investigation............................................................................41
5.13    No Other Representations and Warranties....................................................42

**ARTICLE VI Covenants and Agreements** .........................................................................**42**

6.1     Certain Bankruptcy Matters.........................................................................42
6.2     Automatic Stay.............................................................................................43
6.3     Agreement Motion and Agreement Order ...................................................43
6.4     Interim Operations of the Company ............................................................43
6.5     Financing......................................................................................................46
6.6     Reasonable Access; Confidentiality ............................................................46
6.7     Publicity .......................................................................................................47
6.8     Notice of Events...........................................................................................47
6.9     All Commercially Reasonable Efforts; Cooperation ..................................48
6.10    Financial Information...................................................................................49
6.11    Common Interest Agreement .......................................................................49
6.12    [Intentionally Deleted].................................................................................49
6.13    Capitalization of the Company as of the Effective Date..............................50
6.14    Diligence Questionnaire...............................................................................50

**ARTICLE VII Conditions to Closing** ................................................................................**50**

7.1     Conditions to Obligations of the Parties .....................................................51
7.2     Conditions to Obligations of the Company .................................................51
7.3     Conditions to Obligations of Investor.........................................................54
7.4     Frustration of Closing Conditions...............................................................55

**ARTICLE VIII Termination of Agreement** ......................................................................**56**

| | | | |
|---|---|---|---|
| 8.1 | Termination by Investor | ....................... | 56 |
| 8.2 | Termination by the Company | ....................... | 57 |
| 8.3 | Termination by Mutual Agreement | ....................... | 58 |
| 8.4 | Effect of Termination | ....................... | 58 |
| 8.5 | Damages Upon Termination | ....................... | 58 |

**ARTICLE IX Tax Matters** ....................................................... **60**

| | | | |
|---|---|---|---|
| 9.1 | Transfer Taxes | ....................... | 60 |

**ARTICLE X Miscellaneous and General** .......................... **60**

| | | | |
|---|---|---|---|
| 10.1 | Successors and Assigns | ....................... | 60 |
| 10.2 | Third Party Beneficiaries | ....................... | 60 |
| 10.3 | No Survival of Representations and Warranties | ....................... | 60 |
| 10.4 | Further Assurances | ....................... | 60 |
| 10.5 | Notices | ....................... | 61 |
| 10.6 | Entire Agreement | ....................... | 63 |
| 10.7 | Captions; Interpretation | ....................... | 63 |
| 10.8 | Amendment | ....................... | 63 |
| 10.9 | Waiver | ....................... | 64 |
| 10.10 | Governing Law; Submission to Jurisdiction | ....................... | 64 |
| 10.11 | Waiver of Jury Trial | ....................... | 64 |
| 10.12 | Severability | ....................... | 65 |
| 10.13 | Counterparts | ....................... | 65 |
| 10.14 | Specific Performance | ....................... | 65 |
| 10.15 | Disclosure | ....................... | 66 |
| 10.16 | Noteholders' Representative | ....................... | 66 |

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Plan Term Sheet |
| Exhibit B | - | Form of the Bidding Procedures |
| Exhibit C | - | Sample Calculation of Closing Working Capital |
| Exhibit D | - | Common Interest Agreement |
| Exhibit E | - | [Intentionally Omitted] |
| Exhibit F | - | Form of Opinion for Amended Notes |
| Exhibit G | - | Terms of Amended Notes |
| Exhibit H | - | Diligence Questionnaire |
| Exhibit I | - | DIP Motion |

**SCHEDULES**

| | | |
|---|---|---|
| Schedule 1.1(a) | - | First Day Motions |
| Schedule 1.1(b) | - | Management Services Agreements |
| Schedule 1.1(d) | - | Executory Contracts and Leases |
| Schedule 4.3(b) | - | Capitalization of Subsidiaries |
| Schedule 4.4(a) | - | Breaches and Defaults |

Schedule 4.4(b)          -          Government Authority and Contractual Consents
Schedule 4.5(c)          -          Material Liabilities
Schedule 4.7             -          Taxes
Schedule 4.8(a)          -          Leased Real Property
Schedule 4.8(b)          -          Owned Real Property
Schedule 4.10(a)(i)      -          Purchased Intellectual Property
Schedule 4.10(a)(ii)     -          Intellectual Property Claims or Proceedings
Schedule 4.11(a)         -          Material Contracts
Schedule 4.11(b)         -          Enforceability of Material Contracts
Schedule 4.12            -          Insurance
Schedule 4.13            -          Litigation and Orders
Schedule 4.14            -          Compliance with Law
Schedule 4.15            -          Permits
Schedule 4.16            -          Labor Matters
Schedule 4.17(a)         -          Employee Benefit Plans
Schedule 4.17(g)         -          Post-Termination Employee Benefits
Schedule 4.17(i)         -          Payments Under Employee Benefit Plans
Schedule 4.18            -          Environmental Matters
Schedule 4.20(a)         -          Top Managed Practices
Schedule 4.20(b)         -          Material Suppliers
Schedule 4.21            -          Brokers
Schedule 5.3(b)          -          Required Filings and Consents of Investor
Schedule 5.5(c)          -          Material Liabilities of Investor and its Subsidiaries
Schedule 5.8             -          Capitalization of Parent and Investor
Schedule 6.4             -          Interim Operations of the Company
Schedule 6.13            -          Capitalization of the Company
Schedule 7.3(l)          -          Excluded Management Services Agreements
Schedule 7.3(m)          -          Additional Delivery

## INVESTMENT AGREEMENT

This INVESTMENT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), is dated as of June 22, 2013, by and between OnCure Holdings, Inc., a Delaware corporation (the "Company"), and Radiation Therapy Services, Inc., a Florida corporation ("Investor"). Capitalized terms used, but not otherwise defined in this Agreement, shall have the respective meanings ascribed to such terms in Section 1.1.

## RECITALS

**WHEREAS**, the Company has implemented a financial restructuring of its existing debt, equity and other obligations by commencing cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to pursue confirmation of a chapter 11 plan of reorganization on terms and conditions that are consistent in all material respects with Exhibit A attached hereto and on terms and conditions otherwise reasonably acceptable to Investor (the "Plan", and such restructuring that is contemplated by the Plan, the "Restructuring");

**WHEREAS**, on or prior to the date hereof, the Consenting Debtholders consented in writing to the Company's execution and delivery of this Agreement and its consummation of the transactions contemplated herein; and

**WHEREAS**, subject to the entry of the Confirmation Order and in accordance with the terms and conditions set forth in this Agreement, upon the effective date of the Plan (the "Effective Date"), Investor shall buy from the Company, and the Company shall issue and sell to Investor, 100% of the shares of the reorganized Company's common stock, par value $0.001 per share (collectively, the "Shares"), to be newly issued pursuant to the terms of the Plan (the "Issuance").

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and subject to the terms and conditions set forth herein, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions.  For purposes of this Agreement:

"Accounting Firm" means a nationally recognized accounting firm jointly selected by the Noteholders' Representative and Investor; provided, however, that if the Noteholders' Representative and Investor cannot jointly agree on an Accounting Firm, the Noteholders' Representative and Investor shall each submit to their respective accountants the name of an accounting firm (which shall not be either of their respective accounting firms), and the Accounting Firm shall be selected by lot from these two firms by the respective accountants of the Noteholders' Representative and Investor.

"<u>Affiliate</u>" means, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of this definition, "control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with an agreement, arrangement or other understanding (written or oral); and the terms "controlling" and "controlled" shall have meanings correlative to the foregoing.

"<u>Agreed Principles</u>" means GAAP, as applied by the Company in connection with the preparation of the Audited Financial Statements.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Agreement Motion</u>" has the meaning set forth in <u>Section 6.3</u>.

"<u>Agreement Order</u>" means an order entered by the Bankruptcy Court granting the relief requested in the Agreement Motion for the approval of the Bidding Procedures and authorization to pay the Break Up Fee and the Transaction Expenses in accordance with the terms of (and subject to the conditions and limitations set forth in) this Agreement, which order shall be in form and substance reasonably acceptable to Investor.

"<u>Amended Note Documents</u>" means, collectively, the Amended Notes, the indenture governing the Amended Notes, the Amended Note Guarantees, and each other agreement (including any security agreement, pledge agreement, access agreement, control agreement and other collateral document), certificate, document, guarantee or instrument executed and/or delivered in connection with any of the foregoing.

"<u>Amended Note Guarantees</u>" has the meaning set forth in <u>Section 7.2(i)</u>.

"<u>Amended Notes</u>" has the meaning set forth in <u>Section 7.3(d)</u>.

"<u>Ancillary Agreement</u>" means the Restructuring Support Agreement, the Escrow Agreement, the Common Interest Agreement, and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Investor or the Company in connection with the consummation of the transactions contemplated by this Agreement, in each case only as applicable to the relevant party or parties to such Ancillary Agreement, as indicated by the context in which such term is used.

"<u>Audited Financial Statements</u>" has the meaning set forth in <u>Section 4.5(a)</u>.

"<u>Balance Sheet Date</u>" has the meaning set forth in <u>Section 4.5(a)</u>.

"<u>Bankruptcy Code</u>" has the meaning given to such term in the recitals to this Agreement.

"<u>Bankruptcy Court</u>" has the meaning given to such term in the recitals to this Agreement.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as

amended from time to time, applicable to the Chapter 11 Cases and any Local Rules of the Bankruptcy Court.

"<u>Bidding Procedures</u>" means the bidding, auction and notice procedures consistent in all material respects with the procedures set forth on <u>Exhibit B</u> attached hereto.

"<u>Break Up Fee</u>" has the meaning set forth in <u>Section 8.5(a)</u>.

"<u>Business</u>" has the meaning set forth in <u>Section 4.22(d)</u>.

"<u>Business Day</u>" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the City of New York in the State of New York.

"<u>Cash</u>" means, as of any time, all cash and all cash equivalent assets of the Company and its Subsidiaries as of such time (reduced by any certificates of deposit, bankers' acceptances or other restricted cash and any outstanding checks and transfers, but including any checks received and deposited by the Company or its Subsidiaries in the ordinary course of business prior to the Closing Date), determined on a consolidated basis in accordance with GAAP.

"<u>Chapter 11 Cases</u>" has the meaning given to such term in the recitals to this Agreement.

"<u>Closing</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Closing Inquiry Date</u>" has the meaning set forth in <u>Section 6.8</u>.

"<u>Closing Statement</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Closing Working Capital</u>" means Net Working Capital as of immediately prior to the Closing but after giving effect to (i) the releases, discharges, compromises, settlements, injunctions and restructurings of fees, costs, expenses, claims, liabilities and obligations of the Company and its Subsidiaries under the Plan, as well as making pro forma adjustments for any fees, costs, expenses or claims that are (w) not included in current liabilities of the Company or its Subsidiaries, (x) liabilities of the Company immediately prior to the Closing, (y) not satisfied in cash pursuant to the Plan or payable from, or covered by, a reserve that has been established under the Plan or an Order of the Bankruptcy Court and (z) will be included in current liabilities of the Company or its Subsidiaries immediately following the Closing Date, and (ii) all distributions made under the Plan on account of fees, costs, expenses, claims, liabilities and obligations of the Company and its Subsidiaries, but not giving effect to any other transactions, events, actions, omissions, circumstances or matters that occur after the Closing. Any fees, costs, expenses, claims, liabilities and obligations of the Company and its Subsidiaries which are (a) paid at or before the Closing, (b) payable from, or are covered by, a reserve that has been established under the Plan or an Order of the Bankruptcy Court, or (c) described in the second sentence of the definition of "Selling Expenses" shall not be included in Closing Working Capital. In addition, for purposes of calculating Closing Working Capital, the current assets of the Company and its Subsidiaries shall be increased, on a dollar-for-dollar basis, by an amount equal to the aggregate amount of fees, costs, expenses and/or claims paid in cash by the

Company or any of its Subsidiaries after the Petition Date and prior to the Closing for any of the items described in the second sentence of the definition of "Selling Expenses". A sample calculation of Closing Working Capital, based on the information included in the Audited Financial Statements, is attached as <u>Exhibit C</u> attached hereto.

"<u>Closing Working Capital Lower Target</u>" means an amount equal to (a) the Target Working Capital <u>minus</u> (b) $500,000.

"<u>Closing Working Capital Upper Target</u>" means an amount equal to (a) the Target Working Capital <u>plus</u> (b) $500,000.

"<u>CMS</u>" has the meaning set forth in <u>Section 1.1</u> in the definition of "Investor MAE".

"<u>CMS MAE</u>" has the meaning set forth in <u>Section 1.1</u> in the definition of "Investor MAE".

"<u>COBRA</u>" has the meaning set forth in <u>Section 4.17(f)</u>.

"<u>Code</u>" means the United States Internal Revenue Code of 1986.

"<u>Common Interest Agreement</u>" means an agreement substantially in the form of <u>Exhibit D</u> attached hereto.

"<u>Company</u>" has the meaning set forth in the preamble.

"<u>Company Debt</u>" means, as of any time, all Indebtedness (including accrued and unpaid interest thereon) of the Company and its Subsidiaries as at such time determined on a consolidated basis in accordance with GAAP. As used herein, the term "<u>Indebtedness</u>" means, with respect to any Person as at any time of determination, without duplication, (a) all indebtedness and other obligations of the Person for borrowed money (including all obligations for principal, interest, premiums, penalties, fees, expenses, breakage costs and bank overdrafts thereunder), (b) all indebtedness and other obligations of the Person evidenced by any bonds, debentures, notes or other similar instruments or debt securities, (c) any indebtedness guaranteed in any manner by the Person or any commitment by which the Person assures any other Person against loss with respect to Indebtedness (including contingent reimbursement obligations with respect to letters of credit), (d) all obligations of the Person secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on any property or assets owned or acquired by, or equity securities of, the Person, (e) any off balance sheet financing, including synthetic leases and project financing, (f) all obligations under capitalized leases required to be recorded as capital leases by GAAP, (g) any payment obligations in respect of banker's acceptances or letters of credit, (h) any liability with respect to interest rate swaps, collars, caps and similar hedging obligations, (i) all obligations for the deferred and unpaid purchase price of property or services, including any "earn-out" payments payable with respect to acquisitions (contingent or otherwise) (excluding any trade accounts payable), (j) any and all amounts payable pursuant to that certain letter agreement, dated as of January 17, 2013, by and between the Company and Match Point Partners, LLC (including the completion fee contemplated thereby), and (k) the retention bonuses owed to each of William

-4-

Pegler and Timothy Peach pursuant to their respective retention letter agreements with the Company, each dated as of September 1, 2011.

"Company's Knowledge" or words of similar import, when used in connection with any representation and warranty contained in Article IV, means the actual (but not constructive or imputed) knowledge as of the date of this Agreement of Bradford C. Burkett, William Pegler, Timothy Peach and Peter Kase (such persons, collectively, the "Knowledge Members"), without any implication of verification or investigation concerning such knowledge.

"Computer Systems" has the meaning set forth in Section 4.10(b).

"Confidentiality Agreement" has the meaning set forth in Section 6.6(b).

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to Investor.

"Consent" means any consent, approval, authorization, qualification, waiver or registration required to be obtained from, filed with or delivered to any Person.

"Consenting Debtholders" means those holders of the Notes and other Indebtedness of the Company and/or its Subsidiaries parties to the Restructuring Support Agreement as "Consenting Debtholders" thereunder; provided, that the Consenting Debtholders shall include, as a minimum, the holders of two-thirds of the aggregate principal amount of Notes outstanding from time to time.

"Contemplated Transactions" means, collectively, the Restructuring Transactions and the Issuance.

"Contracts" means all oral or written contracts, leases, licenses, indentures, notes, bonds, loans, instruments, undertakings, commitments and other agreements or arrangements (including any exhibits, supplements, amendments and other modifications thereto).

"Controlled Group" means any trade or business (whether or not incorporated) or other Person at any relevant time (a) under common control within the meaning of Section 4001(b)(1) of ERISA with the Company or any of its Subsidiaries or (b) that together with the Company or any of its Subsidiaries is or was treated as a single employer under Section 414 of the Code.

"Data Room" means (a) the virtual data room established by the Company in connection with the Contemplated Transactions and (b) the virtual data room used by the Company to post its annual report, quarterly reports, current reports and other related information concerning the Company.

"Diligence Questionnaire" has the meaning set forth in Section 6.14.

"DIP Credit Agreement" has the meaning set forth in Section 6.4.

"DIP Motion" has the meaning set forth in Section 6.4(c).

"DIP Order" has the meaning set forth in Section 6.5.

"Disclosing Party" has the meaning set forth in Section 6.8.

"Disclosure Statement" means the disclosure statement that relates to the Plan, as such disclosure statement may be amended, modified or supplemented (including all exhibits, term sheets and schedules annexed thereto or referred to therein).

"Dispute Notice" has the meaning set forth in Section 2.3(b).

"Disputed Item" has the meaning set forth in Section 2.3(b).

"Effective Date" has the meaning set forth in the recitals to this Agreement.

"Employee Plan" or "Employee Plans" has the meaning set forth in Section 4.17(a).

"End Date" has the meaning set forth in Section 6.1(d).

"Environment" means soil, surface waters, groundwater, land, stream, sediments, surface or subsurface strata, ambient air, indoor air or indoor air quality, including any material or substance used in the physical structure of any building or improvement.

"Environmental Law" means any Law that relates to worker health and safety, public health and safety, or the pollution or protection of the Environment.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Escrow Account" has the meaning set forth in Section 2.5(a).

"Escrow Agent" has the meaning set forth in Section 2.5(a).

"Escrow Agreement" has the meaning set forth in Section 2.5(a).

"Escrow Amount" has the meaning set forth in Section 2.5(a).

"Estimated Closing Statement" has the meaning set forth in Section 2.2(b).

"Estimated Working Capital" has the meaning set forth in Section 2.3(c).

"Exchange Act" means the Securities Exchange Act of 1934 and the rules and regulations of the SEC thereunder.

"Final Order" means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court) that:  (a) is in full force and effect; (b) is not stayed; and (c) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed

relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order.

"Final Purchase Price" has the meaning set forth in Section 2.3(c).

"Final Statement" has the meaning set forth in Section 2.3(b).

"Final Working Capital" has the meaning set forth in Section 2.3(c).

"Financial Statements" has the meaning set forth in Section 4.5(a).

"Financing Documents" has the meaning set forth in Section 1.1 in the definition of "Financing Transactions".

"Financing Transactions" means, collectively, (a) the execution and/or delivery of the Amended Notes, the Amended Note Guarantees, the Specified Intercreditor Agreements, the Specified Consents and the Specified Amendments, and all agreements, instruments and documents in connection therewith or contemplated thereby (collectively, the "Financing Documents"), and the consummation of the transactions contemplated thereby, and (b) the obtaining of any Specified Consents.

"First Day Motions" means any motion listed on Schedule 1.1(a) attached hereto.

"GAAP" means United States generally accepted accounting principles (as in effect from time to time) applied on a consistent basis.

"General Enforceability Exceptions" has the meaning set forth in Section 4.2.

"Government Reimbursement Programs" has the meaning set forth in Section 4.22(c).

"Governmental Authority" means any government or political subdivision, whether federal, state, local or foreign, or any agency or instrumentality of any such government or political subdivision, or any federal, state, local or foreign court or arbitrator.

"Hazardous Material" means any pollutant, hazardous material or toxic substance, including asbestos and asbestos-containing materials, hazardous waste, hazardous material, hazardous substance, contaminant, petroleum, or petroleum-containing materials, radiation and radioactive materials and polychlorinated biphenyls, as defined in, or which would reasonably be expected to give rise to liability under, any Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Inconsistent Transaction" means any direct or indirect (through any Person) acquisition, divestiture, sale, business combination, restructuring or reorganization of or involving all or substantially all of the consolidated assets of the Company and its Subsidiaries or all or substantially all of the equity securities of the Company and its Subsidiaries, in either case, whether proposed to be effected pursuant to a merger, consolidation, share exchange, amalgamation or plan of reorganization, other than the Restructuring or any other transaction

with Investor or any of its Affiliates.  A Stand-Alone Plan shall not be deemed an Inconsistent Transaction.

"Indebtedness" has the meaning set forth in Section 1.1 in the definition of "Company Debt".

"Initial Purchase Price" has the meaning set forth in Section 2.2(b).

"Inquiry Period" has the meaning set forth in Section 6.8.

"Intellectual Property" means any and all patents and patent applications; trademarks, service marks, trade names, brand names, trade dress, slogans, logos and Internet domain names and uniform resource locators and the goodwill associated with any of the foregoing; inventions (whether patentable or not), industrial designs, discoveries, improvements, ideas, designs, models, formulae, patterns, compilations, data collections, drawings, blueprints, mask works, devices, methods, techniques, processes, know-how, proprietary information, customer and supplier lists, software, technical and other information and trade secrets; copyrights, copyrightable works, and rights in databases and data collections; moral and economic rights of authors and inventors; other intellectual or industrial property rights and foreign equivalent or counterpart rights and forms of protection of a similar or analogous nature to any of the foregoing or having similar effect in any jurisdiction throughout the world; and any issuances, registrations and applications for registration of, any of the foregoing, including any renewals, extensions, continuations (in whole or in part), divisionals, re-examinations or reissues or equivalent or counterpart thereof; and all documentation and embodiments of the foregoing.

"Interim Financial Statements" has the meaning set forth in Section 4.5(a).

"Investor" has the meaning set forth in the preamble.

"Investor Audited Financial Statements" has the meaning set forth in Section 5.5(a).

"Investor Credit Documents" means, collectively, (a) the Credit Agreement, dated as of May 10, 2012, by and among Investor, certain Affiliates of Investor parties thereto, Wells Fargo Bank, National Association as "Administrative Agent" and "Collateral Agent" thereunder, the financial institutions parties thereto as "Lenders" thereunder, and the other Persons parties thereto, and (b) the other "Loan Documents" (as defined in such Credit Agreement), in each case, as amended, supplemented, amended and restated, renewed, extended, replaced, refinanced or otherwise modified from time to time.

"Investor Debt" has the meaning set forth in Section 5.8.

"Investor Financial Statements" has the meaning set forth in Section 5.5(a).

"Investor Financing Documents" means, collectively, (a) the Investor Credit Documents, (b) the Investor Secured Notes Documents, (c) the Investor Subordinated Notes Documents, and (d) any other agreements, documents or instruments that are material to Parent and its Subsidiaries (taken as a whole) or Investor and its Subsidiaries (taken as a whole) and that evidence or govern any Indebtedness of Parent, Investor or any of their respective Subsidiaries.

"<u>Investor Interim Financial Statements</u>" has the meaning set forth in <u>Section 5.5(a)</u>.

"<u>Investor MAE</u>" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate with any other changes, effects, events, occurrences, facts or developments, has had or would reasonably be expected to have a material adverse effect on the business, assets, liabilities, operations, results of operations or financial condition of (x) Parent or any of its Subsidiaries (taken as a whole) or (y) Investor or any of its Subsidiaries (taken as a whole); <u>provided</u>, that none of the following will be deemed, either alone or in combination to constitute, and none of the following will be taken into account in determining whether there has been, an Investor MAE: any change, effect, event, occurrence, state of facts or development (a) resulting from any adverse change or disruption in the financial, credit, capital or securities markets or the economy in general, (b) arising out of, resulting from or attributable to changes in applicable Laws or changes in accounting standards, requirements or principles (including GAAP), (c) affecting companies in the free standing outpatient radiation oncology treatment center industry, (d) arising out of, resulting from or attributable to any natural disaster or any acts of terrorism, sabotage, military action or war (whether or not declared) or any escalation or worsening thereof, whether or not occurring or commenced before or after the date of this Agreement, (e) resulting from any failure by Parent or Investor to meet any internal or published projections, forecasts or revenue or earnings predictions for any period ending on or after the date of this Agreement; <u>provided</u>, that the underlying causes of such failures shall be included in determining whether there has been an Investor MAE (unless such underlying causes are otherwise excluded from consideration by one or more of the other clauses set forth in this definition), (f) resulting from any national or international political or social conditions, including the engagement by the United States or any other country in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or any other country, or any of their respective territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States or any other country, (g) related to any damages to any of Parent's or Investor's real or personal property, solely to the extent such damages are fully covered by Parent's or Investor's insurance policies or (h) arising out of, resulting from or attributable to the announcement, execution or performance of this Agreement or the consummation of the Contemplated Transactions or the identity of the Company or any of its Affiliates; <u>provided</u>, that, with respect to each of <u>clauses (a)</u>, <u>(b)</u>, <u>(c)</u> and <u>(f)</u> above, any such change, effect, event, occurrence, state of facts or development shall only be disregarded and not taken into account in determining whether an Investor MAE has occurred to the extent (and solely to the extent) that such change, effect, event, occurrence, state of facts or development does not have, and would not reasonably be expected to have, a materially disproportionate adverse effect on Parent, Investor and/or any Subsidiary of Parent or Investor relative to the other participants in the industries in which Parent, Investor or any of their respective Subsidiaries conduct their respective businesses. Notwithstanding anything to the contrary herein, if the Centers for Medicare & Medicaid Services ("<u>CMS</u>"), in its proposed physician fee schedule included in its proposed rule addressing changes to payment policies applicable to radiation oncology services (which is expected to be announced on or about July 1, 2013), sets forth a cumulative combined impact to radiation oncology equal to or greater than ten percent (10%), then such event shall be deemed to constitute an "Investor MAE" (such event, a "<u>CMS MAE</u>"); <u>provided</u>, <u>however</u>, that a CMS MAE shall cease to be an Investor MAE for all purposes of this

Agreement, and a CMS MAE shall not be taken into account in determining whether there has been an Investor MAE, on and at all times after 11:59 p.m. prevailing Eastern Time on the tenth (10th) day following the date of issuance or publication by CMS of such proposed rule.  For the purposes of clarity, the comparable number released by CMS in its proposed rules in 2012 applicable to services furnished in the 2013 calendar year was 15%, as set forth in the Federal Register, Volume 77, No. 146, dated July 30, 2012 in Table 84, under the specialty "Radiation Oncology" and in the column "Total (Cumulative Impact)".

"Investor Secured Notes Documents" means, collectively, (a) the Indenture, dated as of May 10, 2012, by and among Investor, certain Affiliates of Investor parties thereto, and Wilmington Trust, National Association as "Trustee" and "Collateral Agent" thereunder, and (b) the other "Note Documents" (as defined in such Indenture), in each case, as amended, supplemented, amended and restated, renewed, extended, replaced, refinanced or otherwise modified from time to time.

"Investor Subordinated Notes Documents" means, collectively, (a) the Indenture, dated as of April 20, 2012, by and among Investor, certain Affiliates of Investor parties thereto, and Wells Fargo Bank, National Association as "Trustee" thereunder, and (b) the "Notes" (as defined in such Indenture), in each case, as amended, supplemented, amended and restated, renewed, extended, replaced, refinanced or otherwise modified from time to time.

"IRS" means the United States Internal Revenue Service.

"Issuance" has the meaning set forth in the recitals to this Agreement.

"Knowledge Members" has the meaning set forth in Section 1.1 in the definition of "Company's Knowledge".

"Law" means any law (including common law), statute, code, ordinance, rule, resolution, executive order, Order or regulation of any Governmental Authority.

"Leased Real Property" has the meaning set forth in Section 4.8.

"Leases" means all leases, subleases, licenses, concessions and other Contracts (written or oral) pursuant to which the Company or any of its Subsidiaries holds any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of the Company and/or any of its Subsidiaries thereunder.

"Liens" means any mortgage, lien, pledge, security interest, option, right-of-way, right of setoff, claim, charge, easement, option or other similar encumbrance.

"Majority Consenting Debtholders" means the Consenting Debtholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes held by all of the Consenting Debtholders.

"Managed Practice" means any medical professional association, professional corporation, partnership or similar entity that provides medical services at a center, clinic or other facility operated or managed by the Company or any of its Subsidiaries pursuant to a

-10-

Management Services Agreement, or at a hospital or hospital department with which the Company or any of its Subsidiaries has a Management Services Agreement.

"Management Services Agreements" means all of the management services agreements to which the Company or any of its Subsidiaries is a party and pursuant to which the Company or the applicable Subsidiary provides management and/or administrative services and other related services to the applicable Managed Practice; provided, however, that, upon delivery of the Disclosure Schedules by the Company to Investor, "Management Services Agreements" shall mean those management services agreements set forth on Schedule 1.1(b).

"Material Adverse Effect" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate with any other changes, effects, events, occurrences, facts or developments, has had or would reasonably be expected to have a material adverse effect on the business, assets, liabilities, operations, results of operations or financial condition of the Company or any of its Subsidiaries (taken as a whole); provided, that none of the following will be deemed, either alone or in combination to constitute, and none of the following will be taken into account in determining whether there has been, a Material Adverse Effect: any change, effect, event, occurrence, state of facts or development (a) resulting from any adverse change or disruption in the financial, credit, capital or securities markets or the economy in general, (b) arising out of, resulting from or attributable to changes in applicable Laws or changes in accounting standards, requirements or principles (including GAAP), (c) affecting companies in the free standing outpatient radiation oncology treatment center industry, (d) arising out of, resulting from or attributable to the announcement, execution or performance of this Agreement or the consummation of the Contemplated Transactions or the identity of Investor or any of its Affiliates, (e) arising out of, resulting from or attributable to any natural disaster or any acts of terrorism, sabotage, military action or war (whether or not declared) or any escalation or worsening thereof, whether or not occurring or commenced before or after the date of this Agreement, (f) resulting from any failure by the Company or any of its Subsidiaries to meet any internal or published projections, forecasts or revenue or earnings predictions for any period ending on or after the date of this Agreement; provided, that the underlying causes of such failures shall be included in determining whether there has been a Material Adverse Effect (unless such underlying causes are otherwise excluded from consideration by one or more of the other clauses set forth in this definition), (g) resulting from any national or international political or social conditions, including the engagement by the United States or any other country in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or any other country, or any of their respective territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States or any other country, (h) arising out of or resulting from the commencement of the Chapter 11 Cases, or (i) related to any damages to any of the Company's or any of its Subsidiaries' real or personal property, solely to the extent such damages are fully covered by the Company's or any of its Subsidiaries' insurance policies; provided, that, with respect to each of clauses (a), (b), (c) and (g) above, any such change, effect, event, occurrence, state of facts or development shall only be disregarded and not taken into account in determining whether a Material Adverse Effect has occurred to the extent (and solely to the extent) that such change, effect, event, occurrence, state of facts or development does not have, and would not reasonably be expected to have, a materially disproportionate adverse effect

on the Company and/or any Subsidiary of the Company relative to the other participants in the industries in which the Company and its Subsidiaries conduct their respective businesses. Notwithstanding anything to the contrary herein, a CMS MAE shall be deemed to constitute a "Material Adverse Effect"; provided, however, that a CMS MAE shall cease to be a Material Adverse Effect for all purposes of this Agreement, and a CMS MAE shall not be taken into account in determining whether there has been a Material Adverse Effect, on and at all times after 11:59 p.m. prevailing Eastern Time on the tenth (10th) day following the date of the issuance or publication by CMS of its proposed rule addressing changes to payment policies applicable to radiation oncology services.  For the purposes of clarity, the comparable number released by CMS in its proposed rules in 2012 applicable to services furnished in the 2013 calendar year was 15%, as set forth in the Federal Register, Volume 77, No. 146, dated July 30, 2012 in Table 84, under the specialty "Radiation Oncology" and in the column "Total (Cumulative Impact)".

"Material Contracts" has the meaning set forth in Section 4.11(a).

"Material Suppliers" has the meaning set forth in Section 4.20(b).

"Monthly Financial Statements" has the meaning set forth in Section 6.10.

"Net Working Capital" means, as of any time, the amount of (a) the Company's and its Subsidiaries' current assets (net of related reserves and excluding Cash, intercompany receivables, and deferred Tax assets) minus (b) the Company's and its Subsidiaries' current liabilities (including all deferred revenue and accrued Selling Expenses, but excluding (i) all Company Debt, (ii) income or other Tax liabilities, (iii) accrued but unpaid interest relating to Company Debt, (iv) management fee accruals (to the extent not otherwise included in Company Debt) and (v) intercompany payables), in each case, as of such time and calculated on a consolidated basis in accordance with the Agreed Principles.

"Noteholders' Representative" means any Person or Persons designated in writing as the "Noteholders' Representative" from time to time by the Majority Consenting Debtholders.

"Notes" means the 11-3/4% Senior Secured Notes due 2017 issued by the Company under the Notes Indenture, as amended, supplemented, amended and restated, renewed, extended, replaced, refinanced or otherwise modified from time to time.

"Notes Indenture" means the Indenture, dated as of May 13, 2010, by and among the Company, the Subsidiaries of the Company parties thereto, and Wilmington Trust, National Association (successor by merger to Wilmington Trust FSB) as "Trustee" and "Collateral Agent" thereunder, as amended, supplemented, amended and restated, renewed, extended, replaced, refinanced or otherwise modified from time to time.

"Notice" shall have the meaning set forth in Section 10.5.

"Order" means any order, judgment, ruling, decree, injunction, assessment, award, charge or writ of any Governmental Authority.

"Overage" has the meaning set forth in Section 2.2(a)(i).

"ordinary course of business" means, the operation of the Company and its Subsidiaries in the usual and ordinary course in a manner substantially consistent with past custom and practice and normal day to day operations (taking into account the effects on such operations resulting from the Company's financial condition and the diligence, negotiation, preparation and/or consummation of the Restructuring Transactions).

"Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement), in each case to which such Person is a party or to which such Person is bound.

"Owned Real Property" has the meaning set forth in Section 4.8.

"Owner" shall have the meaning set forth in Section 1.1 in the definition of "Subsidiary".

"Parent" means Radiation Therapy Services Holdings, Inc., a Delaware corporation.

"Permits" means any license, permit, authorization, certificate of authority, qualification or similar document or authority that has been issued or granted by any Governmental Authority.

"Permitted Liens" means (a) Liens arising under agreements governing the Company Debt, (b) Liens for Taxes not yet due and payable or delinquent (or which may be paid without interest or penalties) or the validity or amount of which are being contested in good faith by appropriate proceedings, (c) Liens arising under conditional sales contracts and equipment leases with third parties, (d) mechanics', materialman's, workmens', repairmen's, warehousemen's, supplier's, vendor's, carriers' or other similar Liens arising or incurred in the ordinary course of business by operation of Law securing amounts that are not yet due and payable, (e) easements, covenants, conditions and restrictions of record affecting title to the Owned Real Property or Leased Real Property which do not or would not materially impair the use or occupancy of any Owned Real Property or Leased Real Property in the operation of the business conducted thereon, (f) any zoning or other governmentally established restrictions or encumbrances which are not violated by the current use or occupancy of any Owned Real Property or Leased Real Property or the operation of the business of the Company and/or any of its Subsidiaries conducted thereon, (g) all purchase money Liens (including Liens securing obligations to pay the deferred and unpaid purchase price of property acquired by the Company and/or any of its Subsidiaries in the ordinary course of business), (h) Liens that do not materially impair the current use or value of any of the properties or assets of the Company or any of its Subsidiaries, (i) Liens in favor of a bank or other financial institution encumbering deposits or other funds maintained with a bank or other financial institution, (j) Liens that will be terminated at or prior to the Closing, and (k) Liens arising out of, under or in connection with applicable federal, state and/or local securities Laws.

"Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, unincorporated society or association, trust or other legal entity or Governmental Authority.

"Petition Date" means June 14, 2013.

"Plan" has the meaning set forth in the recitals to this Agreement.

"Proceeding" means any suit, complaint, claim, litigation, prosecution, cause of action, audit, investigation, legal proceeding, administrative enforcement proceeding or arbitration proceeding before any Governmental Authority.

"Purchase Price" has the meaning set forth in Section 2.2(a)(ii).

"Purchased Intellectual Property" means all Intellectual Property owned, used or held for use by the Company or any of its Subsidiaries, including all rights of the Company or its Subsidiaries therein to sue and collect damages for past, present or future infringement, misappropriation or other violation of such Intellectual Property.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing, migrating or dumping of a Hazardous Material (including drums or containers of Hazardous Materials) into the Environment.

"Representatives" means, with respect to any Person, such Person's Affiliates and its and their respective officers, directors, managers, employees, agents, counsel, accountants, financial advisors, investment bankers, lenders, equity partners, consultants and other representatives.

"Restructuring" has the meaning given to such term in the recitals to this Agreement.

"Restructuring Support Agreement" means the Restructuring Support Agreement, dated as of June 14, 2013, by and among the Company and the Consenting Debtholders as amended, restated, supplemented or otherwise modified from time to time; provided, that the Restructuring Support Agreement shall not be amended, restated, supplemented or otherwise modified without Investor's prior written consent to the extent that such amendment, restatement, supplement or modification would materially and adversely affect Investor.

"Restructuring Transactions" means all of the transactions contemplated by this Agreement, the Plan and the Restructuring Support Agreement, other than the Issuance.

"SEC" means the U.S. Securities and Exchange Commission.

"SEC Reports" has the meaning set forth in Section 5.9(a).

"Securities Act" means the Securities Act of 1933, as amended, and the rules promulgated pursuant thereto.

"Selling Expenses" means all fees, costs and expenses incurred by or on behalf of the Company and/or any of its Subsidiaries arising from the preparation, execution, performance

and/or consummation of this Agreement, the Ancillary Agreements, the Plan and the Restructuring Transactions (including the Closing) (including any change of control, success, retention or similar bonus payable to any employee or other service provider to the Company or any of its Subsidiaries arising as a result of the Contemplated Transactions, including any amounts payable pursuant to Schedule 7.3(m), in each case, which fees, costs and expenses are not either (a) paid at or before the Closing or (b) payable from, or covered by, a reserve that has been established under the Plan or an Order of the Bankruptcy Court. Notwithstanding the foregoing, "Selling Expenses" shall not include any fees, costs, expenses or claims that (i) are incurred in connection with the Financing Transactions, (ii) Investor is responsible or liable for pursuant to the terms of this Agreement or any of the other Ancillary Agreements (including any Transfer Taxes and all filing fees in connection with any filings, applications or submissions under the HSR Act or any other applicable competition Laws), (iii) are associated with or arise from any executory Contracts or unexpired Leases that Investor requests in writing to be rejected, except with respect to related fees, costs, expenses or claims related to the rejection of the executory Contracts or Leases set forth on Schedule 1.1(d) hereto (which shall be deemed to be "Selling Expenses" hereunder), (iv) are incurred in connection with any Proceeding regarding the severability of a Management Services Agreement and any of the leases that relate to the Managed Practice associated with such Management Services Agreement, or (v) are incurred in connection with the termination of the operations of any Managed Practice as a result of the rejection of the related Management Services Agreement.

"Shares" has the meaning set forth in the recitals to this Agreement.

"Shortfall" has the meaning set forth in Section 2.2(a)(ii).

"Specified Amendments" has the meaning set forth in Section 7.2(g).

"Specified Consents" has the meaning set forth in Section 7.2(f).

"Specified Intercreditor Agreement" has the meaning set forth in Section 7.2(h).

"Specified Representatives" has the meaning set forth in Section 6.14.

"Stand-Alone Plan" means any transaction involving all or substantially all of the consolidated assets of the Company and/or its Subsidiaries or all or substantially all of the equity securities of the Company and/or its Subsidiaries pursuant to any stand-alone plan of reorganization among the Company and the Company's debt or equityholders.

"Start Date Meeting" has the meaning set forth in Section 6.14.

"Subsidiary" means, with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held by the Owner or one or more of its Subsidiaries.

"Target Working Capital" means an amount equal to $11,500,000.

"Tax" means (a) any income, alternative or add-on minimum, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, escheat, environmental, windfall profit, customs duty, estimated capital stock, social security (or similar), unemployment, disability, registration, or other tax, duty, charge, assessment, fee, levy or other governmental charge in the nature of a tax, together with any interest, penalties, additions to tax or additional amounts imposed by any Governmental Authority, (b) any liability for or in respect of the payment of any amount of a type described in clause (a) of this definition as a result of being a member of an affiliated, combined, consolidated, unitary or other group for Tax purposes, or (c) any liability for or in respect of the payment of any amount described in clauses (a) or (b) of this definition as a transferee or successor under applicable Law.

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Top Managed Practices" has the meaning set forth in Section 4.20(a).

"Transaction Expenses" means the reasonable and documented fees, costs, expenses, disbursements and charges of Investor paid or payable to third parties (that are not Affiliates of Investor) incurred in connection with the diligence, negotiation, preparation or implementation (including legal, accounting, restructuring, business strategy, advisory and consulting services) of this Agreement or any of the transactions contemplated herein or by the Plan, which shall include but is not limited to, the reasonable and documented fees, costs and expenses of the advisors, agents and Representatives of Investor (that are not Affiliates of Investor) (including, for the avoidance of doubt, the reasonable and documented fees, costs and expenses of each of Kirkland & Ellis LLP, Deloitte & Touche LLP, Millstein & Co. L.P., K&L Gates LLP and Alvarez & Marsal).

"Transfer Taxes" has the meaning set forth in Section 9.1.

"Update MAE" has the meaning set forth in Section 6.8.

"Update MAE Determination Period" has the meaning set forth in Section 6.8.

"Update MAE Notice" has the meaning set forth in Section 6.8.

"Update Recipient" has the meaning set forth in Section 6.8.

"Updated Company Knowledge" has the meaning set forth in Section 6.8.

"Updated Schedules" has the meaning set forth in Section 6.8.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

"willful and intentional breach" has the meaning set forth in Section 8.5(c).

## ARTICLE II
## SALE AND PURCHASE

2.1    Purchase and Sale of the Shares.  On the terms, subject to the conditions and limitations, and in reliance on the representations and warranties, set forth in this Agreement (including the entry of the Confirmation Order by the Bankruptcy Court and the Confirmation Order becoming a Final Order), Investor hereby agrees to purchase at the Closing, and the Company hereby agrees to sell, issue and deliver to Investor at the Closing, for an aggregate purchase price equal to the Purchase Price, the Shares free and clear of any and all Liens (other than Permitted Liens).

2.2    Purchase Price.

(a)    In full consideration for the issuance, sale and delivery of the Shares, on the terms, and subject to the conditions and limitations set forth herein, the aggregate consideration to be paid to the Company shall be an amount in cash equal to $42,500,000:

(i)    plus the amount, if any, by which the Closing Working Capital exceeds the Target Working Capital (the "Overage"); provided that there shall be no such increase unless the amount of the Closing Working Capital exceeds the Closing Working Capital Upper Target, in which case, the full amount of the Overage shall be added thereto; or

(ii)    minus the amount, if any, by which the Target Working Capital exceeds the Closing Working Capital (the "Shortfall"); provided that there shall be no such decrease unless the Closing Working Capital Lower Target exceeds the amount of the Closing Working Capital, in which case, the full amount of the Shortfall shall be deducted therefrom (such amount, as adjusted pursuant to Section 2.3, the "Purchase Price").

(b)    Not later than five (5) days prior to the Closing Date, the Company shall deliver to Investor a statement (the "Estimated Closing Statement") containing (i) the Company's good faith estimate of the Closing Working Capital (including each component thereof) and (ii) a calculation of the Purchase Price based on such estimate based on the provisions of Sections 2.2(a)(i) and 2.2(a)(ii) (the "Initial Purchase Price").

(c)    At the Closing, on the terms, and subject to the conditions and limitations set forth herein, Investor shall pay to the Company, in cash by bank wire transfer of immediately available funds to an account or accounts designated by the Company at least two (2) Business Days prior to Closing, an aggregate amount in cash equal to (i) the Initial Purchase Price minus (ii) the Escrow Amount.

2.3    Purchase Price Adjustment.

-17-

(a)       Within 75 days after the Closing Date, Investor shall prepare and deliver to the Noteholders' Representative a statement (the "Closing Statement") containing (i) the Company's determination of the actual Closing Working Capital (including each component thereof) and (ii) a calculation of the Purchase Price based on such actual Closing Working Capital based on the provisions of Sections 2.2(a)(i) and 2.2(a)(ii).

(b)       Within 75 days following receipt by the Noteholders' Representative of the Closing Statement, the Noteholders' Representative shall deliver written notice to Investor of any dispute it has with respect to the preparation or content of, or any other items or matters set forth in, the Closing Statement (a "Dispute Notice"). Any amount, determination or calculation contained in the Closing Statement and not specifically disputed in a timely delivered Dispute Notice shall be final, conclusive and binding on the parties. If the Noteholders' Representative does not deliver to Investor a Dispute Notice within such 75-day period, such Closing Statement will be final, conclusive and binding on the parties. If the Noteholders' Representative does deliver to Investor a Dispute Notice within such 75-day period, Investor and the Noteholders' Representative shall negotiate in good faith to resolve each disputed amount, determination, calculation, item or other matter raised therein (each, a "Disputed Item"). If Investor and the Noteholders' Representative, notwithstanding such good faith effort, fail to resolve such dispute within 30 days after Investor's receipt of the Dispute Notice, Investor and the Company shall jointly engage the Accounting Firm to resolve each outstanding Disputed Item.   The Accounting Firm shall be instructed by Investor and the Noteholders' Representative to use every reasonable effort to review and resolve such Disputed Items (acting as an expert and not an arbitrator) and to deliver a written report containing its calculation of each Disputed Item (in each case, calculated in accordance with this Agreement and determined within the range of dispute between the Closing Statement and the Dispute Notice) within 45 days of engagement. All Disputed Items that are resolved between Investor and the Noteholders' Representative or are determined by the Accounting Firm will be final, conclusive and binding on the parties absent manifest error.   Until the Accounting Firm makes its determination of the Closing Working Capital, the costs and expenses of the Accounting Firm shall be borne equally by Investor, on the one hand, and the Company, on the other hand; provided that, upon the issuance of its determination of the Closing Working Capital, any costs and expenses (including costs and expenses previously advanced) of the Accounting Firm shall be borne pro rata by Investor, on the one hand, and the Company, on the other hand, in proportion to the difference between (x) the Final Purchase Price and (y) the Final Purchase Price that would have resulted from the use of the proposed calculations of Investor, on the one hand, and the Noteholders' Representative, on the other hand. For example, if the Final Purchase Price that would have resulted based on the Closing Statement delivered by Investor pursuant to Section 2.3(a) was $500,000 less than the Final Purchase Price (as finally determined), but the Final Purchase Price that would have resulted based on the adjustments set forth in the Dispute Notice delivered by the Noteholders' Representative pursuant to Section 2.3(b) was $250,000 more than the Final Purchase Price (as finally determined), Investor will pay 2/3 of such costs and expenses, and the Company will pay 1/3 of such costs and expenses. Any costs and expenses to be paid by the Company pursuant to this Section 2.3(b) shall be satisfied with a portion of

the Escrow Amount , and Investor and the Noteholders' Representative shall execute and deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to distribute a portion of the Escrow Amount to satisfy such costs and expenses concurrently with the payments that are made pursuant to Section 2.3(e) or Section 2.3(f), as the case may be (or if no such payments are to be made, within five (5) Business Days after the date on which the Final Purchase Price is determined) finally determined pursuant to Section 2.3(c); provided, however, that if the Noteholders' Representative has not become a party to the Escrow Agreement in accordance with the terms thereof, the Company shall execute and  deliver such joint written instructions in lieu of the Noteholders' Representative, but such joint written instructions shall not be delivered by Investor and/or the Company to the Escrow Agent without the prior written consent of the Noteholders' Representative (such consent not to be unreasonably withheld, delayed or conditioned). The "Final Statement" shall be deemed to be (i) the Closing Statement if no Dispute Notice is delivered by the Noteholders' Representative within the 75-day period specified in this Section 2.3(b), (ii) the Closing Statement if the Noteholders' Representative notifies Investor in writing that the Noteholders' Representative agrees with the Closing Statement in its entirety at any time during the 75-day period specified in this Section 2.3(b), or (iii) if a Dispute Notice is delivered by the Noteholders' Representative within the 75-day period specified in this Section 2.3(b), the Closing Statement as adjusted by (A) the written agreement of the Noteholders' Representative and Investor and/or (B) the written determination of the Accounting Firm.

(c)    Within five (5) Business Days after the date on which the Closing Statement becomes the Final Statement in accordance with Section 2.3(b), the Initial Purchase Price shall be increased (if the Adjustment Amount as determined in accordance with this Section 2.3(c) is greater than zero) or decreased (if the Adjustment Amount as determined in accordance with this Section 2.3(c) is less than zero) by the Adjustment Amount. The "Adjustment Amount" shall equal the sum of: (i) the difference between the Closing Working Capital set forth on the Final Statement (the "Final Working Capital") and the Target Working Capital, expressed as (A) a positive number if the Final Working Capital is more than $500,000 greater than the Target Working Capital, (B) a negative number if the Target Working Capital exceeds the Final Working Capital by more than $500,000 or (C) zero if the Final Working Capital is not more than $500,000 greater or less than the Target Working Capital, plus (ii) the difference between the Target Working Capital and the Closing Working Capital set forth on the Estimated Closing Statement (the "Estimated Working Capital"), expressed as (A) a negative number if the Estimated Working Capital is more than $500,000 greater than the Target Working Capital, (B) a positive number if the Target Working Capital exceeds the Estimated Working Capital by more than $500,000 or (C) zero if the Estimated Working Capital is not more than $500,000 greater or less than the Target Working Capital.

The Initial Purchase Price, as so adjusted pursuant to this Section 2.3(c) (or not adjusted after application of the provisions of this Section 2.3(c)), is referred to herein as the "Final Purchase Price".

(d)    Access.  For purposes of complying with the terms set forth in this Section 2.3, each party shall reasonably cooperate with and make available to the other

-19-

party and its Representatives, and, subsequent to the Closing Date, Investor shall (and Investor shall cause the Company and its Subsidiaries to) reasonably cooperate with and make available to the Noteholders' Representative, all information, records, data and working papers and shall permit access to its facilities and personnel, as may be reasonably required in connection with the preparation and analysis of the Estimated Closing Statement and the Closing Statement and the resolution of any disputes thereunder.

(e)      Downward Adjustment.  If the Final Purchase Price (as finally determined pursuant to Section 2.3(c)) is less than the Initial Purchase Price paid on the Closing Date, then, within five (5) Business Days after the date on which the Final Purchase Price is finally determined pursuant to Section 2.3(c), Investor shall receive the amount of such shortfall, by wire transfer of immediately available funds, to be disbursed from the funds remaining in the Escrow Account to an account designated in writing by Investor to the Noteholders' Representative and the Company prior to the date such payment is due hereunder, and Investor and the Noteholders' Representative shall execute and deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to distribute funds from the Escrow Account (to the extent remaining) in the amount of such shortfall to such designated account; provided, however, that if the Noteholders' Representative has not become a party to the Escrow Agreement in accordance with the terms thereof, the Company shall execute and  deliver such joint written instructions in lieu of the Noteholders' Representative, but such joint written instructions shall not be delivered by Investor and/or the Company to the Escrow Agent without the prior written consent of the Noteholders' Representative (such consent not to be unreasonably withheld, delayed or conditioned).  For the avoidance of doubt, in no event shall (i) the amount payable to Investor pursuant to this Section 2.3(e) exceed the Escrow Amount and (ii) neither Investor nor any of its Affiliates shall have any right, or be entitled, to pursue any amount payable to Investor pursuant to Section 2.3(e) against the Noteholders' Representative, any holder of the Notes or any other creditor of the Company.

(f)      Upward Adjustment.  If the Final Purchase Price (as finally determined pursuant to Section 2.3(c)) is greater than Initial Purchase Price paid on the Closing Date, then Investor shall pay, or cause to be paid, an amount in cash equal to such excess, to the Company within five (5) Business Days from the date on which the Final Purchase Price is finally determined pursuant to Section 2.3(c) by bank wire transfer of immediately available funds, and the Company shall, and Investor shall cause the Company to, immediately distribute such amount pursuant to the terms of the Plan.

2.4      Transaction Expenses.

(a)      If this Agreement is terminated pursuant to Section 8.1(b), 8.1(c) (unless such termination is due to the existence of a CMS MAE), 8.1(f) or 8.2(a), then (subject to Section 2.4(b)) all accrued and unpaid Transaction Expenses incurred up to (and including) the date of such termination shall be paid in full promptly after such termination (but in any event within two (2) Business Days after such termination), but only after invoices are presented to the Company, and without Bankruptcy Court review or further Bankruptcy Court order, but in accordance with the Plan; provided, however,

that, notwithstanding anything to the contrary herein, if at the time of any such termination described in this Section 2.4(a) Investor is also in material breach of this Agreement such that any of the conditions set forth in Section 7.2(d) or Section 7.3(e) would not be satisfied, Investor shall have no right to reimbursement for, or otherwise be paid in respect of, any Transaction Expenses. All Transaction Expenses of Investor that are payable by the Company shall be paid to Investor (or its designee) in cash by wire transfer of immediately available funds to the account(s) specified by Investor. For the avoidance of doubt, Investor shall not be entitled to receive payment of any Transaction Expenses, and the Company shall not be required to pay any Transaction Expenses to Investor, if this Agreement is terminated by Investor as a result of, or on account of, a CMS MAE.

(b)     The amount of Transaction Expenses reimbursable and payable pursuant to this Section 2.4 shall not exceed $2,000,000.00 in the aggregate.

(c)     The obligations set forth in this Section 2.4 are in addition to, and do not limit, the Company's obligations under Article VIII.

(d)     Amounts required to be paid by the Company pursuant to this Section 2.4 shall constitute allowed superpriority administrative expenses under the Bankruptcy Code (which shall be an administrative expense claim of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code).

2.5     Deposit.

(a)     On the date of this Agreement, the Company and Investor shall enter into an escrow agreement (the "Escrow Agreement") with JPMorgan Chase Bank, National Association (the "Escrow Agent"), and prior to 5:00 p.m. (prevailing Eastern Time) on June 24, 2013, Investor shall deposit in cash an amount equal to $5,000,000.00 (together with all interest and other earnings accrued thereon that have not been otherwise distributed in accordance with the Escrow Agreement, the "Escrow Amount") to an escrow account (the "Escrow Account") to be established and maintained with the Escrow Agent pursuant to the terms of the Escrow Agreement. Upon the written request of the Noteholders' Representative, the Company shall immediately assign any or all of its rights under the Escrow Agreement to the Noteholders' Representative pursuant to the terms of Section 11 of the Escrow Agreement, including compliance by the Noteholders' Representative with the last sentence of Section 11 thereof.

(b)     Upon (i) the termination of this Agreement for any reason other than pursuant to Section 8.2(b) or Section 8.2(c), the remaining Escrow Amount shall be distributed to Investor and Investor shall have no further obligation or liability of any kind whatsoever to any Person except as otherwise set forth in Article VIII, or (ii) the determination of the Final Purchase Price (as finally determined pursuant to Section 2.3(c)), on the terms, and subject to the conditions and limitations set forth herein, and subject to the prior payment of any amounts that are payable from the Escrow Account pursuant to Section 2.3(b) and/or Section 2.3(e), the remaining Escrow Amount shall be distributed to the Company, by bank wire transfer of immediately available

-21-

funds, and the Company shall, and Investor shall cause the Company to, immediately distribute such remaining Escrow Amount pursuant to the terms of the Plan.  Promptly following any such termination referred to in <u>clause (i)</u> of the immediately preceding sentence or any such determination of the Final Purchase Price referred to in <u>clause (ii)</u> of the immediately preceding sentence, Investor and the Noteholders' Representative shall execute and deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to distribute the Escrow Amount in accordance with the terms of the immediately preceding sentence; <u>provided</u>, <u>however</u>, that if the Noteholders' Representative has not become a party to the Escrow Agreement in accordance with the terms thereof, the Company shall execute and deliver such joint written instructions in lieu of the Noteholders' Representative, but such joint written instructions shall not be delivered by Investor and/or the Company to the Escrow Agent without the prior written consent of the Noteholders' Representative (such consent not to be unreasonably withheld, delayed or conditioned).  The Company shall also be entitled to receive the Escrow Amount pursuant to the terms of <u>Section 8.5(c)</u>.  The fees and charges of the Escrow Agent shall be paid 50% by the Company and 50% by Investor in accordance with the terms of the Escrow Agreement.  Anything in this Agreement to the contrary notwithstanding, if the Noteholders' Representative has not become a party to the Escrow Agreement in accordance with the terms thereof at or following the Closing, neither the Company nor Investor shall instruct or otherwise direct the Escrow Agent to release and/or distribute any funds from the Escrow Account without the prior written consent of the Noteholders' Representative (such consent not to be unreasonably withheld, delayed or conditioned).

2.6    <u>Use of Proceeds</u>.  The Company shall apply the net proceeds from the sale of the Shares pursuant to this Agreement (including any proceeds received pursuant to <u>Section 2.3(f)</u> and <u>clause (ii)</u> of <u>Section 2.5(b)</u>) in accordance with the terms of the Plan, including if applicable, to fund the payment of claims and administrative claims as provided in the Plan.

## ARTICLE III
## CLOSING AND DELIVERIES

3.1    <u>Closing</u>.  The closing of the purchase and sale of the Shares hereunder (the "<u>Closing</u>") will occur at 10:00 a.m. (prevailing Eastern Time) on the Effective Date, subject to the satisfaction or waiver (by the party having the benefit of any such condition) of all conditions to Closing set forth in <u>Article VII</u> (other than those conditions that are to be satisfied at the Closing), or at such other time, on such other date or in such other manner as the parties mutually agree in writing (the "<u>Closing Date</u>").  All proceedings to be taken and all documents to be executed and delivered by the parties at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

3.2    <u>Deliveries by the Company</u>.  At the Closing, the Company shall deliver or cause to be delivered to Investor the following items:

(a)    original corporate record books and stock record books of the Company and its Subsidiaries that are in the possession or control of the Company (or make such

-22-

record books otherwise available if a delivery at Closing would not be reasonably practicable);

    (b)    the original stock certificates representing the Shares;

    (c)    a certificate of good standing for the Company and each of its Subsidiaries issued by the applicable Governmental Authority of the jurisdiction of organization or formation of the Company and each such Subsidiary; and

    (d)    a certificate from an officer of the Company, given by or on behalf of the Company and not in his or her individual capacity, to the effect that the conditions set forth in Sections 7.3(g), 7.3(i) and 7.3(j) have been satisfied.

    3.3    <u>Deliveries by Investor</u>.  At the Closing, Investor shall deliver to the Company (or, in the case of <u>Section 3.3(f)(i)</u>, the Persons set forth therein) the following items:

    (a)    the Initial Purchase Price <u>minus</u> the Escrow Amount, paid in accordance with <u>Section 2.2(c)</u>;

    (b)    the certificate of incorporation (or equivalent document) of Investor certified by the Secretary of State of its jurisdiction of incorporation and a copy of the bylaws (or equivalent document) of Investor, certified by an officer of Investor on behalf of Investor and not in his or her individual capacity;

    (c)    a certificate of good standing for Investor and each of the other Subsidiaries of Parent issued by the Secretary of State of such Person's jurisdiction of organization or formation;

    (d)    a certified copy of the resolutions (or written consent) of the board of directors (or comparable governing body) of Investor and each of the other Subsidiaries of Parent authorizing the execution and delivery of this Agreement, the Ancillary Agreements and the Financing Documents to which Investor and/or such Subsidiary is a party, and the consummation of the Contemplated Transactions and the Financing Transactions;

    (e)    a certificate of an officer of Investor, given on behalf of Investor and not in his or her individual capacity, to the effect that the conditions set forth in Sections 7.2(d), 7.2(e) and 7.2(m) have been satisfied; and

    (f)    (i) the unpaid fees, costs, expenses and disbursements of Stroock & Stroock & Lavan LLP, counsel to the Consenting Debtholders, and GLC Advisors & Co., LLC, financial advisor to the Consenting Debtholders, in an aggregate amount not to exceed $1,500,000, such amounts to be paid by wire transfer in immediately available funds to the account(s) designated for such Persons in writing to Investor prior to the Closing Date; and (ii) all fees, costs, expenses and disbursements previously paid by the Company to Stroock & Stroock & Lavan LLP, counsel to the Consenting Debtholders, and GLC Advisors & Co., LLC, financial advisor to the Consenting Debtholders, in an

aggregate amount not to exceed (x) $1,500,000 *less* (y) such amounts paid by Investor pursuant to Section 3.3(f)(i) (which amount shall in no event be less than $0.00), such amounts to be paid by wire transfer in immediately available funds to the account designated by the Company in writing to Investor prior to the Closing Date.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in (a) the schedules to this Agreement delivered by the Company to Investor within ten (10) Business Days after the date hereof or subsequently delivered to Investor in accordance with Section 6.8 (collectively, the "Disclosure Schedules"), (b) the Data Room and (c) the Plan, the Company hereby represents and warrants to Investor as of the date of the delivery of the applicable Disclosure Schedules and as of the Closing as follows:

4.1    Existence and Good Standing.  The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and the Company is duly qualified to do business, and in good standing, in each jurisdiction in which the character of the properties owned or leased by it or in which the conduct of its business requires it to be so qualified, except where the failure to be so qualified or to be in good standing would not have a Material Adverse Effect. Each Subsidiary of the Company (a) is duly organized and formed, validly existing and in good standing under the laws of its jurisdiction of formation, (b) has all requisite power and authority to own its properties and to carry on its businesses as now conducted and (c) is qualified to do business and is in good standing in every jurisdiction in which the property owned, leased or held for use by it or the conduct of its business as now conducted requires it to qualify, except in each such case where the failure to be so qualified would not have a Material Adverse Effect. To the Company's Knowledge, the copies of the governing documents of the Company and its Subsidiaries which have been furnished to Investor reflect all amendments made thereto and are true, complete and correct copies of the originals thereof.

4.2    Validity and Enforceability.  Subject to entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order, the Company has the requisite power and authority (a) to enter into, execute and deliver this Agreement, the Ancillary Agreements and the Plan and (b) to consummate the Contemplated Transactions, and has taken all necessary corporate action required for (i) the due authorization, execution and delivery of this Agreement and the Ancillary Agreements, (ii) the due authorization, execution and filing with the Bankruptcy Court of the Plan and (iii) the performance and consummation of the Contemplated Transactions.  Subject to entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order, this Agreement and each of the Ancillary Agreements have been duly executed and delivered by the Company and, assuming due authorization, execution and delivery by Investor, represent the legal, valid and binding obligation of the Company, enforceable against it in accordance with their respective terms, except as limited by (y) applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally from time to time in effect and (z) the availability of equitable remedies (regardless of whether enforceability is considered in a proceeding at law or in equity) (collectively, the "General Enforceability Exceptions").  The Plan, upon being entered by the Bankruptcy Court, will be duly executed and delivered by the Company and its

Subsidiaries, and, subject to entry of the Confirmation Order, the Plan will constitute the legal, valid and binding obligation of the Company and its Subsidiaries, enforceable against the Company and its Subsidiaries in accordance with its terms.

4.3    <u>Capitalization of the Company and its Subsidiaries</u>.

(a)    As of the date hereof, the authorized capital stock of the Company consists of 50,000,000 shares of common stock, $0.001 par value per share, of which 26,317,673 are issued and outstanding, and all of which are duly authorized, validly issued, fully paid and nonassessable, and 1,000,000 shares of preferred stock, $0.001 par value per share, of which no shares are issued and outstanding.

(b)    <u>Schedule 4.3(b)</u> sets forth for each Subsidiary of the Company, in each case, as of the date hereof (i) its name and jurisdiction of incorporation or organization, (ii) the number of authorized shares (or equivalent) for each class of its capital stock or other ownership interest, (iii) the number of issued and outstanding shares (or equivalent) of each class of its capital stock or other ownership interest, the names of the holders thereof and the number of shares (or equivalent) held by each such holder and (iv) the number of shares (or equivalent) of its capital stock or other ownership interest held in treasury.  To the Company's Knowledge, all of the issued and outstanding shares (or equivalent) of capital stock or other ownership interest of each Subsidiary of the Company have been duly authorized and are validly issued, and, if applicable, are fully paid and non-assessable.  To the Company's Knowledge, there are no authorized or outstanding options, warrants, calls, subscriptions, equity appreciation, phantom equity or other rights relating to the capital stock or other ownership interest of any Subsidiary of the Company or with respect to which any Subsidiary may be obligated to issue or sell any shares of capital stock or other ownership interests of such Subsidiary.  The Company directly or indirectly owns all of the issued and outstanding shares of capital stock of each Subsidiary (free and clear of all Liens other than Permitted Liens).

4.4    <u>No Conflict; Required Filings and Consents</u>.

(a)    To the extent any such breach, default, right or violation described below is valid and enforceable under applicable Law, including the Bankruptcy Code, neither the execution and delivery of this Agreement, any Ancillary Agreement or the Plan by the Company, nor the consummation by the Company of the Contemplated Transactions, nor compliance by the Company with any term, condition or provision hereof, will, directly or indirectly, (i) conflict with, constitute or otherwise result in a breach of any term, condition or provision of the Organizational Documents of the Company or any of its Subsidiaries, (ii) except as set forth in <u>Schedule 4.4(a)</u>, and subject to the entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order, constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation, modification or acceleration with respect to, or result in the creation or imposition of a Lien upon any property or assets of the Company or any of its Subsidiaries, pursuant to any Material Contract to which any of them is a party, or (iii) subject to receipt of the requisite approvals referred to in <u>Schedule 4.4(b)</u>, violate any Order or Law applicable to the Company or any of its

-25-

Subsidiaries or pursuant to which any of their respective properties, assets, rights or interests may be subject, except in the case of clause (ii) and (iii), where any such breach, default, right or violation would not reasonably be expected to have a Material Adverse Effect.

(b)    Other than as set forth in Schedule 4.4(b) and entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order, no Consent of any Governmental Authority is required to be obtained by the Company for the consummation by the Company of the Contemplated Transactions, except for such Consent the failure of which to be obtained would not reasonably be expected to have a Material Adverse Effect.

4.5    Financial Statements.

(a)    Copies of the following financial statements have been delivered to Investor or have been made available to Investor for its review: (i) the audited consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2010, December 31, 2011, and December 31, 2012 (the "Balance Sheet Date"), and the related audited consolidated statements of income, Company' equity, and cash flows for the years then ended, together with the notes thereto (the "Audited Financial Statements"), and (ii) the unaudited consolidated balance sheet of the Company and its Subsidiaries as of March 31, 2013, and the related unaudited consolidated statements of income for the 3-month period then ended (the "Interim Financial Statements", and together with the Audited Financial Statements, the "Financial Statements").

(b)    The Audited Financial Statements have been prepared in accordance with GAAP and fairly present, in all material respects, the financial position, results of operations, shareholders' equity, and cash flows of the Company and its Subsidiaries on a consolidated basis, as of the date and for the period indicated.  The Interim Financial Statements have been prepared by management in accordance with GAAP applied consistently with the Audited Financial Statements (except for the absence of footnote disclosure, which, if presented would not provide information materially different than the information set forth in such Interim Financial Statements, and year-end adjustments, the effect of which will not, individually or on the aggregate, be materially adverse).  The Financial Statements were derived from the books and records of the Company and its Subsidiaries.

(c)    Except as set forth on Schedule 4.5(c), none of the Company or any of its Subsidiaries has any material liabilities that would be required to be reflected in, or reserved against, or otherwise described on, a balance sheet prepared in accordance with GAAP, other than (i) liabilities that are set forth on the face of, or quantified in the footnotes to, the Interim Financial Statements, (ii) liabilities incurred since the date of the Interim Financial Statements, (iii)  liabilities arising since the Balance Sheet Date (none of which is a liability resulting from tort, infringement or violation of Law), and (iv) liabilities or obligations incurred in connection with the Contemplated Transactions and the Financing Transactions.

-26-

4.6    <u>Conduct of Business</u>.  Since the Balance Sheet Date through the Petition Date, there has not been any event, change or circumstance that has had, or would be reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.7    <u>Taxes</u>.  To the Company's Knowledge and except as set forth on <u>Schedule 4.7</u>:

(a)    Each of the Company and each of its Subsidiaries has filed all federal income and all other material Tax Returns that it was required to file and has paid all Taxes required to be paid, whether or not such Taxes are shown or are required to be shown on any Tax Return. All such Tax Returns are true, correct and complete in all material respects.  The Company and each of its Subsidiaries has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, except as would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

(b)    Neither the Company nor any of its Subsidiaries has agreed to any extension or waiver of the statute of limitations applicable to any material Tax, or agreed to any extension of time with respect to a material Tax assessment or deficiency, which period (after giving effect to such extension or waiver) has not yet expired.

(c)    There are no Liens for unpaid Taxes (other than Taxes not yet due and payable) on the assets of the Company or any of its Subsidiaries.

(d)    There is no Proceeding currently pending or, to the Company's Knowledge, threatened with respect to the Company or any of its Subsidiaries in respect of any Tax that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No written claim has ever been made by a Governmental Authority in a jurisdiction where the Company or any of its Subsidiaries does not file Tax Returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction, except as would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

(e)    Neither the Company nor any of its Subsidiaries (i) has been a member of an affiliated group of corporations within the meaning of Section 1504 of the Code (other than a group the common parent of which is the Company) or (ii) has any material liability for Taxes of any Person (other than the Company and its Subsidiaries) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. law), as a transferee, successor, by Contract or otherwise.

(f)    Neither the Company nor any of its Subsidiaries has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction occurring during the last three (3) years that was purported or intended to be governed in whole or in part by Section 355 or 361 of the Code.

(g)    Neither the Company nor any of its Subsidiaries will be required to include any item of income in, or to exclude any item of deduction from, taxable income

for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method, or use of an improper method, of accounting, (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. income Tax law), (iii) intercompany transaction or excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or non-U.S. income Tax law), (iv) installment sale or open transaction disposition made on or prior to the Closing Date, (v) prepaid amount received on or prior to the Closing Date or (vi) election under Section 108(i) of the Code.

(h)    Since the Balance Sheet Date, neither the Company nor any of its Subsidiaries has made or changed any Tax election, changed an annual accounting period, adopted or changed any accounting method, filed any amended Tax Return, entered into any closing agreement, settled any Tax claim or assessment, surrendered any right to claim a refund of Taxes or consented to any extension or waiver of the limitation period applicable to any Tax claim or assessment.

(i)    Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this <u>Section 4.7</u> and <u>Section 4.17</u> are the sole representations and warranties of the Company relating to Taxes.

4.8    <u>Real Property</u>.    <u>Schedule 4.8(a)</u> contains a true and complete list of all real property owned by the Company or any of its Subsidiaries ("<u>Owned Real Property</u>"). <u>Schedule 4.8(b)</u> contains a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each leasehold or subleasehold estate and all other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by the Company and/or any of its Subsidiaries (the "<u>Leased Real Property</u>"). To the Company's Knowledge, the Company has delivered to Investor a true and complete copy of each such Lease and in the case of any oral Lease, a written summary of the material terms of such Lease. To the Company's Knowledge and except as set forth in <u>Schedule 4.8(b)</u>, with respect to each of the Leases: (a) the Company's or any of its Subsidiary's possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed and there are no material disputes with respect to such Lease; (b) neither the Company nor any of its Subsidiaries has subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (c) neither the Company nor any of its Subsidiaries has collaterally assigned or granted any other security interest in such Lease or any interest therein; and (d) there are no Liens on the estate or interest created by such Lease, other than Permitted Liens. The owned real property listed on <u>Schedule 4.8(a)</u> and the Leased Real Property listed on <u>Schedule 4.8(b)</u> comprise all real property interests used or held for use in the conduct of the business and operations of the Company and/or any of its Subsidiaries as now conducted.

4.9    <u>Personal Property</u>.    Except as would not reasonably be expected to have a Material Adverse Effect, the Company and/or its Subsidiaries have (a) good and valid title to all of the material properties and material assets, tangible or intangible, reflected in the Financial Statements as being owned by the Company and/or any of its Subsidiaries and (b) a valid leasehold interest in all material assets leased by it, in each case, free and clear of all Liens

except for Permitted Liens, excluding properties and assets sold or disposed of by the Company or its Subsidiaries since the Balance Sheet Date. All items of personal property which, individually or in the aggregate, are material to the Company or its Subsidiaries, are in good condition and in a state of good maintenance and repair (ordinary wear and tear are excepted) and are suitable for all purposes currently used.

4.10    Intellectual Property.

(a)    To the Company's Knowledge, Schedule 4.10(a)(i) contains a complete list of all patented, registered or applied for all material Purchased Intellectual Property owned by the Company or any of its Subsidiaries. The Company or its Subsidiaries is the sole owner of (free and clear of all Liens) all right, title and interest in and to, or has the right to use pursuant to a valid and enforceable license, all Purchased Intellectual Property. To the Company's Knowledge and except as set forth on Schedule 4.10(a)(ii), neither the Company nor any of its Subsidiaries has received within the last year any written notice of any Proceeding and there is no threatened Proceeding pending against the Company or any of its Subsidiaries, asserting that any use of the Purchased Intellectual Property, or the conduct of the businesses of the Company or any of its Subsidiaries, infringes, misappropriates or otherwise violates the Intellectual Property of any Person.    To the Company's Knowledge and except as set forth on Schedule 4.10(a)(ii), (i) the conduct of the businesses of the Company or its Subsidiaries has not infringed, misappropriated or otherwise violated any Intellectual Property of any Person, and (ii) no Person has infringed, misappropriated or otherwise violated any of the Purchased Intellectual Property.

(b)    To the Company's Knowledge, the computer systems, including the software, firmware, hardware, networks, interfaces and related systems (collectively, the "Computer Systems") owned or leased by the Company or any of its Subsidiaries that are used or held for use in the conduct of their respective businesses are sufficient for the immediate needs of such businesses, and in the last six (6) months, there have been no material failures, substandard performance or other similar material adverse events with respect to any Computer Systems that have not been remedied or replaced in all material respects. The Computer Systems and the Purchased Intellectual Property will continue to be owned or available for use by the Company and its Subsidiaries on the same terms and conditions after Closing as they were prior to Closing, except where the failure to own or possess any such rights would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.11    Material Contracts.

(a)    Set forth on Schedule 4.11(a) is a list of the following Contracts to which the Company and/or any of its Subsidiaries is a party or by which any or their respective properties or assets are bound (the "Material Contracts"):

(i)    the Management Services Agreements;

-29-

(ii)    each partnership, collaboration, joint development, strategic alliance or joint venture Contract or other Contract for the sharing of profits;

(iii)    each management, consulting, severance or similar Contract, and each employment Contract;

(iv)    each Contract with a Material Supplier;

(v)    each Contract relating to the acquisition, sale, assignment, disposition or lease of all or a material portion of the assets, business or capital stock of any Person within the last three (3) years (including the Company and/or any of its Subsidiaries);

(vi)    each Contract that contains any non-solicitation, non-competition, confidentiality or similar obligations (other than any Contract with an employee or former employee or with a customer or supplier entered into in the ordinary course of business otherwise described in this clause vi solely because it contains customary restrictions);

(vii)    each Contract pursuant to which the Company or any of its Subsidiaries have granted to, or been granted from, any Person any (x) exclusive license to any Intellectual Property, or (y) material non-exclusive license to any software (other than any unmodified commercially available off-the-shelf software); and

(viii)    each other Contract that involves (x) payments over the life thereof in excess of $500,000 or (y) payments in any one fiscal year in excess of $100,000.

(b)    To the Company's Knowledge and except as set forth on Schedule 4.11(b), each of the Material Contracts is in full force and effect and is a legal, valid and binding Contract or agreement of the Company and/or its Subsidiaries, as applicable, and, there is no material default, violation or breach by the Company and/or any of its Subsidiaries, or, to the Company's Knowledge, any other party thereto, in the timely performance of any material obligation to be performed or paid thereunder or any other material provision thereof, nor does any condition exist that with notice or lapse of time or both would constitute such a material default, violation or breach thereunder by the Company, any of its Subsidiaries or, to the Company's Knowledge, any such other party (as applicable), in each case to the extent such material default, violation or breach is not or cannot be cured under Section 365 of the Bankruptcy Code. To the Company's Knowledge, except as set forth on Schedule 4.11(b), and to the extent such action is valid and enforceable under applicable Law, including the Bankruptcy Code, neither the Company nor any of its Subsidiaries has received written notice that any party to any Material Contract intends to cancel or terminate any such Material Contract or to not exercise any option to renew thereunder and, to the Company's Knowledge, no party to any Material Contract intends to exercise any right of cancellation, termination, acceleration or modification under any such Material Contract.

4.12    Insurance.  Schedule 4.12 sets forth, as of the date of this Agreement, all policies of insurance covering the Company and its Subsidiaries and their respective businesses, and, to the Company's Knowledge, as of the date hereof such policies are in full force and effect and all premiums and amounts due and payable thereunder have been paid.

4.13    Litigation and Orders.  To the Company's Knowledge and except as set forth in Schedule 4.13, there are no pending, outstanding or threatened, and for the past twelve (12) months there have been no Proceedings against, (a) the Company or any of its Subsidiaries or any current or former officer, director, employee, consultant, agent or equityholder of the Company or any of its Subsidiaries with respect to the Company, any of its Subsidiaries or their respective businesses or assets, except for (i) the Chapter 11 Cases, (ii) such Proceedings that, if adversely determined, are not covered by insurance of the Company or any of its Subsidiaries, subject to a discharge in the Chapter 11 Cases, and would not, individually or in the aggregate, reasonably be expected to result in (A) liabilities or obligations of any nature of the Company or its Subsidiaries in excess of $1,000,000, and (iii) claims of creditors or other parties in the Chapter 11 Cases, or (b) Proceedings that challenge, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions.  To the Company's Knowledge, neither the Company nor any of its Subsidiaries is subject to any Order, other than Orders of the Bankruptcy Court.

4.14    Compliance with Laws.  To the Company' Knowledge and except as set forth in Schedule 4.14, each of the Company and its Subsidiaries:

(a)    is, and for the past six (6) months has been, in compliance, in all material respects, with all Laws applicable to its business and/or employees (except for Laws addressed in Section 4.7, Section 4.16, Section 4.17, Section 4.18 and Section 4.22); and

(b)    has not received any written notification or communication from any Person, and no Proceeding has been filed or otherwise commenced, asserting that the Company or any of its Subsidiaries is not in material compliance with any Law (except for Laws addressed in Section 4.7, Section 4.16, Section 4.17, Section 4.18 and Section 4.22).

4.15    Permits.  To the Company's Knowledge, Schedule 4.15 contains a complete list of all material Permits issued to the Company or its Subsidiaries that are currently used by the Company or any of its Subsidiaries in connection with their respective businesses and, to the Company's Knowledge, such Permits constitute all of the material Permits required for the conduct of the respective businesses of the Company and the Subsidiaries, as applicable, as currently conducted, all of which are valid and in full force and effect except in each such case where the failure to be in full force and effect would not have a Material Adverse Effect. To the Company's Knowledge each of the Company and the Subsidiaries is in material compliance with all such listed Permits and no written notice has been received by the Company or any Subsidiary alleging a default or violation in connection with any such Permit, except such defaults or violations that would not have, nor would reasonably be expected to have, a Material Adverse Effect.  Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this Section 4.15 are the sole representations and warranties of the Company relating to Permits.

4.16    <u>Labor Matters</u>.  Neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or any other Contract or relationship with any labor union or similar employee representative.  To the Company's Knowledge, (a) no labor union or other collective bargaining unit represents any of the Company's or any of its Subsidiaries' employees and (b) there is no union campaign being conducted to solicit cards from employees to authorize a union to request a National Labor Relations Board certifications election with respect to the Company's or any of its Subsidiaries' employees.  Except as set forth on <u>Schedule 4.16</u>, (i) with respect to the employees of the Company and/or any of the Subsidiaries, there is no strike, slowdown, work stoppage, lockout or other material labor dispute underway or, to the Company's Knowledge, threatened, and no such dispute has occurred in the past five years, and (ii) neither the Company nor any Subsidiary has engaged in any unfair labor practices. Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this <u>Section 4.16</u> are the sole representations and warranties of the Company relating to labor matters.

4.17    <u>Employee Benefit Plans</u>.

(a)    <u>Schedule 4.17(a)</u> sets forth a complete and correct list of (i) all "employee benefit plans", as defined in Section 3(3) of ERISA, (ii) all other severance pay, salary continuation, bonus, incentive, stock option, equity based retirement, pension, profit sharing or deferred compensation plans, retention, change in control contracts, programs, funds or arrangements of any kind, (iii) all other benefit or compensation plans, Contracts, programs, funds, or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated) and any trust, escrow, or similar agreement related thereto, whether or not funded, and (iv) all employment, consulting or independent contractor agreements (A) in respect of any present or former employees, directors, officers, shareholders, consultants or independent contractors of the Company or any of its Subsidiaries that are sponsored or maintained or contributed or required to be contributed to by the Company or any of its Subsidiaries or (B) with respect to which the Company or any of its Subsidiaries is required to make payments, transfers or contributions or with respect to which, to the Company's Knowledge, the Company or any of its Subsidiaries has any liability or obligation (all of the above being hereinafter individually or collectively referred to as "<u>Employee Plan</u>" or "<u>Employee Plans</u>", respectively).

(b)    Copies of the following materials have been made available to Investor: (i) all current plan documents for each Employee Plan, (ii) all determination letters from the IRS with respect to any of the Employee Plans, if applicable, (iii) all current summary plan descriptions, summaries of material modifications, annual reports, and summary annual reports with respect to the Employee Plans, (iv) all current trust agreements, insurance contracts and other documents relating to the funding or payment of benefits under any Employee Plan, and (v) the two most recent Form 5500 required to be filed for each Employee Plan.

(c)    To the Company's Knowledge, each Employee Plan has been maintained, operated, funded and administered in material compliance with its terms and any related documents or agreements and in material compliance with all applicable Laws other than

noncompliance which would not be reasonably expected to give rise to any material liability on the part of the Company or its Subsidiaries or, as of or subsequent to the Closing Date, the Investor. To the Company's Knowledge, there have been no prohibited transactions or breaches of any of the duties imposed on "fiduciaries" (within the meaning of Section 3(21) of ERISA) by ERISA with respect to the Employee Plans that would result in any material liability or excise Tax under ERISA or the Code being imposed on the Company or any of its Subsidiaries. All material contributions, premiums or other payments under or with respect to each Employee Plan that are due from the Company or any of its Subsidiaries for any time period ending on or before the Closing Date shall have been paid.

(d)     Except as would not reasonably be expected to have a Material Adverse Effect, each Employee Plan intended to be qualified under Section 401(a) of the Code is so qualified, has received a favorable determination letter from the IRS, and each trust created thereunder has been determined by the IRS to be exempt from tax under the provisions of Section 501(a) of the Code, and nothing has occurred that could adversely affect the qualification of such Employee Plan.

(e)     Neither the Company nor, to the Company's Knowledge, any member of the Controlled Group currently has an obligation to contribute to, and neither the Company nor any of its Subsidiaries has any current or potential liability or obligation under or with respect to, a "defined benefit plan" as defined in Section 3(35) of ERISA, a pension plan subject to the funding standards of Section 302 of ERISA or Section 412 of the Code, or a "multiemployer plan" as defined in Section 3(37) of ERISA or Section 414(f) of the Code. To the Company's Knowledge, neither the Company nor any of its Subsidiaries has any current or potential liability or obligation on account of at any time being considered a single employer under Section 414 of the Code with any other Person.

(f)     With respect to each group health plan benefiting any current or former employee of the Company or any of its Subsidiaries that is subject to Section 4980B of the Code, the Company and its Subsidiaries have complied in all material respects with the continuation coverage requirements of Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA ("COBRA").

(g)     Except as set forth on Schedule 4.17(g), no Employee Plan provides benefits, including death or medical benefits, beyond termination of service or retirement other than (i) coverage mandated by COBRA, or (ii) death or retirement benefits under any Employee Plan that is intended to be qualified under Section 401(a) of the Code.

(h)     To the Company's Knowledge, no amount that could be received (whether in cash or property or the vesting of property) as a result of any of the transactions contemplated by this Agreement by any employee, officer or director of the Company or any of its Affiliates who is a "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) under any employment, severance or termination agreement, other compensation arrangement or Employee Plan currently in effect would be characterized as an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code). No individual is entitled to receive any additional payment

-33-

(e.g., a Tax gross-up or other payment) from the Company or any of its Subsidiaries in the event that the excise or penalty tax required by Section 409A of the Code (or any corresponding provision of state, local, or foreign Tax law) is imposed on such individual.

(i)    Except as set forth on Schedule 4.17(i), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will, alone or in connection with any other event: (i) result in a payment (including severance, unemployment compensation or otherwise) becoming due under any Employee Plan; (ii) increase the amount or value of any benefit or compensation otherwise payable under any Employee Plan; or (iii) accelerate the time of payment or vesting, or increase the amount of or result in the funding of, any compensation or benefit due to any Person.

(j)    Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this Section 4.17 are the sole representations and warranties of the Company relating to Employee Plans.

4.18    Environmental.

(a)    Except as set forth on Schedule 4.18 or as would not reasonably be excepted to have a Material Adverse Effect:

(i)    the Company and its Subsidiaries are and have been in compliance with all Environmental Laws, including those applicable to their use and occupation of the Leased Real Property and operation of their respective businesses;

(ii)    neither the Company nor its Subsidiaries has generated, manufactured, refined, transported, treated, stored, handled, arranged for or permitted the disposal of, disposed, transferred, produced, processed or exposed any Person to any Hazardous Materials, and, as of the date of this Agreement, there has been no Release or, to the Company's Knowledge, threat of Release of any Hazardous Material at or in the vicinity of any Leased Real Property, in each case above, that requires reporting, investigation, assessment, cleanup, remediation or any other type of response action by, or would otherwise give rise to any material liability of, the Company or any of its Subsidiaries pursuant to any Environmental Law;

(iii)    neither the Company nor its Subsidiaries has (A) received written notice under the citizen suit provisions of any Environmental Law, (B) received any written request for information, notice, demand letter, administrative inquiry or formal or informal complaint or claim under or relating to any Environmental Law or (C) been subject to or, to the Company's Knowledge, threatened with any governmental or citizen enforcement action, claim or other Proceeding with respect to any Environmental Law;

-34-

(iv)    neither the Company nor any of its Subsidiaries nor, to the Company's Knowledge, any predecessor or affiliate of the Company or any of its Subsidiaries, has manufactured, sold, marketed, installed or distributed products or items containing asbestos or other Hazardous Materials and none of the foregoing Persons have any material liability, contingent or otherwise, with respect to the presence or alleged presence of asbestos or other Hazardous Materials in any product or item or at or upon any property or facility; and

(v)    the Company and its Subsidiaries have obtained all material Permits required under any Environmental Law that are materially necessary for the Company's or its Subsidiaries' activities and operations at the Leased Real Property, and all such Permits are in full force and effect.

(b)    To the Company's Knowledge, the Company and each of its Subsidiaries have made available to Investor all environmental audits, assessments, reports and other documents materially bearing on any environmental, health or safety matters, which are in their possession or under their reasonable control.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the representations and warranties in this Section 4.18 are the sole representations and warranties of the Company relating to environmental matters.

4.19    Accounts Receivable.  To the Company's Knowledge, all accounts receivable of each of the Company and its Subsidiaries represent bona fide sales actually made in the ordinary course of business or valid claims as to which performance has been rendered by the Company or its Subsidiaries and none of the Company and/or any of its Subsidiaries has increased or extended the payment terms with respect to any such accounts receivables in a manner not consistent with its ordinary course of business.

4.20    Managed Practices and Suppliers.

(a)    Schedule 4.20(a) sets forth the top ten (10) Managed Practices of the Company and its Subsidiaries on a consolidated basis (based on the dollar amount of sales to such customers) for the year ended December 31, 2012 (collectively, the "Top Managed Practices"). To the Company's Knowledge and except as set forth on Schedule 4.20(a), (i) neither the Company nor any of its Subsidiaries has received written notice that any Top Managed Practice intends to terminate its relationship with the Company or such Subsidiary, and (ii) neither the Company nor any of its Subsidiaries is involved in any dispute or disagreement with any Top Managed Practice that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, in each case of clause (i) and clause (ii) to the extent such termination is valid and enforceable under applicable Law, including the Bankruptcy Code.

(b)    Schedule 4.20(b) sets forth the top ten suppliers of the Company and its Subsidiaries on a consolidated basis (based on the dollar amount of purchases from such suppliers) for the year ended December 31, 2012 and each additional supplier who based on such purchases of the Company or any of the Subsidiaries since December 31, 2012

would reasonably be expected to be a top ten supplier of the Company and its Subsidiaries on a consolidated basis for the year ended December 31, 2013 (the "Material Suppliers"). Except as set forth on Schedule 4.20(b), neither the Company nor any of its Subsidiaries has received written notice, and to the Company's Knowledge no facts or circumstances exist to the effect, that (i) any Material Supplier intends to terminate its relationship with the Company or such Subsidiary, (ii) any dispute exists or is anticipated with any Material Supplier that, individually or in the aggregate, could reasonably be anticipated to be material and adverse to the Company or any of its Subsidiaries, or (iii) any Material Supplier has or may stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to supplying materials, products or services to the Company or any of its Subsidiaries (whether as a result of the consummation of the Contemplated Transactions or otherwise), in each case to the extent such action described above is valid and enforceable under applicable Law, including the Bankruptcy Code. The terms under which the Material Suppliers supply materials, products or services to the Company and its Subsidiaries are on market terms and are the result of arms'-length transactions.

4.21    Brokers.  Except as set forth on Schedule 4.21, no broker, finder or similar agent has been employed by or on behalf of the Company, and no Person with which the Company has had any dealings or communications of any kind is entitled to any brokerage commission or finder's fee in connection with this Agreement or the Contemplated Transactions.

4.22    Healthcare.

(a)    To the Company's Knowledge, the Company and each of its Subsidiaries, and their respective directors and officers, is, and for the past three (3) years has been, in material compliance with all applicable and material healthcare laws, ordinances, regulations and orders relating to or affecting its healthcare operations, including, but not limited to, Sections 1128A, 1128B, or 1877 of the Social Security Act (42 U.S.C. §§ 1320a-7a, 1320a-7b, and 1395nn), 31 U.S.C. § 3729 et seq. (the Civil False Claims Act), 18 U.S.C. § 1347 (Health Care Fraud), Public Law 104-191 (the Health Insurance Portability and Accountability Act of 1996), fraud and abuse, false claims and anti-self referral Laws and Laws related to the confidentiality, privacy and security of medical information, or to licensing, the corporate practice of medicine, fee-splitting, certificate of need  and reimbursement or billing for healthcare services, except where such noncompliance would not have, nor would reasonably be expected to have, a Material Adverse Effect and, to the Company's Knowledge, neither the Company, any of its Subsidiaries, nor any of the Managed Practices has received any written notice to the contrary. To the Company's Knowledge, each of the Company and its Subsidiaries possess all material Permits, orders and franchises reasonably necessary to own, lease and conduct their respective businesses in the manner and to the full extent now operated, in each case issued by the appropriate Governmental Authority, including, without limitation, the United States Department of Health and Human Services and each other federal, state and local agency, except where the failure to possess such Permits would not reasonably be expected to have a Material Adverse Effect.

(b)     To the Company's Knowledge, the operation of the healthcare business of the Company and its Subsidiaries is in material compliance with the applicable material healthcare Permits, franchises and orders, and no event has occurred which permits (nor has an event occurred which with notice or lapse of time or both would permit) the revocation or termination of any such necessary material Permits, orders or franchises or which might result in any other impairment of the rights of the Company therein or thereunder, except where the failure to so comply or such revocation, termination or impairment would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     Neither the Company nor any of its Subsidiaries participates in any federal healthcare programs, including the Medicare program, the Medicaid program, and the Tricare program (together with their respective intermediaries or carriers, the "Government Reimbursement Programs").

(d)     The Company is not a party to any corporate integrity or similar agreements with any Governmental Agency which apply to its businesses and activities and those of its Subsidiaries (collectively, the "Business").  To the Company's Knowledge, no employee of the Business is excluded from participating in any Government Reimbursement Program, nor to the Company's Knowledge is any such exclusion threatened or pending.  To the Company's Knowledge, none of the officers, directors or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)) of the Company or its Subsidiaries has been excluded from any Government Reimbursement Program, been subject to sanction pursuant to 42 U.S.C. §1320a-7a or 1320a-8, or been convicted of a crime described at 42 U.S.C. §1320a-7b, nor to the Company's Knowledge is any such exclusion, sanction or conviction threatened or pending.  Neither the Company nor its Subsidiaries has been excluded from the Government Reimbursement Programs.

(e)     This Section 4.22 contains the sole representations and warranties of the Company and the Subsidiaries with respect to healthcare regulatory matters.

4.23    Arm's Length.  The Company acknowledges and agrees that Investor is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the Contemplated Transactions (including in connection with determining the terms of the Issuance) and not as a financial advisor or fiduciary to, or agent of, the Company or any other Person.  Additionally, Investor is not advising the Company or any other Person as to any legal, Tax, investment, accounting or regulatory matters in any jurisdiction. The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the Contemplated Transactions, and Investor shall not have any responsibility or liability to the Company with respect thereto.  Any review by Investor of the Company, the Contemplated Transactions or other matters relating to the Contemplated Transactions will be performed solely for the benefit of Investor and shall not be on behalf of the Company.

4.24    No Unlawful Payments.  Except as would not reasonably be expected to create a Material Adverse Effect, neither the Company nor any of its Subsidiaries nor, to the Company's

Knowledge, any current or former director, officer or employee of the Company or any of its Subsidiaries has, directly or indirectly:  (a) offered, paid, delivered or otherwise used any funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (b) offered, delivered or made any direct or indirect unlawful payment to any official or employee of a Governmental Authority; (c) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977 or any comparable legislation applicable under foreign Law; or (d) offered, delivered, made or received any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

4.25    No Other Representations and Warranties.   EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE COMPANY MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE COMPANY OR ITS SUBSIDIARIES OR ANY OF THEIR RESPECTIVE ASSETS, LIABILITIES OR OPERATIONS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. INVESTOR HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT TO THE EXTENT SET FORTH IN THIS AGREEMENT, INVESTOR IS ACQUIRING THE SHARES ON AN "AS IS, WHERE IS" BASIS.  THE DISCLOSURE OF ANY MATTER OR ITEM IN ANY SCHEDULE HERETO WILL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGEMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF INVESTOR

Investor represents and warrants to the Company as of the date of this Agreement and as of the Closing as follows:

5.1    Existence and Good Standing.  Investor and each other Subsidiary of Parent is a corporation or limited liability company, duly formed or organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization. Investor and each other Subsidiary of Parent is duly qualified to do business, and in good standing, in each jurisdiction in which the character of the properties owned or leased by it or in which the conduct of its business requires it to be so qualified, except where the failure to be so qualified or to be in good standing would not have an Investor MAE.

5.2    Validity and Enforceability.  Investor and each other Subsidiary of Parent has the requisite corporate or limited liability company power and authority to execute and deliver this Agreement, the Ancillary Agreements and the Financing Documents to which it is (or will be) a party, and to consummate the Contemplated Transactions and the Financing Transactions.  The execution and delivery of this Agreement, the Ancillary Agreements and the Financing Documents, and the consummation of the transactions contemplated herein and therein, have been duly and validly authorized by all necessary corporate or limited liability action on the part of Investor and each other Subsidiary of Parent.  This Agreement has been (or, in the case of each other Ancillary Agreement and Financing Document to be entered into by Investor and each other Subsidiary of Parent at or prior to the Closing will be) duly and validly executed and delivered by Investor and each other Subsidiary of Parent and, assuming due authorization,

execution and delivery by the Company, represents (or, in the case of each other Ancillary Agreement and Financing Documents to be entered into by Investor and each other Subsidiary of Parent at or prior to the Closing, will represent) the legal, valid and binding obligation of Investor and each other Subsidiary of Parent, enforceable against Investor and each other Subsidiary of Parent in accordance with its terms, except as limited by the General Enforceability Exceptions.

5.3     No Conflict; Required Filings and Consents.

(a)     Neither the execution and delivery of this Agreement, any Ancillary Agreements or any Financing Documents to which Investor and each other Subsidiary of Parent is a (or will be a) party, nor the consummation by Investor and each other Subsidiary of Parent of the transactions contemplated herein or therein, nor compliance by Investor and each other Subsidiary of Parent with any of the provisions hereof or thereof, will (i) conflict with or result in a breach of any provisions of the Organizational Documents of Investor or each other Subsidiary of Parent, (ii) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of any Lien upon, any property or assets of Investor or each other Subsidiary of Parent or, pursuant to any Contract to which it is a party or by which it or any of its properties or assets may be subject, or (iii) subject to receipt of the requisite approvals referred to in Schedule 5.3(b), violate any Law applicable to Investor or each other Subsidiary of Parent or any of its properties or assets, except in the case of clause (ii) and (iii), where any such breach, default, right or violation would not reasonably be expected to have an Investor MAE.

(b)     Other than as set forth in Schedule 5.3(b), no third party Consent is necessary for the consummation by Investor or each other Subsidiary of Parent of the Contemplated Transactions or the Financing Transactions.

5.4     Financial Ability.  Investor currently has, and on the Closing Date will have, sufficient immediately available funds in such amount as is required to pay the Initial Purchase Price (less the Escrow Amount) and to make all other payments (including the fees and expenses of Investor related to the Contemplated Transactions and the Financing Transactions) required by the terms hereof to consummate the Contemplated Transactions and the Financing Transactions on the terms set forth herein and otherwise to perform all of Investor's obligations under this Agreement.

5.5     Financial Statements.

(a)     Copies of the following financial statements have been made available to the Company for its review: (i) the audited consolidated balance sheet of Investor and its Subsidiaries as of December 31, 2010, December 31, 2011, and December 31, 2012, and the related audited consolidated statements of comprehensive loss, cash flows and changes in equity for the years then ended, together with the notes thereto (the "Investor Audited Financial Statements"), and (ii) the unaudited condensed consolidated balance sheet of Investor and its Subsidiaries as of March 31, 2013, and the related unaudited

condensed consolidated statements of operations and comprehensive loss, and cash flows for the 3-month period then ended (the "Investor Interim Financial Statements", and together with the Investor Audited Financial Statements, the "Investor Financial Statements").

(b)     The Investor Audited Financial Statements have been prepared in accordance with GAAP and fairly present, in all material respects, the financial position, results of operations, shareholders' equity, and cash flows of Investor and its Subsidiaries on a consolidated basis, as of the date and for the period indicated.  The Investor Interim Financial Statements have been prepared by management in accordance with GAAP applied consistently with the Investor Audited Financial Statements (except for the absence of footnote disclosure, which, if presented would not provide information materially different than the information set forth in such Investor Interim Financial Statements, and year-end adjustments, the effect of which will not, individually or on the aggregate, be materially adverse).  The Investor Financial Statements were derived from the books and records of Investor and its Subsidiaries.

(c)     Except as set forth on Schedule 5.5(c), none of Investor nor any of its Subsidiaries has any material liabilities, other than (i) liabilities that are set forth on the face of, or quantified in the footnotes to, the Investor Interim Financial Statements, (ii) liabilities incurred in the ordinary course of business that are not required to be set forth in the Investor Interim Financial Statements under GAAP, (iii) liabilities arising since the Balance Sheet Date in the ordinary course of business and consistent with past practice (none of which is a liability resulting from breach of Contract, breach of warranty, tort, infringement or violation of Law), and (iv) liabilities incurred in connection with the execution of this Agreement.

5.6     Solvency.  On the Closing Date, Investor and the other Subsidiaries of Parent will not (a) be insolvent (either because their financial condition is such that the sum of their debts is greater than the fair value of their assets or because the present fair saleable value of their assets will be less than the amount required to pay their probable liability on their debts as they become absolute and matured), (b) have unreasonably small capital with which to engage in their businesses or (c) have incurred or plan to incur debts beyond their ability to pay as they become absolute and matured.

5.7     No Litigation or Regulatory Action.  There is no litigation, arbitration, or other proceedings pending or, to Investor's knowledge, threatened, against Investor or its Affiliates which would reasonably be expected to prevent, hinder or delay the consummation of the Contemplated Transactions, the Financing Transactions or the payment of the Purchase Price.  There is no litigation, arbitration, or other proceedings pending or, to Investor's knowledge, threatened, that questions the legality or propriety of the Contemplated Transactions or the Financing Transactions.

5.8     Capitalization.  Schedule 5.8 correctly and accurately sets forth (a) all of the issued and outstanding shares of capital stock of Parent and Investor of each class and/or series and the names of the holders of such shares and (b) all of the issued and outstanding funded

Indebtedness for borrowed money of Parent, Investor and/or any of their Subsidiaries (collectively, the "Investor Debt").

5.9    SEC Reports.

(a)    Parent has timely filed all forms, reports, statements, certifications and other documents (including all exhibits, amendments and supplements thereto) required to be filed by it with the SEC pursuant to the Exchange Act or other applicable United States federal securities Laws (the "SEC Reports").

(b)    As of their respective filing dates, the SEC Reports complied as to form in all material respects with the applicable requirements of the Securities Act and Exchange Act.

(c)    None of the SEC Reports when filed with the SEC and, if amended, as of the date of such amendment, contained any untrue statement of a material fact or omitted to state a material fact required to be stated or incorporated by reference therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(d)    There are no material unresolved comments issued by the staff of the SEC with respect to any of the SEC Reports.

5.10    Brokers.  No broker, finder or similar agent has been employed by or on behalf of Investor, and no Person with which Investor has had any dealings or communications of any kind is entitled to any brokerage commission or finder's fee in connection with this Agreement, the Contemplated Transactions or the Financing Transactions.

5.11    Exemption from Registration.  It is not necessary, in connection with the offer, issuance and delivery of the Amended Note Guarantees, to register the Amended Note Guarantees under the Securities Act.

5.12    Independent Investigation.    Investor has conducted its own independent investigation, review and analysis of the business, operations, assets (including Contracts), liabilities, results of operations, financial condition, software, technology and prospects of the Company and its Subsidiaries, which investigation, review and analysis was undertaken by Investor and its Affiliates and Representatives.  Investor hereby agrees and acknowledges that (a) other than the representations and warranties made in Article IV, neither the Company, its Affiliates, nor any of their respective officers, directors, employees or Representatives makes or has made any representation or warranty, express or implied, at law or in equity, with respect to the Company or any of its Subsidiaries and (b) except in the case of fraud or intentional misrepresentation, none of the Company, its Affiliates, or any of their respective officers, directors, employees or Representatives will have or be subject to any liability or indemnification obligation to Investor or to any other Person resulting from this Agreement or the transactions contemplated hereby.

5.13    No Other Representations and Warranties.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, INVESTOR MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF INVESTOR, PARENT OR ITS SUBSIDIARIES OR ANY OF THEIR RESPECTIVE ASSETS, LIABILITIES OR OPERATIONS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. THE COMPANY HEREBY ACKNOWLEDGES THE DISCLOSURE OF ANY MATTER OR ITEM IN ANY SCHEDULE HERETO WILL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGEMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED.

**ARTICLE VI**
**COVENANTS AND AGREEMENTS**

6.1    Certain Bankruptcy Matters.  Except as expressly set forth in this Agreement, the Plan or the Restructuring Support Agreement, or as required by applicable Law, during the period from the date of this Agreement to the Closing Date or the earlier termination of this Agreement, the Company shall use all commercially reasonable efforts to, and shall cause each of its Subsidiaries to use all commercially reasonable efforts to:

(a)    [Intentionally Deleted];

(b)    [Intentionally Deleted];

(c)    within thirty (30) days after filing of the Agreement Motion, obtain entry by the Bankruptcy Court of the Agreement Order;

(d)    (i) file the motion to approve the Disclosure Statement on or before July 15, 2013; (ii) commence the solicitation of the Plan in accordance with Section 1126(b) of the Bankruptcy Code on or before August 26, 2013; (iii) hold the confirmation hearing to approve the Plan on or before October 11, 2013; and (iv) cause the Effective Date to occur on or before October 25, 2013 (the "End Date");

(e)    timely file with the Bankruptcy Court a formal written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of an examiner with expanded powers or a trustee, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases or (iv) modifying or terminating the Company's exclusive right to file or solicit acceptances of a plan of reorganization; and

(f)    provide to Investor or its representatives, no later than five (5) business days before the hearing on the confirmation of the Plan, a schedule of executory Contracts and unexpired Leases the Company intends to reject, which schedule shall be in form and substance acceptable to Investor in its sole discretion; provided, however, that nothing in this Agreement shall require the Company or any of its Subsidiaries to, and neither the Company nor any of its Subsidiaries shall be required to, (i) reject the lease described on Schedule 7.3(m), (ii) reject any executory Contract or unexpired Lease

-42-

prior to the conclusion of the Auction and the acceptance of the Winning Bid (as defined in the Bidding Procedures) in accordance with the terms of the Bidding Procedures or (iii) reject any executory Contract or unexpired Lease that would result in or cause to occur any expense or claim that is associated with or arises from the rejection thereof and that is entitled to treatment under the Plan in priority to, or equal to, the Notes (including any expense or claim described in section 503(b)(7) or section 503(b)(8) of the Bankruptcy Code) unless the amount of any such expense or claim that has been paid at or prior to the Closing increases the current assets of the Company and its Subsidiaries for purposes of the calculation of "Closing Working Capital" in accordance with the terms of such definition set forth in Section 1.1.  For the avoidance of doubt, to the extent such expenses or claims referred to in clause (iii) of the immediately preceding sentence have not been paid at or prior to Closing, they shall not be deemed to constitute "Selling Expenses" or a current liability of the Company or its Subsidiaries for purposes of the definition of "Closing Working Capital".

6.2    Automatic Stay.  The Company acknowledges and agrees and shall not dispute that the giving of notice of termination by any party pursuant to this Agreement shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

6.3    Agreement Motion and Agreement Order.  As soon as is practicable after the date of this Agreement, the Company shall file a motion (the "Agreement Motion") with the Bankruptcy Court seeking approval of the Bidding Procedures and the payment by the Company of the Break Up Fee and the Transaction Expenses in accordance with the terms of (and subject to the conditions and limitations set forth in) this Agreement.

6.4    Interim Operations of the Company.  From the date hereof until the Closing or the earlier termination of this Agreement, except as (i) set forth in Schedule 6.4 or Schedule 7.3(m), (ii) contemplated by this Agreement, the Plan or the Restructuring Support Agreement, (iii) consented to in writing by Investor (such consent not to be unreasonably withheld, delayed or conditioned, except with respect to the matters set forth in subsections (c), (e), (f), (g), (m) and (q), which shall be subject to Investor's consent in its sole discretion), (iv) necessary to effect the Contemplated Transactions, (v) required by Law, (vi) contemplated or permitted by the DIP Order or the credit agreement entered into pursuant to the DIP Order (the "DIP Credit Agreement") or (vii) contemplated by any First Day Motion, (a) the Company will, and will cause its Subsidiaries to, conduct the Company's and its Subsidiaries' business in the ordinary course of business (as is customary for Chapter 11 debtors), and use all commercially reasonable efforts to preserve in all material respects their current material relationships with Governmental Authorities, Managed Practices, suppliers, lessors, creditors and key employees and (b) the Company shall not, and shall cause its Subsidiaries not to:

(a)    (i) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of the capital stock of the Company or any of its Subsidiaries, or (ii) purchase, redeem or otherwise acquire any shares of capital stock of the Company or any of its Subsidiaries or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities;

-43-

(b)    adjust, split, combine or reclassify any capital stock or equity interests or issue or propose or authorize the issuance of any other securities (including options, profit interests, warrants or any similar security exercisable for, or convertible into, such other security);

(c)    incur or commit to incur any capital expenditure in excess of $100,000 individually or $500,000 in the aggregate, or authorization or commitment with respect thereto, or fail to make any material capital expenditures contemplated by the debtor-in-possession motion filed by the Company on June 16, 2013, attached hereto as Exhibit I(the "DIP Motion"), on or prior to the time that such capital expenditure was to be incurred as set forth in the DIP Motion;

(d)    acquire or agree to acquire by merging or consolidating with, or purchase any portion of the stock of, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, or limited liability company;

(e)    sell, lease, mortgage, pledge, grant any Lien on or otherwise encumber (excluding any Permitted Liens) or dispose of any of its material properties (including the real property) or material assets, including the capital stock or equity interests of the Company, in each case, having value in excess of $100,000 individually or $375,000 in the aggregate or discharge or cause the satisfaction of any material Lien or obligation other than current liabilities in the ordinary course of business;

(f)    (i) incur or permit to exist any Company Debt in excess of $375,000 in the aggregate, except as permitted pursuant to and in accordance with the DIP Order, (ii) waive, cancel or modify any Company Debt, claims or rights involving in excess of $375,000, except as contemplated by the Plan, (iii) make any loan or advances to any Person (except as permitted by the DIP Credit Agreement) or (iv) guarantee any Company Debt of any Person (other than the Company or any of its Subsidiaries) or enter into any "keep well" or other agreement to maintain any financial condition of another Person (other than a Subsidiary of the Company) or enter into any arrangement having the economic effect of any of the foregoing;

(g)    (i) other than in the ordinary course of business, enter into, assume, amend, waive or terminate any Material Contract, material permit or unexpired Lease, or any provision thereof, (ii) enter into any settlement of any material Proceeding relating to a Material Contract, except as contemplated by the Plan, or (iii) enter into any Contract that would not be a Material Contract that delays or is reasonably expected to impede or materially delay the Contemplated Transactions, including the Closing;

(h)    adopt or propose any amendments to any of the Company's or its Subsidiaries' Organizational Documents or take any steps to incorporate or organize any Subsidiary, except, in each case, in furtherance of the Restructuring or the Contemplated Transactions (and approved by Investor to the extent not expressly set forth in this Agreement or the Plan);

-44-

(i)    fail to maintain the Leased Real Property in substantially the same condition as of the date of this Agreement, ordinary wear and tear excepted, in accordance with the applicable terms under the applicable Lease;

(j)    except (i) as required by the terms of an existing Contract, agreement, arrangement, plan or policy disclosed to Investor on a schedule to this Agreement or provided in the Plan, (ii) as required to comply with Law or (iii) in the ordinary course of business, (A) enter into, adopt, amend or terminate any Employee Plan, (B) increase in any material manner the compensation or benefits of any director or officer, or management level employee with a total annual compensation as of the date hereof in excess of $250,000, of the Company or any of its Subsidiaries, or (C) enter into, renew (other than automatically without action by either party) or terminate any Contract, agreement, commitment or arrangement providing for the payment of compensation or benefits to any director or officer, or management level employee, of the Company or any of its Subsidiaries, with a total annual compensation as of the date hereof in excess of $250,000;

(k)    implement any employee layoffs that would reasonably be expected to implicate the WARN Act;

(l)    commence any Proceeding (other than a Proceeding as a result of a Proceeding commenced against the Company or any of its Subsidiaries), or compromise, settle or agree to settle any Proceeding other than compromises, settlements or agreements contemplated by the Plan or in the ordinary course of business that involve only the payment of money damages either covered by insurance of the Company or any of its Subsidiaries or not in excess of $250,000 individually or $500,000 in the aggregate, in any case without the imposition of any equitable relief;

(m)    change materially its financial or tax accounting methods, elections, principles, periods or practices, except insofar as may have been required by a change in GAAP or applicable Law;

(n)    amend or modify the Restructuring Support Agreement or the Plan to the extent that such amendment or modification would materially and adversely affect Investor;

(o)    withdraw or revoke the Restructuring Support Agreement or the Plan or publicly announce its intention not to pursue the Restructuring Support Agreement or the Plan;

(p)    file any motion, application or pleading with the Bankruptcy Court (including any modifications or amendments thereof) that, in whole or in part, is not consistent in any material respect with this Agreement, the Restructuring Support Agreement or the Plan, except for, with respect to the Restructuring Support Agreement or the Plan any, such motion, application or pleading that would not materially and adversely affect Investor;

(q)    make any material changes to the working capital policies applicable to the Company and its Subsidiaries;

(r)    make any disclosure to, or any other filing with, a Government Authority, unless required by Law, required in the reasonable judgment of the Company or otherwise required by the Bankruptcy Court in connection with the Chapter 11 Cases (in which case, such disclosure or filing would be made subject to the terms and conditions of this Agreement, the Ancillary Agreements and the Plan); or

(s)    commit or agree in writing to take any of the foregoing actions.

6.5    <u>Financing</u>.  The Company shall obtain the use of cash collateral and debtor-in-possession financing pursuant to an order entered by the Bankruptcy Court (the "<u>DIP Order</u>"), which financing shall in form and substance be reasonably acceptable to Investor, and such order shall be consistent in all material respects with the financing contemplated by the DIP Credit Agreement and such order shall be substantially in the form attached as an exhibit to the DIP Motion.

6.6    <u>Reasonable Access; Confidentiality</u>.

(a)    From the date hereof until the Closing Date or the earlier termination of this Agreement, and subject to applicable Law, the Company and its Subsidiaries shall give Investor and its Representatives reasonable access, during normal business hours and upon reasonable advance written notice delivered to the Company's Chief Executive Officer or Chief Financial Officer, to the assets, properties, books, records, agreements, employees and other personnel, customers, suppliers, vendors, Managed Practices and any other significant business relationships of the Company and its Subsidiaries and shall permit Investor to make such inspections as it may reasonably require and to furnish Investor during such period with all such information relating to the Company and its Subsidiaries as Investor may from time to time reasonably request in writing (for which purposes e-mail shall suffice).  Notwithstanding anything to the contrary contained in this Agreement, the Company is not required to provide any information or access that the Company reasonably believes would violate applicable Law, the terms of any confidentiality agreement or confidentiality provision in any Contract to which the Company or any of its Subsidiaries is otherwise bound, the fiduciary duties of the Company's board of directors, or impact any privilege; <u>provided</u> that the Company shall, with respect to any privileged information that Investor is requesting, promptly upon the request of Investor enter into a common interest agreement with Investor that is in the form of the Common Interest Agreement with respect to such information, and shall thereafter provide such privileged information to Investor; <u>provided</u>, <u>further</u>, that with respect to any such other information, agreements, provisions or facts the Company shall use all reasonable best efforts to provide to Investor (or its agents) a description of such information, agreement, provision or facts and without the express prior written consent of the Company (which consent shall not be unreasonably withheld, delayed or conditioned), Investor shall not contact any Managed Practice or any physicians within a Managed Practice. Notwithstanding anything to the contrary in this Agreement, the Company shall not be required to disclose any information to Investor if such disclosure

would, in the Company's reasonable discretion, cause significant competitive harm to the Company and its Subsidiaries. For the avoidance of doubt, the failure of the Company to disclose any information to Investor in accordance with the foregoing shall not constitute a breach or inaccuracy of any representations and warranties of the Company contained in this Agreement.

(b)    Any information provided to or obtained by Investor pursuant to Section 6.6(a) above will be subject to that certain Confidentiality Agreement, dated January 22, 2013, by and between the Company and Investor (the "Confidentiality Agreement").    The Company and Investor agree and acknowledge that the Confidentiality Agreement shall upon the Closing immediately terminate and be of no further force and effect without the need for any further action by any Person.

6.7    Publicity.    Except as may be required to comply with the requirements of any applicable Law (including by the Bankruptcy Court in connection with the Chapter 11 Cases) or the Plan, no party will issue any press release or other public announcement relating to the subject matter of this Agreement or the Contemplated Transactions without the prior approval (which approval will not be unreasonably withheld, conditioned or delayed) of the other party. Notwithstanding anything to the contrary in this Agreement, in no event shall either Section 6.7 or Section 6.6 limit disclosure by Investor and/or any of its Affiliates to any direct or indirect investors in any such Person, as applicable, or in connection with normal fund raising and related marketing or informational or reporting activities of Investor and/or any such Affiliate.

6.8    Notice of Events.    During the period from the date of this Agreement until the Closing Date or the earlier termination of this Agreement, each party hereto shall promptly notify the other party hereto in writing as soon as such party becomes aware of the occurrence, or non-occurrence, of any event, condition or circumstance occurring at any time (whether before or after the date of this Agreement) which (a) has caused, or would reasonably be expected to cause, any representation or warranty made by such party in this Agreement to become untrue; provided, that, for purposes of this clause (a) any reference to the "Company's Knowledge" or similar qualification set forth in such representation or warranty shall be disregarded, (b) would constitute a violation or breach of this Agreement or cause any failure by such party to comply with or satisfy any covenant, Closing condition or agreement to be complied with or satisfied by such party hereunder or (c) would reasonably be expected to delay or otherwise materially affect the consummation of the Contemplated Transactions and/or the Financing Transactions. In furtherance and not in limitation of the foregoing, (i) following the date hereof for a period of 20 consecutive days (the "Inquiry Period") and (ii) on a date determined by the Company within five (5) Business Days of the written request of Investor (the "Closing Inquiry Date") (for the avoidance of doubt, Investor can make the foregoing request only once and such request must be at least five (5) Business Days prior to the Closing Date), with respect to any representation or warranty contained in Article IV that is qualified by the "Company's Knowledge", the Company agrees to use commercially reasonable efforts to cause the Knowledge Members to (x) make reasonable due inquiry of each such Knowledge Member's direct reports and (y) make due inquiry of the Company's counsel (including healthcare counsel) with respect to the subject matter addressed by the applicable representations and warranties (the Company's Knowledge, as qualified by the information obtained from such inquiries, the "Updated Company Knowledge").    Promptly following such Inquiry Period, the Company shall update the

Disclosure Schedules with any additional information and disclosures applicable as a result of the foregoing inquiry. In the event that the Company provides an update to the Disclosure Schedules in accordance with this Section 6.8, it shall provide such additional disclosures to Investor promptly in accordance with Section 10.5. Following the delivery of notice by a Party (the "Disclosing Party") to the other Party (the "Update Recipient") of any addition to the disclosure included in the Disclosing Party's Schedules in accordance with this Section 6.8 (the "Updated Schedules"), the Update Recipient would have ten (10) Business Days to advise the Disclosing Party in writing (an "Update MAE Notice") in accordance with Section 10.5 that, as of such date, it believes the information set forth in the Updated Schedules, together with all changes, effects, events, occurrences, state of facts or developments previously disclosed in accordance with this Section 6.8 (individually or in the aggregate), constitute a Material Adverse Effect or Investor MAE, as the case may be (an "Update MAE"). Following the delivery notice of an Update MAE Notice to the Disclosing Party, the Update Recipient would have an additional five (5) Business Days (the "Update MAE Determination Period") in which to terminate this Agreement as a result of the Update MAE pursuant to, in the case of Investor, Section 8.1(c)(ii) or Section 8.1(c)(iii), or, in the case of the Company, Section 8.2(b)(ii). During the Update MAE Determination Period, the Disclosing Party and the Update Recipient shall cooperate in good faith with respect to the determination of whether there is a Material Adverse Effect or an Investor MAE, as the case may. If the Update Recipient has not terminated this Agreement pursuant to the applicable provisions referenced above prior to 10:00 pm Eastern Time on the last day of the Update MAE Determination Period, the Update Recipient shall have been deemed to have waived its right to terminate this Agreement based on the changes, effects, events, occurrences, state of facts or developments disclosed in accordance with this Section 6.8 prior to the delivery of the Update MAE Notice pursuant to, in the case of Investor, Section 7.3(g) or Section 7.3(i), or, in the case of the Company, Section 7.2(d) or Section 7.2(m); provided, however, that in the event that there is a further update to the Schedules by the Disclosing Party, the provisions of this Section 6.8 with respect to an Update MAE shall once again apply and all changes, effects, events, occurrences, state of facts or developments previously disclosed in accordance with this Section 6.8 will be taken into consideration by the Update Recipient in determining whether there is a Material Adverse Effect or an Investor MAE, as the case may be.

      6.9     All Commercially Reasonable Efforts; Cooperation. Upon the terms and subject to the conditions set forth in this Agreement, each of the parties agrees to use all commercially reasonable efforts to take, or cause to be taken, all reasonable actions, and to do, or cause to be done, and to reasonably assist and cooperate with the other parties in doing, all things reasonably necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Contemplated Transactions and the Financing Transactions, and to obtain satisfaction or waiver of the conditions precedent to the parties' obligations hereunder, including the execution and delivery of any additional agreements and instruments reasonably necessary to consummate the transactions contemplated by this Agreement, the Ancillary Agreements and the Financing Documents. Anything in this Agreement to the contrary notwithstanding, neither the Company nor any of its Subsidiaries shall be required to make any payments, or incur any expenses, in connection with any of the Financing Transactions. Notwithstanding anything to the contrary in this Agreement, Investor shall not be required to (i)

sell, license, divest, dispose of or hold separate, or agree to sell, license, divest, dispose of or hold separate, any assets, services or businesses of either Investor or the Company, or otherwise take or commit to take any action that reasonably could limit its freedom of action with respect to, or its ability to retain, one or more businesses, services or assets or (ii) litigate or defend against any administrative or judicial action or proceeding (including any proceeding seeking a temporary restraining order or preliminary injunction) challenging any of the transactions contemplated hereby as violating the HSR Act or any other law that is designed or intended to prohibit, restrict, or regulate antitrust, monopolization, restraint of trade or competition. Anything in this Agreement to the contrary notwithstanding, this Agreement and the transactions contemplated hereby are subject to the Company's right and ability to consider higher or better competing bids with respect to the assets or equity securities of the Company and/or its Subsidiaries pursuant to the Bidding Procedures. In accordance with the Bidding Procedures, but subject to the Company's obligation, as applicable, to pay Investor the Transaction Expenses and/or the Break Up Fee pursuant to (and only to the extent required by) this Agreement, the Company shall have the right to, and may cause its Representatives and Affiliates to, (x) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Investor and its Affiliates and Representatives) in connection with any sale or other disposition of the assets or equity securities of the Company and/or its Subsidiaries; (y) respond to any request for information or due diligence inquiry, or make any employee or Representative available for such purposes, to any such Person; and (z) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing.

6.10    <u>Financial Information</u>.  The Company shall provide to Investor (a) an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of cash flows for each month, beginning June 2013 until the Effective Date (the "<u>Monthly Financial Statements</u>"), in each case, as promptly as practicable and in any event within 45 days of the end of each month and the end of each fiscal quarter, (b) copies of any materials, correspondence and other information of a material nature that is (i) provided by or on behalf of the Company to the lender(s) under the DIP Credit Agreement (including Weekly Reports (as defined in the DIP Credit Agreement) required to be delivered under Section 5.3 of the DIP Credit Agreement), or (ii) received by the Company or on its behalf from the lender(s) under the DIP Credit Agreement , including such information and reports that are provided under Section 6.1 of the DIP Credit Agreement, in each case, promptly upon receipt or delivery thereof, and (c) such other financial information as is reasonably requested by Investor.  The Monthly Financial Statements, except as indicated therein and the absence of footnote disclosures and year-end adjustments, shall be prepared in accordance with GAAP and shall fairly present in all material respects the financial position, results of operations and cash flows of the Company as of the dates indicated and for the periods specified.

6.11    <u>Common Interest Agreement</u>.  Immediately following the execution of this Agreement by the parties hereto, the parties shall execute and deliver the Common Interest Agreement.

6.12    [Intentionally Deleted]

6.13    <u>Capitalization of the Company as of the Effective Date</u>.  As of the Effective Date (a) the authorized capital stock of the Company will be as set forth in the certificate of incorporation of the Company, as amended to reflect the terms set forth on the applicable exhibit to the Plan, (b) the only shares of capital stock of the Company that shall be issued and outstanding shall be the Shares, which shall have been issued in accordance with this Agreement and the Plan and all of which will be duly authorized, validly issued, fully paid and nonassessable, (c) the Shares will be offered, issued, sold and delivered by the Company in compliance with all applicable Laws governing the issuance of securities, (d) except as set forth on <u>Schedule 6.13</u>, there will be no (i) outstanding securities convertible or exchangeable into shares of capital stock of the Company or other equity securities of the Company; (ii) options, warrants, calls, subscriptions or other rights, agreements or commitments obligating the Company to issue, transfer, repurchase, redeem, acquire or sell any shares of its capital stock or other equity securities; (iii) voting trusts or other agreements or understandings to which the Company is a party or by which the Company is bound with respect to the voting, transfer or other disposition of its shares of capital stock or other equity securities; or (iv) outstanding or authorized equity appreciation, phantom equity or similar rights with respect to the Company, and (e) no registration rights will be outstanding with respect to any of the Company's securities or any securities of its Subsidiaries.

6.14    <u>Diligence Questionnaire</u>.  Immediately following the execution of the Common Interest Agreement, the Company will use all commercially reasonable efforts to (and will use all commercially reasonable efforts to cause its applicable Representatives to) promptly provide Investor and its Representatives to whom information may disclosed under the Common Interest Agreement (the "<u>Specified Representatives</u>") with oral responses (to the Company's Knowledge) to the matters identified in the questionnaire attached hereto as <u>Exhibit H</u> (the "<u>Diligence Questionnaire</u>"), and will otherwise reasonably cooperate and assist Investor and the Specified Representatives in connection with such due diligence investigation, including (i) having the Company's counsel (including its healthcare counsel) participate in a telephonic meeting on a mutually acceptable Business Day and during regular business hours that the Company may propose to Investor on not less than 2 Business Days' notice among the Company and such counsel, on the one hand, and Investor and the Specified Representatives, on the other hand, at which the Company shall provide (with the assistance of such counsel) its initial oral responses to the questions included in the Diligence Questionnaire (the date of such telephonic meeting described in this <u>clause (i)</u>, the "<u>Start Date Meeting</u>"), (ii) providing Investor and the Specified Representatives with such documents, agreements and other material communications that are reasonably requested by Investor or the Specified Representatives in the Diligence Questionnaire (as well as any internal or external correspondence that is materially relevant to the questions and requests set forth in the Diligence Questionnaire) and (iii) reasonably assisting and cooperating with Investor and the Specified Representatives with any reasonable follow up questions or requests that arise in connection with the matters that are the subject of the Diligence Questionnaire (the Company's obligations hereunder are deemed to be in furtherance, and not in limitation, of the Company's obligations under <u>Section 6.9</u> hereof).

**ARTICLE VII**
**CONDITIONS TO CLOSING**

7.1     <u>Conditions to Obligations of the Parties</u>.  The respective obligations of the Company and Investor to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver (if permitted by applicable Law and in any event in each applicable party's sole and absolute discretion) at or prior to the Closing of each of the following conditions:

(a)     none of the parties hereto will be subject to any Order of a court of competent jurisdiction that prohibits the consummation of the transactions contemplated by this Agreement.  Subject to <u>Section 6.9</u> hereof, if any such Order has been issued, the party that is subject to such Order shall use all commercially reasonable efforts to have any such Order overturned or lifted;

(b)     no Proceeding shall be pending or threatened by a Governmental Authority before any Governmental Authority wherein an unfavorable Order would reasonably be expected to (i) prevent consummation of a material portion of the transactions contemplated by this Agreement, or (ii) cause a material portion of the transactions contemplated by this Agreement to be rescinded following consummation;

(c)     no Law shall be in effect as of the Closing Date having the effect of making the transactions contemplated herein illegal or otherwise prohibiting consummation of, or making void or voidable, the transactions contemplated herein; and

(d)     if the purchase of the Shares by Investor pursuant to this Agreement is subject to the terms of the HSR Act or any foreign competition Laws, the applicable waiting periods shall have expired or been terminated thereunder with respect to such purchase.

7.2     <u>Conditions to Obligations of the Company</u>.  The obligations of the Company to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver (if permitted by applicable Law and in any event in the Company's sole and absolute discretion) at or prior to the Closing of each of the following additional conditions:

(a)     <u>Agreement Order</u>.  The Agreement Order shall have been entered by the Bankruptcy Court and the Agreement Order shall have become a Final Order;

(b)     <u>Confirmation Order</u>.  The Confirmation Order shall have been entered by the Bankruptcy Court and the Confirmation Order shall have become a Final Order;

(c)     <u>Conditions to Effective Date</u>. The conditions to the Effective Date set forth in the Plan shall have been satisfied or waived in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing;

(d)     <u>Representations and Warranties</u>.  (i) The representations and warranties of Investor set forth in this Agreement shall be true and correct in all respects (<u>provided</u> that any representation or warranty of Investor contained herein that is subject to a "materiality" or "Investor MAE" qualification, will not be so qualified and any such qualification shall be given no effect for purposes of determining the existence of any

-51-

breach thereof on the part of Investor) as of the Closing Date as though made on and as of the Closing Date except where the failure of such representations and warranties (other than the representations and warranties set forth in Sections 5.1, 5.2, 5.6, and 5.10) to be so true and correct would not, individually or in the aggregate with any other such failures or breaches on the part of Investor, have an Investor MAE and (ii) the representations and warranties of Investor set forth in Section 5.8 shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date;

(e)    Agreements and Covenants. Each of the agreements and covenants of Investor to be performed and complied with by Investor pursuant to this Agreement prior to the Closing Date will have been duly performed and complied with in all material respects;

(f)    Consents.  Investor shall have delivered to the Company all Consents that are necessary or required under the terms of the Investor Financing Documents to permit the Contemplated Transactions and/or the Financing Transactions (the "Specified Consents"), and all such Specified Consents shall be in form and substance reasonably acceptable to the Company and in full force and effect;

(g)    Amendments and Modifications.  Investor shall have delivered to the Company all amendments, modifications and supplements to the Investor Financing Documents that are necessary or required to permit the Contemplated Transactions and/or the Financing Transactions (the "Specified Amendments"), and all such Specified Amendments shall be in form and substance reasonably acceptable to the Company and in full force and effect;

(h)    Intercreditor Agreement(s).  Investor shall have delivered to the Company (i) an intercreditor agreement or amendment to an existing intercreditor agreement (which may be combined with the intercreditor agreement referenced in clause (ii)) duly executed by Parent, Investor, the other Subsidiaries of Parent and the holders of the Indebtedness under the Investor Credit Documents, or their duly appointed agent, pursuant to which the Liens on the assets and properties of the Company and its Subsidiaries that secure the Indebtedness and other obligations under the Investor Credit Documents are made junior and subordinate in all respects to all Liens on the assets and properties of the Company and its Subsidiaries that secure the Indebtedness and other obligations under the Amended Notes and the other Amended Note Documents, and (ii) an intercreditor agreement or amendment to an existing intercreditor agreement (which may be combined with the intercreditor agreement referenced in clause (i)) duly executed by Parent, Investor, the other Subsidiaries of Parent and the holders of the Indebtedness under the Investor Secured Notes Documents, or their duly appointed agent, pursuant to which the Liens on the assets and properties of the Company and its Subsidiaries that secure the Indebtedness and other obligations under the Investor Secured Notes Documents are made junior and subordinate in all respects to all Liens on the assets and properties of the Company and its Subsidiaries that secure the Indebtedness and other obligations under the Amended Notes and the other Amended Note Documents, and each such intercreditor agreement referred to in clause (i) and clause (ii)

-52-

(collectively, the "Specified Intercreditor Agreements") shall be in form and substance reasonably acceptable to the Company and in full force and effect (subject to the execution and delivery thereof by the duly appointed agent of the holders of the Amended Notes);

(i)　　Amended Note Guarantees.  Investor shall have delivered to the Company one or more guarantees (the "Amended Note Guarantees") duly executed and delivered by Radiation Therapy Services Holdings, Inc. and each of its Subsidiaries that guarantee the obligations of Radiation Therapy Services, Inc. under the Investor Secured Notes Documents pursuant to which such Persons guarantee the due and punctual payment and performance of all Indebtedness and other obligations of the Company and its Subsidiaries under the Amended Notes and the other Amended Note Documents, and such Amended Note Guarantees shall contain covenants substantially the same as the covenants contained in the Investor Secured Notes Documents (as in effect on the date of this Agreement) and shall otherwise be in form and substance reasonably acceptable to the Company, and in full force and effect;

(j)　　Liens on Collateral.  The Indebtedness and other obligations under the Amended Notes and the other Amended Note Documents shall be secured by valid and perfected first-priority Liens on the same assets and properties of the Company and its Subsidiaries that secure, or purport to secure, the Indebtedness and other obligations of the Company and/or any of its Subsidiaries under the Notes and the Notes Indenture (as in effect immediately prior to the consummation of the Closing), granted in favor of the duly appointed agent of the holders of the Amended Notes, for the benefit of the holders of the Amended Notes; provided, however, that in no event shall any assets or properties of the Company or any of its Subsidiaries be subject to, or otherwise encumbered by, any Lien that secures the Indebtedness and other obligations under any of the Investor Financing Documents unless such asset or property is also subject to, or otherwise encumbered by, a valid and perfected first-priority Lien that secures the Indebtedness and other obligations under Amended Note Documents;

(k)　　Legal Opinion.  Investor shall have delivered to the Company a written opinion of (i) Kirkland & Ellis LLP (counsel to Investor), accompanied by a reliance letter authorizing the holders of the Amended Notes as of the Closing to rely on such opinion, covering such matters as are set forth in Exhibit F-1 attached hereto, and such opinion shall be in form and substance reasonably acceptable to the Company, and (ii) counsel to Investor reasonably acceptable to the Company in each jurisdiction where a Subsidiary of Parent has been formed or organized other than New York or Delaware, accompanied by a reliance letter authorizing the holders of the Amended Notes as of the Closing to rely on such opinion, covering such matters as are set forth in Exhibit F-2 attached hereto, and such opinion shall be in form and substance reasonably acceptable to the Company;

(l)　　No Registration; Compliance with Securities Laws.  The offer, issuance and delivery of the Amended Note Guarantees shall be exempt from the registration and prospectus delivery requirements of the Securities Act, and no Proceeding shall be pending or threatened by any Governmental Authority that alleges that the offer, issuance

-53-

and/or delivery of the Amended Note Guarantees is not exempt from the registration and prospectus delivery requirements of the Securities Act;

(m)    <u>Investor MAE</u>.  Since the date of this Agreement, there shall not have occurred an Investor MAE; and

(n)    <u>Closing Deliveries</u>. Investor shall have delivered to the Company (or, in the case of <u>Section 3.3(f)</u>, the Persons set forth therein) the items required by <u>Section 3.3</u> of this Agreement.

7.3    <u>Conditions to Obligations of Investor</u>.  The obligations of Investor to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver (if permitted by applicable Law and in any event in Investor's sole and absolute discretion) at or prior to the Closing of each of the following conditions:

(a)    <u>Agreement Order</u>.  The Agreement Order shall have been entered by the Bankruptcy Court, and the Agreement Order shall have become a Final Order; <u>provided</u>, <u>however</u>, that the condition set forth in this <u>Section 7.3(a)</u> shall be deemed waived and of no further force or effect fifteen (15) days following the date on which an Order is entered by the Bankruptcy Court with respect to the Agreement Motion;

(b)    <u>Confirmation Order</u>. The Confirmation Order shall have been entered by the Bankruptcy Court and the Confirmation Order shall have become a Final Order;

(c)    <u>Conditions to Confirmation</u>. The conditions to the Effective Date set forth in the Plan shall have been satisfied (or waived) in accordance with the Plan, and the Effective Date shall have occurred or shall occur simultaneously with the Closing;

(d)    <u>Amended Notes</u>.  The terms of the Notes shall have been amended on terms and conditions consistent in all material respects with those set forth on <u>Exhibit G</u> (the "<u>Amended Notes</u>") and, to the extent any terms and conditions are not set forth on or contemplated by <u>Exhibit G</u>, such other terms and conditions shall be reasonably acceptable by the Majority Consenting Debtholders and Investor;

(e)    [<u>Intentionally Deleted</u>];

(f)    <u>Valid Issuance</u>.  The Shares shall be, upon payment of the Purchase Price as provided herein, duly authorized, validly issued, fully paid, non-assessable and free and clear of all Taxes, Liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except for any restrictions on transfer as may be imposed by applicable Law or Liens created under the Investor Financing Documents or other Liens created by Investor;

(g)    <u>Company Representations and Warranties</u>. The representations and warranties of the Company set forth in <u>Article IV</u> shall be true and correct in all respects (<u>provided</u> that any representation or warranty of the Company contained in <u>Article IV</u> that is subject to a "materiality" or "Material Adverse Effect" qualification will not be so

qualified and any such qualification shall be given no effect for purposes of determining the existence of any breach thereof on the part of the Company) as of the Closing Inquiry Date as though made on and as of the Closing Inquiry Date (except to the extent such representations and warranties speak as of an earlier date and provided that any reference to the "Company's Knowledge" set forth therein shall for purposes of this Section 7.3(g) be deemed to be the "Updated Company Knowledge"), except where the failure of such representations and warranties (other than the representations and warranties set forth in Sections 4.1 and 4.2) to be so true and correct would not, individually or in the aggregate with any other such failures or breaches on the part of the Company, have a Material Adverse Effect.

(h)    Organizational Documents.  At the written request of Investor (given no less than ten (10) days prior to the Closing Date), the Organizational Documents of the Company and each of its Subsidiaries shall have been (or simultaneously with the Closing will be) amended, and shall have been (or simultaneously with the Closing will be) filed with the applicable Governmental Authority of the jurisdiction of organization or formation of the Company and each such Subsidiary to be effective as such as of the Closing, and such amended Organizational Documents shall be in form and substance reasonably acceptable to Investor;

(i)    Material Adverse Effect. Since the date of this Agreement, there shall not have occurred a Material Adverse Effect;

(j)    Company Agreements and Covenants. Each of the agreements and covenants of the Company to be performed and complied with by the Company pursuant to this Agreement prior to or as of the Closing Date will have been duly performed and complied with in all material respects;

(k)    Closing Deliveries. The Company shall have delivered to Investor the items required by Section 3.2 of this Agreement (other than Section 3.2(a));

(l)    Management Services Agreements.  Except for the Management Services Agreements set forth on Schedule 7.3(l), each Management Services Agreement shall be valid and in full force and effect. The Bankruptcy Court shall have entered an Order authorizing the assumption of each of the Management Services Agreements by the Company or its applicable Subsidiary party to such Management Services Agreement pursuant to and in accordance with the Plan (except to the extent any covenants are modified by the Bankruptcy Court), except for the Management Services Agreements set forth on Schedule 7.3(l); and

(m)    Additional Delivery.    The Company shall have made the delivery described on Schedule 7.3(m).

7.4    Frustration of Closing Conditions.  Neither Investor nor the Company may rely on the failure of any condition set forth in Section 7.1, Section 7.2 or Section 7.3, as the case may be, to be satisfied if such failure was caused by such party's failure to comply with its obligations under Section 6.9.

**ARTICLE VIII**
**TERMINATION OF AGREEMENT**

8.1     <u>Termination by Investor</u>.    This Agreement may be terminated and the Contemplated Transactions may be abandoned at any time by Investor by written notice to the Company:

(a)     if the Company has breached or failed to perform any of its covenants, obligations or other agreements that are set forth in <u>Section 6.1(e)</u>; <u>provided</u> that such breach or failure to perform is not cured within 30 days after receipt by the Company of written notice thereof from Investor or is incapable of being cured by the Company on or prior to the End Date;

(b)     if the Company has breached or failed to perform any of its covenants, obligations or other agreements that are set forth in <u>Sections 6.1(c)</u> and <u>6.1(d)</u>; <u>provided</u> that such breach or failure to perform is not cured within 30 days after receipt by the Company of written notice thereof from Investor or is incapable of being cured by the Company on or prior to the End Date (it being understood that the 30 day cure period set forth in this <u>Section 8.1(b)</u> shall correspondingly extend the applicable dates set forth in <u>Section 6.1(c)</u> and <u>6.1(d)</u>, except the End Date);

(c)     if (i) the Company has breached or failed to perform any of its covenants or other agreements contained in this Agreement to be complied with by it such that the closing condition set forth in <u>Section 7.3(j)</u> would not be satisfied, except with respect to the covenants or other agreements set forth in <u>Sections 6.1(c)</u>, <u>6.1(d)</u>, <u>6.1(e)</u> and <u>6.14</u>, which shall be governed with regard to such matters by <u>Section 8.1(a)</u>, <u>Section 8.1(b)</u> and <u>Section 8.1(g)</u> (as applicable), (ii) there exists any change, effect, event, occurrence, state of facts or development such that the closing condition set forth in <u>Section 7.3(i)</u> would not be satisfied or (iii) any representation or warranty of the Company contained in this Agreement shall have become untrue such that the closing condition set forth in <u>Section 7.3(g)</u> would not be satisfied, and in the case of each of <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> above, such breach, failure to perform or occurrence is not cured within thirty (30) days after receipt by the Company of written notice thereof from Investor or is incapable of being cured by the Company on or prior to the End Date;

(d)     if the Restructuring Support Agreement shall have been terminated as to (i) the Company or (ii) the Consenting Debtholders;

(e)     if the Bankruptcy Court enters an Order (i) directing the appointment of an examiner with expanded powers or a trustee, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases;

(f)     if the Company enters into a definitive agreement with any Person (other than Investor or its Affiliates) with respect to (i) any Inconsistent Transaction except, subject to the terms of the Bidding Procedures, in the event that the entering into such agreement relates to an Inconsistent Transaction with the Winning Bidder (as defined in

the Bidding Procedures) and Investor is the Second-Highest Bidder (as defined in the Bidding Procedures), in which case, Investor shall have the right to terminate this Agreement pursuant to this <u>Section 8.1(f)</u> upon the earlier of (x) the date that is 90 days after acceptance by the Company of the Winning Bid in accordance with the Bidding Procedures and (y) the closing of the Winning Bid or (ii) a Stand-Alone Plan; or

(g)    within ten (10) Business Days following the Start Date Meeting, without liability or obligation to any party hereunder, if Investor determines, in its sole discretion, that the results of its due diligence investigation with respect to the matters that are the subject of the Diligence Questionnaire could have a material impact on any of Investor or its Affiliates, the Company or the Subsidiaries of the Company following the Closing, whether due to the substance of such findings or a conclusion that it has not received sufficient or complete information with respect to such matters or for any other reason.

8.2    <u>Termination by the Company</u>.    This Agreement may be terminated and the Contemplated Transactions may be abandoned at any time by the Company by written notice to Investor:

(a)    in the event that the Company's board of directors approves an Inconsistent Transaction or Stand-Alone Plan at any time after the date of this Agreement and prior to the entry of the Confirmation Order;

(b)    if (i) Investor has breached or failed to perform any of its covenants or other agreements contained in this Agreement to be complied with by it such that the closing condition set forth in <u>Section 7.2(e)</u> would not be satisfied or (ii) any representation or warranty of Investor contained in this Agreement shall have become untrue such that the closing condition set forth in <u>Section 7.2(d)</u> would not be satisfied, and in the case of both <u>clauses (i)</u> and <u>(ii)</u> above, such breach, failure to perform or occurrence is not cured within thirty (30) days after receipt by Investor of written notice thereof from the Company or is incapable of being cured by Investor on or prior to the End Date;

(c)    if (i) Investor shall have failed to satisfy any of the conditions set forth in <u>Section 7.2(f)</u>, <u>Section 7.2(g)</u>, <u>Section 7.2(h)</u>, <u>Section 7.2(i)</u>, <u>Section 7.2(k)</u> or <u>Section 7.2(l)</u> prior to the End Date or (ii) any event, fact, circumstance or condition exists that shall have made any of the conditions set forth in <u>Section 7.2(f)</u>, <u>Section 7.2(g)</u>, <u>Section 7.2(h)</u>, <u>Section 7.2(i)</u> or <u>Section 7.2(l)</u> incapable or impossible of being satisfied prior to the End Date.  If the Company terminates this Agreement pursuant to this <u>Section 8.2(c)</u> on the End Date or on any date after the End Date and the Investor terminates this Agreement pursuant to <u>Section 8.3(c)</u> on the same date that the Company so terminated this Agreement, then this Agreement shall be deemed to be terminated by the Company pursuant to this <u>Section 8.2(c)</u>; or

(d)    if the condition set forth in <u>Section 7.3(m)</u> has not been satisfied as of the date that is forty-five (45) days from the date of this Agreement.

8.3    Termination by Mutual Agreement. This Agreement may be terminated at any time:

(a)    by mutual written consent of the Company and Investor;

(b)    by Investor or the Company, upon written notice to the other party, if a Governmental Authority of competent jurisdiction has issued an Order permanently enjoining or otherwise prohibiting the consummation of the Contemplated Transactions, and such Order has become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this Section 8.3(b) shall not be available to any party whose material breach of any provision of this Agreement results in or causes such Order; or

(c)    by either Investor or the Company if the Closing has not occurred on or before 11:59 p.m. prevailing Eastern Time on the End Date; provided, however, that the right to terminate this Agreement pursuant to this Section 8.3(c) shall not be available to any party who is in material breach of this Agreement.

8.4    Effect of Termination. In the event of termination of this Agreement pursuant to this Article VIII, this Agreement shall become void and have no further force or effect and no party will have any liability or any further obligation to any other party, except that (a) the terms and provisions of this Section 8.4, Section 2.4, Section 2.5, Section 6.7, Section 8.5, Article I and Article X will survive any termination of this Agreement, and (b) the terms and provisions of the Confidentiality Agreement shall survive any termination of this Agreement in accordance with its terms. The Company hereby acknowledges and agrees and shall not dispute that the giving of notice of termination by Investor pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and each such person hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

8.5    Damages Upon Termination.

(a)    If (i) this Agreement is (x) terminated pursuant to  and in accordance with Section 8.1(b) or Section 8.1(c) (unless such termination is due to the existence of a CMS MAE) and (y) the Company consummates an Inconsistent Transaction on or prior to the date that is four (4) months following the date of such termination, (ii) this Agreement is terminated pursuant to Section 8.1(f)(i), (iii) this Agreement is (x) terminated pursuant to Section 8.1(f)(ii) and (y) the Company consummates an Inconsistent Transaction on or prior to the date that is four (4) months following the date of such termination or (iv) this Agreement is terminated pursuant to Section 8.2(a), whether or not any of parties are then party, voluntarily or involuntarily, to a Proceeding under the Bankruptcy Code, then at such time, the Company will pay (or will cause to be paid) to Investor (or its designee), as liquidated damages, a payment of $1,000,000 (the "Break Up Fee"), by wire transfer of immediately available funds to an account designated by Investor, and Investor's right to receive the Break Up Fee under the circumstances described in this Section 8.5(a) shall be Investor's sole and exclusive remedy following a termination of this Agreement; provided, however, that, notwithstanding anything to the contrary herein, if at the time of any such termination described in this Section 8.5 Investor is also in material breach of

-58-

this Agreement such that any of the conditions set forth in <u>Section 7.2(d)</u> or <u>Section 7.2(e)</u> would not be satisfied, Investor shall have no right to the Break Up Fee. For the avoidance of doubt, Investor shall not be entitled to receive payment of the Break Up Fee, and the Company shall not be required to pay the Break Up Fee to Investor, if this Agreement is terminated by Investor as a result of, or on account of, a CMS MAE. Investor acknowledges and agrees that payment of the Break Up Fee and reimbursement of its Transaction Expenses, in each case to the extent due and payable in accordance with the terms and conditions of this Agreement, shall be Investor's sole and exclusive remedies against the Company, any Affiliate or Representative of the Company and each of their respective assets and properties following a termination of this Agreement.

(b)    Any such payments pursuant to <u>Section 8.5(a)</u> will be earned and payable by the Company to Investor (or its designee) immediately upon the consummation of the Inconsistent Transaction and without Bankruptcy Court review or further Bankruptcy Court order, but in accordance with the Plan. Investor and the Company agree that it would be impractical and extremely difficult to determine the extent of any damages to Investor that might result from a termination of this Agreement by the Company under such circumstances. Therefore, the parties acknowledge and agree that any payment to Investor made pursuant <u>Section 8.5(a)</u> will be paid as liquidated damages and the parties' good faith estimate of the actual potential damages to Investor for any such termination.

(c)    In the event of a termination of this Agreement prior to the Closing pursuant to <u>Section 8.2(b)</u> or <u>Section 8.2(c)</u>, whether or not the parties are then party, voluntarily or involuntarily, to a Proceeding under the Bankruptcy Code , then the Company shall receive all of the amounts then remaining in the Escrow Account and the receipt of such amounts shall be the Company's sole and exclusive remedy as a result of any such termination; <u>provided</u>, <u>however</u>, that in the event that the termination of this Agreement pursuant to <u>Section 8.2(b)</u> or <u>Section 8.2(c)</u> shall have been caused by, or shall have resulted from, a willful and intentional breach of any term, covenant, representation, warranty or other provision of this Agreement (including Investor's willful and intentional failure to pay any portion of the Initial Purchase Price upon satisfaction (or deemed satisfaction) or waiver of the conditions to Closing set forth in <u>Section 7.1</u> and <u>Section 7.3</u> (other than those conditions which are to be satisfied only on the Closing Date)), then, in addition to (and not in lieu of) the Company's right to receive the amounts then remaining in the Escrow Account in accordance with the terms hereof, and as the Company's sole and exclusive remedy, Investor shall be liable for all actual damages and/or liabilities incurred or suffered by the Company or any of its Subsidiaries as a result of any such breach; <u>provided</u>, that, in no event shall such liability exceed an amount equal to the sum of (x) amounts then remaining in the Escrow Account and (y) $10,000,000; <u>provided</u>, <u>further</u>, that, notwithstanding anything to the contrary herein, if at such time the Company is also in material breach of this Agreement such that any of the conditions set forth in <u>Section 7.3(j)</u> or <u>Section 7.3(g)</u> would not be satisfied, the Company shall have no right to any damages and/or liabilities under this <u>Section 8.5</u>, and for purposes of clarity, Investor shall receive the Escrow Amount then remaining in the Escrow Account. Immediately following any termination of this Agreement pursuant to <u>Section 8.2(b)</u> or <u>Section 8.2(c)</u>, Investor and the Company shall execute and deliver joint

-59-

written instructions to the Escrow Agent instructing the Escrow Agent to distribute all of the amounts then remaining in the Escrow Account to the Company by wire transfer of immediately available funds to an account designated by the Company.  For purposes of this Agreement, "<u>willful and intentional breach</u>" shall mean a breach by Investor of any term, covenant, representation, warranty or other provision set forth in this Agreement that is a consequence of an act or failure to act, in each case, taken or omitted intentionally and with the knowledge that the taking of such act or failure to act would, when taken in the context of other related actions taken by Investor, cause a breach of this Agreement.

# ARTICLE IX
# TAX MATTERS

9.1    <u>Transfer Taxes</u>.  All transfer, documentary, sales, use, registration, stamp and other such Taxes and conveyancing fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement ("<u>Transfer Taxes</u>") shall be paid by Investor, and Investor will file all necessary Tax Returns and other documentation with respect to such Transfer Taxes.

# ARTICLE X
# MISCELLANEOUS AND GENERAL

10.1    <u>Successors and Assigns</u>.  This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns, but is not assignable by any party without the prior written consent of the other parties hereto; <u>provided</u> that Investor may, without the prior written consent of any party, assign any or all of its rights hereunder to (a) one or more of its Affiliates; <u>provided</u> that (i) the assignee shall assume in writing all of Investor's obligations hereunder and (ii) Investor shall not be released from any of its obligations hereunder by reason of such assignment, (b) any lender for collateral purposes or (c) any future purchaser of all or substantially all of the equity securities or assets of the Company.

10.2    <u>Third Party Beneficiaries</u>.  Each party hereto intends that this Agreement does not benefit or create any right, remedy or cause of action in or on behalf of any Person other than the parties hereto (and their permitted assigns).  Notwithstanding the foregoing, subject to the occurrence of the Closing, the Noteholders' Representative is an intended third party beneficiary of the provisions of this Agreement, to the extent such provisions expressly relate to the Noteholders' Representative.

10.3    <u>No Survival of Representations and Warranties</u>.  None of the representations and warranties contained in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Closing.  No party hereto will be entitled to any indemnification or other recourse on account of any breaches of any of the representations, warranties, covenants or obligations contained in this Agreement.

10.4    <u>Further Assurances</u>.  The parties shall execute such further instruments and take such further actions as may reasonably be necessary to carry out the intent of this Agreement.  Each party hereto shall use its commercially reasonable efforts to cooperate affirmatively with

the other party, to the extent reasonably requested by such other party, to enforce rights and obligations herein provided.

10.5    <u>Notices</u>.    Any notice, direction or other communication given regarding the matters contemplated by this Agreement (each, a "<u>Notice</u>") must be in writing, sent by personal delivery, electronic mail, courier or facsimile and addressed:

If to the Company (only after Closing) or Investor:

Radiation Therapy Services
1010 Northern Boulevard - Suite 314
Great Neck, NY 11021
Attention: Norton L. Travis
Fax:  (516) 301-5778
E-mail:ntravis@rtsx.com

with a copy to:

Vestar Capital Partners V, L.P.
245 Park Avenue
41st Floor
New York, NY 10167
Attention: Erin Russell
Fax: (212) 808-4922
E-mail:ERussell@VestarCapital.com

with a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Michael Movsovich, P.C.
            Christopher Marcus, P.C.
Fax: (212) 446-6460
E-mail: <u>mmovsovich@kirkland.com</u>;<u>cmarcus@kirkland.com</u>

If to the Company (only prior to Closing):

OnCure Holdings, Inc.
Attn: Bradford C. Burkett
188 Inverness Drive West, Suite 650
Englewood, Colorado, 80112
Fax: (303) 643-6560
E-mail: brad@mppartnersllc.com

with a copy to:

-61-

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attention:       Scott Haber
Fax:  1-212-751.4864; 1-213-8918763
E-mail:paul.harner@lw.com

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attention:       Scott Haber
Fax:  1-212-751.4864; 1-213-8918763
E-mail:scott.haber@lw.com

If to the Noteholders' Representative:

The name, address, e-mail address and facsimile
number delivered to the Company and Investor by
the Majority Consenting Debtholders or, after the
Majority Consenting Debtholders have notified the
Company and Investor of the identity of the
Noteholders' Representative, the name, address, e-
mail address and facsimile number delivered to the
Company and Investor by the Noteholders'
Representative.

with a copy to:

Stroock & Stroock & Lavan LLP
2029 Century Park East, Suite 1600
Los Angeles, California 90067
Attention: Frank Merola, Esq.
Fax: (310) 407-6302
E-mail: fmerola@stroock.com

with a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attention: Jayme T. Goldstein, Esq.
Fax: (212) 806-6006
E-mail: jgoldstein@stroock.com

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day,  or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this <u>Section 10.5</u>.  Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed.  Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party.  The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

10.6    <u>Entire Agreement</u>.  This Agreement, the Exhibits and Disclosure Schedules referred to herein, the Plan, the Common Interest Agreement, the Escrow Agreement and the Confidentiality Agreement contain the complete agreement between the parties hereto with respect to the subject matter hereof and supersede and cancel all prior and contemporaneous agreements and understandings between the parties hereto with respect thereto, whether written or oral, express or implied.

10.7    <u>Captions; Interpretation</u>.  The captions contained in this Agreement are for convenience of reference only and do not form a part of this Agreement.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any schedules and exhibits hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.  Any capitalized terms used in any schedule or exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement.  The words "include", "includes" and "including" will be deemed to be followed by the phrase "without limitation".  The word "if" means "if and only if."  The meanings given to terms defined herein will be equally applicable to both the singular and plural forms of such terms.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  All references to "dollars" or "$" will be deemed references to the lawful money of the United States of America.  Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules and regulations made under it, as it or they may have been or may from time to time be amended, re-enacted or replaced. The Disclosure Schedules shall be arranged in sections and subsections corresponding to the numbered and lettered sections and subsections contained in <u>Article IV</u> and the disclosure in any section or subsection shall, to the extent applicable, qualify other sections and subsections in <u>Article IV</u>.

10.8    <u>Amendment</u>.  This Agreement may be amended or modified only by an instrument in writing duly executed by the Company and Investor; <u>provided</u>, that no amendment may be made that alters the terms, substance or meaning of the provisions expressly relating to the Noteholders' Representative without the prior written approval of the Noteholders' Representative.

10.9    <u>Waiver</u>.  At any time prior to the Closing Date, the Company and Investor may (a) extend the time for the performance of any of the obligations or other acts of the parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto or (c) waive compliance with any of the agreements or conditions contained herein, to the extent permitted by applicable Law.  Any agreement to any such extension or waiver will be valid only if set forth in a writing signed by the Company, Noteholders' Representative and Investor.

10.10    <u>Governing Law; Submission to Jurisdiction</u>.  This Agreement and any claim, controversy or dispute arising under or related in any way to this Agreement, the relationship of the parties, the transactions leading to this Agreement or contemplated hereby, and/or the interpretation and enforcement of the rights and duties of the parties hereunder or related in any way to the foregoing, shall be governed by and construed in accordance with Federal bankruptcy law and, where state law is implicated, the internal, substantive laws of the State of New York applicable to agreements entered into and to be performed solely within such state without giving effect to the principles of conflict of laws thereof that would require the application of the laws of another jurisdiction.  ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING UNDER OR RELATED IN ANY WAY TO THIS AGREEMENT, THE RELATIONSHIP OF THE PARTIES, THE TRANSACTIONS LEADING TO THIS AGREEMENT OR CONTEMPLATED HEREBY, AND/OR THE INTERPRETATION AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER OR RELATED IN ANY WAY TO THE FOREGOING MAY ONLY BE INSTITUTED IN THE BANKRUPTCY COURT (AS DEFINED HEREIN), AND EACH PARTY WAIVES ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH ACTION, SUIT OR PROCEEDING, AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT (AS DEFINED HEREIN) IN ANY SUCH ACTION, SUIT OR PROCEEDING. EACH OF THE PARTIES WAIVES ANY BOND, SURETY, OR OTHER SECURITY THAT MIGHT BE REQUIRED OF ANY OTHER PARTY WITH RESPECT THERETO. ANY PARTY MAY MAKE SERVICE ON ANY OTHER PARTY BY SENDING OR DELIVERING A COPY OF THE PROCESS TO SUCH PARTY TO BE SERVED AT THE ADDRESS AND IN THE MANNER PROVIDED FOR THE GIVING OF NOTICES IN <u>SECTION 10.5</u> ABOVE.  NOTHING IN THIS <u>SECTION 10.10</u>, HOWEVER, SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR IN EQUITY.  EACH PARTY AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING SO BROUGHT SHALL BE CONCLUSIVE AND MAY BE ENFORCED BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW OR IN EQUITY.

10.11    <u>Waiver of Jury Trial</u>.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER

HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE CONTEMPLATED TRANSACTIONS OR THE FINANCING TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTY HERETO THAT THIS <u>SECTION 10.11</u> CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH IT IS RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 10.11</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

10.12  <u>Severability</u>.    Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

10.13  <u>Counterparts</u>.    This Agreement may be executed in two or more counterparts (including by means of telecopied, facsimile or .pdf signature pages), each of which will be deemed an original but all of which will constitute but one instrument.

10.14  <u>Specific Performance</u>.    Subject in all respects to the last sentence of this <u>Section 10.14</u>, the Company and Investor acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (b) remedies at Law would not be adequate to compensate the non-breaching party.  Accordingly, subject to the Bidding Procedures and the last sentence of this <u>Section 10.14</u>, prior to any valid termination of this Agreement in accordance with the terms hereof, the Company and Investor agree that each of them and (following the Closing) the Noteholders' Representative shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce its rights and obligations hereunder not only by a Proceeding or Proceedings for damages but also by a Proceeding or Proceedings for specific performance, injunctive or other equitable relief without the necessity of proving the inadequacy of money damages as a remedy.  Subject to the Bidding Procedures and the last sentence of this <u>Section 10.14</u>, the right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement.  Each of the Company and Investor hereby waives any defense that a remedy at Law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  Subject to the Bidding Procedures and the last sentence of this <u>Section 10.14</u>, each of the Company and Investor hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, and invalid, contrary to Law or inequitable for any reason.  The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, or the limitations set forth in the last sentence of this <u>Section 10.14</u>, neither the Company

nor Investor would have entered into this Agreement.  Notwithstanding the foregoing, nothing in this Section 10.14 shall limit, alter or impair the Company's rights under Section 6.9 of this Agreement or to consummate an Inconsistent Transaction in accordance with the Bidding Procedures.  Anything in this Agreement to the contrary notwithstanding, neither the Company, the Noteholders' Representative or any other Person shall be entitled to seek or otherwise obtain specific performance to require Investor (or its assignee) to effect the Closing or pay the Initial Purchase Price.  In furtherance and not in limitation of the foregoing, neither the Company, the Noteholders' Representative or any other Person shall have any right whatsoever to injunctive relief in order to prevent breaches of the provisions of Article III or Article VII, or any right whatsoever to specific performance, injunctive or other equitable relief under Article III or Article VII.

10.15    Disclosure.  Unless otherwise required by applicable Law or in connection with the Chapter 11 Cases or as permitted by the Confidentiality Agreement, the Company will not, without Investor's prior written consent, disclose to any Person the identity of Investor or its Representatives, other than to the Company's Representatives, in each case in connection with the Contemplated Transactions  and the Financing Transactions.

10.16    Noteholders' Representative.    Anything in this Agreement to the contrary notwithstanding, neither the Noteholders' Representative nor any past, present or future incorporator, member, partner, stockholder, trustee or Representative of the Noteholders' Representative shall have any liability or obligation with respect to this Agreement or with respect to any claim or cause of action that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.  For the avoidance of doubt, the Company shall not be deemed to be a Representative of the Noteholders' Representative hereunder.

**[Signatures on Following Page]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**RADIATION THERAPY SERVICES, INC.**

By: _____

Name:  Bryan Carey

Title:  Vice Chairman and Chief Financial Officer

**ONCURE HOLDINGS, INC.**

By: _____

Name: Bradford C. Burkett

Title:   President and Chief Executive Officer
(JLT with permission of Bradford C. Burkett)

[Signature Page to Investment Agreement]

## Exhibit C

|  | [m/d/yyyy] | |
|---|---|---|
| **Current Assets** | | |
| Cash | $[ ] | |
| Net accounts receivable | +[ ] | |
| Deferred income taxes | +[ ] | |
| Prepaid expenses | +[ ] | |
| Other current assets | +[ ] | |
| **Total Current Assets** | =$[ ] | A |
| | | |
| **Current Liabilities** | | |
| Accounts payable | $[ ] | |
| Accrued expenses | +[ ] | |
| Accrued interest | +[ ] | |
| Current portion of note payable | +[ ] | |
| Capital lease obligations – current | +[ ] | |
| Other current obligations | +[ ] | |
| **Total Current Liabilities** | =$[ ] | B |
| | | |
| **Investment Agreement Adjustments** | | |
| 1. Exclude Cash | -$[ ] | |
| 2. Exclude Tax assets | -[ ] | |
| 3. Exclude Tax liabilities | +[ ] | |
| 4. Exclude current portion of Company Debt[1] | +[ ] | |
| 5. Exclude accrued interest on Company Debt | +[ ] | |
| 6. Exclude management fee[2] | +[ ] | |
| 7. Paid Selling Expenses[3] | +[ ] | |
| 8. Other current liabilities of the Company[4] | -[ ] | |
| 9. Accrued Selling Expenses[5] | -[ ] | |
| **Total Investment Agreement Adjustments** | =$[ ] | C |
| | | |
| **Closing Working Capital (A – B + C)** | =$[ ] | |

---

[1] Including current capital lease obligations and the current portion of note payable.

[2] For the avoidance of doubt, management fees include any accrued but unpaid fees included in current liabilities owed to Genstar Capital, LLC ("Genstar") or any of Genstar's affiliates.

[3] Includes the aggregate expenses paid in cash by the Company after the Petition Date and prior to the Closing for items described in the second sentence of "Selling Expenses" in the Investment Agreement.

[4] Included as a deduction only to the extent are (w) not included in current liabilities of the Company or its Subsidiaries, (x) liabilities of the Company immediately prior to the Closing, (y) not satisfied in cash pursuant to the Plan or payable from, or covered by, a reserve that has been established under the Plan or an Order of the Bankruptcy Court and (z) will be included in current liabilities of the Company or its Subsidiaries immediately following the Closing Date (e.g., liabilities subject to compromise not actually extinguished).

[5] Includes Selling Expenses not paid or reserved for with funds from the Company and pursuant to the Plan.

## Exhibit D

## COMMON INTEREST AGREEMENT

This **COMMON INTEREST AGREEMENT** (the "Agreement"), effective as of this June 22, 2013, is entered into by and between OnCure Holdings, Inc. (the "Company") and Radiation Therapy Services, Inc. (the "Investor", and together with the Company, each a "Party", and collectively, the "Parties"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in that certain Investment Agreement, dated as of June 22, 2013, by and between the Parties (the "Investment Agreement").

**WHEREAS**, the Company intends to implement a financial restructuring of its existing debt, equity and other obligations, which restructuring will be consummated by commencing the Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court to pursue confirmation of the Plan;

**WHEREAS**, pursuant to the Investment Agreement, on the terms and subject to the conditions set forth therein, the Investor shall buy from the Company, and the Company shall issue to Investor, 100% of the shares of the Company's common stock, par value $0.001 per share, that are to be newly issued pursuant to the terms of the Plan, and the Investor will assume certain of the legal liabilities, claims, obligations and matters of the Company as expressly set forth in, and subject to the terms and conditions of, the Investment Agreement;

**WHEREAS**, the Parties have common legal interests (the "Common Interests") in seeking, among other things, to analyze and consider the legal liabilities, claims, obligations and matters that are the subject of, or arise in connection with, the due diligence questionnaire

attached hereto as <u>Exhibit A</u> (such matters, the "<u>Due Diligence Matters</u>", and such questionnaire, the "<u>Due Diligence Questionnaire</u>");

**WHEREAS**, the Parties believe that their Common Interests will be furthered by the Parties and their respective counsel sharing and exchanging information, documents, materials, mental impressions, opinions, legal theories and conclusions in connection with the Due Diligence Matters and Due Diligence Questionnaire (the "<u>Common Interest Information</u>", and the Party that, directly or indirectly, shares or exchanges Common Interest Information, the "<u>Disclosing Party</u>", and the Party that receives, directly or indirectly, Common Interest Information, the "<u>Receiving Party</u>", in each case, with respect to such Common Interest Information);

**WHEREAS**, the Common Interest Information may be privileged from disclosure as a result of the attorney-client privilege, the work-product doctrine, or other applicable privileges or immunities; and

**WHEREAS**, by entering into this Agreement, the Parties wish to ensure and intend that the exchange and disclosure of Common Interest Information in furtherance of a joint and/or coordinated effort while preserving and protecting the confidentiality of the Common Interest Information, and the Parties expressly do not intend to waive any privileges or immunities otherwise applicable.

NOW, THEREFORE, IT IS HEREBY AGREED, by the Parties as follows:

1.      All Common Interest Information shall be and remain confidential and privileged or otherwise protected from discovery by third parties and any exchange or disclosure of

SF\5600032.3

Common Interest Information pursuant to this Agreement will be made within the so-called "common interest" privilege, as recognized by numerous courts and other authorities, to the maximum extent recognized by law.

2.      The Parties may disclose to each other or exchange documents and communications (written, oral or in electronic form) which are or may be helpful in furthering their common legal interests under this Agreement.  Nothing in this Agreement shall be construed to require any Party to disclose or exchange documents or communications related to any matter in which they share a common legal interest.

3.      Common Interest Information that is in written or electronic form should be marked "Privileged" or "Confidential" where possible, but a failure to so mark any materials shall not in any way constitute a waiver of privilege or the applicability of this Agreement.

4.      Each Party shall treat all Common Interest Information provided to it by any Disclosing Party, or by any expert, consultant, or other person retained by such Disclosing Party, as confidential and, except as set forth in this Agreement, shall not disclose or make available any such Common Interest Information to any third party, shall not treat such Common Interest Information in any way that is inconsistent with its privileged and confidential status, and shall maintain the Common Interest Information in confidence in accordance with the terms hereof and preserve all applicable privileges and legal protections with respect thereto.

5.      All Common Interest Information produced by or on behalf of a Disclosing Party or its attorneys, experts or consultants to any Receiving Party shall be used by such Receiving Party solely in furtherance of the Parties' Common Interests and for no other purposes whatsoever.

3

6.    Except as permitted by this Agreement, the Receiving Party and its counsel agree not to disclose Common Interest Information received from the Disclosing Party or its counsel to any other person or entity other than (1) attorneys and their staff representing the Receiving Party who are involved in or have responsibilities for the Due Diligence Matters; (2) experts or consultants retained by the Receiving Party in connection with evaluating the Due Diligence Matters or preparing a defense with respect to such matters; and (3) employees, officers, principals or directors of the Receiving Party who are or may be involved in, or who have responsibilities with respect to, the Due Diligence Matters, without the prior written consent of the Disclosing Party.    Persons permitted access to Common Interest Information shall be advised by Receiving Party that the Common Interest Information is confidential and subject to this Agreement.

7.    If any other person or entity requests or demands, by notice, subpoena or otherwise, any Common Interest Information from any Receiving Party (or its attorneys or any persons assisting such attorneys, or any other person who has received Common Interest Information pursuant to Paragraph 6 of this Agreement), the Receiving Party (or its attorneys or any persons assisting such attorneys, or any other person who has received Common Interest Information pursuant to Paragraph 6 of this Agreement) receiving the request or demand shall promptly notify the Disclosing Party, provide a copy of the request or demand to the Disclosing Party to the extent it relates to the Common Interest Information and as permitted by applicable law, use commercially reasonably efforts to assert all applicable rights, privileges and objections with respect to such requests or demands, and, at the sole cost and expense of the Disclosing Party, reasonably cooperate with the Disclosing Party if it seeks a protective order or other relief

4

to prevent or limit the disclosure of Common Interest Information provided to the Receiving Party.

8.     Any Party is free to terminate this Agreement upon giving express written notification to the other Party, in which event this Agreement shall no longer be operative with respect to any information disclosed after such date; provided, however, that this Agreement shall continue to cover and protect all Common Interest Information disclosed prior to such termination in accordance with the terms hereof. Each Receiving Party shall return, or provide confirmation of the destruction of, all Common Interest Information to the Disclosing Party within thirty (30) days after termination of this Agreement.

9.     The Parties agree that the existence of this Agreement or of their Common Interest shall not be used by any of them in any litigation or otherwise except to enforce the terms thereof or to prove the continued existence of any privilege, and neither the existence of this Agreement nor the exchange or disclosure of Common Interest Information or other information pursuant hereto shall constitute waiver of the attorney-client privilege, work product doctrine or any other applicable privilege or protection in any dispute between the Parties.

10.    The Parties acknowledge and agree that disclosure of any communication or information in violation of this Agreement will cause the other Parties to suffer irreparable harm for which there is no adequate legal remedy. Accordingly, specific performance and injunctive relief (without the requirement of posting a bond) is an appropriate remedy to compel compliance with the provisions of the Agreement.

11.    Nothing in this Agreement has any effect of transforming any Party's counsel into counsel for any other Party or entity. There is no duty of loyalty, and no duty of loyalty will be

5

deemed to arise by implication from this Agreement, between an attorney and anyone other than the attorney's own client.

12.    In the event that any provision(s) of this Agreement shall be held by any court of competent jurisdiction to be illegal, void, or unenforceable, such provision(s) shall have no force or effect, but the illegality or unenforceability of such provision(s) shall neither affect nor impair the enforceability of any provision in this Agreement.

13.    This Agreement shall be governed by, and construed in accordance with, the substantive laws of the State of New York, without reference to principles of conflicts of laws that would require the application of the laws of another jurisdiction. ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING UNDER OR RELATED TO THIS AGREEMENT AND/OR THE INTERPRETATION AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER MAY ONLY BE INSTITUTED IN THE U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN OR THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK, AND EACH PARTY WAIVES ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH ACTION, SUIT OR PROCEEDING, AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH ACTION, SUIT OR PROCEEDING.

14.    No modification, rescission, waiver or amendment of any provision of this Agreement shall be effective unless set forth in a written agreement signed by or on behalf of each Party.

SF\5600032.3

15.     This Agreement does not amend, limit, or otherwise alter the provisions of, or obligations of the Parties under, that certain Non-Disclosure Agreement between the Parties dated January 22, 2013, and such Non-Disclosure Agreement remains in full force and effect in accordance with the terms thereof.

16.     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or pdf signature pages shall be equally effective as delivery of the original, and shall not affect the validity, enforceability or binding effect of this Agreement.

*[Signature Page to Follow]*

SF\5600032.3

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.


By:_____    By:_____
    Radiation Therapy Services, Inc.       OnCure Holdings, Inc.

## Exhibit F-1

## Matters Covered by Kirkland & Ellis Opinion[1][2]

1.      Based solely upon our review of the Good Standing Certificates, each of the Specified Guarantors[3] is a corporation or limited liability company existing and in good standing under the laws of the jurisdiction of its organization.

2.      Each of the Specified Guarantors has the corporate or limited liability company power, as applicable, to enter into and perform its obligations under the Transaction Documents[4] to which it is a party.

3.      Each of the Specified Guarantors has the corporate or limited liability company power, as applicable, to own and lease its properties and to conduct its business as presently conducted.

4.      Assuming due authorization, execution and delivery of the Specified Intercreditor Agreements by the Non-Specified Guarantors party thereto and the other parties thereto (other than the Specified Guarantors), the Intercreditor Agreements are valid and binding obligations of such Non-Specified Guarantors and are enforceable against such Non-Specified Guarantors in accordance with their terms. The Specified Intercreditor Agreements have been duly authorized, executed and delivered by the Specified Guarantors party thereto, and the Specified Intercreditor Agreements are valid and binding obligations of such Specified Guarantors and are enforceable against such Specified Guarantors in accordance with their terms.

5.      The Amended Note Guarantees have been duly authorized, executed and delivered by each of the Specified Guarantors and (assuming the due authorization, execution and delivery of the Amended Note Guarantees by the Non-Specified Guarantors,[5] the due authorization, execution and delivery of the indenture governing the Amended Notes (the "Amended Notes Indenture") by the Trustee[6] and the Company and its Subsidiaries party

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Investment Agreement to which this exhibit is attached as Exhibit F-1 thereto.

[2] The opinion will address these matters under New York law and Delaware law and, as applicable, federal law, and will be subject to qualifications customarily contained within opinions given by Kirkland & Ellis LLP in transactions similar to the Financing Transactions.

[3] The Specified Guarantors will be each of the guarantors of the Amended Notes whose jurisdiction of organization or formation is New York or Delaware.

[4] Transaction Documents will be defined as the Amended Note Guarantees and the Specified Intercreditor Agreements.

[5] The Non-Specified Guarantors will be each of the guarantors of the Amended Notes other than the Specified Guarantors.

[6] The Trustee under the Amended Notes Indenture.

thereto and the due authentication and delivery of the Amended Notes by the Trustee and the Company in accordance with the Amended Indenture), the Amended Note Guarantees constitute the valid and legally binding obligations of each of the Guarantors,[7] and will be enforceable against each of the Guarantors in accordance with their terms.

6.      The execution and delivery of the Transaction Documents by each of the Guarantors, as applicable, the performance by each of the Guarantors of their respective obligations thereunder (collectively, the "Transactions") and the purchase of the Shares by Investor pursuant to the Investment Agreement do not and will not (i) result in any breach of any of the terms and provisions of the charter, bylaws or other organizational documents of the Specified Guarantors, (ii) result in any breach of any of the terms and provisions of, or constitute a default (or an event which with notice or lapse of time or both, would constitute a default) under, or result in the creation or imposition of any lien, charge or encumbrance upon any property or assets of the Guarantors pursuant to, any Specified Contracts,[8] it being expressly understood that in each case we express no opinion as to compliance with any financial covenant or test or cross-default provision in any Specified Contract, or (iii) violate any Specified Law,[9] except in the case of clause (ii), for any such conflict, breach, violation or default which has been waived by the party or parties with power to waive such conflict, breach, violation or default.  (The advice in this paragraph is referred to herein as the "No Conflicts Opinion").

7.      No consent, approval, authorization, or order of, or qualification with, any governmental body or agency under any Specified Law is required to be obtained, nor are any filings required to be made by the Guarantors under any Specified Law with respect to the execution and delivery of the Transaction Documents by the Guarantors or the consummation of the Transactions. (The advice in this paragraph is referred to herein as the "No Consent Opinion").

8.      Based upon our review of the Confirmation Order, no registration under the Securities Act of the Amended Note Guarantees is required in connection with the issuance of the Amended Note Guarantees to the holders of Amended Notes.

9.      Each of the Guarantors is not and, immediately after giving effect to the issuance of the Amended Note Guarantees will not be, required to register as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended.

---

[7] The Guarantors will be the Specified Guarantors and the Non-Specified Guarantors, collectively.

[8] Specified Contracts will include (i) the credit agreement described in clause (a) of the definition of "Investor Credit Documents," (ii) the indenture described in clause (a) of the definition of "Investor Secured Notes Documents," (iii) the indenture described in clause (a) of the definition of "Investor Subordinated Notes Documents," and (iv) certain of the agreements filed as exhibits to the Annual Report on Form 10-K filed by Radiation Therapy Services Holdings, Inc. with the Securities and Exchange Commission on March 28, 2013.

[9] Specified Law will be defined as internal law of the State of New York, the General Corporation Law of the State of Delaware, the Delaware Limited Liability Company Act, and the federal laws of the United States (except that we do not opine as to the federal securities laws with respect to the No Conflicts Opinion and the No Consent Opinion).

## Exhibit F-2

## Matters Covered by Local Counsel Opinion[12]

1.      Based solely upon our review of the Good Standing Certificates, each of the Specified Guarantors[3] is a corporation or limited liability company existing and in good standing[4] under the laws of the jurisdiction of its organization.

2.      Each of the Specified Guarantors has the corporate or limited liability company power, as applicable, to enter into and perform its obligations under the Transaction Documents[5] to which it is a party.

3.      Each of the Specified Guarantors has the corporate or limited liability company power, as applicable, to own and lease its properties and to conduct its business as presently conducted.

4.      The Specified Intercreditor Agreements have been duly authorized, executed and delivered each of the Specified Guarantors party thereto.

5.      The Amended Note Guarantees have been duly authorized, executed and delivered by each of the Specified Guarantors.

6.      The execution and delivery of the Transaction Documents by each of the Specified Guarantors, as applicable, and the performance by each of the Specified Guarantors of their respective obligations thereunder (collectively, the "Transactions") do not and will not (i) result in any breach of any of the terms and provisions of the charter, bylaws or other organizational documents of the Specified Guarantors, or (ii) violate any Specified Law[6].

7.      No consent, approval, authorization, or order of, or qualification with, any governmental body or agency under any Specified Law is required to be obtained, nor are any filings

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Investment Agreement to which this exhibit is attached as Exhibit F-2 thereto.

[2] The opinion will address these matters under the local law covered by the local counsel and will be subject to qualifications customarily contained within opinions given by such counsel in transactions similar to the Financing Transactions.

[3] The Specified Guarantors will be each of the guarantors of the Amended Notes whose jurisdiction of organization or formation is the jurisdiction(s) covered by the local counsel.

[4] Or a similar concept in jurisdictions where the concept of good standing is not used.

[5] Transaction Documents will be defined as the Amended Note Guarantees and the Specified Intercreditor Agreements.

[6] Specified Law will be defined as the local law covered by the local counsel.

required to be made by the Guarantors[7] under any Specified Law with respect to the execution and delivery of the Transaction Documents by the Guarantors, or the execution and delivery of the Transaction Documents by the Guarantors, or the consummation of the Transactions.

---

[7] The Guarantors will be the Specified Guarantors and each of the guarantors of the Amended Notes whose jurisdiction of organization or formation is New York or Delaware, collectively.

## Exhibit G

### Summary of Principal Terms and Conditions of
### OnCure Holdings, Inc. First Lien Notes

*This Summary of Principal Terms and Conditions, together with the Annexes attached hereto, (collectively, this "Term Sheet") outlines certain key terms of the Amended Notes. Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Investment Agreement to which this Term Sheet is attached as Exhibit L thereto.*

**General Rules of Construction.........** The terms, covenants, conditions and other provisions contained in the indenture (the "OnCure Indenture") governing the Amended Notes will be substantially similar in form to the terms, covenants, conditions and other provisions contained in the indenture (the "RTS Indenture") governing the 8 7/8% Senior Secured Second Lien Notes due 2017 (the "RTS Second Lien Notes") issued by Radiation Therapy Services, Inc., a Florida corporation (the "Investor"), with revised basket sizes and revisions as described in Annex A hereto; provided, however, that (i) that with respect to matters that are (x) not covered herein or (y) contemplated herein but not fully specified in detail, the Investor and the Consenting Debtholders agree, in each case, to negotiate in good faith to develop modifications and revisions to the OnCure Indenture that are appropriate to reflect such matters and reasonably acceptable to the Investor and the Majority Consenting Debtholders. Without limitation to the generality of the foregoing, it is acknowledged and agreed that due to the proposed structure of the Amended Notes (including, without limitation, as to matters set forth in "**Guarantors**", "**Ranking**" and "**Collateral**" below), there will be certain terms and conditions in the OnCure Indenture that are (x) not covered herein or (y) contemplated herein but not fully specified in detail that will also need to be modified or otherwise revised to account for such proposed structure and the Investor and the Consenting Debtholders agree to negotiate in good faith to develop modifications and revisions to such terms and conditions that are appropriate to reflect such proposed structure and reasonably acceptable to Investor and the Majority Consenting Debtholders.

Unless otherwise specifically set forth in this Term Sheet, the terms, covenants, conditions and other provisions contained in the OnCure Indenture will address OnCure (as defined below) and its subsidiaries, such that references in the OnCure Indenture to the term "Company" and "Subsidiaries" (or variations thereof, such as "Restricted Subsidiaries") shall mean and be a reference to OnCure and the subsidiaries of OnCure, respectively.

1

| | |
|---|---|
| **Issuer**.......................................... | OnCure Holdings, Inc., a Delaware corporation ("OnCure"). |
| **Amended Notes**............................ | $75.0 million in aggregate principal amount (after giving effect to the amendment of the Notes (as in effect on the date of the Investment Agreement)). |

In addition, $7.5 million in aggregate principal amount of Amended Notes (the "Earn-Out Notes") will be deposited on the Closing Date into an escrow account (the "Escrow Account") to be held by an escrow agent, which escrow agent shall be selected by the Majority Consenting Debtholders in their reasonable discretion and reasonably acceptable to Investor (the "Escrow Agent"), pursuant to an escrow agreement in form and substance reasonably satisfactory to the Investor and the Majority Consenting Debtholders (the "Escrow Agreement"). Pursuant to the terms of the Escrow Agreement, the Escrow Agent shall release the Earn-Out Notes, together with any amounts deposited therein pursuant to any Earn-Out Prepayment Event, to holders of the Amended Notes of record as of December 31, 2015 (or, if an Earn-Out Prepayment Event has occurred prior to such date that resulted in the redemption, prepayment, retirement, defeasance or refinancing of all of the Amended Notes, the date of determination of the holders of the Amended Notes that were entitled to receive payment in respect of the Amended Notes in connection with such Earn-Out Prepayment Event) upon receipt of audited annual financial statements of OnCure and its subsidiaries for the fiscal year ended December 31, 2015 (the "2015 Financial Statements"), if the combined aggregate "Center-Level EBITDA" (to be defined in the OnCure Indenture) for the Specified Centers (as defined below) for such fiscal year is greater than $1.5 million (such condition, the "Earn-Out Condition"). In the event that the Earn-Out Condition is not satisfied, the Escrow Agent shall release the Earn-Out Notes to OnCure for cancellation, together with any other amounts then held in or credited to the Escrow Account. Any cash interest paid on the Earn-Out Notes while such Earn-Out Notes are held in or credited to the Escrow Account will be released to OnCure, promptly after such interest payment is made to the Escrow Agent, in accordance with the terms of the Escrow Agreement.

In the event an Earn-Out Prepayment Event (as defined below) occurs, OnCure shall pay to the Escrow Agent, for distribution by the Escrow Agent to holders of record of the Amended Notes on December 31, 2015 (or, in the case of any such Earn-Out Prepayment Event that results in the redemption, prepayment, retirement, defeasance or refinancing of all of the Amended Notes, the date of determination of the holders of the Amended Notes entitled to

2

receive payment in respect of the Amended Notes in connection with such Earn-Out Prepayment Event) upon satisfaction of the Earn-Out Condition, an amount in cash equal to the aggregate principal amount of the Earn-Out Notes that are subject to such Earn-Out Prepayment Event. "Earn-Out Prepayment Event" means any redemption, prepayment, retirement, defeasance or refinancing of the Amended Notes prior to the date on which OnCure receives the 2015 Financial Statements.

**Interest Rate and Payments**............ 11.75% cash coupon. Interest on the Amended Notes will be paid semi-annually in cash on dates to be determined. Interest will accrue from the Closing Date.

**Maturity Date**............................. The Amended Notes will mature on January 15, 2017.

**Guarantors**................................. The Amended Notes will be jointly and severally guaranteed on a senior secured basis by each existing and future domestic restricted subsidiary of OnCure (the "OnCure Subsidiaries," together with OnCure, the "OnCure Entities"). As of the Closing Date, such guarantors shall be the subsidiaries of OnCure that guarantee the obligations under the Note Indenture (as in effect immediately prior to the Closing Date).

The Amended Notes will be jointly and severally guaranteed on a senior unsecured basis by Investor, Radiation Therapy Services Holdings, Inc. (the "Parent") and each existing and future restricted subsidiary of Investor (other than foreign subsidiaries and excluding the OnCure Entities) (the "RTS Subsidiaries," together with Investor and the Parent, the "RTS Entities;" and the RTS Entities together with the OnCure Entities, collectively, the "RTS/OnCure Entities") that guarantees the obligations of the Investor under Credit Agreement (as defined in the RTS Indenture), pursuant to a covenant substantially similar to the covenant to provide guarantees under the RTS Indenture. As of the Closing Date, such guarantors shall be the Investor, Parent and each RTS Subsidiary that guarantees the obligations of the Investor on such date under the Credit Agreement (as defined in the RTS Indenture) as in effect on the Closing Date. The guarantee (the "RTS Guarantee") of each of the RTS Entities shall contain covenants and events of default substantially similar to those applicable to the RTS Entities contained in the RTS Indenture. For the avoidance of doubt, Parent will not be subject to any additional covenants than those to which it is currently subject under the RTS Indenture, except as otherwise set forth herein.

**Ranking**..................................... The Amended Notes will be:

3

- ranked *pari passu* in right of payment with all existing and future senior indebtedness of the OnCure Entities, but effectively senior to all existing and future senior indebtedness of the OnCure Entities to the extent of the value of the OnCure Collateral (as defined below); and

- senior in right of payment to all existing and future subordinated obligations of the OnCure Entities.

**Optional Redemption**..................... Non-callable, in whole or in part, prior to September 30, 2015. At any time on or prior to such date, the Amended Notes may be redeemed or purchased, in whole or in part, at a price equal to 100% the principal amount thereof *plus* the Applicable Premium (to be defined substantially similar to such definition contained in the RTS Indenture) *plus* accrued and unpaid interest thereon.

Thereafter, the Amended Notes shall be callable, in whole or in part, during the periods set forth below, for the redemption prices set forth opposite such period below (expressed as a percentage of the principal amount of the Amended Notes to be redeemed):

|  |  |
|---|---|
| September 30, 2015 through but excluding February 15, 2016 | 106% (*plus* accrued and unpaid interest) |
| February 15, 2016 through but excluding July 31, 2016 | 103% (*plus* accrued and unpaid interest) |
| July 31, 2016 and thereafter | 100% (*plus* accrued and unpaid interest) |

At any time on or prior to September 30, 2015, up to 35% of the principal amount of the Amended Notes may be redeemed, with the use of net cash proceeds of one or more equity offerings, at a redemption price of 111.75% of the principal amount thereof *plus* accrued and unpaid interest thereon.

**Change of Control**....................... Upon the occurrence of a change of control of either Investor or OnCure, OnCure will be required to offer to repurchase the Amended Notes at 101% of the outstanding principal amount thereof *plus* accrued and unpaid interest thereon.

**Collateral**................................. The Amended Notes will be secured by a valid and perfected first priority lien on the same assets and properties of the

4

OnCure Entities that secure, or purport to secure, the OnCure Entities' obligations under the indebtedness and other obligations under the Note Indenture and the related financing documents, in each case, as in effect immediately prior to the Closing Date (such assets and properties, the "OnCure Collateral").

**Intercreditor Agreements**................ An intercreditor agreement (such intercreditor agreement, the "Lender Intercreditor Agreement") between the duly appointed agent of the holders of the indebtedness and the other obligations under the Investor Credit Documents and the duly appointed agent of the holders of the Amended Notes (the "Amended Notes Agent") shall be entered into on customary terms pursuant to which the Liens on the OnCure Collateral that secure the indebtedness and other obligations under the Investor Credit Documents are made junior and subordinate in all respects to all Liens on the OnCure Collateral that secure the indebtedness and other obligations under the Amended Notes, the OnCure Indenture and the related financing documents (the "Amended Notes Obligations").

An intercreditor agreement (such intercreditor agreement, the "Notes Intercreditor Agreement") between the duly appointed agent of the holders of the RTS Second Lien Notes and the Amended Notes Agent shall be entered into on customary terms pursuant to which the Liens on the OnCure Collateral that secure the indebtedness and other obligations under the RTS Indenture, the RTS Second Lien Notes and the related financing documents are made junior and subordinate in all respects to all Liens on the OnCure Collateral that secure the Amended Notes Obligations.

Each of the Lender Intercreditor Agreement and the Notes Intercreditor Agreement shall be in form and substance reasonably acceptable to the Amended Notes Agent and Majority Consenting Debtholders.

Notwithstanding the foregoing, in lieu of the Lender Intercreditor Agreement and/or the Notes Intercreditor Agreement, a supplemental intercreditor agreement to, or an amendment and/or a joinder to, the Intercreditor Agreement (as defined in the RTS Indenture) may be entered into to the extent that such Intercreditor Agreement as so supplemented or amended provides for both (x) the terms contemplated above for the Lender Intercreditor Agreement and (y) the terms contemplated above for the Notes Intercreditor Agreement, and shall be in form and substance reasonably acceptable to the Amended Notes Agent and Majority Consenting Debtholders,

5

**Covenants (applicable to the OnCure
Entities)**.....................................

Notwithstanding the terms and other provisions included in "General Rules of Construction" set forth above, the following modifications will be made to the covenants applicable to the Amended Notes (and the defined terms related to such covenants):

*Restricted Payments*

The restricted payments covenant shall include the following two separate baskets in lieu of the building-basket included in the RTS Indenture:

- A restricted payments build-up basket which shall permit distributions of cash or other assets from the OnCure Entities to the RTS Entities in an amount equal to the sum of (i) the cumulative amount of cash and the fair market value of other assets that are used in the business of the OnCure Entities that, in each case, the RTS Entities contribute to or invest in the OnCure Entities after the Closing Date and (ii) in the event that the cash so contributed or invested pursuant to clause (i) above was drawn from, or the assets so contributed or invested pursuant to clause (i) above were purchased with amounts drawn from, the credit facilities or other credit sources of the RTS Entities, the aggregate amount of interest payments made by the RTS Entities, as of the date of calculation, on such outstanding drawn indebtedness (collectively, the "RTS Contribution Indebtedness"), provided that the aggregate amount of restricted payments subsequently made under this basket shall be deemed to reduce the aggregate principal amount of such RTS Contribution Indebtedness as of the date of such restricted payment is made for purposes of calculating such interest amount under this clause (ii) (the "Investment Build-Up Basket"). Use of the Investment Build-Up Basket will be subject to a minimum liquidity (to be defined) threshold of $5.0 million at the OnCure Entities.

- A build-up basket which shall permit distributions of restricted payments from the OnCure Entities to the RTS Entities in an amount equal to 50% of the Consolidated Net Income (as defined in the RTS Indenture) of the OnCure Entities (or, if Consolidated Net Income is a loss, less 100% of such loss).

The restricted payments carve-outs permitting payments to parent companies for certain taxes, expenses, salaries and other payments (i.e. a carve-out as set forth in Section

6

4.10(b)(5) of the RTS Indenture) will provide for (x) the proportional allocation to the RTS Entities and OnCure Entities of any such tax, expense, payment and salary that is attributable to the operations of both the RTS Entities and OnCure Entities or (y) any such tax, expense, payment and salary that is related to or derived from a specific RTS Entity or OnCure Entity or the business, assets, liabilities, operations, finances, existence or other activities of a specific RTS Entity or OnCure Entity to be directly allocated to such RTS Entity or OnCure Entity.

Appropriate modifications will be made in the OnCure Indenture to prevent "double-counting" of other restricted payments baskets and the separate baskets described above.

Transactions contemplated by the Intercompany Services Agreement (as defined below) shall be permitted without restriction under the OnCure Indenture; provided that such transactions shall not increase or decrease the amount of the Investment Build-Up Basket.

| | |
|---|---|
| *Permitted Liens* | Liens securing indebtedness and the other obligations permitted to be incurred under credit facilities to be made junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
| | Liens securing permitted refinancing indebtedness must be junior and subordinate in all respects to the Liens securing the Amended Notes Obligations at least to the same extent that the Liens securing the refinanced indebtedness are junior and subordinate to the Liens securing the Amended Notes Obligations. |
| | Liens securing indebtedness that are permitted under the 3.25:1.00 consolidated secured leverage ratio test, which ratio shall be calculated with respect to the RTS/OnCure Entities, must be made junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. Other than guarantees of indebtedness of the RTS Entities, indebtedness related to such permitted Liens must have a maturity date on or after July 16, 2017. |
| *Indebtedness Covenant* | The calculation of the 2.0:1.0 consolidated fixed charge coverage ratio for purposes of allowing general "ratio" indebtedness (i.e., not indebtedness subject to specific |

7

baskets) shall be based on the RTS/OnCure Entities.

All intercompany indebtedness will be unsecured and subordinate in right of payment to the Amended Notes Obligations pursuant to a subordination agreement, to be an exhibit to the OnCure Indenture (which exhibit shall be in form and substance reasonably satisfactory to the Amended Notes Agent and the Majority Consenting Debtholders).

The anti-layering provision shall be in form and substance substantially identical to the anti-layering provision in the Note Indenture (as in effect on the date of the Investment Agreement).

*Asset Sales*

The asset sale covenant shall be on terms substantially the same as the covenant in the RTS Indenture; provided, that:

- Net proceeds from asset sales of the OnCure Entities must be applied, within 365 days of the receipt thereof, to (i) pre-pay the Amended Notes or (ii) re-invest in the assets or properties owned by the OnCure Entities.

- Asset sales shall include a transaction or series of related transactions for which the OnCure Entities receive aggregate consideration of $1.25 million or more.

- Designated Non-Cash Consideration (as defined in the RTS Indenture) will be limited to the greater of $2.5 million and 2.0% of total assets (calculated with respect to the OnCure Entities).

*Reports*

OnCure will provide the following information to holders of Amended Notes (which, at OnCure's option, may be provided through a password protected website): (i) audited annual financial statements prepared in accordance with GAAP (subject to the absence of footnotes), within the time periods required for such financial statements under the RTS Indenture, provided that such time period for the first fiscal year ending after the Closing Date shall be 120 days, (ii) unaudited quarterly financial statements prepared in accordance with GAAP (subject to the absence of footnotes), within the time periods required for such financial statements under the RTS Indenture, provided that such time period for the first fiscal quarter ending after the Closing Date shall be 60 days, and (iii) within the time periods required in a Current Report on Form 8-K under the Exchange Act, reports containing substantially the same information required to be contained in a Form 8-K pursuant to Item 1.01 (Entry into a

8

Material Definitive Agreement), 1.02 (Termination of a Material Definitive Agreement), 2.01 (Completion of Acquisition or Disposition of Assets), 2.03 (Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant), 2.04 (Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement), 4.01 (Changes in Registrant's Certifying Accountant), 4.02 (Non-Reliance of Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review), 5.01 (Changes in Control of Registrant), 5.02 (Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers), or 5.05 (Amendments to Articles of Incorporation or By-Laws; Change in Fiscal Year) thereof.

The RTS Guarantee shall contain a reporting covenant that requires the Investor to provide, together with delivery of its annual and quarterly reports, segment reporting including operational statistics with respect to the OnCure Entities.

*Intercompany Services Agreement*

OnCure and Investor shall enter into an intercompany services agreement (the "Intercompany Services Agreement"), the terms of which are subject to further mutual agreement; provided, however, it is understood and agreed that the services provided under such Intercompany Services Agreement shall be chargeable to the OnCure Entities at cost and the OnCure Entities shall be provided an annual inspection right (including the right to hire a third party consultant or advisor to assist with such inspection) to verify the books and records of the RTS Entities with respect to such services and the cost thereof.

*Affiliate Transactions*

- Transactions between the OnCure Entities and the RTS Entities ("Internal Affiliate Transactions") in excess of a threshold of $500,000 shall (i) be subject to an "arm's length basis" standard, (ii) to the extent in excess of $2.5 million, require board approval, and (iii) to the extent in excess of $10.0 million, require a fairness opinion; provided, however, no Internal Affiliate Transactions shall be permitted to the extent involving or relating to (w) a management services agreement or any similar agreement with any Managed Practice (to be defined) of the OnCure Entities, except to the extent permitted under **"Certain Additional Restrictions"** below, (x) any of the physicians or other employees within any

9

Managed Practice of the OnCure Entities, except to the extent permitted under "**Certain Additional Restrictions**" below, (y) equipment of the OnCure Entities, except to the extent such equipment is replaced prior to or concurrently with the consummation of such Internal Affiliate Transaction with similar equipment of a higher fair market value useful in the business of the OnCure Entities, and (z) transfers of real property of OnCure Entities or transfers of leases for real property under which an OnCure Entity is the lessee immediately prior to the consummation of such Internal Affiliate Transaction, except to the extent permitted under "**Certain Additional Restrictions**" below.

- The thresholds for affiliate transactions (other than Internal Affiliate Transactions) shall be as set forth on <u>Annex A</u> attached hereto.

*Certain Additional Restrictions*

- None of the RTS Entities shall enter into any management services agreement or any similar agreement with any Managed Practice of the OnCure Entities or any of the physicians or other employees affiliated with any such Managed Practice (for the avoidance of doubt, excluding any physicians or employees within RTS Entities) or transfer any real property or leases for real property of a Managed Practice or the OnCure Entities for a period of three (3) years following the date of expiration or termination of such management services agreement or similar agreement; provided that the RTS Entities may take the actions described above under a profits interest arrangement whereby if a Managed Practice is consolidated with an RTS Entity, the OnCure Entities will be provided in exchange an interest in such entity with a fair market value of no less than the Center-Level EBITDA on a LTM basis of such practice just prior to the consolidation, plus a sharing of the synergies of such consolidation in proportion to the revenue contribution of the relevant OnCure Entity on an LTM basis just prior to such consolidation, provided, that, (i) the Amended Notes Agent is provided a first priority Lien on such interest, (ii) such arrangement provides for a cash management arrangement pursuant to which cash allocable to the OnCure Entities

10

under such arrangement is promptly transferred to an account of OnCure in which the Amended Notes Agent has a first priority perfected Lien, and (iii) the aggregate amount of Center-Level EBITDA of all such practices subject to such arrangements does not exceed 20% of Center-Level EBITDA of all practices calculated as of the Closing Date; provided that the liens contemplated by clauses (i) and (ii) will be granted only to the extent that such Liens are on property or assets that would otherwise constitute OnCure Collateral. In addition, the RTS Entities shall not enter into an agreement outside of such consolidation with any of the physicians or other employees at the relevant Managed Practice unless such agreement is reasonably expected to result in increased synergies to the Managed Practice or Investor is able to replace the physicians or employees with persons reasonably expected to be of comparable talent.

- The OnCure Entities will not consummate any asset sale with respect to the property or assets of any of the Specified Centers or any sale of all or substantially all of the equity interests in any entity that owns a Specified Center and, for purposes hereof, an asset sale shall include any asset sale in which property or assets of any of the Specified Centers are sold or transferred to RTS Entities. Additionally, OnCure shall conduct the business and operations at the Specified Centers in the usual and ordinary course of business. The "Specified Centers" means those outpatient radiation oncology treatment centers for which affiliates of OnCure currently provide management services that are located in (i) Fountain Valley, California, (ii) Anaheim, California, (iii) Placentia, California, and (iv) Santa Maria, California.

- All cash, cash equivalents and other funds that are held or received by or owing to the OnCure Entities shall be deposited and held in or credited to an account or accounts over which a valid and perfected first priority lien has been granted in favor of the Amended Notes Agent (and shall not be commingled with any cash, cash equivalents and other funds of the RTS Entities), and the OnCure Entities shall direct and instruct all of their account debtors and obligors to make all payments due or to become due to the

11

OnCure Entities directly to such an account.

**First Lien Obligations**.................... The Amended Notes Obligations shall be designated and otherwise deemed to constitute "First Lien Obligations" for purposes of the Investor Secured Notes Documents and "Senior Debt" for purposes of the Investor Subordinated Notes Document.   The Investor shall designate Amended Notes Obligations as "senior debt" or the equivalent for purposes any future indenture or financing documentation.

**Registration Rights**....................... None.

12

# ONCURE HOLDINGS, INC.

### First Lien Notes

*Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Term Sheet.*

Covenant Baskets[1]

| Covenant | RTS Indenture Section Reference | Basket Amount |
|---|---|---|
| **Indebtedness** | | |
| *Credit Facilities Basket* | Section 4.09(b)(2) | $150 million; provided that such indebtedness shall at all times be subject to the Lender Intercreditor Agreement. |
| *Capital Leases/Purchase Money Indebtedness* | Section 4.09(b)(4) | The greater of $10.0 million and 4.0% of total assets (calculated with respect to the OnCure Entities); provided, that the OnCure Entities may incur indebtedness in respect of guarantees of Capital Leases/Purchase Money Indebtedness of the RTS Entities so long as (x) the aggregate principal amount of such guarantees, together with all such other indebtedness incurred under this basket, does not exceed the greater of $50.0 million and 4.0% of Total Assets (calculated with respect to the RTS/OnCure Entities) and (y) such guarantees are unsecured or secured by Liens junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance |

---

[1] Baskets set forth herein apply to the OnCure Entities.

| | | substantially similar to the Lender Intercreditor Agreement. |
|---|---|---|
| *Intercompany Indebtedness* | Section 4.09(b)(8) | Such intercompany indebtedness to be unsecured and subordinated to the Amended Notes as set forth in "**Indebtedness Covenant**" in the Term Sheet. |
| *General Basket* | Section 4.09(b)(15) | $5.0 million; provided, that the OnCure Entities may incur indebtedness in respect of guarantees of indebtedness of the RTS Entities so long as (x) the aggregate principal amount of such guarantees, together with all such other indebtedness incurred under this basket, does not exceed $25.0 million and (y) such guarantees are unsecured or secured by Liens junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
| *Indebtedness of Non-Guarantors* | Section 4.09(b)(18) | The greater of $3.0 million and 1.25% of total assets (calculated with respect to the OnCure Entities). |
| **Restricted Payments** | | |
| *Annual                    Management Buyback/Rollover* | Section 4.10(b)(4) | $1.0 million per calendar year. |
| *Dividends post-IPO* | Section 4.10(b)(6) | To be deleted. |
| *General Basket* | Section 4.10(b)(12) | $4.0 million. |
| **Investments** | | |

A-2

| | | |
|---|---|---|
| *Management Advances* | Clause (4) of "Permitted Investments" definition. | $1.0 million. |
| *Insurance Subsidiaries* | Clause (11) of "Permitted Investments" definition. | To be deleted |
| *JVs/Unrestricted Subs* | Clauses (10) and (12) of "Permitted Investments" definition. | $3.0 million in the aggregate; provided, however, an additional $7.0 million (or $10.0 million in the aggregate) to the extent that the only RTS/OnCure Entity that is an equity owner of such JVs/Unrestricted Sub is an OnCure Entity. |
| *Increases to existing Investments* | Clause (16) of "Permitted Investments" definition. | $2.5 million. |
| *General Basket* | Clause (19) of "Permitted Investments" definition. | $2.5 million. |
| **Liens** | | |
| *Hedging Obligations* | Clause (5) of "Permitted Liens" definition. | $1.0 million. |
| *Indebtedness Under Currency Agreements* | Clause (12) of "Permitted Liens" definition. | To be deleted (redundant to Clause (11) of "Permitted Liens" definition). |
| *Restricted Subsidiary* | Clause (19) of "Permitted Liens" definition. | To be deleted (redundant to Clause (14) of "Permitted Liens" definition). |
| *General Basket* | Clause (25) of "Permitted Liens" definition. | $5.0 million; provided, that the OnCure Entities may incur Liens in respect of guarantees of indebtedness of the RTS Entities incurred in the ordinary course of business so long as (i) the aggregate principal amount of such guarantees, together with all such other indebtedness secured by Liens under this basket, does not exceed $25.0 million and |

A-3

| | | (y) such Liens are junior and subordinate in all respects to the Liens securing the Amended Notes Obligations pursuant to an intercreditor agreement in form and substance substantially similar to the Lender Intercreditor Agreement. |
|---|---|---|
| *Secured Debt Ratio Test* | Clause (26) of "Permitted Liens" definition. | As set forth in "**Permitted Liens**" in the Term Sheet. |
| **Affiliate Transactions** | | |
| *Carve-out* | Section 4.14(a) | $500,000.00 (other than with respect to Internal Affiliate Transactions). |
| *Board of Directors Approval Threshold* | Section 4.14(a) | $2.5 million (other than with respect to Internal Affiliate Transactions). |
| *Fairness Opinion Threshold* | Section 4.14(a) | $5.0 million (other than with respect to Internal Affiliate Transactions). |
| **Events of Default** | | |
| *Cross Acceleration Threshold* | Section 6.01(4) | $10.0 million (with respect to indebtedness of the RTS/OnCure Entities). |
| *Litigation Threshold* | Section 6.01(5) | $10.0 million (with respect to indebtedness of the RTS/OnCure Entities). |
| *% of Holders Needed to Call an Event of Default* | Section 6.02 | 25% |

A-4

**<u>Exhibit I</u>**

**Attached.**

# *See* Docket No. 13

Debtors' Motion (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, (C) Approving Use of Cash Collateral of Prepetition Secured Parties, and (D) Granting Adequate Protection to Prepetition Lenders; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); (III) Sealing Related Fee Letters and (IV) Granting Related Relief

## Schedule 1.1(a)

## First Day Motions

1.   Motion of Debtors for Order Under Fed. R. Bankr. P. 1015 and Del . Bankr. L.R. 1015-1 Authorizing Joint Administration of Chapter 11 Cases (Docket No. 3)

2.   Motion of Debtors for Order Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment (Docket No. 5)

3.   Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 1107, and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors to (A) Maintain Postpetition Financing of Insurance Premiums and Renewals Thereof, (B) Pay Prepetition Insurance Obligations, (C) Refund Overpayments Made by Third-Party Payors, and (D) Maintain Postpetition Insurance Coverage (Docket No. 6)

4.   Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 506(b), 1107(a), and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Certain Prepetition (I) Warehousing and Related Claims and (II) Mechanics and Materialmen Claims (Docket No. 7)

5.   Motion of Debtors for Order Under 11 U.S.C. §§ 105(A), 362(A)(3), and 541 Establishing Certain Notice and Hearing Procedures for Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Interests of OnCure Holdings, Inc. (Docket No. 8)

6.   Motion of Debtors for Order (I) Under 11 U.S.C. §§ 105(a), 363(b), 364, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Claims of Certain Critical Vendors and Service Providers, and (II) Under 11 U.S.C. §§ 105(a), 363(c), and 503(b)(1)(A) and Fed. R. Bankr. P. 6003 Confirming Administrative Expense Priority Status of Debtors' Undisputed Obligations for Postpetition Delivery of Goods and Services (Docket No. 9)

7.   Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 506(a), 507(a)(8) and 541 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Taxes and Fees (Docket No. 10)

8.   Motion of Debtors for an Order Pursuant to 11 U.S.C. §§ 105(a), 345, 363, and 364, Fed. R. Bankr. P. 6003, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Authorizing Continuation of Intercompany Transactions, and (IV) Granting Superpriority Status to Postpetition Intercompany Claims (Docket No. 11)

9.    Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 (I) Authorizing Payment of Certain Prepetition Workforce Obligations, Including Compensation, Benefits, Expense Reimbursements, and Related Obligations, (II) Confirming Right to Continue Workforce Programs on Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators of, or Third Party Providers Under, Workforce Programs, and (V) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments (Docket No. 12)

10.    Debtors' Motion (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, (C) Approving Use of Cash Collateral of Prepetition Secured Parties, and (D) Granting Adequate Protection to Prepetition Lenders; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); (III) Sealing Related Fee Letters and (IV) Granting Related Relief (Docket No. 13)

11.    Declaration of Richard Klein in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors' (A) Use of Cash Collateral and (B) Entry into Debtor In Possession Financing Facility and (II) Granting Related Relief (Docket No. 14)

**<u>Schedule 5.3(b)</u>**

**Required Filings and Consents of Investor**

Any Consent necessary or required in connection with the Financing Transactions.
.

Amendment No. 1 to Investment Agreement


Available to Holders of Class 5 Claims on the Debtors' Secured Noteholder Website

**<u>Exhibit H</u>**

New Intercreditor Agreements

[To Be Filed With Plan Supplement]

**Exhibit I**

Restructuring Support Agreement

**<u>Exhibit I</u>**

Restructuring Support Agreement

**EXECUTION VERSION**

# RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (as may be amended, modified or otherwise supplemented from time to time in accordance with the terms hereof, and including the exhibits attached hereto, including, without limitation, the Term Sheet and the Bidding Procedures (each as defined below)), this "**Agreement**"), dated as of June 14, 2013, is entered into by and among (a) OnCure Holdings, Inc. ("**HoldCo**"), (b) each direct and indirect, wholly-owned subsidiary of HoldCo (each, a "**HoldCo Subsidiary**" and, collectively, the "**HoldCo Subsidiaries**", and together with HoldCo, the "**Company**"), and (c)(i) each of the beneficial owners (or investment managers or advisors on behalf of the beneficial owners) of the Notes or Term Loans (each as defined below) identified on the signature pages hereto and (ii) each of the beneficial owners (or investment managers or advisors for the beneficial owners) of the Notes or the Term Loans that becomes a party hereto from time to time in accordance with the terms hereof by executing a Joinder (as defined below) (such persons and entities described in this clause (c), together with any of their respective successors and permitted assigns, each, a "**Consenting Debtholder**", and collectively, the "**Consenting Debtholders**"); provided, however, for the avoidance of doubt, it is understood that an investment manager or advisor for a beneficial owner of the Notes or the Term Loans is considered to be a Consenting Debtholder only with respect to the beneficial owners specifically identified on the signature pages of this Agreement, and such investment manager or advisor shall not be considered a Consenting Debtholder with respect to any other beneficial owners of the Notes or the Term Loans not a party hereto, including beneficial owners that are advised by its affiliates or other separate business units. Each of the Company and the Consenting Debtholders are referred to herein individually as a "**Party**", and collectively as the "**Parties**".

## RECITALS

WHEREAS, HoldCo has outstanding term loans (the "**Term Loans**") under that certain Amended and Restated Credit Agreement, dated as of December 24, 2012 (as the same has been, and may be, amended, modified or supplemented from time to time, the "**Term Loan Agreement**"), among HoldCo, the HoldCo Subsidiaries party thereto, the lenders party thereto (the "**Term Loan Lenders**"), and Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, together with any successor agent, the "**Term Loan Agent**," and all claims and obligations arising under or in connection with the Term Loan Agreement and the other Loan Documents (as defined in the Term Loan Agreement), the "**Term Loan Obligations**");

WHEREAS, HoldCo issued $210 million in principal amount of $11^{3/4}$% Senior Secured Notes due 2017 (together with any and all guarantees of the indebtedness and obligations evidenced by such Notes, the "**Notes**," and the holders thereof, the "**Noteholders**") pursuant to that certain Indenture, dated May 13, 2010 (as the same may have been or as may be amended, modified or otherwise supplemented from time to time, the "**Indenture**"), by and among HoldCo, the HoldCo Subsidiaries party thereto, and Wilmington Trust FSB, as trustee and collateral agent (in such capacity, together with any successor trustee, the "**Trustee**", and all

claims and obligations arising under or in connection with the Indenture, the "**Indenture Obligations**");

WHEREAS, as of the date hereof, the Consenting Debtholders collectively hold or otherwise control, in the aggregate, in excess of 73% of the aggregate outstanding principal amount of the Notes and 100% of the aggregate outstanding principal amount of the Term Loans;

WHEREAS, prior to the date hereof, the Parties engaged in good faith, arm's length negotiations that have led to an agreement regarding the material terms of a restructuring of the Company (the "**Transaction**") that the Parties now desire to implement in accordance with the terms and conditions set forth in this Agreement (including the restructuring term sheet attached hereto as Exhibit A (the "**Term Sheet**")); [1]

WHEREAS, it is anticipated that, subject to the terms and conditions set forth in this Agreement, the Transaction will be implemented through a plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), which plan of reorganization shall be consistent in all material respects with the terms and conditions of this Agreement (as amended, modified or otherwise supplemented from time to time in accordance with this Agreement, the "**Plan**") and provide for, among other things, certain distributions on account of the Indenture Obligations;

WHEREAS, the Transaction shall be implemented pursuant to the Plan through either (A) (i) the marketing and sale of (x) all or substantially all of the Company's assets or (y) all of the new equity of Reorganized Holdco, (ii) the distribution of the proceeds of such sale and (iii) (x) in the case of a sale of all or substantially all of the Company's assets, the wind down of the Company's estates or (y) in the case of a sale of all of the new equity of Reorganized Holdco, a restructuring of the Company's liabilities, including the Notes, in each case, consistent in all material respects with the terms and conditions of, this Agreement (a "**Sale Transaction**") or (B) the reorganization of the Company on a standalone basis without the consummation of a Sale Transaction consistent in all material respects with the terms and conditions of, this Agreement (the "**Plan Transaction**");

WHEREAS, in accordance with, and subject to the terms and conditions of, this Agreement, HoldCo and each wholly-owned subsidiary of HoldCo intends to commence voluntary, pre-arranged reorganization cases (to be jointly administered) under chapter 11 of the Bankruptcy Code for the Company (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to implement the Transaction and to (a) file (x) the Plan and (y) the accompanying disclosure statement (as amended, supplemented or otherwise modified from time to time in accordance with this Agreement, the "**Disclosure Statement**") with the Bankruptcy Court, (b) use commercially reasonable efforts to have the Disclosure Statement approved and the Plan confirmed by the Bankruptcy Court, and (c) conduct a sale and marketing process in pursuit of a potential Sale Transaction in accordance with, and subject to the terms and conditions of, this Agreement, including, without limitation,

---

[1] Capitalized terms used but not otherwise defined herein are defined in accordance with the Term Sheet, which is expressly made part of this Agreement as if fully set forth herein and incorporated herein by reference.

2

the bidding procedures to be filed with the Bankruptcy Court, which shall be materially consistent in form and substance with the bidding procedures attached hereto as Exhibit B (the "**Bidding Procedures**");

WHEREAS, this Agreement is the product of good faith, arm's length negotiations among the Parties and their respective professionals; and

WHEREAS, the Parties desire to express to each other their mutual support and commitment in respect of the Transaction on the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the premises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Generally

a.    Subject to the terms and conditions of this Agreement, each of the Parties agrees that, during the Plan Support Period (as defined below), the Parties will use commercially reasonable efforts to cause to occur, and cooperate in the prompt consummation of, the Transaction on terms and conditions consistent in all material respects with this Agreement.  Notwithstanding anything in this Agreement to the contrary, the representations, warranties, covenants and agreements of the Company set forth in this Agreement shall be joint and several but the representations, warranties, covenants and agreements of each Consenting Debtholder set forth in this Agreement shall be several but not joint, and shall only be applicable to each Consenting Debtholder with respect to and to the extent of the Specified Debt Claims (defined below) for which it is the legal owner, beneficial owner and/or investment advisor or manager with the power and authority to vote the claims arising under the Specified Debt Claims.

b.    The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet sets forth the material terms and conditions of the Transaction; provided, however, the Term Sheet is supplemented by the other terms and conditions of this Agreement.  In the event of any inconsistency between the Term Sheet and any other provision of this Agreement, the Term Sheet will govern.

2.    Agreement Effective Date

This Agreement shall be effective at 12:01 a.m. prevailing Eastern Time on the date on which the following conditions have been satisfied (such date, the "**Agreement Effective Date**"): (a) the Company shall have executed and delivered counterpart signature pages to this Agreement to the Consenting Debtholders; and (b) Consenting Debtholders holding at least 66 2/3% of the aggregate outstanding principal amount of the Notes and at least 66 2/3% of the aggregate outstanding principal amount of the Term Loans shall have executed and delivered counterpart signature pages to this Agreement to the Company; provided, however, that signature pages executed by the Consenting Debtholders shall be delivered to (x) other Consenting Debtholders in a redacted form that removes each Consenting Debtholder's holdings of Notes

3

and any other claims against the Company, and (y) the Company in an unredacted form.  The terms and provisions of this Agreement, and the rights and the obligations of the Parties hereunder, shall not become effective or binding until the occurrence of the Agreement Effective Date.  The "**Plan Support Period**" means the period commencing on the Agreement Effective Date and ending on the date this Agreement is terminated in accordance with <u>Section 6</u> hereof; <u>provided</u>, <u>however</u>, that with respect to any Consenting Debtholder that becomes a Party after the Agreement Effective Date, the Plan Support Period with respect to such Consenting Debtholder will commence on the date that it becomes a Party.

3.      <u>Implementation of the Transaction</u>

Subject to the terms and conditions of this Agreement, each Party hereby covenants and agrees, during the Plan Support Period, (i) to negotiate in good faith any material instrument, pleading, order or other related document utilized for implementing or achieving, or that otherwise relates to, this Agreement, the Plan or the Transaction, which is described in or contemplated by this Agreement, the Plan or the Disclosure Statement (collectively, such material instruments, pleadings, orders and documents, the "**Restructuring Documents**"), including, but not limited to, any stock purchase agreement, investment agreement, equity transfer agreement, stockholder agreement, equity commitment agreement, asset purchase agreement, the Bidding Procedures (including any bid protections, whether or not included in the Bidding Procedures (and any motion seeking approval thereof or the order of the Bankruptcy Court approving thereof)), the motion approving the sale of the assets of the Company or the new equity of Reorganized Holdco (and any order of the Bankruptcy Court approving such sale), debtor-in-possession and exit financing documents, any document, instrument, guarantee or agreement related to the issuance of notes or other debt securities under a Plan (each a "**Notes Document**", and collectively, the "**Notes Documents**"), the Disclosure Statement (and any motion seeking the approval thereof or the order of the Bankruptcy Court approving thereof), the Plan, the order of the Bankruptcy Court confirming the Plan, any "first day" pleadings to be filed by the Company in connection with the Chapter 11 Cases (the "**First Day Motions**"), the ballots, the motion to approve the form of ballots and solicitation procedures and the order of the Bankruptcy Court approving the form of ballots and solicitation procedures, in each case the terms and conditions of which shall be consistent in all material respects with the Term Sheet and otherwise acceptable to the Company and Consenting Debtholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes held by all Consenting Debtholders (the "**Majority Consenting Debtholders**"); <u>provided</u>, that all aspects of the Restructuring Documents, including, without limitation, any Notes Documents, relating to (i) a Winning Bid (as defined below) or (ii) the recovery or consideration to be received (pursuant to the Plan or otherwise) by holders of Indenture Obligations,   shall be acceptable to the Consenting Debtholders holding at least 66 2/3% of the aggregate outstanding principal amount of the Notes held by all Consenting Debtholders (the "**Supermajority Consenting Debtholders**"), (ii) to promptly execute and deliver (as applicable, and to the extent such Party is a party thereto) the Restructuring Documents and otherwise support the prompt consummation of the Transaction, and (iii) not object to, delay, impede, commence any proceeding, or take any other action to interfere, directly or indirectly, in any material respect with the prompt consummation of the Transaction or acceptance or approval of the Disclosure Statement or the Plan (or encourage or

4

support any person or entity to do any of the foregoing or, in the case of a Consenting Debtholder, to instruct or direct the Trustee to do any of the foregoing).

    4.    <u>Consenting Debtholders' Obligations</u>

    Subject to the terms and conditions of this Agreement, during the Plan Support Period:

    a.    <u>Support of the Transaction</u>.  Each Consenting Debtholder agrees that it will (i) not object to, or otherwise commence any proceeding to oppose, the Transaction, the confirmation or consummation of the Plan, or approval of the Disclosure Statement, (ii) not take any action to prevent, delay or impede the consummation of the Transaction or the approval or execution (as applicable) of the Restructuring Documents, (iii) provided that such Consenting Debtholder has been solicited in accordance with sections 1125 and 1126 of the Bankruptcy Code, if applicable, and other applicable law, vote all Specified Debt Claims beneficially owned by such Consenting Debtholder or for which it is the nominee, investment manager, or advisor for beneficial holders thereof to accept the Plan and in favor of the releases and exculpation provided under the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and accompanying voting materials, and return a duly-executed ballot in connection therewith no later than the applicable deadline set forth in the Disclosure Statement, (iv) not change, withdraw or revoke (or seek to change, withdraw or revoke) its vote to accept the Plan; <u>provided</u>, <u>however</u>, that upon written notice to the Company and the other Parties, any Consenting Debtholder can revoke its vote (upon such revocation, such vote being deemed void *ab initio*) at any time following the expiration of the Plan Support Period, and (v) not support or vote in favor of any other restructuring, liquidation or reorganization of the Company (or any plan or proposal in respect of the same) other than the Transaction (an "**Alternative Transaction**"); <u>provided</u> <u>further</u>, <u>however</u>, that an Alternative Transaction does not, and shall not be deemed to, include any bid selected as the winning bid at any auction conducted in connection with, and pursuant to, the Bidding Procedures (the "**Auction**"), so long as such winning bid so selected by the Company shall be acceptable in all respects to the Supermajority Consenting Debtholders, including, without limitation: (i) the purchase price and form of consideration to be provided by such bid; (ii) the valuation of any non-cash consideration to be provided by such bid; (iii) the terms or provisions relating to distributions to creditors under the plan of reorganization to be implemented in connection with such bid; (iv) the terms and conditions with respect to any debt instrument or security to be distributed to, or otherwise received by, creditors in connection with such bid; (v) the terms or provisions relating to the rejection or assumption of any executory contracts or unexpired leases in connection with such bid; (vi) the terms or provisions contained in such bid relating to the closing of any radiation oncology treatment centers subject to a management services agreement between the Company and a physician group; (vii) the terms or provisions relating to the treatment of cure costs contained in such bid; and (viii) any other terms or provisions, including, without limitation, excluded liabilities or adjustments to the purchase price in connection with such bid that would impact or affect the net sale proceeds available for distribution to creditors under the Plan (such bid, the "**Winning Bid**").

5

b.    Certain Rights of Consenting Debtholders Unaffected.  Nothing contained herein shall (i) limit the ability of any Consenting Debtholder to consult with any other Noteholder, Term Loan Lender, the Company or their respective advisors, (ii) other than as expressly provided herein, limit the rights of any Consenting Debtholder under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance is not in breach of the obligations of such Consenting Debtholder hereunder or under the terms and conditions of the Term Sheet, (iii) limit the ability of any Consenting Debtholder to assert or raise any objection permitted under the proviso in Section 4(a)(iv) above in connection with any hearing on confirmation of the Plan, (iv) limit the ability of any Consenting Debtholder to sell or enter into any transactions in connection with the Notes or Term Loans, as applicable, or any other claims against or interests in the Company, subject to Sections 9 and 10 hereof, (v) other than as expressly provided herein, limit the rights of any Consenting Debtholder under the Indenture, any of the other Note Documents (as defined in the Indenture), the Term Loan Agreement or any of the other Loan Documents (as defined in the Term Loan Agreement) or constitute a waiver or amendment of any provisions of the Indenture, any of the other Note Documents, the Term Loan Agreement or any of the other Loan Documents, (vi) limit the rights of any Consenting Debtholder to take any action related to providing or arranging financing for any party in connection with a Sale Transaction, including, but not limited to, financing in such party's capacity as a prospective bidder at the Auction (if any) or otherwise pursuant to or, in connection with, any Winning Bid, or (vii) other than as expressly provided herein, limit the ability of any Consenting Debtholder to assert or raise objections in the Chapter 11 Cases to the party selected by the Company to consummate a Sale Transaction (including any party selected by the Company as submitting the Winning Bid at the Auction) or the terms of any such Sale Transaction to the extent such Sale Transaction is not consistent with, or otherwise violates, the terms and conditions of this Agreement.

c.    Restructuring Documents.  The obligations of each Consenting Debtholder under Section 1, Section 3 and this Section 4 are conditioned upon the terms of all documents implementing the Transaction, including, without limitation, the Disclosure Statement, the Plan and the other Restructuring Documents, being consistent in all material respects with this Agreement and otherwise containing terms and conditions reasonably acceptable to the Majority Consenting Debtholders or the Supermajority Consenting Debtholders (as applicable).

5.    The Company's Obligations

a.    Affirmative Covenants.  The Company agrees that, subject to the terms and conditions of this Agreement, during the Plan Support Period (unless otherwise consented to in writing by the Majority Consenting Debtholders), the Company shall do the following:

(1)    conduct the process of marketing the equity and the assets of the Company in order to determine the highest and/or best offer for a Sale Transaction (the "**Marketing Process**").  The Marketing Process shall be conducted by the Company in a commercially reasonable manner and the Company shall provide the Consenting Debtholder Advisors (as defined below) regular updates as to such process and, in any event, upon the

6

reasonable request of any of the Consenting Debtholder Advisors.  As part of the Marketing Process, the Company shall use commercially reasonable efforts to ensure that potential bids for the Company's assets or the equity of Reorganized Holdco that are qualified under the Bidding Procedures are due no later than twenty (20) days after entry of an order approving the Bidding Procedures;

(2)    consult in good faith with the Consenting Debtholder Advisors regarding the selection of the Winning Bid at the Auction (if any);

(3)    support and promptly consummate the Transaction as expeditiously as practicable under applicable law on terms and conditions consistent in all material respects with the Term Sheet, and not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with or impede or delay consummation of, the Transaction;

(4)    comply with all material terms, conditions, provisions and obligations (subject to the expiration of any applicable cure periods) contained in any purchase or investment agreement or other transaction document entered into with any stalking horse bidder or the party who submits the Winning Bid (the "<u>Winning Bidder</u>");

(5)    obtain debtor-in-possession financing in an amount, and subject to terms and conditions that are, materially consistent with this Agreement (the "**<u>DIP Facility</u>**");

(6)    provide draft copies of all Restructuring Documents (including, but not limited to, all material motions, applications, orders, agreements and other documents) the Company intends to execute and/or file with the Bankruptcy Court to Stroock & Stroock & Lavan LLP, as counsel to the Consenting Debtholders, ("**<u>Stroock</u>**") within three (3) business days prior to the date the Company intends to execute and/or file any such motion, application, order, agreement or other document, and consult in advance in good faith with Stroock regarding the form and substance of any such proposed motion, application, order, agreement or other document;

(7)    except as otherwise provided in this Agreement, cause the amount of Indenture Obligations and Term Loan Obligations identified on the signature pages attached to this Agreement to be redacted to the extent this Agreement is filed on the docket maintained in the Chapter 11 Cases;

(8)    maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized (unless the failure to do so would not, and would not reasonably be expected to, have a Materially Adverse Effect);

(9)    timely file a formal written objection to any motion filed with the Bankruptcy Court by any party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

7

(10)    timely file a formal written objection to any motion filed with the Bankruptcy Court by any party seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(11)    to the extent approved by order of the Bankruptcy Court (to the extent such order is required by the local rules of the Bankruptcy Court), timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any party with respect to the DIP Facility (or motion filed by such party that seeks to interfere with the DIP Facility);

(12)    subject to any applicable confidentiality restrictions, provide Stroock, GLC Advisors & Co., LLC, as financial advisor to the Consenting Debtholders ("**GLC**"), and such other identified professionals as may be retained by the Consenting Debtholders (collectively, the "**Consenting Debtholder Advisors**") (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records, facilities, management and advisors (including Jefferies, LLC) for the purposes of evaluating the Transaction and the business, assets, liabilities and operations of the Company (to the fullest extent possible under applicable law), (B) timely and reasonably detailed responses to all reasonable diligence requests of the Consenting Debtholder Advisors or any Consenting Debtholder, (C) information with respect to all material executory contracts and unexpired leases of the Company (including the estimated amount of cure costs and rejection damages associated with the assumption, assignment and/or rejection thereof in the Chapter 11 Cases) and (D) full access to the electronic virtual data room established for potential bidders in connection with the Transaction;

(13)    indefeasibly pay in full in cash, to the extent not previously paid, all reasonable and documented fees and expenses of the Consenting Debtholder Advisors, (x) on a current basis prior to the Filing Date and (y) after the Filing Date, under the Plan, to the extent permitted by the Bankruptcy Court and not otherwise paid in connection with the Chapter 11 Cases, pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise, in each case to the extent an invoice is provided to the Company;

(14)    promptly notify the Consenting Debtholder Advisors in writing of any governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened) known to senior management of the Company or the restructuring advisors to the Company, in any such case which could reasonably be expected to (A) materially and adversely affect the Company or (B) prevent or materially delay the consummation of the Transaction;

(15)    comply in all material respects with the covenants contained in the DIP Facility (subject to the expiration of any applicable cure periods); and

(16)    take all reasonable actions contemplated by this Agreement that are necessary to (A) facilitate the implementation or consummation of the Transaction and/or (B) obtain approval by the Bankruptcy Court of the Restructuring Documents.

8

b.    <u>Negative Covenants</u>.  The Company agrees that, subject to the terms and conditions of this Agreement, during the Plan Support Period (unless otherwise consented to in writing by the Majority Consenting Debtholders), the Company shall not, directly or indirectly, do or permit to occur any of the following:

(1)    except as contemplated by this Agreement and pursuant to the Bidding Procedures, directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with, or participate in the formulation of, any Alternative Transaction;

(2)    modify the Plan, in whole or in part, in a manner that is inconsistent in any material respect with this Agreement;

(3)    withdraw or revoke the Plan or publicly announce its intention not to pursue the Plan;

(4)    take any action in connection with the Transaction that, in whole or in part, is inconsistent in any material respect with this Agreement;

(5)    select or enter into any purchase or investment agreement or other transaction document with a stalking horse bidder or Winning Bidder without the consent of the Supermajority Consenting Debtholders;

(6)    (A) make any material modification to a purchase or investment agreement or other transaction document entered into with a stalking horse bidder or Winning Bidder without the consent of the Supermajoirty Consenting Debtholders or (B) grant any waiver with respect to such document or agreement, including a waiver of any closing condition, without the consent of the Supermajority Consenting Debtholders;

(7)    execute, enter into, amend, withdraw, modify, file or agree to any Restructuring Document or other document relating to the Transaction (including any modifications or amendments thereof) that, in whole or in part, is inconsistent in any material respect with this Agreement or the Plan and is not otherwise acceptable to the Majority Consenting Debtholders or the Supermajority Consenting Debtholders (as applicable);

(8)    to the extent the Company has any discretionary consent or approval right in any transaction document in connection with a Winning Bid, or any purchase or investment agreement or other transaction document entered into with a stalking horse bidder, over the form and/or substance of any document (including any Notes Document), instrument, consent, approval, waiver, amendment, modification, supplement, opinion or agreement, or any action or other matter related to a Winning Bid, exercise such consent or approval right without obtaining and complying with the written direction of the Supermajority Consenting Debtholders;

(9)    to the extent not in the ordinary course of business consistent with past practices, pay any post-petition trade payable or other post-petition expense

9

prior to the date such trade payable or expense is due and payable, unless permitted by the terms of this Agreement, or otherwise consented to in writing by the Majority Consenting Debtholders;

(10)    file any motion or pleading with the Bankruptcy Court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent in any material respect with this Agreement or the Plan and is not otherwise reasonably satisfactory in all material respects to the Majority Consenting Debtholders or the Supermajority Consenting Debtholders (as applicable);

(11)    move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of a material executory contract or unexpired lease other than in accordance with this Agreement or the Plan;

(12)    commence an avoidance action or other legal proceeding that challenges the validity, enforceability or priority of the Indenture Obligations or the Term Loan Obligations or liens on, or security interests in, any of the assets or properties of the Company that secures any of the Indenture Obligations or the Term Loan Obligations;

(13)    other than as contemplated by this Agreement or the Plan, issue, sell, pledge, dispose of or encumber any common stock, limited liability company interests and any other equity, ownership or profits interests, or any options, warrants or other agreements to acquire common stock, limited liability company interests or other equity, ownership or profits interests;

(14)    other than as contemplated by this Agreement or the Plan, amend or propose to amend its respective certificate or articles of incorporation, bylaws or other organizational documents;

(15)    split, combine or reclassify any of its outstanding Existing Equity Interests (as defined in the Term Sheet), or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its Existing Equity Interests;

(16)    redeem, purchase or acquire or offer to acquire any of its Existing Equity Interests;

(17)    other than as contemplated by this Agreement or the Plan, acquire or divest (by merger, sale, lease, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or collection of assets constituting all or substantially all of a business or business unit, or (B) assets of the Company, other than in the ordinary course of business consistent with past practices;

(18)    incur any capital expenditures, other than capital expenditures expressly provided for in, or otherwise in compliance with, the capital expenditure budget included in the Company's weekly cash flow budgets that have been provided to the Consenting Debtholders prior to the Agreement Effective Date;

10

(19)    incur or suffer to exist any post-petition indebtedness, except indebtedness existing and outstanding immediately prior to the date hereof, trade payables and operating liabilities arising and incurred in the ordinary course of business and indebtedness arising under the DIP Facility or as otherwise permitted by the documents governing the DIP Facility, this Agreement or the Plan;

(20)    create or suffer to exist any post-petition liens or security interests in or on any of its assets or properties (tangible or intangible), except liens or security interests that secure obligations under the DIP Facility or as otherwise permitted by the documents governing the DIP Facility, this Agreement or the Plan;

(21)    enter into any collective bargaining agreements or materially modify any existing collective bargaining agreements;

(22)    enter into any commitment or agreement with respect to exit financing that is not on terms acceptable to the Supermajority Consenting Debtholders;

(23)    enter into any commitment or agreement with respect to debtor-in-possession financing other than the DIP Facility, unless such commitment or agreement (A) requires the satisfaction of the DIP Facility obligations in full in cash on the closing date thereof, (B) provides for adequate protection to the Noteholders and Term Loan Lenders acceptable to the Majority Consenting Debtholders and (C) complies in all material respects with this Agreement;

(24)    hire any executive or employee whose total annual compensation is greater than $175,000 or increase the compensation for any executive or employee whose total annual compensation is (or, after giving effect to any such increase, will be) greater than $175,000; provided, however, that the Company may hire any medical employee in replacement of another medical employee so long as done in the ordinary course of business consistent with past practices and the annual compensation of such newly hired medical employee shall not be greater, without the consent of the Majority Consenting Debtholders, than the medical employee being replaced;

(25)    enter into, amend, waive, supplement or otherwise modify any material term, condition or provision of any (a) management services agreement, (b) real estate lease, (c) medical equipment lease or (d) any other agreement that would require or would be reasonably expected to require the Company to pay (in one or more payments), as a result of such agreement, amendment, waiver, supplement or modification, more than $100,000 to any person or entity in any twelve (12) month period; and

(26)    settle any claim, dispute, controversy, cause of action, proceeding, appeal or pending litigation (A) not otherwise insured under the Company's insurance policies and paid for by the Company's applicable insurance carrier for more than $150,000 (whether such payouts are made individually or in the aggregate) or (B) that would reasonably be expected to materially and adversely affect the Company.

11

c.    <u>Automatic Stay</u>.    The Company acknowledges and agrees, and shall not dispute, that after the commencement of the Chapter 11 Cases, (i) the giving of notice of termination by any Party pursuant to this Agreement and (ii) the seeking of the enforcement of any rights or remedies under this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

6.    <u>Termination</u>

a.    This Agreement shall terminate immediately and all of the obligations of the Parties hereunder shall be of no further force or effect in the event that: (i) the Transaction is consummated; (ii) the Transaction is not consummated in accordance with this Agreement by November 5, 2013, as such date may be extended in writing from time to time by the Company and the Majority Consenting Debtholders; (iii) the Company and the Majority Consenting Debtholders mutually agree to such termination in writing; or (iv) this Agreement is terminated pursuant to paragraph (b) or (c) of this <u>Section 6</u>.

b.    The Company may terminate this Agreement by written notice to the Consenting Debtholders, delivered in accordance with <u>Section 18</u> hereof, upon the occurrence of any of the following events:

(1)    the material breach of this Agreement, by one or more of the Consenting Debtholders of its obligations hereunder and the Consenting Debtholders who have not so breached this Agreement hold less than 50.01% of the outstanding aggregate principal amount of the Notes, which breach is not cured within five (5) business days after the giving of written notice of such breach by the Company to the applicable Consenting Debtholder(s);

(2)    any representation or warranty made by the Consenting Debtholder(s) in this Agreement is materially incorrect or inaccurate as of the Agreement Effective Date (or such other applicable date with respect to representations and warranties expressly made as of a specific date other than the Agreement Effective Date) and the remaining Consenting Debtholders hold less than 50.01% of the outstanding aggregate principal amount of the Notes;

(3)    the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction or other decree or taken any other action, in each case, which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the implementation of the Transaction;

(4)    any court of competent jurisdiction shall enter a final, non-appealable judgment or order declaring this Agreement or any material provision contained herein to be unenforceable; or

(5)    the Company determines termination is required pursuant to Section 31 hereof.

12

c.    The Majority Consenting Debtholders may terminate this Agreement (which shall terminate the obligations of all Consenting Debtholders hereunder) by written notice to the Company, delivered by the Majority Consenting Debtholders in accordance with <u>Section 18</u> hereof, upon the occurrence of any of the following events:

(1)    upon a material breach by the Company of its obligations hereunder (without giving effect to any materiality qualifier), which breach is not cured within five (5) business days after the giving of written notice of such breach; <u>provided</u>, <u>however</u>, the Company shall not be entitled to any such cure period with respect to a breach of any of the provisions of <u>Sections 5(a)</u> or <u>5(b)</u> of this Agreement;

(2)    upon the amendment or modification, or waiver of, any term or condition of any Restructuring Document so as to be, in whole or in part, inconsistent in any material respect with this Agreement or otherwise not reasonably acceptable to the Majority Consenting Debtholders or the Supermajority Consenting Debtholders (as applicable), without the prior written consent of the Majority Consenting Debtholders or the Supermajority Consenting Debtholders (as applicable);

(3)    the selection of a bid at the Auction (if any) that does not constitute a Winning Bid pursuant to this Agreement;

(4)    any Notes Document (which the Company (i) is a party to or otherwise bound by, (ii) is a beneficiary of, (iii) has negotiated or (iv) has a consent right or approval over) is entered into, executed, filed, amended, or withdrawn by any party, including any Winning Bidder or affiliate thereof, without the prior written consent of the Supermajority Consenting Debtholders;

(5)    any representation or warranty made by the Company in this Agreement is materially incorrect (without giving effect to any materiality qualifier) or inaccurate as of the Agreement Effective Date (or such other applicable date with respect to representations and warranties expressly made as of a specific date other than the Agreement Effective Date);

(6)    entry of an order of the Bankruptcy Court denying approval of the Disclosure Statement or confirmation of the Plan;

(7)    the Company (i) withdraws the Plan, or publicly announces its intention to withdraw the Plan, to pursue an Alternative Transaction, (ii) moves to voluntarily dismiss any of the Chapter 11 Cases, (iii) moves for conversion of any of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code or (iv) moves for appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Chapter 11 Cases;

(8)    (i) a trustee or an examiner with expanded powers is appointed in any of the Chapter 11 Cases or (ii) any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

13

(9)    the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(10)    the occurrence of any "event of default" under the Indenture or Term Loan Agreement (as defined in each applicable agreement, respectively) on or after the Agreement Effective Date, other than any such event of default arising from (A) the public announcement of this Agreement or the Plan, (B) the commencement or prosecution of the Chapter 11 Cases, or (C) any failure of the Company to pay principal or interest when due under the Term Loan Agreement or the Indenture, other than any payment of interest that the Company is either permitted or required to make as adequate protection pursuant to the order approving the DIP Facility;

(11)    the occurrence of a Material Adverse Effect on or after the Agreement Effective Date.  As used herein, the term "**Material Adverse Effect**" means the occurrence of a change, effect, event, occurrence, development, circumstance or state of facts that, either alone or in combination, has had or would reasonably be expected to have a materially adverse effect on the business, properties, operations, financial condition, assets, liabilities, prospects or results of operations of the Company taken as a whole, or which would or would reasonably be expected to materially impair the ability of the Company to perform its obligations under this Agreement or the Plan, which would have or would reasonably be expected to have a materially adverse effect on or prevent or materially delay the consummation of the Transaction; provided, however, that in no event shall the public announcement of this Agreement or the Plan, the pursuit of the Marketing Process or Auction, the commencement or prosecution of the Chapter 11 Cases, the pursuit of confirmation or consummation of the Plan, or the Company's compliance with its obligations and covenants hereunder, be taken into account in determining whether there has been, or would reasonably be expected to be, a Material Adverse Effect for purposes of this Agreement;

(12)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $250,000; provided that any modification of the automatic stay (A) provided by an order approving the DIP Facility that relates to the DIP Facility or authorizing the Company's use of cash collateral in connection with the DIP Facility or (B) to the extent reasonably necessary to permit the Company's employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum (and the filing of such claims) shall not constitute a termination event;

(13)    the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of a material executory contract or unexpired lease other than in accordance with this Agreement or the Plan or as otherwise approved in writing by the Majority Consenting Debtholders;

(14)    the commencement of an avoidance action or other legal proceeding by the Company to challenge the validity, enforceability or priority of any of the Indenture Obligations or the Term Loan Obligations or any of the liens on or security interests in

14

any of the assets or properties of the Company that secure any of the Indenture Obligations or the Term Loan Obligations;

      (15)    the termination of, or occurrence of an "event of default" (as defined in the applicable agreement) under, the DIP Facility or any commitment or agreement to provide exit financing to the Company to the extent permitted hereunder, which shall not have been cured within any applicable grace periods or waived pursuant to the terms of the applicable agreement governing the DIP Facility or exit financing;

      (16)    the termination of, or occurrence of an "event of default" (as defined in the applicable order or agreement) under, any order or agreement permitting the use of cash collateral to the extent permitted hereunder, which shall not have been cured within any applicable grace periods or waived pursuant to the terms of such order or agreement;

      (17)    except as contemplated by the Bidding Procedures, the termination of any purchase or investment agreement or other transaction document entered into with any stalking horse bidder or Winning Bidder or, subject to the expiration of any applicable cure periods, the occurrence of any breach, violation, event or matter that provides a stalking horse bidder or Winning Bidder (as applicable) with the right to terminate such agreement or document;

      (18)    the failure to satisfy, other than as a result of the intentional act of any Consenting Debtholder or the breach by a Consenting Debtholder of its obligations hereunder, any of the conditions to effectiveness set forth in the Plan by the deadlines set forth in the Plan unless otherwise waived in accordance with the terms of the Plan;

      (19)    the Bankruptcy Court grants relief that would, or would be reasonably expected to, frustrate the purpose of this Agreement, including, without limitation, by preventing the consummation of the Transaction;

      (20)    the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction or other decree or taken any other action, in each case, which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the implementation of the Transaction;

      (21)    any court of competent jurisdiction shall enter a final, non-appealable judgment or order declaring this Agreement or any material provision contained herein to be unenforceable; or

      (22)    the occurrence of any of the following events:

      (a)    the Chapter 11 Cases shall not have been commenced and First Day Motions filed on or prior to June 15, 2013 (the date of commencement of the Chapter 11 Cases, the "**Filing Date**");

      (b)    a motion shall not have been filed with the Bankruptcy Court within one (1) day of the Filing Date seeking approval of the DIP Facility;

15

(c)      an order approving the DIP Facility on an interim basis (which order shall be in form and substance reasonably acceptable to the Majority Consenting Debtholders) shall not have been entered by the Bankruptcy Court on or prior to a date that is five (5) days after the Filing Date;

(d)      the Plan and a motion seeking entry of an order approving the Disclosure Statement shall not have been filed with the Bankruptcy Court on or prior to a date that is fourteen (14) days after the Filing Date;

(e)      an order approving the Bidding Procedures shall not have been entered by the Bankruptcy Court on or prior to a date that is twenty-one (21) days after the Filing Date;

(f)      the Auction (if any) shall not have occurred on or prior to a date that is thirty (30) days after entry of the order approving the Bidding Procedures;

(g)      an order approving the DIP Facility on a final basis (which order shall be in form and substance reasonably acceptable to the Majority Consenting Debtholders) shall not have been entered by the Bankruptcy Court on or prior to a date that is thirty-five (35) days after the Filing Date;

(h)      (A) if the Plan Transaction is to be consummated, an order approving the Disclosure Statement (the "**Disclosure Statement Order**") shall not have been entered by the Bankruptcy Court on or prior to a date that is sixty (60) days after the Filing Date, or (B) if a Sale Transaction is to be consummated, the Disclosure Statement Order shall not have been entered by the Bankruptcy Court on or prior to a date that is eighty-five (85) days after the Filing Date;

(i)      solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, as applicable, shall not have commenced on or prior to a date that is five (5) days after entry of the Disclosure Statement Order;

(j)      (A) if the Plan Transaction is to be consummated, an order confirming the Plan shall not have been entered by the Bankruptcy Court on or prior to a date that is one hundred (100) days after the Filing Date, or (B) if a Sale Transaction is to be consummated, an order confirming the Plan shall not have been entered by the Bankruptcy Court on or prior to a date that is one hundred and twenty-five (125) days after the Filing Date; and

(k)      (A) if the Plan Transaction is to be consummated, the effective date of the Plan shall not have occurred and/or the Company shall not have obtained any and all required regulatory and/or third-party approvals for the Transaction (if any and to the extent such approvals are not overridden by the Bankruptcy Code) on or prior to a date that is one hundred fifteen (115) days after the Filing Date, or (B) if a Sale Transaction is to be consummated, the effective date of the Plan shall not have occurred and/or the Company shall not have obtained any and all required regulatory and/or third-party approvals for the

16

Transaction (if any and to the extent such approvals are not overridden by the Bankruptcy Code) on or prior to a date that is one hundred and forty (140) days after the Filing Date.

          d.      If this Agreement is terminated pursuant to this <u>Section 6</u>, any and all further obligations of the Parties hereunder shall be terminated without further liability except as provided in <u>Section 26</u> herein; <u>provided</u>, <u>however</u>, that each Party shall have all rights and remedies available to it under the Indenture, the other Note Documents, the Term Loan Agreement or the other Loan Documents and applicable law.  If this Agreement may be terminated at a time when permission of the Bankruptcy Court is required for a Consenting Debtholder to terminate, or cause the termination of, this Agreement, the Company shall not oppose any attempt by such Consenting Debtholder to terminate, or cause the termination of, this Agreement at such time so long as the respective Consenting Debtholder has complied with the provisions of this <u>Section 6</u>.  Furthermore, if this Agreement is terminated at a time when permission of the Bankruptcy Court is required for a Consenting Debtholder to change, revoke or withdraw, or cause to change, revoke or withdraw, its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Debtholder to change, revoke or withdraw, or cause to change, revoke or withdraw, such vote at such time so long as such Consenting Debtholder has complied with the provisions of this <u>Section 6</u>.  The Consenting Debtholders shall have no liability to the Company in respect of any termination of this Agreement pursuant to and in accordance with the terms and conditions of this <u>Section 6</u>.

          e.      Notwithstanding anything to the contrary in this Agreement, (i) no termination of this Agreement shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination and (ii) the right to terminate this Agreement under this <u>Section 6</u> shall not be available to any Party whose failure to fulfill any of its material obligations under this Agreement has been the cause of, or resulted in, the occurrence of the proposed termination event.

          f.      Notwithstanding anything to the contrary herein, any right to terminate this Agreement as to the Consenting Debtholders may be exercised only by the Majority Consenting Debtholders on behalf of all Consenting Debtholders, and may not be exercised by one or more individual Consenting Debtholders not constituting the Majority Consenting Debtholders.

          7.      <u>Representations of the Company</u>

          The Company hereby jointly and severally represents and warrants to the other Parties that the following statements are true and correct as of the date hereof:

          a.      <u>Due Organization and Good Standing</u>.  It is duly organized or formed, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization.

          b.      <u>Power and Authority</u>.  It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

17

c.      Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

d.      No Conflicts.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and will not (i) violate any order, edict, injunction, decree, law, statute, rule or regulation applicable to it, (ii) conflict with, result in a breach or violation of, or constitute (with due notice or lapse of time or both and exclusive of defaults relating to solvency and bankruptcy) a default under, or the creation of a right of acceleration of any obligations under or termination of, or require any action by (including any authorization, consent or approval) or notice to any person or entity with respect to, any material contractual obligation (other than this Agreement, the Indenture and Term Loan Agreement) to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents), other than approval of the board of directors of the Company (which approval has been obtained prior to the execution of this Agreement) or (iii) result in the creation of any lien or other encumbrance upon any properties or assets of the Company.

e.      Governmental Consents.   The execution and delivery of this Agreement and the performance of its obligations hereunder do not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than (i) the filing of a pre-merger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, including the rules and regulations promulgated thereunder (the "**HSR Act**"), which, to the extent required, will be made prior to the Filing Date and (ii) such filings as may be necessary or required in connection with the Chapter 11 Cases, the Plan or the Disclosure Statement.

f.      Binding Obligation.  This Agreement has been duly executed and delivered by the Company and is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

g.      No Litigation.  No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

h.      Representation.  It has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement, and has had the contents hereof fully explained by such counsel and is fully aware of such contents and legal effect.

18

8.    Representations of the Consenting Debtholders

Each of the Consenting Debtholders severally, but not jointly, represents and warrants to the other Parties that the following statements are true and correct as of the date hereof (or as of the date such Consenting Debtholder becomes a Party) with respect to itself only:

a.    Holdings by Consenting Debtholders.  It either (i) is the beneficial owner of the principal amount of Notes and Term Loans set forth on its respective signature page hereto or set forth on the Joinder executed by such Consenting Debtholder (as applicable), or (ii) has investment or voting discretion with respect to such Notes and Term Loans and has the power and authority to bind the beneficial owner(s) of such Notes and Term Loans to the terms of this Agreement.  It has full power and authority to vote on and consent to matters concerning such Notes and Term Loans with respect to this Agreement and the Transaction.

b.    Prior Transfers.  It has made no prior assignment, sale, grant, pledge, conveyance, or other transfer of, and has not entered into any agreement to assign, sell, grant, pledge, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in its Notes and Term Loans or its voting rights with respect thereto that are inconsistent with the representations and warranties of such Consenting Debtholder herein or would render such Consenting Debtholder otherwise unable to comply with this Agreement and timely perform its obligations hereunder.

c.    Power and Authority.  It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

d.    Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

e.    No Conflicts.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and will not (i) violate any order, edict, injunction, decree, law, statute, rule or regulation applicable to it, (ii) conflict with, result in a breach or violation of, or constitute (with due notice or lapse of time or both) a default under, or the creation of a right of acceleration of any obligations under or termination of, or require any action by (including any authorization, consent or approval) or notice to any person or entity with respect to, any material contractual obligation (other than this Agreement) to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents), or (iii) result in the creation of any lien or other encumbrance upon any properties or assets of such Consenting Debtholder.

f.    Governmental Consents.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and will not require such Consenting Debtholder to make or obtain any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than (i) such filings as may be necessary and/or required for disclosure by

19

the Securities and Exchange Commission, and (ii) such filings as may be necessary or required in connection with the Chapter 11 Cases.

g.    <u>Binding Obligation</u>.  This Agreement has been duly executed and delivered by such Consenting Debtholder and is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

h.    <u>No Litigation</u>.  No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

i.    <u>Representation</u>.  It has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement, and has had the contents hereof fully explained by such counsel and is fully aware of such contents and legal effect.

j.    <u>Accredited Investor</u>.  It (i) is a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in securities of the Company (including any securities that may be issued in connection with the Transaction), making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement, (ii) is an "accredited investor" within the meaning of Rule 501 of the Securities Act of 1933 (as amended) or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933 (as amended), (iii) is acquiring any securities that may be issued in connection with the Transaction for its own account and not with a view to the distribution thereof, and (iv) has obtained adequate information regarding the Transaction in advance of executing this Agreement.  Each Consenting Debtholder hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate and sufficient (for the avoidance of doubt, if a Consenting Debtholder is the investment manager or advisor for a beneficial owner, the foregoing confirmation applies to such Consenting Debtholder and not the beneficial owner).

20

9.      Additional Notes, Claims and Interests

This Agreement shall in no way be construed to preclude a Consenting Debtholder from acquiring additional Notes, Term Loans or other claims against or interests in the Company (collectively, the "**Additional Claims/Interests**").  However, so long as this Agreement has not been terminated as provided herein, in the event a Consenting Debtholder shall acquire any such Additional Claims/Interests after the date hereof (or holds such Additional Claims/Interests as of the date hereof), such Additional Claims/Interests shall automatically be deemed, without further notice to or action of any Party, to be subject to the terms and conditions of this Agreement.

10.      Transfer of Notes

Each Consenting Debtholder agrees that, until this Agreement has been terminated in accordance with Section 6, it will not, directly or indirectly, (i) sell, transfer, pledge, assign, hypothecate, grant an option on, or otherwise convey or dispose of any of its respective rights, title, or interests (including, without limitation, voting or consent rights) in the Notes, Term Loans or Additional Claims/Interests (and, in each case, claims on account thereof) (collectively, the "**Specified Debt Claims**"), unless such transferee or other recipient (x) is a Consenting Debtholder, or (y) has executed and delivered to the Company and Stroock a joinder, substantially in the form attached hereto as Exhibit C (a "**Joinder**"), pursuant to which (1) such transferee or other recipient agrees to become a Consenting Debtholder and be bound by all of the terms and conditions of this Agreement and (2) the transferor shall be deemed to relinquish its Notes and other applicable Specified Debt Claims (and be released from its obligations under this Agreement solely to the extent of such transferred Notes and other applicable Specified Debt Claims), or (ii) grant any proxies, deposit any of the Notes or other Specified Debt Claims into a voting trust or enter into a voting agreement with respect to any of the Notes or other Specified Debt Claims (collectively, a "**Debt Claim Transfer**").  Any Debt Claim Transfer that does not comply with the foregoing shall be deemed void *ab initio* and of no force or effect.  No Consenting Debtholder (including in its capacity as a Term Loan Lender) shall have any liability under this Agreement arising from or related to the failure of its permitted transferee to comply with the terms of this Agreement.

11.      Prior Negotiations

This Agreement sets forth in full the terms of agreement between the Parties and is intended as the full, complete and exclusive contract governing the relationship between the Parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect thereto; provided, however, that (a) any confidentiality agreement between or among the Company and any Consenting Debtholder shall remain in full force and effect in accordance with its terms and (b) the Indenture, all other Note Documents, the Term Loan Agreement, all other Loan Documents (as defined in the Term Loan Agreement) and any security interest, lien or collateral securing the Indenture Obligations and Term Loan Obligations shall remain in full force and effect in accordance with their respective terms.

12.    <u>Amendment or Waiver</u>

No waiver, modification or amendment of the terms of this Agreement shall be valid unless such waiver, modification or amendment is in writing and has been signed by the Company and the Majority Consenting Debtholders, <u>provided</u>, <u>however</u>, that (i) any term or provision of this Agreement that may require the consent or approval of all Consenting Debtholders shall require, as applicable, the written consent or approval of all Consenting Debtholders to waive, amend or modify such term or provision and (ii) any term or provision of this Agreement that may require the consent of the Supermajority Consenting Debtholders shall require, as applicable, the written consent or approval of the Supermajority Consenting Debtholders to waive, amend or modify such term or provision.  No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver. Any amendment or modification of this <u>Section 12</u> shall require the written consent of the Company and all Consenting Debtholders.  In determining whether any consent or approval has been given or obtained by the Majority Consenting Debtholders, Supermajority Consenting Debtholders and/or all Consenting Debtholders, as applicable, each then existing Consenting Debtholder (and the respective Notes held by such Consenting Debtholder) that is in material breach of its covenants, obligations or representations under this Agreement shall be excluded from such determination.

13.    **<u>WAIVER OF JURY TRIAL</u>**

**EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE EXHIBITS ATTACHED HERETO.**

14.    <u>Governing Law and Consent to Jurisdiction and Venue</u>

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the United States District Court for the Southern District of New York and only to the extent such court lacks jurisdiction, in the New York State Supreme Court sitting in the Borough of Manhattan, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the jurisdiction of such courts, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to jurisdiction and venue, upon any commencement of the Chapter 11 Cases and until the effective date of the Plan, each of the Parties agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

22

15.     <u>Specific Performance</u>

It is understood and agreed by the Parties that, without limiting any rights or remedies available under applicable law or in equity, money damages would not be a sufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach without the necessity of proving the inadequacy of damages as a remedy, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

16.     <u>Reservation of Rights; Settlement Discussions</u>

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner, waive, limit, impair or restrict the ability of each Consenting Debtholder to protect and preserve its rights, remedies and interests, including its claims against the Company. Except as expressly provided herein or in the Plan, nothing in this Agreement or the Plan shall be, or shall be deemed to be or constitute, a/an: (1) release, waiver, novation, cancellation, termination or discharge of (i) the Notes (or any of the other Indenture Obligations) or any security interest or lien securing such Notes (or any of the other Indenture Obligations), (ii) the Term Loan (or any Term Loan Obligations) or any security interest or lien securing such Term Loan (or any of the Term Loan Obligations), or (iii) the Company, any guarantor or any other person or entity party to any guarantee from their respective requirements and obligations to pay in full in cash the Notes (and all of the other Indenture Obligations) pursuant to the terms and conditions of the Indenture and the Term Loan (and all of the other Term Loan Obligations) pursuant to the terms and conditions of the Credit Agreement; or (2) amendment, modification or waiver of any term or provision of (A) the Indenture or any of the other Note Documents or (B) the Term Loan Agreement and all other Loan Documents (as defined in the Term Loan Agreement), which are hereby reserved and reaffirmed in full. If this Agreement is terminated for any reason, the Parties fully reserve any and all of their respective rights and remedies under the Indenture, the other Note Documents, the Term Loan Agreement, all other Loan Documents (as defined in the Term Loan Agreement), and applicable law.

This Agreement and the Transaction are part of a proposed settlement of a dispute among the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

17.     <u>Headings; Recitals</u>

The section headings of this Agreement are for convenience of reference only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement. The recitals to this Agreement are true and correct and incorporated by reference into this <u>Section 17</u>.

23

18.    Notice

Any notices or other communications required or permitted under, or otherwise in connection with, this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger or if duly deposited in the mails, by certified or registered mail, postage prepaid-return receipt requested, or if sent by facsimile or electronic (e-mail) transmission, upon receipt of confirmation that such transmission has been received, to the following addresses, facsimile numbers or e-mail addresses, or such other addresses, facsimile numbers or e-mail addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the Company:

OnCure Holdings, Inc.
188 Inverness Drive West, Suite 650
Englewood, Colorado 80112
Attn: Bradford C. Burkett, Chief Executive Officer
Email:  brad@mppartnersllc.com

- and   -

OnCure Holdings, Inc.
188 Inverness Drive West, Suite 650
Englewood, Colorado 80112
Attn: Timothy A. Peach, Chief Financial Officer
Email:  tpeach@oncure.com
Facsimile: 303-643-6528

with a copy to:

Latham & Watkins LLP
505 Montgomery Street, Suite #2000
San Francisco, CA 94111
Attn: Scott Haber, Esq.
Email:  Scott.Haber@lw.com
Facsimile: 415-395-8095

- and   -

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attn: Paul Harner, Esq.
      Keith Simon, Esq.
Email:  Paul.Harner@lw.com
        Keith.Simon@lw.com

24

Facsimile: 212-751-4864


If to any Consenting Debtholder:

To the address (if any) specified on the signature page of this Agreement or in the Joinder (as applicable) for the applicable Consenting Debtholder

*with a copy to*:

Stroock & Stroock & Lavan, LLP
2029 Century Park East, Suite 1600
Los Angeles, California 90067
Attn: Frank A. Merola, Esq.
Email: fmerola@stroock.com
Facsimile: 310-407-6302

*with a copy to*:

Stroock & Stroock & Lavan, LLP
180 Maiden Lane
New York, New York 10038
Attn: Jayme T. Goldstein, Esq.
Email: jgoldstein@stroock.com
Facsimile: 212-806-6006

19.     Successors and Assigns, Several Obligations

Subject to Section 10, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto, without the prior written consent of the other Parties hereto, and then only to a Person who has agreed to be bound by the provisions of this Agreement. This Agreement is intended to and shall bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives. The agreements, representations and obligations of the Consenting Debtholders under this Agreement are several and not joint in all respects. Any breach of this Agreement by a Consenting Debtholder shall not result in liability for any other Consenting Debtholder.

20.     No Third-Party Beneficiaries

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives, and no other person or entity shall be a third party beneficiary hereof or shall otherwise be entitled to enforce any provision hereof.

25

21.    Counterparts

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Any Party may execute and deliver a counterpart of this Agreement by delivery by facsimile transmission or electronic mail of a signature page of this Agreement signed by such Party, and any such facsimile or electronic mail signature shall be treated in all respects as having the same effect as having an original signature.

22.    Acknowledgement; Not a Solicitation

This Agreement does not constitute, and shall not be deemed to constitute (i) an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934 (or any other federal or state law or regulation) or (ii) a solicitation of votes on the Plan for purposes of the Bankruptcy Code.  Each Consenting Debtholder's vote on the Plan shall not be solicited until it has received the Disclosure Statement.

23.    Disclosure; Publicity

a.    Not later than 9:00 a.m. New York City time on the business day following the Filing Date, subject to the provisions set forth in Section 23(b) below, the Company shall issue a press release disclosing the existence of this Agreement and the terms hereof (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the Filing Date with such redactions as may be requested by Stroock or the Majority Consenting Debtholders to maintain the confidentiality of the items identified in Section 23(b) below, in each case except as otherwise required by order of the Bankruptcy Court or applicable law, subpoena, order, or other legal process or regulation).  In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any Consenting Debtholder may, thereafter, publicly disclose the foregoing, including, without limitation, this Agreement (including all of its exhibits) (subject to the redactions called for by this Section 23) and the Company hereby waives any claims against the Consenting Debtholders arising as a result of such disclosure by a Consenting Debtholder in compliance with this Agreement.

b.    The Company shall submit drafts to the Consenting Debtholder Advisors of any press releases and public documents that constitute the disclosure of the existence or terms of this Agreement or the Plan or any amendment to the terms of this Agreement or the Plan at least two (2) business days prior to making any such disclosure, which such press releases and public documents shall be subject to the prior approval of the Majority Consenting Debtholders, such approval not to be unreasonably withheld or delayed.  Except as required by order of the Bankruptcy Court or applicable law, subpoena, order, or other legal process or regulation or otherwise permitted under the terms of any other agreement between the Company and a Consenting Debtholder, no Party or its advisors shall (i) use the name of such Consenting Debtholder in any public manner when identifying the parties to this Agreement or (ii) disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Debtholder), other than to the Consenting Debtholder Advisors and to the officers, directors, and advisors to the Company, the principal amount or percentage of any Notes, Term Loans or any

26

other securities of the Company held by any Consenting Debtholder, in each case, without such Consenting Debtholder's prior written consent; provided, however, that (x) if such disclosure is required by order of the Bankruptcy Court, or applicable law, subpoena, order, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Debtholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (y) nothing in this Agreement shall, or shall be deemed to, prohibit or limit the disclosure of the aggregate percentage or aggregate principal amount of Notes or Term Loans held by all the Consenting Debtholders collectively or the aggregate number of Consenting Debtholders party hereto.  Notwithstanding the provisions in this Section 23, (A) any Party may disclose the identities of the Parties in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof and (B) any Party may disclose, to the extent consented to in writing by a Consenting Debtholder, such Consenting Debtholder's identity and individual holdings.

24.    Relationship Among Parties

It is understood and agreed that no Consenting Debtholder (a) has any duty of trust or confidence in any form with the Company or any other Consenting Debtholder or (b) has or owes any other duties whatsoever to each other, and, except as expressly provided in this Agreement, there are no commitments among or between them, arising from or in connection with this Agreement.  In this regard, it is understood and agreed that any Consenting Debtholder may trade in the Notes (subject to the terms of the Indenture), Term Loans (subject to the terms of the Credit Agreement) or other debt or equity securities of the Company without the consent of any Party, subject to applicable securities laws and Sections 9 and 10 of this Agreement.  No Consenting Debtholder shall have any responsibility for any such trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Company and the Consenting Debtholders shall in any way affect or negate this understanding and agreement.

25.    No Strict Construction

Each Party acknowledges that it has received adequate information to enter into this Agreement, and that this Agreement has been prepared through the joint efforts of all of the Parties.  Neither the provisions of this Agreement nor any alleged ambiguity herein shall be interpreted or resolved against any Party on the ground that such Party's counsel drafted this Agreement, or based on any other rule of strict construction.

26.    Survival

Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, the agreements and obligations of the Parties in this Section 26, the first proviso set forth in Section 4(a), and in Sections 2, 6(d), 6(e), 11, 12, 13, 14, 15, 16, 18, 19, 20, 24, 25, 26, 28, 29

27

and 31 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

### 27.    Remedies Cumulative; No Waiver

All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.  The failure of any Party to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

### 28.    Severability

If any portion of this Agreement shall be held to be invalid, unenforceable, void or voidable, or violative of applicable law, the remaining portions of this Agreement so far as they may practicably be performed shall remain in full force and effect and binding on the Parties.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. Notwithstanding anything in the foregoing, if Section 6(c)(3) of this Agreement is held to be invalid, unenforceable, void or voidable, or violative of applicable law, the entire Agreement shall terminate immediately and all of the obligations of the Parties shall be of no further force or effect; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

### 29.    Time of Essence

Time is of the essence in the performance of each of the obligations of the Parties and with respect to all covenants and conditions to be satisfied by the Parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

### 30.    Additional Parties

Without in any way limiting the provisions hereof, additional Noteholders and Term Loan Lenders may elect to become Parties by executing and delivering to the Company and the Consenting Debtholders a Joinder.  Such additional Noteholders and Term Loan Lenders shall become a Party as a Consenting Debtholder in accordance with the terms of this Agreement.

28

31.    <u>Company's Fiduciary Duty</u>

Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or any director or officer of the Company (in such person's capacity as such) to take any action, or to refrain from taking any action, to the extent such person or entity determines, in good faith and based upon advice of legal counsel, that proceeding with such action or refraining from taking such action would be inconsistent with the exercise by such person or entity of its applicable fiduciary duties.  The Company represents and warrants to the Consenting Debtholders that, as of the Agreement Effective Date, the Company's entry into this Agreement is consistent with the fiduciary duties of each of the officers and directors of the Company.

32.    <u>Rules of Interpretation</u>

For purposes of this Agreement, unless otherwise specified:  (a) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) all references herein to "Articles", "Sections", and "Exhibits" are references to Articles, Sections, and Exhibits of this Agreement; and (c) the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Agreement in its entirety rather than to a particular portion of this Agreement.

*[Remainder of page intentionally left blank; signature page follows.]*

29

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**THE COMPANY:**

ONCURE HOLDINGS, INC.
ONCURE MEDICAL CORP.
CENTER FOR RADIATION ONCOLOGY OF TAMPA BAY, INC.
CHARLOTTE COMMUNITY RADIATION ONCOLOGY, INC.
COASTAL ONCOLOGY, INC.
ENGLEWOOD ONCOLOGY, INC.
FOUNTAIN VALLEY & ANAHEIM RADIATION ONCOLOGY CENTERS, INC.
INTERHEALTH FACILITY TRANSPORT, INC.
JAX PET, LLC
JAXPET/POSITECH, L.L.C.
MANATEE RADIATION ONCOLOGY, INC.
MICA FLO II, INC.
MISSION VIEJO RADIATION ONCOLOGY MEDICAL GROUP, INC.
POINTE WEST ONCOLOGY, LLC
RADIATION ONCOLOGY CENTER, LLC
SANTA CRUZ RADIATION ONCOLOGY MANAGEMENT CORP.
SARASOTA COUNTY ONCOLOGY, INC.
SARASOTA RADIATION & MEDICAL ONCOLOGY CENTER, INC.
U.S. CANCER CARE, INC.
USCC ACQUISITION CORP.
USCC FLORIDA ACQUISITION CORP.
USCC HEALTHCARE MANAGEMENT CORP.
VENICE ONCOLOGY CENTER, INC.


By: _____
Name: Bradford C. Burkett
Title:   Chief Executive Officer of OnCure Holdings, Inc.
          Authorized Person

**Exhibit J**

Restructuring Term Sheet

*RESTRUCTURING TERM SHEET*

**THIS TERM SHEET (THE "TERM SHEET") IS NOT AN OFFER WITH RESPECT TO, OR OF, ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. THE TRANSACTIONS DESCRIBED IN THIS SUMMARY ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION AND SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH THEREIN.**

This Term Sheet outlines certain material terms of a proposed restructuring for OnCure Holdings, Inc. ("**HoldCo**") and each direct and indirect, wholly-owned subsidiary of HoldCo (each a "**HoldCo Subsidiary**" and collectively the "**HoldCo Subsidiaries**," and together with HoldCo, the "**Company**"). Subject to the terms and conditions of the Investment Agreement (as defined below): (i) the terms of this Term Sheet will be effected pursuant to a joint plan of reorganization of the Company (the "**Plan**"), which will be consistent in all material respects with this Term Sheet; (ii) the Plan will be confirmed in the Company's voluntary reorganization cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") that was commenced on June 14, 2013 (the "**Filing Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"); and (iii) the Plan will be made effective on the date upon which all conditions precedent to the effectiveness of the Plan (as described herein) are satisfied or waived, as the case may be but in no event later than the End Date (as defined in the Investment Agreement) (the "**Effective Date**").

The Plan shall provide that Radiation Therapy Services, Inc. ("**RTS**") shall buy from reorganized HoldCo, and reorganized HoldCo shall issue and sell to RTS or its designated Affiliate (as defined in the Investment Agreement, dated as of June 22, 2013 (the "**Investment Agreement**")),[1] 100% of the shares of reorganized HoldCo's new common stock (the "**New Stock**"), par value $0.001 per share. Pursuant to the Investment Agreement, RTS will acquire all of the New Stock in exchange for a cash purchase price as set forth in the Investment Agreement and this Term Sheet. The Plan shall be subject to higher and better bids at an auction conducted pursuant to the Bidding Procedures (as defined in the Investment Agreement).

Reference is made to the following documents and obligations:

(i)        that certain Amended and Restated Credit Agreement, dated as of December 24, 2012 (as the same has been, and may be, amended, modified or supplemented from time to time, the "**Term Loan Agreement**"), among HoldCo, the HoldCo Subsidiaries party thereto, the lenders party thereto (the "**Term Loan Lenders**"), and Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, together with any successor agent, the "**Term Loan Agent**," and all claims and obligations arising under or in connection with the Term Loan Agreement and the other Loan Documents (as defined in the Term Loan Agreement), the "**Term Loan Obligations**"); and

(ii)        those certain $210.0 million in aggregate outstanding principal amount of 11 3/4% Senior Secured Notes due 2017 (collectively, the "**Notes**", and the holders thereof, the "**Noteholders**") issued by HoldCo pursuant to that certain Indenture, dated as of May 13, 2010 (as the same has been, and may be, amended, modified or supplemented from time to time, the "**Indenture**"), among HoldCo, the HoldCo Subsidiaries party thereto, and Wilmington Trust FSB, as trustee and collateral agent (in such capacities, together with any successor trustee, the "**Trustee**," and all claims and obligations arising under or in connection with the Indenture and the other Note Documents (as defined in the Indenture), the "**Indenture Obligations**").

Reference is also made to the following defined terms:

"**Amended Notes**" means the Notes reduced to the principal amount of $82,500,000 and otherwise as amended pursuant to the amended indenture to be negotiated consistent in all material respects with Exhibit L to the Investment Agreement (the "**Amended Indenture**").

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Investment Agreement.

"**Purchase Price**" shall have the meaning set forth in the Investment Agreement.

## SUMMARY OF PROPOSED TREATMENT[2]

Below is a summary of the proposed treatment to be received on the Effective Date from the Company (unless provided otherwise in the Plan) by holders of claims against, and interests in, the Company pursuant to the Plan.

## TREATMENT OF UNCLASSIFIED CLAIMS

| | |
|---|---|
| **DIP Facility Claims** | Each holder of an allowed claim arising under the DIP Facility (defined below) (each, a "**DIP Facility Claim**") shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such claim, payment in full in cash on the Effective Date. |
| **Administrative Claims** | Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) of the Bankruptcy Code, to the extent such claim has not already been paid during the Chapter 11 Cases (each, an "**Administrative Claim**"), shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Administrative Claim, either (A) payment in full in cash of the due and unpaid portion of its Administrative Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) , or (y) the date such claim becomes due and payable; (B) such other treatment to render such Administrative Claim unimpaired under section 1124 of the Bankruptcy Code; or (C) such other treatment permitted by section 1129(a)(9) of the Bankruptcy Code. |
| **Priority/Secured Tax Claims** | Each holder of an allowed claim described in sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, to the extent such claim has not already been paid during the Chapter 11 Cases (each, a "**Priority/Secured Tax Claim**"), shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Priority/Secured Tax Claim, either (A) payment in full in cash of the due and unpaid portion of its Priority/Secured Tax Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable), or (y) the date such claim becomes due and payable; (B) such other treatment to render such Priority/Secured Tax Claim unimpaired under section 1124 of the Bankruptcy Code; or (C) such other treatment permitted by section 1129(a)(9)(C) of the Bankruptcy Code. Allowed Priority/Secured Tax Claims due and payable as of the Effective Date shall be payable and paid from the Purchase Price or other cash of the Company on hand as of the Effective Date (or from a reserve established to the extent that such claims are disputed or are not yet due and payable as of the Effective Date). |

---

[2] Administrative Claims, Priority/Secured Tax Claims, Other Secured Claims and Other Priority Claims (each as defined below) due and payable as of the Effective Date shall be payable and paid from the Purchase Price or other cash of the Company on hand as of the Effective Date (or from a reserve established to the extent that such claims are disputed or are not yet due and payable as of the Effective Date). Notwithstanding anything to the contrary in the foregoing or otherwise in this Term Sheet, any and all Administrative Claims, Priority/Secured Tax Claims, Other Secured Claims and Other Priority Claims that are (i) included in Closing Working Capital or (ii) a fee, cost, expense, liability or obligation described in the second sentence of the definition of "Selling Expenses" in the Investment Agreement, shall be payable and paid by the reorganized Company (with cash of the reorganized Company) following the Effective Date.

Allowed Priority/Secured Tax Claims due and payable following the Effective Date shall be payable and paid by the reorganized Company (with cash of the reorganized Company) following the Effective Date; provided, however, that the accrued portion as of the Effective Date of Allowed Priority/Secured Tax Claims due and payable following the Effective Date shall be payable and paid from the Purchase Price (or from a reserve established to the extent that such claims are disputed or are not yet due and payable as of the Effective Date).

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

| CLASS | CLAIMS/INTEREST | IMPAIRMENT – VOTING RIGHTS |
| --- | --- | --- |
| 1 | **Other Secured Claims** | Unimpaired – Deemed to Accept |

Each holder of an allowed prepetition secured claim other than a Term Loan Obligation or an Indenture Obligation, to the extent such claim has not already been paid during the Chapter 11 Cases, (each, an "**Other Secured Claim**") shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such claim, either (A) payment in full in cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable), or (y) the date such claim becomes due and payable; (B) such other treatment to render such Other Secured Claim unimpaired under section 1124 of the Bankruptcy Code; or (C) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

| CLASS | CLAIMS/INTEREST | IMPAIRMENT – VOTING RIGHTS |
| --- | --- | --- |
| 2 | **Other Priority Claims** | Unimpaired – Deemed to Accept |

Each holder of an allowed claim described in section 507(a) of the Bankruptcy Code other than a DIP Facility Claim, Administrative Claim, or Priority/Secured Tax Claim, to the extent such claim has not already been paid during the Chapter 11 Cases (each, an "**Other Priority Claim**") shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such claim, either (A) payment in full in cash of the due and unpaid portion of its Other Priority Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) or (y) the date such claim becomes due and payable; (B) such other treatment to render such Other Priority Claim unimpaired under section 1124 of the Bankruptcy Code; or (C) such other treatment permitted by section 1129(a)(9) of the Bankruptcy Code.

| CLASS | CLAIMS/INTEREST | IMPAIRMENT – VOTING RIGHTS |
| --- | --- | --- |
| 3 | **Term Loan Obligations** | Unimpaired – Deemed to Accept |

Each holder of a Term Loan Obligation, to the extent such claim has not already been paid during the Chapter 11 Cases, shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such claim, payment in full in cash on the Effective Date (or as soon thereafter as reasonably practicable).

| CLASS | CLAIMS/INTEREST | IMPAIRMENT – VOTING RIGHTS |
| --- | --- | --- |
| 4 | **Indenture Obligations** | Impaired – Entitled to Vote |

The principal amount of the Notes shall be reduced on a pro rata basis to $82,500,000, the Indenture and the Notes shall be amended as set forth in the Amended Indenture and the Amended Notes, $7,500,000 of Amended Notes (the "**Escrowed Notes**", and the remaining $75,000,000 of Amended Notes, the "**Base Notes**") will be transferred to an escrow agent and held in escrow pending release to holders of Amended Notes upon satisfaction of the conditions contained in the related escrow agreement (the "**Notes Escrow Agreement**"), and each holder of an Indenture Obligation shall receive such holder's pro rata share of the Base Notes and each holder of Amended Notes will have the right to receive, upon satisfaction of the conditions contained in the Notes Escrow Agreement, its pro rata share of the Escrowed Notes. For the avoidance of doubt, interest accrued on the Escrowed Notes

3

while on deposit in the escrow account will be returned to the Company.  The obligations under the Amended Notes and the Amended Indenture will be guaranteed by Radiation Therapy Services Holdings, Inc., RTS and certain of RTS's subsidiaries, and certain of the HoldCo Subsidiaries, in each case, as set forth in the Term Sheet for the Amended Notes attached as Exhibit L to the Investment Agreement.  The Amended Notes will represent the same indebtedness as the Notes. In addition, each holder of an Indenture Obligation shall receive its pro rata share of the Purchase Price (including the Escrow Amount (as defined in the Investment Agreement)) plus the amount of the Company's cash on the balance sheet as of the Effective Date remaining after payment in full in cash of, or reserve for the payment in full in cash, in each case in accordance with this Term Sheet and the Plan: DIP Facility Claims, Administrative Claims, Priority/Secured Tax Claims, Other Secured Claims, Other Priority Claims and Term Loan Obligations, except to the extent that such claims are (i) included in Closing Working Capital or (ii) a fee, cost, expense, liability or obligation described in the second sentence of the definition of "Selling Expenses" in the Investment Agreement.

| 5 | **General Unsecured Claims** | Impaired – Deemed to Reject |

Each General Unsecured Claim[3] shall be extinguished without any distribution and such holders of General Unsecured Claims will receive no recovery on account of such claim.

| 6 | **Section 510(b) Claims** | Impaired – Deemed to Reject |

Claims arising under section 510(b) of the Bankruptcy Code (each, a "**510(b) Claim**") shall be extinguished without any distribution and such holders of 510(b) Claims will receive no recovery on account of such claim.

| 7 | **Intercompany Claims** | Unimpaired – Deemed to Accept |

There shall be no distributions on account of intercompany claims between and among Holdco and the Holdco Subsidiaries.  Notwithstanding the foregoing, the Plan shall reinstate, compromise, or otherwise treat in a tax efficient manner, as the case may be, the intercompany claims between and among Holdco and the Holdco Subsidiaries.

| 8 | **Existing Equity Interests in HoldCo** | Impaired – Deemed to Reject |

On the Effective Date, all outstanding Existing Equity Interests[4] in HoldCo shall be extinguished and cancelled, and the holders of Existing Equity Interests in Holdco will receive no recovery.

| 9 | **Existing Equity Interests in the HoldCo Subsidiaries** | Unimpaired – Deemed to Accept |

---

[3]  "**General Unsecured Claim**" means any claim against the Company that is (i) not secured pursuant to section 506(a) of the Bankruptcy Code, (ii) not subordinated pursuant to section 510 of the Bankruptcy Code, (iii) not entitled to priority under section 503(b) or section 507(a) of the Bankruptcy Code, (iv) not a claim on account of intercompany claims between or among  Holdco and the Holdco Subsidiaries, and (v) not an Indenture Obligation.

[4]  "**Existing Equity Interests**" shall include common stock, limited liability company interests and any other equity, ownership or profits interests, and options, warrants or other agreements to acquire common stock, limited liability company interests or other equity, ownership or profits interests (whether or not arising under or in connection with any employment agreement).

4

On the Effective Date, all Existing Equity Interests in each HoldCo Subsidiary that are owned by Holdco or another Holdco Subsidiary shall remain effective and outstanding and continue to be owned by reorganized HoldCo or the applicable HoldCo Subsidiary on the Effective Date pursuant to the Plan and the other Restructuring Documents.

### OTHER TERMS OF PROPOSED TRANSACTION

**Limited Substantive Consolidation……………**

Subject to the approval of the Consenting Debtholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes held by all Consenting Debtholders, the Plan may be predicated upon entry of an order substantively consolidating the estates of HoldCo and the HoldCo Subsidiaries for the limited purposes of voting and confirmation under the Plan, and not for any other purpose.

**New Stock ……………………………....………...**

All of the New Stock of reorganized HoldCo shall be issued to RTS or its designated subsidiaries on the Effective Date.

**Amended Notes …………...……….....................**

The Plan shall provide for reduction in the principal amount of the Notes on a pro rata basis to $82,500,000 and the amendment of the Indenture, consistent in all material respects with the terms set forth in the term sheet for the Amended Notes, attached as Exhibit L to the Investment Agreement.

**DIP Financing
and Use of Cash Collateral …………...………...**

On or after the Filing Date, the Company shall enter into a debtor in possession financing facility consistent in all material respects with Exhibit H to the Investment Agreement (the "**DIP Facility**").

**Releases & Exculpation …………………………**

The Restructuring Documents shall contain mutual customary releases and other exculpatory provisions in favor of the Company, and each of the following who consent to such releases: (a) the Term Loan Agent; (b) the Term Loan Lenders; (c) the Trustee; (d) the Consenting Debtholders; (e) Match Point Partners LLC; (f) RTS; (g) Vestar Capital Partners, Inc.; (h) Genstar Capital, LLC; and (i) each other holder of Existing Equity Interests in the Company; and each of their respective affiliates, subsidiaries and shareholders, and each of their respective current and former members, managers, professionals, directors and officers and other persons and entities, acceptable to the Company, the Majority Consenting Debtholders, and RTS (collectively, the "**Released Parties**").

**Injunction………………………………………..**

Customary injunction provisions, including all Released Parties.

5

| | |
|---|---|
| **Discharge** ……………………………………….. | Customary discharge provisions. |
| **D&O Liability Insurance Policies, Tail Policies and Indemnification**………………. | RTS shall, and the Company shall continue to, indemnify and hold harmless directors and officers of the Company that served in such capacity as of the Petition Date with respect to claims arising out of acts, omissions, or alleged acts or omissions that took place prior to the Effective Date, but only to the extent that (a) such acts, omissions or alleged acts or omissions were indemnifiable under the Company's prepetition organizational documents and (b) the otherwise indemnifiable expense, liability, or loss is determined not to be covered under the tail policy purchased by the Company prior to the Filing Date. |
| **Executory Contracts and Unexpired Leases** ….. | All executory contracts and unexpired leases to which the Company is a party shall be assumed or rejected in accordance with the terms and conditions of the Investment Agreement. |
| **Effective Date** ……………………………..….. | The date on which all of the conditions to effectiveness set forth in the Plan and the Investment Agreement have been satisfied or waived (in accordance with their terms) and the Plan is substantially consummated.  The Effective Date must occur on or prior to the End Date. |
| **Cancellation of Instruments, Certificates, and Other Documents**……………………………………… | On the Effective Date, except to the extent otherwise provided herein or in the Plan, all instruments, certificates, and other documents evidencing debt or equity interests in Holdco and the Holdco Subsidiaries, including any intercreditor agreement between the Term Loan Lenders and Noteholders (except the Existing Equity Interests in the Holdco Subsidiaries that are owned by HoldCo or another HoldCo Subsidiary, to the extent expressly reinstated by the Plan) shall be cancelled, and the obligations of Holdco and the Holdco Subsidiaries thereunder, or in any way related thereto, shall be discharged. |
| **Board of Directors of Reorganized HoldCo.** ..……… | The board of directors of reorganized HoldCo shall be designated by RTS not later than five (5) business days prior to the Confirmation Hearing. |
| **Employees of the Reorganized Company** ..………… | The terms and conditions of employment for the officers and directors of the reorganized Company shall be determined by RTS in its sole discretion; *provided*, however, that execution and delivery of employment agreements or other agreements relating to employment |

6

by any employees of the Company shall not be a condition to effectiveness of the Plan.

**Charter and Bylaws** ...………..……………..…… The charter and bylaws of each Debtor shall be amended and restated consistent with section 1123(a)(6) of the Bankruptcy Code and otherwise be in form and substance satisfactory to RTS.

**Exemption Under Section 1145 of the Bankruptcy Code** ..………………..…… The Plan shall provide that the issuance of any securities thereunder will be exempt from securities laws in accordance with section 1145 of the Bankruptcy Code.

**Resolution of Disputed Claims** ………………..…… The Plan shall provide for the resolution of disputed claims and any reserves therefor.

**Conditions Precedent** ……………..……………... The Plan shall contain customary conditions precedent to confirmation of the Plan and the Effective Date, including, among others:

(i) the Plan and Restructuring Documents shall be in form and substance consistent in all material respects with this Term Sheet and the Investment Agreement;

(ii) the Bankruptcy Court shall have entered an order confirming the Plan in form and substance consistent in all material respects with this Term Sheet and otherwise reasonably acceptable in all respects to the Company and RTS, and such order shall not have been stayed or modified or vacated on appeal;

(iii) all of the schedules, documents, supplements, and exhibits to the Plan shall be in form and substance consistent in all material respects with this Term Sheet and the Investment Agreement and reasonably acceptable to RTS;

(iv) all governmental approvals and consents, including Bankruptcy Court approval, that are legally required for the consummation of the Transaction shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect; and

(v) the Investment Agreement shall be in full force and effect.

**Purchase Price Adjustment/Consenting Debtholder Representative**…………………………………….. The Plan shall provide for the appointment of a Consenting Debtholder to represent the Consenting Debtholders in connection with any dispute regarding the calculation of the post-closing adjustment to the purchase

7

price under the Investment Agreement (the "Consenting Debtholders' Representative") consistent with the Investment Agreement.

The Plan shall include a reserve sufficient to pay any fees, costs and expenses of the Consenting Debtholders' Representative, including any legal, accounting and consultant fees incurred in connection with the discharge of its responsibilities under the Plan.

The Plan shall provide (i) that the Consenting Debtholders' Representative and its officers, directors, managers, employees, stockholders, members, partners, employers, advisors, attorneys, owners, agents and representatives (the "Representative Parties") shall not be liable to any party for any action taken or omitted to be taken by any Representative Party in its capacity as such, except for such actions taken or omitted to be taken resulting from any Representative Party's willful misconduct or gross negligence, and (ii) that an insurance policy shall be obtained (and paid for from the Purchase Price or other cash of the Company on hand as of the Effective Date) on behalf of the Representative Parties so as to indemnify the Representative Parties from all expenses, losses, claims, fines, liabilities, damages, judgments or settlements arising out of or relating to acts or omissions of such Representative Party in such capacity except for actions taken or omitted to be taken resulting from willful misconduct or gross negligence of any Representative Party.

**Other Terms and Conditions ……………………..**    The Restructuring Documents will contain such other terms and conditions as are reasonable or customary for transactions of this type and otherwise reasonably acceptable in all respects to RTS.

8

**<u>Plan Schedule 1</u>**

Non-Exclusive List of Litigation Claims

[To Be Filed With Plan Supplement]

**Plan Schedule 2**

New Board of Reorganized HoldCo

[To Be Filed With Plan Supplement]

**<u>Plan Schedule 3</u>**

Non-Released Parties

[To Be Filed With Plan Supplement]

**<u>Plan Schedule 4</u>**


Noteholders' Representative


[To Be Filed With Plan Supplement]

**Plan Schedule 5**

Non-Exclusive List of Rejected Executory Contracts and Unexpired Leases

[To Be Filed With Plan Supplement]

**<u>Plan Schedule 6</u>**

Causes of Action Preserved by the Debtor Releasing Parties

[To Be Filed With Plan Supplement]

**<u>Plan Schedule 7</u>**


Causes of Action Preserved by the Non-Debtor Releasing Parties


[To Be Filed With Plan Supplement]

**EXHIBIT B**


Disclosure Statement Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------- x

In re:                                                                :    Chapter 11
                                                                         :
ONCURE HOLDINGS, INC., et al.,                    :    Case No. 13-11540 (KG)
                                                                         :
            Debtors.[1]                                           :    Jointly Administered
                                                                         :
                                                                         :    **Re: Docket Nos. 121, 122, 269 & 271**

------------------------------------------------------------- x

**ORDER (A) APPROVING THE DISCLOSURE STATEMENT,**
**(B) ESTABLISHING THE VOTING RECORD DATE, VOTING DEADLINE**
**AND OTHER DATES, (C) APPROVING PROCEDURES FOR SOLICITING,**
**RECEIVING AND TABULATING VOTES ON THE PLAN AND FOR FILING**
**OBJECTIONS TO THE PLAN AND (D) APPROVING THE MANNER AND**
**FORMS OF NOTICE AND OTHER RELATED DOCUMENTS**

Upon the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in

possession (collectively, the "**Debtors**") for entry of an order, pursuant to 11 U.S.C. §§ 105(a),

1125, and 1126 and Rules 2002, 3003, 3017, 3018, and 3020 of the Federal Rules of Bankruptcy

Procedure, (a) approving the Disclosure Statement, (b) establishing the applicable voting record

dates, the Voting Deadline and other dates (a summary chart of which is attached hereto as Chart

A), (c) approving procedures for soliciting, receiving and tabulating votes on the Plan and for

filing objections to the Plan, (d) approving the manner and forms of notice and other related

---

[1]        The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471).  The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

[2]        Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

documents and (e) granting other relief relating thereto as set forth herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefore:

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.      The Disclosure Statement contains adequate information within the meaning of Bankruptcy Code Section 1125.

B.      The notices attached hereto as <u>Exhibits 1, 2, 4, 5, 6, and 7</u> (collectively, the "**Notices**") contain sufficient information and are appropriate under the circumstances.

C.      The form of the ballots attached hereto as <u>Exhibits 3-A and 3-B</u> (collectively, the "**Ballots**") (i) are sufficiently consistent with Official Form No. 14, (ii) adequately address the particular needs of these Chapter 11 Cases and (iii) are appropriate for the Class of Claims entitled under the Plan to vote to accept or reject the Plan.

D.      The time period set forth below during which the Debtors may solicit votes on the Plan is a reasonable period of time for creditors to make an informed decision as to whether to accept or reject the Plan.

E.      The procedures set forth below for the solicitation and tabulation of votes to accept or reject the Plan provide for a fair and equitable voting process and are consistent with Bankruptcy Code Section 1126.

F.      The procedures set forth below regarding the Confirmation Hearing Notice and the contents of the Solicitation Package comply with Bankruptcy Rules 2002 and 3017 and constitute sufficient notice to all interested parties.

**IT IS THEREFORE**:

1.      ORDERED that the Motion is granted in its entirety; and it is further

## I.      Approval of the Disclosure Statement

2.      ORDERED that, pursuant to Bankruptcy Rule 3017(b), the Disclosure Statement is approved as containing adequate information within the meaning of Bankruptcy Code Section 1125(a), and the Debtors are authorized to distribute the Disclosure Statement and Solicitation Package in order to solicit votes on, and pursue confirmation of, the Plan; and it is further

3.      ORDERED that the Disclosure Statement Notice attached hereto as Exhibit 1 is approved pursuant to Bankruptcy Rules 2002 and 3017; and it is further

4.      ORDERED that the notice and objection procedures provided in connection with the Disclosure Statement Hearing were reasonable and appropriate under the circumstances, and such notice and objection procedures were adequate pursuant to Bankruptcy Rule 3017; and it is further

## II.     Confirmation Hearing and Objections

5.      ORDERED that, pursuant to Bankruptcy Rule 3020(b)(2), the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") shall be on October 3, 2013 at 10:00 a.m. prevailing Eastern Time; and it is further

6.      ORDERED that, pursuant to Bankruptcy Rule 3020(b)(1), the deadline (the "**Confirmation Objection Deadline**") for filing and serving objections to confirmation of the Plan ("**Confirmation Objections**") shall be September 23, 2013 at 4:00 p.m. prevailing Eastern Time; and it is further

7.     ORDERED that the Confirmation Objections, if any, shall (a) be in writing, (b) comply with the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objector and the nature and amount of any claim or interest asserted by the objector against or in the Debtors, (d) state with particularity the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan that would resolve such objection, and (e) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so as to be **actually received** by each of the following parties (the "**Notice Parties**") on or before the Confirmation Objection Deadline:

> (a)    <u>Counsel to the Debtors</u>, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834 (Attn: Aaron M. Singer, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq.);

> (b)    <u>Counsel to the Ad Hoc Secured Noteholders Committee</u>, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038 (Attn: Jayme T. Goldstein, Esq.) and 2029 Century Park East, Los Angeles, California 90067 (Attn: Frank Merola, Esq.) and Young Conaway Stargatt & Taylor, LLP (Attn: Edmon L. Morton, Esq. and Matthew B. Lunn, Esq.);

> (c)    <u>Counsel to the Prepetition Secured Notes Indenture Trustee</u>, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004 (Attn: John R. Ashmead, Esq.); and

> (d)    <u>The Office of the United States Trustee for the District of Delaware</u>, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: David L. Buchbinder, Esq.).

and it is further

## III.     Establishment of Voting Record Date and Approving Procedures for Temporary Allowance of Claims that are Subject to an Objection Filed by the Debtors

8.     ORDERED that, pursuant to Bankruptcy Rule 3017(d), August 14, 2013 shall be the voting record date (the "**Securities Voting Record Date**") with respect to the Prepetition Secured Notes and Old HoldCo Interests (collectively, the "**Securities**") and August 21, 2013

shall be the voting record date (the "**Non-Securities Voting Record Date**" and together with the Securities Voting Record Date, the "**Voting Record Date**") with respect to all other Claims and Equity Interests (*i.e.*, those in Classes 1, 2, 3, 4, 6, 7 and 9). The Debtors shall use the applicable Voting Record Date for determining which (a) creditors are entitled to receive Solicitation Packages, (b) creditors are entitled to vote to accept or reject the Plan, and (c) non-voting creditors and equity interest holders are entitled to receive notice of the Confirmation Hearing; and it is further

9. ORDERED that any holder of a claim against the Debtors for which the Debtors have filed an objection on or before August 21, 2013, whether such objection related to the entire claim or a portion thereof, shall not be entitled to vote on the Plan and shall not be counted in determining whether the requirements of Bankruptcy Code Section 1126(c) have been met with respect to the Plan (except to the extent and in the manner as may be set forth in the objection) unless (a) the claim has been temporarily allowed for voting purposes pursuant to Bankruptcy Rule 3018(a) and in accordance with this Order or (b) on or before the Voting Deadline, the objection to such claim has been withdrawn or resolved in favor of the creditor asserting the claim; and it is further

10. ORDERED that a recipient of an objection to expunge or disallow its claim will receive a notice of non-voting status (the "**Notice of Non-Voting Status: Disputed Claims**"), substantially in the form of Exhibit 2 attached hereto; and it is further

11. ORDERED that September 19, 2013 at 4:00 p.m. prevailing Eastern Time (the "**Rule 3018(a) Motion Deadline**") shall be the deadline for the filing and serving of any motion requesting temporary allowance of a movant's claim for purposes of voting pursuant to Bankruptcy Rule 3018(a) (the "**Rule 3018(a) Motion(s)**"); and it is further

12.     ORDERED that Rule 3018(a) Motions must be filed with the Bankruptcy Court and served on undersigned counsel and the other Notice Parties so as to be <u>actually received</u> not later than the Rule 3018(a) Motion Deadline; and it is further

13.     ORDERED that any party timely filing and serving a Rule 3018(a) Motion shall be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan, if such party is in a voting class.  If, and to the extent that, the Debtors and such party are unable to resolve the issues raised by the Rule 3018(a) Motion prior to the Voting Deadline, then at the Confirmation Hearing this Court shall determine whether the provisional ballot should be counted as a vote on the Plan; and it is further

14.     [intentionally deleted]

**IV.     <u>Approval of Solicitation Procedures</u>**

A.     <u>Duties of Voting and Claims Agent</u>

15.     ORDERED that the Voting and Claims Agent shall assist the Debtors in, among other things, (a) mailing Confirmation Hearing Notices to holders of claims in Non-Voting Classes and other non-voting parties entitled to notice, (b) mailing Solicitation Packages, (c) soliciting votes on the Plan, (d) receiving, tabulating, and reporting on ballots cast for or against the Plan by holders of claims against the Debtors, (e) responding to inquiries from creditors and stakeholders relating to the Plan, the Disclosure Statement, the ballots and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan, and (f) if necessary, contacting creditors regarding the Plan and their ballots; and it is further

B.    <u>Notices and Ballots</u>

16.    ORDERED that the Notices and Ballots to be used in connection with the solicitation of votes on, and confirmation of, the Plan (as applicable) are hereby approved in full; and it is further

17.    ORDERED that all Ballots sent to the holders of the Prepetition Secured Notes Claims shall be accompanied by pre-addressed, postage prepaid return envelopes addressed to either (a) the Intermediary Record Owner (as defined below) or (b) if the ballot is pre-validated or the Prepetition Secured Notes Claims are held by the Registered Record Owner (as defined below), the Voting and Claims Agent; and it is further

18.    ORDERED that Administrative Claims, DIP Facility Claims, Priority Tax Claims and Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 3 (Secured Tax Claims) and Class 4 (Prepetition Term Loan Claims), and Equity Interests in Class 9 (Old Affiliate Interests in any HoldCo Subsidiary) are deemed Unimpaired Claims and, thus, the Holders of such Unimpaired Claims are conclusively presumed to accept the Plan pursuant to Bankruptcy Code Section 1126(f), and the Debtors are not required to solicit their vote with respect to such Unimpaired Claims.  Claims in Class 7 (Intercompany Claims) are deemed Impaired Claims but the Holders of such Class 7 Claims are nevertheless presumed to accept the Plan.  Accordingly, the Debtors are not required to solicit their vote; and it is further

19.    ORDERED that the Debtors shall not be obligated to deliver Solicitation Packages or ballots to Holders of Unimpaired Claims or Holders of Intercompany Claims in Class 7.  Rather, in lieu thereof and in accordance with Bankruptcy Rule 3017(d), the Debtors shall mail to the Holders of Unimpaired Claims a notice, substantially in the form of <u>Exhibit 4</u> attached hereto (the "**<u>Unimpaired Claims Notice</u>**") and to the Holders of Intercompany Claims

in Class 7 a notice, substantially in the form of Exhibit 5 attached hereto (the "**Non-Voting Status Notice: No Recovery**"); and it is further

20.    ORDERED that, because Holders of Claims in Class 6 (General Unsecured Claims) and Equity Interests in Class 8 (Old HoldCo Interests) do not retain or receive any property under the Plan, such Holders are, therefore, deemed to reject the Plan pursuant to Bankruptcy Code Section 1126(g).  The Holders of such Claims shall receive the Solicitation Packages (other than a ballot and the Plan Supplement) as provided in paragraph 26 below and a Non-Voting Status Notice: No Recovery.  In lieu of sending Solicitation Packages to Holders of such Equity Interests, the Debtors shall mail to such Holders a Non-Voting Status Notice: No Recovery; and it is further

21.    ORDERED that the Debtors shall not be required to deliver ballots or Solicitation Packages to counterparties to the Debtors' executory contracts and unexpired leases who do not have scheduled Claims or Claims based upon filed Proofs of Claim.  Rather, in lieu thereof, and in accordance with Bankruptcy Rule 3017(d), the Debtors shall mail to the counterparties to the Debtors' executory contracts and unexpired leases a notice, substantially in the form of Exhibit 6 attached hereto (the "**Contract/Lease Notice**"); and it is further

22.    ORDERED that nothing in this Order shall be deemed to amend or alter the Cure Claim Procedures Order; and it is further

C.    Content and General Transmittal of Solicitation Packages; Notice of Confirmation Hearing

23.    ORDERED that the Debtors are authorized to transmit, or cause to be transmitted, on or before August 26, 2013 (the "**Solicitation Mailing Date**"), to the persons listed below in paragraphs 26 and 27, subject to the limitations contained therein and elsewhere in this Order, by United States mail, first-class postage prepaid, personal service, or overnight delivery, a

SF\5611903.3

solicitation package (the "**Solicitation Package**") containing a CD-ROM or printed version of the following:

    (a)    the Confirmation Hearing Notice, substantially in the form attached hereto as Exhibit 7;

    (b)    the Disclosure Statement;

    (c)    the Plan (which may be furnished in the Solicitation Package as Exhibit A to the Disclosure Statement);

    (d)    the Disclosure Statement Order (without exhibits attached);

    (e)    a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Class to vote to accept the Plan; and

    (f)    to the extent applicable, a ballot and/or notice, appropriate for the specific creditor, in substantially the forms attached to this Order (as may be modified for particular classes and with instruction attached thereto). For the avoidance of doubt, the Solicitation Packages distributed to Holders of Claims in Class 6 will not include a ballot or the Plan Supplement;

and it is further

24.    ORDERED that the Debtors shall file the Plan Supplement with the Court on or before September 13, 2013 (the "**Exhibit Filing Date**"), which filing is without prejudice to the Debtors' rights to amend or supplement the Plan Supplement; and it is further

25.    ORDERED that the Plan Supplement shall be made available in accordance with the procedures set forth in paragraphs 26 and 53 of this Order; and it is further

26.    ORDERED that the Debtors shall provide copies of the Solicitation Package (other than a ballot) and the Plan Supplement (with the exception noted below for Holders of Class 6 Claims) to (a) the Office of the United States Trustee; (b) counsel to the DIP Facility Agent; (c) counsel to the Prepetition Term Loan Agent; (d) counsel to the Ad Hoc Secured Noteholders Committee; (e) counsel to the Prepetition Secured Notes Indenture Trustee; (f) the Stock Transfer Agent (as defined below); (g) counsel to the Investor; (h) the Internal Revenue

Service; (i) all parties that have filed requests for notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the date of mailing the Solicitation Package or filing the Plan Supplement (as applicable); and (j) Holders of Claims in Class 6 whose Claims are scheduled in the Schedules or who have filed Proofs of Claim on or before September 12, 2013; provided that, with respect to Holders of Class 6 Claims, the Plan Supplement will be made available only in accordance with paragraph 53 and the Solicitation Packages will include a Non-Voting Status Notice: No Recovery in lieu of a ballot; and it is further

27.     ORDERED that the Debtors shall provide Solicitation Packages to creditors who are holding Claims in Class 5 (with exclusions as noted herein) and are entitled to vote on the Plan because such creditors (i) have timely filed Proofs of Claim (or filed untimely Proofs of Claim which have been allowed as timely by the Court under applicable law on or before the applicable Voting Record Date) that have not been disallowed by an order of the Court entered on or before the applicable Voting Record Date or (ii) hold claims which are scheduled in the Schedules, other than those scheduled, in whole or part, as (x) unliquidated, contingent, or disputed or (y) zero or unknown in amount; and it is further

28.     ORDERED that creditors who have filed duplicate claims shall be entitled to receive only one Solicitation Package and shall be allowed one ballot for voting their claims with respect to that class; and it is further

29.     ORDERED that the Debtors shall provide the Confirmation Hearing Notice to all parties that received the Disclosure Statement Notice, and to parties to executory contracts and unexpired leases, which parties are not currently "creditors" as defined in Bankruptcy Code Section 101(10); and it is further

30.     ORDERED that the Debtors shall publish the Confirmation Hearing Notice on or prior to August 26, 2013 in the national edition of <u>The Wall Street Journal</u> and shall be authorized (but not required) to publish the Confirmation Hearing Notice in such trade or other local publications of general circulation as the Debtors shall determine; and it is further

31.     ORDERED that publication of the Confirmation Hearing Notice as described herein shall constitute sufficient notice of the Confirmation Hearing to persons who do not otherwise receive notice by mail as provided for in this Order; and it is further

D.     <u>Transmittal of Solicitation Packages to Holders of Contingent, Unliquidated, and Disputed Claims that are Not Subject to an Objection Filed by the Debtors</u>

32.     [intentionally deleted]

33.     [intentionally deleted]

E.     <u>Holders of Securities and Approval of Certain Transmittal Procedures</u>

34.     ORDERED that, pursuant to Bankruptcy Rule 3017(e), the Debtors shall transmit (a) the Solicitation Packages to holders of the Prepetition Secured Notes and (b) the Non-Voting Status Notice: No Recovery and Confirmation Hearing Notice to holders of Old HoldCo Interests by mailing or causing to be mailed such materials by the Solicitation Mailing Date to (x) the Registered Record Owner and (y) the Intermediary Record Owners.  The Debtors shall transmit to each Intermediary Record Owner one Solicitation Package for each Beneficial Holder represented by the Intermediary Record Holder as of the Securities Voting Record Date.  In addition, the Debtors shall distribute Master Ballots to the Intermediary Record Owner in accordance with customary procedures in the securities industry; and it is further

35.     ORDERED that the trustee and transfer agent for the Debtors' Securities, including, without limitation, the Prepetition Secured Notes Indenture Trustee and American Stock Transfer & Trust Company, LLC (the "**Stock Transfer Agent**"), on or before August 25,

2013, shall provide the Voting and Claims Agent with an electronic file containing the names, addresses, and holdings of the respective owners that hold the Securities in their own name (the "**Registered Record Owners**") as of the Securities Voting Record Date or, if they are unable to provide an electronic file, two sets of pressure-sensitive labels and a list containing the same information, and KCC is authorized to rely on the records of The Depository Trust Company ("**DTC**") for a listing of the banks, brokerage firms, or the agents thereof as the entity through which the Beneficial Holders (as defined below) hold the Securities (collectively, the "**Intermediary Record Owners**"), as of the Securities Voting Record Date; and it is further

36.    ORDERED that the Intermediary Record Owners shall distribute Solicitation Packages and notices to the respective beneficial holders of the Prepetition Secured Notes (the "**Beneficial Holders**"), as applicable, within five (5) business days of receiving the Solicitation Packages and notices; and it is further

37.    ORDERED that the Intermediary Record Owners shall follow either of the two following options, as such entities determine, to obtain the votes of the Beneficial Holders:

(a)    The Intermediary Record Owners may forward the Solicitation Package to the Beneficial Holders of the Prepetition Secured Notes for voting, which Solicitation Package shall include a Beneficial Holders Ballot substantially in the form of Exhibit 3-A attached hereto, and a return envelope provided by, and addressed to, the Intermediary Record Owner.  Under this option, the Intermediary Record Owners shall summarize the individual votes of their Beneficial Holders from the Beneficial Holders Ballots on a Master Ballot in substantially the form attached as Exhibit 3-B to this Order.  The Intermediary Record Owners shall then date and return the Master Ballot to the Voting and Claims Agent prior to the Voting Deadline; or

(b)    The Intermediary Record Owner may "pre-validate" a Beneficial Holders Ballot (a "**Prevalidated Ballot**") by signing that ballot and by indicating the following on that ballot: (a) the Intermediary Record Owner, (b) the principal amount of Prepetition Secured Notes owned by the applicable Beneficial Holder, (c) and the appropriate account numbers through which the Beneficial Holder's holdings are derived.  The Intermediary Record Owner shall then forward the Solicitation Package, including the Prevalidated Ballot and a return envelope addressed to the Voting and

Claims Agent, to the Beneficial Holder for voting by such Beneficial Holder;

and it is further

38.    ORDERED that the Debtors are authorized (but not directed) to reimburse the Intermediary Record Owners for their reasonable, actual, and necessary out-of-pocket expenses incurred in performing the tasks described in the subparagraphs (a) and (b) of the preceding paragraph upon written request by such entities without further order or notice (subject to the Court's retaining jurisdiction to resolve any disputes over any request for reimbursement); and it is further

39.    ORDERED that the Debtors shall serve a copy of this Order on the Prepetition Secured Notes Indenture Trustee, the Stock Transfer Agent and each Intermediary Record Owner identified by the Debtors and the Voting and Claims Agent as an entity through which Beneficial Holders hold any of the Securities; and it is further

40.    ORDERED that, notwithstanding anything in this Order to the contrary, the Debtors shall not be required to send Solicitation Packages, individual solicitation materials or other notices to any of the following creditors or other parties in interest in the Chapter 11 Cases:

(a)    any creditor whose claim is based solely on amounts scheduled by the Debtors but whose claim already has been paid or satisfied in the full scheduled amount; provided, however, if, and to the extent that, any such creditor would be entitled to receive a Solicitation Package for any reason other than by virtue of the fact that its claim had been scheduled by the Debtors, then such creditor shall be sent a Solicitation Package in accordance with the procedures set forth herein;

(b)    any creditor who filed a Proof of Claim if the amount asserted in such Proof of Claim is less than or equal to the amount that has already been paid;

(c)    any Holder of a Claim that was disallowed in full by order of this Court; or

(d)     any person or entity to whom the Debtors mailed the Disclosure Statement Hearing Notice and received any such notices returned by the United States Postal Service marked "undeliverable as addressed," "moved - left no forwarding address," "forwarding order expired," or any similar reason, unless the Debtors have been informed in writing by such person of that person's new address;

and it is further

## V.     <u>Voting Deadline and Procedures for Vote Tabulation</u>

41.     ORDERED that 5:00 p.m. Prevailing Eastern Time on September 23, 2013 (the "**<u>Voting Deadline</u>**") is the last date and time by which ballots for accepting or rejecting the Plan must be received by the Voting and Claims Agent in order to be counted; and it is further

42.     ORDERED that, with respect to Class 5, any timely received ballot that contains sufficient information to permit the identification of the claimant and is cast as an acceptance or rejection of the Plan shall be counted and shall be deemed to be cast as an acceptance or rejection, as the case may be, of the Plan.  The foregoing general procedures shall be subject to the following exceptions:

(a)     If a Claim is deemed Allowed in accordance with the Plan, such Claim shall be Allowed for voting purposes in the deemed Allowed amount set forth in the Plan;

(b)     If a Claim for which a Proof of Claim has been timely filed is marked, in whole or in part, as contingent, unliquidated, or disputed, and that is not subject to an objection filed by the Debtors, then such Claim shall be temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00;

(c)     If a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, then such Claim shall be temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

(d)     If a Claim is not listed on the Schedules, or is scheduled at zero, in an unknown amount, or, in whole or in part, as unliquidated, contingent, or disputed, and a Proof of Claim was not (a) timely filed by the Claims Bar Date or (b) deemed timely filed by an order of the Bankruptcy Court prior to the Voting Deadline, then such Claim shall be disallowed for voting

14

purposes and for purposes of allowance and distribution pursuant to Bankruptcy Rule 3003(c);

(e)     If the Debtors have served and filed an objection to a Claim or any portion thereof, then such Claim shall be temporarily disallowed for voting purposes only and not for the purposes of the allowance or distribution, except to the extent and in the manner as may be set forth in the objection; and

(f)     Ballots cast in amounts in excess of their allowed amount will only be counted to the extent of the creditors' allowed Claim;

and it is further

43.     ORDERED that the following ballots shall not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

(a)     Any ballot received after the Voting Deadline unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such ballot;

(b)     Any ballot that is illegible or contains insufficient information to permit the identification of the claimant;

(c)     Any ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan;

(d)     Any ballot cast for a claim not listed on the Schedules, or scheduled at zero, in an unknown amount, or, in whole or in part, as unliquidated, contingent, or disputed, and for which no Proof of Claim was timely filed;

(e)     Any ballot that is properly completed, executed and timely filed, but (a) does not indicate an acceptance or rejection of the Plan, (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

(f)     Any ballot submitted by facsimile, telecopy or electronic mail;

(g)     Any unsigned ballot;

(h)     Any ballot sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), any indenture trustee, or the Debtors' financial or legal advisors; or

(i)     Any ballot not cast in accordance with the procedures approved in the Disclosure Statement Order;

SF\5611903.3

and it is further

44.    ORDERED that any duplicate ballot will only be counted once; and it is further

45.    ORDERED that, notwithstanding anything in this Order to the contrary, the ballot of any creditor who filed a Rule 3018(a) Motion in accordance with the procedures set forth in this Order shall not be counted for voting purposes, unless such creditor's claim is temporarily allowed by the Court after notice and a hearing or agreed to in writing by the Debtors; and it is further

46.    ORDERED that, notwithstanding Bankruptcy Rule 3018(a), whenever two or more ballots are cast which attempt to vote the same claim prior to the Voting Deadline, the last ballot received by the Voting and Claims Agent prior to the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede any prior ballots, provided, however, that where an ambiguity exists as to which ballot was the latest mailed, the Voting and Claims Agent reserves the right to contact the creditor and calculate the vote according to such voter's stated intent.[3]  This procedure is without prejudice to the Debtors' rights to object to the validity of the second ballot on any basis permitted by law and, if the objection is sustained, to count the first ballot for all purposes; and it is further

47.    ORDERED that claims splitting is not permitted and creditors who vote must vote all of their Claims within a particular class to either accept or reject the Plan; and it is further

48.    ORDERED that the following procedures for tabulating votes cast by Beneficial Holders of the Prepetition Secured Notes are hereby approved:

(a)    first, Intermediary Record Owners electing to use the Master Ballot voting process shall be required to retain for one year following the Effective

---

[3]    Likewise, if a Beneficial Holder submits more than one Beneficial Holder Ballot to its Intermediary Record Owner, (i) the latest dated Beneficial Holder Ballot received before the submission deadline imposed by the Intermediary Record Owner shall be deemed to supersede any prior Beneficial Holder Ballots submitted by the Beneficial Holder; and (ii) the Intermediary Record Owner shall complete the Master Ballot accordingly.

SF\5611903.3

Date, for inspection by the Court, the Beneficial Holders Ballots cast by Beneficial Holders, and that Intermediary Record Owners electing to send Prevalidated Ballots to Beneficial Holders for direct return to the Voting and Claims Agent shall be required to retain for one year following the Effective Date, for inspection by the Court, a list of those Beneficial Holders to whom such Prevalidated Ballots were sent. The Voting and Claims Agent shall be required to retain for one year following the Effective Date, for inspection by the Court, the Prevalidated Ballots returned by the Beneficial Holders, as well as the Master Ballots returned by the Intermediary Record Owners;

(b)    second, (a) votes cast by Beneficial Holders holding Prepetition Secured Notes through Intermediary Record Owners and transmitted by means of a Master Ballot or Prevalidated Ballot shall be applied against the positions held by such Intermediary Record Owners with respect to such Prepetition Secured Notes as of the Securities Voting Record Date and (b) votes submitted by Prevalidated Ballot or by an Intermediary Record Owner on a Master Ballot shall not be counted to the extent that they are in excess of the position maintained by the respective Intermediary Record Owner in the Prepetition Secured Notes on the Securities Voting Record Date;

(c)    third, the following assumptions apply to Prevalidated Ballots: (a) each Prevalidated Ballot is for a single account, and (b) each vote is a separate vote and not duplicative of any other vote cast by other customers of such Intermediary Record Owner (unless specific evidence indicates that one vote is for the identical account number and amount of another vote);

(d)    fourth, to the extent that conflicting votes or overvotes are submitted on a timely received Master Ballot or Prevalidated Ballot, the Voting and Claims Agent shall attempt to resolve the conflict or overvote prior to the preparation of the vote certification;

(e)    fifth, to the extent that overvotes on a timely received Master Ballot or Prevalidated Ballot are not reconcilable prior to the preparation of the vote certification, the Voting and Claims Agent shall count votes in respect of such Master Ballot or Prevalidated Ballot in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or Prevalidated Ballot that contained the overvote, but only to the extent of the applicable Intermediary Record Owner's position on the Securities Voting Record Date in the Prepetition Secured Notes;

(f)    sixth, Intermediary Record Owners shall complete multiple Master Ballots, and the votes reflected by such multiple Master Ballots shall be counted except to the extent that they are duplicative of other Master Ballots. If two or more Master Ballots submitted are inconsistent in whole or in part, the latest Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior

Master Ballot, subject to the Debtors' rights to object to the validity of the second Master Ballot on any basis permitted by law, including under Bankruptcy Rule 3018(a), and, if such objection is sustained, the first Master Ballot will then be counted;

(g)     for purposes of tabulating votes, each Beneficial Holder shall be deemed (regardless of whether such holder includes interest in the amount voted on its Beneficial Holder Ballot) to have voted only the principal amount of its Prepetition Secured Notes, and any other accrued interest, fees or expenses shall not be included for purposes of tabulating votes;

(h)     finally, each Beneficial Holder of the Prepetition Secured Notes shall be deemed to have voted the full principal amount of its Prepetition Secured Notes Claims, notwithstanding anything to the contrary on any ballot;

and it is further

## V.     <u>Miscellaneous</u>

49.     ORDERED that the service of Solicitation Packages and other notices and documents described herein in the time and manner set forth in this Order constitutes adequate and sufficient notice of the Confirmation Hearing and no further notice is necessary; and it is further

50.     ORDERED that the Debtors are authorized to take all actions necessary to implement the relief granted in this Order; and it is further

51.     ORDERED that, notwithstanding any applicable Bankruptcy Rule, the terms and conditions of this Order shall be immediately effective and enforceable upon its entirety; and it is further

52.     ORDERED that this Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order; and it is further

53.     ORDERED that copies of the Plan and Disclosure Statement (including after the Exhibit Filing Date, the Plan Supplement) and all pleadings and orders of the Bankruptcy Court are publicly available, for a fee via PACER at: http://www.deb.uscourts.gov, or free of charge

from the Voting and Claims Agent at http://www.kccllc.net/OnCure.  Such documents and

pleadings may also be obtained by:  (i) calling the Debtors' restructuring hotline at (877) 634-

7166; (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/OnCure; and/or

(iii) writing to OnCure, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El

Segundo, California 90245.

Dated: _____, 2013
        Wilmington, Delaware

_____

THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

**Chart A**

**Summary Chart of Approved Dates and Deadlines**[1]

| Event | Date/Deadline |
|-------|---------------|
| Securities Voting Record Date | August 14, 2013 |
| Non-Securities Voting Record Date | August 21, 2013 |
| Solicitation Mailing Date | August 26, 2013 |
| Deadline to Publish Notice of Confirmation Hearing | August 26, 2013 |
| Exhibit Filing Date (Deadline to File Plan Supplement) | September 13, 2013 |
| Rule 3018(a) Motion Deadline | September 19, 2013 |
| Objection Deadline for Confirmation Hearing | September 23, 2013 |
| Voting Deadline | September 23, 2013 |
| Confirmation Hearing | October 3, 2013 |

---

[1]     To the extent of any conflict between the dates in this chart and those in the Order, the dates in the Order shall control.

# **EXHIBIT 1**

**Disclosure Statement Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x

In re:                            :     Chapter 11

                                   :

ONCURE HOLDINGS, INC., et al.,     :     Case No. 13-11540 (KG)

                                   :

          Debtors.[1]            :     Jointly Administered

                                   :

                                   :     **Hearing Date: August 21, 2013 at 10:30 a.m. (ET)**

-------------------------------------------------------- x     **Objection Deadline:  August 14, 2013 at 4:00 p.m. (ET)**

## NOTICE OF DISCLOSURE STATEMENT HEARING

**TO:**     **ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN, ONCURE HOLDINGS, INC. AND ITS AFFILIATE DEBTORS AND ALL OTHER PARTIES-IN-INTEREST IN THE ABOVE-CAPTIONED CHAPTER 11 CASES**

     **PLEASE TAKE NOTICE THAT** on July 17, 2013, OnCure Holdings, Inc. and its affiliate debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed their (i) Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. 120] (the "Plan") and (ii) Disclosure Statement for the Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. 121] (the "Disclosure Statement").[2]  The Debtors intend to promptly file a motion seeking entry of an order (i) approving the Disclosure Statement as containing "adequate information" pursuant to Bankruptcy Code Section 1125, (ii) establishing the Voting Record Date, Voting Deadline and other dates, (iii) approving procedures for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan, and (iv) approving the manner and forms of certain notices (the "Disclosure Statement Motion").

     **PLEASE TAKE FURTHER NOTICE THAT** a hearing will held before the Honorable Mary F. Walrath, United States Bankruptcy Judge, on **August 21, 2013 at 10:30 a.m. prevailing Eastern Time**, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Courtroom 4, Wilmington, Delaware 19801 (the "Disclosure Statement Hearing"), to consider the entry of an order approving the Disclosure Statement Motion.  Please be advised that the Disclosure Statement Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471).  The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

[2]     Capitalized terms used but not otherwise defined herein will have the meanings set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan or related documents, you should contact Kurtzman Carson Consultants LLC, the voting and claims agent retained by the Debtor in these chapter 11 cases, by: (i) calling the Debtors' restructuring hotline at (877) 634-7166; (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/OnCure; and/or (iii) writing to OnCure Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at http://www.kccllc.net/OnCure.

**PLEASE TAKE FURTHER NOTICE THAT** objections, if any, to the adequacy of the Disclosure Statement or the relief sought in connection therewith <u>must</u>: (i) be made in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware; (iii) state with particularity the legal and factual basis for the objection; and (iv) be filed with the Bankruptcy Court (contemporaneously with a proof of service), and be served upon the following parties (the "<u>Notice Parties</u>") so as to be **<u>actually</u> <u>received</u>** by each of them on or before **4:00 p.m. prevailing Eastern Time on August 14, 2013** (the "<u>Objection Deadline</u>"):

(a)    <u>Counsel to the Debtors</u>, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834 (Attn: Aaron M. Singer, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq.);

(b)    <u>Counsel to the Ad Hoc Secured Noteholders Committee</u>, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038 (Attn: Jayme T. Goldstein, Esq.) and 2029 Century Park East, Los Angeles, California 90067 (Attn: Frank Merola, Esq.) and Young Conaway Stargatt & Taylor, LLP (Attn: Edmon L. Morton, Esq. and Matthew B. Lunn, Esq.);

(c)    <u>Counsel to the Prepetition Secured Notes Indenture Trustee</u>, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004 (Attn: John R. Ashmead, Esq.); and

(d)    <u>The Office of the United States Trustee for the District of Delaware</u>, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: David L. Buchbinder, Esq.).

**PLEASE TAKE FURTHER NOTICE THAT** only those objections made in writing and timely filed and received by the Objection Deadline will be considered by the Bankruptcy Court during the Disclosure Statement Hearing. If no objections to the Disclosure Statement Motion are timely and properly filed and served in accordance with the procedures set forth herein, the Bankruptcy Court may enter an order granting the Disclosure Statement Motion without further notice.

Dated:    July 17, 2013
        Wilmington, Delaware

| **LATHAM & WATKINS LLP** | **RICHARDS, LAYTON & FINGER, P.A.** |
|---|---|
| Attn: Paul E. Harner | Attn: Daniel J. DeFranceschi |
| Attn: Keith A. Simon | Attn: Tyler D. Semmelman |
| Attn: Aaron M. Singer | One Rodney Square |
| Attn: Annemarie V. Reilly | 920 North King Street |
| 885 Third Avenue | Wilmington, Delaware 19801 |
| New York, New York 10022-4834 | Fax: 302-651-7701 |
| Fax: 212-751-4864 | |
| *Proposed Co-Counsel to the Debtors* | |

## __EXHIBIT 2__

**Notice of Non-Voting Status:  Disputed Claims**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
In re:                                      :    Chapter 11
                                            :
ONCURE HOLDINGS, INC., et al.,              :    Case No. 13-11540 (KG)
                                            :
              Debtors.¹                     :    Jointly Administered
------------------------------------------------------------ x
```

## NOTICE OF NON-VOTING STATUS TO HOLDERS OF CLAIMS
## FOR WHICH AN OBJECTION HAS BEEN FILED BY THE DEBTORS

**PLEASE TAKE NOTICE THAT** on August 22, 2013, OnCure Holdings, Inc. and its affiliate debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed their (i) Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. ___] (as may be amended from time to time, the "Plan") and (ii) Disclosure Statement for the Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. ___] (as may be amended from time to time, the "Disclosure Statement").²  On August 22, 2013, the Bankruptcy Court entered an order (i) approving the Disclosure Statement as containing "adequate information" pursuant to Bankruptcy Code Section 1125, (ii) establishing the Voting Record Date, Voting Deadline and other dates (iii) approving procedures for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan and (iv) approving the manner and forms of certain notices [Docket No. ___] (the "Disclosure Statement Order").

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the Holder of a Claim or Equity Interest that has timely filed a proof of claim (or an untimely proof of claim which has been allowed as timely by the Court under applicable law on or before the applicable Voting Record Date), which is subject, in whole or in part, to an objection filed by the Debtors.  As a result, you are not entitled to vote on the Plan for any purpose and you have not been sent a Solicitation Package or Ballot.  Provided that you are the Holder of a Claim in Class 5, if you disagree with the Debtors' classification or status of your Claim, then you MUST file with the Bankruptcy Court and serve upon the Notice Parties listed below, on or before 4:00 p.m. prevailing Eastern Time on September 19, 2013 (the "Resolution Deadline"), a motion requesting temporary allowance of your Claim solely for voting purposes in accordance with Bankruptcy Rule 3018 (such motion, the "Temporary Allowance Motion").

---

¹     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471).  The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

²     Capitalized terms used but not otherwise defined herein will have the meanings set forth in the Plan.

No later than three (3) Business Days after the filing and service of such Temporary Allowance Motion, the Voting and Claims Agent will send you a Solicitation Package, including the appropriate ballot, and a pre-addressed, postage pre-paid envelope, which you must then return your ballot according to the instructions attached thereto so it is **actually received** by the Voting and Claims Agent on or before September 23, 2013 (the "Voting Deadline").  Please be advised that the Debtors reserve all of their rights and objections regarding any and all Temporary Allowance Motions that may be filed with the Bankruptcy Court and that the distribution of a Solicitation Package is not and shall not constitute a waiver or release of such rights and objections.

**PLEASE TAKE FURTHER NOTICE THAT** the Confirmation Hearing to consider confirmation of the Plan will commence at **10:00 a.m. prevailing Eastern Time on October 3, 2013**, before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to Bankruptcy Code Section 1127, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **September 23, 2013 at 4:00 p.m. prevailing Eastern Time** (the "Plan Objection Deadline").  Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Plan Objection Deadline by the following parties (the "Notice Parties").  CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

<u>*Notice Parties*</u>

(a)  Counsel to the Debtors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834 (Attn: Aaron M. Singer, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq.);

(b)  Counsel to the Ad Hoc Secured Noteholders Committee, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038 (Attn: Jayme T. Goldstein, Esq.) and 2029 Century Park East, Los Angeles, California 90067 (Attn: Frank Merola, Esq.) and Young Conaway Stargatt & Taylor, LLP (Attn: Edmon L. Morton, Esq. and Matthew B. Lunn, Esq.);

(c)  Counsel to the Prepetition Secured Notes Indenture Trustee, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004 (Attn: John R. Ashmead, Esq.); and

(d)  The Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: David L. Buchbinder, Esq.).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a Solicitation Package (excluding Beneficial Owner Ballots and Master Ballots) or if you have questions regarding the procedures and requirements for objecting to the Plan, you may contact the Debtors' Voting and Claims Agent, Kurtzman Carson Consultants LLC, by:  (i) calling the Debtors' restructuring hotline at (877) 634-7166; (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/OnCure; and/or (iii) writing to OnCure Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at:  http://www.deb.uscourts.gov or free of charge at http://www.kccllc.net/OnCure.

THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS. THE PROVISIONS ARE SET FORTH AT THE END OF THIS NOTICE.  YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE.**

---

Wilmington, Delaware
[_____], 2013

---

| **LATHAM & WATKINS LLP** | **RICHARDS, LAYTON & FINGER, P.A.** |
|---|---|
| Attn:  Paul E. Harner | Attn: Daniel J. DeFranceschi |
| Attn:  Keith A. Simon | Attn:  Tyler D. Semmelman |
| Attn:  Aaron M. Singer | One Rodney Square |
| Attn: Annemarie V. Reilly | 920 North King Street |
| 885 Third Avenue | Wilmington, Delaware  19801 |
| New York, New York  10022-4834 | Fax:  302-651-7701 |
| Fax:  212-751-4864 | |

*Co-Counsel to the Debtors*

---

**RELEASE, EXCULPATION AND INJUNCTION PROVISIONS CONTAINED IN PLAN**

X.B.    *Release of Claims and Causes of Action*

1.    *Release by the Debtors*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**Debtor Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held,

existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule 6; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this Article X.B shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

2.    *Release by Third Parties*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any

way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party Release shall not operate to waive or release (i) any Causes of Action expressly listed on Plan Schedule 7; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

X.E.    *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the

foregoing, nothing in this <u>Article X.E</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

X.G.      *Injunction*

Except as otherwise expressly provided in this Plan or the Confirmation Order, from and after the Effective Date, all entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind,  in each case on account of or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to this Plan or the Confirmation Order against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated).   All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

SF\5601894.6

## **EXHIBIT 3-A**

**Beneficial Holder Ballot for Holders of
Class 5 Prepetition Secured Notes Claims**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ONCURE HOLDINGS, INC., et al., | : | Case No. 13-11540 (KG) |
| | : | |
| Debtors.[1] | : | Jointly Administered |

-------------------------------------------------------------- x

## BENEFICIAL HOLDER BALLOT FOR VOTING ON
## THE ABOVE-CAPTIONED DEBTORS' CHAPTER 11 PLAN

### Class 5 — Prepetition Secured Notes Claims

---

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER BALLOT CAREFULLY <u>BEFORE</u> COMPLETING THIS BALLOT.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, ALL (I) PRE-VALIDATED BENEFICIAL HOLDER BALLOTS; (II) BENEFICIAL HOLDER BALLOTS OF REGISTERED RECORD OWNERS; AND (III) MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDER BALLOTS THAT WERE NOT PRE-VALIDATED MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE VOTING AND CLAIMS AGENT (KURTZMAN CARSON CONSULTANTS LLC) ON OR BEFORE 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 23, 2013 (THE "<u>VOTING DEADLINE</u>") IN ACCORDANCE WITH THE FOLLOWING:**

**A.    <u>IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR INTERMEDIARY RECORD OWNER</u>:[2]**

YOUR INTERMEDIARY RECORD OWNER HAS <u>NOT</u> PRE-VALIDATED THIS BENEFICIAL HOLDER BALLOT. YOU MUST RETURN THIS BENEFICIAL HOLDER BALLOT TO YOUR INTERMEDIARY RECORD OWNER IN SUFFICIENT TIME TO PERMIT YOUR INTERMEDIARY RECORD OWNER TO DELIVER A MASTER BALLOT INCLUDING YOUR VOTE TO THE VOTING AND CLAIMS AGENT BY THE VOTING DEADLINE.

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471). The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

[2]    "***Intermediary Record Owner***" means the bank, brokerage firm, or the agent thereof as the entity through which the Beneficial Holders hold the Prepetition Secured Notes.

**B.  IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO THE VOTING AND CLAIMS AGENT (KURTZMAN CARSON CONSULTANTS LLC):**

EITHER (1) YOUR INTERMEDIARY RECORD OWNER HAS PRE-VALIDATED THIS BENEFICIAL HOLDER BALLOT; <u>OR</u> (2) YOU HAVE BEEN IDENTIFIED AS A REGISTERED RECORD OWNER.

THEREFORE, YOU MUST RETURN THIS BENEFICIAL HOLDER BALLOT DIRECTLY TO THE VOTING AND CLAIMS AGENT SO IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. ___] (as may be amended from time to time, the "Plan") as set forth in the Disclosure Statement for the Plan [Docket No. ___] (as may be amended from time to time, the "Disclosure Statement").  The Bankruptcy Court has approved the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code Section 1125, by entry of an order on August 22, 2013 [Docket No. __] (the "Disclosure Statement Order").  Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Beneficial Holder Ballot because our records indicate that you are a direct Beneficial Holder of a Class 5 – Prepetition Secured Notes Claim, as of the applicable Voting Record Date (the close of business on August 14, 2013).  Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which is included (along with the Plan, Disclosure Statement Order and certain other materials) in the Solicitation Package you are receiving with this Beneficial Holder Ballot.  If you need to obtain additional solicitation materials, you may contact the Debtors' Voting and Claims Agent by:  (1) visiting the Debtors' restructuring website at www.kccllc.net/OnCure; (2) writing to OnCure Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 599 Lexington Avenue, 39th Floor, New York, NY 10022; and/or (3) calling the Debtors' restructuring hotline at (917) 281-4800.  You may also obtain these documents (other than a ballot) and any other pleadings filed in the Debtors' chapter 11 cases (for a fee) via PACER at: www.deb.uscourts.gov or free of charge at www.kccllc.net/OnCure.

This Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan.  If you believe you have received this Beneficial Holder Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Voting and Claims Agent <u>immediately</u> at the address or telephone number set forth above.

You should review the Disclosure Statement and the Plan in their entirety before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 5 – Prepetition Secured Notes Claims under the Plan.  If you hold Claims in more than one Class, you will receive a Ballot for each Class in which you are entitled to vote.

The Bankruptcy Court can confirm the Plan and bind you if the Plan is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class who vote on the Plan and if the Plan otherwise satisfies the applicable requirements of Bankruptcy Code Section 1129(a).  If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Plan and (b) otherwise satisfies the requirements of Bankruptcy Code Section 1129(b).  If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or affirmatively vote to reject the Plan.  To have your vote counted, you must complete, sign and return this Ballot to the Voting and Claims Agent by the Voting Deadline.

Before completing this Beneficial Holder Ballot, please read and follow the enclosed "Instructions for Completing this Beneficial Holder Ballot" carefully to ensure that you complete, execute and return this Beneficial Holder Ballot properly.

**Item 1.  Amount of Claim.**

The undersigned hereby certifies that as of the applicable Voting Record Date (the close of business on August 14, 2013), the undersigned was the Beneficial Holder (or authorized signatory for a Beneficial Holder) of Class 5 – Prepetition Secured Notes Claims in the following aggregate unpaid principal amount (insert unpaid amount in box below if not already completed).  If your Prepetition Secured Notes are held by an Intermediary Record Owner on your behalf and you do not know the amount of the Prepetition Secured Notes held, please contact your Intermediary Record Owner <u>immediately</u>:

> $_____

**Item 2.  Vote on Plan and Opting Into Third Party Release.**

The Holder of the Class 5 – Prepetition Secured Notes Claims against the Debtors set forth in Item 1 above votes to (please check <u>one</u> box below):

| | |
|---|---|
| **ACCEPT** (vote FOR) the Plan | **REJECT** (vote AGAINST) the Plan |

THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

<u>**IMPORTANT INFORMATION REGARDING THE RELEASE OF CLAIMS BY THIRD PARTIES**</u>

ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, WHICH ARE SET FORTH AT THE END OF THIS BALLOT.  YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

**Check the box below if you elect to grant the Third Party Release contained in Article X.B.2 of the Plan.  If you are not a signatory to the Restructuring Support Agreement, election to withhold consent is at your option.  If you submit your Ballot without this box checked, then you will be deemed <u>NOT</u> to consent to the Third Party Release set forth in Article X.B.2 of the Plan.  PLEASE BE ADVISED THAT BY CHECKING THE BOX BELOW YOU ELECT TO GRANT THE THIRD-PARTY RELEASE IN EACH AND EVERY CAPACITY IN WHICH YOU HOLD A CLAIM AGAINST, OR EQUITY INTEREST IN, ANY OF THE DEBTORS.**

**PLEASE ALSO BE ADVISED THAT THE DEBTOR RELEASE CONTAINED IN ARTICLE X.B.1 OF THE PLAN WILL BE INCLUDED IN THE CONFIRMATION ORDER AND THAT IT IS SEPARATE FROM AND INDEPENDENT OF THE THIRD PARTY RELEASE.  IF YOU OBJECT TO THE DEBTOR RELEASE, YOU MUST FILE A SEPARATE OBJECTION WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH THE PROCEDURES DESCRIBED IN THE DISCLOSURE STATEMENT.**

☐    OPT-IN ELECTION:  The undersigned elects to grant the Third Party Releases contained in Article X.B.2 of the Plan.

**Item 3.  Certifications as to Class 5 – Prepetition Secured Notes Claims Held in Additional Accounts.**

By completing and returning this Beneficial Holder Ballot, the undersigned Beneficial Holder certifies that either (1) it has not submitted any other Ballots for other Class 5 – Prepetition Secured Notes Claims held in other accounts or other record names or (2) it has provided the information specified in the following table for all other Class 5 – Prepetition Secured Notes Claims for which it has submitted additional Beneficial Holder Ballots, each of which indicates the same vote to accept or reject the Plan (please use additional sheets of paper if necessary):

ONLY COMPLETE THIS SECTION IF YOU HAVE VOTED CLASS 5 – PREPETITION SECURED NOTES CLAIMS ON A BENEFICIAL HOLDER BALLOT OTHER THAN THIS BENEFICIAL HOLDER BALLOT.

| Name of Beneficial Holder | Account Number | Principal Amount of Other Class 5 – Prepetition Secured Notes Claims Voted |
|---|---|---|
| 1. | | $ |
| 2. | | $ |
| 3. | | $ |
| 4. | | $ |
| 5. | | $ |
| 6. | | $ |
| 7. | | $ |
| 8. | | $ |
| 9. | | $ |
| 10. | | $ |

**Item 4.  Certifications.**

By signing this Beneficial Holder Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a)    that either: (i) the undersigned is the Beneficial Holder of the Class 5 – Prepetition Secured Notes Claims being voted; or (ii) the undersigned is an authorized signatory for an Entity that is a Beneficial Holder of the Class 5 – Prepetition Secured Notes Claims being voted, and, in either case, has the full power and authority to vote to accept or reject the Plan with respect to the Claims identified in Item 1 above;

(b)    that the undersigned (or in the case of an authorized signatory, the Beneficial Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)    that the undersigned has cast the same vote with respect to all Class 5 – Prepetition Secured Notes Claims in a single Class; and

(d)    that no other Beneficial Holder Ballots with respect to the amount of the Class 5 – Prepetition Secured Notes  Claims identified in Item 1 above have been cast or, if any other Beneficial Holder Ballots have been cast with respect to such Class 5 Claims, then any such earlier Beneficial Holder Ballots are hereby revoked.

By signing this Beneficial Holder Ballot, the undersigned authorizes and instructs its Intermediary Record Owner (unless this is a pre-validated Beneficial Holder Ballot or the Beneficial Holder Ballot of a Registered Record Owner to be forwarded directly by the undersigned to the Voting and Claims Agent) (a) to furnish the voting information and the amount of Class 5 – Prepetition Secured Notes Claims the Intermediary Record Owner holds on its behalf in a Master Ballot to be transmitted to the Voting and Claims Agent  and (b) to retain this Beneficial Holder Ballot and related information in its records for at least one year after the Effective Date of the Plan.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Social Security or Federal Tax Identification Number: | |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Date Completed: | |
| | |

No fees, commissions or other remuneration will be payable to any person for soliciting votes on the Plan.

If your address or contact information has changed, please note the new information here.

**PLEASE COMPLETE, SIGN AND DATE THIS BENEFICIAL HOLDER BALLOT AND RETURN IT <u>PROMPTLY</u> IN THE ENVELOPE PROVIDED TO THE ADDRESSEE SPECIFIED THEREON.**

IF THE VOTING AND CLAIMS AGENT DOES NOT **ACTUALLY** **RECEIVE** THIS BENEFICIAL HOLDER BALLOT (IF PRE-VALIDATED OR IF OF A REGISTERED RECORD OWNER) **OR** THE MASTER BALLOT INCORPORATING THE VOTE CAST BY THIS BENEFICIAL HOLDER BALLOT **ON OR BEFORE 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 23, 2013**, THEN YOUR VOTE TRANSMITTED BY THIS BENEFICIAL HOLDER BALLOT WILL **<u>NOT</u>** BE COUNTED TOWARD CONFIRMATION OF THE PLAN.

IF YOU ARE RETURNING THIS BENEFICIAL HOLDER BALLOT TO YOUR INTERMEDIARY RECORD OWNER, PLEASE ALLOW SUFFICIENT TIME FOR YOUR INTERMEDIARY RECORD OWNER TO RECEIVE YOUR BALLOT AND PROCESS YOUR VOTE ON A MASTER BALLOT SUCH THAT THE MASTER BALLOT IS RECEIVED BY THE VOTING AND CLAIMS AGENT ON OR BEFORE 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 23, 2013.

BALLOTS SENT BY FACSIMILE, TELECOPY OR ELECTRONIC MAIL WILL <u>NOT</u> BE ACCEPTED

| Class 5 – Prepetition Secured Notes Claims |
|---|

**INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER BALLOT**

1.  The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement.  Capitalized terms used in the Beneficial Holder Ballot or in these instructions (the "<u>Ballot Instructions</u>") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Beneficial Holder Ballot.

2.  To ensure that your vote is counted, you <u>must</u> complete the Ballot and take the following steps:  (a) make sure that the information required by Item 1 above has been inserted (if you do not know the amount of your claim, please contact the Voting and Claims Agent); (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 above; (c) provide the information required by Item 3 above <u>and</u> (d) sign, date and return an original of your Beneficial Holder Ballot in accordance with paragraph 3 directly below.

3.  **Return of Beneficial Holder Ballots**:  Your Beneficial Holder Ballot (if pre-validated or if you are a Registered Record Owner) and/or the Master Ballot incorporating the vote cast on your Beneficial Holder Ballot MUST be returned to the Voting and Claims Agent so as to be **actually received** by the Voting and Claims Agent on or before the Voting Deadline, which is 5:00 p.m. prevailing Eastern Time on September 23, 2013.  To ensure your vote is counted toward confirmation of the Plan, please read the following information carefully so that you understand where your Beneficial Holder Ballot must be sent in order for it to be received before the Voting Deadline:

    ➢  <u>Pre-validated Beneficial Holder Ballot and Beneficial Holder Ballots of Registered Record Owners</u>:  If you received a Beneficial Holder Ballot and a return envelope addressed to the Voting and Claims Agent, then you must return your completed Beneficial Holder Ballot <u>directly to the Voting and Claims Agent</u> so that it is **actually received** by the Voting and Claims Agent on or before the Voting Deadline.

    ➢  <u>Not pre-validated Beneficial Holder Ballot</u>:  If you received a Beneficial Holder Ballot and a return envelope addressed to your Intermediary Record Owner, you must return your completed Beneficial Holder Ballot <u>directly to your Intermediary Record Owner</u> so that it is **actually received** by the Intermediary Record Owner in sufficient time to permit your Intermediary Record Owner to deliver a Master Ballot including your vote to the Voting and Claims Agent by the Voting Deadline.

4.  If a Master Ballot or Beneficial Holder Ballot is received by the Voting and Claims Agent <u>after</u> the Voting Deadline, it will not be counted, unless the Debtors have granted an extension of the Voting Deadline in writing with respect to such Master Ballot or Beneficial Holder Ballot.  Additionally**,** the following Beneficial Holder Ballots will <u>NOT</u> be counted:

    ➢  any Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

    ➢  any Beneficial Holder Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan;

    ➢  any Beneficial Holder Ballot cast for a claim that is not listed on the Schedules, or that is scheduled at zero, in an unknown amount, or, in whole or in part, as unliquidated, contingent, or disputed, and for which no proof of claim was timely filed;

    ➢  any Beneficial Holder Ballot that is properly completed, executed and timely filed, but (a) does not indicate an acceptance or rejection of the Plan, (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

1

> ➤ any Beneficial Holder Ballot submitted by facsimile, telecopy or electronic mail;

> ➤ any unsigned Beneficial Holder Ballot;

> ➤ any Beneficial Holder Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), any indenture trustee, or the Debtors' financial or legal advisors; and/or

> ➤ any Beneficial Holder Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order.

5. The method of delivery of Beneficial Holder Ballots to the Voting and Claims Agent or your Intermediary Record Owner is at the election and risk of each Holder of a Prepetition Secured Notes Claim. Except as otherwise provided herein, such delivery will be deemed made to the Voting and Claims Agent only when the Voting and Claims Agent **actually receives** the originally executed Beneficial Holder Ballot or Master Ballot incorporating the Beneficial Holder Ballot. Instead of effecting delivery by first-class mail, it is recommended, though not required, that Holders use an overnight or hand delivery service. In all cases, Holders should allow sufficient time to assure timely delivery.

6. If multiple Beneficial Holder Ballots are received from the same Holder of a Class 5 – Prepetition Secured Notes Claim with respect to the same Class 5 Claim prior to the Voting Deadline, the last Beneficial Holder Ballot timely received will supersede and revoke any earlier received Beneficial Holder Ballots.

7. You must vote all of your Prepetition Secured Notes Claims within Class 5 either to accept or reject the Plan and may <u>not</u> split your vote. Further, if a Holder has multiple Prepetition Secured Notes Claims within Class 5, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple Prepetition Secured Notes Claims within Class 5 for the purpose of counting votes.

8. The Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Voting and Claims Agent will accept delivery of any such certificates or instruments surrendered together with a Beneficial Holder Ballot.

9. This Beneficial Holder Ballot does <u>not</u> constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

10. <u>Please be sure to sign and date your Beneficial Holder Ballot.</u> If you are signing a Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Voting and Claims Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Beneficial Holder Ballot.

11. If you hold Claims in more than one Class under the Plan you may receive more than one Ballot coded for each different Class. Each Ballot votes <u>only</u> your Claims indicated on that Ballot, so please complete and return each Beneficial Holder Ballot and/or Ballot that you received.

**PLEASE MAIL YOUR BENEFICIAL HOLDER BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BENEFICIAL HOLDER BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE VOTING AND CLAIMS AGENT AT: (917) 281-4800.**

---

**IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY RECEIVE</u> THIS BENEFICIAL HOLDER BALLOT FROM YOU <u>OR</u> THE MASTER BALLOT CONTAINING YOUR VOTE FROM YOUR INTERMEDIARY RECORD OWNER ON OR BEFORE THE VOTING DEADLINE, WHICH IS 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 23, 2013, THEN YOUR VOTE TRANSMITTED HEREBY WILL NOT BE COUNTED.**

---

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE SOLICITATION PACKAGE MAILED HEREWITH.

**RELEASE, EXCULPATION AND INJUNCTION PROVISIONS CONTAINED IN PLAN**

X.B.    *Release of Claims and Causes of Action*

      1.      *Release by the Debtors*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this <u>Article X</u> or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**<u>Debtor Releasing Parties</u>**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**<u>Debtor Release</u>**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on <u>Plan Schedule 6</u>; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy

3

Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this Article X.B shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

2.      *Release by Third Parties*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party Release shall not operate to waive or release (i) any Causes of Action expressly listed on Plan Schedule 7; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits,

4

judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

X.E.    *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; *provided, however*, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

X.G.    *Injunction*

Except as otherwise expressly provided in this Plan or the Confirmation Order, from and after the Effective Date, all entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind,  in each case on account of or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to this Plan or the Confirmation Order against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated).   All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

5

# EXHIBIT 3-B

**Master Ballot for Holders of
Class 5 Prepetition Secured Notes Claims**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------x
In re:                                    :    Chapter 11
                                          :
ONCURE HOLDINGS, INC., et al.,            :    Case No. 13-11540 (KG)
                                          :
          Debtors.1                       :    Jointly Administered
------------------------------------------------------------x
```

**MASTER BALLOT FOR INTERMEDIARY RECORD OWNERS OF**
**BENEFICIAL HOLDERS OF CLASS 5 – PREPETITION SECURED NOTES CLAIMS**

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING
THIS MASTER BALLOT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.

**THIS MASTER BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED**
**SO THAT IT IS ACTUALLY RECEIVED BY THE VOTING AND CLAIMS AGENT ON OR BEFORE**
**5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 23, 2013 (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. ___] (as may be amended from time to time, the "Plan") as set forth in the Disclosure Statement for the Plan [Docket No. ___] (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court has approved the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code Section 1125, by entry of an order on August 22, 2013 [Docket No. ___] (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

This Master Ballot is being sent to you because the Debtors' records indicate that, as of the applicable Voting Record Date (the close of business on August 14, 2013), you are a bank, brokerage firm, or the agent thereof (each, an "Intermediary Record Owner") of beneficial holders (collectively, the "Beneficial Holders") of the Prepetition Secured Notes.

As an Intermediary Record Owner, you are required, within five (5) business days of your receipt of the Solicitation Packages, to deliver a Solicitation Package, including a Beneficial Holder Ballot, to each Beneficial Holder for whom you hold Prepetition Secured Notes as of the Securities Voting Record Date and take any action required to enable such Beneficial Holder to timely vote its Claim to accept or reject the Plan. You should include

---

1    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471). The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

in each Solicitation Package a return envelope addressed to you (and not include a return envelope addressed to the Voting and Claims Agent), unless you choose to pre-validate such Beneficial Holder Ballot, in which case the Solicitation Package should include a return envelope addressed only to the Voting and Claims Agent (Kurtzman Carson Consultants LLC). With respect to any Beneficial Holder Ballots returned to you, you must (1) execute this Master Ballot so as to reflect the voting instructions given to you in the Beneficial Holder Ballots by the Beneficial Holders for whom you hold Prepetition Secured Notes and (2) forward this Master Ballot to the Voting and Claims Agent in accordance with the Master Ballot Instructions accompanying this Master Ballot.

If you are both the Registered Record Owner and Beneficial Holder of any Prepetition Secured Notes and you wish to vote such Prepetition Secured Notes, you MUST complete a Beneficial Holder Ballot and return it to the Voting and Claims Agent prior to the Voting Deadline.

If you need to obtain additional solicitation materials, you may contact the Debtors' Voting and Claims Agent by: (1) visiting the Debtors' restructuring website at www.kccllc.net/OnCure; (2) writing to OnCure Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 599 Lexington Avenue, 39th Floor, New York, NY 10022; and/or (3) calling the Debtors' restructuring hotline at (917) 281-4800. You may also obtain these documents (other than a ballot) and any other pleadings filed in the Debtors' chapter 11 cases (for a fee) via PACER at: www.deb.uscourts.gov or free of charge at www.kccllc.net/OnCure.

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan. If you believe you have received this Master Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Voting and Claims Agent immediately at the address or telephone number set forth above.

---

**If the Voting and Claims Agent does not actually receive this Master Ballot on or before the Voting Deadline, which is 5:00 p.m. prevailing Eastern Time on September 23, 2013, then the Beneficial Holders' votes transmitted on such Master Ballot will NOT be counted.**

---

Before completing this Master Ballot, please read and follow the enclosed "Instructions for Completing this Master Ballot" carefully to ensure that you complete, execute and return this Master Ballot properly.

ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, WHICH ARE SET FORTH AT THE END OF THIS BALLOT. YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

**Item 1. Certification of Authority to Vote.**

The undersigned hereby certifies that, as of the applicable Voting Record Date (the close of business on August 14, 2013), the undersigned (please check the applicable box):

❑ is an Intermediary Record Owner for the Beneficial Holders of the aggregate principal amount of Class 5 Prepetition Secured Notes Claims listed in Item 2 below and is the registered Holder of the Prepetition Secured Notes Claims represented by any such Class 5 Prepetition Secured Notes Claims; or

❑ is acting under a power of attorney and/or agency agreement (a copy of which will be provided upon request) granted by an Intermediary Record Owner that is the registered Holder of the aggregate principal amount of Class 5 Prepetition Secured Notes Claims listed in Item 2 below; or

❑ has been granted a proxy (an original of which is annexed hereto) from (1) an Intermediary Record Owner or (2) a Beneficial Holder, that is the registered Holder of the aggregate amount of the Class 5 Prepetition Secured Notes Claims listed in Item 2 below;

and, accordingly, has full power and authority to vote to accept or reject the Plan on behalf of the Beneficial Holders of the Class 5 Prepetition Secured Notes Claims described in Item 2 below.

2

<u>Item 2.</u>  **Class 5 Claims Vote.**

  <u>Number of Beneficial Holders</u>:  The undersigned transmits the following votes of Beneficial Holders in respect of their Class 5 Prepetition Secured Notes Claims.  The undersigned certifies that the following Beneficial Holders of Class 5 Prepetition Secured Notes Claims, as identified by their respective customer account numbers set forth below, are Beneficial Holders of the Debtors' Prepetition Secured Notes as of the applicable Voting Record Date and have delivered to the undersigned, as Intermediary Record Owner, Beneficial Holder Ballots casting such votes.

  <u>To Properly Complete the Following Table</u>:  Indicate in the appropriate column below the aggregate principal amount voted for each account (please use additional sheets of paper if necessary and, if possible, attach such information to this Master Ballot in the form of the following table).  <u>Please note</u>:  (1) each account of a Beneficial Holder must vote all such Beneficial Holder's Class 5 Prepetition Secured Notes Claims to accept or reject the Plan and may <u>not</u> split such vote; and (2) do not count any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan.

| **Your Customer Account Number For Each Beneficial Holder of Voting Class 5 Prepetition Secured Notes Claims** | **Face Amount of Prepetition Secured Notes** In order to vote on the Plan, the Beneficial Holder must have checked a box in Item 2 on the Beneficial Holder Ballot to ACCEPT or REJECT the Plan.  In addition, if the Beneficial Holder returned a signed Beneficial Holder Ballot but did not check a box in Item 2 or checked both boxes in Item 2, the Beneficial Holder Ballot will not be counted for purposes of determining acceptance or rejection of the Plan. | | **Consent to Third Party Release** Did the Beneficial Holder check the "Opt-In Election" box in Item 2 on the Beneficial Holder Ballot? |
|---|---|---|---|
| | **ACCEPT THE PLAN** | **REJECT THE PLAN** | **YES/NO** |
| 1. | $ | $ | |
| 2. | $ | $ | |
| 3. | $ | $ | |
| 4. | $ | $ | |
| 5. | $ | $ | |
| 6. | $ | $ | |
| 7. | $ | $ | |
| 8. | $ | $ | |
| 9. | $ | $ | |
| 10. | $ | $ | |
| **TOTALS:** | $ | $ | |

3

**Item 3.  Certification as to Transcription of Information from Item 3 of the Beneficial Holder Ballots as to Class 5 Claims Voted Through Other Beneficial Holder Ballots.**

The undersigned certifies that it has transcribed in the following table the information, if any, provided by Beneficial Holders in Item 3 of each of the Beneficial Holder's original Beneficial Holder Ballots, identifying any Class 5 Prepetition Secured Notes Claims for which such Beneficial Holders have submitted other Beneficial Holder Ballots other than to the undersigned:

| Your Customer Account Number For Each Beneficial Holder of Voting Class 5 Prepetition Secured Notes Claims | TRANSCRIBE FROM ITEM 3 OF THE BENEFICIAL HOLDER BALLOTS: | | |
|---|---|---|---|
| | Account Number | Name of Holder | Principal Amount of Other Class 5 Prepetition Secured Notes Claims Voted |
| 1. | | | $ |
| 2. | | | $ |
| 3. | | | $ |
| 4. | | | $ |
| 5. | | | $ |
| 6. | | | $ |
| 7. | | | $ |
| 8. | | | $ |
| 9. | | | $ |
| 10. | | | $ |

**Item 4.  Certification.**

By signing this Master Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)    it has received a copy of the Disclosure Statement, the Beneficial Holder Ballots and the Solicitation Package and has delivered the same to the Beneficial Holders listed on the Beneficial Holder Ballots;

(b)    it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;

(c)    it is the registered Holder of the Prepetition Secured Notes being voted;

(d)    it has been authorized by each such Beneficial Holder to vote on the Plan and to make applicable elections;

(e)    it has properly disclosed:

(i)    the number of Beneficial Holders who completed Beneficial Holder Ballots;

(ii)    the respective amounts of the Class 5 Prepetition Secured Notes Claims owned, as the case may be, by each Beneficial Holder who completed a Beneficial Holder Ballot;

(iii)    each such Beneficial Holder's respective vote concerning the Plan and election to opt into the Third Party Release;

(iv)    each such Beneficial Holder's certification as to other Class 5 Prepetition Secured Notes Claims voted; and

(v)    the customer account or other identification number for each such Beneficial Holder;

(f)    each such Beneficial Holder has certified to the undersigned that it is eligible to vote on the Plan; and

(g)    it will maintain Beneficial Holder Ballots and evidence of separate transactions returned by Beneficial Holders (whether properly completed or defective) for at least one year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, as the case may be, if so ordered.

4

Name of Intermediary
Record Owner: _____
                                                  (Print or Type)

Participant Number: _____

Name of Proxy Holder or Agent for
         Intermediary Record Owner: _____
                                                                 (Print or Type)

Social Security or Federal Tax Identification Number: _____

Signature: _____

Name of Signatory: _____
                                     (If other than Intermediary Record Owner)

Title: _____

Address: _____

         _____

         _____

Date Completed: _____

**PLEASE COMPLETE, SIGN AND DATE THIS MASTER BALLOT
AND RETURN IT <u>PROMPTLY</u> IN THE ENVELOPE PROVIDED TO:**

OnCure Holdings, Inc.
c/o Kurtzman Carson Consultants LLC
599 Lexington Avenue, 39th Floor
New York, NY 10022
Telephone:  (917) 281-4800

**IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY</u> <u>RECEIVE</u> THIS MASTER BALLOT
ON OR BEFORE 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 23, 2013, THE VOTES
CAST HEREBY WILL <u>NOT</u> BE COUNTED.**

**BALLOTS SENT BY FACSIMILE, TELECOPY OR ELECTRONIC MAIL WILL <u>NOT</u> BE ACCEPTED.**

| Class 5 — Intermediary Record Owners of Beneficial Holders of Prepetition Secured Notes Claims |
|---|

**INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT**

1.   The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions (the "Master Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot.

**HOW TO VOTE:**

2.   Within five (5) business days of your receipt of the Solicitation Packages, you must distribute Solicitation Package(s), including Beneficial Holders Ballots, to each Beneficial Holder of Class 5 Prepetition Secured Notes Claims as of the Securities Voting Record Date and take any action required to enable each such Beneficial Holder to timely vote their Claims.

3.   If you are both the record holder and the Beneficial Holder of any principal amount of the Prepetition Secured Notes and you wish to vote any Class 5 Prepetition Secured Notes Claims on account thereof, then you MUST complete and execute an individual Beneficial Holder Ballot and return the same to the Voting and Claims Agent in accordance with these instructions and the instructions attached to such Beneficial Holder Ballot.

4.   If you are transmitting the votes of any Beneficial Holders other than yourself (i.e. you are an Intermediary Record Owner), you may, at your option, elect to pre-validate the Beneficial Holder Ballots sent to you by the Voting and Claims Agent. Based on your decision as to whether or not to pre-validate Beneficial Holders Ballots, the instructions in either paragraph (5) or paragraph (6) below apply (but not both).

5.   **PRE-VALIDATED BENEFICIAL HOLDER BALLOTS**:   An Intermediary Record Owner "pre-validates" a Beneficial Holder Ballot by indicating thereon the record holder of the Prepetition Secured Notes Claims voted, the amount of the Prepetition Secured Notes held by the Beneficial Holder and the appropriate account numbers through which the Beneficial Holder's holdings are derived.   The Intermediary Record Owner must also complete and execute the Class 5 Beneficial Holders Ballot (other than Item 2 and Item 3 therein).   If you choose to pre-validate individual Beneficial Holder Ballots, you must immediately:   (a) "pre-validate" the individual Beneficial Holder Ballot contained in the Solicitation Package sent to you by the Voting and Claims Agent and (b) forward the Solicitation Package to the Beneficial Holder for voting, including:

      i.      the pre-validated Beneficial Holder Ballot;

      ii.     a return envelope addressed to the Voting and Claims Agent as follows: OnCure Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 599 Lexington Avenue, 39th Floor, New York, NY 10022; and

      iii.    clear instructions stating that Beneficial Holders must return their pre-validated Beneficial Holder Ballot directly to the Voting and Claims Agent so that it is **actually received** by the Voting and Claims Agent on or before the Voting Deadline.

6.   **NON-PRE-VALIDATED BENEFICIAL HOLDER BALLOTS**:  If you do NOT choose to pre-validate individual Beneficial Holder Ballots, you must:

      i.      immediately forward the Solicitation Package(s) sent to you by the Voting and Claims Agent to each Beneficial Holder for voting, including: (a) the Beneficial Holder Ballot; (b) a return envelope addressed to the Intermediary Record Owner; and (c) clear instructions stating that Beneficial Holders must return

1

their Beneficial Holder Ballot directly to the Intermediary Record Owner so that it is **actually** **received** by the Intermediary Record Owner with enough time for the Intermediary Record Owner to prepare the Master Ballot in accordance with paragraph (ii) directly below and return the Master Ballot to the Voting and Claims Agent so it is **actually** **received** by the Voting and Claims Agent on or before the Voting Deadline; and

ii.     upon receipt of completed, executed Beneficial Holder Ballots returned to you by a Beneficial Holder you must:

➢     check the appropriate box in Item 1 of the Master Ballot;

➢     compile and validate the votes and other relevant information of each such Beneficial Holder in Item 2 and Item 3 of the Master Ballot using the customer account number or other identification number assigned by you to each such Beneficial Holder;

➢     date and execute the Master Ballot;

➢     transmit such Master Ballot to the Voting and Claims Agent by the Voting Deadline; and

➢     retain such Beneficial Holder Ballots in your files for a period of at least one year after the Effective Date of the Plan (as you may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court).

7.     If a Master Ballot is received <u>after</u> the Voting Deadline, it will not be counted, unless the Debtors have granted an extension of the Voting Deadline in writing with respect to such Master Ballot.  Additionally, the following Master Ballots (and therefore Beneficial Holder Ballots reflected thereon) will <u>NOT</u> be counted:

➢     any Master Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

➢     any Master Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan;

➢     any Master Ballot cast for a claim that is not listed on the Schedules, or that is scheduled at zero, in an unknown amount, or, in whole or in part, as unliquidated, contingent, or disputed, and for which no proof of claim was timely filed;

➢     any Master Ballot that is properly completed, executed and timely filed, but (a) does not indicate an acceptance or rejection of the Plan, (b) with respect to a single account number, indicates both an acceptance and rejection of the Plan, or (c) with respect to a single account number, partially accepts and partially rejects the Plan;

➢     any Master Ballot submitted by facsimile, telecopy or electronic mail;

➢     any unsigned Master Ballot;

➢     any Master Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), any indenture trustee, or the Debtors' financial or legal advisors; and/or

2

> ➤ any Master Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order.

8.    Any Ballot returned to you by a Beneficial Holder of a Claim shall not be counted for purposes of accepting or rejecting the Plan <u>until</u> you properly complete and deliver to the Voting and Claims Agent a Master Ballot that reflects the vote of such Beneficial Holders by the Voting Deadline or otherwise validate the Beneficial Holder Ballot in a manner acceptable to the Voting and Claims Agent.

9.    The method of delivery of Master Ballots to the Voting and Claims Agent is at the election and risk of each Intermediary Record Owner. Except as otherwise provided herein, such delivery will be deemed made only when the Voting and Claims Agent **actually receives** the originally executed Master Ballot. Instead of effecting delivery by first-class mail, it is recommended, though not required, that Intermediary Record Owners use an overnight or hand delivery service. In all cases, Intermediary Record Owners should allow sufficient time to assure timely delivery.

10.   If multiple Master Ballots are received from the same Intermediary Record Owner with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim prior to the Voting Deadline, the <u>last</u> Master Ballot timely received will supersede and revoke any earlier received Master Ballots. If you receive more than one Beneficial Holder Ballot from the same Beneficial Holder, the latest dated Beneficial Holder Ballot you receive before you submit the Master Ballot shall be deemed to supersede any prior Beneficial Holder Ballots submitted by such Beneficial Holder and you should complete the Master Ballot accordingly.

11.   The Master Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims and you should not accept delivery of any such certificates or instruments surrendered together with a Beneficial Holder Ballot.

12.   This Master Ballot does not constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

13.   <u>Please be sure to properly execute your Master Ballot</u>. You must: (a) sign and date your Master Ballot; (b) if applicable, indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Voting and Claims Agent, the Debtors or the Bankruptcy Court, submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder; and (c) provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

14.   No fees or commissions or other remuneration will be payable to any Intermediary Record Owner for soliciting Beneficial Holder Ballots accepting the Plan. The Debtors will, however, upon request, reimburse you for customary mailing and handling expenses incurred by you in forwarding the Beneficial Holder Ballots and other enclosed materials to your customers.

**<u>PLEASE MAIL YOUR MASTER BALLOT PROMPTLY!</u>**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT
OR THE VOTING INSTRUCTIONS OR PROCEDURES, PLEASE CALL:**

**THE VOTING AND CLAIMS AGENT AT: (917) 281-4800.**

---

**NOTHING CONTAINED HEREIN OR IN THE ENCLOSED DOCUMENTS SHALL RENDER YOU OR ANY OTHER ENTITY THE AGENT OF THE DEBTORS OR THE VOTING AND CLAIMS AGENT OR AUTHORIZE YOU OR ANY OTHER ENTITY TO USE ANY DOCUMENT OR MAKE ANY STATEMENTS ON BEHALF OF THE DEBTORS WITH RESPECT TO THE PLAN.**

---

SF5602221.7

**IF THE VOTING AND CLAIMS AGENT DOES NOT <u>ACTUALLY RECEIVE</u> THIS MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 23, 2013, THEN THE VOTES TRANSMITTED THEREBY WILL NOT BE COUNTED.**

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE SOLICITATION PACKAGE MAILED HEREWITH.

<u>**RELEASE, EXCULPATION AND INJUNCTION PROVISIONS CONTAINED IN PLAN**</u>

X.B.    *Release of Claims and Causes of Action*

1.        *Release by the Debtors*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this <u>Article X</u> or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**Debtor Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on <u>Plan Schedule 6</u>; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this <u>Article X.B</u> shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a

confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

2.    _Release by Third Parties_.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party Release shall not operate to waive or release (i) any Causes of Action expressly listed on Plan Schedule 7; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all

5

Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

X.E.    *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; *provided*, *however*, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; *provided*, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this <u>Article X.E</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

X.G.    *Injunction*

Except as otherwise expressly provided in this Plan or the Confirmation Order, from and after the Effective Date, all entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind,  in each case on account of or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to this Plan or the Confirmation Order against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated).   All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

# EXHIBIT 4

**Unimpaired Claims Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
In re:                              :   Chapter 11
                                    :
ONCURE HOLDINGS, INC., et al.,      :   Case No. 13-11540 (KG)
                                    :
            Debtors.¹               :   Jointly Administered
                                    :
-------------------------------------------------------- x
```

### NOTICE OF NON-VOTING STATUS TO HOLDERS OF UNCLASSIFIED CLAIMS AND HOLDERS OF UNIMPAIRED CLAIMS DEEMED TO ACCEPT THE PLAN

**PLEASE TAKE NOTICE THAT** on August 22, 2013, OnCure Holdings, Inc. and its affiliate debtors and debtors in possession in the above-captioned chapter 11 cases (collective, the "Debtors") filed their (i) Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. ___] (as may be amended from time to time, the "Plan") and (ii) Disclosure Statement for the Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. ___] (as may be amended from time to time, the "Disclosure Statement").² On August 22, 2013, the Bankruptcy Court entered an order (i) approving the Disclosure Statement as containing "adequate information" pursuant to Bankruptcy Code Section 1125, (ii) establishing the Voting Record Date, Voting Deadline and other dates (iii) approving procedures for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan and (iv) approving the manner and forms of certain notices [Docket No. ___] (the "Disclosure Statement Order").

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim or Equity Interest under the Plan, you are not entitled to vote on the Plan. Specifically, you are not entitled to vote on the Plan because you have been identified as a Holder of a Claim or Equity Interest that (as currently asserted against one or more of the Debtors) is either (i) an unclassified, non-voting claim pursuant to Bankruptcy Code Section

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471). The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

[2]    Capitalized terms used but not otherwise defined herein will have the meanings set forth in the Plan.

SF\5602438.6

1123(a)(1) or (ii) unimpaired and therefore deemed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f).

**PLEASE TAKE FURTHER NOTICE THAT** the Confirmation Hearing to consider confirmation of the Plan will commence at **10:00 a.m. prevailing Eastern Time on October 3, 2013**, before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to Bankruptcy Code Section 1127, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

**PLEASE TAKE FURTHER NOTICE THAT**, notwithstanding that you are not entitled to vote on the Plan, you are nevertheless a party in interest in the Debtors' chapter 11 cases and you are entitled to participate in the Debtors' chapter 11 cases, including by filing objections to confirmation of the Plan.  The deadline for filing objections to the Plan is **September 23, 2013 at 4:00 p.m. prevailing Eastern Time** (the "Plan Objection Deadline").  Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Plan Objection Deadline by the following parties (the "Notice Parties").  CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

### *Notice Parties*

(a)    Counsel to the Debtors, Latham & Watkins LLP, 885 Third Avenue, New York, New York  10022-4834 (Attn: Aaron M. Singer, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware  19801 (Attn: Daniel J. DeFranceschi, Esq.);

(b)    Counsel to the Ad Hoc Secured Noteholders Committee, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038 (Attn: Jayme T. Goldstein, Esq.) and 2029 Century Park East, Los Angeles, California 90067 (Attn: Frank Merola, Esq.) and Young Conaway Stargatt & Taylor, LLP (Attn: Edmon L. Morton, Esq. and Matthew B. Lunn, Esq.);

(c)    Counsel to the Prepetition Secured Notes Indenture Trustee, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004 (Attn: John R. Ashmead, Esq.); and

(d)    The Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware  19801 (Attn: David L. Buchbinder, Esq.).

SF\5602438.6

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a Solicitation Package (excluding Beneficial Holder Ballots and Master Ballots) or if you have questions regarding the procedures and requirements for objecting to the Plan, you may contact the Debtors' Voting and Claims Agent, Kurtzman Carson Consultants LLC, by: (i) calling the Debtors' restructuring hotline at (877) 634-7166; (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/OnCure; and/or (iii) writing to OnCure Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at http://www.kccllc.net/OnCure.

THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS. THE PROVISIONS ARE SET FORTH AT THE END OF THIS NOTICE. YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE.**

Wilmington, Delaware
[_____], 2013

| LATHAM & WATKINS LLP | RICHARDS, LAYTON & FINGER, P.A. |
|---|---|
| Attn: Paul E. Harner | Attn: Daniel J. DeFranceschi |
| Attn: Keith A. Simon | Attn: Tyler D. Semmelman |
| Attn: Aaron M. Singer | One Rodney Square |
| Attn: Annemarie V. Reilly | 920 North King Street |
| 885 Third Avenue | Wilmington, Delaware 19801 |
| New York, New York 10022-4834 | Fax: 302-651-7701 |
| Fax: 212-751-4864 | |

*Co-Counsel to the Debtors*

**RELEASE, EXCULPATION AND INJUNCTION PROVISIONS CONTAINED IN PLAN**

X.B.    *Release of Claims and Causes of Action*

1.    *Release by the Debtors*. Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**Debtor Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all Claims,

Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement, the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; _provided_, _however_, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule 6; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this Article X.B shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

2.      _Release by Third Parties_.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or

SF\5602438.6

state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party Release shall not operate to waive or release (i) any Causes of Action expressly listed on Plan Schedule 7; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

X.E.    *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective

SF\5602438.6

as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

X.G.     *Injunction*

Except as otherwise expressly provided in this Plan or the Confirmation Order, from and after the Effective Date, all entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to this Plan or the Confirmation Order against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated). All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

SF\5602438.6

## **EXHIBIT 5**

**Notice of Non-Voting Status: No Recovery**

SF\5611903.3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------- x
In re:                                     :   Chapter 11
                                           :
ONCURE HOLDINGS, INC., et al.,             :   Case No. 13-11540 (KG)
                                           :
            Debtors.¹                      :   Jointly Administered
                                           :
--------------------------------------------------------- x
```

### NOTICE OF NON-VOTING STATUS TO HOLDERS
### OF CLASS 6 GENERAL UNSECURED CLAIMS, CLASS 7
### INTERCOMPANY CLAIMS AND CLASS 8 OLD HOLDCO INTERESTS

**PLEASE TAKE NOTICE THAT** on August 22, 2013, OnCure Holdings, Inc. and its affiliate debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed their (i) Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. ____] (as may be amended from time to time, the "Plan") and (ii) Disclosure Statement for the Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. ____] (as may be amended from time to time, the "Disclosure Statement").[2]  On August 22, 2013, the Bankruptcy Court entered an order (i) approving the Disclosure Statement as containing "adequate information" pursuant to Bankruptcy Code Section 1125, (ii) establishing the Voting Record Date, Voting Deadline and other dates (iii) approving procedures for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan and (iv) approving the manner and forms of certain notices [Docket No. ____] (the "Disclosure Statement Order").

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of Class 6 General Unsecured Claims, Class 7 Intercompany Claims and Class 8 Old HoldCo Interests under the Plan, you are not entitled to vote on the Plan.  Specifically, under the terms of the Plan, there are insufficient assets for the Debtors to satisfy Claims in Classes 6, 7 and 8 in full and, as a result, Holders of Claims in Classes 6 and 7 and Holders of Equity Interests in

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471).  The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

[2]    Capitalized terms used but not otherwise defined herein will have the meanings set forth in the Plan.

Class 8 are not entitled to receive or retain any property of the Debtors on account of such Claims against and Equity Interests in the Debtors. Additionally, on the Effective Date of the Plan, all Old HoldCo Interests will be deemed canceled and of no further force and effect, whether surrendered for cancellation or otherwise, resulting in no distribution to the Holders of such Equity Interests on account thereof. Accordingly, pursuant to Bankruptcy Code Section 1126(g), Holders of Claims in Class 6 or Equity Interests in Class 8 are deemed to have rejected the Plan and Holders of Intercompany Claims in Class 7 are deemed to have accepted the Plan, and, therefore, you are not entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Confirmation Hearing to consider confirmation of the Plan will commence at **10:00 a.m. prevailing Eastern Time on October 3, 2013**, before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to Bankruptcy Code Section 1127, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

**PLEASE TAKE FURTHER NOTICE THAT**, notwithstanding that you are not entitled to vote on the Plan, you are nevertheless a party in interest in the Debtors' chapter 11 cases and you are entitled to participate in the Debtors' chapter 11 cases, including by filing objections to confirmation of the Plan. The deadline for filing objections to the Plan is **September 23, 2013 at 4:00 p.m. prevailing Eastern Time** (the "Plan Objection Deadline"). Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually** **received** no later than the Plan Objection Deadline by the parties listed below (the "Notice Parties"). CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

*Notice Parties*

(a)  Counsel to the Debtors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834 (Attn: Aaron M. Singer, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq.);

(b)  Counsel to the Ad Hoc Secured Noteholders Committee, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038 (Attn: Jayme T. Goldstein, Esq.) and 2029 Century Park East, Los Angeles, California 90067 (Attn: Frank Merola, Esq.)

2

and Young Conaway Stargatt & Taylor, LLP (Attn: Edmon L. Morton, Esq. and Matthew B. Lunn, Esq.);

(c)    <u>Counsel to the Prepetition Secured Notes Indenture Trustee</u>, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004 (Attn: John R. Ashmead, Esq.); and

(d)    <u>The Office of the United States Trustee for the District of Delaware</u>, 844 King Street, Suite 2207, Wilmington, Delaware  19801 (Attn: David L. Buchbinder, Esq.).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a Solicitation Package (<u>excluding</u> Beneficial Holder Ballots and Master Ballots) or if you have questions regarding the procedures and requirements for objecting to the Plan, you may contact the Debtors' Voting and Claims Agent, Kurtzman Carson Consultants LLC, by:  (i) calling the Debtors' restructuring hotline at (877) 634-7166; (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/OnCure; and/or (iii) writing to OnCure Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at:  http://www.deb.uscourts.gov or free of charge at http://www.kccllc.net/OnCure.

THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS.  THE PROVISIONS ARE SET FORTH AT THE END OF THIS NOTICE.  YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE.**

---

Wilmington, Delaware
[_____], 2013

| **LATHAM & WATKINS LLP** | **RICHARDS, LAYTON & FINGER, P.A.** |
|---|---|
| Attn:  Paul E. Harner | Attn: Daniel J. DeFranceschi |
| Attn:  Keith A. Simon | Attn:  Tyler D. Semmelman |
| Attn:  Aaron M. Singer | One Rodney Square |
| Attn: Annemarie V. Reilly | 920 North King Street |
| 885 Third Avenue | Wilmington, Delaware  19801 |
| New York, New York  10022-4834 | Fax:  302-651-7701 |
| Fax:  212-751-4864 | |

*Co-Counsel to the Debtors*

## RELEASE, EXCULPATION AND INJUNCTION PROVISIONS CONTAINED IN PLAN

**X.B.**    *Release of Claims and Causes of Action*

1.    *Release by the Debtors*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**Debtor Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule 6; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in this Article X.B shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

2.    *Release by Third Parties*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party Release shall not operate to waive or release (i) any Causes of Action expressly listed on Plan Schedule 7; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

X.E.    *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this

SF\5602440.6

Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; *provided*, *however*, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

X.G.    *Injunction*

Except as otherwise expressly provided in this Plan or the Confirmation Order, from and after the Effective Date, all entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind,  in each case on account of or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to this Plan or the Confirmation Order against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated).   All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

# **EXHIBIT 6**

**Contract/Lease Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
In re:                                         :   Chapter 11
                                               :
ONCURE HOLDINGS, INC., et al.,                 :   Case No. 13-11540 (KG)
                                               :
              Debtors.[1]                      :   Jointly Administered
                                               :
------------------------------------------------------------ x
```

## NOTICE TO CONTRACT AND LEASE COUNTERPARTIES

**PLEASE TAKE NOTICE THAT** on August 22, 2013, OnCure Holdings, Inc. and its affiliate debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed their (i) Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. ___] (as may be amended from time to time, the "Plan") and (ii) Disclosure Statement for the Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. ___] (as may be amended from time to time, the "Disclosure Statement").[2] On August 22, 2013, the Bankruptcy Court entered an order (i) approving the Disclosure Statement as containing "adequate information" pursuant to Bankruptcy Code Section 1125, (ii) establishing the Voting Record Date, Voting Deadline and other dates (iii) approving procedures for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan and (iv) approving the manner and forms of certain notices [Docket No. ___] (the "Disclosure Statement Order").

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you or one of your affiliates is a counterparty to an executory contract or unexpired lease with one or more of the Debtors that has not been assumed or rejected as of the Non-Securities Voting Record Date (August 21, 2013).

**PLEASE TAKE FURTHER NOTICE THAT** the Confirmation Hearing to consider confirmation of the Plan will commence at **10:00 a.m. prevailing Eastern Time on October 3, 2013**, before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471). The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

[2]     Capitalized terms used but not otherwise defined herein will have the meanings set forth in the Plan.

Plan may be modified or amended, if necessary, pursuant to Bankruptcy Code Section 1127, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

**PLEASE TAKE FURTHER NOTICE THAT**, notwithstanding that you are not entitled to vote on the Plan, you are nevertheless a party in interest in the Debtors' chapter 11 cases and you are entitled to participate in the Debtors' chapter 11 cases, including by filing objections to confirmation of the Plan.  The deadline for filing objections to the Plan is **September 23, 2013 at 4:00 p.m. prevailing Eastern Time** (the "Plan Objection Deadline"). Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Plan Objection Deadline by the parties set forth below (the "Notice Parties").  CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

*Notice Parties*

(a)  Counsel to the Debtors, Latham & Watkins LLP, 885 Third Avenue, New York, New York  10022-4834 (Attn: Aaron M. Singer, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware  19801 (Attn: Daniel J. DeFranceschi, Esq.);

(b)  Counsel to the Ad Hoc Secured Noteholders Committee, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038 (Attn: Jayme T. Goldstein, Esq.) and 2029 Century Park East, Los Angeles, California 90067 (Attn: Frank Merola, Esq.) and Young Conaway Stargatt & Taylor, LLP (Attn: Edmon L. Morton, Esq. and Matthew B. Lunn, Esq.);

(c)  Counsel to the Prepetition Secured Notes Indenture Trustee, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004 (Attn: John R. Ashmead, Esq.); and

(d)  The Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware  19801 (Attn: David L. Buchbinder, Esq.).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a Solicitation Package (excluding Beneficial Holder Ballots and Master Ballots) or if you have questions regarding the procedures and requirements for objecting to the Plan, you may contact the Debtors' Voting and Claims Agent, Kurtzman Carson Consultants LLC, by:  (i) calling the Debtors' restructuring hotline at (877) 634-7166; (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/OnCure; and/or (iii) writing to OnCure Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at:  http://www.deb.uscourts.gov or free of charge at http://www.kccllc.net/OnCure.

THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS. THE PROVISIONS ARE SET FORTH AT THE END OF THIS NOTICE.  YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE VOTING AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE.**

Wilmington, Delaware
[_____], 2013

| **LATHAM & WATKINS LLP** | **RICHARDS, LAYTON & FINGER, P.A.** |
|---|---|
| Attn:  Paul E. Harner | Attn: Daniel J. DeFranceschi |
| Attn:  Keith A. Simon | Attn:  Tyler D. Semmelman |
| Attn:  Aaron M. Singer | One Rodney Square |
| Attn:  Annemarie V. Reilly | 920 North King Street |
| 885 Third Avenue | Wilmington, Delaware  19801 |
| New York, New York  10022-4834 | Fax:  302-651-7701 |
| Fax:  212-751-4864 | |

*Co-Counsel to the Debtors*

### RELEASE, EXCULPATION AND INJUNCTION PROVISIONS CONTAINED IN PLAN

X.B.    *Release of Claims and Causes of Action*

1.    *Release by the Debtors*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**Debtor Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule 6; (ii) any Causes of Action arising from gross negligence,

3 SF\5602445.6

actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this Article X.B shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

2. _Release by Third Parties_. Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party Release shall not operate to waive or release (i) any Causes of Action expressly listed on Plan Schedule 7; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent,

authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

X.E.    *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; *provided*, *however*, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

X.G.    *Injunction*

Except as otherwise expressly provided in this Plan or the Confirmation Order, from and after the Effective Date, all entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind,  in each case on account of or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to this Plan or the Confirmation Order against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated).  All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## EXHIBIT 7

**Confirmation Hearing Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------ x
In re:                                          :    Chapter 11
                                                :
ONCURE HOLDINGS, INC., et al.,                  :    Case No. 13-11540 (KG)
                                                :
          Debtors.[1]                           :    Jointly Administered
------------------------------------------------------------ x

**NOTICE OF (A) PLAN CONFIRMATION HEARING, (B) OBJECTION AND
VOTING DEADLINES AND (C) SOLICITATION AND VOTING PROCEDURES**

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY BE ENTITLED
> TO VOTE ON THE PLAN.  THEREFORE, YOU SHOULD READ THIS
> NOTICE CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY.  IF
> YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

**TO:    ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN,
ONCURE HOLDINGS, INC. AND ITS AFFILIATE DEBTORS AND DEBTORS IN
POSSESSION AND ALL OTHER PARTIES IN INTEREST IN THE ABOVE-
CAPTIONED CHAPTER 11 CASES**

        **PLEASE TAKE NOTICE THAT** on August 22, 2013, OnCure Holdings, Inc. and its affiliate
debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")
filed their (i) Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors Under Chapter
11 of the Bankruptcy Code [Docket No. ___] (as may be amended from time to time, the "Plan") and (ii)
Disclosure Statement for the Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors
Under Chapter 11 of the Bankruptcy Code [Docket No. ___] (as may be amended from time to time, the
"Disclosure Statement").[2]  On August 22, 2013, the Bankruptcy Court entered an order (i) approving the
Disclosure Statement as containing "adequate information" pursuant to Bankruptcy Code Section 1125,
(ii) establishing the Voting Record Date, Voting Deadline and other dates (iii) approving procedures for
soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan and (iv)
approving the manner and forms of certain notices [Docket No. ___] (the "Disclosure Statement Order").

        **PLEASE TAKE FURTHER NOTICE THAT** the Debtors are soliciting acceptances of the
Plan from Holders of Claims who are entitled to vote on the Plan.  The Bankruptcy Court can confirm the
Plan and bind all Holders of Claims and Equity Interests if it is accepted by the holders of at least two-

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte
Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072);
Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243);
JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II,
Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe
West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology
Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology
Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition
Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471).  The address
for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado,
80112.

[2]     Capitalized terms used but not otherwise defined herein will have the meanings set forth in the Plan.

thirds in amount and more than one-half in number of the Claims in each Impaired Class who vote on the Plan and if the Plan otherwise satisfies the applicable requirements of Bankruptcy Code Section 1129(a). If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, each Class rejecting the Plan and (b) otherwise satisfies the requirements of Bankruptcy Code Section 1129(b). If the Plan is confirmed by the Bankruptcy Court, it will be binding on all Holders of Claims and Equity Interests whether or not a particular Holder voted or affirmatively voted to reject the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Confirmation Hearing to consider confirmation of the Plan will commence at **10:00 a.m. prevailing Eastern Time on October 3, 2013**, before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to Bankruptcy Code Section 1127, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

1.      In accordance with Bankruptcy Code Sections 1122 and 1123, the Plan contemplates classifying Holders of Claims and Equity Interests into various Classes for all purposes, including with respect to voting on the Plan, as follows:

### SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|-----------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4 | Prepetition Term Loan Claims | Unimpaired | Deemed to Accept |
| 5 | Prepetition Secured Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Deemed to Reject |
| 7 | Intercompany Claims | Impaired | Deemed to Accept |
| 8 | Old HoldCo Interests | Impaired | Deemed to Reject |
| 9 | Old Affiliate Interests in any HoldCo Subsidiary | Unimpaired | Deemed to Accept |

2.      Voting Record Date. The Voting Record Date is **August 14, 2013** with respect to Claims in Class 5 and Equity Interests in Class 8 and **August 21, 2013** with respect to all other Claims. The Voting Record Date is the date by which it will be determined which Holders of Claims in Class 5 are entitled to vote on the Plan.

3.      Voting Deadline. The deadline for voting on the Plan is **5:00 p.m. prevailing Eastern Time on September 23, 2013** (the "**Voting Deadline**"). If you hold a Claim against one or more of the Debtors as of the applicable Voting Record Date and are entitled to vote to accept or reject the Plan, you should have received a Beneficial Holder Ballot or a Master Ballot (as applicable) and corresponding voting instructions. For your vote to be counted, you <u>must</u>: (a) follow such voting instructions carefully, (b) complete <u>all</u> the required information on the Beneficial Holder Ballot or Master Ballot, as applicable; <u>and</u> (c) sign, date and return your completed Beneficial Holder Ballot or Master Ballot, as applicable, so that it is **actually received** by the Voting and Claims Agent according to and as set forth in detail in the voting instructions on or before the Voting Deadline. If you are instructed to return your Beneficial Holder Ballot to your Intermediary Record Owner, you must submit your completed ballot to your Intermediary Record Owner in enough time for your Intermediary Record Owner to send a Master Ballot recording your vote to the Voting and Claims Agent by the Voting Deadline. *A failure to follow such*

*instructions may disqualify your vote.*

4.     <u>Temporary Allowance of Claims for Voting Purposes</u>.  Any Holder of a Claim against the Debtors for which the Debtors have filed an objection on or before August 21, 2013, whether such objection related to the entire claim or a portion thereof, shall not be entitled to vote on the Plan and shall not be counted in determining whether the requirements of Bankruptcy Code Section 1126(c) have been met with respect to the Plan.  Any Holder of a Class 5 Claim against the Debtors for which such Holder has timely filed a proof of claim (or an untimely proof of claim which has been allowed as timely by the Court under applicable law on or before the applicable Voting Record Date) which, in whole or in part, reflects a disputed, unliquidated, or contingent claim, and which is not subject to an objection filed by the Debtors, shall have its entire claim temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00.  If any such Holder of a Class 5 Claim described in this paragraph 4 disagrees with the Debtors' classification or status of its Claim, then such Holder <u>MUST</u> file with the Bankruptcy Court and serve upon the Notice Parties listed below, on or before **4:00 p.m. prevailing Eastern Time on September 19, 2013** (the "<u>Resolution Deadline</u>"), a motion requesting temporary allowance of its Claim solely for voting purposes in accordance with Bankruptcy Rule 3018 (such motion, the "<u>Temporary Allowance Motion</u>").  No later than three (3) Business Days after the filing and service of such Temporary Allowance Motion, the Voting and Claims Agent will send such Holder a Solicitation Package, including the appropriate ballot, and a pre-addressed, postage pre-paid envelope, which such Holder must then return its ballot according to the instructions attached thereto so it is **<u>actually received</u>** by the Voting and Claims Agent on or before the Voting Deadline.  Please be advised that the Debtors reserve all of their rights and objections regarding any and all Temporary Allowance Motions that may be filed with the Bankruptcy Court and that the distribution of a Solicitation Package is not and shall not constitute a waiver or release of such rights and objections.

<u>**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**</u>

> **ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

5.     <u>Plan Objection Deadline</u>.  The deadline for filing objections to the Plan is **September 23, 2013 at 4:00 p.m. prevailing Eastern Time** (the "<u>Plan Objection Deadline</u>").

6.     <u>Objections to the Plan</u>.  Any objection to the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **<u>actually received</u>** no later than the Plan Objection Deadline by the parties listed below (the "<u>Notice Parties</u>").  CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

*Notice Parties*

(a)     <u>Counsel to the Debtors</u>, Latham & Watkins LLP, 885 Third Avenue, New York, New York  10022-4834 (Attn: Aaron M. Singer, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware  19801 (Attn: Daniel J. DeFranceschi, Esq.);

(b)     <u>Counsel to the Ad Hoc Secured Noteholders Committee</u>, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038 (Attn: Jayme T. Goldstein, Esq.) and 2029 Century Park East, Los Angeles, California 90067 (Attn: Frank Merola, Esq.) and Young Conaway Stargatt & Taylor, LLP (Attn: Edmon L. Morton, Esq. and Matthew

B. Lunn, Esq.);

(c)    <u>Counsel to the Prepetition Secured Notes Indenture Trustee</u>, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004 (Attn: John R. Ashmead, Esq.); and

(d)    <u>The Office of the United States Trustee for the District of Delaware</u>, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: David L. Buchbinder, Esq.).

## ADDITIONAL INFORMATION

7.    <u>Obtaining Solicitation Materials</u>.  If you would like to obtain a Solicitation Package (<u>excluding</u> Beneficial Holder Ballots and Master Ballots) or if you have questions regarding the procedures and requirements for objecting to the Plan, you may contact the Debtors' Voting and Claims Agent, Kurtzman Carson Consultants LLC, by:  (i) calling the Debtors' restructuring hotline at (877) 634-7166; (ii) visiting the Debtors' restructuring website at: http://www.kccllc.net/OnCure; and/or (iii) writing to OnCure Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at:  http://www.deb.uscourts.gov or free of charge at http://www.kccllc.net/OnCure.  Please be advised that the Voting and Claims Agent is authorized to answer questions and provide additional copies of solicitation materials but may <u>not</u> advise you as to whether you should vote to accept or reject the Plan.

8.    <u>Filing the Plan Supplement</u>.  The Debtors will file the Plan Supplement no fewer than ten (10) days prior to the Voting Deadline and will serve the Plan Supplement on all parties that have filed requests for notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of such filing date and on such parties directed by the Court pursuant to the Disclosure Statement Order.  Copies of the Plan Supplement may be obtained in the manner set forth in paragraph 7 above.

9.    THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS.  THE PROVISIONS ARE SET FORTH AT THE END OF THIS NOTICE.  YOU SHOULD REVIEW THESE PROVISIONS CAREFULLY.

Dated: [_____], 2013
        Wilmington, Delaware

| **LATHAM & WATKINS LLP** | **RICHARDS, LAYTON & FINGER, P.A.** |
|---|---|
| Attn:  Paul E. Harner | Attn: Daniel J. DeFranceschi |
| Attn:  Keith A. Simon | Attn:  Tyler D. Semmelman |
| Attn:  Aaron M. Singer | One Rodney Square |
| Attn: Annemarie V. Reilly | 920 North King Street |
| 885 Third Avenue | Wilmington, Delaware  19801 |
| New York, New York  10022-4834 | Fax:  302-651-7701 |
| Fax:  212-751-4864 | |
| ***Co-Counsel to the Debtors*** | |

**RELEASE, EXCULPATION AND INJUNCTION PROVISIONS CONTAINED IN PLAN**

X.B.    *Release of Claims and Causes of Action*

1.    *Release by the Debtors*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**Debtor Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule 6; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in this Article X.B shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

2.      *Release by Third Parties*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party Release shall not operate to waive or release (i) any Causes of Action expressly listed on Plan Schedule 7; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

X.E.     *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the

restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; *provided*, *however*, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; *provided*, *further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this <u>Article X.E</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

X.G.    *Injunction*

Except as otherwise expressly provided in this Plan or the Confirmation Order, from and after the Effective Date, all entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind,  in each case on account of or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to this Plan or the Confirmation Order against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated).  All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**EXHIBIT C**


Financial Projections

## EXHIBIT C

## FINANCIAL PROJECTIONS

The Debtors believe that the Plan meets the Bankruptcy Code's feasibility requirement contained in Section 1129(a)(11) of the Bankruptcy Code that Plan confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources to continue in business.  In this regard, financial projections of the Reorganized Debtors (the "**Projections**") for the quarter ending December 31, 2013, and for the years ending December 31, 2014 and December 31, 2015 (taken together, the "**Projection Period**") are included with this Disclosure Statement.

Neither the Debtors nor the Investor, as a matter of course, publish their respective business plans and strategies or projections or their anticipated financial position or results of operations.  Accordingly, neither the Debtors nor the Investor anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or Interests after the Confirmation Date, or to include such information in documents required to be filed with the Securities and Exchange Commission or otherwise make public such information.

ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA OR ANY OTHER JURISDICTION, THE FINANCIAL ACCOUNTING STANDARDS BOARD, OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY THE DEBTORS' OR THE INVESTOR'S INDEPENDENT CERTIFIED ACCOUNTANTS. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED ON A VARIETY OF ASSUMPTIONS, WHICH MAY NOT BE REALIZED, AND WHICH ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND THE INVESTOR. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY ANY OF THE DEBTORS, THE INVESTOR, OR ANY OTHER PERSON THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS. HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN REACHING THEIR DETERMINATIONS OF WHETHER TO ACCEPT OR REJECT THE PLAN.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995:

SF\5613541.2

Certain statements made in this presentation constitute forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995, including statements regarding the transaction, the financing and the combined company's future plans, objectives and expected performance. Statements that are not historical facts, including statements accompanied by words such as "believe," "expect," "estimate," "intend," or "plan," are intended to identify forward looking statements and convey the uncertainty of future events or outcomes.  The Debtors caution that any such forward-looking statements are based on assumptions that are subject to a wide range of risks, and actual results may differ materially. Given these risks and uncertainties, you are cautioned not to place undue reliance on such forward-looking statements. Certain areas of this presentation also depict Adjusted EBITDA, a non-GAAP disclosure, which adds back non-cash items, management fees and certain other adjustments. Adjusted EBITDA is shown as a supplemental disclosure because it is widely used by the investment community. It should not be considered to be an alternative to net income or any other figure calculated in accordance with GAAP, or as an indicator of operating performance. The Debtors' and the Investor's calculation of Adjusted EBITDA may differ from methods used by other companies.

The Debtors, the Reorganized Debtors and the Investor assume no obligation to publicly update any forward-looking statement to reflect actual results, changes in assumptions or changes in other factors affecting these estimates other than as required by applicable law. Similarly, these and other factors, including the terms of any plan of reorganization of the Debtors ultimately confirmed, can affect the value of the Debtors' various prepetition liabilities and/or other securities. Accordingly, the Debtors urge that the appropriate caution be exercised with respect to existing and future investments in any of these liabilities and/or securities.

**Summary of Significant Assumptions**

(1)  The Effective Date of the Plan is October 31, 2013.

(2)  The Amended Notes total $75 million in principal amount on the Effective Date.  The Escrowed Notes are not illustrated as obligations of the Reorganized Debtors.

(3)  Illustrative synergies relating to the Investor's acquisition of the Reorganized Debtors have been included at $7 million per annum, though these are still being considered in light of the Plan and treatment of certain claims not being finalized.

| Projections ($ in millions) | Q4 2013E | FY 2014P | FY 2015P |
|---|---|---|---|
| Net Revenue | $22.3 | $88.1 | $89.2 |
| Gross Profit | $6.7 | $25.2 | $25.7 |
| Plus: Center Level Depreciation & Amortization | 1.8 | 6.7 | 6.7 |
| Center Level EBITDA | $8.4 | $31.9 | $32.4 |
| Less: General & Administrative Expense | (3.1) | (13.0) | (13.0) |
| Income from Operations | $5.4 | $18.9 | $19.4 |
| Plus: Other Income | $0.0 | $0.1 | $0.1 |
| Plus: Non-Center Level Depreciation & Amortization | 0.1 | 0.2 | 0.1 |
| Adj. EBITDA | $5.5 | $19.2 | $19.6 |
| Plus: Estimated Synergies | - | 7.0 | 7.0 |
| **Pro Forma Adj. EBITDA** | **$5.5** | **$26.2** | **$26.6** |
| Less: Capital Expenditures | (1.3) | (8.2) | (10.4) |
| Unlevered Free Cash Flow | $4.2 | $18.0 | $16.2 |
| Less: Cash Interest (Incl. Capital Leases) [1] | ($0.1) | ($9.0) | ($9.0) |
| Net Change in Working Capital | 0.3 | (0.4) | (0.2) |
| **Levered Free Cash Flow** | **$4.4** | **$8.7** | **$7.1** |

*Memo: Key Terms of Amended Notes*

| | | |
|---|---|---|
| *Principal Amount* [2] | *$75.0* | |
| *Cash Coupon (Payable Semi-Annually)* | *11.75%* | |
| *Maturity Date* | *1/15/2017* | |

(1) *Includes interest under capital leases, assuming an average interest rate of 8.3% (per OnCure's 2012 10-K filing).*

(2) *Excludes $7.5 million in aggregate principal amount of Amended Notes, which will be deposited into an escrow account and released upon delivery of fiscal year 2015 financial results, subject to conditions specified in Exhibit G of Docket #0064.  Per Exhibit G, any interest paid on the Escrowed Notes prior to their release will be remitted to OnCure.*

## EXHIBIT D

Liquidation Analysis

# LIQUIDATION ANALYSIS

## INTRODUCTION

The Debtors, with the assistance of Jefferies, prepared this Liquidation Analysis in connection with the Disclosure Statement[1] for the purpose of evaluating whether the Plan meets the "best interest of creditors" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the Plan meets this test and that the members of each impaired class that have not voted to accept the Plan or that are not deemed to accept the Plan will receive under the Plan at least as much as they would if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This analysis is summarized below.

In determining whether the best interests of creditors test has been met, the first step is to estimate cash proceeds that would be realized if the Debtors were to be liquidated in accordance with chapter 7 of the Bankruptcy Code. The Debtors' assets are primarily outstanding accounts receivables, property, plant and equipment, goodwill and MSAs.

The total value available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 cases. The total value available would then be reduced, first, by the estimated chapter 7 liquidation-related costs, including the fees and expenses of the chapter 7 trustee (the "**Trustee**"), second, by any claims secured by enforceable security interests and liens against assets of the Debtors, and third, by such additional administrative expenses and priority claims that may exist or may result from the termination of the Debtors' business and liquidation under chapter 7. Finally, any remaining cash would be allocated to creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code. This Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 Cases would convert to chapter 7 cases under the Bankruptcy Code on October 18, 2013 (the "**Liquidation Date**"). The Trustee would be appointed or elected to commence a liquidation of the Debtors and/or all of their assets. Thus, this Liquidation Analysis has been prepared based on the Debtors' estimated balance sheet as of October 31, 2013.

Estimating recoveries in a chapter 7 liquidation is an uncertain process due to the number of unknown variables and is necessarily speculative. Thus, this Liquidation Analysis relies upon the extensive use of estimates and assumptions that, although considered reasonable by the Debtors and their financial advisor, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.

This Liquidation Analysis presents a liquidation of the Debtors on a consolidated basis. Proceeds realized from each Debtor are aggregated in a common distribution source. For purposes of distribution, each and every Claim asserted against or Interest in any Debtor is presumed to be entitled to a distribution from the aggregated proceeds. Any Claim against a Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors are deemed to have one right to a distribution from the aggregated proceeds.

This Liquidation Analysis should be reviewed in conjunction with the accompanying notes below.

---

[1]     All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Disclosure Statement. To the extent that a definition of a term in the text of this Liquidation Analysis and the definition of such term in the Disclosure Statement are inconsistent, the definition included in the Disclosure Statement shall control and govern.

NEITHER THE DEBTORS NOR THEIR FINANCIAL ADVISOR MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS OR THE ABILITY TO ACHIEVE FORECASTED RESULTS.  THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THIS LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION. IN THE EVENT THE CHAPTER 11 CASES ARE CONVERTED TO CHAPTER 7 CASES, ACTUAL RESULTS MAY VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS AND THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED WOULD BE REALIZED.

NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS.

EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS LIQUIDATION ANALYSIS WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT THE ANALYSES IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS DO NOT INTEND AND DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THIS LIQUIDATION ANALYSIS (OR ANY OTHER PART OF THE DISCLOSURE STATEMENT) TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THIS LIQUIDATION ANALYSIS IS PREPARED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THIS LIQUIDATION ANALYSIS SHOULD NOT BE RELIED ON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THIS LIQUIDATION ANALYSIS.


THIS LIQUIDATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE DISCLOSURE STATEMENT AND PLAN AND TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE RESTRUCTURING AND PLAN AND SHOULD NOT BE USED OR RELIED ON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

**GENERAL ASSUMPTIONS**

ESTIMATE OF NET PROCEEDS

The conversion of the Debtors' chapter 11 reorganization to chapter 7 would entail a forced sale of the Debtors' assets in one or more sales pursuant to section 363 of the Bankruptcy Code and/or liquidating the tangible assets, which, for purposes of this Liquidation Analysis, is assumed would take place over a 30-day period of time.

In order to estimate the net proceeds of a chapter 7 liquidation, this Liquidation Analysis estimates the proceeds that would be realized from an expedited chapter 7 sale of the Debtors' assets, including the sale of the radiation oncology treatment centers where the Debtors provide management services to physician groups (the "**Centers**") as going concerns.

Without limitation, it is assumed that the following factors would adversely affect the net proceeds that would be realized from a chapter 7 liquidation of the Debtors' assets:

(i)     Sale process to be run by the Trustee;
(ii)    Shortened time period involved in the sale process;
(iii)   Possible discounts buyers would require given a shorter due diligence period;
(iv)    Potentially negative perceptions involved in liquidation sales;
(v)     The potential impact on the Debtors' business and its profitability, including, without limitation, loss of key employees and patients, and worse terms from vendors;
(vi)    The limited universe of prospective buyers; and
(vii)   Dynamics within a highly competitive industry.

The estimated values of Debtors' assets, other than the value of the Centers, are based on an estimated percentage of recovery of the gross book value of the Debtors' assets that the Trustee might realize. This Liquidation Analysis does not take into account any insurance proceeds that may be paid to any Holder of an Allowed Claim.

This Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions.

ESTIMATE OF COSTS

Proceeds from a chapter 7 liquidation would be reduced by administrative costs incurred during a liquidation period. These costs would include fees payable to the Trustee and professional advisors to the Trustee, salaries and severances, occupancy, costs of sale of assets, costs of closing their office and costs of the claims reconciliation and adjudication process, plus any unpaid expenses incurred by the Debtors during their Chapter 11 Cases and allowed in the chapter 7 cases, such as compensation for professionals and costs.

DISTRIBUTION OF NET PROCEEDS

Under a chapter 7 liquidation, all secured claims are required to be satisfied from the proceeds of the collateral securing such claims before any such proceeds would be distributed to any other creditors. This analysis assumes the application of the rule of absolute priority of distributions with respect to the remaining proceeds of the Debtors.

It is likely that the pool of General Unsecured Claims would be significantly larger in a chapter 7 liquidation than in a chapter 11 restructuring. For example, in a chapter 7 liquidation claims could arise due to breach or rejection of obligations assumed by the Debtors during their Chapter 11 Cases and the rejection of executory contracts or other obligations entered into by the Debtors both pre and post-petition. These claims would dilute any potential recoveries to all Holders of General Unsecured Claims. The Debtors have not attempted to estimate the amount of such additional General Unsecured Claims in the context of a chapter 7 liquidation, but it is assumed that the total amount of Claims allowed in a chapter 7 liquidation would be significantly higher than the total Allowed Claims under the Plan.

| ($ US ) | Estimated Book Value (Unaudited) 10/31/2013 | Notes | Assumed Recovery Percentage | | Estimated Liquidation Value | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| Sale Proceeds from Centers | | A | | | $ 15,177,768 | $ 48,391,191 |
| **CURRENT ASSETS:** | | | | | | |
| Cash and Cash Equivalents [(1)] | $ 16,390,162 | B | 100% | 100% | $ 16,390,162 | $ 16,390,162 |
| Accounts Receivable, Net | 15,200,000 | C | 70% | 90% | 10,640,000 | 13,680,000 |
| Deferred Tax Assets | 981,923 | D | 0% | 0% | 0 | 0 |
| Prepaid Expenses | 3,826,561 | E | 0% | 5% | 0 | 191,328 |
| Other Current Assets | 544,799 | F | 0% | 5% | 0 | 27,240 |
| **Total Current Assets** | $ 36,943,445 | | | | $ 27,030,162 | $ 30,288,730 |
| **PROPERTY, PLANT AND EQUIPMENT, NET:** | | G | | | | |
| Property, Plant and Equipment, Net – Centers | $ 22,845,718 | | 0% | 0% | $ 0 | $ 0 |
| Property, Plant and Equipment, Net – Corporate | 544,222 | | 0% | 10% | 0 | 54,422 |
| **Total Property, Plant and Equipment, Net** | $ 23,389,940 | | | | $ 0 | $ 54,422 |
| **OTHER ASSETS:** | | | | | | |
| Goodwill | $ 25,904,000 | H | 0% | 0% | $ 0 | $ 0 |
| Management Services Agreements, Net | 22,433,000 | I | 0% | 0% | 0 | 0 |
| Other Assets | 8,342,149 | J | 0% | 5% | 0 | 417,107 |
| **Total Other Assets** | $ 56,679,149 | | | | $ 0 | $ 417,107 |
| **Total Assets** | $ 117,012,534 | | | | | |
| **Preliminary Proceeds from Liquidation of Assets Range** | | | | | $ 42,207,930 | $ 79,151,451 |
| **Costs of Liquidation:** | | K | | | | |
| Corporate Payroll & Severance | | | | | $ (3,150,001) | $ (3,150,001) |
| Trustee | | | | | (774,533) | (1,882,839) |
| **Total Costs of Liquidation** | | | | | $ (3,924,534) | $ (5,032,840) |
| **Net Estimated Proceeds Available for Distribution** | | | | | $ 38,283,396 | $ 74,118,611 |

(1) Cash and Cash Equivalents balance based on the week of 10/31/2013 Cash Balance per DIP budget filed on June 16, 2013.

- 5 -

($ US )

| | Class | Estimated Allowable Claim Low | High | Notes | Recoveries Low | High |
|---|---|---|---|---|---|---|
| **Net Estimated Proceeds Available for Distribution** | | | | | $ 38,283,396 | $ 74,118,611 |
| **DIP Claims** | | | | L | | |
| DIP Facility | | $ 25,000,000 | $ 25,000,000 | | $ 25,000,000 | $ 25,000,000 |
| **Total DIP Claims** | | 25,000,000 | 25,000,000 | | 25,000,000 | 25,000,000 |
| Recovery Rate | | | | | 100.0% | 100.0% |
| **Administrative & Priority Claims Payable in Liquidation** | | | | M | | |
| General Admin and Operating Expenses | | $ 0 | $ 0 | | $ 0 | $ 0 |
| Outstanding Professional Fee Claims | | 1,420,869 | 1,420,869 | | 1,420,869 | 1,420,869 |
| Bankruptcy Fees | | 57,300 | 57,300 | | 57,300 | 57,300 |
| Outstanding Ad Hoc Secured Noteholder Committee Fees | | 1,056,297 | 1,056,297 | | 1,056,297 | 1,056,297 |
| Prepetition Secured Notes Indenture Trustee Fees and Expenses | | 0 | 0 | | 0 | 0 |
| Prepetition Term Loan Agent Fees and Expenses | | 0 | 0 | | 0 | 0 |
| Cure Claim Amounts | | 350,051 | 350,051 | | 350,051 | 350,051 |
| **Total Administrative & Priority Claims Payable in Liquidation** | | 2,884,517 | 2,884,517 | | 2,884,517 | 2,884,517 |
| Recovery Rate | | | | | 100.0% | 100.0% |
| **Other Priority Claims** | 1 | | | L | | |
| Other Priority Claims | | $ 0 | $ 0 | | $ 0 | $ 0 |
| **Other Priority Claims** | | 0 | 0 | | 0 | 0 |
| Recovery Rate | | | | | 0.0% | 0.0% |
| **Other Secured Claims** | 2 | | | L | | |
| Other Secured Claims | | $ 0 | $ 0 | | $ 0 | $ 0 |
| **Total Other Secured Claims** | | 0 | 0 | | 0 | 0 |
| Recovery Rate | | | | | 0.0% | 0.0% |
| **Secured Tax Claims** | 3 | | | L | | |
| Secured Tax Claims | | $ 0 | $ 0 | | $ 0 | $ 0 |
| **Total Secured Tax Claims** | | 0 | 0 | | 0 | 0 |
| Recovery Rate | | | | | 0.0% | 0.0% |
| **Prepetition Term Loan Claims** | 4 | | | L | | |
| Prepetition Term Loan Claims | | $ 0 | $ 0 | | $ 0 | $ 0 |
| **Total Prepetition Term Loan Claims** | | 0 | 0 | | 0 | 0 |
| Recovery Rate | | | | | 0.0% | 0.0% |
| **Prepetition Senior Secured Notes Claim** | 5 | | | L | | |
| Prepetition Senior Secured Notes Claims | | $ 210,000,000 | $ 210,000,000 | | $ 10,398,879 | $ 46,234,094 |
| **Total Prepetition Senior Secured Notes Claims** | | 210,000,000 | 210,000,000 | | 10,398,879 | 46,234,094 |
| Recovery Rate | | | | | 5.0% | 22.0% |
| **Other Administrative & Priority Claims** | | | | M | | |
| 503(b)(9) Claims | | $ 24,628 | $ 0 | | $ 0 | $ 0 |
| Priority Tax Claims | | 559,472 | 0 | | 0 | 0 |
| Bid Protections | | 3,000,000 | 0 | | 0 | 0 |
| **Total Other Administrative & Priority Claims** | | 3,584,100 | 0 | | 0 | 0 |
| Recovery Rate | | | | | 0.0% | 0.0% |
| **General Unsecured Claims** | 6 | | | N | | |
| General Unsecured Claims | | $ 2,546,983 | $ 2,546,983 | | $ 0 | $ 0 |
| **Total General Unsecured Claims** | | 2,546,983 | 2,546,983 | | 0 | 0 |
| Recovery Rate | | | | | 0.0% | 0.0% |
| **Intercompany Claims** | 7 | | | N | | |
| Intercompany Claims | | $ 0 | $ 0 | | $ 0 | $ 0 |
| **Total Intercompany Claims** | | 0 | 0 | | 0 | 0 |
| Recovery Rate | | | | | 0.0% | 0.0% |
| **Old Holdco Interest Claims** | 8 | | | N | | |
| Old Holdco Interest Claims | | $ 0 | $ 0 | | $ 0 | $ 0 |
| **Total Old Holdco Interest Claims** | | 0 | 0 | | 0 | 0 |
| Recovery Rate | | | | | 0.0% | 0.0% |
| **Old Affiliate Interests in any Holdco Subsidiary Claims** | 9 | | | N | | |
| Old Affiliate Interests in any Holdco Subsidiary Claims | | $ 0 | $ 0 | | $ 0 | $ 0 |
| **Total Old Affiliate Interests in any Holdco Subsidiary Claims** | | 0 | 0 | | 0 | 0 |
| Recovery Rate | | | | | 0.0% | 0.0% |

**NOTES**

NOTE A – SALE PROCEEDS FROM CENTERS

This Liquidation Analysis assumes the Debtors' assets would be sold within a 30-day period following conversion to chapter 7 proceedings. In light of the factors described above, a chapter 7 liquidation of the Debtors would likely reduce the value of the Centers significantly. This Liquidation Analysis concludes that the value generated from a chapter 7 liquidation, without deducting any liquidation or other costs (such as Trustee fees, professional fees, net operating losses and corporate payroll and expenses), would be between $15.2 million and $48.4 million ("**Sale Proceeds from Centers**"). This reflects the application of a range of multiples of 0.0x to 1.0x to estimated 2013 EBITDA for various Centers under the low liquidation value range and 1.0x to 2.0x to estimated 2013 EBITDA for various Centers under the high liquidation value range. The recovery for any Center is based on the assumption that the Centers are sold on a going concern basis and not on an asset by asset basis. The Debtors estimate that certain Centers have no going concern value and/or cannot be sold in a limited time frame. The Debtors assume that such Centers would be transferred to the physician groups that operate their medical practices at the Centers, and no recovery would be realized from the transfer of the Centers. If these Centers are to be sold on an asset by asset basis, the cost of liquidating these Centers would likely be greater than the proceeds that the Debtors would realize.

A chapter 7 liquidation would have a material effect on the value of the Debtors' assets. The Debtors believe that the above assumptions are conservative and could ultimately not be achieved. The Debtors cannot judge the impact of a chapter 7 liquidation and sale process on the recoverable value of the Debtors' assets with any degree of certainty.

U.S. taxes due on the gain (if any) from the sale of the Debtors' assets are assumed to be offset by existing tax attributes and deductions generated by payments made in the chapter 7 cases.

NOTE B – CASH AND CASH EQUIVALENTS

This Liquidation Analysis assumes, based on the Debtors' estimated balance sheets as of October 31, 2013, that cash and cash equivalents of approximately $16.4 million will be in the Debtors' accounts.

NOTE C – ACCOUNTS RECEIVABLE, NET

The analysis of accounts receivables assumes that the Trustee would retain certain existing staff of the Debtors to handle an aggressive collection effort for outstanding trade accounts receivable. Collections during a liquidation could be significantly compromised because customers may attempt to set off outstanding amounts owed to the Debtors against alleged damage and breach of contract claims. The liquidation value of accounts receivable was estimated by applying a recovery factor consistent with the

Debtors' experience in collecting accounts. The estimate also considers the inevitable difficulty that a liquidating company has in collecting its receivables and any concessions that might be required to facilitate the collection of certain accounts. The Debtors estimate recoveries between 70% to 90% of net accounts receivable.

## NOTE D – DEFERRED TAX ASSETS

The Debtors estimate that the deferred tax assets will have no value in liquidation.

## NOTE E – PREPAID EXPENSES

Prepaid expenses include retainers for professional fees, rent payments, income tax refunds, prepaid insurance premiums and unamortized software licensing agreements. The Debtors estimate that these assets will have minimal value in liquidation.

## NOTE F – OTHER CURRENT ASSETS

The Debtors estimate that these assets will have minimal value in liquidation.

## NOTE G – PROPERTY, PLANT & EQUIPMENT, NET

The property, plant and equipment value relates primarily to medical equipment, other equipment, office furniture and automobiles. The Debtors assume the property, plant and equipment at the Centers will be included in the sale of the Centers and therefore included in the Sale Proceeds from Centers. The Debtors estimate that they will recover 0% to 10% of the value of property, plant and equipment not located at the Centers through liquidation.

## NOTE H – GOODWILL

The Debtors estimate that Goodwill will have no value in liquidation.

## NOTE I – MANAGEMENT SERVICES AGREEMENTS

The value of the MSAs is included in the estimate for the Sale Proceeds from the sale of the Centers.

## NOTE J – OTHER ASSETS

Other assets include lease deposits, certain investments, net cost for debt issuance and costs related to certain MSAs. The Debtors assume that these assets will have limited or no value in a liquidation.

## NOTE K – COSTS ASSOCIATED WITH LIQUIDATION

Corporate payroll, severances and certain operating costs during a liquidation are based

upon the assumption that certain business functions would be retained to oversee a liquidation process for 30 days. The remaining staff would also be needed to maintain and close the accounting records and to complete certain administrative tasks, including payroll, tax forms and records.

Trustee fees include those fees associated with the appointment of the Trustee in accordance with section 326 of the Bankruptcy Code. Trustee fees are calculated at 3% of the gross proceeds of a liquidation (excluding cash). The combined net operating costs, corporate payroll expenses and Trustee fees are assumed to range from $3.9 million to $5.0 million.

NOTE L – SECURED CLAIMS

For purposes of this Liquidation Analysis, the Debtors assume that Secured Claims consist of the estimated amount owed under the DIP Facility Credit Agreement, the Prepetition Term Loan Credit Agreement and the Prepetition Secured Notes. This Liquidation Analysis does not account for any prepetition accrued interest and assumes that there are no Other Secured Claims. The Liquidation Analysis also assumes that amounts due under the DIP Facility Credit Agreement are secured by a first-priority lien on all of the assets of the Debtors. As of June 19, 2013, the Prepetition Term Loan Credit Agreement was fully repaid and there is no claim currently outstanding against the Debtors.

NOTE M – ADMINISTRATIVE AND PRIORITY CLAIMS

Certain Administrative Claims are payable under the carve-out permitted by the Final DIP Order. The Debtors estimate that the total amount of such claims to be approximately $2.9 million. The Debtors estimate that the total Other Administrative & Priority Claims to be between $0.0 million and $3.6 million.

NOTE N – UNSECURED CLAIMS

General Unsecured Claims include trade claims and certain accrued liability claims. This Liquidation Analysis does not attempt to estimate potential additional General Unsecured Claims that could arise in the context of a chapter 7 liquidation, but such additional claims could be substantial in amount.

**<u>EXHIBIT E</u>**

Historical Financial Statements

**ONCURE HOLDINGS, INC. AND DEBTOR SUBSIDIARIES**
**CONSOLIDATED INCOME STATEMENTS**
**($ in Thousands)**

| | Fiscal Year Ended | | | Quarter Ended |
|---|---|---|---|---|
| | 12/31/2010 | 12/31/2011 | 12/31/2012 | 3/31/2013 [1] |
| Net revenue | $ 97,334 | $ 100,739 | $ 93,927 | $ 21,716 |
| Cost of operations: | | | | |
| Salaries and benefits | 34,686 | 32,229 | 31,973 | 8,110 |
| Depreciation and amortization | 18,365 | 17,445 | 15,451 | 3,012 |
| Impairment loss | - | - | 104,757 | - |
| General and administrative expenses | 35,082 | 38,887 | 40,026 | 11,782 |
| Total operating expenses | $ 88,133 | $ 88,561 | $ 192,207 | $ 22,904 |
| (Loss) income from operations | $ 9,201 | $ 12,178 | $ (98,280) | $ (1,188) |
| Other income (expense): | | | | |
| Interest expense | (22,908) | (26,816) | (27,039) | (7,743) |
| Debt extinguishment costs | (2,932) | - | (1,098) | - |
| Loss on interest rate swap | (267) | - | - | - |
| Equity interest in net earnings of joint ventures | 436 | 340 | 373 | 29 |
| Impairment loss on equity interest of joint | - | (160) | (2,741) | - |
| Interest income and other (expense), net | (920) | (491) | (59) | 4 |
| Total other expense | $ (26,591) | $ (27,127) | $ (30,564) | $ (7,710) |
| Loss from continuing operations before income tax | (17,390) | (14,949) | (128,844) | (8,898) |
| Income tax benefit | 6,969 | 4,637 | 10,526 | (12) |
| Loss from continuing operations | $ (10,421) | $ (10,312) | $ (118,318) | $ (8,910) |
| Discontinued operations, net of tax: | | | | |
| Impairment loss from discontinued operations | (275) | - | - | - |
| Consolidated net loss | (10,696) | (10,312) | (118,318) | (8,910) |
| Less: Net income attributable to noncontrolling interest | - | 1 | 243 | 24 |
| Net loss attributable to OnCure Holdings, Inc. | $ (10,696) | $ (10,313) | $ (118,561) | $ (8,934) |

**Notes:**
(1) Unaudited financials for quarter ended March 31, 2013.

## ONCURE HOLDINGS, INC. AND DEBTOR SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS
### ($ in Thousands)

| | Fiscal Year Ended | | | Quarter Ended |
|---|---|---|---|---|
| | 12/31/2010 | 12/31/2011 | 12/31/2012 | 3/31/2013 [1] |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash | $ 7,047 | $ 6,988 | $ 6,380 | $ 15,374 |
| Accounts receivable [2] | 17,273 | 18,812 | 16,389 | 17,144 |
| Deferred income taxes | 936 | 1,391 | 982 | 982 |
| Prepaid expenses | 2,555 | 2,477 | 2,917 | 3,366 |
| Other current assets | 2,880 | 991 | 605 | 620 |
| Total current assets | 30,691 | 30,659 | 27,273 | 37,486 |
| Property and equipment, net | 37,483 | 31,117 | 27,371 | 25,773 |
| Goodwill | 174,353 | 174,353 | 81,353 | 81,353 |
| Management service agreements, net | 51,923 | 45,295 | 27,395 | 26,452 |
| Other assets, net | 12,905 | 12,055 | 9,454 | 8,263 |
| Assets of discontinued operations | 191 | - | - | - |
| Total assets | $ 307,546 | $ 293,479 | $ 172,846 | $ 179,327 |
| **Liabilities and stockholders' equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ 2,475 | $ 1,709 | $ 2,220 | $ 3,210 |
| Accrued expenses | 6,451 | 6,436 | 7,256 | 6,535 |
| Accrued interest | 3,136 | 3,084 | 3,096 | 9,283 |
| Current portion of debt | 284 | 292 | 7,357 | 16,560 |
| Current portion of obligations under capital leases | 1,610 | 1,341 | 1,288 | 1,231 |
| Other current liabilities | 479 | 446 | 311 | 640 |
| Total current liabilities | 14,435 | 13,308 | 21,528 | 37,459 |
| Long-term debt [3] | 206,568 | 206,951 | 208,250 | 208,081 |
| Capital leases, less current portion | 3,487 | 2,146 | 858 | 596 |
| Other long-term liabilities | 2,272 | 2,403 | 2,575 | 2,558 |
| Deferred income tax liabilities | 16,790 | 12,608 | 1,673 | 1,685 |
| Total liabilities | 243,552 | 237,416 | 234,884 | 250,379 |
| Stockholders' equity: | | | | |
| Preferred stock [4] | - | - | - | - |
| Common stock [5] | 26 | 26 | 26 | 26 |
| Additional paid-in capital | 96,323 | 96,299 | 96,815 | 96,840 |
| Accumulated deficit | (32,355) | (42,668) | (161,229) | (170,163) |
| Total OnCure Holdings, Inc. stockholders' equity | 63,994 | 53,657 | (64,388) | (73,297) |
| Noncontrolling interest | - | 2,406 | 2,350 | 2,245 |
| Total stockholders' equity | 63,994 | 56,063 | (62,038) | (71,052) |
| Total liabilities and stockholders' equity | $ 307,546 | $ 293,479 | $ 172,846 | $ 179,327 |

**Notes:**

(1) Unaudited financials for quarter ended March 31, 2013.

(2) Accounts receivable less allowances of $1,947, $1,955, $1,931 and $2,065 in 2010, 2011, 2012 and Q1 2013 respectively.

(3) Long term debt is net of unamortized discount of $3,432, $3,049, $2,617 and $2,501 in 2010, 2011, 2012 and Q1 2013 respectively.

(4) Preferred stock has $0.001 par value, 1,000,000 shares authorized, no shares issued and outstanding.

(5) Common stock has $0.001 par value, 50,000,000 shares authorized, 26,317,675 shares issued and outstanding.

## ONCURE HOLDINGS, INC. AND DEBTOR SUBSIDIARIES
## CONSOLIDATED CASH FLOW STATEMENTS
### ($ in Thousands)

| | Fiscal Year Ended | | | Quarter Ended |
| --- | --- | --- | --- | --- |
| | 12/31/2010 | 12/31/2011 | 12/31/2012 | 3/31/2013 [1] |
| **Operating activities** | | | | |
| Net loss | $ (10,696) | $ (10,312) | $ (118,318) | $ (8,910) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | | |
| Equity interest in net earnings of joint ventures | (436) | (340) | (373) | (29) |
| Depreciation | 11,609 | 10,889 | 9,366 | 2,080 |
| Amortization | 6,756 | 6,556 | 6,085 | 932 |
| Amortization of loan fees and deferred interest expense | 1,442 | 1,523 | 1,775 | 1,307 |
| Debt extinguishment costs | 2,932 | - | 1,098 | - |
| Impairment losses | - | 160 | 107,498 | - |
| Impairment loss from discontinued operations | 275 | - | - | - |
| Deferred income tax benefit | (6,981) | (4,637) | (10,526) | 12 |
| Stock-based compensation | 588 | 381 | 516 | 25 |
| Provision for bad debts | 2,423 | 2,573 | 2,394 | 547 |
| Other, net | 734 | 947 | 429 | 24 |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | 1,456 | (4,112) | 29 | (1,302) |
| Prepaid expenses and other current assets | 340 | 2,367 | 325 | (4) |
| Accounts payable and accrued expenses | 2,208 | (834) | 1,343 | 6,456 |
| Other liabilities | (2,576) | 143 | (392) | 252 |
| Net cash provided by operating activities | 10,074 | 5,304 | 1,249 | 1,390 |
| **Investing activities** | | | | |
| Purchases of property and equipment | (8,038) | (5,141) | (3,105) | (482) |
| Distribution received from unconsolidated joint ventures | 720 | 290 | 362 | 76 |
| Investment in unconsolidated joint ventures | - | (392) | (900) | - |
| Net cash used in investing activities | (7,318) | (5,243) | (3,643) | (406) |
| **Financing activities** | | | | |
| Proceeds from issuance of debt | 206,348 | - | - | - |
| Principal repayments of debt | (196,773) | (392) | (1,037) | (542) |
| Payment of debt issuance costs | (8,963) | (118) | (1,537) | - |
| Principal repayments of capital leases | (1,686) | (1,610) | (1,341) | (319) |
| Draw on Credit Agreement | - | - | 6,000 | 9,000 |
| Distribution to noncontrolling interest | - | - | (299) | (129) |
| Proceeds from sale of noncontrolling interest | - | 2,000 | - | - |
| Net cash provided by (used in) financing activities | (1,074) | (120) | 1,786 | 8,010 |
| Net (decrease) increase in cash | 1,682 | (59) | (608) | 8,994 |
| Cash, beginning of year | 5,365 | 7,047 | 6,988 | 6,380 |
| Cash, end of year | $ 7,047 | $ 6,988 | $ 6,380 | $ 15,374 |

**Notes:**
(1) Unaudited financials for quarter ended March 31, 2013.