## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ONCURE HOLDINGS, INC., *et al.*,[1]<br><br>　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 13-11540 (KG)<br><br>(Jointly Administered)<br><br>**Ref. No. 268** |

## OBJECTION TO PLAN OF REORGANIZATION FOR ONCURE HOLDINGS, INC. AND ITS AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Travers McLoughlin, Peter Sien, Cynthia Anderson, Abhijit Deshmukh, Anand Kuruvilla, Neenad Shah, Shyam Paryani, Dwelvin Simmons, Brian Chang, John Crawford, Xiao Lin, and R. Prasad Mantravadi (the "**Physicians**"), by and through their undersigned counsel, hereby object (the "**Objection**") to confirmation of the Plan of Reorganization for OnCure Holdings, Inc. and its Affiliate Debtors (collectively, the "**Debtors**") Under Chapter 11 of the Bankruptcy Code. In support of this Objection, the Physicians respectfully represent to the Court as follows:

---

[1]　　The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OnCure Holdings, Inc. (1697); Center for Radiation Oncology of Tampa Bay, Inc. (8772); Charlotte Community Radiation Oncology, Inc. (7550); Coastal Oncology, Inc. (6166); Englewood Oncology, Inc. (7072); Fountain Valley & Anaheim Radiation Oncology Centers, Inc. (3999); Interhealth Facility Transport, Inc. (1243); JAXPET, LLC (1932); JAXPET/Positech, L.L.C. (8952); Manatee Radiation Oncology, Inc. (3848); Mica Flo II, Inc. (3431); Mission Viejo Radiation Oncology Medical Group, Inc. (3523); Oncure Medical Corp. (1053); Pointe West Oncology, LLC (4963); Radiation Oncology Center, LLC (8888); Santa Cruz Radiation Oncology Management Corp. (2410); Sarasota County Oncology, Inc. (5920); Sarasota Radiation & Medical Oncology Center, Inc. (4395); U.S. Cancer Care, Inc. (3730); USCC Acquisition Corp. (2679); USCC Florida Acquisition Corp. (0485); USCC Healthcare Management Corp. (6788); and Venice Oncology Center, Inc. (5471). The address for OnCure Holdings, Inc. and certain other Debtors is 188 Inverness Drive West, Suite 650, Englewood, Colorado, 80112.

## PRELIMINARY STATEMENT

The Physicians are plaintiffs in a pending adversary proceeding in which they seek a declaration that the automatic stay does not bar them from terminating agreements to which they are parties with certain non-debtor Physician Groups. The agreements—known as Member Physician Agreements ("**MPAs**")—permit the Physicians and Physician Groups to terminate by mutual consent. At no point in the proceedings during which the Court approved the Debtors' current disclosure statement did the Debtors advise the Court—either in writing or as part of the hearing—that that they consider termination of the MPAs reorganization-threatening. The Court approved the disclosure statement without knowing the Debtors' concerns.

In their subsequent motion to dismiss the adversary proceeding filed less than a week later, the Debtors sounded a roaring alarm that should the Court ultimately declare permissible the Physicians' and Physician Groups' exercise of their contractually-assured termination rights, the result would "clearly impact the value of the Debtors and their ability to successfully reorganize." Indeed, the Debtors allege that the Physicians' exercise of their independent contractual rights to terminate would have a substantial impact on the Debtors' revenue. Moreover, the Debtors suggest that termination would permit the Physicians to compete with the ultimate purchaser of the Debtors' assets thereby deterring a proposed purchaser of the Debtors from finalizing its purchase.[2]

The reorganization concerns the Debtors express as a reason to dismiss the adversary proceeding are found nowhere in the disclosure statement that was approved by the Court and was distributed to describe, and to solicit votes in support of, their proposed Amended Plan of Reorganization. Indeed, the risks to reorganization and Amended Plan consummation appear in

---

[2]    For the Court's convenience, copies of the Adversary Complaint and the Motion to Dismiss are attached hereto as **Exhibits 1-2**, respectively.

no document delivered to those entitled to vote on whether to approve the Amended Plan; those persons remain in the dark about the Physicians' and Physician Groups' clear contractual rights, and the Debtors' concerns about the risks posed by termination (of course, unless they reviewed the docket in the adversary proceeding).  If the reorganization risks associated with the adversary proceeding are as the Debtors say, they are not only required to be disclosed, but the adversary proceeding should be resolved before Amended Plan confirmation.

For these reasons, and as demonstrated below, the Amended Plan should not be confirmed because the Debtors failed to make adequate disclosures as required under sections 1129(a)(2) and 1125(b) of the Bankruptcy Code.  The Court should adjourn confirmation until the Debtors properly disclose the risks associated with the adversary proceeding and the Physicians' exercise of their independent contractual rights, and until the adversary proceeding is resolved.  Should the Court determine to move forward towards confirmation, the adversary proceeding and the rights and obligations under the MPAs should not be discharged, enjoined, or otherwise impacted.

## BACKGROUND

### The Debtors' Cases Under Chapter 11 Of The Bankruptcy Code

1.    On June 14, 2013 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

2.    On June 22, 2013, the Debtors and Radiation Therapy Services, Inc. ("**RTS**") entered into an investment agreement (the "**Investment Agreement**") under which RTS agreed to buy 100% of the shares of reorganized OnCure Holdings, Inc. and to assume certain liabilities upon the effective date of a plan of reorganization.  [*See* Docket No. 284]

3.      On the same date, the Debtors filed a Motion for Order (A) Establishing Bidding Procedures for the Sale of All or Substantially All of the Debtors' Purchased Assets or New Stock Pursuant to a Chapter 11 Plan (B) Approving Certain Stalking Horse Protections (C) Authorizing and Scheduling a Date and Time for an Auction Pursuant to Such Procedures and (D) Granting Certain Related Relief [Docket No. 58] in which, among other things, the Debtors identified their proposed "Stalking Horse Purchaser" as RTS.

4.      On July 17, 2013, the Debtors filed the Plan of Reorganization for Oncure Holdings, Inc. and its Affiliate Debtors under Chapter 11 of the Bankruptcy Code (the "**Initial Plan**") [Docket No. 120].  In conjunction with the Initial Plan, the Debtors filed the Disclosure Statement for the Plan of Reorganization for Oncure Holdings, Inc. and its Affiliate Debtors under Chapter 11 of the Bankruptcy Code (the "**Initial Disclosure Statement**") [Docket No. 121].

5.      On the same date, the Debtors filed a Motion of the Debtors for Entry of an Order (A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline and Other Dates, (C) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan and (D) Approving the Manner and Forms of Notice and other Related Documents (the "**Plan Approval Motion**") [Docket No. 122].

**The Physicians' Adversary Proceeding**

6.      The Physicians are oncology physicians located in Florida, California and Indiana who treat cancer patients as members of individual Physician Groups.  The Physician Groups are, in turn, part of the Oncure network of cancer treatment centers.

7.      Oncure provides administrative services to each Physician Group pursuant to Master Service Agreements ("**MSAs**") to which Oncure and the Physician Groups are parties, but to which the individual Physicians are not parties.   Through separate MPAs that the Physician Groups enter into with each Physician—contracts to which the Debtors are not parties—the Physician Groups and the Physicians set forth the terms of their financial and working relationships by which the Physicians work for the Physician Groups. The Physicians have no contractual relationship with the Debtors, are not employed by the Debtors, and provide no work or services to the Debtors.

8.      A critical term of the MPAs is the manner in which they may be terminated; they "shall immediately terminate upon any of the following" including "at any time upon the mutual written agreement of Company and Physician."   The Physicians and the Physician Groups are also entitled to amend the MPAs by "written instrument."

9.      Approximately one week after the Debtors filed the Initial Plan and Disclosure Statement, the Physicians commenced an adversary proceeding (the "**Adversary Proceeding**") against the Debtors styled *McLoughlin, et al. v. OnCure Holdings, Inc., et al.* (Adv. Pro. No. 13-51318 (KG)).   On July 25, 2013, the Physicians amended their adversary complaint to make clear the Physicians that are the Plaintiffs (the "**Adversary Complaint**").

10.      By the Adversary Complaint, the Physicians seek declarations: (1) "that any actions by the [Physicians] to amend and to terminate certain Member Physician Agreements—to which the Debtors are not parties—are not affected by the automatic stay provisions of section 362(a) of the Bankruptcy Code or in any other way violative of the Bankruptcy Code;" and, (2) delineating "their rights and obligations under certain [MSAs], including the extent to which the

MSAs apply to the MPAs and the enforceability and scope of certain non-solicitation covenants" [Adv. Docket No. 3].

**The Faulty Amended Disclosure Statement**

11.     Thereafter, on August 19, 2013, the Debtors filed an amended plan of reorganization (the "**Amended Plan**") [Docket No. 268], and an amended disclosure statement (the "**Amended Disclosure Statement**") [Docket No. 269].  Neither the Amended Plan nor the Amended Disclosure Statement mentions the Adversary Proceeding much less the Debtors' views concerning potential impact of the Adversary Proceeding or the termination of the MPAs on their chapter 11 cases and their reorganization.

12.     On August 21, 2013, the Court conducted a hearing on the Amended Disclosure Statement, where the Debtors again failed to explain their views concerning potential impact of the Adversary Proceeding or the termination of the MPAs on their chapter 11 cases and their reorganization.

13.     On August 22, 2013, the Court entered the Order (a) Approving the Disclosure Statement, (b) Establishing the Voting Record Date, Voting Deadline and Other Dates, (c) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan and (d) Approving the Manner and Forms of Notice and Other Related Documents (the "**Disclosure Statement Order**") [Docket No. 285].

14.     Six days later, on August 28, 2013, the Debtors moved to dismiss the Adversary Complaint [Adv. Docket Nos. 5 and 6] (the "**Motion to Dismiss**").

15.     In their Motion to Dismiss, the Debtors reference the impact that MPA termination would have on their estates and reorganization efforts as support for their assertion that the Adversary Proceeding is not ripe and that the automatic stay nevertheless applies.

16.     The Debtors allege that "allowing the Physicians to evade their obligations under the MPAs would significantly diminish the profitability of the Debtors, as payments out of those obligations accounted for millions of dollars in gross revenue to the Debtors' estates in 2012." (Adv. Docket No. 6 ¶ 2).

17.     The Debtors further allege that "[e]ven worse, a verdict for the Physicians would allow them to *directly compete* with the Debtors in the relevant markets (directly contrary to the terms used to induce the Debtors to enter into the MSAs), creating yet another obstacle to the Debtors' successful financial reorganization." (Id.) (emphasis in original).

18.     And the Debtors conclude that "[t]he proposed actions by the Physicians would clearly impact the value of the Debtors and their ability to successfully reorganize, both of which are at the heart of the chapter 11 process." (Id. ¶ 26).

19.     The Motion to Dismiss was filed only on the Adversary Proceeding docket, not on the main case docket.  Thus, only parties to the Adversary Proceeding and the United States Trustee received notice and service of the Motion to Dismiss.  (*See* Certificates of Service applicable to Motion to Dismiss and Reply Brief).

20.     On September 13, 2013, the Debtors filed a Notice of Filing of Plan Supplement (the "**Plan Supplement**") [Docket No. 315].  Although the Plan Supplement reveals the existence of the Adversary Proceeding, it is completely bereft of any reference to the Adversary Proceeding or termination of the MPAs as a threat to the Debtors' reorganization.

21.     Shortly thereafter, on September 17, 2013, the Debtors filed the Notice of (I) Contracts and Leases to be Assumed in Connection with the Plan of Reorganization for Oncure Holdings, Inc. and its Affiliate Debtors under Chapter 11 of the Bankruptcy Code and (II) Proposed Cure Claim Amounts Relating Thereto (the "**Plan Assumption List**") [Docket No.

323].  Article VI(A) of the Plan addresses assumption and rejection of executory contracts and

unexpired leases, stating that,

> [o]n the Effective Date, all Executory Contracts and Unexpired Leases of the
> Debtors will be assumed by the Debtors […] in accordance with, and subject to,
> the provisions and requirements of sections 365 and 1123 of the Bankruptcy
> Code, except for those Executory Contracts and Unexpired Leases that: (i) have
> been assumed or rejected by prior order of the Bankruptcy Court; (ii) are the
> subject of a motion to reject pending on the Effective Date; (iii) are identified on
> Plan Schedule 5 hereto or in the Plan Supplement […]; or (iv) are rejected or
> terminated pursuant to the terms of this Plan.

## ARGUMENT

I.    **THE AMENDED PLAN CANNOT BE CONFIRMED
      BECAUSE THE DEBTORS FAILED TO PROVIDE
      ADEQUATE INFORMATION UNDER 11 U.S.C. § 1125(B)**

22.    Before the Court may confirm the Amended Plan, the plan must comply with all

"applicable provisions" of the Bankruptcy Code, including the requirement that adequate

information be provided to holders of claims or interests.  11 U.S.C. § 1129(a)(1).  *See also In re*

*PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

23.    Although the Court initially determined that the Amended Disclosure Statement

contains "adequate information" as required by section 1125(b) of the Bankruptcy Code, the

Court should revisit its adequacy as part of the confirmation hearing, particularly where, as here,

the Debtor failed to include information material "to make an informed judgment about the

plan."  11 U.S.C. § 1125(a)(1).  *See also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v.*

*General Motors Corp.*, 337 F.3d 314, 321-22 (3d Cir. 2003); *In re Newkirk*, 2012 WL 830552, at

*3 (E.D.N.C. March 9, 2012); *In re Prudential Energy Corp.*, 58 B.R. 857, 867-68 (Bankr.

S.D.N.Y. 1986).  Indeed, providing impaired classes with adequate disclosure is at the "heart" of

the chapter 11 process.  H.R. Rep. No. 595, 95th Cong. 1st Sess. 408 (1977), 1978 U.S.C.C.A.N.

News 5787, 6364.

24.    Although the Court is vested with discretion in determining whether a disclosure statement meets the Bankruptcy Code's requirements, for sure "'a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.'" *In re Commonwealth Group–Mocksville Partners, LP*, 2013 WL 1728056, *3 (E.D. Tenn. April 22, 2013) (quoting *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H.1991)). Providing information concerning the Debtors' financial condition, including available assets, "is essential before any informed decision concerning the merits of a plan can be made." *In re Ligon*, 50 B.R. 127, 130 (M.D. Tenn. 1985).

25.    It was not until they filed their Motion to Dismiss in the Adversary Proceeding that it has become apparent that the Debtors' Amended Disclosure Statement is patently inadequate.    The Amended Disclosure Statement explains that "the Debtors' revenue is generated from their MSAs" and it is "materially impacted by the operations of the treatment centers, especially as they relate to revenues generated by the physician groups." (Docket No. 269 Art. II(B)).

26.    The Amended Disclosure Statement further states that "[i]f revenues generated by the physician groups decrease, the Debtors' net revenue and profitability would be adversely affected. (*Id.* Art. VI(C)(2)). And the Amended Disclosure Statement states that "[t]he Debtors may in the future have disputes with physicians and/or physician groups that could result in harmful changes to the Debtors' relationships with them or a termination of an MSA." (*Id.* Art. VI(C)(5)).

27.    The Amended Disclosure Statement also warns of the risks of competition.    In particular, it states that "[c]ompetitors with greater access to financial resources or other

operational advantages may enter the markets" and "make it more difficult for the Debtors to affiliate with additional radiation oncology groups on terms that are favorable to the Debtors or maintain the Debtors' relationships with existing physician groups, which could adversely affect the Debtors' businesses." (*Id.* Art. VI(C)(5)).

28.     But despite speculating that they "may in the future have disputes with physicians and/or physician groups that could result in harmful changes to the Debtors' relationships with them," at no point in the Amended Disclosure Statement have the Debtors advised the voting constituencies that the Physicians and the Physician Groups presently seek to terminate the MPAs and to be relieved of any non-competition covenant that would prevent them from continuing to treat their patients.   Indeed, those are the very issues presently raised in the Adversary Complaint—not in some potential "dispute" in the future—and that current dispute has been concealed by the Debtors.

29.     That the Debtors believe the issues raised in the Adversary Complaint, but not disclosed in the Amended Disclosure Statement, are of great concern and are material to the success of their Amended Plan is made clear in the Debtors' Motion to Dismiss.   In the Motion to Dismiss, the Debtors assert that:

> "[t]he practical effect of an amendment or termination [of the MPAs] would be both to eviscerate the Debtors' rights under the MSAs [...] and to gut the Debtors' resulting income stream.   Indeed, allowing the Physicians to evade their obligations under the MPAs would significantly diminish the profitability of the Debtors, as payments out of those obligations accounted for millions of dollars in gross revenue to the Debtors' estates in 2012.   Even worse, a verdict for the Physicians would allow them to directly compete with the Debtors in the relevant markets [...] creating yet another obstacle to the Debtors' successful financial reorganization."

(Adv. Docket No. 6 ¶ 2).

30.    The Debtors further allege that, should the MPAs be terminated as is sought by the Physicians, the Debtors' "revenue stream would evaporate, while at the same time the Physicians would be able to directly compete with the Debtors without any restrictions," and that the "proposed actions by the Physicians would clearly impact the value of the Debtors and their ability to successfully reorganize [...]" (Adv. Docket No. 6 ¶ 26).

31.    But despite believing that the relief sought in the currently-pending Adversary Proceeding, and the Physicians' intent to terminate the MPAs, would directly impact their ability to reorganize, the Debtors failed to include in the Amended Disclosure Statement any reference to those present contingencies.

32.    Having failed to disclose the Adversary Proceeding and the present risks to Plan Confirmation it entails, the Debtors failed to meet the plan disclosure requirements contained in sections 1129(a)(2) and 1125(b) of the Bankruptcy Code.  Moreover, because the Physicians' rights under the MPAs are independent of the Debtors, the Court should resolve the pending Adversary Proceeding before considering plan confirmation.

## II.    THE PHYSICIANS OBJECT TO ANY PLAN PROVISION THAT PURPORTS TO RESULT IN A DISCHARGE OF THEIR RIGHTS UNDER THE MPAs

33.    Article X of the Amended Plan contains provisions addressing discharge, injunction, and release of claims.  Specifically, Article X(A) states as follows:

> Pursuant to section 1123 of the Bankruptcy Code (and in addition, but solely with respect to Class 5 Claims, Bankruptcy Rule 9019), and in consideration for the classification, distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to this Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

34.    Article X(D) further details the claims discharged pursuant to the confirmation order, stating that "upon the Effective Date, the Debtors and their Estates shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever [...]"

35.    Article X(B)(1) - (2) similarly states as follows:

> [t]he Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this [...] Release.

36.    Although the Adversary Proceeding is not among the matters released under the Amended Plan (*see* Plan Supplement Schedules 6 & 7), the language in Article X purports to extinguish all claims and causes of action currently pending against the Debtors to the fullest extent permitted by law.  The Physicians object to confirmation of the Amended Plan to the extent that the Debtors seek to revise Schedules 6 and 7 to include the Adversary Proceeding within claims and causes of action discharged pursuant to the confirmation order.

## III.    OBJECTION TO ASSUMPTION AND ASSIGNMENT OF THE MSAs

37.    Article VI(A) of the Plan addresses assumption and rejection of executory contracts and unexpired leases, stating that,

> [o]n the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors [...] in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that: (i) have been assumed or rejected by prior order of the Bankruptcy Court; (ii) are the subject of a motion to reject pending on the Effective Date; (iii) are identified on Plan Schedule 5 hereto or in the Plan Supplement [...]; or (iv) are rejected or terminated pursuant to the terms of this Plan.

38.    Additionally, pursuant to Article VI(B) of the Plan, assumed executory contracts and unexpired leases may be assigned to RTS as purchaser of the Debtors' assets.  The Debtors have not yet filed the list of assumed executory contracts and unexpired leases proposed to be assigned to RTS.  The Physicians object to confirmation of the Amended Plan to the extent that the Debtors assign the MSAs applicable to their MPAs to RTS.[3]

---

[3]    Certain MSAs may be exempt from assignment to RTS pursuant to Schedule 7.3(l) of the Investment Agreement.  However, this schedule appears nowhere on the docket, so at this point, the Physicians are wholly unable to determine whether all MSAs applicable to their MPAs will be assumed and assigned to RTS.  Assuming that such contracts will indeed be assigned, they thus file this objection to assumption and assignment should the Debtors intend to assume and assign all relevant MSAs to RTS.

## CONCLUSION

WHEREFORE, the Physicians respectfully request that this Court (a) adjourn confirmation of the Amended Plan until such time as the Debtors have made proper disclosures in connection therewith; (b) adjourn confirmation of the Amended Plan until the Adversary Proceeding has been resolved; (c) declare that any order confirming the Amended Plan shall not discharge, enjoin, or otherwise impact the Adversary Proceeding; (d) deny assumption and assignment of the MSAs applicable to the Physicians' MPAs pending resolution of the Adversary Proceeding; and (e) grant such other and further relief as the Court deems just and proper.

Dated: September 23, 2013
      Wilmington, Delaware

                      **COUSINS CHIPMAN & BROWN, LLP**

                      Scott D. Cousins (No. 3079)
                      Ann M. Kashishian (No. 5622)
                      1007 North Orange Street, Suite 1110
                      Wilmington, Delaware 19801
                      Telephone:     (302) 295-0191
                      Facsimile:     (302) 295-0199
                      Email:          cousins@ccbllp.com
                                     kashishian@ccbllp.com
                           -and-

                      Adam D. Cole
                      380 Lexington Avenue, 17th Floor
                      New York, New York 10168
                      Telephone:     (212) 551-1152
                      Facsimile:     (302) 295-0199
                      Email:          cole@ccbllp.com

                      *Counsel for the Physicians*